1        UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,          .
                                      .
5          PLAINTIFF,                 . NO. 09-CR-4426
                                      .
6             V.                      . FEBRUARY 23, 2011
                                      .
7  GILBERT FLORES,                    . 9:13 A.M.
                                      .
8          DEFENDANT.                 . SAN DIEGO, CALIFORNIA
   . . . . . . . . . . . . . . . .    .
9

10

11

            TRANSCRIPT OF JURY TRIAL, DAY 1
12       BEFORE THE HONORABLE ROGER T. BENITEZ
              UNITED STATES DISTRICT JUDGE
13

14     APPEARANCES:

15

       FOR THE PLAINTIFF:      U.S. ATTORNEY'S OFFICE
16                             SOUTHERN DISTRICT OF CALIFORNIA
                               BY:  MARK CONOVER, ESQ.
17                             BY:  SARAH BOOT, ESQ.
                               880 FRONT STREET, ROOM 6293
18                             SAN DIEGO, CALIFORNIA  92101

19     FOR THE DEFENDANT:      FEDERAL DEFENDERS OF SAN DIEGO
                               BY:  TIMOTHY GARRISON, ESQ.
20                             BY:  HANNI FAKHOURY, ESQ.
                               225 BROADWAY, SUITE 900
21                             SAN DIEGO, CALIFORNIA  92101

22

       COURT REPORTER:        DEBORAH M. O'CONNELL, RPR, CSR
23                            880 FRONT STREET, ROOM 4290
                              SAN DIEGO, CALIFORNIA, 92101

24

25  REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER

I N D E X


GENERAL INDEX


                                                        PAGE

MOTION HEARING                                            5

PRELIMINARY JURY INSTRUCTIONS                            10

GOVERNMENT'S OPENING STATEMENT                           18

DEFENSE'S OPENING STATEMENT                              26

GOVERNMENT BEGINS CASE IN CHIEF                          31




INDEX TO WITNESSES


| FOR THE GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CBPO AINSLIE COVE | | | | |
| BY MS. BOOT | 31 | | 62 | |
| BY MR. FAKHOURY | | 48 | | |
| | | | | |
| CBPO SANDRA FIGUEROA | | | | |
| BY MR. CONOVER | 63 | | 90 | |
| BY MR. FAKHOURY | | 78 | | 91 |
| | | | | |
| CBPO RODOLFO SANCHEZ | | | | |
| BY MR. CONOVER | 93 | | | |
| BY MR. GARRISON | | 112 | | |

CONT'D.                    INDEX TO WITNESSES

FOR THE GOVERNMENT    DIRECT   CROSS   REDIRECT   RECROSS

OFFICER DOUGLAS MORTON

BY MS. BOOT                118

BY MR. GARRISON                    127

SHANNON JENKINSON

BY MR. CONOVER            133

BY MR. GARRISON                    141

DEA SR. FORENSIC CHEMIST JASON BORDELON

BY MS. BOOT                144

BY MR. FAKHOURY                    152

RUSS BUTLER

BY MR. CONOVER            157

INDEX TO EXHIBITS

| FOR THE GOVERNMENT | IDENTIFIED | RECEIVED |
| --- | --- | --- |
| 2 | 33 | 34 |
| 3 | 33 | 34 |
| 4 | 38 | 39 |
| 5 | 39 | 40 |

CONT'D.                 INDEX TO EXHIBITS

| FOR THE GOVERNMENT | IDENTIFIED | RECEIVED |
|---|---|---|
| 6 | 42 | 43 |
| 7 | 75 | 75 |
| 8 | 97 | 98 |
| 9 | 97 | 98 |
| 10 | 97 | 98 |
| 11 | 97 | 98 |
| 12 | 97 | 98 |
| 13 | 97 | 98 |
| 14 | 102 | 107 |
| 15 | 166 | 166 |
| 16 | 97 | 98 |
| 17 | 126 | 127 |
| 18 | 125 | |
| 19 | 147 | 148 |
| 19-A | 149 | 149 |
| 20 | 150 | 150 |
| 21 | 136 | 137 |
| 22 | 141 | 141 |

1           SAN DIEGO, CALIFORNIA, FEBRUARY 23, 2011, 9:13 A.M.

2                              * * * *

3           THE COURT:  GOOD MORNING.

4           MR. CONOVER:  GOOD MORNING, YOUR HONOR.

5           MS. BOOT:  GOOD MORNING, YOUR HONOR.

6           MR. FAKHOURY:  GOOD MORNING, YOUR HONOR.

7           THE CLERK:  ONE ON CALENDAR, CASE NO. 09-CR-4426, USA

8    V. GILBERT FLORES, MOTION HEARING.

9           MR. GARRISON:  GOOD MORNING, YOUR HONOR, TIM

10   GARRISON, FEDERAL DEFENDERS, AND HANNI FAKHOURY, FROM MY

11   OFFICE.  MR. FLORES IS PRESENT BEFORE THE COURT ON BOND, YOUR

12   HONOR.

13          MR. CONOVER:  GOOD MORNING, YOUR HONOR.  MARK CONOVER

14   AND SARAH BOOT FOR THE UNITED STATES.

15          THE COURT:  LET ME FIRST ADDRESS, I HAVE A MOTION TO

16   RECONSIDER MY RULING ON THE MOTIONS IN LIM.  I HAVE -- I'VE

17   LOOKED AT THE MOTION.  I HAVE A COUPLE COMMENTS.  FIRST OF ALL,

18   I DON'T KNOW THAT A MOTION TO RECONSIDER IS PROPER.  I DON'T

19   THINK THAT THERE IS ANYTHING THAT CHANGED, THERE IS NO CHANGED

20   CIRCUMSTANCE, THERE IS NO CHANGE IN THE LAW SINCE I MADE MY

21   RULING.  AND I DON'T THINK THAT THERE IS ANY FACT OR EVIDENCE

22   THAT COULD NOT HAVE BEEN INTRODUCED AT THE TIME OF THE ORIGINAL

23   MOTION.

24          BE THAT AS IT MAY, I HAVE LOOKED AT THE MOTION, I'VE

25   LOOKED AT THE OPPOSITION.  AND MR. GARRISON, IT SEEMS TO ME,

1    I'M STILL OF THE OPINION THAT MY ORIGINAL RULING WAS CORRECT.

2    THIS IS A CASE WHERE THE GOVERNMENT HAS CHARGED A CONSPIRACY.

3    AND AS BEST AS I CAN TELL -- JUST A SECOND.  I BELIEVE YOU WERE

4    RELYING -- OR ARE RELYING MOSTLY ON THE U.S. VS. MEJIA CASE.

5    MY RECOLLECTION IS THAT WAS A SIMPLE POSSESSION CASE.  THERE

6    WAS NO CONSPIRACY THAT WAS CHARGED.  I TOOK A LOOK AT U.S. VS.

7    PINEDA-TORRES.  AND IN THAT CASE, THE QUOTE OF PINEDA-TORRES

8    SAYS -- NEITHER PINEDA-TORRES WAS CHARGED WITH CONSPIRACY, AND

9    IN NEITHER CASE DID THE GOVERNMENT INTRODUCE ANY EVIDENCE

10   ESTABLISHING A CONNECTION BETWEEN THE DEFENDANT AND A DRUG

11   TRAFFICKING ORGANIZATION.

12        AND HERE, AS I RECALL, THE GOVERNMENT HAS CHARGED

13   CONSPIRACY, RIGHT?

14             MR. GARRISON:  THAT'S CORRECT, YOUR HONOR.

15             THE COURT:  SO I THINK GIVEN THAT THERE IS A

16   CONSPIRACY THAT'S BEEN CHARGED, THERE IS NO REASON FOR ME TO

17   RECONSIDER MY RULING, OKAY.

18        NOW DID WE -- I THINK I'D ASKED FOR JURY INSTRUCTIONS AND

19   VOIR DIRE QUESTIONS.  DID -- HAVE THOSE BEEN SUBMITTED?  HAS

20   ANYONE SUBMITTED THEM?

21             MR. CONOVER:  YOUR HONOR, THE GOVERNMENT SUBMITTED

22   ITS VOIR DIRE QUESTIONS IN ITS TRIAL MEMO.  AND WE HAVE JURY

23   INSTRUCTIONS THAT WE PREPARED.  AND WE HAVE SOME SPLIT

24   DISAGREEMENTS, BUT THE INSTRUCTIONS HAVE BEEN PREPARED.  AND I

25   CAN GIVE THEM TO THE COURT IF YOU LIKE.

1          THE COURT:  AGAIN, WHAT I ASKED FOR WAS THOSE THAT --

2    IF THERE WAS NO DISAGREEMENT, AS TO SOME, I WOULD LIKE TO SEE

3    THOSE, THEN I WOULD LIKE TO SEE THE ONES THAT ARE NOT AGREEABLE

4    TO BOTH SIDES, AND THEN WE'LL DECIDE ON THOSE AT THE RULE 30

5    CONFERENCE.  IF YOU DO ME A FAVOR AND GIVE ME THE ONES THAT ARE

6    NOT OPPOSED, I'D APPRECIATE THAT.

7          AND MR. GARRISON, DID YOU SUBMIT PROPOSED VOIR DIRE

8    QUESTIONS?

9          MR. GARRISON:  I DID, YOUR HONOR, YESTERDAY

10   AFTERNOON.

11         THE COURT:  LET ME CHECK.

12         MR. GARRISON:  I HAVE A COPY FOR THE COURT IF THE

13   COURT WOULD LIKE.

14         THE COURT:  SURE.  THAT WOULD BE GREAT.

15         MR. CONOVER:  YOUR HONOR, IF I MAY APPROACH WITH THE

16   JURY INSTRUCTIONS.

17         THE COURT:  SURE.  ALL RIGHT.  I BELIEVE THE JURY IS

18   SUPPOSED TO BE HERE AT 9:30, IF I'M NOT MISTAKEN.  I'M GOING TO

19   GO BACK INTO CHAMBERS AND LOOK AT YOUR VOIR DIRE QUESTIONS.

20   AND THEN WHEN THE JURY GETS HERE, MY COURTROOM DEPUTY WILL

21   BRING THEM IN, TAKE ROLL, AND WHEN EVERYBODY IS READY -- JUST

22   AS A MATTER OF HOUSEKEEPING, I NOTE THERE ARE TWO COUNSEL

23   SITTING AT BOTH COUNSEL TABLE.  LET'S MAKE SURE THAT WE ONLY

24   HAVE ONE PERSON DOING THE QUESTIONING, OBJECTIONS, OF A

25   WITNESS, OKAY.  SO IF YOU'RE GOING TO QUESTION A WITNESS, THEN

1    YOU SHOULD BE THE ONE THAT IS MAKING ANY OBJECTIONS TO THE

2    WITNESS'S TESTIMONY, OKAY.

3          ANYTHING ELSE WE OUGHT TO TALK ABOUT?   ANY HOUSEKEEPING

4    THINGS WE NEED TO DISCUSS?

5                MR. GARRISON:   JUST BRIEFLY, YOUR HONOR, WE DO HAVE

6    MS. LEANNE HUDSON FROM OUR OFFICE.   CAN SHE SIT AT COUNSEL

7    TABLE DURING VOIR DIRE?

8                THE COURT:   SURE, ABSOLUTELY.

9                MR. CONOVER:   DURING OPENING, WE INTEND TO USE TWO

10   EXHIBITS.   WE WANT TO CLEAR THAT WITH THE COURT.   IT'S A

11   PICTURE OF THE METHAMPHETAMINE FOUND IN THE VEHICLE, AS WELL AS

12   THE SENDING UNIT FROM THE GAS TANK OF THE VEHICLE.   I DON'T

13   BELIEVE THERE IS ANY QUESTION ABOUT WHETHER THESE ARE

14   ADMISSIBLE.

15               THE COURT:   ANY OBJECTION TO THOSE BEING USED?

16               MR. GARRISON:   NO, YOUR HONOR.   I'LL LOOK AT THE

17   PICTURE WHEN THE COURT IS BACK IN CHAMBERS, IT SHOULD BE FINE.

18               THE COURT:   OKAY.

19               THE CLERK:   THOSE AREN'T GOING INTO THE JURY ROOM,

20   ARE THEY?

21               THE COURT:   WE'LL SEE.

22         BY THE WAY, COUNSEL, ON YOUR ARGUMENTS, I'LL ALLOW YOU TO

23   STEP INTO THE WELL IF YOU WISH TO.   PLEASE DO NOT GO ACROSS THE

24   LINE THAT EXTENDS -- YOU SEE THIS LINE FROM MY COURT REPORTER'S

25   DESK, IF YOU FOLLOW THAT LINE STRAIGHT OUT THAT WAY, DON'T STEP

1    ANY CLOSER TO THE JURY ROOM.  OR IF YOU WISH, YOU COULD SPEAK

2    FROM THE PODIUM.  IT TURNS 90 DEGREES.  YOU'RE CERTAINLY

3    WELCOME TO DO THAT AS WELL.

4              MR. GARRISON:  YOUR HONOR, ONE MORE THING, SHOULD WE

5    ASK PERMISSION BEFORE ENTERING THE WELL?

6              THE COURT:  YOU DON'T HAVE TO.  IT TAKES UP A LOT OF

7    TIME.  IF I DON'T THINK YOU SHOULD, I'LL CLEAR MY THROAT OR

8    SOMETHING.

9              MR. GARRISON:  OKAY.

10             THE COURT:  I HAVEN'T HAD ANY PROBLEMS WITH ANY OF

11   YOU FOLKS ABUSING THAT, SO THAT IS FINE.

12             MR. CONOVER:  THANK YOU, YOUR HONOR.

13             MR. GARRISON:  THANK YOU, YOUR HONOR.

14             THE COURT:  ALL RIGHT, WE'LL SEE YOU AT 9:30.

15             THE CLERK:  JURY ENTERING.

16                     (PROSPECTIVE JURY ENTERS COURTROOM.)

17                (JURY VOIR DIRE REPORTED, NOT TRANSCRIBED.)

18                          (JURORS SWORN.)

19             THE COURT:  GREAT.  THANK YOU.  OTHER THAN AS

20   PREVIOUSLY NOTED, IS THE GOVERNMENT SATISFIED WITH THE JURY AS

21   IMPANELED?

22             MR. CONOVER:  YES, YOUR HONOR.  THANK YOU.

23             THE COURT:  MR. GARRISON?

24             MR. GARRISON:  YES, YOUR HONOR.

25             THE COURT:  THANK YOU.  NOW, LADIES AND GENTLEMEN,

1    WHAT I'M GOING TO DO IS READ TO YOU SOME INSTRUCTIONS.  THEY'RE

2    KIND OF LONG.  I APOLOGIZE.  BUT I'LL DO MY BEST TO GET THROUGH

3    THESE RATHER QUICKLY.  IT'S IMPORTANT THAT YOU LISTEN TO THEM

4    BECAUSE JUST BECAUSE I'M KIND OF RUSHING THROUGH THEM, DOESN'T

5    MEAN THEY'RE NOT IMPORTANT.  I'M TRYING TO GET YOU OUT SO YOU

6    CAN GRAB SOME LUNCH.

7                    PRELIMINARY JURY INSTRUCTIONS

8            THE COURT:  LADIES AND GENTLEMEN, YOU NOW ARE THE

9    JURY IN THIS CASE.  AND I WANT TO TAKE A FEW MINUTES TO TELL

10   YOU SOMETHING ABOUT YOUR DUTY AS JURORS AND TO GIVE YOU SOME

11   INSTRUCTIONS.  THESE ARE PRELIMINARY INSTRUCTIONS.  AND AT THE

12   END OF THE TRIAL, I WILL GIVE YOU MORE DETAILED INSTRUCTIONS.

13   THOSE INSTRUCTIONS WILL CONTROL YOUR DELIBERATIONS.

14       YOU SHOULD NOT TAKE ANYTHING THAT I MAY SAY OR DO DURING

15   THE TRIAL AS INDICATING WHAT I THINK OF THE EVIDENCE OR WHAT

16   YOUR VERDICT SHOULD BE.  AS I TOLD YOU BEFORE, THIS IS A

17   CRIMINAL CASE BROUGHT BY THE UNITED STATES GOVERNMENT.  THE

18   UNITED STATES CHARGES THE DEFENDANT WITH THE FOLLOWING FOUR

19   CRIMES:  ONE, IMPORTATION OF METHAMPHETAMINE, IN VIOLATION OF

20   THE TITLE 21, UNITED STATES CODE, SECTIONS 952 AND 960; TWO,

21   POSSESSION OF METHAMPHETAMINE WITH INTENT TO DISTRIBUTE IN

22   VIOLATION OF TITLE 21, UNITED STATES CODE, SECTION 841(A)(1);

23   THREE, CONSPIRACY TO IMPORT METHAMPHETAMINE IN VIOLATION OF THE

24   TITLE 21, UNITED STATES CODE, SECTIONS 952, 960, AND 963; AND

25   FOUR, CONSPIRACY TO DISTRIBUTE METHAMPHETAMINE IN VIOLATION OF

1  THE TITLE 21, UNITED STATES CODE, SECTIONS 841(A)(1) AND 846.

2     NOW THE CHARGES AGAINST THE DEFENDANT ARE CONTAINED IN THE

3  INDICTMENT.  THE INDICTMENT IS SIMPLY A DESCRIPTION OF THE

4  CHARGES MADE BY THE GOVERNMENT AGAINST THE DEFENDANT.  IT IS

5  NOT EVIDENCE OF ANYTHING.

6     IN ORDER TO HELP YOU FOLLOW THE EVIDENCE, I'LL NOW GIVE

7  YOU A BRIEF SUMMARY OF THE ELEMENTS WHICH THE GOVERNMENT MUST

8  PROVE TO MAKE ITS CASE.  THE ELEMENTS OF COUNT 1, CONSPIRACY TO

9  IMPORT METHAMPHETAMINE, ARE AS FOLLOWS:  ONE, THERE WAS AN

10 AGREEMENT BETWEEN TWO OR MORE PERSONS TO IMPORT METHAMPHETAMINE

11 INTO THE UNITED STATES FROM A PLACE OUTSIDE THE UNITED STATES;

12 AND TWO, THE DEFENDANT JOINED THE AGREEMENT KNOWING OF ITS

13 PURPOSE, THAT IS, THE IMPORTATION OF METHAMPHETAMINE, AND

14 INTENDING TO FURTHER THAT PURPOSE.

15    THE ELEMENTS OF COUNT 2, IMPORTATION OF THE

16 METHAMPHETAMINE, ARE AS FOLLOWS:  THE DEFENDANT KNOWINGLY

17 BROUGHT METHAMPHETAMINE INTO THE UNITED STATES FROM A PLACE

18 OUTSIDE THE UNITED STATES; AND TWO, THE DEFENDANT KNEW THAT THE

19 SUBSTANCE HE WAS BRINGING INTO THE UNITED STATES WAS

20 METHAMPHETAMINE OR SOME OTHER PROHIBITED DRUG.

21    THE ELEMENTS OF COUNT 3, CONSPIRACY TO DISTRIBUTE

22 METHAMPHETAMINE, ARE AS FOLLOWS:  ONE, THERE WAS AN AGREEMENT

23 BETWEEN TWO OR MORE PERSONS TO DISTRIBUTE METHAMPHETAMINE; AND

24 TWO, THE DEFENDANT JOINED THE AGREEMENT KNOWING OF ITS PURPOSE,

25 I.E., THE DISTRIBUTION OF METHAMPHETAMINE AND INTENDING TO

1   FURTHER THAT PURPOSE.

2       THE ELEMENTS OF COUNT 4, POSSESSION OF METHAMPHETAMINE

3   WITH INTENT TO DISTRIBUTE, ARE AS FOLLOWS:  ONE, THE DEFENDANT

4   KNOWINGLY POSSESSED METHAMPHETAMINE; AND TWO, THE DEFENDANT

5   POSSESSED IT WITH THE INTENT TO DISTRIBUTE TO ANOTHER PERSON.

6       THERE WILL BE FURTHER INSTRUCTIONS REGARDING CONSPIRACY

7   LAW, BUT FOR NOW, IT IS SUFFICIENT TO NOTE THAT A CONSPIRACY IS

8   A KIND OF CRIMINAL PARTNERSHIP, AN AGREEMENT OF TWO OR MORE

9   PEOPLE TO COMMIT A CRIME.  THESE INSTRUCTIONS ARE PRELIMINARY,

10  AND THE INSTRUCTIONS I WILL GIVE AT THE END OF THE CASE WILL

11  CONTROL.

12      AS I TOLD YOU BEFORE, THE DEFENDANT HAS PLEADED NOT GUILTY

13  TO THE CHARGES AND IS PRESUMED INNOCENT UNLESS AND UNTIL PROVED

14  GUILTY BEYOND A REASONABLE DOUBT.  THE DEFENDANT HAS A RIGHT TO

15  REMAIN SILENT AND NEVER HAS TO PROVE INNOCENCE OR TO PRESENT

16  ANY EVIDENCE.

17      NOW THE EVIDENCE THAT YOU'RE TO CONSIDER IN DECIDING WHAT

18  THE FACTS ARE CONSISTS OF:  ONE, THE SWORN TESTIMONY OF ANY

19  WITNESS; TWO, THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE;

20  AND THREE, ANY FACTS TO WHICH ALL THE LAWYERS MAY STIPULATE.

21      THE FOLLOWING THINGS ARE NOT EVIDENCE, AND YOU MUST NOT

22  CONSIDER THEM AS EVIDENCE IN DECIDING THE FACTS OF THIS CASE:

23  ONE, STATEMENTS AND ARGUMENTS OF THE ATTORNEYS; TWO, QUESTIONS

24  AND OBJECTIONS OF THE ATTORNEYS; THREE, TESTIMONY THAT I MAY

25  INSTRUCT YOU TO DISREGARD; AND FOUR, ANYTHING THAT YOU MAY SEE

1  OR HEAR WHEN THE COURT IS NOT IN SESSION, EVEN IF WHAT YOU SEE

2  OR HEAR IS DONE OR SAID BY ONE OF THE PARTIES OR BY ONE OF THE

3  WITNESSES.

4      NOW EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

5  EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A

6  WITNESS, ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR

7  DID.  CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS,

8  IT'S PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER

9  FACT.  YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

10 EVIDENCE, AND THE LAW PERMITS YOU TO GIVE EQUAL WEIGHT TO BOTH.

11 BUT IT'S FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY

12 EVIDENCE.

13     NOW THERE ARE RULES OF EVIDENCE WHICH CONTROL WHAT CAN BE

14 RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION, OR

15 OFFERS AN EXHIBIT INTO EVIDENCE, AND A LAWYER ON THE OTHER SIDE

16 THINKS IT'S NOT PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER

17 MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE

18 ANSWERED OR THE EXHIBIT MAY BE RECEIVED.  IF I SUSTAIN THE

19 OBJECTION, THE QUESTION CANNOT BE ANSWERED AND THE EXHIBIT

20 CANNOT BE RECEIVED.  WHENEVER I SUSTAIN AN OBJECTION TO A

21 QUESTION, YOU MUST IGNORE THE QUESTION AND MUST NOT GUESS WHAT

22 THE ANSWER WOULD HAVE BEEN.

23     SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

24 RECORD, AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

25 MEANS THAT WHEN YOU'RE DECIDING THE CASE, YOU MUST NOT CONSIDER

1   THE EVIDENCE WHICH I TOLD YOU TO DISREGARD.

2        NOW IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

3   DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

4   BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF

5   IT OR NONE OF IT.  IN CONSIDERING THE TESTIMONY OF ANY WITNESS,

6   YOU MAY TAKE INTO ACCOUNT:  ONE, THE OPPORTUNITY AND ABILITY OF

7   THE WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

8   TWO, THE WITNESS'S MEMORY; THREE, THE WITNESS'S MANNER WHILE

9   TESTIFYING; FOUR, THE WITNESS'S INTEREST IN THE OUTCOME OF THE

10  CASE, AND ANY BIAS OR PREJUDICE; FIVE, WHETHER OTHER EVIDENCE

11  CONTRADICTED THE WITNESS'S TESTIMONY; SIX, THE REASONABLENESS

12  OF THE WITNESS'S TESTIMONY IN LIGHT OF THE ALL THE EVIDENCE;

13  AND SEVEN, ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.  THE

14  WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT NECESSARILY DEPEND

15  ON THE NUMBER OF WITNESSES WHO TESTIFY.

16       NOW I WILL SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

17  YOU'VE ALREADY HEARD THIS, BUT I'M GOING TO READ THIS TO YOU

18  ONE MORE TIME BECAUSE IT IS REALLY IMPORTANT.  FIRST, KEEP AN

19  OPEN MIND THROUGHOUT THE TRIAL AND DO NOT DECIDE WHAT THE

20  VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW JURORS HAVE

21  COMPLETED YOUR DELIBERATIONS AT THE END OF THE CASE.

22       SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

23  THE EVIDENCE RECEIVED IN THE CASE, AND ON MY INSTRUCTIONS AS TO

24  THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

25  INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

THE COURSE OF YOUR JURY DUTY.  THUS, UNTIL THE END OF THE CASE,

OR UNLESS I TELL YOU OTHERWISE, DO NOT COMMUNICATE WITH ANYONE

IN ANY WAY, AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN

ANY WAY ABOUT THE MERITS OF THE CASE, OR ANYTHING TO DO WITH

IT; AND THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN

WRITING, BY PHONE, OR ELECTRONIC MEANS, VIA E-MAIL, TEXT

MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE, OR OTHER

FEATURE.  THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS

UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES TO

COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR FAMILY

MEMBERS, YOUR EMPLOYER, AND THE PEOPLE INVOLVED IN THE TRIAL;

ALTHOUGH, YOU MAY NOTIFY YOUR FAMILY AND YOUR EMPLOYER THAT YOU

HAVE SEATED AS A JUROR IN THE CASE.  BUT IF YOU'RE ASKED OR

APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE, OR ANYTHING

ABOUT THIS CASE, YOU MUST RESPOND THAT YOU'VE BEEN ORDERED NOT

TO DISCUSS THE MATTER AND TO REPORT THE CONTACT TO THE COURT.

BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

INSTRUCTIONS YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT, DO

NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.  DO NOT DO

ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

INTERNET, OR USING OTHER REFERENCE MATERIALS.  AND DO NOT MAKE

ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

CASE ON YOUR OWN.

THE LAW REQUIRES THESE INSTRUCTIONS TO ENSURE THE PARTIES

1    HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

2    HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

3    INSTRUCTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS, AND

4    A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL

5    PROCESS TO START OVER.

6         IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

7    NOTIFY THE COURT IMMEDIATELY.  AT THE END OF THE TRIAL, YOU

8    WILL HAVE TO MAKE YOUR DECISION BASED ON WHAT YOU RECALL OF THE

9    EVIDENCE.  YOU WILL NOT HAVE A WRITTEN TRANSCRIPT OF THE TRIAL;

10   I, THEREFORE, URGE YOU TO PAY CLOSE ATTENTION TO THE TESTIMONY

11   AS IT WAS GIVEN.

12        IF YOU WISH, YOU MAKE TAKE NOTES TO HELP YOU REMEMBER WHAT

13   WITNESSES SAID.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO

14   YOURSELF UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM

15   TO DECIDE THE CASE.  DO NOT LET NOTE TAKING DISTRACT YOU SO

16   THAT YOU DO NOT HEAR OTHER ANSWERS BY WITNESSES.  WHEN YOU

17   LEAVE, YOUR NOTES SHOULD BE LEFT IN THE COURTROOM.  WHETHER OR

18   NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT

19   WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY, AND YOU SHOULD

20   NOT BE OVERLY INFLUENCED BY THE NOTES.

21        NOW THE NEXT PHASE OF THE TRIAL WILL NOW BEGIN.  FIRST,

22   EACH SIDE MAY MAKE AN OPENING STATEMENT.  AN OPENING STATEMENT

23   IS NOT EVIDENCE.  IT'S SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND

24   WHAT THAT PARTY EXPECTS THE EVIDENCE WILL SHOW.  A PARTY IS NOT

25   REQUIRED TO MAKE AN OPENING STATEMENT.  THE GOVERNMENT WILL

1   THEN PRESENT EVIDENCE, AND COUNSEL FOR THE DEFENDANT MAY

2   CROSS-EXAMINE.  THEN THE DEFENDANT MAY PRESENT EVIDENCE, AND

3   COUNSEL FOR THE GOVERNMENT MAY CROSS-EXAMINE.

4       NOW AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL INSTRUCT

5   YOU ON THE LAW THAT APPLIES TO THE CASE.  AND THE ATTORNEYS

6   WILL MAKE THEIR CLOSING ARGUMENTS.  AFTER THAT, YOU WILL GO TO

7   THE JURY ROOM TO DELIBERATE ON YOUR VERDICT.

8       NOW DURING THE TRIAL, LANGUAGES OTHER THAN ENGLISH MAY BE

9   USED.  THE EVIDENCE THAT YOU'RE TO CONSIDER IS ONLY THAT WHICH

10  IS PROVIDED THROUGH THE OFFICIAL COURT INTERPRETERS.  ALTHOUGH

11  SOME OF YOU MAY KNOW THE NON-ENGLISH LANGUAGE USED, IT IS

12  IMPORTANT THAT ALL JURORS CONSIDER THE SAME EVIDENCE;

13  THEREFORE, YOU MUST BASE YOUR DECISION ON THE EVIDENCE

14  PRESENTED IN THE ENGLISH INTERPRETATION.  YOU MUST DISREGARD

15  ANY DIFFERENT MEANING FOR THE NON-ENGLISH WORDS.

16      ALL RIGHT.  NOW WHAT I'M GOING TO DO IS I'M GOING TO SEND

17  YOU ON A LUNCH BREAK AND ASK YOU TO COME BACK, BE OUTSIDE THOSE

18  DOORS, PROMPTLY AT A QUARTER UNTIL 1:00.

19      PLEASE REMEMBER MY ADMONITION.

20      COUNSEL, WOULD YOU STIPULATE THAT I NEED NOT DELIVER THE

21  ADMONITION AT EACH BREAK, AT EACH RECESS?

22          MR. CONOVER:  SO STIPULATED, YOUR HONOR.

23          MR. GARRISON:  YES, YOUR HONOR.

24          THE COURT:  THANK YOU VERY MUCH.  WE'LL SEE YOU A

25  QUARTER UNTIL 1:00.  HAVE A GOOD LUNCH.

1                    (JURY EXITS COURTROOM.)

2            THE COURT:  ALL RIGHT, WE'RE IN RECESS.  THANK YOU.

3                    (LUNCH RECESS TAKEN.)

4            THE CLERK:  JURY ENTERING.

5                    (JURY ENTERS COURTROOM.)

6            THE COURT:  ALL RIGHT, WELCOME BACK.  PLEASE BE

7    SEATED.  ALL RIGHT, AS I SAID, LADIES AND GENTLEMEN, THE NEXT

8    STEP OF THE TRIAL WILL NOW BEGIN.  IT'S CALLED THE OPENING

9    STATEMENTS.

10       IS THE GOVERNMENT COUNSEL READY TO PROCEED?

11           MS. BOOT:  YES, YOUR HONOR.

12           THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

13                  GOVERNMENT'S OPENING STATEMENT

14           MS. BOOT:  LADIES AND GENTLEMEN, THE DEFENDANT,

15   GILBERT FLORES, WAS CAUGHT RED-HANDED DRIVING HIS OWN CAR FROM

16   MEXICO INTO THE UNITED STATES WITH OVER 22 POUNDS OF

17   METHAMPHETAMINE SHOVED INTO HIS GAS TANK.  THAT AMOUNT OF DRUGS

18   IS WORTH OVER $1 MILLION.  ALTHOUGH THE DEFENDANT WAS DRIVING

19   ALONE, HE WASN'T ACTING ALONE.

20       THE EVIDENCE IN THIS CASE WILL SHOW THAT THE DEFENDANT HAD

21   BEEN ENGAGED IN A CONSPIRACY TO SMUGGLE METHAMPHETAMINE INTO

22   THE UNITED STATES FOR QUITE SOME TIME.  WE'RE HERE TODAY

23   BECAUSE HE FINALLY GOT CAUGHT.  ON NOVEMBER 28, 2009, THE

24   DEFENDANT WAS DRIVING A SILVER VOLKSWAGEN BEETLE.  IT WAS A CAR

25   THAT HE BOUGHT IN 2002 AND HAD OWNED EVER SINCE.  IT WAS A

1    SATURDAY, MIDDLE OF THE DAY, AT THE OTAY MESA PORT OF ENTRY.

2    IT WAS A REGULAR -- REGULAR DAY.  TRAFFIC, THE WAIT TO GET INTO

3    THE UNITED STATES WAS ABOUT ONE TO TWO HOURS.  THERE ARE 13

4    LANES OF TRAFFIC THERE AT THE OTAY MESA PORT OF ENTRY.  THE

5    DEFENDANT HAD WAITED LONG ENOUGH TO CROSS THAT BOUNDARY BETWEEN

6    THE MEXICO AND THE UNITED STATES, AND WAS NOW WHAT IS KNOWN AT

7    PRE-PRIMARY AREA, WHICH IS THAT AREA JUST BEFORE THAT PRIMARY

8    INSPECTION BOOTH.

9         I KNOW A LOT OF YOU SAID YOU HAD BEEN THROUGH THE PORT OF

10   ENTRY IN THE PAST.  FOR THOSE THAT HAVEN'T, THE PRIMARY

11   INSPECTION BOOTH IS WHERE CUSTOMS AND BORDER PROTECTION

12   OFFICERS ASKS THE DRIVERS AND PASSENGERS FOR THEIR

13   IDENTIFICATION, AND IF THEY HAVE ANYTHING TO DECLARE, AND

14   ULTIMATELY DECIDES WHETHER OR NOT THEY'RE ABLE TO COME INTO THE

15   COUNTRY.

16        AND IN THAT PRE-PRIMARY AREA, JUST BEFORE THAT BOOTH,

17   OFFICERS WEAVE IN AND OUT OF THE LANES OF TRAFFIC WITH DOGS

18   THAT ARE TRAINED TO SNIFF NARCOTICS.  AND ON THAT DAY, OFFICER

19   AINSLIE COVE WAS WALKING THROUGH THE PRE-PRIMARY AREA WITH HER

20   DOG.  AND SHE WAS HEADING OVER TOWARDS LANE 12, WHICH IS WHERE

21   THE DEFENDANT'S BEETLE WAS, HEADED OVER TOWARDS HIS BEETLE.

22   OFFICER SANDRA FIGUEROA WAS SITTING IN THE LANE 12 PRIMARY

23   INSPECTION BOOTH.  AND SHE LOOKED OUT HER BOOTH TO SEE THE NEXT

24   CAR THAT WAS APPROACHING, AND IT WAS GOING TO BE THE

25   DEFENDANT'S BEETLE.  SHE SAW OFFICER COVE AND HER DOG WALK UP

1   TOWARDS THE BACK SIDE OF THE BEETLE, AND SHE SAW THE DEFENDANT

2   LOOKING UP IN HIS REARVIEW MIRROR AND SEE THE DOG.

3        AT THAT MOMENT, HE TOOK OFF AND SPED UP TO THE PRIMARY

4   INSPECTION BOOTH.  BEFORE THE CAR EVEN STOPPED, HE THRUST HIS

5   ARM OUT THE WINDOW, HANDED OFFICER FIGUEROA A PASSPORT, AND IT

6   SAID U.S. CITIZEN.  OFFICER FIGUEROA FELT THAT THE -- THOUGHT

7   THAT WAS OUT OF THE ORDINARY.  SHE THOUGHT HE WAS ACTING

8   IMPATIENTLY.  SHE NOTICED HE KEPT HIS ARM OUT OF THE WINDOW.

9   HE KEPT HIS OTHER ARM GRIPPED TO THE STEERING WHEEL AND KEPT

10  LOOKING BACK AND FORTH BETWEEN THE REARVIEW MIRROR AND SIDE

11  MIRRORS TO SEE WHETHER OFFICER COVE AND HER DOG WERE GOING TO

12  FOLLOW THE CAR.  WELL, THEY DID.  AS SOON AS THAT CAR TOOK OFF,

13  IT CREATED A WIND AND THAT GAVE THE DOG A REALLY GOOD CHANCE TO

14  GET A SMELL OF THE CAR.  AND AT THAT POINT, IT STARTED PULLING

15  OFFICER COVE TO CHASE AFTER THE CART.

16       ULTIMATELY THEY CHASED AFTER THE CAR.  THE DOG LAID DOWN

17  UNDERNEATH THE CAR AND PUT ITS NOSE TO THE UNDERCARRIAGE, WHERE

18  THE GAS TANK WAS.  SO AT THIS POINT, THAT IS A SIGNAL THAT

19  THERE ARE DRUGS IN THE CAR.  AND OFFICER COVE TOLD OFFICER

20  FIGUEROA TO HANDCUFF THE DEFENDANT.  AND THEY CALLED FOR

21  BACKUP.

22       SO OTHER OFFICERS ARRIVED ON THE SCENE TO HELP OUT.  THEY

23  TOOK THE DEFENDANT OVER TO THE SECURITY OFFICE.  AND THEY DROVE

24  THE BEETLE OVER TO THE SECONDARY INSPECTION LOT.  AND AT THE

25  SECONDARY INSPECTION LOT, OFFICER RUDOLFO SANCHEZ BEGAN HIS

INSPECTION OF THE CAR.  SO FIRST HE LOOKED ALL AROUND THE CAR
AND THOUGHT IT SEEMED REALLY CLEAN.  THERE WERE NO PERSONAL
ITEMS IN THE CAR.  THERE IS NO LUGGAGE OR ANYTHING LIKE THAT.

AND BECAUSE THE DOG HAD ALERTED TO THE GAS TANK AREA OF
THE CAR, HE TOOK A FIBEROPTIC SCOPE AND INSERTED IT INTO THE
GAS TANK WHERE THE FUEL NOZZLE TYPICALLY GOES.  AND HE WAS ABLE
TO LOOK THROUGH THAT SCOPE AND SEE PACKAGES INSIDE THE CAR.

SO AT THIS POINT, THE OFFICERS KNOW THEY NEED TO BEGIN THE
PROCESS OF REMOVING THESE PACKAGES FROM THE CAR TO TEST TO FIND
OUT WHAT THEY ARE.  SO THE INTERESTING THING ABOUT A VOLKSWAGEN
BEETLE IS THAT YOU CAN ACTUALLY ACCESS THE GAS TANK FROM THE
INSIDE OF THE CAR.  AND THE WAY YOU DO IT IS BY REMOVING WHAT
IS KNOWN AS THE SENDING UNIT.  AND AS THE NAME MIGHT IMPLY,
SENDING UNIT SENDS A MESSAGE FROM THE GAS TANK TO THE GAS GAUGE
UP BY THE DRIVER AND LET'S THE DRIVER KNOW HOW MUCH GAS IS IN
THE CAR.  SO IN ANY EVENT, YOU REMOVE THE SENDING UNIT AND FROM
THE HOLE WHERE THE SENDING UNIT IS HOUSED, YOU'RE ABLE TO LOOK
DOWN INTO THE GAS TANK, WHICH RUNS BELOW THE CAR.  SO THAT IS
WHAT OFFICER SANCHEZ DID, HE BEGAN THIS PROCESS.

AND THE FIRST THING HE DID WAS REMOVE -- PULL UP THAT BACK
SEAT IN THE VOLKSWAGEN BEETLE.  AND THEN, YOU KNOW, HE PULLED
UP SOME FELT OFF OF WHERE THAT BENCH IS ON THE BACK SEAT AND
BEGAN THE PROCESS OF TAKING OFF THE LID OF THE SENDING UNIT.

AND LADIES AND GENTLEMEN, THIS IS THE ACTUAL SENDING UNIT
THAT WAS PULLED OUT OF THE CAR THAT DAY.  SO OFFICER SANCHEZ

1   BENT DOWN AND HE WENT TO REMOVE THE THREE SCREWS THAT WERE

2   HOLDING THAT LID IN PLACE.  AND HE NOTICED THAT THEY HAD A --

3   THEY HAD TOOL MARKS ON THEM AND IT MADE HIM THINK, IT LOOKS

4   LIKE IT'S BEEN REMOVED IN THE PAST.  HE TOOK THOSE SCREWS OFF

5   AND REMOVED THE LID TO THE SENDING UNIT.  AT THAT POINT, HE HAD

6   TO REMOVE ELECTRICAL WIRING FROM THE SENDING UNIT AND THEN HE

7   HAD TO REMOVE A PRESSURIZED GAS HOSE FROM THE SENDING UNIT.

8   WHEN HE DID THAT, GAS SQUIRTED ALL OVER HIM BECAUSE OF THAT

9   PRESSURE.

10      NEXT, HE HAD TO REMOVE THIS SORT OF THE PLASTIC NUT THAT

11  KIND OF SCREWS THE SENDING UNIT INTO PLACE IN THAT COMPARTMENT.

12  HE NOTICED THAT THE NUT HAD SCRATCHES AND TOOL MARKS ON IT,

13  AGAIN MAKING HIM THINK THIS THING HAD BEEN MOVED OUT A FEW

14  TIMES IN THE PAST.  SO ANYWAY, HE TAKES THE NUT OFF, AND AT

15  THIS POINT, HE'S ABLE TO REMOVE THE SENDING UNIT UP FROM OUT OF

16  THE HOLE -- THE COMPARTMENT WHERE IT IS NORMALLY HOUSED.  AND

17  HE'S ABLE TO LOOK DOWN INTO THE GAS TANK AND SEE PACKAGES AND

18  GAS IN THE GAS TANK.

19      SO HE REACHES DOWN IN, AND HE GRABS ONE OF THE PACKAGES,

20  AND HE HANDED IT OVER TO OFFICER DOUG MORTON.  OFFICER MORTON

21  TOOK A LITTLE PIECE OF SOME OF THE INSIDES OF THE PACKAGE AND

22  TESTED IT.  AND IT CAME BACK AS A POSITIVE TEST FOR

23  METHAMPHETAMINE.

24      SO I WANT TO -- FIRST, I WANT TO TAKE YOUR ATTENTION BACK

25  TO THE SENDING UNIT THAT WAS PULLED OUT OF THE GAS TANK.  IT

1    HAD BEEN TAMPERED WITH.  A NORMAL SENDING UNIT FUNCTIONS

2    SOMEWHAT SIMILARLY TO THE -- KIND OF THAT BALL AND ARM IN THE

3    BACK OF YOUR TOILET, REGULATING THE FLOW THERE.  A SENDING UNIT

4    IS SUPPOSED TO HAVE WHAT IS KNOWN AS AN ARM AND A FLOAT

5    ATTACHED TO IT.  AND THE WAY IT WORKS IS, WHEN THE LEVELS OF

6    GAS IN YOUR GAS TANK GO DOWN, THAT FLOAT SINKS DOWN.  AND THAT

7    SENDS A MESSAGE TO YOUR FUEL GAUGE UP AT THE FRONT OF THE CAR

8    LETTING YOU KNOW FUEL LEVELS ARE APPROACHING EMPTY.  ON THE

9    OTHER HAND, WHEN THE FUEL STARTS TO FILL UP IN A GAS TANK, THAT

10   LEVER RISES AND THAT SENDS A MESSAGE TO THE GAS GAUGE UP AT THE

11   FRONT OF THE CAR THAT THE FUEL TANK IS APPROACHING FULL.

12       NOW IN THIS CASE, THERE WAS NO ARM AND FLOW.  IT WAS

13   MISSING AT THIS TIME.  IN PLACE OF WHERE THE ARM WOULD NORMALLY

14   BE, THERE WAS A WOODEN STICK SHOVED IN THERE, AND IT WAS HELD

15   IN PLACE BY A RED STRING WRAPPED ALL THE WAY AROUND THE SENDING

16   UNIT.

17       THE GOVERNMENT'S AUTO MECHANIC EXPERT, RUSS BUTLER, WILL

18   TESTIFY THAT THIS STRING AND THIS STICK WERE RIGGED IN SUCH A

19   WAY THAT IT WOULD MAKE THE GAS GAUGE READ LIKE IT WAS ALMOST

20   FULL, REGARDLESS OF HOW MUCH GAS WAS IN THE GAS TANK.  AND

21   WHERE WAS THAT ARM AND FLOW?  WELL, LADIES AND GENTLEMEN, THE

22   ARM AND FLOW WAS ACTUALLY FOUND LOOSE, UNDERNEATH THE DRIVER'S

23   SEAT, RIGHT UP BY WHERE HIS FEET WOULD HAVE BEEN.

24       AND I WANT TO TALK TO YOU FOR A MINUTE ABOUT THE DRUGS

25   THAT WERE FOUND THAT DAY.  SO AFTER THE SENDING UNIT IS PULLED

1    OUT, AT THIS POINT, OFFICERS BEGIN THE PROCESS OF REMOVING

2    THESE PACKAGES FROM THE VEHICLE.

3        FIRST, THEY -- OFFICER MORTON AT THE PORT CONTACTS A

4    CONTRACT MECHANIC TO COME IN AND HELP DRAIN THE GAS OUT OF THE

5    GAS TANK.  THEY USE A SIPHON, AND THEY'RE ABLE TO DRAIN THAT

6    GAS INTO A SINGLE CAN.  NEXT, HE STARTS REACHING INTO THE TANK,

7    AND HE'S ABLE TO PULL OUT A TOTAL OF 23 PACKAGES.

8        LADIES AND GENTLEMEN, THESE ARE THOSE PACKAGES.  AS YOU

9    CAN SEE, THEY'RE WRAPPED IN PLASTIC.  AND IT TURNS OUT, THEY'RE

10   THE PERFECT SIZE AND SHAPE TO FIT DOWN THROUGH THAT NARROW

11   SENDING UNIT HOLE AND BE SHOVED DOWN AND OVER INTO THE GAS

12   TANK.

13       YOU WILL HEAR TESTIMONY FROM THE GOVERNMENT'S EXPERT

14   CHEMIST, JASON BORDELON, THAT THE CONTENTS OF THESE PACKAGES

15   WAS METHAMPHETAMINE, IN ITS CRYSTAL FORM, ALSO KNOWN AS "ICE."

16   AND METHAMPHETAMINE, THAT METHAMPHETAMINE WAS 930.8 PERCENT

17   PURE.  METHAMPHETAMINE THAT PURE, OVER 22 POUNDS OF IT, IS

18   EXTREMELY VALUABLE.  ON THE STREETS OF SAN DIEGO IT COULD BE

19   WORTH AS MUCH AS $1.6 MILLION.

20       YOU WILL HEAR TESTIMONY FROM A GOVERNMENT EXPERT THAT

21   SOMEBODY MOVING THAT AMOUNT OF DRUGS WOULD NOT HAVE BEEN ACTING

22   ALONE.  AND THAT IS WHY THE DEFENDANT IN THIS CASE IS CHARGED

23   WITH CONSPIRACY, IN ADDITION TO IMPORTATION OF THE DRUGS AND

24   POSSESSION OF AN AMOUNT OF DRUGS SUFFICIENT FOR DISTRIBUTION.

25       THE DEFENDANT AND -- EVIDENCE WILL SHOW IN THIS CASE THAT

1    THE DEFENDANT HAD BEEN ENGAGED IN A CONSPIRACY FOR QUITE SOME

2    TIME TO SMUGGLE DRUGS INTO THE UNITED STATES WITH AT LEAST ONE

3    OTHER MAN, A MAN BY THE NAME OF DAVID GUTIERREZ.  ONE PIECE OF

4    EVIDENCE THAT DEMONSTRATES THEIR PARTNERSHIP IS A GARAGE DOOR

5    OPENER THAT WAS FOUND IN THE DEFENDANT'S BEETLE, NEAR THE

6    DRIVER'S SIDE, WITH A TAG ON IT.  AND THE TAG HAD ALL THE

7    INFORMATION FOR THAT CAR, THE MAKE, MODEL, YEAR.  IT WAS DATED

8    A FEW WEEKS BEFORE THE ARREST, AND IT HAD DAVID GUTIERREZ'S

9    NAME ON IT.

10        FURTHER, ANY TIME SOMEBODY COMES FROM ANOTHER COUNTRY INTO

11   THE UNITED STATES, THE GOVERNMENT KEEPS A RECORD OF WHERE THEY

12   CAME FROM, WHERE THEY CROSSED IN, HOW THEY DID IT, DID THEY

13   WALK, DRIVE, WERE THEY FLYING IN A PLANE, WHAT DAY, WHAT TIME.

14   RECORDS HERE INDICATE THAT ON 16 SEPARATE OCCASIONS, THE

15   DEFENDANT AND DAVID GUTIERREZ CROSSED FROM MEXICO, INTO THE

16   UNITED STATES, THE EXACT SAME PLACE, ON THE EXACT SAME DATE, AT

17   ALMOST THE EXACT SAME TIME.

18        BUT INTERESTINGLY ENOUGH, DID THE TWO OF THEM COME

19   TOGETHER IN THE DEFENDANT'S JETTA -- OR EXCUSE ME, BEETLE?  DID

20   THEY DRIVE TOGETHER ACROSS THE BORDER?  NO.  THE DEFENDANT

21   WOULD ALWAYS DRIVE HIS BEETLE ACROSS ON THESE 16 OCCASIONS.

22   BUT DAVID GUTIERREZ, AT THE SAME TIME, WOULD WALK ACROSS THE

23   BORDER OR SOMETIMES DRIVE IN A SEPARATE CAR ACROSS THE BORDER.

24        AND PHONE RECORDS INDICATE THAT OFTENTIMES AFTER THEY HAD

25   CROSSED ABOUT THE SAME TIME, THE SAME PLACE, BUT SEPARATELY,

1    THEY WOULD CALL EACH OTHER.

2        YOU WILL HEAR TESTIMONY FROM A GOVERNMENT EXPERT THAT THIS

3    TYPE OF BEHAVIOR IS TYPICAL FOR PEOPLE ENGAGED IN THE DRUG

4    SMUGGLING CONSPIRACY.  THEY CROSSED IN THIS WAY ON 15 TIMES,

5    AND ON THAT 16TH TIME, THEY GOT CAUGHT.

6        NOW AT THE END OF THIS TRIAL, MY FELLOW PROSECUTOR, MARK

7    CONOVER, WILL STAND HERE BEFORE YOU, AFTER ALL THE EVIDENCE HAS

8    BEEN PRESENTED, AND HE WILL ASK YOU TO RETURN THE ONLY VERDICT

9    THAT THE EVIDENCE SUPPORTS, AND THAT IS GUILTY.

10        THE COURT:  THANK YOU.  MR. FAKHOURY.

11        MR. FAKHOURY:  THANK YOU, YOUR HONOR.

12                    DEFENSE'S OPENING STATEMENT

13        MR. FAKHOURY:  THIRTY MINUTES, THAT'S ALL IT TOOK.

14    THIRTY MINUTES TO FOREVER ALTER THE LIFE OF GILBERT FLORES.

15    AND IN 30 MINUTES THE BACK SEAT OF A BEETLE WAS REMOVED, THIS

16    CAP WAS REMOVED.  THIS SENDING UNIT WAS PULLED OUT, AND

17    METHAMPHETAMINE WAS STUFFED INTO A GAS TANK.  IN 30 MINUTES

18    GILBERT FLORES WENT FROM BEING A HUSBAND, A FATHER, A

19    SUPERVISOR AT HIS JOB, TO BEING A SUSPECT, A BOOKING NUMBER,

20    AND THE DEFENDANT.  BUT MR. FLORES DID NOT KNOW THERE WAS

21    METHAMPHETAMINE IN THAT GAS TANK.  HE DID NOT CONSPIRE TO

22    IMPORT METHAMPHETAMINE INTO THE UNITED STATES.  HE DID NOT

23    AGREE WITH ANYONE TO DISTRIBUTE METHAMPHETAMINE.  AND HE'S NOT

24    GUILTY OF THESE CHARGES.  NOVEMBER 28, 2009, LIKE MS. BOOT

25    SAID, A REGULAR DAY.  MR. FLORES WAS AT THE OTAY MESA PORT OF

1  ENTRY, HE WAS RETURNING BACK TO HIS HOME IN MONTEBELLO,

2  CALIFORNIA, NEAR LOS ANGELES.

3      HE HAD SPENT THE DAY IN MEXICO.  HE'D GONE TO MEXICO

4  OFTEN.  HE WOULD VISIT FRIENDS, FAMILY MEMBERS, GIVE FRIENDS

5  RIDES TO SEE THEIR FAMILY MEMBERS.  AND IT WAS JUST A REGULAR

6  DAY FOR MR. FLORES.  AND EVEN THOUGH HE'D BEEN TO MEXICO, HIS

7  HOME WAS IN MONTEBELLO.  IT'S WHERE HIS FAMILY WAS, HIS WIFE,

8  HIS CHILDREN.  IT'S WHERE HE WORKED AT SOUTHERN CALIFORNIA

9  EDISON POWER COMPANY, WHERE HE'D WORKED FOR ALMOST 25 YEARS, HE

10 WAS NOW A SUPERVISOR.  AND WHILE HE WAS THERE AT THE PORT OF

11 ENTRY, HE WASN'T NERVOUS.  YOU'VE HEARD MS. BOOT MENTION SOME

12 OBSERVATIONS THE AGENTS MADE.  YOU'LL FIND THAT NONE OF THOSE

13 OBSERVATIONS WERE CONTAINED IN ANY REPORTS THAT WERE EVER

14 WRITTEN ABOUT THIS CASE.  NO, MR. FLORES WAS THERE AND HE WAS

15 CALM.  HE WAS READY TO GO HOME.  HE HAD NO REASON TO BE NERVOUS

16 BECAUSE HE DIDN'T KNOW THERE WAS METHAMPHETAMINE IN THE GAS

17 TANK OF THE CAR.

18      AND LADIES AND GENTLEMEN, THAT WAS THE WHOLE POINT.  THIS

19 METHAMPHETAMINE WAS HIDDEN.  IT WAS HIDDEN FROM THE NAKED EYE.

20 IT WAS STUFFED INSIDE A GAS TANK.  YOU'LL FIND IT WAS HIDDEN

21 FROM THE GOVERNMENT AGENTS.  BECAUSE IT WAS ARIAS, THE

22 NARCOTICS DETECTOR DOG, TRAINED TO SNIFF NARCOTICS, WHO HAS A

23 HEIGHTENED SENSE OF SMELL THAT HUMANS CAN'T SMELL.  ARIAS WAS

24 THE ONE WHO FOUND THESE DRUGS.  THESE DRUGS WERE HIDDEN FROM

25 MR. FLORES HIMSELF.  HE DIDN'T KNOW THERE WAS DRUGS HIDDEN

1  INSIDE THE GAS TANK.  YOU'LL SEE THE GAS TANK.  YOU'LL SEE THE

2  FUEL PUMP, AND YOU'LL HEAR THAT IT TOOK 30 MINUTES TO REMOVE

3  THAT BACK SEAT, TAKE OFF THIS FLAP, PULL THIS OUT, AND STUFF

4  DRUGS INSIDE THAT GAS TANK.

5      NOW THERE IS ONE CRUCIAL FACT THAT I WANT YOU TO PAY CLOSE

6  ATTENTION TO, AND MS. BOOT ALREADY MENTIONED IT.  AND THAT'S

7  WITH RESPECT TO THE SENDING UNIT.  YOU'LL HAVE A CHANCE TO

8  OBSERVE IT, AND YOU'LL NOTICE THAT THERE IS A LITTLE PIECE OF

9  WOOD.  IT'S ACTUALLY A TOOTHPICK AND SOME RED STRING OR TWINE.

10     AND AS MS. BOOT INDICATED, THIS WAS DESIGNED TO MAKE THE

11  GAS GAUGE AND THE DASHBOARD FULL, READ FUEL, EVEN IF THE GAS

12  TANK WASN'T COMPLETELY FULL.  AND YOU'LL FIND THAT THE PURPOSE

13  OF THAT WAS TO DUPE MR. FLORES INTO THINKING THAT THERE WAS

14  NOTHING WRONG WITH HIS CAR.  COMBINED WITH THE FACT THAT THE

15  GAS THE GOVERNMENT WAS ABLE TO SIPHON OUT OF THAT GAS TANK

16  EQUALED SEVEN GALLONS, MORE THAN ENOUGH GAS TO GET MR. FLORES

17  FROM THE PORT OF ENTRY TO HIS HOME IN MONTEBELLO, CALIFORNIA.

18  SO THIS, IN 30 MINUTES, WITH A TOOTHPICK AND SOME RED STRING,

19  MR. FLORES WAS DUPED.  DRUGS WERE STUFFED INTO THE GAS TANK,

20  AND HE WAS, UNKNOWINGLY, TRANSPORTING THEM ACROSS THE BORDER.

21     AS FOR THE SENDING UNIT BY THE FOOT, YOU'LL AGAIN HEAR

22  THAT WAS ALSO A FACT NOT MENTIONED IN ANY REPORTS.  NOW YOU'RE

23  PROBABLY ASKING YOURSELF, WELL, IF MR. FLORES ISN'T RESPONSIBLE

24  FOR THESE DRUGS, THEN WHO IS?  AND THE ANSWER TO THAT QUESTION

25  IS, DAVID GUTIERREZ.  AND AS MS. BOOT ALREADY SAID, THE

1   GOVERNMENT'S ALLEGATION IS THAT MR. FLORES CONSPIRED OR AGREED

2   WITH DAVID GUTIERREZ TO IMPORT THESE DRUGS AND DISTRIBUTE THEM.

3         BUT MR. GUTIERREZ ISN'T HERE.  HE'S NOT A DEFENDANT.  HE'S

4   NOT SITTING AT THIS TABLE.  HE'S NEVER BEEN ARRESTED.  HE'S

5   NEVER BEEN CHARGED.  BUT HE'S THE ONE RESPONSIBLE FOR THESE

6   DRUGS, AND HE'S THE ONE WHO UNKNOWINGLY DUPED MR. FLORES INTO

7   BRINGING THESE DRUGS INTO THE UNITED STATES.

8         DAVID GUTIERREZ IS A FAMILY FRIEND OF MR. FLORES.  AND

9   THEY'VE KNOWN EACH OTHER FOR 16 YEARS.  WELL, THEY WERE FRIENDS

10  UNTIL ALL OF THIS HAPPENED.  AND AS THE GOVERNMENT HAS ALREADY

11  ALLUDED TO, MR. GUTIERREZ HAD ACCESS TO THIS VOLKSWAGEN BEETLE.

12  BUT MORE IMPORTANT THAN THAT, HE KNEW WHERE MR. FLORES LIVED.

13        IT WAS DAVID GUTIERREZ WHO COORDINATED THIS WHOLE SCHEME.

14  AND THERE IS NO EVIDENCE, AND YOU WILL BE SHOWN NO EVIDENCE,

15  LET ALONE EVIDENCE THAT WOULD CONVINCE YOU BEYOND A REASONABLE

16  DOUBT, THAT GILBERT FLORES EVER AGREED TO BRING THESE DRUGS FOR

17  MR. FLORES -- FOR MR. GUTIERREZ, EXCUSE ME, THAT HE EVER KNEW

18  WHAT DAVID GUTIERREZ WAS UP TO.  THIS POINT IS NOT IN DISPUTE,

19  LADIES AND GENTLEMEN, THAT DAVID GUTIERREZ IS RESPONSIBLE FOR

20  THESE DRUGS.  THE GOVERNMENT ALREADY SAID SO.

21            MS. BOOT:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

22            THE COURT:  OVERRULED.

23            MR. FAKHOURY:  BUT HE ISN'T HERE TODAY.  HE'S NOT ON

24  TRIAL TODAY.  AND AGAIN, YOU'LL HEAR NO EVIDENCE THAT SHOWS

25  THAT THERE WAS ANY AGREEMENT BETWEEN DAVID GUTIERREZ AND

1   MR. FLORES, OR THAT MR. FLORES EVER KNOWINGLY AGREED TO SMUGGLE

2   DRUGS FOR DAVID GUTIERREZ.

3       AND YOU'LL LEARN ABOUT THE CONSIDERABLE LENGTHS THAT THE

4   GOVERNMENT HAS GONE TO TO TRY TO CONVICT MR. FLORES IN THIS

5   CASE.  YOU'LL READ ABOUT THE CELL PHONE THEY SEARCHED.  YOU'LL

6   HEAR ABOUT THE 220 TEXT MESSAGES THEY ANALYZED, NONE OF WHICH

7   SHOW ANY AGREEMENT BETWEEN MR. FLORES AND DAVID GUTIERREZ TO

8   ENGAGE IN DRUG TRAFFICKING.  YOU'LL HEAR ABOUT GOVERNMENT RAIDS

9   IN MONTEBELLO, TRACKING DOWN MR. FLORES' FAMILY, HIS CHILDREN.

10          MS. BOOT:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

11  IMPROPER.

12          THE COURT:  OVERRULED.

13          MR. FAKHOURY:  YOU'LL HEAR ABOUT THE EFFORTS THE

14  GOVERNMENT MADE TO GO TO ALTA DENA, NEAR PASADENA, TO GO TO

15  MONTEBELLO TO SPEAK TO MR. FLORES'S FAMILY MEMBERS TO LOOK FOR

16  ANY EVIDENCE, AND ALL YOU'LL GET IS NOTHING.

17      YOU'VE BEEN ASKED TO DECIDE THE FATE OF ONE MAN, AND THAT

18  IS NOT DAVID GUTIERREZ.  IT'S GILBERT FLORES, WHO IS SITTING

19  RIGHT THERE IN THE CHAIR.  THE GOVERNMENT WANTS YOU TO THROW

20  THIS MAN IN PRISON FOR FEDERAL DRUG TRAFFICKING CHARGES, BUT

21  THEY WON'T BRING YOU ANY EVIDENCE THAT SHOWS THAT HE KNEW THERE

22  WERE DRUGS HIDDEN IN THAT GAS TANK OR HE CONSPIRED OR AGREED

23  WITH MR. GUTIERREZ TO DO ANYTHING.  ULTIMATELY, MR. FLORES IS

24  ASKING FOR YOU FOLKS TO GIVE HIM MORE THAN 30 MINUTES.  OVER

25  THESE NEXT FEW DAYS, HE ASKS YOU TO THINK ABOUT THIS CASE, TO

1  CONSIDER THE GOVERNMENT'S EVIDENCE, TO SCRUTINIZE IT, TO ASK

2  THOSE TOUGH QUESTIONS.  AND COMBINED WITH THE ABSOLUTE LACK OF

3  EVIDENCE THAT SHOWS ANY AGREEMENT BETWEEN MR. GUTIERREZ AND

4  MR. FLORES, COMBINED WITH THE FACT THAT THE GAS TANK WAS

5  MODIFIED TO DECEIVE MR. FLORES HIMSELF, WHEN YOU CONSIDER ALL

6  OF THOSE THINGS, I'M CONFIDENT AND MR. FLORES IS CONFIDENT THAT

7  YOU'LL RETURN THE ONLY JUST VERDICT IN THIS CASE, AND THAT IS A

8  VERDICT OF NOT GUILTY.  THANK YOU.

9          THE COURT:  ALL RIGHT, THANK YOU, MR. FAKHOURY.

10      PLEASE CALL YOUR FIRST WITNESS.

11          MR. CONOVER:  YOUR HONOR, THE UNITED STATES CALLS

12  CUSTOMS AND BORDER PROTECTION OFFICE AINSLIE COVE.

13                  (WITNESS SWORN.)

14          THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

15  RECORD, SPELLING YOUR LAST NAME.

16          THE WITNESS:  MY NAME IS AINSLIE COVE, SPELLING IS

17  A-I-N-S-L-I-E, LAST NAME COVE, C-O-V-E.

18                  DIRECT EXAMINATION

19  BY MS. BOOT:

20  Q.   GOOD AFTERNOON, OFFICER COVE.

21  A.   GOOD AFTERNOON.

22  Q.   COULD YOU PLEASE TELL THE JURY WHERE YOU WORK.

23  A.   I WORK AT THE CANINE SECTION, AT THE PORT OF SAN DIEGO.

24  WE COVER SAN YSIDRO PORT OF ENTRY, OTAY MESA PORT OF ENTRY,

25  TECATE PORT OF ENTRY, AND THE CARGO FACILITY AT OTAY MESA.

1  Q.   IS THAT DIVISION OF THE DEPARTMENT OF HOMELAND SECURITY?

2  A.   YES, MA'AM.

3  Q.   HOW LONG HAVE YOU WORKED THERE?

4  A.   I'VE BEEN WORKING FOR CBP FOR SEVEN YEARS NOW.

5  Q.   I BELIEVE YOU SAID YOUR TITLE WAS CANINE ENFORCEMENT

6  OFFICER?

7  A.   YES.  I'VE BEEN A CANINE OFFICER FOR FOUR YEARS NOW.

8  Q.   WHAT ARE YOUR DUTIES AS A CANINE ENFORCEMENT OFFICER?

9  A.   BASICALLY WHAT WE DO IS WE WALK AROUND, MYSELF, MY CANINE

10  PARTNER AND BACKUP OFFICER, AT THE PORTS OF ENTRY, THE CARGO

11  FACILITIES.  AND WE'RE BASICALLY LOOKING FOR DRUGS OR CONCEALED

12  HUMANS.  WE WALK AROUND INSIDE THE TRAFFIC, LETTING THE DOG

13  BASICALLY SMELL THE VEHICLES AS THEY'RE COMING IN.

14  Q.   AND PRIOR TO BECOMING A CANINE ENFORCEMENT OFFICER, WHAT

15  WAS YOUR ROLE WITH THE DEPARTMENT OF HOMELAND SECURITY?

16  A.   I WAS AN INSPECTOR AT THE SAN DIEGO AIRPORT SEAPORT.

17  Q.   AND WHERE DID YOU WORK BEFORE YOU STARTED WORKING WITH THE

18  GOVERNMENT AND HOMELAND SECURITY?

19  A.   I WAS IN THE MARINE CORPS FOR NINE YEARS.

20  Q.   WERE YOU EVER DEPLOYED?

21  A.   YES.  I DEPLOYED TO EGYPT FOR A FEW MONTHS, BACK IN '99.

22  Q.   AND WHAT KIND OF SPECIALIZED TRAINING DID YOU RECEIVE TO

23  BECOME A CUSTOMS AND BORDER PROTECTION OFFICER?

24  A.   WE DID -- MY TRAINING WAS -- THE INITIAL TRAINING TO

25  BECOME AN OFFICER WAS AT FRONT ROYAL VIRGINIA, AND IT WAS ABOUT

1    13 WEEKS.  AND IT'S JUST THE BASIC ACADEMY, AND THEN FOR THE

2    CANINE ENFORCEMENT PART WAS THREE YEARS LATER AT THE CANINE

3    ENFORCEMENT TRAINING CENTER, THAT WAS ABOUT 13 WEEKS AS WELL.

4    Q.   DID YOU RECEIVE ANY ON-THE-JOB TRAINING?

5    A.   YES.

6    Q.   SO BEFORE WE TURN TO THE DAY OF THE DEFENDANT'S ARREST, I

7    WANT TO DISCUSS THE OTAY MESA PORT OF ENTRY WITH YOU GENERALLY.

8    CAN YOU PLEASE TURN IN YOUR EXHIBIT BINDER TO -- WHICH IS RIGHT

9    THERE IN FRONT OF YOU -- TO GOVERNMENT EXHIBITS 2 AND 3 AND

10   TAKE A LOOK AT THOSE.

11      (GOVERNMENT'S EXHIBITS 2 AND 3 MARKED FOR IDENTIFICATION.)

12   BY MS. BOOT:

13   Q.   DO YOU RECOGNIZE WHAT IS DEPICTED IN THOSE PHOTOGRAPHS?

14   A.   YES.  IT IS THE PORT OF ENTRY.  THE FIRST ONE, EXHIBIT 2,

15   LOOKS LIKE SAN YSIDRO PORT OF ENTRY, AND THE SECOND ONE LOOKS

16   LIKE THE OTAY MESA PORT OF ENTRY.

17   Q.   ARE YOU SURE -- CHECK OUT THE DIFFERENCE BETWEEN EXHIBIT 1

18   AND EXHIBIT 2 IF YOU WOULDN'T MIND.

19           THE CLERK:  IS THIS 2 AND 3?

20           THE WITNESS:  I'M SORRY, I WAS ON 1, SORRY.  YEAH,

21   THEY'RE BOTH OTAY MESA PORT OF ENTRY, 2 AND 3.

22   BY MS. BOOT:

23   Q.   ARE THESE EXHIBITS FAIRLY ACCURATE DEPICTIONS OF THE OTAY

24   MESA PORT OF ENTRY ON NOVEMBER 28, 2009?

25   A.   YES.

1          MS. BOOT:  YOUR HONOR, I MOVE TO ADMIT THESE EXHIBITS

2   INTO EVIDENCE?

3          THE COURT:  ANY OBJECTION?

4          MR. FAKHOURY:  NO.

5          THE COURT:  ALL RIGHT, THEY'LL COME IN.

6      (GOVERNMENT'S EXHIBITS 2 AND 3 RECEIVED INTO EVIDENCE.)

7          MS. BOOT:  I ALSO MOVE TO SHOW THEM TO THE JURY.

8          THE COURT:  SURE.

9   BY MS. BOOT:

10  Q.  OFFICER COVE, NOW SHOWING YOU EXHIBIT 2, AND NOW THE JURY

11  CAN SEE IT, CAN YOU PLEASE REAL QUICKLY TELL THEM WHAT THIS IS

12  A PICTURE OF.

13  A.  IT IS AN OVERHEAD SHOT OF THE OTAY MESA PORT OF ENTRY.

14  Q.  OKAY.  AND NOW ON THIS PICTURE -- DO YOU HAVE A POINTER UP

15  THERE?

16  A.  I DON'T SEE ONE.

17  Q.  DO YOU HAVE THAT?  OKAY.  SO IN THIS PICTURE, WHERE IS

18  MEXICO?

19  A.  MEXICO IS THIS SOUTHERN AREA HERE, (INDICATING).

20  Q.  WHERE IS THE UNITED STATES?

21  A.  THIS PART HERE, THERE IS ACTUALLY A LIMIT LINE.  I CAN'T

22  REALLY SEE IT FROM BACK HERE, BUT THERE IS A LIMIT LINE RIGHT

23  ABOUT HERE (INDICATING).  AND THAT ACTUALLY IS THE BOUNDARY FOR

24  THE MEXICO AND U.S. SIDE.  AND THIS RIGHT HERE IS THE PRIMARY

25  BOOTHS, WHERE THE VEHICLES STOP FOR INSPECTION.

1   Q.   AND WHAT ARE THOSE CARS DOING --

2   A.   THESE CARS ARE ALL LINED UP, WAITING TO MAKE ENTRY INTO

3   THE UNITED STATES.

4   Q.   NOW I'M GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 3, A BIT

5   MORE OF A CLOSE UP THERE.

6   A.   OKAY.  YEAH, THERE IS THE LIMIT LINE RIGHT THERE,

7   (INDICATING).

8   Q.   AND AGAIN, THIS IS STILL THE OTAY MESA PORT OF ENTRY,

9   OFFICER COVE?

10   A.   YES.

11   Q.   SO YOU'RE -- WHEN YOU SAY THE LIMIT LINE, WHAT ARE YOU

12   REFERRING TO THERE?  WHAT DOES THAT --

13   A.   IT'S ACTUALLY THE BOUNDARY THAT SEPARATES THE UNITED

14   STATES FROM MEXICO.

15   Q.   OKAY.  AND WHERE ARE THE PRIMARY INSPECTION BOOTHS?

16   A.   RIGHT HERE, (INDICATING).

17   Q.   WHERE IS THE PRE-PRIMARY AREA?

18   A.   THAT WOULD BE FROM THE LINE UNTIL THE BOOTHS, SO THIS

19   LITTLE AREA RIGHT HERE, (INDICATING).

20   Q.   WHAT SORTS OF THINGS HAPPEN WHEN CARS ARE WAITING THERE IN

21   THAT PRE-PRIMARY?

22   A.   THIS IS ACTUALLY THE AREA WHERE MYSELF AND MY CANINE

23   PARTNER ARE WALKING AROUND, AND I'M LETTING HIM SMELL THE CARS

24   AND SEE IF HE CAN FIND ANYTHING.

25   Q.   SO YOU'RE SAYING, WHEN YOU'RE --

```
1   A.   YEAH, THAT'S THE AREA WHERE I WALK AROUND WITH MY CANINE

2   PARTNER.  THE OTHER CANINE TEAMS WALK AROUND.  AND WE'RE

3   LETTING OUR DOGS BASICALLY SMELL VEHICLES TO SEE IF THEY CAN

4   FIND ANYTHING THAT THERE ARE BEING SMUGGLED, DRUGS OR HUMANS.

5   Q.   DO YOU EVER INSPECT CARS, TALK TO DRIVERS?

6   A.   YES, UH-HUH.

7   Q.   YES TO BOTH?

8   A.   YES.

9   Q.   AND WHAT SORT OF THINGS MIGHT MAKE YOU SUSPICIOUS WHILE

10  YOU'RE INSPECTING CARS, WALKING AROUND THE AREA, PERFORMING

11  YOUR DUTIES?

12  A.   LITTLE THINGS, A LOT OF TIMES, LIKE IN THE SMALLER PORTS

13  OF ENTRY, IF WE'VE NEVER SEEN ONE OF THE TRAVELERS BEFORE, I'VE

14  BEEN WORKING THERE FOUR YEARS, WE PRETTY MUCH, ESPECIALLY IN

15  THE MORNING TRAFFIC, WE KNOW THE WORKERS.  OR IF THERE IS

16  SOMEBODY THAT WE KNOW, AND THEY'RE IN A NEW CAR, HEY, DID YOU

17  GET A NEW CAR?  WE'LL TALK TO THEM, FIND OUT WHAT IS GOING ON.

18  OR, YOU KNOW, ESPECIALLY WITH ME, IF MY DOG HAPPENS TO BE

19  INTERESTED IN THAT VEHICLE, DEFINITELY I'M GOING OVER THERE TO

20  TALK TO THEM.

21  Q.   AND IF YOU'RE TALKING TO SOMEONE WAITING IN THAT

22  PRE-PRIMARY LANE, WOULD YOU EVER LOOK AT THE GAS TANK?

23  A.   SOMETIMES, YEAH.  IT MIGHT BE AN INDICATOR, IF THE LINE IS

24  EXTREMELY LONG THAT DAY, AND THEY'RE ON A VERY FULL TANK, WHERE

25  DID YOU FILL UP AT, OTHER THINGS, IF IT'S WAY -- TO THE -- YOU
```

1   KNOW, WAY FULL, YOU KNOW, I MIGHT WANT TO ASK ESPECIALLY IF

2   THEY HAVE A NEW CAR, IS YOUR GAS GAUGE BROKEN, ARE YOU HAVING

3   ANY PROBLEMS WITH YOUR VEHICLE, STUFF LIKE THAT.

4   Q.   DID YOU EVER LOOK TO SEE IF A GAS GAUGE IS EMPTY, IT SAYS

5   IT'S EMPTY?

6   A.   YEAH, SAME THING, IF IT'S ALL THE WAY PAST "E," HOW IS

7   YOUR CAR RUNNING?  YOU MIGHT WANT TO ASK, IS THERE ANYTHING

8   WRONG?  HAVE YOU BEEN HAVING MECHANICAL PROBLEMS WITH YOUR

9   VEHICLE?  STUFF LIKE THAT.

10  Q.   AND WHEN A CAR GETS UP TO THE PRIMARY INSPECTION BOOTH AT

11  THE PORT OF ENTRY, WHAT HAPPENS THERE?

12  A.   THEY PRESENT THEMSELVES FOR INSPECTION, THEY HAVE TO GIVE

13  THEIR TRAVEL DOCUMENTS, ENTRY DOCUMENTS INTO THE UNITED STATES

14  TO THE OFFICER AT THE BOOTH.  AND THEY PROCESS THEM THERE.

15  Q.   AND IF A CAR IS GIVEN PERMISSION TO ENTER THE UNITED

16  STATES -- I DON'T KNOW IF -- I KNOW YOU LOST THE POINTER

17  PRIVILEGES, IF YOU CAN USE IT SPARINGLY.  IF CARS ARE GIVEN

18  PERMISSION TO ENTER THE U.S., WHERE WOULD IT ENTER; HOW WOULD

19  THAT WORK?

20  A.   THERE ARE TWO EGRESSES HERE.  THERE IS ONE THIS WAY, AND

21  THEN YOU CAN SEE THIS VEHICLE HERE.  HE LOOKS LIKE HE'S JUST

22  GOTTEN PERMISSION TO GO FORWARD, AND HE'LL GO THROUGH THIS

23  EGRESS HERE.

24  Q.   AND ONCE IT GOES THROUGH THAT EGRESS, ARE THEY BASICALLY

25  FREE TO GO WHEREVER THEY WANT?

1    A.   YES, MA'AM.  THEY'LL GO NORTH WHEREVER THEY'RE HEADING TO.

2    Q.   AND WHAT IF A CAR -- WHAT IF THE OFFICER AT THE PRIMARY

3    INSPECTION BOOTH DOES NOT GIVE PERMISSION TO ENTER THE UNITED

4    STATES, WHERE DOES IT GO THEN?

5    A.   THEN THEY GO TO WHAT WE CALL SECONDARY.  AND IT'S A

6    SECONDARY LOT, AND IF THEY NEED, YOU KNOW, ANY KIND OF FURTHER

7    INSPECTION, THEY'LL GO THERE AND THAT IS RIGHT UNDER HERE,

8    (INDICATING).  IF YOU GO A LITTLE FARTHER SOUTH, YOU SEE THAT

9    IS ACTUALLY THE ROOF OF IT RIGHT HERE, (INDICATING).

10   Q.   AND CAN YOU SHOW US, WHERE IS THE PEDESTRIAN CROSSING?

11   A.   THE PEDESTRIAN CROSSING IS INSIDE THE BUILDING HERE.  SO

12   YOU SEE THIS WALKWAY HERE, THEY'LL LINE UP THROUGH HERE AND

13   ENTER INTO THIS BUILDING HERE.  I THINK THAT'S THE ROOF RIGHT

14   THERE, (INDICATING).

15   Q.   WHERE DO THEY EXIT; CAN YOU SEE THAT ON THIS PICTURE?

16   A.   NOT ON THIS PICTURE.  MAYBE IF YOU GO THAT WAY.  YEAH,

17   RIGHT OUT THROUGH HERE, (INDICATING).

18   Q.   OKAY.  IF SOMEONE CROSSES IN THE PEDESTRIAN LANE, AND

19   ANOTHER PERSON CROSSES IN A CAR, CAN THEY MEET UP AFTER THEY

20   GET ACROSS THE BORDER?

21   A.   YES.

22   Q.   I WANT TO ASK YOU TO TURN IN YOUR BINDER NOW TO EXHIBIT 4.

23        (GOVERNMENT'S EXHIBIT 4 MARKED FOR IDENTIFICATION.)

24   BY MS. BOOT:

25   Q.   DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT PHOTOGRAPH?

```
1    A.   YES.  IT'S THE PRE-PRIMARY AREA, FACING LIKE THE CARS AT

2    THE PRIMARY BOOTH.

3    Q.   OKAY.  AND IS THAT AN ACCURATE DEPICTION OF A PRIMARY

4    INSPECTION BOOTH AT THE OTAY MESA PORT OF ENTRY?

5    A.   YES, IT IS.

6         MS. BOOT:  YOUR HONOR, I MOVE TO ADMIT THIS EXHIBIT

7    INTO EVIDENCE.

8         THE COURT:  ANY OBJECTION?

9         MR. FAKHOURY:  NO, YOUR HONOR.

10        THE COURT:  IT WILL COME IN.

11        MS. BOOT:  AND MAY I SHOW IT TO THE JURY?

12        THE COURT:  YES.

13        (GOVERNMENT'S EXHIBIT 4 RECEIVED INTO EVIDENCE.)

14   BY MS. BOOT:

15   Q.   OFFICER COVE, CAN YOU TELL THE JURY WHAT THAT IS, NOW THAT

16   THEY CAN SEE IT.

17   A.   YES.  THAT IS A VEHICLE WHO IS ACTUALLY AT THE BOOTH FOR

18   INSPECTION.  YOU CAN'T SEE THE BOOTH HERE, BUT HE'S -- IT'S

19   JUST LIKE THAT BOOTH RIGHT HERE, BUT IT'S ON THE DRIVER'S SIDE,

20   WHERE HE WOULD ACTUALLY GIVE HIS DOCUMENTS TO THE OFFICER.

21   Q.   OKAY.  AND I WANT TO SHOW YOU NOW WHAT HAS BEEN MARKED AS

22   GOVERNMENT'S EXHIBIT 5.

23        (GOVERNMENT'S EXHIBIT 5 MARKED FOR IDENTIFICATION.)

24   BY MS. BOOT:

25   Q.   CAN YOU LOOK AT THAT IN YOUR BINDER, PLEASE.
```

1   A.   UH-HUH.

2   Q.   DO YOU SEE WHAT IS DEPICTED IN THAT PHOTO?

3   A.   YES.

4   Q.   WHAT IS THAT?

5   A.   IT'S THE SECONDARY LOT AT THE OTAY MESA PORT OF ENTRY.

6         MS. BOOT:  YOUR HONOR, I MOVE TO ADMIT THAT EXHIBIT

7   INTO EVIDENCE.

8         THE COURT:  ANY OBJECTION?

9         MR. FAKHOURY:  NO, YOUR HONOR.

10        THE COURT:  IT WILL COME IN.

11        MS. BOOT:  MAY I PLEASE SHOW IT TO THE JURY?

12        THE COURT:  YES.

13        (GOVERNMENT'S EXHIBIT 5 RECEIVED INTO EVIDENCE.)

14  BY MS. BOOT:

15  Q.   OFFICER COVE, CAN YOU EXPLAIN THIS NOW THAT THE JURY CAN

16  SEE IT.

17  A.   YES.  THIS IS THE SECONDARY LOT AT THE OTAY MESA PORT OF

18  ENTRY.  THIS IS WHERE THE VEHICLES COME WHEN THE OFFICER AT

19  PRIMARY HAS DETERMINED THAT THERE NEEDS TO BE FURTHER

20  INSPECTION WITH THAT VEHICLE OR THE OCCUPANTS IN THE VEHICLE.

21  AND YOU CAN SEE THIS GUY LOOKS LIKE HE'S GETTING READY TO

22  LEAVE, AND WHAT THEY'LL DO IS, PARK RIGHT HERE AND THEY'LL DO

23  WHATEVER INSPECTIONS NEED TO BE DONE THERE.

24  Q.   WHAT SORTS OF REASONS WOULD A PRIMARY INSPECTION OFFICER

25  REFER A CAR TO SECONDARY?

1  A.   THERE ARE A LOT OF REASONS.  IF, NO. 1, IF THE TRAVELER

2  DOESN'T HAVE THE CORRECT ENTRY DOCUMENTATION TO COME INTO THE

3  UNITED STATES.  IF THERE IS ANY KIND OF GENERATED MANDATORY

4  REFERRALS THAT WE NEED TO LOOK AT.  IF THE DRIVER MAYBE APPEARS

5  TO BE NERVOUS TO THE INSPECTOR, IF THE DRIVER DOESN'T MATCH --

6  IF HE'S NOT THE OWNER OF THE VEHICLE, ALL KINDS OF DIFFERENT

7  THINGS.  IT DEPENDS ON THE OFFICER THAT IS THERE.  BUT THERE

8  ARE SOME MANDATORY COMPUTER-GENERATED REFERRALS THAT WE HAVE TO

9  SEND IN AS WELL.

10  Q.   IF A DOG ALERTS TO A CAR, IS THAT A REASON?

11  A.   YES, IT IS.

12  Q.   WHAT SORTS OF THINGS HAPPEN ONCE A CAR GETS TO THE

13  SECONDARY INSPECTION LOT?

14  A.   WHAT HAPPENS IS THERE IS A -- WHAT WE CALL A SEVEN-POINT

15  INSPECTION OF THE VEHICLE.  THE DRIVER AND OCCUPANTS ARE TAKEN

16  OUT, AND THERE IS A SEVEN-POINT INSPECTION DONE.  BASICALLY WE

17  GO AROUND THE VEHICLE AND WE CHECK IT, FROM INSIDE AND OUT, TO

18  SEE IF THERE IS ANYTHING WRONG, ANY KIND OF COMPARTMENTS,

19  ANYTHING LIKE THAT.

20  Q.   SO I'D LIKE TO TURN YOUR ATTENTION NOW TO SATURDAY,

21  NOVEMBER 28TH, 2009.  WERE YOU ON DUTY THAT DAY?

22  A.   YES, I WAS.

23  Q.   WHAT SHIFT WERE YOU WORKING?

24  A.   I WAS WORKING THE DAY SHIFT, WHICH WOULD BE 06 UNTIL 1500.

25  Q.   I'M SORRY, I MISSED THAT?

1   A.   06 UNTIL 1500.

2   Q.   AND WHERE WERE YOU WORKING?

3   A.   AT THE OTAY MESA PORT OF ENTRY.

4   Q.   DID YOU COME INTO CONTACT WITH A SILVER VOLKSWAGON BEETLE

5   ON THAT DAY?

6   A.   YES, I DID.

7   Q.   CAN YOU CHECK IN YOUR BINDER AT WHAT HAS BEEN MARKED AS

8   GOVERNMENT'S EXHIBIT 6.

9   A.   UH-HUH.

10          (GOVERNMENT'S EXHIBIT 6 MARKED FOR IDENTIFICATION.)

11  BY MS. BOOT:

12  Q.   DO YOU RECOGNIZE WHAT IS DEPICTED IN THAT PHOTOGRAPH?

13  A.   YES, I DO.

14  Q.   WHAT IS IT?

15  A.   IT'S A SILVER VOLKSWAGEN BEETLE.

16  Q.   IS THAT AN ACCURATE DEPICTION OF THE SILVER VOLKSWAGEN

17  BEETLE THAT YOU SAW ON NOVEMBER 28, 2009?

18  A.   YES, IT IS.

19          MS. BOOT:  YOUR HONOR, I MOVE TO ADMIT THIS EXHIBIT

20  INTO EVIDENCE.

21          THE COURT:  ANY OBJECTION?

22          MR. FAKHOURY:  NO, YOUR HONOR.

23          THE COURT:  IT WILL COME IN.

24          MS. BOOT:  MAY I PLEASE SHOW IT TO THE JURY?

25          THE COURT:  YES.  COUNSEL, ONCE IT COMES IN, YOU NEED

1    NOT ASK FOR PERMISSION TO SHOW IT.

2            MS. BOOT:  THANK YOU, YOUR HONOR.

3            (GOVERNMENT'S EXHIBIT 6 RECEIVED INTO EVIDENCE.)

4    BY MS. BOOT:

5    Q.   SO OFFICER COVE, NOW THAT IT'S ON THE SCREEN FOR THE JURY

6    TO SEE, CAN YOU SAY WHAT THIS IS?

7    A.   YES.  THAT IS THE SILVER VOLKSWAGON BEETLE THAT I CAME IN

8    CONTACT WITH ON NOVEMBER 28, AT THE PORT OF ENTRY OF OTAY MESA.

9    Q.   AND WHERE -- WHAT PART OF THE PORT WERE YOU WORKING AT

10   WHEN YOU CAME IN CONTACT WITH THE BEETLE?

11   A.   I WAS WORKING WITH MY CANINE PARTNER IN THE PRE-PRIMARY

12   SECTION AT OTAY MESA.

13   Q.   AND WHERE WAS THE BEETLE WHEN YOU FIRST SAW IT THAT DAY?

14   A.   IT WAS THE NEXT CAR IN LINE.  I BELIEVE IT WAS ON LANE 12,

15   WAITING TO GO TO THE BOOTH.

16   Q.   AND AT ANY POINT THAT DAY, DID YOU SEE THE DRIVER OF THE

17   BEETLE?

18   A.   VERY QUICKLY.  WHAT HAPPENED WAS, IS I WAS WALKING --

19   THERE ARE 13 LANES AT THE OTAY MESA PORT OF ENTRY, 1 BEING ON

20   THE MOST EAST SIDE AND 13 BEING ON THE WEST SIDE.  AND WHAT WE

21   WERE DOING IS, WE WERE WALKING TOWARDS THE WEST SIDE, AS WE

22   APPROACHED THE VEHICLE.

23   Q.   EXCUSE ME, WHEN YOU SAY "WE," WHO IS "WE"?

24   A.   MYSELF AND MY CANINE PARTNER ARIAS.

25   Q.   SORRY.

1   A.   WE WERE WALKING, WE CAME UP, MAYBE A LANE AWAY, AND HE WAS

2   THE NEXT CAR AT THE BOOTH.   AS WE APPROACHED IT FROM THE SIDE,

3   HE TOOK OFF TO THE BOOTH.   AT THAT POINT, MY CANINE PARTNER

4   GAVE ME AN ALERT, WHICH IS A CHANGE OF BEHAVIOR, THREW HIS HEAD

5   UP AND WENT AFTER THE VEHICLE.   HE'S TRAINED TO DO THAT WHEN

6   THERE IS A NARCOTIC ODOR AVAILABLE.   WHEN HE WENT TO THE

7   VEHICLE AND BEGAN SEARCHING IT, I HAD THE PRIMARY OFFICER AT

8   THE BOOTH WHO WAS OFFICER FIGUEROA, HAD HER TURN THE -- HAD THE

9   DRIVER TURN OFF THE VEHICLE FOR SAFETY --

10           MR. FAKHOURY:   YOUR HONOR, I'M SORRY, OBJECTION.

11   PERSONAL KNOWLEDGE.   SPECULATION.

12           THE COURT:   WELL, I THINK IT'S A NARRATIVE.   I THINK

13   THE QUESTION WAS, DID SHE EVER SEE THE DRIVER OF THE VEHICLE.

14   OBJECTION SUSTAINED.

15   BY MS. BOOT:

16   Q.   OKAY, SO AFTER OFFICER FIGUEROA, AFTER YOU --

17   A.   WELL, WHAT I WAS TRYING TO SAY WAS, WHEN I CAME AROUND THE

18   VEHICLE --

19           MR. FAKHOURY:   OBJECTION.   NO QUESTION POSED.

20           MS. BOOT:   YES, JUST ONE MOMENT.

21   BY MS. BOOT:

22   Q.   SO AFTER YOUR DOG ALERTED AND YOU TOOK OFF AFTER THE CAR,

23   WHAT HAPPENED?   WHAT DID YOU DO NEXT?

24   A.   I HAD OFFICER FIGUEROA TURN -- HAD THE DRIVER TURN OFF THE

25   VEHICLE BECAUSE HE WAS ACTUALLY AT THE BOOTH AT THIS TIME.

1  Q.   WHY DID YOU ASK HER TO DO THAT?

2  A.   FOR SAFETY.

3  Q.   OKAY.

4  A.   I HAD A CANINE ALERT, AND THAT IS -- THAT'S WHAT WE DO

5  WHEN WE HAVE A CANINE ALERT.  WE TURN THE VEHICLE OFF AND

6  OBTAIN THE KEYS BECAUSE WE DON'T WANT THE DRIVER TAKING OFF ON

7  US.

8  Q.   WHAT HAPPENED NEXT?  WHAT DID YOU DO NEXT?

9  A.   THIS IS WHEN I SAY THAT -- I VAGUELY SAW THE DRIVER, LIKE

10 QUICKLY SAW THE DRIVER.  WE CAME AROUND --

11 Q.   CAN I STOP YOU RIGHT THERE.

12 A.   UH-HUH.

13 Q.   DO YOU SEE THE DRIVER OF THAT BEETLE HERE IN COURT TODAY?

14 A.   YES, I DO.

15 Q.   CAN YOU PLEASE POINT TO HIM AND IDENTIFY AN ARTICLE OF

16 CLOTHING.

17 A.   HE'S THE GENTLEMAN SITTING ALL THE WAY TO THE LEFT, WITH

18 THE GRAY SUIT, BLUE SHIRT, AND TIE.

19         MS. BOOT:  YOUR HONOR, MAY THE RECORD REFLECT THE

20 WITNESS HAS IDENTIFIED THE DEFENDANT?

21         THE COURT:  YES.

22 BY MS. BOOT:

23 Q.   SO AS YOU SAID, AFTER YOU SAW THE DEFENDANT, WHAT DID YOU

24 DO NEXT?

25 A.   FOLLOWED MY DOG.  MY DOG GAVE ME THE FINAL RESPONSE AT THE

1    REAR OF THE VEHICLE UNDERNEATH.

2    Q.   HOW DID THE DOG GIVE YOU A RESPONSE?   WHAT DID THE DOG DO?

3    A.   THE DOG IS TRAINED TO GO TO WHERE THE SOURCE OF THE ODOR

4    IS.  AND WHAT HE DID, HE WENT UP UNDERNEATH THE GAS TANK, AND

5    THEY'RE SUPPOSED TO SIT, BUT BEING THAT IT'S SO LOW, HE

6    ACTUALLY LAID DOWN, AND THAT IS HIS FINAL RESPONSE.

7    Q.   WHAT DOES THAT RESPONSE MEAN?

8    A.   THAT THERE IS THE PRESENCE OF A NARCOTIC ODOR OR CONCEALED

9    HUMAN.

10   Q.   WHAT HAPPENED NEXT?

11   A.   I CALLED FOR BACKUP.  I TOLD OFFICER FIGUEROA THAT I HAD A

12   CANINE ALERT.  THEY -- I'M NOT SURE, I DON'T REMEMBER WHO CAME

13   FROM THE CET TEAM, BUT THEY HANDCUFFED THE DRIVER AND TOOK HIM

14   INTO CUSTODY AGAIN FOR SAFETY.  THE CAR WAS TAKEN INTO THE

15   SECONDARY LOT.

16   Q.   BY "CET" TEAM, IS THAT CONTRABAND ENFORCEMENT TEAM?

17   A.   YES.

18   Q.   WHAT DID YOU DO NEXT?  DID YOU FOLLOW THE CAR?

19   A.   YES.  WE FOLLOWED IT IN.  I DID NOT REWARD MY DOG WITH A

20   TOY AT THAT MOMENT BECAUSE WE DIDN'T SEE ANY NARCOTICS OR

21   CONCEALED HUMANS.  BUT ANOTHER REWARD FOR THE DOG IS A LOT OF

22   PRAISE AND A LOT OF LOVE, SO THE WHOLE WAY IN, I'M LOVING ON MY

23   DOG, PRAISING HIM, GOOD BOY, GOOD BOY, HE DID A GOOD JOB, DID

24   WHAT HE WAS SUPPOSED TO DO.  WE TOOK HIM INTO THE SECONDARY

25   LOT, LET HIM FOLLOW IN THE VEHICLE.  I AT THAT TIME, PUT MY DOG

1    IN MY VEHICLE, MY GOVERNMENT VEHICLE.  AND WE CAME BACK AND

2    STARTED INSPECTING THE VOLKSWAGON.

3    Q.   AND, ULTIMATELY, WHAT DID YOU SEE OF THE INSPECTION OF THE

4    VOLKSWAGEN?

5    A.   THEY GOT THE SCOPE, WHICH IS ONE OF THE TOOLS THAT WE USE.

6    AND IT'S A FIBEROPTIC SCOPE.  IT CAN GO INTO THE GAS TANK, AND

7    YOU SEE WHAT IS IN THE GAS TANK.  AND THERE SEEMED TO BE WHAT

8    LOOKED LIKE PACKAGES, VACUUM-SEALED PACKAGES.  SO WE TOOK OFF

9    THE SENDING UNIT, AND THAT'S WHEN WE SAW PACKAGES.

10   Q.   DID YOU, YOURSELF, TAKE OFF THE SENDING UNIT?

11   A.   I DID NOT TAKE IT OFF, BUT I WAS THERE WHEN THEY WERE

12   TAKING IT OFF.

13   Q.   WERE YOU THERE -- AT WHAT POINT DID YOU BELIEVE THAT DRUGS

14   HAD BEEN FOUND?

15   A.   PERSONALLY, I BELIEVED IT WHEN I SAW THE IMAGE IN THE

16   SCOPE --

17            MR. FAKHOURY:  OBJECTION.  IMPROPER --

18   BY MS. BOOT:

19   Q.   WHEN WAS IT --

20            THE COURT:  STOP.  WHAT WAS THE OBJECTION?

21            MR. FAKHOURY:  SPECULATION AND IMPROPER OPINION.

22            THE COURT:  NO, OVERRULED.

23            THE WITNESS:  I THOUGHT THAT WHEN I SAW THE IMAGE IN

24   THE SCOPE, WHAT LOOKED LIKE VACUUM-SEALED PACKAGES, I THOUGHT

25   THAT, OH, YEAH, IT'S PACKAGES IN THE GAS TANK.

1  BY MS. BOOT:

2  Q.   AND DID YOU, AT SOME POINT, GET CONFIRMATION OF WHAT WAS

3  IN THOSE PACKAGES?

4  A.   YES.

5  Q.   AND WHEN DID THAT HAPPEN?

6  A.   THAT WAS AFTER THE SENDING UNIT WAS TAKEN OFF, AND THE

7  PACKAGES WERE THERE, AND THEY FIELD TESTED IT.

8  Q.   AND WHAT DID THE FIELD TEST SHOW?

9  A.   IT TESTED POSITIVE FOR METH.

10  Q.   WHAT DID YOU DO AFTER THAT?

11  A.   BEFORE IT WAS EVEN TESTED, WHEN WE SAW THE PACKAGES, I

12  BROUGHT MY DOG BACK AND LET HIM GET ON IT, SO HE COULD GET HIS

13  TOY.

14  Q.   WHY DID YOU DO THAT?

15  A.   BECAUSE IT'S GOOD FOR THE DOG.  IT BUILDS HIS CONFIDENCE.

16  THAT'S WHAT HAPPENS -- THERE ARE TWO WAYS OF PAYING YOUR DOG.

17  YOU CAN GIVE HIM PRAISE, WHICH I DID OUT FRONT, AND ALL THE WAY

18  INTO THE SECONDARY LOT.  AND THEN THERE IS ALSO WHEN HE FINDS

19  IT AND HE GIVES A FINAL RESPONSE, HE HAS -- WHAT HE HAS IS A

20  RUBBER HOSE.  AND IT'S JUST BASICALLY A TUG GAME WITH HIM.

21           MS. BOOT:  THANK YOU.

22           THE COURT:  MR. FAKHOURY.

23           MR. FAKHOURY:  THANK YOU, YOUR HONOR.

24                     CROSS-EXAMINATION

25  BY MR. FAKHOURY:

1    Q.   GOOD AFTERNOON, OFFICER COVE.

2    A.   GOOD AFTERNOON.

3    Q.   YOU WROTE A REPORT IN THIS CASE; IS THAT CORRECT?

4    A.   YES.

5    Q.   YOU WROTE ONE REPORT, RIGHT?

6    A.   YES.

7    Q.   DID YOU WRITE ANY OTHER REPORTS?

8    A.   NO.

9    Q.   DID YOU REVIEW ANY OTHER REPORTS?

10   A.   NO.

11   Q.   LET'S TALK A BIT ABOUT YOUR REPORT.  YOUR TESTIMONY TODAY

12   IS THAT YOU VERY QUICKLY SAW MR. FLORES; IS THAT CORRECT?

13   A.   WHEN I CAME AROUND THE VEHICLE, YES, I DID SEE HIM.

14   Q.   AND THEN AFTERWARDS, HE VERY QUICKLY TOOK OFF TOWARDS THE

15   PRIMARY BOOTH; IS THAT CORRECT?

16   A.   WELL, I DIDN'T SEE HIM AT THAT TIME.  I SAW HIS VEHICLE.

17            MS. BOOT:  OBJECTION.  THE QUESTION MISSTATES THE

18   TESTIMONY.

19            THE COURT:  OVERRULED.

20   BY MR. FAKHOURY:

21   Q.   LET ME ASK THE QUESTION AGAIN.

22   A.   GO AHEAD.

23   Q.   LET ME ASK IT A LITTLE BIT CLEARER.

24        YOUR TESTIMONY TODAY WAS THAT YOU SAW THE CAR TAKE OFF

25   TOWARDS THE PRIMARY BOOTH RIGHT AS YOU GOT TOWARDS THE BEETLE;

1    IS THAT ACCURATE?

2    A.   RIGHT.   WHEN WE CAME UP ON THE PASSENGER SIDE OF IT, YES.

3    Q.   AND THEN YOU ALSO TESTIFIED THAT YOU FOLLOWED THE CAR INTO

4    SECONDARY AS WELL; IS THAT CORRECT?

5    A.   RIGHT.

6    Q.   OKAY.   NOW YOU'VE BEEN TO THE ACADEMY; IS THAT CORRECT?

7    A.   YES.

8    Q.   HOW LONG IS THAT TRAINING PROGRAM?

9    A.   WHICH ACADEMY?

10   Q.   THE -- WELL, HOW MANY ACADEMIES HAVE YOU BEEN TO?   LET ME

11   ASK IT THAT WAY.

12   A.   I'VE BEEN TO TWO ACADEMIES.   I'VE BEEN TO THE REGULAR

13   OFFICER ACADEMY FOR CBP, AND THEN THREE YEARS AFTER THAT, I

14   WENT TO THE CANINE ACADEMY, BOTH BEING 13 WEEKS.

15   Q.   OKAY.   THANK YOU.   AND PART OF THE TRAINING, AT LEAST IN

16   THE STANDARD CBP ACADEMY, IS REPORT WRITING; IS THAT CORRECT?

17   A.   RIGHT.

18   Q.   THEY TRAIN YOU TO BE THOROUGH IN WRITING YOUR REPORTS; IS

19   THAT CORRECT?

20   A.   RIGHT.

21   Q.   TO INCLUDE ALL THE IMPORTANT DETAILS IN YOUR REPORT,

22   RIGHT?

23   A.   RIGHT.

24   Q.   TO BE ACCURATE?

25   A.   YES.

1  Q.   YOU KNOW THAT YOUR REPORT WILL BE RELIED UPON LATER; IS

2  THAT RIGHT?

3  A.   YES.

4  Q.   THE GOVERNMENT WILL RELY ON YOUR REPORT?

5  A.   YES.

6  Q.   DEFENSE ATTORNEYS WILL RELY ON YOUR REPORT?

7  A.   YES.

8  Q.   SUPERVISORS WILL RELY ON YOUR REPORT?

9  A.   YES.

10 Q.   YOU, YOURSELF, MAY RELY ON A REPORT?

11 A.   RIGHT.

12 Q.   PARTICULARLY BECAUSE EVENTS HAPPEN AND TIME PASSES --

13 A.   AND YOU DON'T REMEMBER THEM, YEAH.

14 Q.   EXACTLY.  AND THIS IS A PRETTY GOOD EXAMPLE, RIGHT?  THESE

15 EVENTS TOOK PLACE IN NOVEMBER OF 2009; IS THAT CORRECT?

16 A.   YES, IT IS.

17 Q.   SO IT'S BEEN QUITE SOME TIME SINCE THEN, RIGHT?

18 A.   YES.

19 Q.   OKAY.  WHEN YOU WRITE A REPORT, THAT REPORT GETS SUBMITTED

20 TO A SUPERVISOR; IS THAT CORRECT?

21 A.   YES, IT DOES.

22 Q.   AND THAT SUPERVISOR REVIEWS THAT REPORT AND ULTIMATELY

23 SIGNS OFF ON IT?

24 A.   YES.

25 Q.   YOU HAVE AN OPPORTUNITY TO GO BACK IN AND REVISE YOUR

```
 1   REPORT IF NECESSARY?

 2   A.   NOT AFTER IT IS SIGNED OFF.

 3   Q.   OKAY.  BUT BEFORE YOU TURN IT OVER TO THE SUPERVISOR, YOU

 4   CAN REVISE THE REPORT; IS THAT CORRECT?

 5   A.   RIGHT.

 6   Q.   YOU CAN MAKE SURE THERE ARE NO TYPOS?

 7   A.   RIGHT.

 8   Q.   YOU CAN CHECK TO SEE THAT YOU GOT ALL THE FACTS CORRECT?

 9   A.   RIGHT.

10   Q.   YOU CAN CHECK TO SEE IF IT'S ACCURATE?

11   A.   YES.

12   Q.   YOU CAN ADD OTHER FACTS THAT YOU MAY HAVE REMEMBERED?

13   A.   YES.

14   Q.   NOW YOU WROTE ONE REPORT IN THIS CASE, CORRECT?

15   A.   YES.

16   Q.   YOU DIDN'T MAKE ANY CHANGES TO THAT REPORT?

17   A.   I DID NOT.

18   Q.   AND THAT REPORT IS A RECOLLECTION OF YOUR MEMORY OF THE

19   EVENTS ON NOVEMBER 28, OF 2009?

20   A.   RIGHT.  IT WAS WRITTEN THAT DAY.

21   Q.   SO RIGHT WHEN THE EVENTS WERE VERY FRESH IN YOUR MIND?

22   A.   YEAH.  YOU HAVE TO WRITE IT THAT DAY.

23   Q.   AND OBVIOUSLY -- MAYBE THIS IS A STUPID QUESTION, AND I'M

24   SORRY IF IT IS, BUT OUR MEMORY GETS WORSE AS WE GET OLDER?

25   A.   THAT'S TRUE.
```

1    Q.   OKAY.  MAKING SURE I'M NOT THE ONLY ONE, OKAY.

2         NOW IN YOUR REPORT, YOU NEVER INDICATED THAT MR. FLORES

3    TOOK OFF TO THE BOOTH VERY QUICKLY WHEN YOU APPROACHED HIS CAR;

4    IS THAT CORRECT?

5    A.   I DON'T THINK I PUT THOSE WORDS IN THERE, NO.

6    Q.   YOU DIDN'T PUT THOSE WORDS IN YOUR REPORT?

7    A.   NO.

8    Q.   YOU ALSO DIDN'T PUT IN YOUR REPORT THAT YOU FOLLOWED HIS

9    CAR INTO SECONDARY; IS THAT CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   NOW LET'S TALK A LITTLE BIT MORE ABOUT SOME OF THE

12   TRAINING YOU HAVE RECEIVED AT THE CBP ACADEMY.  WAS THAT AT

13   GLYNCO?

14   A.   YES.

15   Q.   AT GLYNCO, YOU SAID IT WAS A 13-WEEK TRAINING PROGRAM,

16   CORRECT?

17   A.   YES.

18   Q.   AND PART OF THAT TRAINING IS IN CAR INSPECTION AT THE PORT

19   OF ENTRY; IS THAT RIGHT?

20   A.   RIGHT.

21   Q.   AND IF MY MEMORY SERVES ME CORRECT, YOU TESTIFIED YOU HAVE

22   WORKED FOR CBP FOR SEVEN YEARS; IS THAT RIGHT?

23   A.   YES.

24   Q.   AND FOR THE LAST FOUR YEARS, YOU'VE BEEN WORKING WITH A

25   CANINE?

1    A.   YES.

2    Q.   THE FIRST THREE YEARS, WERE YOU PRIMARILY INSPECTING CARS

3    AT THE PORT OF ENTRY?

4    A.   NO.   THE FIRST THREE YEARS, I WAS AN OFFICER AT THE

5    SAN DIEGO SEAPORT.

6    Q.   YOU'RE RIGHT.   MY MEMORY FAILED ME, THERE YOU GO.

7         BUT IN THE LAST FOUR YEARS, YOU'VE BEEN WORKING WITH A

8    CANINE; IS THAT RIGHT?

9    A.   YES.   AND THAT'S THE LAB WORK.

10   Q.   AND AS PART OF THOSE RESPONSIBILITIES, YOU INSPECT CARS?

11   A.   YES, I DO.

12   Q.   SO YOU'VE BEEN TRAINED TO LOOK FOR HIDDEN COMPARTMENTS?

13   A.   UH-HUH.

14   Q.   IN CARS, CORRECT?

15   A.   RIGHT.

16   Q.   ANY PLACE WHERE A DRUG MAY BE HIDDEN?

17   A.   RIGHT.

18   Q.   OR WHERE A PERSON COULD BE HIDDEN?

19   A.   RIGHT.

20   Q.   AND YOU CAN SPOT COMPARTMENTS PRETTY WELL?

21   A.   SOMETIMES.

22   Q.   OKAY.   YOU CAN FIND, FOR EXAMPLE, IF SCREWS HAVE

23   SUSPICIOUS SCRATCH MARKS, CORRECT?

24   A.   YES.   FRESH, IF THEY'VE BEEN RECENTLY WASHED.

25   Q.   YOU'RE TRAINED TO LOOK FOR BULGES IN CAR SEATS, FOR

1   EXAMPLE?

2   A.   THAT WOULD BE SOMETHING I WOULD LOOK AT, YEAH.

3   Q.   YOU ALSO MENTIONED YOU'RE TRAINED TO OBSERVE PEOPLE; IS

4   THAT RIGHT?

5   A.   YES.

6   Q.   YOU'RE TRAINED TO LOOK FOR SIGNS OF NERVOUSNESS?

7   A.   YES.

8   Q.   YOU'RE TRAINED TO LOOK AT WHETHER SOMEONE'S HANDS ARE

9   SHAKING, FOR EXAMPLE?

10  A.   YES.

11  Q.   YOU'RE TRAINED TO LOOK AND SEE IF THEY'RE MAKING EYE

12  CONTACT OR NOT?

13  A.   YES.

14  Q.   I'M GOING TO SHOW YOU WHAT HAS ALREADY BEEN ADMITTED AS

15  GOVERNMENT'S EXHIBIT 3.   I'M NOT VERY GOOD WITH THIS ELMO

16  THING, SO YOU'LL HAVE TO FORGIVE ME.

17       THIS IS EXHIBIT 3.   THIS IS THE OTAY MESA PORT OF ENTRY;

18  IS THAT CORRECT?

19  A.   YES, IT IS.

20  Q.   AND YOU TESTIFIED THAT PRE-PRIMARY CONSISTS OF THIS AREA

21  PRETTY MUCH RIGHT AROUND HERE; IS THAT SAFE TO SAY?

22  A.   YES, IT IS.

23  Q.   YOU SAID THERE ARE 13 LANES AT THE PORT OF ENTRY?

24  A.   AT THE OTAY MESA PORT OF ENTRY, YES.

25  Q.   HOW MANY CANINE OFFICERS ARE IN THE PRE-PRIMARY SECTION,

1  AT THE PORT OF ENTRY ON ANY GIVEN DAY?

2  A.  IT DEPENDS.  IT DEPENDS ON HOW CANINE OFFICERS ARE

3  STATIONED THERE ON THAT DAY, ON DUTY.  AT THAT DAY, THERE WERE

4  -- I BELIEVE THERE WERE TWO OF US, TWO TEAMS.  SO TWO OFFICERS,

5  TWO DOGS.

6  Q.  AND THE TWO OF YOU THAT -- THE TWO TEAMS, RATHER, YOU --

7  I'M ASSUMING, AND CORRECT ME IF I'M WRONG, BUT EACH OF YOU KIND

8  OF PATROL FROM LANE TO LANE; IS THAT SAFE TO SAY?

9  A.  RIGHT.  WE WONDER AROUND, USUALLY DEPENDING ON HOW THE

10  WIND IS BLOWING, GIVE THE ADVANTAGE.

11  Q.  OKAY.  WHEN YOU'RE IN THE PRE-PRIMARY SECTION WITH YOUR

12  CANINE, YOU, THE OFFICER, YOU ARE ARMED WITH A FIREARM; IS THAT

13  SAFE TO SAY?

14  A.  YES.

15  Q.  YOU'RE WEARING A UNIFORM OBVIOUSLY, CORRECT?

16  A.  YES, YES.

17  Q.  I'M GOING TO SHOW YOU NOW WHAT HAS BEEN ADMITTED AS

18  EXHIBIT 4.  THIS IS THE PRIMARY SECTION OF THE PORT OF ENTRY;

19  IS THAT SAFE TO SAY?

20  A.  RIGHT.  THAT VEHICLE IS ACTUALLY AT THE PRIMARY BOOTH.

21  Q.  WOULD THIS SECTION, THIS YELLOW POLE RIGHT HERE, IS

22  THIS -- EVERYTHING BEFORE THAT, WOULD THAT BE PRE-PRIMARY?

23  A.  YES.

24  Q.  OKAY, SO WHEN YOU ENCOUNTERED MR. FLORES, HE WAS IN

25  PRE-PRIMARY, CORRECT?

1    A.   RIGHT.

2    Q.   SO HE WAS RIGHT HERE (INDICATING)?

3    A.   HE MIGHT HAVE BEEN RIGHT BEFORE THAT.

4    Q.   BEFORE --

5    A.   LIKE RIGHT WHERE THE POLE IS.  YOU KNOW WHAT I MEAN?

6    Q.   SO HE WAS -- LET'S SAY IT THIS WAY:  WOULD THE FRONT OF

7    HIS CAR, WOULD THE FRONT BUMPER OF THE CAR BE AT THIS YELLOW

8    POLE, BEFORE THE YELLOW POLE, OR AFTER THE YELLOW POLE?

9    A.   PROBABLY HIS FRONT BUMPER WAS RIGHT AFTER, RIGHT NORTH OF

10   IT, UH-HUH.

11   Q.   AND THERE IS REALLY ONLY -- IS THIS SPACE HERE, BETWEEN

12   PRE-PRIMARY AND PRIMARY, IS IT FILLED WITH CARS, OR IS THERE

13   USUALLY TWO OR THREE CAR LANES IN BETWEEN THE PRIMARY GATE AND

14   PRE-PRIMARY SECTION?

15   A.   THEY'RE USUALLY SUPPOSED TO STOP RIGHT THERE, WHERE THAT

16   STOP SIGN IS.  BUT SOMETIMES THEY DON'T.  SO ANY GIVEN DAY,

17   IT'S -- THERE ARE CARS THERE, THERE ARE NOT CARS THERE.  BUT

18   USUALLY THEY STOP RIGHT AT THAT POLE, SO THE FRONT BUMPER WOULD

19   BE NORTH OF IT.  AND THERE SHOULD NOT BE ANOTHER VEHICLE BEFORE

20   THAT, UNTIL WHERE THAT STATION WAGON IS OR MINIVAN.

21   Q.   LET'S TALK A LITTLE BIT ABOUT YOUR CANINE.  ON

22   NOVEMBER 28, YOU WERE WORKING WITH ARIES; IS THAT CORRECT?

23   A.   YES.

24   Q.   IS ARIES A MALE OR FEMALE?

25   A.   HE IS A MALE.

1   Q.   AND HE'S TRAINED TO SMELL CARS AT THE PORT OF ENTRY,

2   CORRECT?

3   A.   RIGHT.

4   Q.   HE'S TRAINED TO SMELL FOR DRUGS?

5   A.   RIGHT.

6   Q.   HE'S TRAINED TO SMELL FOR PEOPLE?

7   A.   CONCEALED HUMANS, YEAH.

8   Q.   IS HE TRAINED TO SMELL FOR EXPLOSIVE DEVICES?

9   A.   NO, HE IS NOT.

10  Q.   HE CAN CERTAINLY SMELL THINGS THAT HUMANS CAN'T SMELL,

11  CORRECT?

12  A.   YES.

13  Q.   THAT'S WHAT MAKES HIM USEFUL TO LAW ENFORCEMENT, RIGHT?

14  A.   RIGHT.

15  Q.   AND I'M ASSUMING HE'S PRETTY GOOD AT WHAT HE DOES?

16  A.   YES.

17  Q.   NOW I'M GOING TO PUT BACK EXHIBIT 3 FOR A MINUTE.  NOW YOU

18  TESTIFIED THAT ON NOVEMBER 28, THERE WERE TWO CANINE UNITS AT

19  THE OTAY MESA PORT OF ENTRY, CORRECT?

20  A.   RIGHT.

21  Q.   AND YOU WERE GOING FROM LANE TO LANE ON THAT DAY, RIGHT?

22  A.   RIGHT.

23  Q.   AND IF I UNDERSTAND THIS CORRECT, THE DOG WOULD SMELL THE

24  CAR IN PRE-PRIMARY, AND IF IT ALERTED, OR NOT ALERTED, AND THEN

25  MOVE ON TO THE NEXT CAR; IS THAT CORRECT?

1    A.   IF THERE IS NO ALERT, HE'LL MOVE ON TO THE NEXT CAR,

2    RIGHT.

3    Q.   IS IT SAFE TO SAY THAT ALMOST EVERY CAR IN PRE-PRIMARY HAS

4    A DOG SNIFF OR SMELL IT?

5    A.   AT OTAY MESA, THERE IS MORE OF A CHANCE BECAUSE THERE ARE

6    A LOT LESS LANES.

7    Q.   SO AT OTAY, THERE IS A PRETTY GOOD CHANCE, IF YOU'RE IN

8    PRE-PRIMARY, THE DOG IS GOING TO BE SMELLING THE CAR?

9    A.   RIGHT.

10   Q.   NOW IN THIS CASE, AFTER ARIES ALERTED -- WELL, STRIKE

11   THAT.

12        IN THIS CASE, YOU CAME ACROSS THE BEETLE, CORRECT?

13   A.   CORRECT.

14   Q.   AND YOU HAD ARIES SMELL THE BEETLE, CORRECT?

15   A.   RIGHT.

16   Q.   AND THAT IS THE STANDARD PROCEDURE?

17   A.   UH-HUH.   WE'RE BASICALLY WALKING AROUND AND GOING --

18   WEAVING IN AND OUT OF THE CARS.

19   Q.   OKAY.   AND ON NOVEMBER 28TH, ARIES ALERTED TO THE BEETLE,

20   RIGHT?

21   A.   YES, HE DID.

22   Q.   YOU DIDN'T DIRECT HIM TO THE GAS TANK SPECIFICALLY, RIGHT?

23   A.   NO.

24   Q.   YOU LET HIM SMELL THE CAR, AND YOU FOLLOWED WHERE HE WENT,

25   RIGHT?

1    A.   RIGHT.

2    Q.   SO IF HE HAD ALERTED SOMEWHERE ELSE, YOU WOULD HAVE

3    GONE -- LET'S SAY, FOR EXAMPLE, HE HAD ALERTED TO THE BUMPER,

4    YOU WOULD HAVE GONE TO THE BUMPER, THE FRONT BUMPER, FOR

5    EXAMPLE?

6    A.   RIGHT.

7    Q.   AND YOU -- OF COURSE, YOU MAKE A NOTE OF WHERE HE ALERTS

8    WHEN HE DOES ALERT?

9    A.   RIGHT.  BECAUSE THAT WILL BE THE FIRST PLACE WE CHECK WHEN

10   WE BRING IT INTO SECONDARY.

11   Q.   SO IN THIS CASE, ONCE ARIES ALERTED TO THE UNDERCARRIAGE

12   OF THE CAR, YOUR ATTENTION FOCUSED ON THE UNDERCARRIAGE OF THE

13   CAR, CORRECT?

14   A.   RIGHT.

15   Q.   ONCE ARIES ALERTED, YOU NOTIFIED AGENT FIGUEROA, CORRECT?

16   A.   YES.

17   Q.   AND YOU TOLD AGENT FIGUEROA THAT ARIES HAD ALERTED,

18   CORRECT?

19   A.   RIGHT.

20   Q.   YOU TOLD AGENT FIGUEROA THAT ARIES HAD ALERTED TO THE

21   UNDERCARRIAGE OF THE CAR?

22   A.   RIGHT.

23   Q.   IT SOUNDED LIKE YOU FOLLOWED THE CAR INTO SECONDARY,

24   CORRECT?

25   A.   RIGHT.  THAT WAS AFTER THE DRIVER HAD ALREADY BEEN TAKEN

1    INTO THE SECURITY OFFICE.

2    Q.   AND AFTER -- YOU WERE PRESENT WHEN THE CAR WAS SEARCHED,

3    CORRECT?

4    A.   FOR MOST OF IT, YEAH.

5    Q.   AFTER THE WHOLE SEARCH OF THE BEETLE HAD BEEN COMPLETED,

6    YOU WENT BACK TO YOUR DUTIES WITH ARIES AND PATROLLED THE

7    PRE-PRIMARY, CORRECT?

8    A.   YES.

9    Q.   AND THAT WAS BASICALLY THE END OF YOUR INVOLVEMENT IN THIS

10   CASE, CORRECT?

11   A.   PRETTY MUCH.

12   Q.   YOU DIDN'T, FOR EXAMPLE, INTERVIEW ANY WITNESSES?

13   A.   NO, NO.

14   Q.   YOU DIDN'T REVIEW PHONE RECORDS?

15   A.   NO, NO.

16   Q.   SUBPOENA ANYBODY?

17   A.   NO.

18   Q.   SUBPOENA RECORDS?

19   A.   NO.

20   Q.   THAT'S NOT WHAT YOU DO, RIGHT?

21   A.   NO.

22          MR. FAKHOURY:  JUST A MINUTE, YOUR HONOR.  THANK YOU,

23   YOUR HONOR.  NOTHING FURTHER.  THANK YOU.

24          THE COURT:  REDIRECT?

25          MS. BOOT:  BRIEFLY, YOUR HONOR.

REDIRECT EXAMINATION

BY MS. BOOT:

Q.   OFFICER COVE, WHEN YOU WRITE A REPORT, WHAT IS YOUR GOAL?

A.   MY GOAL AS THE CANINE OFFICER, AS WAS, IN THIS CASE, IS

BASICALLY WHAT MY ROLE WAS THAT DAY, WHICH WAS, I WAS ROVING ON

PRE-PRIMARY, AND MY DOG ALERTED TO A VEHICLE, AND I CALLED A

CANINE ALERT.  AND HE ALERTED TO --

Q.   WHEN YOU WRITE A REPORT -- I'M SORRY TO INTERRUPT YOU.

A.   THAT IS OKAY.

Q.   WHEN YOU WRITE A REPORT, IS IT AN EXHAUSTIVE ACCOUNT OF

ALL THE DETAILS YOU REMEMBER THAT DAY?

A.   NO.  IT IS THE CANINE DUTIES, WHICH WAS SEEING THE CANINE

ALERT, WHERE HE ALERTED, AND BEING ABLE TO INTERPRET IT.

          MS. BOOT:  NOTHING FURTHER.

          THE COURT:  RECROSS?

          MR. FAKHOURY:  NO, YOUR HONOR.  THANK YOU.

          THE COURT:  ALL RIGHT, THANK YOU.  YOU MAY STEP DOWN.

     PLEASE CALL YOUR NEXT WITNESS.

          MR. CONOVER:  YOUR HONOR, THE UNITED STATES CALLS

CUSTOMS AND BORDER PROTECTION OFFICER SANDRA FIGUEROA TO THE

STAND.

                    (WITNESS SWORN.)

          THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

RECORD, SPELLING YOUR LAST NAME.

          THE WITNESS:  SANDRA FIGUEROA, S-A-N-D-R-A,

```
 1    F-I-G-U-E-R-O-A.

 2                        DIRECT EXAMINATION

 3    BY MR. CONOVER:

 4    Q.   OFFICER FIGUEROA, WHERE ARE YOU EMPLOYED?

 5    A.   I'M EMPLOYED WITH CUSTOMS AND BORDER PROTECTION.

 6    Q.   AND HOW LONG HAVE YOU WORKED FOR CUSTOMS AND BORDER

 7    PROTECTION?

 8    A.   THIRTEEN YEARS.

 9    Q.   AND WHAT DID YOU DO PRIOR TO YOUR TIME WITH CUSTOMS AND

10    BORDER PROTECTION?

11    A.   PRIOR TO THAT, I WAS WORKING WITH CORRECTIONS AND JUVENILE

12    HALL.  I WAS WORKING SECURITY.

13    Q.   AND IN YOUR TIME WORKING CORRECTIONS AND JUVENILE HALL AND

14    DURING YOUR TIME AND PREPARATION TO BECOME A CUSTOMS AND BORDER

15    PROTECTION OFFICER, DID YOU RECEIVE ANY TRAINING?

16    A.   I WENT TO SCHOOL.  I TOOK MY BACHELOR'S DEGREE AT

17    SAN DIEGO STATE UNIVERSITY.

18    Q.   WHAT WAS YOUR BACHELOR'S DEGREE IN?

19    A.   CRIMINAL JUSTICE.

20    Q.   AND AFTER YOU RECEIVED YOUR BACHELOR' DEGREE, DID YOU

21    RECEIVE ANY TRAINING TO COME TO WORK AT THE CORRECTIONAL

22    FACILITY?

23    A.   YES.

24    Q.   WHAT SORT OF TRAINING DID YOU RECEIVE?

25    A.   THEY TRAIN US ON HOW TO LOOK AT PEOPLE'S BEHAVIOR, DOING
```

1    HANDCUFFING, PROTECTING YOURSELF FROM THEIR BEHAVIOR OR ANY

2    FIGHTS.

3    Q.   AND WHEN YOU CAME TO WORK FOR CUSTOMS AND BORDER

4    PROTECTION, DID YOU GO AND ATTEND AN ACADEMY?

5    A.   YES, SIR.

6    Q.   WERE YOU TRAINED DURING THAT ACADEMY ON HOW TO INTERACT

7    WITH INDIVIDUALS?

8    A.   YES, SIR.

9    Q.   HOW TO DETERMINE BASED ON INDIVIDUAL'S BEHAVIOR AND

10   DEMEANOR, THINGS ABOUT THEM?

11   A.   YES.

12   Q.   ALL RIGHT.  SO 13 YEARS AGO, YOU CAME TO WORK FOR CUSTOMS

13   AND BORDER PROTECTION?

14   A.   YES, SIR.

15   Q.   AND WHAT DO YOU DO AT CUSTOMS AND BORDER PROTECTION?

16   A.   I'M AN OFFICER.  AND OUR MISSION IS TO LOOK FOR WEAPONS OF

17   MASS DESTRUCTION, TERRORISM, ILLEGAL ALIENS COMING INTO THIS

18   COUNTRY AND NARCOTICS AND MONEY.

19   Q.   DO YOU TESTIFY REGULARLY?

20   A.   NO, SIR.

21   Q.   IS THIS YOUR FIRST TIME?

22   A.   THIS IS MY SECOND TIME.

23   Q.   SECOND TIME?  AND ARE YOU A LITTLE NERVOUS TODAY?

24   A.   YES.

25   Q.   THAT'S OKAY.  THAT'S ALL RIGHT.  JUST RELAX.  CAN YOU

1    DESCRIBE YOUR RESPONSIBILITIES AT THE PORT OF ENTRY WITH

2    REGARDS TO INSPECTION OF INDIVIDUALS WANTING TO COME FROM

3    MEXICO INTO THE UNITED STATES.

4    A.   MY RESPONSIBILITIES IS TO TAKE DECLARATIONS FROM THE

5    PEOPLE COMING FROM MEXICO, OR ANY OTHER COUNTRY, INTO THE U.S.

6    Q.   SORRY TO INTERRUPT, WHAT DO YOU MEAN BY "DECLARATIONS"?

7    WHAT DOES THAT MEAN?

8    A.   ASKING THEM IF THEY BRING ANYTHING WITH THEM.

9    Q.   GENERALLY, WHERE DO YOU WORK WHEN YOU'RE TAKING THOSE

10   DECLARATIONS?

11   A.   AT THE PRIMARY BOOTHS.

12   Q.   CAN YOU SEE THE PROJECTED EXHIBIT THERE?

13   A.   YES.

14   Q.   DO YOU RECOGNIZE THIS?

15   A.   THAT'S THE OTAY MESA PORT OF ENTRY.

16          MR. CONOVER:  YOUR HONOR, MAY I APPROACH THE WITNESS?

17          THE COURT:  YES.

18          MR. CONOVER:  THANK YOU.

19   BY MR. CONOVER:

20   Q.   USING THIS LASER POINTER VERY SPARINGLY, COULD YOU PLEASE

21   POINT OUT WHERE THE PRIMARY BOOTHS ARE AND WHERE THE LINE IS

22   FROM MEXICO TO THE UNITED STATES.

23   A.   THAT'S THE -- COMING FROM MEXICO, RIGHT THERE, IT'S OUR

24   PRIMARY BOOTHS, (INDICATING).

25   Q.   WHERE IS THE BORDER OF MEXICO AND THE UNITED STATES?

1    A.   THE BORDER IS RIGHT THERE, THAT AREA, THAT IS MEXICO

2    OUTSIDE (INDICATING).

3    Q.   ALL RIGHT.   THAT'S MEXICO UP THERE.

4         WERE YOU WORKING ON SATURDAY, NOVEMBER 28, OF 2009?

5    A.   YES.

6    Q.   AND WHAT WERE YOU WORKING -- WHAT WERE YOU DOING THAT DAY?

7    A.   I WAS WORKING AT THE OTAY MESA PORT OF ENTRY, AT GATE 12.

8    Q.   IS THAT THE PRIMARY GATE YOU'RE REFERRING TO?

9    A.   PRIMARY GATE.

10   Q.   I'M SHOWING YOU WHAT HAS BEEN PREVIOUSLY MARKED AND

11   ADMITTED.   IS THIS HERE, WHAT I'M SHOWING YOU, AN ACCURATE

12   PHOTOGRAPH OF ONE OF THE PRIMARY BOOTHS AT THE OTAY MESA PORT

13   OF ENTRY?

14   A.   YES, SIR.

15   Q.   SO YOU WERE MANNING ONE OF THOSE BOOTHS?

16   A.   YES.

17   Q.   AND IT WAS BOOTH NO. 12?

18   A.   YES.

19   Q.   WHERE IS BOOTH NO. 12 IN RELATION TO ALL THE OTHER BOOTHS

20   AT THE OTAY MESA PORT OF ENTRY?   COULD YOU POINT IT OUT THERE

21   FOR THE LADIES AND GENTLEMEN OF THE JURY.

22   A.   ABOUT RIGHT THERE (INDICATING).

23   Q.   SO IT'S ALMOST THE FURTHEST ONE ALL THE WAY TO THE RIGHT?

24   A.   YES.

25   Q.   AND IF YOU WERE ENTERING INTO THE UNITED STATES, AND YOU

1  WANTED TO SPEND THE LEAST AMOUNT OF TIME POSSIBLE IN

2  PRE-PRIMARY, WHAT LANE WOULD YOU CHOOSE?

3  A.  I WOULD CHOOSE 11, 12, AND 13.

4          THE COURT:  WAIT, I'M SORRY --

5          MR. FAKHOURY:  OBJECTION, SPECULATION.

6          THE COURT:  OVERRULED.

7  BY MR. CONOVER:

8  Q.  IF YOU WERE COMING INTO THE UNITED STATES, AND YOU WANTED

9  TO SPEND THE LEAST AMOUNT OF TIME IN PRIMARY AS POSSIBLE, WHAT

10  LANES WOULD YOU CHOOSE?

11  A.  I WOULD CHOOSE 11, 12, AND 13.

12  Q.  WHY IS THAT?

13  A.  BECAUSE THAT LANE BECOMES ONE LANE FROM MEXICO, THE

14  FURTHEST ONE, BECOMES VERY FASTER.  AND IT TURNS INTO THREE

15  LANES, WHEN ALL THE GATES ARE OPEN.  AND AT THAT TIME, THEY

16  WERE ALL OPEN.

17  Q.  WHAT DO YOU MEAN "VERY FASTER"?  WHAT HAPPENS AT THOSE

18  LANES?

19  A.  BECAUSE YOU HAVE ONE LANE IN MEXICO THAT IS TURNING INTO

20  THREE AS THEY APPROACHING THE U.S.A., PRE-PRIMARY.

21  Q.  SO THOSE THREE LANES THERE THAT DON'T HAVE ANY CARS, IS

22  THAT BECAUSE IN THIS PHOTOGRAPH, THEY WERE CLOSED?

23  A.  THEY WERE CLOSED.

24  Q.  ON SEPTEMBER 28, OF 2009, WERE THOSE LANES OPEN?

25  A.  YES, SIR.

1    Q.   SO YOU'RE SAYING IF YOU WERE IN THAT VERY FARTHEST LANE,

2    YOU WOULD -- THAT'S THE LANE YOU WOULD HAVE HAD TO HAVE BEEN

3    IN, YOUR BOOTH, WHICH IS BOOTH 12?

4    A.   YES.

5    Q.   AND THAT MEANS YOU WOULD HAVE SPENT A SHORTER AMOUNT OF

6    TIME IN PRE-PRIMARY?

7    A.   SHORT --

8              MR. FAKHOURY:  OBJECTION.  LEADING.

9              THE WITNESS:  SHORT, VERY SHORT.

10             THE COURT:  OVERRULED.

11   BY MR. CONOVER:

12   Q.   VERY SHORT.  WHY IS THAT?

13   A.   BECAUSE LIKE I MENTIONED, ONE LANE FROM MEXICO BECOMES

14   ONE, AND THE WAIT TIME AT THAT TIME WAS BETWEEN 25 AND 30

15   MINUTES.

16   Q.   SO IF YOU WOULD HAVE CHOSEN THESE OTHER LANES, HERE, HERE,

17   HERE, HERE, HERE, THOSE LANES WOULD HAVE -- YOU WOULD HAVE

18   SPENT MORE TIME OR LESS TIME?

19   A.   MORE TIME.

20   Q.   ALL RIGHT.  THANK YOU.

21        AND ON THAT DAY, DID YOU COME IN CONTACT WITH A SILVER

22   BEETLE?

23   A.   YES, SIR.

24   Q.   DO YOU RECOGNIZE THIS PHOTOGRAPH I'M SHOWING YOU NOW?

25   A.   YES.

1    Q.   HOW DO YOU RECOGNIZE THAT?

2    A.   BY THE VEHICLE AND THE PLATE.

3    Q.   IS THAT THE SILVER BEETLE YOU CAME IN CONTACT WITH THAT

4    DAY?

5    A.   YES.

6    Q.   TELL ME WHAT WAS THE FIRST THING YOU SAW ON THAT DAY WITH

7    REGARD TO THAT BEETLE.

8    A.   BEFORE APPROACHING MY LANE, THIS VEHICLE WAS LIKE A -- ONE

9    CAR BEHIND, FROM MY BOOTH, AND HE WAS NEXT TO COME.

10   Q.   SO IT WAS -- YOU WERE -- IT WAS BACK DOWN IN THIS AREA

11   HERE; IS THAT CORRECT?

12   A.   YES, HE WAS RIGHT HERE (INDICATING).

13   Q.   AND WHAT DID YOU NOTICE IT?

14   A.   I NOTICED THAT THE CANINE OFFICER WAS GOING AROUND THAT

15   VEHICLE, AND THE CANINE DOG SEEMED TO BE VERY INTERESTED ON THE

16   REAR SIDE OF THIS VEHICLE.

17   Q.   WAS THE CANINE APPROACHING THIS VEHICLE?

18   A.   THE CANINE -- WHEN I LOOKED TO SEE, SHE WAS ALREADY ON THE

19   VEHICLE, WITH HER DOG, LOOKING VERY INTERESTED.

20   Q.   WAS THAT OFFICER COVE?

21   A.   YES, OFFICER COVE.

22   Q.   AND HER DOG?

23   A.   YES.

24   Q.   WHAT DID THE DRIVER OF THAT VEHICLE DO?

25   A.   SUDDENLY, WHEN HE -- HE NEVER WAITED.  NEVER SHOWED ANY

1  RESPECT FOR THE CANINE TO FINISH THE OPERATION THEY WERE DOING.

2  AND SUDDENLY, HE TAKES OFF VERY QUICK TO GET TO MY LANE.

3  AND --

4  Q.   WHAT DO YOU MEAN BY TAKES OFF VERY QUICK?

5  A.   HE SEEMED LIKE HE WAS TRYING TO RUN AWAY FROM THE DOG.

6        MR. FAKHOURY:  OBJECTION.  SPECULATION.  MOVE TO

7  STRIKE.

8        THE COURT:  SUSTAINED.

9     LADIES AND GENTLEMEN, DISREGARD THAT LAST COMMENT.

10 BY MR. CONOVER:

11 Q.   WITHOUT TALKING ABOUT WHAT THE DEFENDANT MAY HAVE THOUGHT

12 IN HIS MIND, WHAT DID YOU SEE THE DEFENDANT DO?

13 A.   I NOTICED THAT HE TOOK OFF VERY QUICK.  AND AT THE SAME

14 TIME, HE IS LOOKING VERY NERVOUS AND LOOKING THROUGH THE MIRROR

15 AS HE'S DRIVING TO APPROACH MY LANE.

16        MR. FAKHOURY:  OBJECTION.  SPECULATION.  MOVE TO

17 STRIKE.

18        THE COURT:  NO, OVERRULED.

19 BY MR. CONOVER:

20 Q.   WERE YOU ABLE TO SEE THE INDIVIDUAL DRIVING THAT CAR?

21 A.   YES, SIR.

22 Q.   AND YOU WERE ABLE TO SEE THEM DIRECTLY?

23 A.   YES.

24 Q.   IF YOU SAW THAT PERSON IN THE COURTROOM TODAY, WOULD YOU

25 BE ABLE TO RECOGNIZE THEM?

1    A.   YES, SIR.

2    Q.   DO YOU SEE THAT PERSON IN THE COURTROOM?

3    A.   YES.

4    Q.   COULD YOU PLEASE IDENTIFY THAT PERSON BY AN ITEM OF

5    CLOTHING -- WHERE THEY'RE SEATED AND BY AN ITEM OF CLOTHING

6    THEY'RE WEARING.

7    A.   HE IS SITTING --

8           THE COURT:  DON'T FLASH THAT.

9           THE WITNESS:  I WON'T.

10          THE COURT:  OKAY.

11          THE WITNESS:  HE'S SITTING ON THE FAR END OF THAT

12   SIDE OF THE TABLE.  HE'S WEARING WHAT LOOKS LIKE A GRAY SUIT, A

13   TIE WITH YELLOW AND BLUE, AND A BLUE SHIRT.

14          MR. CONOVER:  YOUR HONOR, MAY THE RECORD REFLECT THAT

15   THE WITNESS HAS IDENTIFIED THE DEFENDANT?

16          THE COURT:  YES.

17          MR. CONOVER:  THANK YOU.

18   BY MR. CONOVER:

19   Q.   AND WHAT WAS THE FIRST THING YOU SAW WHEN YOU SAW THE

20   DEFENDANT'S FACE?

21   A.   HE GETS TO MY BOOTH, AND HE EXTENDS HIS LEFT ARM TO HAND

22   ME THE PASSPORT.  AND AT THE SAME TIME, HE'S DECLARING HIS

23   CITIZENSHIP BEFORE EVEN COMING TO A COMPLETE STOP.

24   Q.   AND PRIOR TO HIM EVER DRIVING UP TO YOUR LANE, DID YOU --

25   WERE YOU ABLE TO VIEW THE DEFENDANT?

1    A.   YES, SIR.

2    Q.   WHAT WERE YOU ABLE TO SEE HIM DOING?

3    A.   I COULD SEE THAT HE LOOKED VERY AGITATED AND WORRIED ABOUT

4    LOOKING THROUGH THE MIRROR, GOING BACK AND FORTH, LOOKING BACK.

5    Q.   DID YOU HAVE ANY INDICATION WHAT IT WAS HE WAS LOOKING AT?

6    A.   HE WAS LOOKING AT THE DOG.

7           MR. FAKHOURY:  OBJECTION.  SPECULATION.

8           THE COURT:  YEAH, SUSTAINED.

9           MR. FAKHOURY:  MOVE TO STRIKE.

10          THE COURT:  DISREGARD THAT LAST COMMENT, LADIES AND

11   GENTLEMEN.

12   BY MR. CONOVER:

13   Q.   YOU JUST SAW HIM LOOKING IN THE REARVIEW MIRRORS?

14   A.   YES.  I SAW HIM, BUT HE LOOKED -- HE SEEMED VERY WORRIED

15   TO ME.

16   Q.   WHAT DID -- WHAT HAPPENED NEXT AFTER YOU SAW HIM LOOKING

17   IN THE REARVIEW MIRROR?

18   A.   HE APPROACHES MY LANE, HE EXTENDS HIS ARM, HE HANDS ME HIS

19   U.S. PASSPORT.  AND AT THE SAME TIME, HE DECLARES HIS

20   CITIZENSHIP BEFORE COMING TO A COMPLETE STOP, AND KEEPS HIS ARM

21   EXTENDED.

22   Q.   SO BEFORE HE EVEN STOPPED THE VEHICLE, HIS ARM WAS OUT

23   WITH HIS PASSPORT?

24   A.   YES, SIR.

25          MR. FAKHOURY:  OBJECTION.  ASKED AND ANSWERED.

```
1    COUNSEL IS TESTIFYING.

2              THE COURT:  OVERRULED.

3    BY MR. CONOVER:

4    Q.   AND WAS THERE ANYTHING DIFFERENT TO YOU THAN THE NORMAL

5    MOTORING PUBLIC ABOUT THE WAY THE DEFENDANT DROVE FROM THE

6    PRE-PRIMARY AREA TO YOUR BOOTH?

7              MR. FAKHOURY:  OBJECTION.  SPECULATION AS TO WHAT THE

8    "NORMAL MOTORING PUBLIC" WOULD DO.

9              THE COURT:  OVERRULED.

10             THE WITNESS:  YES, SIR.

11   BY MR. CONOVER:

12   Q.   AND YOU'VE BEEN WORKING AT THE PORT OF ENTRY FOR HOW MANY

13   YEARS?

14   A.   THIRTEEN YEARS.

15   Q.   HAVE YOU BECOME FAMILIAR WITH WHAT NORMAL MOTORING PUBLIC

16   INDIVIDUALS DO AT THE PORT OF ENTRY?

17   A.   YES.

18   Q.   HAVE YOU INSPECTED THOUSANDS THE PEOPLE?

19   A.   THOUSANDS.

20             MR. FAKHOURY:  OBJECTION.  VOUCHING.

21             THE WITNESS:  YES, SIR.

22             THE COURT:  NO, OVERRULED.

23   BY MR. CONOVER:

24   Q.   SO WHAT WAS DIFFERENT ABOUT THE WAY THE DEFENDANT

25   APPROACHED YOUR BOOTH?
```

1   A.   THE DIFFERENCE -- AGAIN, WHEN I NOTICED THAT MANY OF THE

2   GOOD CITIZENS WILL ALWAYS HAVE RESPECT FOR THE OFFICERS DOING

3   PRE-PRIMARY WITH THEIR CANINE.  AND THEY ALWAYS WAIT UNTIL THEY

4   FINISH WITH THE DOG GOING AROUND THEIR VEHICLE.

5            MR. FAKHOURY:  OBJECTION.  MOVE TO STRIKE.

6   COMPLETELY IMPROPER.

7            THE COURT:  NO, OVERRULED.  SHE'S TESTIFYING TO HER

8   EXPERIENCE.

9   BY MR. CONOVER:

10  Q.   AND AFTER YOU SAW THE DEFENDANT LOOK IN THE REARVIEW

11  MIRRORS, HE DROVE UP TO YOUR LANE; IS THAT CORRECT?

12  A.   YES.  HE TOOK OFF VERY QUICKLY.

13  Q.   AND WHAT HAPPENED ONCE HE APPROACHED YOUR BOOTH?

14  A.   WHEN HE APPROACHED MY BOOTH, LIKE I MENTIONED, HE KEPT HIS

15  ARM EXTENDED, DECLARED HIS CITIZENSHIP AT THE SAME TIME, AND I

16  NOTICED THAT -- WITH MY EXPERIENCE, MANY PEOPLE, THEY ALWAYS

17  HAND YOU THE PASSPORT, ASSUMING THAT YOU FIGURE THAT THEY'RE

18  U.S. CITIZENS BY GIVING YOU THEIR PASSPORT.

19       BUT THE WAY HE WAS ACTING, HE LOOKED VERY AGITATED AND

20  IMPATIENT, TO JUST WAITING FOR ME TO FINISH, SO THAT HE CAN

21  TAKE OFF.

22  Q.   AND WHY DO YOU SAY "IMPATIENT"?  WHAT WAS IT ABOUT THAT

23  SITUATION?

24  A.   IMPATIENT BECAUSE HE WAS -- AT THE SAME TIME HE'S

25  EXTENDING HIS ARM, WAITING FOR ME TO HANDLE HIS PASSPORT AND

1    LOOK THROUGH THE MIRRORS, WORRIED ABOUT THE DOG.

2    Q.   DID HE KEEP HIS ARM EXTENDED?

3    A.   YES, HE DID.

4    Q.   WAITING FOR YOU TO RETURN THE PASSPORT?

5    A.   YES.

6    Q.   I'D LIKE YOU NOW TO TURN TO GOVERNMENT'S EXHIBIT 7 IN THAT

7    BINDER.

8            (GOVERNMENT'S EXHIBIT 7 MARKED FOR IDENTIFICATION.)

9    BY MR. CONOVER:

10   Q.   DO YOU RECOGNIZE THAT EXHIBIT?

11   A.   YES, SIR.

12   Q.   WHAT IS THAT EXHIBIT?

13   A.   THIS IS A U.S. PASSPORT.

14   Q.   WHOSE PASSPORT IS THAT?

15   A.   GILBERT FLORES.

16   Q.   IS THAT AN ACCURATE COPY OF THE PASSPORT THAT THE

17   DEFENDANT HANDED TO YOU THAT DAY?

18   A.   YES, SIR.

19   Q.   ALL RIGHT.

20           MR. CONOVER:  YOUR HONOR, MOVE TO ADMIT AND TO

21   PUBLISH?

22           THE COURT:  ANY OBJECTION?

23           MR. FAKHOURY:  NO, YOUR HONOR.

24           THE COURT:  ALL RIGHT.  IT WILL COME IN.

25           (GOVERNMENT'S EXHIBIT 7 RECEIVED INTO EVIDENCE.)

1    BY MR. CONOVER:

2    Q.   CAN YOU DESCRIBE HOW IT IS THAT THE DEFENDANT WENT ABOUT

3    GIVING YOU THIS PASSPORT.

4    A.   THE PASSPORT WAS FOLDED, AS HE EXTENDED HIS ARM.

5    Q.   WAS THAT BEFORE OR AFTER THE CAR HAD COME TO A STOP?

6    A.   BEFORE.

7    Q.   SO THE CAR WAS STILL MOVING WHEN --

8    A.   THE CAR WAS STILL MOVING WHEN HE'S HANDING ME THE

9    PASSPORT, AND THEN HE CAME TO A COMPLETE STOP AFTER.

10   Q.   DID YOU NOTICE ANYTHING ELSE ABOUT THE VEHICLE ITSELF?

11   DID YOU SEE ANY PERSONAL ITEMS?

12   A.   NO.  I DIDN'T SEE ANY PERSONAL BELONGINGS INSIDE THE

13   VEHICLE.

14   Q.   DID YOU SEE ANY OVERNIGHT BAGS?

15   A.   NO.

16   Q.   ALL RIGHT.  YOUR EXPERIENCE WITH THE DEFENDANT, EVERYTHING

17   THAT SURROUNDED IT, WOULD THAT, BY ITSELF, HAVE BEEN SUFFICIENT

18   FOR YOU TO REFER THE VEHICLE TO SECONDARY?

19   A.   YES, SIR.

20   Q.   EVEN WITHOUT A PRIMARY CANINE ALERT?

21   A.   YES, SIR.  YES.

22   Q.   WHY IS THAT?

23   A.   BECAUSE THE LANE WAS GOING FAST, AND WITH MY EXPERIENCE,

24   I'M ASSUMING THAT HE HASN'T WAITED A LONG TIME ON THE LINE.

25   SINCE THE LINE WAS PROBABLY -- IT WAS 25 TO 30 MINUTES WAIT.

1   AND HE LOOKED VERY, YOU KNOW, IMPATIENT TO GET OUT OF THERE.

2   AND I DO LIKE TO HAVE RESPECT FROM PASSENGERS COMING FROM

3   THERE, SO I CAN DO MY COMPLETE INSPECTION AND AVOID ANYTHING

4   ILLEGAL GOING INTO THIS COUNTRY.

5            MR. FAKHOURY:  OBJECTION.  IMPROPER.  403.

6            THE COURT:  OVERRULED.

7   BY MR. CONOVER:

8   Q.  DID YOU ASK THE DEFENDANT IF HE OWNED THE VEHICLE?

9   A.  YES, SIR.

10  Q.  WHAT WAS HIS RESPONSE?

11  A.  HE STATED HE OWNED THE VEHICLE SINCE 2002.

12  Q.  WERE YOU TOLD BY AGENT COVE THAT HER DOG HAD ALERTED TO

13  THE VEHICLE?

14  A.  YES, YES.

15  Q.  AT THAT POINT, DID YOU TAKE THE DEFENDANT AND TELL HIM TO

16  TURN OFF THE KEYS?

17  A.  YES, SIR.  AT THAT TIME, BECAUSE I ALSO NOTICED THAT HER

18  CANINE WAS VERY INTERESTED.  I HAD TO SECURE THE VEHICLE, SO I

19  HAD HIM TURN OFF HIS ENGINE AND TO HAND ME THE KEYS.

20  Q.  WAS THE DEFENDANT TAKEN INTO CUSTODY AT THAT POINT?

21  A.  YES, SIR.  WE CALLED FOR ASSISTANCE AND HE WAS HANDCUFFED

22  AND TAKEN TO THE SECURITY OFFICE ON FOOT.

23  Q.  COULD YOU DESCRIBE BRIEFLY THE TONE OF VOICE AND THE WAY

24  THE DEFENDANT, WHEN HE SAID UNITED STATES CITIZEN TO YOU.

25  A.   IT WAS IN A QUICK MANNER.  YOU KNOW, JUST, I'LL GIVE YOU

1   MY PASSPORT, BUT AT THE SAME TIME, I'M A U.S. CITIZEN, AND I

2   GOT THE IMPRESSION THAT HE'S VERY IN A HURRY.

3           MR. FAKHOURY:  OBJECTION.  SPECULATION.

4           THE COURT:  OVERRULED.

5           MR. CONOVER:  NOTHING FURTHER, YOUR HONOR.

6           THE COURT:  THANK YOU.  MR. FAKHOURY.

7           MR. FAKHOURY:  THANK YOU, YOUR HONOR.

8                        CROSS-EXAMINATION

9   BY MR. FAKHOURY:

10  Q.   GOOD AFTERNOON, AGENT FIGUEROA.

11  A.   GOOD AFTERNOON.

12  Q.   YOU WROTE A REPORT IN THIS CASE; IS THAT CORRECT?

13  A.   YES, I DID.

14  Q.   YOU WROTE ONE REPORT?

15  A.   ONE.

16  Q.   DID YOU REVIEW ANY OTHER REPORTS BEFORE YOUR TESTIMONY

17  TODAY?

18  A.   YES, SIR.

19  Q.   WHICH REPORTS DID YOU REVIEW?

20  A.   THE ONE I WROTE.

21  Q.   OTHER THAN THAT REPORT, DID YOU REVIEW ANY OTHER REPORTS?

22  A.   NO, SIR.

23  Q.   OKAY.  LET'S TALK ABOUT YOUR REPORT.  YOU TESTIFIED THAT

24  YOU HAVE A BACHELOR'S DEGREE IN CRIMINAL JUSTICE --

25  A.   YES, SIR.

Q.   -- IS THAT CORRECT?

     AS PART OF THAT COLLEGE WORK, DID YOU TAKE ANY COURSES ON

REPORT WRITING?

A.   NO, SIR.

Q.   OKAY.  YOU ALSO HAVE BEEN WORKING WITH CUSTOMS AND BORDER

PROTECTION FOR 13 YEARS; IS THAT CORRECT?

A.   YES, SIR.

Q.   AND I'M ASSUMING YOU WENT TO THE ACADEMY IN GLYNCO,

GEORGIA; IS THAT CORRECT?

A.   YES, SIR, THAT IS CORRECT.

Q.   IT IS A 13-WEEK COURSE?

A.   WHEN I WAS THERE, IT WAS 11 WEEKS.  I'M A LEGACY CUSTOMS.

Q.   THEY MADE IT LONGER NOW?

A.   YES.

Q.   BUT AT THE TIME YOU WENT, IT WAS 11 WEEKS.  AND PART OF

THAT TRAINING INCLUDED REPORT WRITING; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND PART OF THAT TRAINING, THEY TRAINED YOU TO WRITE

THOROUGH REPORTS, CORRECT?

A.   CORRECT.

Q.   TO INCLUDE IMPORTANT DETAILS?

A.   CORRECT.

Q.   TO BE ACCURATE?

A.   CORRECT.

Q.   BECAUSE, OBVIOUSLY, YOUR REPORTS WILL BE RELIED UPON

1  LATER, CORRECT?

2  A.  CORRECT.

3  Q.  A SUPERVISOR IS GOING TO READ THAT REPORT, RIGHT?

4  A.  RIGHT.

5  Q.  THE PROSECUTOR IS GOING TO USE THAT REPORT, CORRECT; IS

6  THAT CORRECT?

7  A.  YEAH.

8  Q.  OKAY.  DEFENSE ATTORNEYS ARE GOING TO USE THAT REPORT?

9  A.  CAN YOU REPEAT YOUR QUESTION.

10  Q.  SURE.  DEFENSE ATTORNEYS MAY USE THE REPORTS, MAY READ THE

11  REPORTS THAT YOU WRITE AND RELY ON THEM; IS THAT CORRECT?

12  A.  CORRECT.

13  Q.  YOU, YOURSELF, MAY RELY ON YOUR OWN REPORTS, RIGHT?

14  A.  CORRECT, IN MY MIND, TOO.

15  Q.  ALL RIGHT.  AND YOU, FOR EXAMPLE, YOU TESTIFIED THAT YOU

16  REVIEWED YOUR REPORT BEFORE YOUR TESTIMONY TODAY, RIGHT?

17  A.  CORRECT.

18  Q.  NOW YOU CAN GO BACK AND FIX YOUR REPORT IF THERE IS

19  SOMETHING WRONG WITH THEM, RIGHT?

20  A.  RIGHT.

21  Q.  YOU CAN ADD THINGS THAT YOU REMEMBER LATER, RIGHT?

22  A.  RIGHT.

23  Q.  YOU CAN WRITE A SECOND REPORT IF YOU REMEMBERED SOMETHING

24  DIFFERENTLY, RIGHT?

25  A.  I CAN EITHER WRITE IT OR I CAN COME AND SAY WHAT MY

1    MIND --

2    Q.   OKAY, BUT YOU COULD WRITE ANOTHER REPORT IF YOU WANTED TO?

3    A.   I COULD.

4    Q.   AND YOUR REPORT IS SUBMITTED TO A SUPERVISOR, RIGHT?

5    A.   CORRECT.

6    Q.   OKAY.  NOW YOUR TESTIMONY TODAY WAS THAT MR. FLORES TOOK

7    OFF QUICKLY FROM PRE-PRIMARY TO GET INTO THE PRIMARY BOOTH --

8    A.   YES.

9    Q.   -- IS THAT CORRECT?

10   A.   YES.

11   Q.   THAT'S NOT IN YOUR REPORT, RIGHT?

12   A.   I WROTE WHAT WAS BASIC AND WHAT HAPPENED AT THAT TIME.

13   Q.   BUT THAT FACT THAT YOU TESTIFIED ABOUT TODAY WAS NOT IN

14   YOUR REPORT, RIGHT?

15   A.   BUT IT'S STILL FRESH IN MY MIND, SIR.

16   Q.   IT'S NOT IN YOUR REPORT?

17   A.   IT'S NOT IN MY REPORT, BUT I WROTE BASIC STUFF.

18   Q.   YOU ALSO TESTIFIED TODAY THAT YOU NOTICED THAT THE CANINE

19   WAS INTERESTED IN THE CAR, CORRECT?

20   A.   CORRECT.

21   Q.   AND ALSO THAT WAS NOT IN YOUR REPORT EITHER, RIGHT?

22   A.   PRIOR TO THE LANE APPROACHING, THE DOG HAD ALERTED TO THE

23   VEHICLE.

24   Q.   MY QUESTION WAS, THAT FACT WAS NOT WRITTEN IN YOUR REPORT,

25   RIGHT?

1   A.   THAT CANINE ALERTED?

2   Q.   LET ME REPHRASE IT.

3        YOUR TESTIMONY TODAY IS THAT YOU SAW THE CANINE WAS

4   INTERESTED IN THE SILVER BEETLE; IS THAT YOUR TESTIMONY THAT

5   YOU GAVE TODAY?

6   A.   THAT IS CORRECT.

7   Q.   THAT FACT WAS NOT WRITTEN IN YOUR REPORT, RIGHT?

8   A.   IT WASN'T.

9   Q.   OKAY.  YOUR TESTIMONY TODAY WAS THAT MR. FLORES EXTENDED

10  HIS LEFT ARM OUT OF THE CAR WITH THE PASSPORT.  DO YOU REMEMBER

11  THAT TESTIMONY?

12  A.   YES, I DID.

13  Q.   THAT FACT WAS NOT WRITTEN IN YOUR REPORT, WAS IT?

14  A.   NO.  BUT IT'S FRESH IN MY MIND.

15  Q.   BUT IT WASN'T WRITTEN IN YOUR REPORT, WAS IT?

16  A.   NO, IT WASN'T.

17  Q.   YOUR TESTIMONY TODAY WAS THAT MR. FLORES DECLARED HE WAS A

18  CITIZEN BEFORE HE CAME TO A STOP; IS THAT RIGHT?

19  A.   THAT HE WAS A CITIZEN.

20  Q.   RIGHT.  THAT HE TOLD YOU THAT -- WHEN HE HANDED YOU THE

21  PASSPORT BEFORE HIS CAR HAD COME TO A COMPLETE STOP?

22  A.   CORRECT.

23  Q.   HE SAID THAT HE WAS A CITIZEN?

24  A.   A UNITED STATES CITIZEN.

25  Q.   OKAY.  THAT WAS YOUR TESTIMONY TODAY, RIGHT?

1    A.   CORRECT.

2    Q.   THAT FACT WAS NOT WRITTEN IN YOUR REPORT, RIGHT?

3    A.   RIGHT.

4    Q.   YOUR TESTIMONY TODAY IS THAT MR. FLORES LOOKED AGITATED,

5    CORRECT?

6    A.   CORRECT.

7    Q.   THAT FACTOR WASN'T WRITTEN IN YOUR REPORT, RIGHT?

8    A.   THAT'S CORRECT.

9    Q.   YOUR TESTIMONY TODAY WAS THAT MR. FLORES LOOKED WORRIED,

10   RIGHT?

11   A.   CORRECT.

12   Q.   AND THAT WASN'T WRITTEN IN YOUR REPORT?

13   A.   CORRECT.

14   Q.   YOUR TESTIMONY TODAY WAS THAT HE KEPT HIS ARM EXTENDED,

15   CORRECT?

16   A.   CORRECT.

17   Q.   AND THAT FACT WASN'T WRITTEN IN YOUR REPORT, RIGHT?

18   A.   CORRECT.

19   Q.   YOUR TESTIMONY TODAY WAS THAT HE LOOKED IMPATIENT, RIGHT?

20   A.   RIGHT.

21   Q.   AND THAT FACT WASN'T WRITTEN IN YOUR REPORT?

22   A.   RIGHT.

23   Q.   YOUR TESTIMONY TODAY WAS THAT YOU SEARCHED, YOU LOOKED AT

24   THE CAR FOR PERSONAL ITEMS, CORRECT?

25   A.   CORRECT.

1   Q.   AND YOU TESTIFIED THAT YOU DIDN'T FIND ANY PERSONAL ITEMS

2   IN THE CAR?

3   A.   I DIDN'T SEE ANY PERSONAL ITEMS --

4   Q.   LET ME REPHRASE IT.   YOU DIDN'T SEE ANY PERSONAL ITEMS IN

5   THE CAR?

6   A.   CORRECT.

7   Q.   AND THAT FACT WAS NOT WRITTEN IN YOUR REPORT?

8   A.   CORRECT.

9   Q.   YOUR TESTIMONY TODAY WAS THAT YOUR IMPRESSION WAS THAT

10  MR. FLORES WAS IN A HURRY, RIGHT?

11  A.   CORRECT.

12  Q.   AND THAT FACT WASN'T WRITTEN IN YOUR REPORT?

13  A.   CORRECT.

14  Q.   OKAY, I WANT TO TALK TO YOU A LITTLE BIT ABOUT LANE 12.

15  THAT IS THE LANE YOU WERE WORKING ON NOVEMBER 28TH, RIGHT?

16  A.   RIGHT.

17  Q.   YOU TESTIFIED THAT THERE WAS ABOUT A 25- TO 30-MINUTE WAIT

18  IN THAT LANE; IS THAT CORRECT?

19  A.   RIGHT.

20  Q.   IS THAT A 25- TO 30-MINUTE WAIT FROM THE MOMENT THE CAR

21  GETS INTO PRE-PRIMARY, OR IS THAT THE LENGTH OF TIME TO GET

22  INTO PRE-PRIMARY?

23  A.   FROM THE TIME THAT THE VEHICLE IS IN MEXICO, STANDING IN

24  LINE.

25  Q.   SO FROM THE BACK -- IF THIS IS THE VERY BEGINNING OF THE

1   LINE, IT TOOK 30 MINUTES TO GET TO THIS LANE RIGHT HERE, OR

2   APPROXIMATELY?

3   A.   APPROXIMATELY.

4   Q.   OKAY.   BUT THERE ARE STILL OFFICERS CONDUCTING PRE-PRIMARY

5   ROVING OPERATIONS IN THIS AREA, CORRECT?

6   A.   CORRECT.

7   Q.   EVEN ON LANE 12, RIGHT?

8   A.   CORRECT.

9   Q.   SO THERE IS STILL A DOG -- I'M SORRY, A CANINE, AND AN

10  OFFICER SMELLING THE CARS ON LANE 12, CORRECT?

11  A.   CORRECT.

12  Q.   AND THERE IS STILL ALL OF THE NECESSARY STEPS A PERSON HAS

13  TO TAKE IN ORDER TO ENTER THE UNITED STATES THROUGH LANE 12,

14  RIGHT?

15  A.   RIGHT.

16  Q.   SO THEY STILL HAVE TO SHOW THEIR ENTITLEMENT TO ENTER THE

17  UNITED STATES, RIGHT?

18  A.   RIGHT.

19  Q.   THEY WOULD STILL BE SUBJECT TO QUESTIONING BY YOU AT THE

20  PRIMARY BOOTH?

21  A.   CORRECT.

22  Q.   THEY WOULD STILL BE SUBJECT TO BEING SENT TO SECONDARY, IF

23  YOU DECIDED THAT THEY NEEDED A MORE DETAILED INSPECTION?

24  A.   YES, SIR.

25  Q.   NOW YOU TESTIFIED THAT YOU NOTICED THAT OFFICER COVE'S

1   CANINE WAS VERY INTERESTED IN THIS VEHICLE; IS THAT RIGHT?

2   A.   RIGHT.

3   Q.   NOW AT THE TIME YOU NOTICED THAT, THERE WAS A CAR IN THE

4   PRIMARY BOOTH THAT YOU WERE INSPECTING, CORRECT?

5   A.   I WAS INSPECTING IT, BUT I WAS DONE WITH IT AND HE WAS

6   BEING RELEASED.

7   Q.   SO YOU WERE STILL IN THE PROCESS -- YOU WERE JUST ABOUT

8   FINISHED, BUT YOU WERE STILL IN THE PROCESS OF GOING THROUGH A

9   PERSON'S TRAVEL DOCUMENTS AND MAKING SURE THEY HAVE PERMISSION

10  TO ENTER THE UNITED STATES, RIGHT?

11  A.   CORRECT.

12  Q.   NOW AS PART OF YOUR TRAINING AT GLYNCO, YOU'RE TRAINED

13  TO -- YOU'VE RECEIVED TRAINING ON INSPECTING CARS, CORRECT?

14  A.   CORRECT.

15  Q.   YOU'RE TRAINED TO LOOK FOR COMPARTMENTS?

16  A.   CORRECT.

17  Q.   YOU CAN NOTICE, FOR EXAMPLE, SCRATCH MARKS ON SCREWS?

18  A.   RIGHT.

19  Q.   YOU CAN TELL WHETHER THERE IS A BULGE IN A CAR SEAT?

20  A.   RIGHT.   BUT LET ME ADD SOMETHING TO IT.

21  Q.   WELL, MY QUESTION FOR NOW IS, YOUR -- YOU RECEIVED

22  TRAINING TO BE ABLE TO LOOK FOR SIGNS THAT CARS HAVE THINGS IN

23  THEM THAT THEY'RE NOT SUPPOSED TO HAVE, RIGHT?

24  A.   RIGHT.

25  Q.   AND IN THIS CASE, YOU NOTICED THAT THE CANINE HAD ALERTED

1   TO MR. FLORES' CAR, CORRECT?

2   A.   CORRECT.

3   Q.   AND THEN AGENT COVE INFORMED YOU THAT MR. FLORES -- I'M

4   SORRY, THAT ARIES HAD ALERTED TO MR. FLORES' CAR?

5   A.   CORRECT.

6   Q.   AND SHE INFORMED YOU THAT ARIES HAD ALERTED TO THE

7   UNDERCARRIAGE OF THE CAR, RIGHT?

8   A.   RIGHT.

9   Q.   NOW AT THE PRIMARY BOOTH, YOU HAD THE DISCRETION TO SEND

10  SOMEONE TO SECONDARY IF YOU THINK THEY NEEDED FURTHER

11  INSPECTION, RIGHT?

12  A.   CORRECT.

13  Q.   AND IN LANE 12, HOW MANY LANES ARE THERE TO GET TO THE

14  SECONDARY INSPECTION FROM LANE 12?

15  A.   HOW MANY LANES?

16  Q.   LET ME REPHRASE THAT.  THAT'S NOT A GOOD QUESTION.

17       IN LANE 12, IF YOU WANT TO SEND SOMEONE TO SECONDARY,

18  WHERE WOULD YOU SEND THEM TO?

19  A.   THEY WOULD TURN, LANE 12, AND THEN THEY WILL GO, MAKE A

20  LEFT, TO COME THIS WAY TO SECONDARY.  THIS LANE RIGHT HERE

21  SHOOTS STRAIGHT TO THE FREEWAY, WHERE YOU -- WHERE HE CAME.  SO

22  ALL THESE VEHICLES COMING ON THESE LANES, HAS TO MAKE A TURN

23  UNTIL THEY GET TO SECONDARY, RIGHT HERE, (INDICATING).

24  Q.   ON THAT LEFT TURN, TO GET TOWARDS SECONDARY, HOW MANY

25  LANES ARE THERE?  IS IT ONLY ONE LANE?

1   A.   SORRY, RIGHT TURN.

2   Q.   YEAH, YOU'RE RIGHT, I'M SORRY.   TO MAKE THAT RIGHT TURN,

3   HOW MANY LANES ARE THERE?   IS IT JUST ONE LANE, OR ARE THERE

4   MULTIPLE LANES, THIS PART RIGHT HERE?

5   A.   IT WOULD BE ALL THE LANES, SIR, THE REMAINDER OF THE

6   LANES, STARTING FROM -- SO THAT WOULD BE 12, THEN THEY SHOOT

7   STRAIGHT THIS WAY, RIGHT HERE IN FRONT, YOU HAVE LANE 2 AND 1,

8   WHERE THEY GO STRAIGHT TO SECONDARY.

9   Q.   LET ME REPHRASE IT, SO WE'RE CLEAR.   I'M NOT TALKING ABOUT

10  THE LANES THAT ARE GOING SOUTH TO NORTH.   I'M TALKING ABOUT THE

11  LANES GOING WEST TO EAST.   IF A PERSON IS IN LANE 12, AND YOU

12  DIRECTED THEM TO GO TO SECONDARY, AND THEY MAKE THAT RIGHT

13  TURN, HOW MANY LANES OF TRAFFIC WOULD THEY BE DRIVING IN?   IS

14  IT ONE LANE, TWO LANES, OR THERE ARE 13 SEPARATE LANES FOR EACH

15  PRIMARY LANE TO SEND TOWARD SECONDARY?

16  A.   NO.   IT WOULD BE APPROXIMATELY EIGHT LANES.

17  Q.   OKAY.   SO AT SOME POINT, THERE IS -- THE LANES COLLAPSE

18  TOGETHER, SO TO SPEAK?

19  A.   TRAFFIC, YES.

20  Q.   OKAY.   NOW ON SATURDAY, NOVEMBER 28, YOU TESTIFIED THAT

21  THESE FAR LANES WERE OPEN, RIGHT?

22  A.   YES.

23  Q.   SO ALL 13 LANES AT THE OTAY PORT OF ENTRY WERE OPEN?

24  A.   CORRECT.

25  Q.   AND EACH OF THOSE LANES HAS AN OFFICER IN THE PRIMARY

1    BOOTH; IS THAT CORRECT?

2    A.   THAT'S CORRECT.

3    Q.   AND EACH OF THOSE OFFICERS CARRIES A FIREARM?

4    A.   CORRECT.

5    Q.   SO YOU CARRIED A FIREARM WITH YOU?

6    A.   CORRECT.

7    Q.   AND THE CANINE OFFICERS WHO ARE PATROLLING IN PRE-PRIMARY

8    ALSO CARRY FIREARMS, CORRECT?

9    A.   CORRECT.

10             MR. CONOVER:  OBJECTION, YOUR HONOR.

11             THE COURT:  OVERRULED.

12   BY MR. FAKHOURY:

13   Q.   THE CANINE OFFICERS IN PRE-PRIMARY ALSO CARRY FIREARMS; IS

14   THAT CORRECT?

15   A.   CORRECT, SIR.

16   Q.   NOW YOU DIRECTED -- MR. FLORES WAS TAKEN OUT OF HIS CAR AT

17   THE PRIMARY BOOTH; IS THAT CORRECT?

18   A.   CORRECT.

19   Q.   AND HIS CAR WAS DRIVEN TO SECONDARY?

20   A.   CORRECT.

21   Q.   YOU WEREN'T THE ONE WHO DROVE THE CAR TO SECONDARY?

22   A.   NO, SIR.

23   Q.   AND AFTER HIS CAR WAS SENT TO SECONDARY, YOUR INVOLVEMENT

24   IN THIS CASE ENDED, CORRECT?

25   A.   YES.

1    Q.   SO YOU DIDN'T INVESTIGATE -- I'M SORRY, LET ME REPHRASE

2    THAT.  YOU DIDN'T INTERVIEW ANY WITNESSES FOR THIS CASE?

3    A.   NO.

4    Q.   YOU DIDN'T SUBPOENA ANY PHONE RECORDS?

5    A.   NO.

6    Q.   YOU DIDN'T REVIEW ANY BORDER CROSSING RECORDS?

7    A.   NO.

8            MR. FAKHOURY:  I HAVE NOTHING FURTHER.  THANK YOU.

9            THE COURT:  REDIRECT?

10           MR. CONOVER:  THANK YOU, YOUR HONOR.

11                      REDIRECT EXAMINATION

12   BY MR. CONOVER:

13   Q.   OFFICER FIGUEROA, THERE SEEMS TO BE A LOT OF DETAILS ABOUT

14   THIS DAY IN QUESTION THAT AREN'T IN YOUR REPORT; IS THAT

15   CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   IS THAT NORMAL?

18   A.   IT IS NORMAL.

19   Q.   IS YOUR REPORT SUPPOSED TO CONTAIN EVERYTHING THAT

20   HAPPENED THAT DAY?

21   A.   NO.  IT CONTAINS BASIC, IMMEDIATE INFORMATION THAT

22   HAPPENED AT THAT TIME.

23   Q.   DOES YOUR REPORT CONTAIN THAT INFORMATION THAT HAPPENED

24   THAT DAY?

25   A.   YES, IT DOES.

1          MR. CONOVER:  NOTHING FURTHER, YOUR HONOR.

2          THE COURT:  ANY RECROSS?

3                    RECROSS-EXAMINATION

4          MR. FAKHOURY:  I HAVE A VERY BRIEF RECROSS.

5   BY MR. FAKHOURY:

6   Q.   YOU TESTIFIED THAT AS PART OF YOUR TRAINING, YOU'RE

7   TRAINED TO WRITE THOROUGH REPORTS, CORRECT?

8   A.   THAT'S CORRECT.

9   Q.   AND NOW YOU'VE EXPLAINED A COUPLE FACTS THAT -- WELL, LET

10  ME STRIKE THAT.

11       IN YOUR TESTIMONY, YOU MENTIONED CERTAIN FACTS THAT WERE

12  IMPORTANT TO YOU IN TERMS OF YOUR INTERACTION WITH MR. FLORES;

13  IS THAT RIGHT?

14  A.   THAT'S CORRECT.

15  Q.   SO, FOR EXAMPLE, THE WAY HE HANDED YOU HIS PASSPORT, THAT

16  WAS IMPORTANT TO YOU, WASN'T IT?

17  A.   YES, IT WAS.

18  Q.   IT WAS IMPORTANT TO YOU ON NOVEMBER 28TH?

19          MR. CONOVER:  OUTSIDE THE SCOPE.

20          THE COURT:  NO, OVERRULED.

21  BY MR. FAKHOURY:

22  Q.   IT WAS IMPORTANT TO YOU ON NOVEMBER 28TH, RIGHT?

23  A.   RIGHT.

24  Q.   FOR EXAMPLE, YOU ALSO TESTIFIED THAT YOU NOTICED HE

25  DECLARED HIS CITIZENSHIP BEFORE COMING TO A COMPLETE STOP; IS

1    THAT CORRECT?

2    A.   CORRECT.

3    Q.   AND THAT WAS AN IMPORTANT FACT FOR YOU ON NOVEMBER 28,

4    RIGHT?

5    A.   RIGHT.

6    Q.   BUT YOU DIDN'T INCLUDE ANY OF THOSE FACTS IN YOUR REPORT?

7    A.   NO.  I ONLY DID MY BASIC.

8    Q.   SO YOUR REPORT DIDN'T INCLUDE THE IMPORTANT FACTS?

9    A.   MY MIND KEPT IT.  IT WAS MY FIRST METHAMPHETAMINE.  IT

10   STAYS CLEAR IN MY MIND.  I WAS VERY EXCITED, AND I FELT VERY

11   REWARDED THAT SOMETHING BIG DIDN'T GO INTO THE U.S., SO I JUST

12   WROTE MY BASIC INFORMATION.

13   Q.   MY QUESTION WAS, YOU DIDN'T INCLUDE THE IMPORTANT FACTS IN

14   YOUR REPORT?

15   A.   NO, SIR.

16   Q.   THANK YOU.

17          THE COURT:  ALL RIGHT, THANK YOU.  YOU MAY BE

18   EXCUSED.

19      LADIES AND GENTLEMEN, NOW IS A GOOD TIME FOR US TO TAKE A

20   BREAK.  ACCORDING TO MY WATCH, IT IS 2:30.  LET'S BE BACK AT

21   PROMPTLY A QUARTER TO 3:00 OUTSIDE THOSE DOORS.  PLEASE

22   REMEMBER MY ADMONITION.

23      COUNSEL, PLEASE MAKE SURE YOU'RE BACK NO LATER THAN

24   QUARTER TO 3:00.

25                  (JURY EXITS COURTROOM.)

1              (RECESS TAKEN.)

2         THE CLERK:  JURY ENTERING.

3              (JURY ENTERS COURT ROOM.)

4         THE COURT:  ALL RIGHT, WELCOME BACK.

5     PLEASE CALL YOUR NEXT WITNESS.

6         MR. CONOVER:  THANK YOU, YOUR HONOR.  THE UNITED

7  STATES CALLS CUSTOMS AND BORDER PROTECTION OFFICER RODOLFO

8  SANCHEZ TO THE STAND.

9         THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

10 RECORD, SPELLING BOTH YOUR FIRST AND LAST NAME.

11        THE WITNESS:  RODOLFO SANCHEZ, R-O-D-O-L-F-O,

12 SANCHEZ, S-A-N-C-H-E-Z.

13                 DIRECT EXAMINATION

14 BY MR. CONOVER:

15 Q.  OFFICER SANCHEZ, WHERE ARE YOU EMPLOYED?

16 A.  I'M EMPLOYED FOR -- ACTUALLY WORK AT OTAY MESA.  I'M

17 EMPLOYED BY DHS, DEPARTMENT OF HOMELAND SECURITY.

18 Q.  HOW LONG HAVE YOU WORKED FOR THE DEPARTMENT OF HOMELAND

19 SECURITY?

20 A.  SEVEN YEARS.

21 Q.  ALL RIGHT.  WHAT DID YOU DO PRIOR TO COMING TO WORK FOR

22 DEPARTMENT OF HOMELAND SECURITY?

23 A.  I WAS A SOCCER COACH.  I WAS WORKING AS A -- DRAFTING.

24 AND I WORKED FOR A FROZEN FOOD COMPANY.

25 Q.  AND YOU WORKED FOR DEPARTMENT OF HOMELAND SECURITY FOR

1    SEVEN YEARS; IS THAT WHAT YOU SAID?

2    A.   FOR SEVEN YEARS, SINCE 2005.

3    Q.   AND HAS THAT ENTIRE TIME BEEN AT THE OTAY MESA PORT OF

4    ENTRY?

5    A.   NO.  I STARTED OVER AT LONG BEACH.  IN 2005, I WAS

6    TRANSFERRED OVER TO SAN YSIDRO.  AND I'VE BEEN WORKING AT SAN

7    YSIDRO PORT OF ENTRY AND OTAY MESA PORT OF ENTRY.

8    Q.   AND WHAT WERE YOUR RESPONSIBILITIES AT THE SAN YSIDRO AND

9    OTAY MESA PORTS OF ENTRY?

10   A.   I WORK FOR THE CONTRABAND ENFORCEMENT TEAM.  I ROVE

11   THROUGH PRE-PRIMARY LANES, PRIMARY LANES, AND POST-PRIMARY

12   LANES, LOOKING FOR CONTRABAND, INCONSISTENCIES IN VEHICLES OR

13   INCONSISTENCIES OF DRIVERS, PASSENGERS, STORIES, OR TRAVEL

14   ITINERARIES.

15   Q.   AND WERE YOU ON DUTY ON NOVEMBER 28, 2009?

16   A.   YES, I WAS.

17   Q.   AND WHAT WERE YOU DOING ON THAT DAY; WHAT WERE YOUR

18   RESPONSIBILITIES THAT SATURDAY?

19   A.   I WAS WORKING FOR THE CONTRABAND ENFORCEMENT TEAM, ROVING

20   THROUGH THE PRE-PRIMARY LANES, AT THE OTAY MESA PORT OF ENTRY.

21   Q.   I'D LIKE TO SHOW YOU NOW WHAT HAS BEEN PREVIOUSLY

22   ADMITTED.  DO YOU RECOGNIZE THIS VEHICLE?

23   A.   YES.

24   Q.   HOW DO YOU RECOGNIZE THAT VEHICLE?

25   A.   IT WAS DRIVEN BY AN OLDER GENTLEMAN, AND HE HAD

1    METHAMPHETAMINE IN THE GAS TANK.

2    Q. IF YOU WERE TO SEE THAT INDIVIDUAL IN THE COURTROOM HERE

3    TODAY, WOULD YOU BE ABLE TO RECOGNIZE HIM?

4    A. YES.

5    Q. DO YOU SEE THAT PERSON IN THE COURTROOM?

6    A. YES.

7    Q. COULD YOU PLEASE POINT TO THEM AND DESCRIBE AN ITEM OF

8    CLOTHING THEY'RE WEARING.

9    A. SITTING WITH THE GRAY SUIT, OVER TO THE LEFT OF THE

10    GENTLEMAN IN THE MIDDLE, (INDICATING).

11    Q. THANK YOU.

12        MR. CONOVER: YOUR HONOR, MAY THE RECORD REFLECT THE

13    WITNESS HAS IDENTIFIED THE DEFENDANT?

14        THE COURT: YES.

15        MR. CONOVER: THANK YOU.

16    BY MR. CONOVER:

17    Q. WHAT WAS THE FIRST THING YOU DID WITH REGARD TO THIS

18    SILVER BEETLE?

19    A. I'M SORRY, SIR, WHAT WAS THAT AGAIN?

20    Q. WHAT WAS THE FIRST THING YOU DID WITH REGARD TO THE SILVER

21    BEETLE?

22    A. WELL, THE SILVER BEETLE WAS TAKEN OVER TO THE SECONDARY

23    LOT. THERE WAS A CANINE ALERT. I CAME ACROSS THE CAR. I

24    WALKED OVER TO THE SECONDARY LOT, AND I USED A SCOPE TO THE GAS

25    TANK.

1  Q.    WHAT IS A "SCOPE"?

2  A.    IT IS A FIBEROPTIC SCOPE TO SEE -- IT LETS YOU SEE TO FIND

3  COMPARTMENTS -- WHAT WAS IT, SPACES.

4  Q.    AND YOU SAW PACKAGES FLOATING IN THE GAS TANK?

5  A.    I SAW PLASTIC BAGS INSIDE THE GAS TANK.

6  Q.    AND AFTER THAT, WHAT HAPPENED NEXT?

7  A.    AFTER THAT, OFFICER MORTON CAME OVER TO THE CAR, DROVE THE

8  CAR TO THE PROCESSING AREA.  I FOLLOWED OFFICER MORTON BECAUSE

9  I KNOW THERE WAS INCONSISTENCIES WITHIN THE GAS TANK.  I TOLD

10  OFFICER MORTON THERE WAS SOMETHING IN THE GAS TANK, HE NEEDED

11  HELP.  I WOULD BE MORE THAN HAPPY TO REMOVE OR GET ACCESS TO

12  THE GAS TANK.

13  Q.    DID YOU ASSIST HIM IN GETTING ACCESS TO THE GAS TANK?

14  A.    YES, I DID, SIR.

15  Q.    ARE YOU FAMILIAR WITH VOLKSWAGEN BEETLES AND HOW TO ACCESS

16  THEIR GAS TANKS?

17  A.    YES, I AM.

18  Q.    HOW ARE YOU FAMILIAR WITH THAT?

19  A.    WELL, I MEAN, I CHECK CAR AFTER CAR, AND I CHECK MANY

20  BEETLES BEFORE.

21  Q.    YOU'VE CHECKED MANY BEETLES BEFORE?

22  A.    YEAH.

23  Q.    AND HAVE YOU CHECKED THEIR GAS TANKS?

24  A.    YES.

25  Q.    AND HOW IS IT THAT YOU ACCESS A VOLKSWAGEN BEETLE'S GAS

1  TANK?

2  A.   YOU HAVE TO LIFT THE REAR SIT, REMOVE THE COVERS.  IT'S

3  KIND OF LIKE A CARPET, REMOVE THE CARPET, AND YOU GET ACCESS TO

4  THE SENDING UNIT COVER.

5  Q.   CAN YOU, PLEASE, TURN IN YOUR BINDER THERE IN FRONT OF YOU

6  TO GOVERNMENT'S EXHIBITS 8, 9, 10, 11, 12, 13, AND 16.

7          (GOVERNMENT'S EXHIBITS 8 THROUGH 13 AND 16 MARKED FOR

8           IDENTIFICATION.)

9  BY MR. CONOVER:

10  Q.   IF YOU COULD JUST LOOK AT ALL OF THOSE PHOTOGRAPHS FOR ME,

11  FINISHING AT GOVERNMENT'S EXHIBIT 16.  DO YOU RECOGNIZE EACH OF

12  THOSE PHOTOGRAPHS?

13  A.   YES, SIR.

14  Q.   ARE EACH OF THOSE PHOTOGRAPHS ACCURATE DEPICTIONS OF THE

15  WAY THE SILVER VOLKSWAGEN BEETLE AND ITS BACK SEAT AND SENDING

16  UNIT APPEARED ON THE DAY THAT YOU REMOVED THE SENDING UNIT FROM

17  THE VEHICLE?

18  A.   YES, SIR.

19          MR. GARRISON:  OBJECTION.  LEADING.  IMPROPER

20  FOUNDATION.

21          THE COURT:  OVERRULED.

22          MR. CONOVER:  YOUR HONOR, THE GOVERNMENT WOULD MOVE

23  TO ADMIT GOVERNMENT'S EXHIBITS 8, 9, 10, 11, 12, 13, AND 16

24  INTO EVIDENCE AND PUBLISH.

25          THE COURT:  ANY OBJECTION?

1      MR. GARRISON:  NO OBJECTION.

2      THE COURT:  ALL RIGHT, THEY'LL COME IN.

3      (GOVERNMENT'S EXHIBITS 8 THROUGH 13 AND 16 RECEIVED

4       INTO EVIDENCE.)

5      MR. CONOVER:  THANK YOU, YOUR HONOR.

6  BY MR. CONOVER:

7  Q.  SHOWING YOU NOW GOVERNMENT'S EXHIBIT NO. 8, DO YOU

8  RECOGNIZE THIS?

9  A.  IT IS THE REAR SEAT OF THE VOLKSWAGEN BEETLE.

10 Q.  COULD YOU DESCRIBE WHAT YOU DID TO PULL UP THIS REAR SEAT.

11 A.  CAN I USE THE POINTER?

12 Q.  YES, PLEASE DO.

13 A.  YOU HAVE TO GRAB THE SEAT FROM THERE, PULL IT UP, AND IT

14 HAS SOME HINGES OVER HERE.  IT LIFTS, AND THEN YOU JUST PULL IT

15 BACK (INDICATING).

16 Q.  AND IS THIS A PHOTOGRAPH OF THAT SEAT PULLED BACK?

17 A.  THAT IS THE CARPETING AND THIS IS THE SEAT ONCE IT'S

18 PULLED BACK (INDICATING).

19 Q.  AND AFTER THE SEAT IS PULLED BACK, WHAT DO YOU SEE NEXT

20 IF -- AFTER YOU HAD PULLED BACK THAT FELT?

21 A.  YOU SEE THE FELT, THE CARPETING RIGHT THERE (INDICATING).

22 Q.  AND WHAT IS UNDERNEATH THE CARPETING?

23 A.  THE SENDING UNIT COVER.

24     MR. CONOVER:  YOUR HONOR, MAY I APPROACH THE WITNESS?

25     THE COURT:  YES.

1           MR. CONOVER:  THANK YOU.

2    BY MR. CONOVER:

3    Q.   OFFICER SANCHEZ, HAVE YOU SEEN THIS BEFORE?

4    A.   THAT'S A COVER.

5    Q.   WHAT IS THAT THE COVER TO?

6    A.   IT COVERS THE TOP -- IT GOES ON TOP, SITS ON TOP OF THE

7    SENDING UNIT.

8    Q.   CAN YOU DESCRIBE FOR THE JURY HOW A SENDING UNIT -- HOW

9    THE SENDING UNIT IS ATTACHED TO THE GAS TANK AND WHAT IS THAT

10   ATTACHED TO?

11   A.   IT'S ATTACHED TO THE BODY OF THE VEHICLE.

12   Q.   THE BODY OF THE VEHICLE?

13   A.   YES, RIGHT ABOVE THE SENDING UNIT.

14   Q.   WHEN YOU FIRST SAW THAT, WHAT DID YOU NOTICE?

15   A.   IT HAS THREE SCREWS, AND THOSE THREE SCREWS HAD TAMPERING

16   MARKS AND SCRATCHES.

17   Q.   TAMPERING MARKS AND SCRATCHES, IS THAT WHAT YOU SAID?

18   A.   YEAH, ON THE SCREWS.

19   Q.   WHAT WOULD TAMPERING MARKS AND SCRATCHES, FROM YOUR

20   EXPERIENCE --

21   A.   USUALLY WHEN THEY HAVE TAMPERING MARKS, SCRATCHES, THAT'S

22   WHAT I MEAN --

23           MR. GARRISON:  OBJECTION.  IMPROPER OPINION.

24           THE COURT:  I'M NOT SURE IF PROPER FOUNDATION HAS

25   BEEN LAID.

1   BY MR. CONOVER:

2   Q.   HAVE YOU WORKED AT THE OTAY MESA PORT OF ENTRY FOR

3   MULTIPLE YEARS?

4   A.   YES, SIR.

5   Q.   DURING YOUR TIME AT THE OTAY MESA PORT OF ENTRY, HAVE YOU

6   HAD THE OPPORTUNITY TO REMOVAL MULTIPLE SENDING UNITS AND

7   DEVICES SIMILAR TO THIS FROM DIFFERENT VEHICLES?

8   A.   YES, I HAVE, SIR.

9   Q.   ARE MANY OF THEM FASTENED DOWN WITH SCREWS?

10   A.   YES.  OR -- YES.

11   Q.   DO SOME SCREWS APPEAR TO BE BRAND NEW, AS THOUGH THEY'VE

12   NEVER BEEN UNDONE?

13   A.   YES, THAT'S CORRECT.

14   Q.   DO OTHER SCREWS APPEAR TO HAVE BEEN USED MULTIPLE TIMES,

15   AS THOUGH THEY HAVE BEEN OPENED REPEATEDLY AND SHOW SIGNS OF

16   WEAR?

17   A.   YES.

18   Q.   WITH REGARDS TO THE SCREWS YOU SAW HOLDING DOWN THAT

19   PLATE, HOW DID THOSE SCREWS APPEAR?

20   A.   LIKE THEY WERE BEING REMOVED MULTIPLE TIMES.

21   Q.   AND WHY DO YOU SAY THAT?

22   A.   BECAUSE OF THE SCRATCHES.

23   Q.   THEY --

24   A.   SCRATCHES ON TOP OF THE HEAD.  ON THE HEAD --

25   Q.   ON THE HEAD --

1    A.   -- ON THE SCREWS.

2    Q.   AND THEY APPEARED AS THOUGH THEY'D BEEN WORN DOWN?

3    A.   YES.

4    Q.   DID YOU, AT SOME POINT, UNSCREW THOSE YOURSELF?

5    A.   YES, I DID.

6    Q.   DID YOU REMOVE THE LID?

7    A.   I REMOVED THE LID.

8    Q.   OKAY.   COULD YOU DESCRIBE WHAT HAPPENED AFTER YOU REMOVED

9    THAT LID.

10   A.   THE LID IS USUALLY HELD BY SOME TYPE OF BLACK GLUE.   THE

11   GLUE WAS NOT THERE, BUT THE SMEAR AROUND THE COVER WAS VISIBLE.

12   Q.   AND SO THERE WAS A SMEAR AROUND --

13   A.   SMEAR, EXACTLY.   SMEAR OF GLUE.

14   Q.   SO THERE WAS GLUE SMEARED AROUND HERE?

15   A.   YES.

16   Q.   WHEN YOU SAY "SMEAR," WHAT DO YOU MEAN EXACTLY?

17   A.   IT WAS KIND OF LIKE FADE -- WOULD THAT BE THE WORD?   FADE

18   THROUGH THE COVER.   USUALLY THE GLUE OF THE SEAL IS ATTACHED TO

19   THE BODY, BUT SINCE IT WAS REMOVED, PROBABLY THE GLUE CAME OUT.

20   Q.   SO THE GLUE WAS NORMALLY ATTACHED TO THE SEAL AND THE

21   BODY?

22   A.   YES.

23   Q.   TO KEEP A TIGHT SEAL?

24   A.   TO KEEP A TIGHT SEAL.

25   Q.   WHY WOULD THEY WANT A TIGHT SEAL NORMALLY?

1   A.   BECAUSE THEY DON'T WANT THE FUMES FROM THE GAS TANK INSIDE

2   THE CAR.

3   Q.   DID THAT LID HAVE A TIGHT SEAL WITH THAT GLUE?

4   A.   NO.

5   Q.   WHAT WAS THE DIFFERENCE?

6   A.   IT JUST HAD A FOAM SEAL.   YOU CAN SEE IT HERE.

7   Q.   AND THE GLUE HAD --

8   A.   THE GLUE IS NOT THERE.

9   Q.   THE GLUE HAD BEEN REMOVED FROM BEING REMOVED, IS THAT --

10  A.   YEAH.

11  Q.   AND AFTER THAT, YOU NOTICED THE SCREWS, AND THE GLUE

12  HAVING BROKEN AROUND THE EDGES.   WHAT DID YOU DO NEXT?

13  A.   IT WAS VISIBLE.   AND IT WAS -- THE SENDING UNIT WAS

14  REMOVED.   THE SENDING UNIT, THERE IS A BIG PLASTIC NOT HOLDING

15  THE SENDING UNIT TO THE GAS TANK.

16  Q.   AND DID YOU GO ABOUT REMOVING THAT SENDING UNIT?

17  A.   YES.   YOU HAVE TO REMOVE THE NUT FIRST.

18          MR. CONOVER:   AND, YOUR HONOR, MAY I APPROACH WITH

19  THE SENDING UNIT?

20          THE COURT:   YES.

21          MR. CONOVER:   THANK YOU.

22  BY MR. CONOVER:

23  Q.   I'M SHOWING YOU NOW WHAT HAS BEEN MARKED AS GOVERNMENT'S

24  EXHIBIT NO. 14.

25          (GOVERNMENT'S EXHIBIT 14 MARKED FOR IDENTIFICATION.)

BY MR. CONOVER:

Q.   DO YOU RECOGNIZE THIS?

A.   YES.

Q.   WHAT IS THIS?

A.   THIS IS THE SENDING UNIT FOR THE BEETLE.

Q.   SO WAS THAT WHAT WAS FOUND UNDERNEATH THIS SEAL?

A.   YES.

Q.   WHAT WAS ATTACHED HERE?

A.   THAT WAS THE GAS LINE AND THEN THE ELECTRICAL PLUG.

Q.   SO THERE WAS AN ELECTRICAL PLUG; WHERE DID THE PLUG GO TO?

A.   CAN I HOLD ONTO IT?

Q.   YES.

A.   THE ELECTRICAL PLUG GOES HERE, (INDICATING).

Q.   OKAY.

A.   AND THE GAS LINE GOES HERE, (INDICATING).

Q.   DID YOU REMOVE THAT ELECTRICAL PLUG?

A.   YES, I DID.

Q.   DID YOU ALSO REMOVE THE GAS LINES?

A.   YES.

Q.   WHAT HAPPENED WHEN YOU REMOVED THE GAS LINES?

A.   THERE WAS PRESSURE, SO I GOT SOAKED WITH GASOLINE.

Q.   THERE WAS PRESSURE IN THOSE GAS LINES STILL?

A.   YES.

Q.   SO WHEN YOU PULLED THE GAS LINES APART, WHAT HAPPENED?

A.   IT SPLASHED ALL OVER MYSELF.

1    Q.   THE GAS DID?

2    A.   YES.

3    Q.   DID THE CAR SMELL LIKE GAS AFTER THAT?

4    A.   YES.

5    Q.   DID YOU SMELL LIKE GAS AFTER THAT?

6    A.   ALL DAY LONG.

7    Q.   HOW LONG DID YOU SMELL LIKE GAS FOR?

8    A.   I DON'T KNOW, UNTIL I GOT ANOTHER SHIRT.

9    Q.   UNTIL YOU GOT ANOTHER SHIRT?

10   A.   NO, I WENT HOME AND I GOT DRESSED.

11   Q.   OKAY.  AFTER YOU REMOVED THE GAS LINE, AND YOU REMOVED THE

12   ELECTRICAL CIRCUIT, THE PLUG WAS ATTACHED TO IT, WHAT DID YOU

13   DO NEXT?

14   A.   I NOTICED THAT THE -- NOT ON THE SENDING UNIT, HOLDING THE

15   SENDING UNIT IN PLACE, SHOWED -- CAN I HOLD ONTO IT?

16   Q.   YEAH.

17   A.   SHOWED SIGNS OF TAMPERING.  YOU CAN SEE THE SCRATCHES

18   RIGHT HERE, (INDICATING), THAT IS DONE WHEN YOU GOT TO REMOVE

19   THE COVER.  YOU EITHER HIT IT WITH A SCREWDRIVER ON THE SIDE,

20   SO YOU CAN MAKE IT TURN AND LOOSEN IT UP.

21   Q.   SO THAT NUT THAT GOES ON TOP OF THAT, IS THAT TURNED ON

22   PRETTY TIGHT --

23   A.   YES, IT'S PRETTY TIGHT.

24   Q.   -- TO HOLD THAT?

25        COULD YOU REMOVE IT WITH YOUR HAND OR DOES IT REQUIRE A

1    TOOL?

2    A.   NO, UNLESS YOU'RE PRETTY STRONG.

3    Q.   SO IF YOU'RE GOING TO REMOVE THAT, HOW WOULD YOU TYPICALLY

4    REMOVE THAT?

5    A.   WHAT I DID IS -- SINCE YOU CAN SEE THE TAMPERING SIGNS, SO

6    I DID THE SAME THING, I GOT THE SCREWDRIVER, GOT A HAMMER, AND

7    STARTED WIGGLING IT AROUND.

8    Q.   TO LOOSEN IT?

9    A.   TO LOOSEN IT.

10   Q.   SO BEFORE YOU EVER HIT THAT WITH YOUR HAMMER AND YOUR

11   SCREWDRIVER, WERE THERE SIGNS THAT THAT HAD BEEN HIT WITH A

12   PRIOR HAMMER AND SCREWDRIVER?

13   A.   YES.

14          MR. GARRISON:  OBJECTION.  SPECULATION.

15          THE COURT:  OVERRULED.

16   BY MR. CONOVER:

17   Q.   AND WERE THERE SIGNS IT HAD BEEN HIT WITH A PRIOR

18   SCREWDRIVER AND HAMMER MULTIPLE TIMES?

19   A.   IT HAD TO BE A SCREWDRIVER, I WOULD SAY, BECAUSE YOU CAN

20   SEE THE MARKS OF HEAD RIGHT HERE, (INDICATING).  YOU DON'T SEE

21   SCRATCHES ANYWHERE ELSE.

22   Q.   OKAY.  AND DID YOU, IN FACT, EVENTUALLY REMOVE THAT NUT

23   FROM THE SENDING UNIT?

24   A.   YES, I DID, SIR.

25   Q.   AND THEN WERE YOU ABLE TO PULL THE SENDING UNIT OUT?

1    A.   I GRABBED THE SENDING UNIT, AND I PULLED IT UP.  AND IT

2    WAS FUNNY BECAUSE USUALLY, THERE IS A FLOATER, THERE IS A

3    FLOATER IN THE SENDING UNIT THAT INDICATES THE LEVEL OF GAS IN

4    THE GAS TANK.

5    Q.   WHAT IS A "FLOATER"?

6    A.   I'M NOT A MECHANIC, BUT IT CONNECTS RIGHT HERE,

7    (INDICATING).  IT CONNECTS RIGHT HERE, AND IT KEEPS -- IT TELLS

8    YOU THE GAS LEVEL IN THE GAS TANK.  SO YOU GO OVER TO THE GAUGE

9    AND IT TELLS YOU -- INDICATES ON THE GAUGE ON THE VEHICLE --

10   Q.   IS THIS --

11   A.   THAT IS A FLOATER.

12   Q.   IS THAT A FLOATER?

13   A.   YEAH, THAT'S A FLOATER.

14   Q.   WAS THERE A FLOATER ATTACHED TO THAT SENDING UNIT?

15   A.   IF THERE WAS A FLOATER, IT WOULD HAVE BEEN HARD FOR ME TO

16   REMOVE THE SENDING UNIT UP.  SO THERE WAS NO FLOATER BECAUSE I

17   GRABBED THE SENDING UNIT AND JUST PULL IT UP.  BUT I DID NOTICE

18   THAT THIS RED STRING IS NOT SUPPOSED TO BE THERE.

19   Q.   WHY IS THE RED STRING NOT SUPPOSED TO BE THERE?

20   A.   BECAUSE NO SENDING UNIT COMES LIKE THAT FROM THE DEALER.

21   IT WAS MODIFIED.

22   Q.   AND WHAT WAS IT MODIFIED TO DO?

23   A.   PROBABLY FROM KEEPING -- FROM KEEPING THE GAS LEVEL HIGH,

24   THE NEEDLE OF THE GAS LEVEL GAUGE HIGH.

25   Q.   ALL RIGHT.  WHEN YOU'RE INSPECTING VEHICLES, DO YOU EVER

1  LOOK AT THE GAS GAUGE TO SEE IF A VEHICLE SHOWS SIGNS OF BEING

2  SUSPICIOUS?

3  A.   YES, I DO.

4  Q.   AND IF IT WAS TO SHOW ALL THE WAY ABOVE FULL, WOULD THAT

5  BE SOMETHING THAT WOULD DRAW YOUR ATTENTION TO THE VEHICLE?

6  A.   BASED ON THE TAPPING OF THE GAS TANK.

7  Q.   AND IF IT SHOWED ALL THE WAY EMPTY, WOULD THAT BE

8  SOMETHING THAT WOULD DRAW YOUR ATTENTION TO THE VEHICLE?

9  A.   YES.  AND IT COMES BACK TO -- DEPENDING ON THE TAPPING OF

10 THE GAS TANK.

11 Q.   ALL RIGHT.  BUT IF IT WAS SHOWN TO BE LIKE THIS SENDING

12 UNIT, PEGGED IN PLACE, REGARDLESS OF FUEL LEVEL, RIGHT AT THE

13 THREE-QUARTERS MARK, WOULD THAT DRAW YOUR ATTENTION?

14 A.   WELL, LET ME PUT IT THIS WAY:  NO MATTER WHERE IT -- THE

15 SENDING UNIT LEVEL IS, IF IT HIT THE TANK, AND IF IT'S -- IF IT

16 HAS SOME SUBSTANCE INSIDE THE GAS TANK, IT'S GOING TO TAP HARD.

17 Q.   OKAY.  NOW DID YOU --

18        MR. CONOVER:  YOUR HONOR, AT THIS POINT, THE

19 GOVERNMENT WOULD MOVE TO ADMIT EXHIBIT NO. 14, THE SENDING

20 UNIT, AND THAT INCLUDES BOTH THE LID AND THE UNIT ITSELF.

21        THE COURT:  ANY OBJECTION?

22        MR. GARRISON:  NO OBJECTION.

23        THE COURT:  OKAY, IT WILL COME IN.

24        (GOVERNMENT'S EXHIBIT 14 RECEIVED INTO EVIDENCE.)

25        MR. CONOVER:  THANK YOU.

1    BY MR. CONOVER:

2    Q.   I'D ALSO LIKE TO SHOW NOW A DIAGRAM.

3        MR. SANCHEZ, DOES THIS APPEAR TO BE AN ACCURATE DEPICTION

4    OF A VOLKSWAGEN BEETLE?

5    A.   YES, SIR.

6    Q.   DOES IT APPEAR TO SHOW A SENDING UNIT ACCESS?

7    A.   YES, RIGHT THERE, (INDICATING).

8            THE COURT:   MR. GARRISON, IF YOU WANT TO COME UP AND

9    LOOK, YOU'RE WELCOME TO DO THAT.

10           MR. GARRISON:   THANK YOU.

11   BY MR. CONOVER:

12   Q.   WOULD THIS AID IN YOUR TESTIMONY HERE TODAY OF EXPLAINING

13   TO THE JURY WHAT YOU FOUND IN THAT GAS TANK?

14   A.   YES, THE PACKAGES, WHAT IS IN THE GAS TANK.

15           MR. CONOVER:   YOUR HONOR, I'D MOVE TO ADMIT

16   GOVERNMENT'S EXHIBIT NO. 15.

17           MR. GARRISON:   YOUR HONOR, I'D OBJECT TO THAT

18   EXHIBIT.  AND I CAN GIVE YOU A REASON SIDE BAR, IF YOU LIKE.

19           THE COURT:   ALL RIGHT.  I'LL TELL YOU WHAT, WE'LL

20   RESERVE ON THAT FOR THE TIME BEING.  I DON'T WANT TO TAKE THE

21   TIME AT SIDE BAR AT THIS TIME.

22           THE CLERK:   COUNSEL, YOU SAID 15?

23           MR. GARRISON:   YOUR HONOR, I OBJECT TO IT BEING

24   PUBLISHED IF IT'S NOT ADMITTED.

25           MS. BOOT:   IT'S NO. 18.

1           THE COURT:  YEAH, I DON'T THINK YOU SHOULD BE SHOWING

2    IT.  WHY DON'T YOU HOLD OFF ON THAT EXHIBIT FOR A FEW MINUTES.

3    LET'S SEE WHAT HAPPENS.

4           MR. CONOVER:  ALL RIGHT.

5    BY MR. CONOVER:

6    Q.   WHEN YOU PULLED THE SENDING UNIT OUT FROM THE GAS TANK,

7    WHAT DID YOU SEE INSIDE THE GAS TANK?

8    A.   I SAW PACKAGES WRAPPED IN VACUUM-SEALED BAGS.

9    Q.   AND WERE THOSE PACKAGES INSIDE THE GAS TANK ITSELF?

10   A.   WITHIN THE GAS TANK, EXACTLY.

11   Q.   AND WHAT DID THOSE PACKAGES LOOK LIKE?

12   A.   WELL, THEY WERE KIND OF, LIKE, A ROUND SHAPE, AND THEY

13   WERE WITHIN A BAG, A VACUUM-SEALED BAG, PLASTIC BAG.

14   Q.   WERE THEY LOCATED THROUGHOUT THE GAS TANK?

15   A.   YES.

16          MR. CONOVER:  AT THIS POINT, YOUR HONOR, THE DIAGRAM

17   THAT WE WOULD LIKE TO SHOW TO THE WITNESS WILL SHOW HOW THE

18   PACKAGES WOULD GO DOWN INTO THE VEHICLE.  THAT'S WHY I WOULD

19   LIKE TO USE THE DIAGRAM AS A DEMONSTRATIVE.

20          THE COURT:  LET ME SEE THE DOCUMENT.

21          MR. CONOVER:  IT WOULD BE FOR DEMONSTRATIVE ONLY.

22          THE COURT:  I'M NOT SURE -- LET ME SEE THAT, COUNSEL.

23   I'M NOT SURE WHAT THIS IS GOING TO ADD TO HIS TESTIMONY, HOW

24   THIS IS GOING TO HELP.

25          MR. CONOVER:  IT HELPS THE JURY TO SEE WHERE THE

1   PACKAGES ARE LOCATED AND HOW THEY GO THROUGHOUT -- THE

2   TESTIMONY NOW WILL BE ABOUT HOW FAR INTO THE TANK AND HOW

3   DIFFICULT THE PACKAGES ARE TO OBTAIN FROM THE EDGES.

4              THE COURT:  ALL RIGHT, COUNSEL, COME UP TO SIDE BAR.

5              (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY.)

6              THE COURT:  SO WHAT IS THE OBJECTION, MR. GARRISON?

7              MR. GARRISON:  THE OBJECTION IS THAT THE WAY THAT THE

8   PACKAGES ARE SHOWN ON THAT DIAGRAM IN THE GAS TANK, THERE IS NO

9   WAY THAT THEY CAN SAY THAT THAT IS HOW THEY APPEARED OR THAT'S

10  HOW THEY LOOKED.  THEY NEVER TOOK ANY X-RAYS.  THIS IS JUST THE

11  GOVERNMENT'S SPECULATION ON HOW IT MIGHT HAVE LOOKED.  AND IT

12  IS OVERLY PREJUDICIAL TO ME.

13             THE COURT:  WHY?

14             MR. GARRISON:  BECAUSE IT'S SPECIFICALLY DESIGNED TO

15  MAKE IT LOOK LIKE THERE IS NO ROOM FOR GAS IN THERE, YOUR

16  HONOR.  AND WHEN, IN TRUTH, WE KNOW THAT THERE WERE SEVEN

17  GALLONS OF GASOLINE.

18             THE COURT:  AREN'T YOU GOING TO GET THAT TESTIMONY

19  IN?  THAT IS GOING TO COME IN, RIGHT?

20             MR. GARRISON:  IT IS, BUT THIS -- THERE IS NO

21  FOUNDATION THAT THIS IS HOW IT APPEARED.  THIS IS JUST THEIR

22  GUESS AS TO HOW IT LOOKED.

23             THE COURT:  I'M NOT SURE --

24             MR. CONOVER:  YOUR HONOR, THERE WERE 23 PACKAGES OF

25  SIMILAR SHAPE, SIMILAR SIZE INSIDE THAT GAS TANK, THROUGHOUT

1   THE GAS TANK.  OFFICER SANCHEZ WILL TESTIFY THAT HE HAD TO

2   REACH ALL THE WAY THROUGH TO THE VERY END TO FIND THOSE

3   PACKAGES.  THERE ARE 23 PACKAGES ON THAT DIAGRAM, AND THEY SHOW

4   A SPAN OF THE ENTIRE GAS TANK.

5          THE COURT:  ARE YOU WILLING TO AGREE THAT THOSE

6   PACKAGES THAT ARE SHOWN IN THAT TANK ARE NOT PRECISELY THE WAY

7   THEY WOULD HAVE BEEN IN THE GAS TANK?

8          MR. CONOVER:  OF COURSE, YOUR HONOR, YES.

9          THE COURT:  OKAY, OBJECTION IS OVERRULED.

10     (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY CONCLUDED.)

11         THE COURT:  GO AHEAD.

12         MR. CONOVER:  THANK YOU, YOUR HONOR.

13  BY MR. CONOVER:

14  Q.  OFFICER SANCHEZ, WHEN YOU REACHED INTO THE GAS TANK, YOU

15  WERE ABLE TO FIND PACKAGES; IS THAT CORRECT?

16  A.  THAT'S CORRECT, SIR.

17  Q.  DID YOU ASSIST IN REMOVING THOSE PACKAGES?

18  A.  I ASSISTED IN REMOVING ONE OF THE PACKAGES.

19  Q.  AND WERE YOU THERE WHEN OFFICER MORTON REMOVED THE OTHER

20  PACKAGES FROM THE GAS TANK?

21  A.  NO, I WASN'T.

22  Q.  WHEN YOU REMOVED THE PACKAGE, WHAT DID IT LOOK LIKE?

23  A.  IT LOOKED LIKE -- IT HAD A SIMILAR SHAPE.  IT WAS IN THE

24  BACK, LIKE I SAID BEFORE.  AND I GRABBED THE PACKAGE, AND I

25  HANDED IT OVER TO OFFICER MORTON.

```
1    Q.   AND THE WAY THESE PACKAGES ARE SHOWN HERE IN THE GAS TANK,

2    THIS ISN'T EXACTLY HOW THE PACKAGES WERE AT THAT TIME?

3    A.   I'M PRETTY SURE.   IT IS IMPOSSIBLE TO HAVE THE SAME

4    LOCATION OF THE PACKAGES FROM THE GAS TANK.

5    Q.   AFTER REMOVING THE PACKAGES FROM THE GAS TANK, DID YOU

6    PLAY A FURTHER ROLE IN THIS INVESTIGATION?

7    A.   NO.   AFTER I GRABBED THE PACKAGE, I HANDED IT OVER TO

8    OFFICER MORTON.   OFFICER MORTON TESTED THE PACKAGE, THE

9    CONTENTS, AND THE CONTENTS CAME BACK TO --

10              MR. GARRISON:   OBJECTION.   HEARSAY.

11              THE COURT:   OVERRULED.

12              THE WITNESS:   THE CONTENTS WITHIN THE PACKAGE CAME

13   BACK POSITIVE FOR THE PROPERTIES OF METHAMPHETAMINE.

14              MR. CONOVER:   THANK YOU.

15         NO FURTHER QUESTIONS, YOUR HONOR.

16              THE COURT:   ALL RIGHT, MR. GARRISON.

17              MR. GARRISON:   THANK YOU, YOUR HONOR.

18                          CROSS-EXAMINATION

19   BY MR. GARRISON:

20   Q.   GOOD AFTERNOON, OFFICER.

21   A.   HOW ARE YOU DOING, SIR?

22   Q.   GOOD.   HOW ARE YOU?

23   A.   DOING GOOD, THANK YOU.

24   Q.   OFFICER SANCHEZ, DID YOU WRITE ANY REPORTS IN THIS CASE?

25   A.   I'M SORRY, SIR?
```

1    Q.   DID YOU WRITE ANY REPORTS, SIR?

2    A.   YES, I HAVE.

3    Q.   YOU HAVE WRITTEN A REPORT?

4    A.   NO.

5    Q.   YOU HAVE NOT?

6    A.   NO.  WELL, NOT FOR THIS CASE.

7    Q.   NOT FOR THIS CASE, OKAY.

8         DID YOU REVIEW ANY REPORTS BEFORE TESTIFYING TODAY, SIR?

9    A.   I'M SORRY, SIR?

10   Q.   DID YOU REVIEW ANY REPORTS BEFORE TESTIFYING TODAY?

11   A.   NO.

12   Q.   HAVE YOU TAKEN ANY NOTES ABOUT THIS CASE?

13   A.   NO.

14   Q.   HAVE YOU TESTIFIED BEFORE ABOUT THIS CASE AT ALL?

15   A.   NO.

16   Q.   OKAY.  NOW OFFICER SANCHEZ, I'M SURE YOU WENT TO THE

17   CUSTOMS AND BORDER PROTECTION ACADEMY; IS THAT RIGHT?

18   A.   IT'S FLETC.

19   Q.   FEDERAL LAW ENFORCEMENT TRAINING CENTER, RIGHT?

20   A.   YES, THAT'S CORRECT.

21   Q.   IN GLYNCO, GEORGIA, RIGHT?

22   A.   YES, THAT'S CORRECT, SIR.

23   Q.   AND YOU TOOK A CLASS THERE THAT WAS ANYWHERE BETWEEN 11-

24   AND 13-WEEKS LONG, RIGHT?

25   A.   THAT'S CORRECT.

1  Q.   ONE OF THE THINGS YOU LEARNED TO DO WAS WRITE REPORTS?

2  A.   YES, SIR.

3  Q.   AND YOU LEARNED TO WRITE REPORTS WHEN SOMETHING IMPORTANT

4  HAPPENED IN A CASE?

5  A.   THAT IS CORRECT, SIR.

6  Q.   IN THIS CASE, YOU DIDN'T WRITE ANY REPORTS?

7  A.   NO.

8  Q.   EVEN THOUGH YOU WERE A MAJOR PART IN TAKING THIS SENDING

9  UNIT OUT OF THE GAS TANK, RIGHT?

10  A.   WELL, LET ME PUT IT THIS WAY:  I WAS IN PRIMARY, I WAS IN

11  SECONDARY, AND I WAS ASSISTING AN OFFICER.

12  Q.   OKAY.  WELL, SO YOU'RE SAYING THAT PRIMARY HAS TO WRITE A

13  REPORT, RIGHT?

14  A.   YES.

15  Q.   SECONDARY HAS TO WRITE A REPORT, RIGHT?

16  A.   CORRECT.

17  Q.   THE SEIZING OFFICER HAS TO WRITE A REPORT?

18  A.   THAT'S CORRECT.

19  Q.   ALL RIGHT.  NOW YOU'RE NOT REQUIRED TO WRITE A REPORT?

20  A.   NO.

21  Q.   ON THE SAME TOKEN, THAT MIGHT BE A GOOD IDEA, RIGHT?

22  A.   IT WOULD BE A GOOD IDEA.

23  Q.   BUT YOU DIDN'T?

24  A.   THEY DIDN'T ASK ME FOR ONE.

25  Q.   OFFICER SANCHEZ, YOU WORK AT LEAST FORTY HOURS A WEEK,

1    RIGHT?

2    A.   YES.

3    Q.   THAT'S FIVE DAYS A WEEK?

4    A.   FIVE DAYS A WEEK, SIR.

5    Q.   AND YOU'VE BEEN DOING THAT FOR THE PAST YEAR AND A HALF?

6    A.   FOR THE PAST SEVEN YEARS.

7    Q.   OKAY.  SO YOU SEE A LOT OF CARS EVERY DAY, RIGHT?

8    A.   A LOT OF CARS.

9    Q.   YOU SEE A LOT OF CARS EVERY MONTH?

10   A.   YES.

11   Q.   A LOT OF CARS EVERY YEAR?

12   A.   A LOT.

13   Q.   I WANT TO TAKE YOU BACK TO SOMETHING YOU SAID ON DIRECT.

14   YOU SAID, I'M NOT A MECHANIC; IS THAT RIGHT?

15   A.   NO, I'M NOT A MECHANIC, SIR.

16   Q.   OKAY.  SO YOU'RE NOT TRAINED IN HOW TO DISASSEMBLE THIS

17   SENDING UNIT, RIGHT?

18   A.   I DID NOT TAKE A CLASS ON DISASSEMBLING A SENDING UNIT.

19   Q.   RIGHT.  YOU HAD NO FORMAL TRAINING ON IT, RIGHT?

20   A.   NO FORMAL TRAINING EXCEPT FOR WORK.

21   Q.   YOU HAVE NO FORMAL TRAINING ON HOW TO DEPRESSURIZE THE GAS

22   LINE?

23   A.   NO.

24   Q.   YOU HAVE NO FORMAL TRAINING ON HOW TO DISCONNECT THE

25   ELECTRICAL?

1   A.   NO.

2   Q.   SO WHAT YOU DID IS, YOU GOT IN THERE AND TOOK THE GAS LINE

3   OFF?

4   A.   YES, SIR.

5   Q.   AND YOU DIDN'T TAKE ANY PRECAUTIONS TO DEPRESSURIZE IT?

6   A.   NO.   WHAT I DID IS, I REMOVED THE GAS LINE, AND WHEN I

7   PULLED IT OUT, THE GAS SPILLED ALL OVER ME.   I PUT IT INSIDE

8   THE GAS TANK.

9   Q.   YOU DIDN'T TAKE ANY PRECAUTIONS TO DEPRESSURIZE IT, DID

10  YOU?

11  A.   NO, SIR.

12  Q.   SO BECAUSE YOU DIDN'T DEPRESSURIZE IT, GAS GOT ALL OVER

13  YOU?

14  A.   THAT'S CORRECT.

15  Q.   YOU HAD NO CONTACT WITH MR. FLORES; IS THAT RIGHT?

16  A.   NO, SIR.

17  Q.   I WANT TO SPEAK TO YOU SPECIFICALLY ABOUT THIS COVER ON

18  THE SENDING UNIT.   OKAY?

19  A.   ALL RIGHT.

20  Q.   YOU TESTIFIED THAT WHEN YOU TOOK THIS OFF, THERE WAS GLUE

21  ON IT.

22  A.   NO.   THAT THERE WAS NO GLUE.   THERE WAS GLUE AROUND

23  HERE -- ACTUALLY, YEAH, THERE IS GLUE HERE.

24  Q.   SO THERE WAS GLUE AROUND THE OUTSIDE?

25  A.   YES.

1   Q.   AND THIS ACTUALLY HAS A RUBBER LIP ON THE --

2   A.   SEAL ON THE GAS CAN.

3   Q.   THIS IS A SEAL, RIGHT?

4   A.   YEAH.  THAT SHOULD BE CONSIDERED A SEAL.

5   Q.   YOU JUST CALLED IT A "SEAL."

6   A.   YES.

7   Q.   AND YOU CALLED IT A "GASKET"?

8   A.   A GASKET, A SEAL.

9   Q.   THE POINT OF THAT IS, WHEN THIS IS HELD TIGHT AGAINST THE

10  BODY OF THE CAR --

11  A.   YES.

12  Q.   -- RIGHT, THEN THAT SEAL COMPRESSES, RIGHT?

13  A.   YES.

14  Q.   AND THAT DOESN'T ALLOW ANY VAPORS TO GET OUT INTO THE CAR,

15  RIGHT?

16  A.   THAT IS THE PURPOSE OF THAT SEAL, SIR.

17  Q.   AND THAT SEAL IS STILL INTACT ON THIS, RIGHT?

18  A.   YES.

19           MR. GARRISON:  YOUR HONOR, COULD I HAVE A MOMENT?

20           THE COURT:  YES.

21  BY MR. GARRISON:

22  Q.   ONE LAST THING WE WANTED TO ASK YOU ABOUT IS, SO WHEN YOU

23  TOOK THE GAS LINE OFF OF THE SENDING UNIT -- REMEMBER THAT?

24  A.   YES, SIR.

25  Q.   -- AND YOU GOT GAS ALL OVER YOU?

1   A.   YES.

2   Q.   ON DIRECT, YOU TESTIFIED THAT GAS GOT ALL OVER THE CAR,

3   TOO, RIGHT?

4   A.   IT GOT -- NOT ALL OVER THE CAR, ALL OVER ME.   AND

5   ACTUALLY, YOU KNOW WHAT, RIGHT NEXT TO THE SENDING UNIT CAVITY.

6   Q.   SO GAS DID GET INTO THE CAR, RIGHT?

7   A.   YES.

8           MR. GARRISON:   NO FURTHER QUESTIONS, YOUR HONOR.

9           THE COURT:   ALL RIGHT.   REDIRECT?

10          MR. CONOVER:   NOTHING FURTHER, YOUR HONOR.

11          THE COURT:   THANK YOU, SIR.   YOU MAY STEP DOWN.

12          THE WITNESS:   THANK YOU, SIR.

13          THE COURT:   PLEASE CALL YOUR NEXT WITNESS.

14          MS. BOOT:   YOUR HONOR, THE GOVERNMENT CALLS OFFICER

15   DOUG MORTON.

16                     (WITNESS SWORN.)

17          THE CLERK:   PLEASE STATE YOUR FULL NAME FOR THE

18   RECORD, SPELLING YOUR FIRST AND LAST NAME.

19          THE WITNESS:   MY NAME IS DOUG MORTON, D-O-U-G-L-A-S,

20   M-O-R-T-O-N.

21                  DIRECT EXAMINATION

22   BY MS. BOOT:

23   Q.   GOOD AFTERNOON, OFFICER MORTON.

24   A.   GOOD AFTERNOON.

25   Q.   CAN YOU PLEASE TELL THE JURY WHO YOU WORK FOR.

1    A.   I WORK FOR U.S. CUSTOMS AND BORDER PROTECTION.

2    Q.   AND WHAT IS YOUR JOB TITLE THERE?

3    A.   MY JOB DOWN THERE IS TO CONDUCT --

4    Q.   I'M SORRY, YOUR JOB TITLE.  SORRY.

5    A.   OH, JOB TITLE, SORRY.  CUSTOMS -- CBPO, CUSTOMS AND BORDER

6    PROTECTION OFFICER.

7    Q.   AND ARE YOU AN INSPECTOR?

8    A.   YES.

9    Q.   HOW LONG HAVE YOU BEEN EMPLOYED AT CUSTOMS AND BORDER

10   PROTECTION?

11   A.   ABOUT THREE AND A HALF YEARS.

12   Q.   AND WHERE DO YOU TYPICALLY WORK, WHAT LOCATION?

13   A.   AT THE PORT OF ENTRY.

14   Q.   WHICH PORTS OF ENTRY?

15   A.   RIGHT NOW, I WORK AT SAN YSIDRO.

16   Q.   DO YOU WORK AT THE OTAY MESA PORT OF ENTRY AS WELL?

17   A.   YES.

18   Q.   CAN YOU DESCRIBE YOUR DUTIES AS AN INSPECTION OFFICER.

19   A.   MY PRIMARY DUTIES?

20   Q.   UH-HUH.

21   A.   CONDUCT PRIMARY INSPECTIONS, CONDUCT SECONDARY

22   INSPECTIONS, INTERVIEWING TRAVELERS.

23   Q.   SO WHEN YOU SAY CONDUCT PRIMARY INSPECTIONS, DOES THAT

24   MEAN YOU SOMETIMES SIT IN THAT PRIMARY INSPECTION BOOTH?

25   A.   YES.

1    Q.   AND WHEN YOU SAY CONDUCT SECONDARY INSPECTIONS, WHAT DO

2    YOU MEAN BY THAT?

3    A.   WELL, ON PRIMARY, IF THERE IS EVER A REASON WHY WE NEED TO

4    SEND THEM FOR MORE QUESTIONING, OR IF THERE IS SOMETHING WE SEE

5    IN THE VEHICLE THAT NEEDS TO BE LOOKED AT BY A SECOND OFFICER,

6    I DO THAT AS WELL.

7    Q.   AND SO IN SECONDARY INSPECTION, THERE IS FURTHER

8    INSPECTION OF VEHICLES?

9    A.   SOMETIMES WE'LL START THE INSPECTION ALL OVER AGAIN, JUST

10   SO WE'RE SURE.

11   Q.   BEFORE BECOMING A CUSTOMS AND BORDER PROTECTION OFFICER,

12   WHERE DID YOU WORK?

13   A.   I WAS IN THE NAVY.

14   Q.   FOR HOW LONG?

15   A.   FOR NINE YEARS.

16   Q.   AND WHAT SPECIALIZED TRAINING DID YOU RECEIVE BEFORE YOU

17   BECAME A CUSTOMS AND BORDER PROTECTION OFFICER?

18   A.   I WENT TO THE ACADEMY.

19   Q.   AND WAS THERE ANY SUBSEQUENT TRAINING?

20   A.   LIKE, ON-THE-JOB TRAINING?

21   Q.   UH-HUH, YES.

22   A.   YES.

23   Q.   AND AS AN OFFICER AT THE PORT OF ENTRY, WHAT SORTS OF

24   THINGS DO YOU ASK DRIVERS WHEN YOU STOP A CAR FOR INSPECTION,

25   OR WHEN A CAR COMES UP TO YOUR PRE-PRIMARY BOOTH -- EXCUSE ME,

1   YOUR PRIMARY INSPECTION BOOTH, IF YOU HAPPEN TO BE WORKING

2   THERE?

3   A.   YOU KNOW, WHERE ARE YOU COMING FROM, WHERE ARE YOU GOING,

4   WHAT ARE YOU BRINGING BACK, BASIC QUESTIONS.

5   Q.   I'M SORRY, GO AHEAD.

6   A.   VERY BASIC QUESTIONS.

7   Q.   WHAT SORTS OF THINGS DO YOU LOOK FOR IN EITHER THE

8   PASSENGERS OR THE VEHICLES THAT YOU INSPECT; WHAT ARE YOU

9   LOOKING FOR?

10  A.   EVERY OFFICER LOOKS FOR DIFFERENT THINGS.  I LOOK FOR --

11  WHATEVER STANDS OUT, WHATEVER IS NOT NORMAL.

12  Q.   DO YOU LOOK TO THE BEHAVIOR OF THE DRIVER?

13  A.   SOMETIMES, YES.

14  Q.   DO YOU -- WOULD YOU EVER LOOK AT THE GAS GAUGE?

15  A.   UH-HUH, YES.

16  Q.   YES?  AND IF THE GAS GAUGE WAS -- READ EMPTY, WOULD THAT

17  RAISE YOUR SUSPICIONS?

18  A.   IT MIGHT.  I'D HAVE TO LOOK AT ALL THE CIRCUMSTANCES, BUT,

19  YES, YES, IT WOULD.

20  Q.   WHAT DO YOU MEAN BY THAT?  WHAT CIRCUMSTANCES WOULD YOU

21  LOOK AT?  WOULD YOU TAP THE TANK?

22  A.   IF THERE WAS A QUESTION, YES.

23  Q.   OKAY.  WHAT WOULD YOU THINK IF YOU SAW THAT THE GAS GAUGE

24  READ EMPTY AND YOU TAPPED THE TANK AND IT SOUNDED SOLID?

25          THE COURT:  COUNSEL, CAN YOU COME UP TO SIDE BAR FOR

1    A SECOND.

2           (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY.)

3           THE COURT:  I DON'T WANT TO RAIN ON YOUR PARADE, BUT

4    IT SOUNDS TO ME LIKE SOME OF THIS IS KIND OF DUPLICATIVE,

5    CUMULATIVE, MARGINALLY RELEVANT.  A LOT OF THIS HAS ALREADY

6    COME OUT.  WE'VE HEARD ALL OF THESE FOLKS, HOW THEY WORK FOR

7    THE CUSTOMS AND BORDER PROTECTION.  YOU KNOW, MAYBE YOU CAN

8    SHORTEN THIS A LITTLE BIT.  I KNOW YOU'RE TRYING TO LAY OUT A

9    STORY, BUT I THINK THE JURY HAS GOTTEN THE PICTURE.  NOW WE'RE

10   AT THE POINT WHERE IT SEEMS TO ME THEY'RE INTERESTED IN HOW DID

11   MR. FLORES KNOW THE DRUGS WERE THERE.

12          MS. BOOT:  RIGHT.  THIS IS OUR LAST COURT WITNESS,

13   AND I'LL GET RIGHT TO THE DATE OF THE ARREST AND MOVE IT ALONG.

14          THE COURT:  OKAY.

15          MR. CONOVER:  THANK YOU, YOUR HONOR.

16       (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY CONCLUDED.)

17   BY MS. BOOT:

18   Q.  OFFICER MORTON, I WANT TO TURN YOUR ATTENTION TO SATURDAY,

19   NOVEMBER 28TH, 2009.  WERE YOU ON DUTY THAT DAY?

20   A.  YES, I WAS.

21   Q.  WHAT SHIFT WERE YOU WORKING?

22   A.  THE DAY SHIFT.

23   Q.  AND WHERE?

24   A.  AT THE OTAY MESA PORT OF ENTRY.

25   Q.  DID YOU COME INTO CONTACT WITH A SILVER VOLKSWAGEN BEETLE

1   ON THAT DAY?

2   A.   YES, I DID.

3   Q.   SHOWING YOU GOVERNMENT'S EXHIBIT 6, IS THIS THE SILVER

4   VOLKSWAGEN BEETLE YOU SAW THAT DAY?

5   A.   YES.

6   Q.   AND HOW DID YOU END UP COMING INTO CONTACT WITH THAT

7   VEHICLE?

8   A.   MY SUPERVISOR HAD INSTRUCTED ME TO INSPECT THE VEHICLE.

9   Q.   SO WHERE WAS THE VEHICLE LOCATED WHEN YOU FIRST SAW IT?

10  A.   IN THE SECONDARY LOT.

11  Q.   AND WHAT DID YOU OBSERVE AS YOU APPROACHED THE VEHICLE?

12  A.   THERE WERE OFFICERS STANDING AROUND IT.

13  Q.   AND DID YOU GET A LOOK INSIDE THE CAR, THE BEETLE?

14  A.   YES.

15  Q.   WHAT DID YOU OBSERVE OF THE CAR?

16  A.   I NOTICED THAT THE BACK SEAT HAD BEEN LIFTED UP.

17  Q.   AND IS THAT -- AT THAT POINT, IS THIS WHAT YOU SAW IN THE

18  CAR HERE?  I'M SHOWING YOU GOVERNMENT EXHIBIT 10.

19  A.   YES.

20  Q.   DID YOU SEE OFFICERS REMOVE THE SENDING UNIT THAT DAY?

21  A.   YES.

22  Q.   AND AT SOME POINT, DID OFFICER SANCHEZ HAND YOU A PACKAGE?

23  A.   NO.  HE DIDN'T HAND IT TO ME.

24  Q.   WHAT HAPPENED?

25  A.   HE REMOVED THE SENDING UNIT, AND I VISUALLY SAW A PACKAGE

```
 1   INSIDE THE HOLE.

 2   Q.   DID YOU CONDUCT A FIELD TEST THAT DAY?

 3   A.   YES.

 4   Q.   TELL ME ABOUT THAT.

 5   A.   SO WE HAVE LITTLE FIELD TESTS --

 6   Q.   I'M SORRY, NOT IN DETAIL.  BUT HOW DID YOU GET THE PACKAGE

 7   TO CONDUCT IT?

 8   A.   JUST REACHED IN AND GRABBED IT OUT.

 9   Q.   YOU REACHED IN AND GRABBED IT OUT?

10   A.   YEAH.

11   Q.   OKAY.  AND SO THEN YOU CONDUCTED A FIELD TEST?

12   A.   YES.

13   Q.   WHAT WERE THE RESULTS OF THE TEST?

14   A.   IT FIELD TESTED POSITIVE FOR METHAMPHETAMINE.

15   Q.   AND AT SOME POINT, DID YOU CONTACT A GOVERNMENT CONTRACTOR

16   MECHANIC?

17   A.   YES.

18   Q.   AND WHAT HAPPENED AFTER THAT; WHAT DID YOU DO THEN?  WHAT

19   DID THE MECHANIC DO?

20   A.   HE INFORMED US THAT WE SHOULD, INSTEAD OF LIFTING IT UP,

21   THE VEHICLE, AND PULLING THE TANK OUT FROM UNDERNEATH, THAT WE

22   SHOULD JUST PULL THE NARCOTICS OUT OF THE -- THAT HOLE RIGHT

23   THERE.

24   Q.   DID YOU HAVE TO DRAIN THE GAS FIRST?

25   A.   THEY DID.
```

1   Q.   THE MECHANIC DID?

2   A.   YES.

3   Q.   HOW DID HE DO IT?

4   A.   HE HAD SOME SORT OF SIPHONING DEVICE.

5   Q.   WHAT DID HE DRAIN THE GAS INTO?

6   A.   A CAN.

7   Q.   IS IT JUST ONE?

8   A.   JUST ONE CAN.

9   Q.   OKAY.  AND AT THAT POINT, DID YOU THEN GO TO PULL THE

10  PACKAGES OUT?

11  A.   YES.

12  Q.   I WANT TO SHOW YOU GOVERNMENT'S EXHIBIT 18.

13       (GOVERNMENT'S EXHIBIT 18 MARKED FOR IDENTIFICATION.)

14  BY MS. BOOT:

15  Q.   NOW WHEN YOU WENT TO GO AND PULL THE PACKAGES OUT, DID YOU

16  REACH DOWN A HOLE, AS INDICATED HERE?

17  A.   YEAH.  YES, I DID.

18  Q.   AND THEN DID YOU -- HOW MANY PACKAGES DID YOU PULL OUT?

19  A.   TWENTY-THREE.

20  Q.   WAS IT DIFFICULT TO PULL THE PACKAGES OUT?

21  A.   THE FIRST ONES, NO; THE ADDITIONAL ONES, YES.

22  Q.   HOW COME?

23  A.   BECAUSE THEY WERE ALL THE WAY ON THE OTHER SIDE.

24  Q.   SO YOU HAD TO REACH IN?

25  A.   YES.

1   Q.   HOW FAR IN DID YOUR ARM GO TO GRAB THE OTHER PACKAGES?

2   A.   AS FAR IN AS IT WOULD GO.

3   Q.   HOW DID YOU SMELL AFTER YOU PULLED THE PACKAGES OUT?

4   A.   LIKE GASOLINE.

5   Q.   AND HOW LONG DID THAT SMELL STAY WITH YOU?

6            MR. GARRISON:  OBJECTION.  RELEVANCE.

7            THE COURT:  YEAH, SUSTAINED.

8            MS. BOOT:  ALL RIGHT.

9   BY MS. BOOT:

10  Q.   I WANT TO SHOW YOU -- CAN YOU LOOK IN YOUR EXHIBIT BINDER

11  AT GOVERNMENT'S EXHIBIT 17.

12  A.   I'M SORRY, WHICH ONE?

13  Q.   17.

14           (GOVERNMENT'S EXHIBIT 17 MARKED FOR IDENTIFICATION.)

15  BY MS. BOOT:

16  Q.   DO YOU SEE IT?

17  A.   YES.

18  Q.   WHAT IS THAT A PICTURE OF?

19  A.   OF THE PACKAGES I PULLED OUT OF THE GAS TANK.

20  Q.   DID YOU ACTUALLY TAKE THAT PHOTOGRAPH?

21  A.   YES.

22           MS. BOOT:  YOUR HONOR, I MOVE TO ADMIT GOVERNMENT'S

23  EXHIBIT 17.

24           THE COURT:  ANY OBJECTION?

25           MR. GARRISON:  NO OBJECTION, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  IT WILL COME IN.

2          (GOVERNMENT'S EXHIBIT 17 RECEIVED INTO EVIDENCE.)

3          MS. BOOT:  THANK YOU.

4    BY MS. BOOT:

5    Q.  AND SO REAL QUICK, CAN YOU JUST LET THE JURY KNOW WHAT

6    THAT -- WHAT THAT IS A PICTURE OF.

7    A.  THAT IS THE PICTURE OF OUR SCALE, AND ALL THE PACKAGES

8    WERE SITTING ON THE SCALE.

9    Q.  THAT'S ALL 23 OF THEM?

10   A.  YES.

11   Q.  AND WHAT DID THE PACKAGES WEIGH?

12   A.  10.94 KILOGRAMS.

13   Q.  AND AGAIN, WHAT WAS IN THE PACKAGES?

14   A.  METHAMPHETAMINE.

15   Q.  AND AFTER YOU WEIGHED THE PACKAGES OF DRUGS, WHAT DID YOU

16   DO WITH THEM?

17   A.  I BOXED THEM UP.

18   Q.  DID YOU SEAL THE BOX?

19   A.  YES.

20          MS. BOOT:  NOTHING FURTHER AT THIS TIME.

21          THE COURT:  ALL RIGHT.  MR. GARRISON?

22          MR. GARRISON:  THANK YOU, YOUR HONOR.

23                    CROSS-EXAMINATION

24   BY MR. GARRISON:

25   Q.  GOOD AFTERNOON, OFFICER MORTON.

1   A.   GOOD AFTERNOON.

2   Q.   OFFICER MORTON, GOVERNMENT'S EXHIBIT 17, YOU TOOK THAT

3   PICTURE, RIGHT?

4   A.   YES, I DID.

5   Q.   SO THEN YOU STACKED UP ALL THE METHAMPHETAMINE ONTO THE

6   SCALE THERE?

7   A.   YES.

8   Q.   KIND OF BUILT A LITTLE WALL OF METHAMPHETAMINE THERE, HUH?

9   A.   A LITTLE STACK, YEAH.

10   Q.   A LITTLE WALL?

11   A.   A LITTLE WALL?

12   Q.   YES.  IT LOOKS LIKE A WALL.

13   A.   MAYBE A LITTLE ONE.

14   Q.   OKAY, A LITTLE ONE.

15        THE COURT:  ALL RIGHT, MR. GARRISON, THE DIFFERENCE

16   BETWEEN A WALL AND A STACK.

17        MR. GARRISON:  I'M NOTHING IF NOT THOROUGH, YOUR

18   HONOR.

19        THE COURT:  THAT IS TRUE.  I GRANT YOU THAT.

20   BY MR. GARRISON:

21   Q.   OFFICER, YOU WROTE ONE REPORT IN THIS CASE, RIGHT?

22   A.   I DID.

23   Q.   OKAY.  DID YOU TAKE ANY NOTES ABOUT THIS CASE AT ANY TIME?

24   A.   ANY ADDITIONAL NOTES?

25   Q.   BESIDES THE REPORT.

1   A.   NO.

2   Q.   HAVE YOU TESTIFIED ABOUT THE CASE BEFORE?

3   A.   NO.

4   Q.   ALL RIGHT.  LET'S TALK JUST ABOUT SOMETHING THAT YOU SAID

5   ON DIRECT.  YOU HAD SAID THAT IN SECONDARY INSPECTION,

6   SOMETIMES AN OFFICER WILL GO THROUGH THE WHOLE INSPECTION

7   AGAIN, RIGHT?

8   A.   YES.

9   Q.   AND YOU SAID THAT THAT WAS JUST TO BE SURE, RIGHT?

10  A.   YES.

11  Q.   SO SECONDARY INSPECTION IS A VERY THOROUGH INSPECTION; IS

12  THAT A FAIR STATEMENT?

13  A.   IT IS A FAIR STATEMENT.

14  Q.   OKAY.  I MEAN, THE GOAL IS THAT IF THERE ARE DRUGS IN THE

15  CAR, IT IS NOT MAKING IT OUT OF SECONDARY INSPECTION, RIGHT?

16  A.   THAT'S THE IDEA.

17  Q.   THAT'S THE GOAL?

18  A.   THAT'S THE GOAL, YES.

19  Q.   THAT'S WHY IT'S SO THOROUGH.

20       NOW I WANT TO TALK TO YOU A LITTLE BIT ABOUT THE SENDING

21  UNIT.  YOU TESTIFIED THAT THE MECHANIC -- THE CONTRACT MECHANIC

22  CAME TO THE PORT; IS THAT RIGHT?

23  A.   YES.

24  Q.   AND AT THAT TIME, THE SENDING UNIT WAS OUT, RIGHT?

25  A.   YES.

1    Q.   AND YOU COULD SEE THE PACKAGES IN THE GAS TANK?

2    A.   YES.

3    Q.   AND THE MECHANIC TOLD YOU IT WOULD BE EASIEST TO JUST

4    REACH DOWN THROUGH THAT HOLE AND TAKE THE PACKAGES OUT, RIGHT?

5    A.   YES.

6    Q.   THAT WOULD BE THE FASTEST WAY?

7    A.   HE SAID IT WOULD BE THE EASIEST.

8    Q.   WELL, WHAT WAS THE ALTERNATIVE?   WHAT DID YOU WANT TO DO

9    BEFORE THAT?

10   A.   WELL, HE ORIGINALLY CAME OUT TO REMOVE THE GAS TANK.

11   Q.   RIGHT.   YOU WANTED TO DROP THE GAS TANK, UNBOLT IT, AND

12   ACTUALLY TAKE IT APART FROM THE CAR?

13   A.   UH-HUH.

14   Q.   THAT WOULD HAVE TAKEN LONGER, ACCORDING TO THE CONTRACT

15   MECHANIC, RIGHT?

16   A.   UH-HUH.

17   Q.   SO HE SAID, JUST GO THROUGH THE HOLE, AND THAT'S WHAT YOU

18   DID?

19   A.   YES.

20   Q.   NOW THE ONLY OTHER THING I WANTED TO TALK TO YOU ABOUT IS,

21   YOU WERE THE ONE WHO ACTUALLY ARRESTED MR. FLORES IN THIS CASE,

22   RIGHT?

23   A.   YES.

24   Q.   YOU WENT UP TO HIM IN THE OFFICE, RIGHT?

25   A.   YES.

```
1    Q.   YOU TOLD HIM THAT YOU WERE PUTTING HIM UNDER ARREST?

2    A.   YES.

3    Q.   HE COMPLIED WITH YOUR COMMANDS?

4    A.   YES.

5    Q.   YOU TOOK HIS PICTURE?

6    A.   YES.

7    Q.   YOU PUT HIM IN A CELL?

8    A.   YES.

9    Q.   HE DID WHATEVER YOU TOLD HIM TO DO?

10   A.   YES.

11   Q.   HE NEVER RESISTED YOU?

12   A.   NO.

13   Q.   NEVER CAUSED A PROBLEM FOR YOU?

14   A.   NO.

15         MR. GARRISON:  NO FURTHER QUESTIONS.

16         THE COURT:  REDIRECT?

17         MS. BOOT:  NOTHING FURTHER, YOUR HONOR.

18         MR. GARRISON:  ACTUALLY, YOUR HONOR, I'M SORRY, THERE

19   WAS ONE CHAPTER THAT I MISSED.  BUT I ALSO HAVE --

20         THE COURT:  WAIT A MINUTE, I THOUGHT THAT YOU WERE

21   THOROUGH IF NOTHING ELSE.

22         MR. GARRISON:  I SHOULDN'T HAVE SAID IT.

23         THE COURT:  ALL RIGHT, GO AHEAD.

24         MR. GARRISON:  THANK YOU.

25   BY MR. GARRISON:
```

1   Q.   ONE THING I FORGOT ABOUT, DRAINING THE GAS.   OKAY.   WHEN

2   THE GAS WAS DRAINED, SEVEN GALLONS OF GAS CAME OUT OF THAT GAS

3   TANK, RIGHT?

4   A.   YES.

5   Q.   AND DID ALL SEVEN GALLONS FIT IN THAT ONE CONTAINER?

6   A.   YES.

7   Q.   OKAY.   SO IT WAS A VERY LARGE CONTAINER?

8   A.   I DON'T KNOW HOW BIG THE CONTAINER WAS.

9   Q.   DID YOU SEE IT?

10  A.   YES.

11  Q.   CAN YOU ESTIMATE HOW BIG IT WAS?

12  A.   MAYBE A -- I MEAN, LESS THAN TEN GALLONS, MORE THAN FIVE,

13  BUT LESS THAN TEN.

14  Q.   SEVEN IS RIGHT BETWEEN FIVE AND TEN, RIGHT?

15  A.   YES.

16  Q.   SO SEVEN GALLONS, RIGHT?

17  A.   YES.

18          MR. GARRISON:  NO FURTHER QUESTIONS.

19          THE COURT:  ALL RIGHT.  REDIRECT?

20          MS. BOOT:  NO, YOUR HONOR.

21          THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN.

22      PLEASE CALL YOUR NEXT WITNESS.

23          MR. CONOVER:  I'LL CHECK OUTSIDE REAL BRIEFLY, YOUR

24  HONOR.

25      THE UNITED STATES CALLS SHANNON JENKINSON.

1          (WITNESS SWORN.)

2          THE CLERK:  STATE YOUR FULL NAME FOR THE RECORD,

3  SPELLING YOUR FIRST AND LAST NAME.

4          THE WITNESS:  SHANNON JENKINSON, S-H-A-N-N-O-N,

5  J-E-N-K-I-N-S-O-N.

6                  DIRECT EXAMINATION

7  BY MR. CONOVER:

8  Q.   MS. JENKINSON, WHERE ARE YOU EMPLOYED?

9  A.   AT&T.

10 Q.   AND HOW LONG HAVE YOU WORKED FOR AT&T?

11 A.   JUST OVER FIVE YEARS.

12 Q.   AND ARE YOU WHAT IS CONSIDERED A CUSTODIAN OF RECORDS FOR

13 AT&T?

14 A.   I AM.

15 Q.   WHAT DOES THAT MEAN, TO BE A CUSTODIAN OF RECORDS?

16 A.   IN OUR OPERATIONS DEPARTMENT, WE -- OUR NORMAL, DAILY

17 BUSINESS, WE MAINTAIN RECORDS, WHETHER THEY BE BILLING RECORDS,

18 CUSTOMER INFORMATION, PROPRIETARY INFORMATION, ETC.

19 Q.   AND DOES AT&T MAINTAIN RECORDS WHEN SOMEONE MAKES PHONE

20 CALLS?

21 A.   YES.

22 Q.   AND DO THEY MAINTAIN RECORDS FOR CELL PHONES?

23 A.   YES.

24 Q.   AND SO IF AN INDIVIDUAL WAS TO HAVE AN ACCOUNT WITH AT&T,

25 WOULD AT&T KEEP RECORDS OF THAT ACCOUNT?

1   A.   YES.

2   Q.   WOULD IT KEEP RECORDS OF SOMEONE -- THEIR, WHAT IS CALLED

3   SUBSCRIBER INFORMATION?

4   A.   ABSOLUTELY.

5   Q.   AND WHAT IS SUBSCRIBER INFORMATION?

6   A.   SUBSCRIBER INFORMATION WOULD BE THE BILLING PHONE NUMBER,

7   THE PLACE OF ADDRESS, WHERE THE BILLING WOULD BE SENT, ANY

8   PHONE CALLS THAT ARE MADE, DATES, TIMES, CELL PHONE TOWERS.

9   Q.   AND WOULD AT&T ALSO KEEP A RECORD OF THE CALLS THAT THAT

10  SUBSCRIBER MADE, BOTH THE CALLS THAT WERE RECEIVED TO HIS

11  PHONE, OR HER PHONE, AND THE CALLS THAT WERE CALLED FROM HIS OR

12  HER PHONE?

13  A.   YES, INCOMING AND OUTGOING.

14  Q.   DOES AT&T ALSO MAINTAIN RECORDS OF TEXT MESSAGES?

15  A.   YES.

16  Q.   DOES IT MAINTAIN RECORDS OF MESSAGES THAT ARE BOTH SENT

17  AND RECEIVED?

18  A.   YES, INCOMING AND OUTGOING.

19  Q.   DOES IT MAINTAIN RECORDS OF THE CONTENT OF WHAT IS

20  ACTUALLY SAID?

21  A.   NO.

22  Q.   JUST WHETHER OR NOT IT WAS SENT OR RECEIVED?

23  A.   CORRECT.

24  Q.   DOES AT&T ALSO MAINTAIN RECORDS OF WHAT IS CALLED "CELL

25  TOWER DATA"?

1   A.   YES.

2   Q.   AND IF I MAY, IS THIS HOW IT'S MAINTAINED, WHERE WHEN AN

3   INDIVIDUAL HAS A CELL PHONE, AND THEY MAKE A CALL, THAT THAT

4   CALL IS ROUTED THROUGH, GENERALLY SPEAKING, THE CLOSEST TOWER;

5   IS THAT CORRECT?

6            MR. GARRISON:  OBJECTION.  LEADING.

7            THE COURT:  OVERRULED.  IT'S FOUNDATIONAL.

8            THE WITNESS:  THE CALL WILL GO TO A CELL PHONE TOWER

9   TO CONNECT TO THE NEXT MOBILE PHONE.

10  BY MR. CONOVER:

11  Q.   ALL RIGHT.  AND DOES IT GO TO THE TOWER IN WHICH THE CALL

12  IS CLOSEST TO?

13  A.   GENERALLY.

14  Q.   UNLESS A TOWER IS OVERWORKED, AND THEN IT WOULD GO TO THE

15  NEXT CLOSEST TOWER?

16  A.   CORRECT.

17  Q.   BUT IT NEVER HAPPENS WHERE YOU'RE IN, SAY, CALIFORNIA AND

18  IT GOES OFF IN A TOWER IN NEW MEXICO, RIGHT?

19  A.   UNLIKELY.

20  Q.   AND DO YOU KEEP RECORD OF WHICH TOWER THE CALLS ARE ROUTED

21  THROUGH?

22  A.   YES.

23  Q.   SO ANY TIME AN INDIVIDUAL USES AN AT&T CELL PHONE, AND

24  THEY MAKE A CALL, YOU HAVE RECORD OF THAT CALL HAVING BEEN

25  MADE, AND YOU HAVE RECORD OF WHICH TOWER THAT CALL WAS ROUTED

1    THROUGH?

2    A.    CORRECT.

3              MR. GARRISON:  OBJECTION.  LEADING.

4              THE COURT:  IT IS FOUNDATIONAL.

5    BY MR. CONOVER:

6    Q.    DID AT&T RECEIVE A SUBPOENA FROM MY OFFICE, THE UNITED

7    STATES ATTORNEY'S OFFICE?

8    A.    YES.

9    Q.    AND WAS THAT SUBPOENA RELATED TO A REQUEST FOR SUBSCRIBER

10   INFORMATION?

11   A.    YES.

12   Q.    FOR TOLL RECORDS?

13   A.    YES.

14   Q.    AND FOR CELL TOWER, CELL SITE DATA?

15   A.    YES.

16   Q.    AND DID AT&T RESPOND TO THAT REQUEST BY SENDING MY OFFICE

17   DOCUMENTATION?

18   A.    YES.

19   Q.    AND DO YOU HAVE A COPY OF THAT DOCUMENTATION?

20   A.    I DO.

21   Q.    COULD YOU PLEASE TURN IN THE BINDER IN FRONT OF YOU TO

22   EXHIBIT NO. 21.

23              (GOVERNMENT'S EXHIBIT 21 MARKED FOR IDENTIFICATION.)

24              THE WITNESS:  OKAY.

25   BY MR. CONOVER:

1    Q.   HAVE YOU SEEN THAT DOCUMENTATION BEFORE?

2    A.   YES.

3    Q.   IS THAT THE DOCUMENTATION THAT AT&T SENT US IN RESPONSE TO

4    OUR SUBPOENA?

5    A.   YES.

6    Q.   AND WHO WAS THE SUBSCRIBER OF THE INFORMATION REQUESTED?

7    A.   GILBERT FLORES.

8    Q.   WHAT WAS THE PHONE NUMBER FOR WHICH THE SUBPOENA WAS SENT?

9    A.   (232) 327-6764.

10   Q.   AND DOES THAT INFORMATION THERE, IS THAT MAINTAINED IN THE

11   ORDINARY COURSE OF BUSINESS BY AT&T?

12   A.   YES.

13   Q.   AND IS AT&T UNDER A DUTY TO MAINTAIN IT ACCURATELY?

14   A.   YES.

15            MR. CONOVER:  YOUR HONOR, THE GOVERNMENT WOULD MOVE

16   TO ADMIT GOVERNMENT'S EXHIBITS 21, THE SUBSCRIBER TOLLS AND

17   CELL SITE DATA FOR MR. FLORES' PHONE.

18            THE COURT:  ANY OBJECTION?

19            MR. GARRISON:  FOUNDATION.

20            THE COURT:  OVERRULED.

21            MR. CONOVER:  THANK YOU.

22            (GOVERNMENT'S EXHIBIT 21 RECEIVED INTO EVIDENCE.)

23   BY MR. CONOVER:

24   Q.   IF YOU COULD PLEASE TURN IN THE INFORMATION YOU HAVE

25   THERE, COULD YOU DESCRIBE WHAT IT IS -- WHAT THOSE DOCUMENTS

1    ARE FOR THE JURY.

2            MR. GARRISON:  OBJECTION.  THE DOCUMENT SPEAKS FOR

3    ITSELF.

4            THE COURT:  NO, OVERRULED.

5            THE WITNESS:  CONTINUE?

6            THE COURT:  YES.

7            THE WITNESS:  OKAY.  SO THERE IS -- THE FINANCIAL

8    LIABILITY PARTY, WHICH WOULD BE THE SUBSCRIBER, WHOEVER IS

9    RESPONSIBLE FOR THE BILL, FOR THE FINANCIAL ASPECT.

10   BY MR. CONOVER:

11   Q.   WHO IS THAT INDIVIDUAL?

12   A.   GILBERT FLORES.

13   Q.   ALL RIGHT.

14   A.   THE USER INFORMATION, SO THE USER OF ANY PARTICULAR PHONE

15   NUMBER ON THAT ACCOUNT, ANY CHANGE IN HISTORY AS FAR AS

16   SUBSCRIBING HISTORY.

17   Q.   DOES IT SHOW WHEN THE FIRST CALL WAS MADE THAT WAS

18   REQUESTED; WHAT WERE THE DATES OF THE REQUEST?

19   A.   CAN YOU REPEAT THE QUESTION.

20   Q.   WHAT WAS THE -- THE DOCUMENTS THAT WERE PRODUCED BY AT&T,

21   IT INCLUDED THE TOLLS OF THE -- FOR MR. FLORES?

22   A.   YES.

23   Q.   WHAT WAS THE FIRST TOLL DATE?

24   A.   NOVEMBER 1ST, 2009, 11:54 A.M.

25   Q.   SO IT WAS FOR THE MONTH OF NOVEMBER, OF 2009; IS THAT

1    CORRECT?

2    A.   YES.

3    Q.   AND DOES IT SHOW HIS CALLS FOR THAT TIME PERIOD?

4    A.   YES.

5    Q.   AND DO YOU ALSO HAVE A DATE OF NOVEMBER 27TH, 2009?

6    A.   I DO.

7    Q.   AND ON NOVEMBER 27TH, 2009, WAS -- WHAT WAS THE LAST PHONE

8    CALL MADE?

9    A.   8:10 P.M.

10   Q.   8:10 P.M., AND WAS THAT AN OUTGOING CALL?

11   A.   YES.

12   Q.   AND WHAT WAS THE CELL SITE TOWER LOCATION, AS FAR AS THE

13   COORDINATES, THE LONGITUDE AND LATITUDE OF THE CELL TOWER IT

14   ROUTED THROUGH?

15   A.   GO AHEAD AND READ THEM?

16   Q.   IF YOU WOULDN'T MIND.

17   A.   NEGATIVE 118.1055634.01694.

18   Q.   AND IS THAT LATITUDE AND LONGITUDE THE GPS COORDINATES FOR

19   THE TOWER THAT THAT CALL WENT THROUGH?

20   A.   YES.

21   Q.   AND ARE THOSE COORDINATES FOR A TOWER IN THE LOS ANGELES,

22   CALIFORNIA AREA?

23   A.   YES.

24           MR. CONOVER:  MAY I APPROACH THE WITNESS, YOUR HONOR?

25           THE COURT:  YES.

1          MR. CONOVER:  THANK YOU.

2    BY MR. CONOVER:

3    Q.   I'M SHOWING YOU HERE -- DO YOU RECOGNIZE WHAT THIS IS

4    DEPICTING?

5    A.   YES.

6    Q.   AND DO YOU RECOGNIZE THE LOCATION OF WHAT IS MARKED HERE

7    AS NO. 1?

8    A.   YES.

9    Q.   AND IS THAT THE LOCATION OF THE CELL TOWER THAT THAT CALL

10   WAS ROUTED THROUGH?

11   A.   YES.

12   Q.   DOES THIS AID YOU IN YOUR TESTIMONY HERE TODAY TO EXPLAIN

13   WHERE THAT CELL TOWER IS?

14   A.   ROUGHLY IN THE AREA THAT THAT GREEN BOX IS INCLUDING.

15   Q.   THANK YOU.

16          MR. CONOVER:  YOUR HONOR, MOVE TO ADMIT AND TO

17   PUBLISH TO THE JURY.

18          THE CLERK:  WHAT IS IT, COUNSEL?

19          THE COURT:  IT IS A MAP.

20          MR. CONOVER:  IT IS A MAP OF SOUTHERN CALIFORNIA,

21   INCLUDING A CELL SITE TOWER LOCATION.

22          THE COURT:  ANY OBJECTION?

23          MR. GARRISON:  WHAT EXHIBIT NUMBER IS IT?

24          THE CLERK:  22.

25          MR. CONOVER:  EXHIBIT NO. 22.

1          MR. GARRISON:  NO OBJECTION.

2          THE COURT:  ALL RIGHT, IT WILL COME IN.

3      (GOVERNMENT'S EXHIBIT 22 MARKED AND RECEIVED INTO EVIDENCE.)

4          MR. CONOVER:  THANK YOU, YOUR HONOR.

5  BY MR. CONOVER:

6  Q.   WHAT DOES THIS DEPICT, MA'AM?

7  A.   A MAP OF SOUTHERN CALIFORNIA, INCLUDING SAN DIEGO AND

8  LOS ANGELES.

9  Q.   THANK YOU.  AND THIS NO. 1 HERE IN GREEN, IS THAT THE

10  LOCATION OF THE CELL SITE TOWER, APPROXIMATELY?

11  A.   YES.

12          MR. CONOVER:  THANK YOU.  NO FURTHER QUESTIONS.

13      THANK YOU, YOUR HONOR.

14          THE COURT:  OKAY, MR. GARRISON?

15          MR. GARRISON:  THANK YOU, YOUR HONOR.

16                      CROSS-EXAMINATION

17  BY MR. GARRISON:

18  Q.   GOOD AFTERNOON.

19  A.   HI.

20  Q.   OKAY.  I WANTED TO ASK YOU -- MR. CONOVER TALKED TO YOU

21  ABOUT WHAT TOWER THE CALL WOULD BOUNCE OFF; DO YOU REMEMBER

22  THAT?

23  A.   IF HE SPOKE WITH ME ABOUT THE TOWER?

24  Q.   YEAH, JUST RIGHT NOW, HE WAS ASKING YOU, WOULD IT BOUNCE

25  OFF THE CLOSEST TOWER TO THE CALLER; DO YOU REMEMBER THAT?

1    A.   YES.

2    Q.   AND HE ASKED YOU, IT WOULDN'T BOUNCE OFF A TOWER IN

3    NEW MEXICO?

4    A.   CORRECT.

5    Q.   AND YOU SAID "UNLIKELY"?

6    A.   YES.

7    Q.   CAN YOU EXPLAIN THAT?

8    A.   IT IS EXTREMELY UNLIKELY BECAUSE OF THE DISTANCE BETWEEN

9    THE CALL ORIGINATING AND THE LOCATION OF THE TOWER IN

10   NEW MEXICO.

11   Q.   OKAY.  BUT IT COULD HAPPEN, THOUGH?

12   A.   NO.

13   Q.   OH, IT COULDN'T, ALL RIGHT.

14        NOW I WANT TO DIRECT YOUR ATTENTION TO GOVERNMENT

15   EXHIBIT 21.  THAT IS THE AT&T RECORDS THAT YOU JUST TESTIFIED

16   ABOUT.

17   A.   OKAY.

18   Q.   AND THE FIRST FEW PAGES OF THIS LIST EVERY NUMBER THAT

19   MR. FLORES IS THE FINANCIALLY-LIABLE PARTY FOR; IS THAT RIGHT?

20   A.   CORRECT.

21   Q.   AND SO, FOR EXAMPLE, ON THE FIRST PAGE OF EXHIBIT 21, IT

22   LISTS A PHONE NUMBER OF (323) 327-6784, RIGHT?

23   A.   UH-HUH.

24   Q.   AND THEN IF YOU MOVE ON TO --

25             THE COURT:  I'M SORRY, JUST FOR THE RECORD, THAT WAS

1   A "YES," RIGHT?

2          THE WITNESS:  YES, CORRECT.  SORRY.

3   BY MR. GARRISON:

4   Q.  IF YOU MOVE ON TO THE SECOND PAGE, IT LISTS A PHONE NUMBER

5   OF (323) 327-6764; IS THAT RIGHT?

6   A.  YES.

7          MR. GARRISON:  YOUR HONOR, CAN I HAVE A MOMENT?

8          THE COURT:  YES.

9             (ATTORNEY CONVERSATION OFF THE RECORD.)

10         MR. GARRISON:  NO FURTHER QUESTIONS, YOUR HONOR.

11         THE COURT:  REDIRECT?

12         MR. CONOVER:  NOTHING FURTHER, YOUR HONOR.

13         THE COURT:  THANK YOU VERY MUCH.

14      PLEASE CALL YOUR NEXT WITNESS.

15         MR. CONOVER:  YOUR HONOR, MAY WE HAVE THIS WITNESS BE

16   SUBJECT TO RECALL?

17         THE COURT:  DO YOU MIND BEING SUBJECT TO RECALL?

18   THAT MEANS IF WE NEED YOU BACK --

19         THE WITNESS:  TODAY?  THAT'S FINE.

20         MR. CONOVER:  IT WOULDN'T BE TODAY.

21         THE COURT:  IT WOULDN'T BE TODAY.

22         THE WITNESS:  THAT IS FINE.

23         THE COURT:  ALL RIGHT, PLEASE CALL YOUR NEXT WITNESS.

24         MS. BOOT:  YOUR HONOR, THE GOVERNMENT CALLS JASON

25   BORDELON.

1          THE COURT:  OKAY.

2                    (WITNESS SWORN.)

3          THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

4    RECORD, AND SPELL YOUR FIRST AND LAST NAME.

5          THE WITNESS:  MY NAME IS JASON BORDELON,

6    B-O-R-D-E-L-O-N.

7                    DIRECT EXAMINATION

8    BY MS. BOOT:

9    Q.   GOOD AFTERNOON.

10   A.   GOOD AFTERNOON.

11   Q.   MR. BORDELON, WHO IS YOUR EMPLOYER?

12   A.   I WORK FOR THE DRUG ENFORCEMENT ADMINISTRATION, SOUTHWEST

13   LABORATORY IN VISTA, CALIFORNIA.

14   Q.   WHAT IS YOUR JOB TITLE THERE?

15   A.   I'M A SENIOR FORENSIC CHEMIST.

16   Q.   HOW LONG HAVE YOU BEEN A SENIOR FORENSIC CHEMIST?

17   A.   I'VE HELD THAT TITLE FOR ABOUT FOUR YEARS, AND I'VE WORKED

18   AS A FORENSIC CHEMIST FOR ABOUT EIGHT.

19   Q.   WHAT IS YOUR EDUCATIONAL BACKGROUND?

20   A.   I HAVE A BACHELOR'S AND MASTER'S DEGREE IN CHEMISTRY FROM

21   FURMAN UNIVERSITY, F-U-R-M-A-N, IN GREENVILLE, SOUTH CAROLINA.

22   Q.   AND DID YOU RECEIVE ANY TRAINING ADDITIONAL TO THAT TO

23   BECOME A FORENSIC CHEMIST AT THE SOUTHWEST LAB.

24   A.   YES.  APPROXIMATELY NINE MONTHS OF ON-THE-JOB TRAINING

25   WHEN I STARTED AT THE SOUTHWEST LABORATORY AND VARIOUS COURSES

1  SINCE I'VE WORKED THERE.

2  Q.   AND WHAT ARE YOUR DUTIES AS A SENIOR FORENSICS CHEMIST?

3  A.   PRIMARILY ANALYZING SEIZED EVIDENCE FOR THE PRESENCE OR

4  ABSENCE OF CONTROLLED SUBSTANCES; TESTIFYING IN COURT ON THESE

5  RESULTS; AND OCCASIONALLY ASSISTING IN CLANDESTINE

6  LABORATORIES, SUCH AS METHAMPHETAMINE LABORATORIES.

7  Q.   MR. BORDELON, WHAT IS A CONTROLLED SUBSTANCE?

8  A.   A CONTROLLED SUBSTANCE IS ANYTHING DEFINED BY THE FEDERAL

9  CODE OF FEDERAL -- EXCUSE ME, CODE OF FEDERAL REGULATIONS AS

10 BEING LIMITED IN TERMS OF ITS DISTRIBUTION.

11 Q.   AND HOW MANY CONTROLLED SUBSTANCES HAVE YOU PERSONALLY

12 ANALYZED?

13 A.   PROBABLY ABOUT 2,500, OR 3,000, SOMEWHERE IN THAT BALL

14 PARK.

15 Q.   IS METHAMPHETAMINE A CONTROLLED SUBSTANCE?

16 A.   YES, IT IS.

17 Q.   AND HOW MANY TIMES HAVE YOU PERSONALLY ANALYZED

18 METHAMPHETAMINE?

19 A.   APPROXIMATELY, 700 OR 800.

20 Q.   AND HAVE YOU PREVIOUSLY TESTIFIED AS AN EXPERT REGARDING

21 THE ANALYSIS OF CONTROLLED SUBSTANCES?

22 A.   YES, I HAVE.

23 Q.   IN FEDERAL OR STATE COURT?

24 A.   IN BOTH.

25 Q.   ABOUT HOW MANY TIMES?

1    A.   ABOUT 16 OR 17, I BELIEVE.

2         MS. BOOT:  YOUR HONOR, THE GOVERNMENT TENDERS

3    MR. BORDELON AS AN EXPERT IN FORENSIC CHEMISTRY.

4         THE COURT:  ANY OBJECTION?

5         MR. GARRISON:  NO, YOUR HONOR.

6         THE COURT:  ALL RIGHT.

7    BY MS. BOOT:

8    Q.   DID YOU HAVE THE OPPORTUNITY TO ANALYZE THE SAMPLES SEIZED

9    IN CONNECTION WITH U.S. VS.  FLORES?

10   A.   YES, I DID.

11   Q.   HOW DID YOU RECEIVE THOSE PACKAGES?

12   A.   WE RECEIVED THE PACKAGES FROM OUR EVIDENCE VAULT, WHERE IT

13   WAS KEPT, UNTIL MY ANALYSIS WAS STARTED.

14   Q.   AND WHEN YOU GOT THE PACKAGES, WHAT WERE THEY IN?

15   A.   INSIDE, THERE WAS ONE BOX WHICH CONTAINED 23 PACKAGES,

16   WHICH WERE WRAPPED WITH VACUUM SEALED BAGS AND NAPKINS, AND ALL

17   OF THEM CONTAINED A CRYSTALLINE SUBSTANCE.

18   Q.   WAS THAT BOX SEALED WHEN YOU GOT IT?

19   A.   YES, IT WAS.

20   Q.   ARE YOU FAMILIAR WITH A FORM ENTITLED A DEA-7?

21   A.   YES, I AM.

22   Q.   WHAT IS THE PURPOSE OF THAT FORM?

23   A.   THE PURPOSE IS, IT ACCOMPANIES ANY EVIDENCE THAT COMES

24   INTO THE LABORATORY AND BASICALLY DESCRIBES THE DETAILS OF THE

25   SEIZURE, THE DATE IT WAS SEIZED, THE DEFENDANT, A DESCRIPTION

1  OF THE EVIDENCE ITSELF.

2  Q.   AND BEFORE YOU ANALYZED THE SAMPLES IN THIS CASE, DID YOU

3  MATCH THE CASE NUMBER THAT WAS ON THE BOX OF SAMPLES, THE BOX

4  THE SAMPLES CAME IN WITH THE CASE NUMBER THAT WAS ON THAT

5  DEA-7?

6  A.   YES, I DID.

7  Q.   AND DID YOU MATCH THE LAB NUMBER THAT WAS ON THE DEA-7

8  WITH THE LAB NUMBER ON THAT BOX OF PACKAGES?

9  A.   YES.

10  Q.   DID YOU WEIGH THE SEALED BOX AND ALL OF ITS CONTENTS?

11  A.   YES, I DID.

12  Q.   DO YOU REMEMBER WHAT IT WEIGHED?

13  A.   I DO NOT.  IF I MAY REFER TO MY NOTES, YOUR HONOR?

14           THE COURT:  YES.

15           THE WITNESS:  THE GROSS WEIGHT, WHICH IS THE WEIGHT

16  OF THE ENTIRE BOX, IS 11.48 KILOGRAMS, WHICH IS ABOUT 24, 25

17  POUNDS.

18  BY MS. BOOT:

19  Q.   AFTER THAT, DID YOU TAKE THE PACKAGES OUT OF THE BOX?

20  A.   YES, I DID.

21  Q.   ALL RIGHT.  I'M GOING TO ASK YOU TO TURN TO -- IN THAT

22  BINDER IN FRONT OF YOU, TURN TO GOVERNMENT EXHIBIT NO. 19.

23           (GOVERNMENT'S EXHIBIT 19 MARKED FOR IDENTIFICATION.)

24           THE WITNESS:  OKAY.

25  BY MS. BOOT:

1    Q.    DO YOU RECOGNIZE THAT PHOTOGRAPH?

2    A.    YES, I DO.

3    Q.    DID YOU TAKE IT?

4    A.    YES.

5    Q.    WHAT IS IT A PHOTO OF?

6    A.    IT IS A PHOTO OF THE 23 PACKAGES WHICH WERE INSIDE THE

7    BOX, WHICH ALL CONTAINED A CRYSTALLINE SUBSTANCE.

8              MS. BOOT:  YOUR HONOR, I MOVE TO ADMIT EXHIBIT 19.

9              THE COURT:  ANY OBJECTION?

10             MR. FAKHOURY:  NO, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  IT WILL COME IN.

12         (GOVERNMENT'S EXHIBIT 19 RECEIVED INTO EVIDENCE.)

13   BY MS. BOOT:

14   Q.    ACTUALLY, MR. BORDELON, I'M NOW --

15             MS. BOOT:  IF IT'S OKAY, YOUR HONOR, I'D LIKE TO

16   APPROACH.

17             THE COURT:  YES.

18   BY MS. BOOT:

19   Q.    SHOWING YOU WHAT HAS BEEN -- WHAT IS GOING TO BE MARKED AS

20   GOVERNMENT'S EXHIBIT 19-A, IS THIS A LARGER VERSION OF THE

21   PHOTO YOU JUST DESCRIBED, AS GOVERNMENT EXHIBIT 19?

22   A.    YES, IT APPEARS TO.

23             MS. BOOT:  YOUR HONOR, MOVE TO ADMIT THIS BLOWN-UP

24   PHOTO.

25             THE COURT:  ANY OBJECTION?

```
1           MR. FAKHOURY:  NO.

2           THE COURT:  ALL RIGHT.  IT WILL COME IN.

3   (GOVERNMENT'S EXHIBIT 19-A MARKED AND RECEIVED INTO EVIDENCE.)

4   BY MS. BOOT:

5   Q.   OKAY.  MR. BORDELON, CAN YOU PLEASE EXPLAIN THIS

6   PHOTOGRAPH -- YOU HAVE THE SMALLER ONE IN FRONT OF YOU,

7   EXHIBIT 19 -- TO THE JURY.

8   A.   BASICALLY IT IS JUST DOCUMENTING THE ENTIRE SEIZURE,

9   SHOWING ALL 23 PACKAGES IN ONE PHOTOGRAPH.

10  Q.   OKAY.  AND YOU ALREADY DESCRIBED WHAT THE PACKAGES WERE

11  WRAPPED IN.  CAN YOU DESCRIBE THE SIZE AND SHAPE OF THE

12  PACKAGES AS YOU SEE THEM.

13  A.   IN LENGTH, THEY APPEAR TO BE ABOUT THE LENGTH OF THE

14  STANDARD PIECE OF PAPER, 10 OR 11 INCHES, SOMEWHERE IN THAT

15  BALL PARK.

16  Q.   AND IN YOUR EXPERIENCE, WHAT SORT -- WHAT TYPES OF

17  PACKAGING DOES METHAMPHETAMINE COME IN?

18  A.   IN MY EXPERIENCE, IT CAN COME IN ALL DIFFERENT TYPES OF

19  PACKAGING.  PROBABLY THE MOST TYPICAL FOR LARGE AMOUNTS OF

20  METHAMPHETAMINE IS TO BE PACKAGED WITHIN TUPPERWARE CONTAINERS,

21  WHICH THEY MAY OR MAY NOT BE WRAPPED.  IT WILL OCCASIONALLY

22  COME IN VACUUM-SEALED BAGS, SUCH AS THIS.  THOSE ARE PROBABLY

23  THE MOST COMMON WAYS.

24  Q.   AFTER YOU STACKED THESE PACKAGES UP AND TOOK THIS PHOTO,

25  DID YOU REMOVE THE CONTENTS OF THE DRUGS FROM THE PACKAGES?
```

1    A.   YES, I DID.

2    Q.   OKAY.  CAN YOU LOOK IN YOUR EXHIBIT BINDER, PLEASE, TO

3    EXHIBIT 20, GOVERNMENT EXHIBIT 20.

4              (GOVERNMENT'S EXHIBIT 20 MARKED FOR IDENTIFICATION.)

5              THE WITNESS:  YES.

6    BY MS. BOOT:

7    Q.   DO YOU RECOGNIZE THAT PHOTOGRAPH?

8    A.   YES, I DO.

9    Q.   DID YOU TAKE THAT PHOTOGRAPH?

10   A.   YES.

11   Q.   WHAT IS IT A PHOTO OF?

12   A.   THIS IS THE CONTENTS OF ONE OF THE BAGS, SO WITH THE

13   PACKAGING REMOVED, THIS IS THE SUSPECTED DRUG MATERIAL ITSELF.

14             MS. BOOT:  OKAY.  YOUR HONOR, I MOVE TO ADMIT

15   GOVERNMENT EXHIBIT 20.

16             THE COURT:  ANY OBJECTION?

17             MR. FAKHOURY:  IT IS A LITTLE CUMULATIVE, YOUR HONOR.

18             THE COURT:  OVERRULED.

19             (GOVERNMENT'S EXHIBIT 20 RECEIVED INTO EVIDENCE.)

20   BY MS. BOOT:

21   Q.   OKAY.  AND CAN YOU JUST BRIEFLY -- THIS PHOTO IS OF THE

22   CONTENTS OF THE INSIDE OF -- YOU SAID ONE PACKAGE?

23   A.   ONE PACKAGE, THAT IS CORRECT.

24   Q.   NOW AFTER YOU HAD TAKEN ALL OF THE CONTENTS OF THE

25   PACKAGES OUT, DID YOU WEIGH ALL OF THOSE CONTENTS WITHOUT THE

1  PACKAGING?

2  A.  YES, I DID.

3  Q.  WHAT DID THEY WEIGH?

4  A.  IN TOTAL, THEY WEIGHED 10.27 KILOGRAMS, WHICH, I THINK, IS

5  PROBABLY 22, 23 POUNDS.

6  Q.  AND LOOKING OVER AT EXHIBIT 20 HERE, WHAT IS THE FORM OF

7  THE METH PICTURED THERE?

8  A.  IT IS -- COMMON NAMES ARE CRYSTAL METHAMPHETAMINE, OR ICE,

9  BECAUSE OF THE APPEARANCE OF THE SUBSTANCE ITSELF.

10  Q.  WHAT TEST DID YOU USE TO IDENTIFY THE SUBSTANCE THAT WAS

11  IN THIS -- IN THESE PACKAGES?

12  A.  FIRST I PERFORMED SCREENING TESTS, WHICH WERE TO DETERMINE

13  THAT A SUBSTANCE, IN THIS CASE METHAMPHETAMINE, WAS CONTAINED

14  IN ALL THE PACKAGES I TESTED, WHICH IN THIS CASE, WAS 15 OF THE

15  23.  AND I CONFIRMED THAT METHAMPHETAMINE HYDROCHLORIDE WAS

16  PRESENT, USING AN INFRARED SPECTROSCOPY,

17  S-P-E-C-T-R-O-S-C-O-P-Y, OR IR FOR SHORT, AND A COLOR TEST.

18  WHEN I CONFIRMED THAT METHAMPHETAMINE WAS PRESENT IN ALL OF THE

19  15 BAGS THAT I TESTED, I PERFORMED A COMPOSITE ANALYSIS.  AND

20  TO DO THIS, I REMOVE PORTIONS FROM ALL 15 AND GROUND THEM

21  TOGETHER INTO A FINE POWDER AND THEN PERFORM TESTING ON THAT

22  COMPOSITE SAMPLE, WHICH IS A REPRESENTATIVE OF THE WHOLE.

23      ON THE COMPOSITE SAMPLE, I PERFORMED MASS SPECTROMETRY, OR

24  MS FOR SHORT, AND LIQUID CHROMATOGRAPHY TO DETERMINE THE PURITY

25  OF THE SAMPLE.

1    Q.   AND DID YOU DETERMINE THE PURITY OF THE METH IN THIS CASE?

2    A.   YES, I DID.

3    Q.   WHAT WAS IT?

4    A.   REFERRING TO MY NOTES, THE PURITY WAS 93.8 PERCENT BY

5    WEIGHT, METHAMPHETAMINE HYDROCHLORIDE.

6    Q.   AND ARE THE TESTS THAT YOU PERFORM GENERALLY ACCEPTED IN

7    THE FORENSIC COMMUNITY TO IDENTIFY METHAMPHETAMINE?

8    A.   YES, THEY ARE.

9    Q.   ARE THEY SUBJECT TO PEER REVIEW?

10   A.   YES.

11   Q.   AND SO WHAT WERE YOUR ULTIMATE CONCLUSIONS IN THIS CASE?

12   A.   MY CONCLUSIONS WERE THAT THE NET WEIGHT, WHICH IS JUST THE

13   WEIGHT OF THE DRUG MATERIAL ITSELF, WAS 10.27 KILOGRAMS.  AND

14   IT CONTAINS METHAMPHETAMINE HYDROCHLORIDE AT PURITY OF --

15   REFERRING TO MY NOTES AGAIN -- 93.8 PERCENT.

16   Q.   AND AFTER YOUR ANALYSIS, WHAT DID YOU DO WITH THE

17   EVIDENCE?

18   A.   THE EVIDENCE WAS RESEALED INTO THE ORIGINAL BOX, AND I

19   BELIEVE A NEW BOX, AND RETURNED TO OUR EVIDENCE VAULT.

20   Q.   ALL RIGHT.  THANK YOU.

21        THE COURT:  ALL RIGHT.

22        MR. FAKHOURY:  THANK YOU, YOUR HONOR.

23                    CROSS-EXAMINATION

24   BY MR. FAKHOURY:

25   Q.   OTHER THAN THE DEA-7, DID YOU WRITE ANY OTHER REPORTS,

1  MR. BORDELON?

2  A.  WE HAVE WHAT IS CALLED A DEA FORM 86, WHICH IS NOTES,

3  CHEMIST -- FORENSIC CHEMIST WORKSHEET, AS WELL AS THE DATA

4  WHICH WAS GENERATED FROM THE INSTRUMENTS.  THIS ALL IS TURNED

5  INTO OUR WORKSHEET.  WE CREATE A LAB REPORT, WHICH IS THEN SENT

6  OUT AS OUR FINAL REPORT.

7  Q.  OKAY.  NOW WHEN YOU CAME TO TEST THIS SUBSTANCE AT THE

8  LABORATORY, YOU KNEW THAT THE AGENTS AT THE PORT OF ENTRY HAD

9  ALREADY FIELD TESTED THIS SUBSTANCE; IS THAT RIGHT?

10  A.  I DID NOT KNOW THAT FOR CERTAIN.  IT IS COMMONLY DONE.

11  Q.  AND YOU SAID "IT IS COMMONLY DONE," SO IT -- IN YOUR

12  EXPERIENCE, IT IS PRETTY COMMON FOR AGENTS AT THE PORT OF ENTRY

13  TO FIELD TEST A SUBSTANCE FIRST, AND THEN SEND IT TO THE DEA

14  LABORATORY FOR MORE INTENSIVE TESTING; IS THAT RIGHT?

15  A.  THAT'S MY UNDERSTANDING; ALTHOUGH, I DON'T HAVE DIRECT

16  KNOWLEDGE OF THAT.

17  Q.  AT THE TIME THAT YOU OPENED THE EVIDENCE VAULT AND PULLED

18  THE BOXES AND PACKAGES OUT, IT WOULD -- IT HAD ALREADY BEEN

19  SUSPECTED THAT THE SUBSTANCE WAS METHAMPHETAMINE, CORRECT?

20  A.  THAT'S CORRECT.

21  Q.  AND DESPITE THAT, YOU STILL WENT THROUGH YOUR STANDARD

22  TESTS, CORRECT?

23  A.  YES, THAT'S CORRECT.

24  Q.  NOW YOU'VE BEEN A CHEMIST FOR QUITE SOME TIME, AND FORGIVE

25  ME, I DON'T REMEMBER THE EXACT NUMBER OF YEARS YOU SAID, BUT

1  IT'S BEEN SEVERAL YEARS, CORRECT?

2  A.   ABOUT EIGHT YEARS.

3  Q.   PERFECT.  EIGHT YEARS YOU'VE WORKED AS A CHEMIST, CORRECT?

4  A.   THAT'S RIGHT.

5  Q.   YOU SAID YOU'VE TESTED METHAMPHETAMINE BETWEEN 700 AND 800

6  TIMES?

7  A.   YES, THAT'S CORRECT.

8  Q.   SO YOU'VE HAD PRETTY EXTENSIVE EXPERIENCE LOOKING AT

9  METHAMPHETAMINE?

10  A.   YES, THAT'S CORRECT.

11  Q.   AND I MEAN THAT IN THE LABORATORY SENSE, IN THE LABORATORY

12  SETTING.

13  A.   CORRECT.

14  Q.   OKAY.  SO YOU KNOW WHAT CRYSTAL METH LOOKS LIKE FROM YOUR

15  TRAINING AND EXPERIENCE WORKING IN THE LABORATORY?

16  A.   IN GENERAL.  IT CAN TAKE MANY DIFFERENT APPEARANCES, BUT

17  IT HAS A GENERAL APPEARANCE TO IT.

18  Q.   WOULD YOU SAY THAT GOVERNMENT'S EXHIBIT -- OKAY, WOULD YOU

19  SAY GOVERNMENT'S EXHIBIT 20, WHICH IS UP ON THE PROJECTOR, IS

20  THAT GENERALLY THE APPEARANCE OF CRYSTAL METHAMPHETAMINE?

21  A.   GENERALLY, YES.

22  Q.   IS IT FAIR TO SAY THAT AT THE TIME YOU OPENED THE PACKAGES

23  AND SAW THIS SUBSTANCE, YOU HAD A PRETTY STRONG HUNCH OR

24  FEELING THAT THIS WAS, IN FACT, CRYSTAL METHAMPHETAMINE?

25  A.   I HAD A SUSPICION, YES.

1   Q.   AND DESPITE THAT SUSPICION, YOU STILL ACTUALLY TESTED THE

2   SUBSTANCE, THOUGH, CORRECT?

3   A.   THAT'S CORRECT.

4   Q.   AND IT SOUNDS LIKE YOU TESTED IT THREE DIFFERENT TIMES; IS

5   THAT ACCURATE?

6   A.   I BELIEVE IN TOTAL THERE WERE FOUR DIFFERENT TESTS THAT

7   WERE PERFORMED ON THE SUBSTANCE.

8   Q.   OKAY.  AND YOU TESTIFIED THAT YOU TESTED, YOU KNOW, 15 OUT

9   OF THE 23 PACKAGES, CORRECT?

10  A.   THAT'S CORRECT.

11  Q.   SO YOU DIDN'T WANT TO JUST RELY ON YOUR SUSPICIONS, RIGHT?

12  A.   CORRECT.

13  Q.   YOU WANTED TO BE ABSOLUTELY SCIENTIFICALLY 100 PERCENT

14  ACCURATE?

15  A.   YES.

16  Q.   AND THAT'S WHY YOU TESTED IT FOUR TIMES?

17  A.   THE COMBINATION OF TESTS LED ME TO BELIEVE THAT

18  METHAMPHETAMINE WAS PRESENT.

19  Q.   OKAY, THAT'S WHY YOU TESTED NOT ONE OR TWO OF THE

20  PACKAGES, BUT FIFTEEN OF THE PACKAGES, CORRECT?

21  A.   YES.

22  Q.   I'M SHOWING YOU WHAT HAS PREVIOUSLY BEEN ADMITTED AS

23  EXHIBIT 19.  THIS IS A PICTURE OF ALL THE PACKAGES STACKED ON

24  TOP OF EACH OTHER, CORRECT?

25  A.   YES, IT IS.

1    Q.   AND I BELIEVE YOU TESTIFIED YOU TOOK THIS PICTURE?

2    A.   YES.

3    Q.   DID YOU STACK THESE PACKAGES AS WELL?

4    A.   YES, I DID.

5    Q.   AND THE WAY IT HAS BEEN STACKED, THEY'VE BEEN STACKED

6    LENGTHWISE CORRECT?

7    A.   IT APPEARS TO BE, YES.

8    Q.   OKAY.  AND WIDTH WISE, IT'S MUCH LONGER?  THE PACKAGES ARE

9    MUCH LONGER THAN THEY ARE WIDE; IS THAT AN ACCURATE STATEMENT?

10   A.   THAT APPEARS TO BE THE CASE, YES.

11   Q.   AND IT'S MUCH LONGER THAN IT IS DEEP, OR TALL, I GUESS, SO

12   TO SPEAK?

13   A.   YES.

14            MR. FAKHOURY:  I HAVE NOTHING FURTHER, THANK YOU.

15            THE COURT:  ALL RIGHT.  REDIRECT?

16            MS. BOOT:  NO, NOTHING FURTHER, YOUR HONOR.

17            THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP

18   DOWN.

19       PLEASE CALL YOUR NEXT WITNESS.

20            MR. CONOVER:  YOUR HONOR, THE UNITED STATES CALLS

21   RUSS BUTLER TO THE STAND.

22                         (WITNESS SWORN.)

23            THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

24   RECORD, SPELLING YOUR FIRST AND LAST NAME.

25            THE WITNESS:  MY NAME IS RUSS ALLEN BUTLER, FIRST

1  NAME R-U-S-S, LAST NAME B-U-T-L-E-R.

2  <u>DIRECT EXAMINATION</u>

3  BY MR. CONOVER:

4  Q.   MR. BUTLER, THANK YOU FOR COMING TODAY.  WHAT DO YOU DO

5  FOR A LIVING?

6  A.   I'M THE OWNER AND OPERATOR OF BUTLER AUTO REPAIR IN

7  EL CENTRO.

8  Q.   IS THAT WHAT IT SAYS ON YOUR SHIRT THERE, "BUTLER AUTO

9  REPAIR"?

10  A.   YES, SIR.

11  Q.   ARE YOU A MECHANIC?

12  A.   YES, SIR.

13  Q.   AND YOU OWN A MECHANIC SHOP?

14  A.   YES, SIR.

15  Q.   OKAY.  AND HOW LONG HAVE YOU WORKED AS A MECHANIC?

16  A.   BASICALLY, FOR THE LAST 35 YEARS.

17  Q.   COULD YOU DESCRIBE WHAT IT IS YOU'VE DONE IN THE MECHANICS

18  AREA FOR THE LAST 35 YEARS.

19  A.   I GENERALLY REPAIR FABRICATION ON ALL TYPES OF VEHICLES,

20  AUTOMOBILES, PICKUPS, LARGE TRUCKS, FARM TRACTORS, MOTORCYCLES,

21  OFF ROAD CARS, BASICALLY EVERYTHING.

22  Q.   HOW DID YOU FIRST START WORKING IN THE FIELD OF MECHANICS?

23  WAS IT WHEN YOU WERE YOUNG?

24  A.   YES.  I WAS RAISED ON A FARM IN IMPERIAL COUNTY, AND MY

25  DAD WAS A FARMER, AND THAT IS PART OF IT.

1   Q.   YOU GOT STUCK FIXING EVERYTHING?

2   A.   YES, SIR.

3   Q.   AND CAN YOU DESCRIBE YOUR BACKGROUND IN ADDITION TO YOUR

4   WORK AS A MECHANIC.

5   A.   I'VE ALSO WORKED FOR -- AS A MECHANIC AND AN OPERATOR,

6   HEAVY EQUIPMENT OPERATOR, FOR A PLACE CALLED PROCTOR LAND

7   LEVELING, IN BRAWLEY.  IN 1982, I WENT TO WORK AT THE IMPERIAL

8   COUNTY SHERIFF'S DEPARTMENT.  I WAS A DEPUTY SHERIFF FOR A

9   COUPLE YEARS.  I STILL DID MECHANIC'S WORK ON THE SIDE.  THEN I

10  WENT TO EL CENTRO POLICE DEPARTMENT.  AND I WAS A POLICE

11  OFFICER, DETECTIVE, AND FINALLY ADMINISTRATIVE.  I RETIRED FROM

12  THERE IN '97, BUT WHILE I WAS THERE, I STILL DID MECHANIC WORK

13  ON THE SIDE TO MAKE EXTRA MONEY.

14       AND FOR THE LAST 13 YEARS, I'VE HAD MY OWN SHOP IN

15  EL CENTRO, DOING GENERAL REPAIRS, FABRICATION ON ALL SORTS OF

16  VEHICLES.

17  Q.   I DON'T KNOW WHAT "FABRICATION" IS.  WHAT DOES THAT MEAN?

18  A.   ANYTHING FROM MODIFICATIONS TO A VEHICLE, AN EXISTING

19  VEHICLE, TO BUILDING A VEHICLE FROM SCRATCH.

20  Q.   SO WOULD YOU SAY YOU HAVE EXTENSIVE EXPERTISE IN

21  REPAIRING, MODIFYING, AND BUILDING, ALL THE THINGS THAT A

22  MECHANIC DOES?

23  A.   YES, SIR.

24  Q.   AND OVER A PERIOD OF 30 YEARS, YOU'VE WORKED IN THE

25  MECHANIC INDUSTRY?

1   A.   YES.

2   Q.   AND FOR 13 YEARS, YOU'VE OWNED YOUR OWN MECHANICS SHOP?

3   A.   YES.

4           MR. CONOVER:  YOUR HONOR, AT THIS POINT, THE

5   GOVERNMENT WOULD TENDER MR. BUTLER AS AN EXPERT IN THE FIELD OF

6   MECHANICS.

7           THE COURT:  ANY OBJECTION?

8           MR. FAKHOURY:  NO, YOUR HONOR.

9           THE COURT:  ALL RIGHT.

10           MR. CONOVER:  THANK YOU.

11   BY MR. CONOVER:

12   Q.   MR. BUTLER, WERE YOU ASKED BY OUR OFFICE, THE UNITED

13   STATES ATTORNEY'S OFFICE, TO GO OUT AND VIEW A VEHICLE?

14   A.   YES, SIR.

15   Q.   AND WHAT WAS THE VEHICLE THAT YOU WERE ASKED TO VIEW?  IS

16   THAT A -- WHAT VEHICLE WAS THAT?

17   A.   IT IS A VOLKSWAGEN BEETLE, THE NEW BEETLE.

18   Q.   IS THAT THE VEHICLE YOU WERE ASKED TO TAKE A LOOK AT,

19   (INDICATING)?

20   A.   YES.  IT APPEARS TO BE.

21   Q.   AND WHEN YOU WENT OUT TO VIEW THIS VEHICLE, WHERE WAS IT

22   LOCATED?

23   A.   IT WAS AT THE IMPOUND LOT ON AIRWAY ROAD.  IT IS

24   9020 AIRWAY ROAD, HERE IN SAN DIEGO, OTAY MESA.

25   Q.   WHEN YOU VIEWED THE VEHICLE, WERE YOU INFORMED THAT

1   METHAMPHETAMINE HAD BEEN FOUND IN THE GAS TANK?

2   A.   YES, SIR.

3   Q.   HAVE YOU SEEN PHOTOGRAPHS SIMILAR TO THIS OF THE

4   METHAMPHETAMINE?

5   A.   YES, SIR.

6   Q.   DID YOU HAVE A CHANCE TO LOOK AT THIS VEHICLE'S GAS TANK?

7   A.   YES, SIR.

8   Q.   DID YOU HAVE A CHANCE TO LOOK AT THE SENDING UNIT FOR THIS

9   VEHICLE?

10   A.   YES, SIR.

11   Q.   OKAY.   AND DID YOU HAVE A CHANCE TO LOOK THROUGH THE REST

12   OF THE VEHICLE TO SEE WHAT ELSE YOU COULD FIND?

13   A.   YES, SIR.

14        MR. CONOVER:   YOUR HONOR, MAY I APPROACH WITH THE

15   SENDING UNIT?

16        THE COURT:   YES.

17        MR. CONOVER:   THANK YOU.

18   BY MR. CONOVER:

19   Q.   WHEN WAS THE FIRST TIME YOU SAW THIS AND THIS,

20   (INDICATING)?

21   A.   IT WAS INSIDE THE VEHICLE, AT THE IMPOUND LOT.   THE PLATE

22   AND THE SENDING UNIT WERE UNDERNEATH THE SEAT THAT HAD ALREADY

23   BEEN REMOVED -- THE REAR SEAT.   IT HAD ALREADY BEEN PULLED UP,

24   AND THIS WAS LAYING UNDERNEATH THE SEAT BETWEEN BASICALLY THE

25   SEAT AND THE GAS TANK OF THE VEHICLE.

1   Q.   IS THAT A SECURE LOCATION, THE IMPOUND LOT?

2   A.   YES.

3   Q.   IT HAS A GATE AND A GUARD?

4   A.   YES.

5   Q.   AND IS MAINTAINED BY THE GOVERNMENT?

6   A.   YES.

7   Q.   ONCE YOU SAW THAT SENDING UNIT, DID YOU NOTICE ANYTHING

8   UNUSUAL ABOUT IT?

9   A.   YES, SIR.  FIRST THING I NOTICED IS THE RED THREAD THAT IS

10  WRAPPED AROUND IT, AND THAT THE SENDING UNIT ARM HAS BEEN

11  REMOVED.

12  Q.   HAVE YOU EVER SEEN A SENDING UNIT WITH RED THREAD WRAPPED

13  AROUND IT LIKE THAT?

14  A.   NO, SIR.

15  Q.   WHY WOULD SOMEONE DO THAT?

16  A.   TO HOLD THE ARM IN A POSITION SO THAT IT WOULD INDICATE

17  FULL, OR NEAR FULL, WHENEVER IT IS PLUGGED IN.

18  Q.   IS THERE ANYTHING ELSE IN PLACE OF THE ARM AND FLOAT OF

19  THIS SENDING UNIT?

20  A.   YES.  IT LOOKS LIKE A TOOTHPICK WAS PUT IN TO MAINTAIN THE

21  PIVOT OF THE ARM WITH THE FLOAT REMOVED.

22  Q.   IF YOU COULD PICK IT UP AND SHOW THE JURY WHAT IT IS

23  YOU'RE REFERRING TO, THE TOOTHPICK AND THE THREAD.  YOU'RE

24  WELCOME TO STEP DOWN, WHATEVER IS EASIEST FOR YOU, MR. BUTLER.

25  A.   THE TOOTHPICK IS RIGHT HERE, WHERE THE -- THIS ARM SHOULD

1  PIVOT DOWN, UP AND DOWN.  THAT INDICATES THE FUEL LEVEL IN THE

2  GAS TANK.  THERE IS A FLOAT ARM THAT COMES OUT.  AS THE LEVEL

3  IS INCREASED, IT RAISES AND IT PULLS THIS UP, AND IT SHOWS THE

4  CAR IS FULL.  AS THE GAS LEVEL DROPS, THIS PIVOTS DOWN, AND

5  THAT SHOWS THAT IT'S EMPTY.  THIS IS THE TOOTHPICK, AND THIS IS

6  THE THREAD THAT I WAS REFERRING TO, AS FAR AS HOLDING THIS

7  PIECE IN PLACE, (INDICATING).

8  Q.   AND WITH A TOOTHPICK AND THE THREAD ATTACHED THE WAY IT

9  IS, HOW WOULD THAT AFFECT THE OPERATION OF THAT SENDING UNIT?

10  A.   WELL, IT'S GOING TO INDICATE FULL OR NEAR FULL AT ALL

11  TIMES.

12  Q.   INDICATE WHERE?

13  A.   ON THE DASH.

14  Q.   ON THE DASH?

15  A.   YES.

16  Q.   WHAT IS THE PURPOSE OF THE SENDING UNIT?  WHAT DOES IT DO

17  INSIDE THE CAR?

18  A.   THIS PARTICULAR UNIT IS -- THIS IS THE SENDING UNIT

19  PORTION FOR THE GAS LEVEL INDICATION.  THE OTHER ITEMS INSIDE

20  THIS ASSEMBLY OR MODULE IS THE FUEL PUMP ITSELF.

21  Q.   WITH REGARD TO THE SENDING UNIT, WHAT DOES IT DO TO TELL

22  AN INDIVIDUAL HOW MUCH GAS THEY HAVE IN THEIR CAR?

23  A.   WELL, IT INDICATES ON THE DASH.  I MEAN, IT MAKES -- THIS

24  IS WHAT CONTROLS WHAT YOU'RE SEEING ON THE DASH, (INDICATING).

25  Q.   OKAY.  SO IF THE SENDING UNIT IS DISMANTLED, SAY AN ARM IS

1  TAKEN OFF, AND THERE ISN'T A TOOTHPICK AND STRING IN PLACE,

2  WHAT WOULD IT SHOW ON THE DASH?

3  A.   IT WILL INDICATE EMPTY.

4  Q.   EMPTY, LIKE COMPLETELY EMPTY?

5  A.   YES.  IT WILL BE PAST THE "E."

6  Q.   PAST THE "E"?

7  A.   YES, SIR.

8  Q.   OKAY, SO IF YOU TOOK A SENDING UNIT AND PULLED THE FLOAT

9  OFF, LEFT IT BACK IN THE GAS TANK, EVERYTHING ELSE STILL

10  ATTACHED, IT WOULD SHOW TOTALLY EMPTY, PAST THE "E"?

11  A.   YES.

12  Q.   AND IF YOU ATTACHED A TOOTHPICK AND STRING IN EXACTLY THAT

13  PLACE WHERE THAT IS, WHAT WOULD IT SHOW ON THE DASH?

14  A.   THE WAY THAT THIS ONE IS FASHIONED, IT SHOULD SHOW FULL OR

15  CLOSE TO FULL.

16  Q.   WHY IS THAT?

17  A.   BECAUSE THE ARM IS -- THE PIVOT IS BEING MAINTAINED, AND

18  THE ARM IS IN THE UP POSITION -- WELL, ALMOST FULL UP.

19  Q.   SO FROM YOUR MECHANIC EXPERIENCE, WHY WOULD SOMEONE FASTEN

20  STRING AND A TOOTHPICK ON A SENDING UNIT LIKE THAT; WHAT WOULD

21  BE THE PURPOSE?

22  A.   THE PURPOSE IS JUST TO MAKE THE CAR INDICATE HOW -- THAT

23  IT HAD A FULL TANK OF GAS, WHETHER IT DID OR NOT.

24  Q.   SO REGARDLESS OF THE GAS LEVEL, IT WOULD INDICATE NEAR

25  FULL?

1   A.   YES.

2   Q.   WERE YOU ASKED TO SEARCH THE VEHICLE AS WELL?  AS PART OF

3   THE PROCESS, YOU LOOKED THROUGH THE ENTIRE VEHICLE?

4   A.   YES, SIR.

5   Q.   WHEN SEARCHING THE VEHICLE, WHAT ELSE DID YOU FIND?

6   A.   I FOUND THE FLOAT ARM UNDER THE DRIVER'S SEAT.

7   Q.   IS THIS THE FLOAT YOU FOUND, (INDICATING)?

8   A.   YES, SIR.

9   Q.   AND WHERE DID YOU FIND THIS FLOAT?

10  A.   IT WAS TUCKED UP UNDERNEATH THE DRIVER'S SEAT,

11  BASICALLY -- WELL, IT WAS TUCKED UP UNDERNEATH THE DRIVER'S

12  SEAT.  IT WOULD BE RIGHT BELOW THE DRIVER'S LEGS.

13  Q.   SO RIGHT BELOW WHERE THE DRIVER WOULD BE SITTING?

14  A.   YES.

15  Q.   SO IF YOU'RE DRIVING THE VEHICLE AND SITTING IN THE SEAT,

16  IT WOULD HAVE BEEN RIGHT NEAR YOUR FEET?

17  A.   IT WOULD HAVE BEEN BASICALLY RIGHT BEHIND YOUR KNEES.

18  Q.   RIGHT BEHIND YOUR KNEES, UNDERNEATH THE SEAT?

19  A.   UNDERNEATH THE SEAT.

20  Q.   AND IF YOU WERE TO STOP A VEHICLE QUICKLY WHEN YOU'RE

21  DRIVING AND THAT WAS UNDERNEATH THE SEAT, WHAT WOULD HAPPEN?

22          MR. FAKHOURY:  OBJECTION.  SPECULATION.

23          THE COURT:  I THINK IT LACKS FOUNDATION.

24  BY MR. CONOVER:

25  Q.   HAVE YOU EVER DRIVEN A VEHICLE?

1    A.   YES.

2    Q.   HAVE YOU EVER STOPPED A VEHICLE QUICKLY?

3    A.   YES.

4    Q.   HAVE YOU HAD EXPERIENCE BEING AN AUTO MECHANIC, WITH PARTS

5    BEING LOOSE UNDERNEATH THE SEAT OF A CAR, AND WHAT THEY DO WHEN

6    A VEHICLE IS STOPPED QUICKLY?

7    A.   YES.

8    Q.   DESCRIBE THAT EXPERIENCE.

9    A.   THEY SLIDE OUT FROM UNDER THE SEAT.

10   Q.   AND WOULD THAT ARM AND FLOAT SLIDE OUT FROM UNDERNEATH THE

11   SEAT IN THE PLACE IT WAS FOUND BY YOU?

12   A.   I BELIEVE SO, YES.

13   Q.   WHAT ELSE WOULD IT DO IF THE CAR WAS TO, SAY, GO OVER A

14   SPEED BUMP, OR GO OVER A DIP, OR ANY OTHER SORT OF MOVEMENT?

15   A.   IT WOULD RATTLE.

16   Q.   WHY WOULD IT RATTLE?

17   A.   BECAUSE THERE IS METAL FRAMING UNDERNEATH THE SEAT.  THERE

18   IS TWO RAILS AND BOLTS AND OTHER PIECES OF METAL THAT ARE

19   UNDERNEATH IT.  AND THIS WIRE IS -- MAKES A LOT OF NOISE.

20   Q.   SO THIS IS -- I'M REFERRING TO GOVERNMENT'S EXHIBIT NO.

21   15.  THIS IS METAL HERE, (INDICATING)?

22   A.   YES.

23   Q.   AND UNDERNEATH THE SEAT IS METAL FRAMING?

24   A.   YES.  THERE IS CARPET IN BETWEEN, BUT YOU HAVE TWO RAILS

25   THAT ARE, YOU KNOW, 14 INCHES LONG.

1   Q.   AND WHAT DOES METAL SOUND LIKE WHEN IT HITS OTHER METAL,

2   AS A MECHANIC?

3   A.   IT MAKES A METALLIC SOUND.

4         THE COURT:  IT SOUNDS LIKE METAL HITTING METAL.

5         MR. CONOVER:  IT SOUNDS LIKE METAL HITTING METAL.

6   THANK YOU.

7       YOUR HONOR, AT THIS POINT, WE'D LIKE TO MOVE TO ADMIT

8   GOVERNMENT'S EXHIBIT 15, THE ARM AND FLOAT THAT WERE FOUND IN

9   DEFENDANT'S VEHICLE.

10         THE COURT:  ANY OBJECTION?

11         MR. FAKHOURY:  YES, YOUR HONOR.  OBJECTION ON

12   FOUNDATION.

13         THE COURT:  OVERRULED.  IT WILL COME IN.

14    (GOVERNMENT'S EXHIBIT 15 MARKED AND RECEIVED INTO EVIDENCE.)

15   BY MR. CONOVER:

16   Q.   MR. BUTLER, DESCRIBE WHAT THE ARM AND FLOAT IS MADE OUT

17   OF.

18   A.   THIS PORTION OF THE ARM, WHICH IS THE ARM ITSELF, IS MADE

19   OUT OF A HEAVY GAUGE METAL WIRE.

20   Q.   IT'S MADE OF METAL?

21   A.   YES.

22   Q.   WHAT IS THE FLOAT MADE OUT OF?

23   A.   THE FLOAT IS MADE OUT OF WOOD.  SOME PEOPLE CALL IT FOLIC

24   MATERIAL, OR IT'S A COMPOSITE MATERIAL.  IT'S BASICALLY MADE UP

25   OF A COMPOSITE OF RUBBER AND PLASTIC.

1   Q.   WHAT IS IT SUPPOSED TO DO?  IS IT SUPPOSED TO SINK OR

2   FLOAT?

3   A.   THIS FLOATS.

4   Q.   IS THAT INTENDED TO BE INSIDE THE GAS TANK OR INSIDE THE

5   PASSENGER COMPARTMENT OF THE VEHICLE?

6   A.   INSIDE THE GAS TANK.

7   Q.   IS THAT POROUS OR NONPOROUS MATERIAL?

8   A.   IT IS VERY POROUS.

9   Q.   WOULD THAT HOLD GASOLINE INSIDE, AS FAR AS THE POROUS

10   MATERIAL, WOULD GASOLINE SEEP IN AND MAINTAIN IN THAT TYPE OF

11   MATERIAL?

12   A.   YES, SIR.

13   Q.   AND WOULD IT BE POROUS ENOUGH WHERE IF THAT WAS REMOVED

14   FROM A GAS TANK, WOULD THERE BE ANY SORT OF NOTICEABLE SMELL?

15   A.   YES.

16   Q.   DESCRIBE THAT FROM YOUR EXPERIENCE.

17   A.   IT'S GOING TO HAVE A VERY STRONG GAS SMELL FOR AT LEAST

18   TWO DAYS.

19   Q.   WHY IS THAT?

20   A.   WELL, BECAUSE THE POROSITY OF THE MATERIAL IT'S MADE OUT

21   OF ACTUALLY RETAINS GAS.

22   Q.   AND THAT'S MEANT TO BE IN A GAS TANK?

23   A.   IN A GAS TANK.

24   Q.   AND IF YOU BOUGHT THE VEHICLE, SAY YOU WERE TO BUY A NEW

25   VOLKSWAGEN BEETLE, WHERE WOULD THAT BE FOUND?

1   A.   INSIDE THE GAS TANK, ATTACHED TO THE SENDING UNIT.

2   Q.   SO IT WOULD HAVE HAD TO HAVE BEEN REMOVED FROM THE SENDING

3   UNIT IF IT WAS BOUGHT NEW?

4   A.   YES.

5   Q.   AND WHEN IT WAS REMOVED, YOU'RE SAYING IT WOULD SMELL FOR

6   TWO DAYS?

7   A.   THE SENDING UNIT ITSELF WILL ACTUALLY SMELL LONGER THAN

8   THAT.  I'M SAYING TWO DAYS, IT'S GOING TO REEK WITH GAS.

9   Q.   HOW DO YOU KNOW THAT?  HAVE YOU EVER HAD ANY PERSONAL

10  EXPERIENCE WITH THAT?

11  A.   YES, SIR.

12  Q.   WHY IS THAT?

13  A.   I HAD CUSTOMERS' CARS IN THERE.  THE GENTLEMAN WORKING ON

14  IT, THAT WORKED FOR ME, OR ME, MYSELF, DIDN'T VENTILATE THE CAR

15  WELL ENOUGH WHILE WE WERE DOING IT.  THE CAR SMELLS LIKE GAS

16  WHENEVER YOU GET DONE, OR THE CUSTOMER COMES BACK COMPLAINING

17  THAT IT SMELLS LIKE GAS.

18  Q.   SO YOU'VE ACTUALLY REMOVED SENDING UNITS LIKE THIS BEFORE?

19  A.   YES.

20  Q.   AND YOU'VE REMOVED THE FLOATS BEFORE?

21  A.   YES.

22  Q.   IN THAT PROCESS, IS IT DIFFICULT TO KEEP THE GAS FROM

23  GETTING AROUND THE VEHICLE?

24  A.   YES.

25  Q.   WHY IS THAT DIFFICULT?

1    A.   BECAUSE IT DRIPS.

2    Q.   DO YOU TAKE PRECAUTIONS TO MAKE SURE THINGS DON'T DRIP ON

3    YOUR CUSTOMERS' VEHICLES?

4    A.   YES.

5    Q.   WHAT SORT OF PRECAUTIONS, LIKE --

6    A.   WE HAVE THINGS THAT WE CALL "FENDER COVERS," WHICH ARE

7    LIKE BIG DOUBLE-SIDED PIECES OF CARPET.  WE HAVE PLASTIC

8    SHEETING, RAGS.  SOME OF THE GUYS WILL EVEN CLEAN OUT A PAN,

9    PUT IT IN THERE, PICK THE UNIT UP AND PUT IT IN A PAN, AND THEN

10   REMOVE IT FROM A CAR TO KEEP FROM DRIPPING ON IT.

11   Q.   BECAUSE THAT UNIT IS SUBMERGED IN GASOLINE?

12   A.   YES.  AND IT'S FULL OF GAS.  THIS ISN'T A SEALED UNIT, SO

13   IT FILLS UP WITH GAS.

14   Q.   OKAY.  AND WHEN YOU ARE REMOVING A SENDING UNIT FROM A GAS

15   TANK OF A VEHICLE, THIS IS ATTACHED HERE, CORRECT?

16   A.   YES.

17   Q.   AND SO WHEN YOU WENT TO JUST PULL UP THE SENDING UNIT OUT,

18   IS IT DIFFICULT TO DO THAT WHEN THIS IS OUT LIKE --

19   A.   YES.  YOU HAVE TO -- YOU PULL IT UP AND THEN YOU HAVE TO

20   ROTATE IT HOWEVER, YOU KNOW, TO GET IT TO COME OUT OF THE TANK.

21   BECAUSE THE HOLE THAT YOU'RE PULLING THAT OUT OF IS ONLY THE

22   SIZE OF THAT BLACK RING ON TOP.

23   Q.   WHAT IF YOU WANTED TO REGULARLY PULL YOUR SENDING UNIT IN

24   AND OUT OF A VEHICLE, WOULD YOU TAKE THIS OFF OR LEAVE IT ON?

25   A.   I'D TAKE IT OFF.

1  Q.  BECAUSE IT'S A LOT EASIER TO COME OUT?

2  A.  YES, SIR.

3  Q.  IF YOU WERE NOT EVER GOING TO PUT IT BACK ON, WOULD THERE

4  BE ANY REASON TO KEEP THIS?

5  A.  NO.

6  Q.  WOULD THERE BE ANY REASON TO PUT THAT UNDER THE DRIVER'S

7  SEAT IF YOU DIDN'T INTEND TO REATTACH IT?

8  A.  NO.

9  Q.  AND HOW LONG WOULD YOU ESTIMATE -- FOR WHEN YOU DO THIS

10  WORK AS A MECHANIC, THAT YOU REMOVE THESE SENDING UNITS, WITH

11  ALL OF THOSE PRECAUTIONS THAT YOU TAKE, DO THE VEHICLES SMELL

12  LIKE GAS?

13  A.  YES.

14  Q.  WHY IS THAT?

15  A.  WELL, WHILE YOU'RE DOING THIS, YOU'RE ALSO CONTENDING WITH

16  THE VAPOR RECOVERY LINE AND THE FUEL LINE.  AND THE VAPOR

17  RECOVERY IS ACTUALLY SENDING GAS VAPOR BACK TO THE CAR -- OR

18  BACK TO THE GAS TANK.  YOU ALSO HAVE THIS RIGHT HERE,

19  (INDICATING).  IF THE FUEL PUMP WAS MAKING PRESSURE, WHENEVER

20  YOU SHUT IT OFF, IT MOST LIKELY IS STILL GOING TO HAVE

21  PRESSURE, OR AT LEAST GAS IN THE LINE.  WHENEVER YOU PULL THAT

22  OFF, YOU HAVE GOT A SMALL AMOUNT OF GAS THAT IS GOING TO RUN ON

23  THE TOP OF THIS, (INDICATING).  WHENEVER YOU PICK THESE UP,

24  YOU'RE GOING TO DRIBBLE GAS.  IT'S JUST KIND OF ONE OF THOSE

25  THINGS.  AND IT ALSO GETS ON THE INTERIOR HEADLINER, THE DOOR

1  BOLSTERS, JUST IN THE FABRIC ITSELF, AND YOU HAVE TO HAVE TIME

2  TO AIR THE CAR BACK OUT.

3  Q.   THAT'S JUST THE VAPOR, NOT THAT THE GAS SPLASHES ON THE

4  HEADLINER --

5  A.   RIGHT, JUST FROM THE VAPOR ITSELF.

6  Q.   JUST REMOVING THE SENDING UNIT, WHERE THE GAS FUMES ARE

7  ABLE TO EMANATE THROUGHOUT THE CAR?

8  A.   YES.

9  Q.   ALL RIGHT.  AND SO IF A SENDING UNIT AND THE FLOAT -- IF

10 THE FLOAT WAS PLACED UNDERNEATH AN INDIVIDUAL'S DRIVER'S

11 SEAT --

12 A.   YES.

13 Q.   -- WOULD THE SMELL OF THAT SENDING UNIT PERMEATE

14 THROUGHOUT THE PASSENGER CABIN?

15 A.   YES.

16 Q.   AND WOULD THE SMELL OF THAT FLOAT -- IF THE FLOAT WAS

17 PLACED UNDERNEATH THE DRIVER'S SEAT -- THAT'S WHAT I MEANT TO

18 SAY -- THE FLOAT, IF THAT WAS PLACED UNDERNEATH THE DRIVER'S

19 SEAT, WOULD THAT SMELL PERMEATE THROUGHOUT THE CABIN?

20 A.   YES.

21 Q.   AND FOR HOW LONG WOULD IT SMELL, EVEN IF IT STARTED TO

22 DISSIPATE, WOULD YOUR ESTIMATE BE?

23 A.   WELL, IT -- A LONG TIME.  IT STILL HAS KIND OF THE OTHER

24 FUEL TO IT NOW.  IT LASTS A LONG TIME.  IF IT'S -- THE

25 CONDITIONS ARE GOING TO CHANGE, TOO, AS FAR AS HOW STRONG THE

1   ODOR IS.  IF IT'S IN A COOL AREA, AND THE CAR IS COOL INSIDE,

2   IT IS GOING TO DISSIPATE A LOT FASTER.  BUT YET, IF YOU HAD

3   THAT INSIDE THE CAR, YOU HAD THE WINDOWS ROLLED UP, AND IT'S A

4   HOT DAY, IT'S GOING TO START SMELLING EVEN WORSE.

5   Q.  CAN YOU BRIEFLY DESCRIBE TO THE JURY HOW LONG THE PROCESS

6   WOULD TAKE TO PREPARE THAT SENDING UNIT THE WAY IT IS PREPARED

7   TO MODIFY IT, TO REMOVE IT, ALL THE THINGS YOU HAVE TO DO

8   REGARDING REMOVING THE GAS LINES AND ELECTRICAL DEVICES,

9   APPROXIMATELY HOW LONG THAT PROCESS WOULD TAKE, AND JUST WALK

10  THE JURY THROUGH THAT FOR ME.

11  A.  OKAY.  THE FIRST THING THAT HAPPENS IS, YOU'D HAVE TO

12  UNBUCKLE THE REAR SEAT, THE LOWER PORTION OF THE REAR SEAT.

13  ONCE YOU HAVE THAT OUT OF THE WAY, THERE IS A LINER THAT IS

14  IN -- AN INSULATION LINER, YOU HAVE TO REMOVE IT.  THEN BETWEEN

15  THE BODY OF THE INTERIOR OF THE CAR, AND THIS FUEL PUMP UNIT,

16  IS THIS PLATE AND IT HAS THREE SCREWS IN IT.  THEY HAVE TO BE

17  REMOVED.  THE SEAT HAS TO COME OUT OF THE CAR.  IT CAN'T STAY

18  IN THERE.  THERE IS NOT THAT MUCH ROOM.

19      THEN ONCE YOU HAVE THE PLATE OFF, THE FELT PULLED BACK,

20  THEN YOU HAVE TO UNHOOK -- THERE IS TWO FUEL LINES THAT HOOK ON

21  TO THIS, ONE IS A VAPOR RECOVERY, AND THE OTHER ONE IS A

22  PRESSURE LINE.  THERE IS ALSO AN ELECTRICAL CONNECTOR TO POWER

23  THE PUMP AND THE SIGNAL FOR THE FUEL SENDING UNIT TO SEND THE

24  SIGNAL TO THE DASH.  THAT HAS TO BE UNCLIPPED.  AND IT HAS TO

25  BE DONE IN A MANNER OTHERWISE YOU'LL BREAK THE PINS IN THE

1   MODULE, SO YOU CAN'T BE REAL HEAVY-HANDED WITH IT.

2       SAME THING WITH THESE FUEL LINES, THEY HAVE TO BE

3   DISCONNECTED.  AND THEY'RE CONNECTED WITH PUSH CLIPS.  ONCE

4   THAT IS TAKEN OFF, THEN THIS LOCK RING -- IT'S ACTUALLY A BIG

5   PLASTIC NUT THAT SCREWS DOWN ON THE GAS TANK.  THAT HAS TO BE

6   REMOVED.  THESE HAVE TO BE PUT ON VERY TIGHT TO MAKE A SEAL SO

7   THE GAS DOESN'T END UP RUNNING ALL OVER FROM THE INSIDE OF THE

8   TANK, ON TOP OF THE GAS TANK.

9   Q.  WHAT SORT OF TOOLS WOULD BE USED TO REMOVE A NUT LIKE

10  THAT?  I'M ASSUMING THEY WOULD BE TOO TIGHT TO TURN WITH YOUR

11  HAND?

12  A.  RIGHT.  THEY MAKE A SPECIAL SOCKET THAT YOU CAN BUY.  MOST

13  PEOPLE USE EITHER A REALLY BIG PAIR OF CHANNEL LOCKS, WHICH WE

14  HAVE, OR A DULL SCREWDRIVER AND A HAMMER.

15  Q.  LOOKING AT THAT PARTICULAR NUT THERE, AND LOOKING ALONG

16  THE GROOVES THERE, DOES IT LOOK AS THOUGH A HAMMER AND CHISEL

17  HAVE BEEN USED TO OPEN THAT MULTIPLE TIMES?

18  A.  YES, SIR.  THERE ARE SCARS IN THE PLASTIC, ON THE EDGES OF

19  THIS NUT, IN SEVERAL DIFFERENT LOCATIONS.

20  Q.  IF YOU COULD CONTINUE WITH YOUR EXPLANATION, MR. BUTLER.

21  A.  ONCE THIS IS TAKEN OFF, THEN YOU HAVE TO PULL THIS UNIT

22  UP, ROTATE IT, GET IT OUT BECAUSE THE ARM WOULD BE ON IT.  YOU

23  TAKE THE ARM OUT, TAKE THE RED THREAD AND THE TOOTHPICK.  HAVE

24  TO LINE THAT BACK UP.  WRAP IT AROUND, TIE IT OFF.

25      THEN IF YOU WERE -- YOU'RE TALKING ABOUT PUTTING STUFF IN

1   THE GAS TANK?

2   Q.   SURE.

3   A.   THEN, AT THAT POINT, ONCE YOU GOT THIS RIGGED, YOU'D HAVE

4   TO PUT WHATEVER PACKAGES YOU WERE GOING TO PUT IN THE GAS TANK

5   BACK IN.   YOU'RE GOING TO HAVE TO MAKE SURE YOU HAVE THEM

6   PUSHED OUT OF THE SIDE SO THIS HAS ROOM TO FIT BACK DOWN IN

7   THERE.

8   Q.   LET ME ASK YOU ONE QUICK QUESTION.   IF YOU WANTED TO RIG

9   THIS DEVICE TO SHOW THREE-QUARTERS FULL, IN ORDER TO KNOW THAT

10  YOU HAVE IT IN THE PROPER LOCATION, IN ORDER FOR A GAUGE ON A

11  2002 JETTA TO WORK --

12  A.   YOU MEAN BEETLE.

13  Q.   BEETLE, THANK YOU.   2002 BEETLE.   DOES THE VEHICLE HAVE TO

14  BE TURNED ON FOR THE GAUGE TO WORK?

15  A.   THE IGNITION HAS TO BE TURNED ON.

16  Q.   SO SOMEONE WOULD HAVE TO HAVE THE KEYS TO THE CAR IN ORDER

17  TO DETERMINE WHETHER OR NOT THIS WAS PROPERLY WORKING, THE

18  TOOTHPICK AND STRING WERE MAKING THE GAUGE SHOW WHAT THEY

19  WANTED TO SHOW?

20  A.   YES, SIR.

21  Q.   YOU COULD NOT DO THAT WITHOUT ACCESS TO THAT VEHICLE?

22  A.   NO, SIR.

23  Q.   PLEASE CONTINUE, MR. BUTLER.

24  A.   ONCE YOU HAVE THE PACKAGES BACK IN, PUT THE PUMP BACK IN,

25  PUT THE NUT BACK ON, REATTACH THE FUEL LINES, REATTACH THE

1   ELECTRICAL CONNECTOR, PUT THE FELT BACK DOWN, PUT THE PLATE

2   BACK ON, TIGHTEN THE SCREWS DOWN -- I'M SORRY, I GOT OUT OF

3   ORDER.  PUT THE PLATE ON, THEN PUT THE FELT INSULATOR BACK

4   DOWN, THEN REATTACH THE SEAT, THE TIMING ESTIMATE WOULD BE TWO

5   AND A HALF HOURS.

6   Q.   FOR THE ENTIRE PROCESS OF --

7   A.   YES, SIR.

8   Q.   -- REMOVING THE SENDING UNIT, MODIFYING IT TO SHOW,

9   PLACING IN THE NARCOTICS, AND THEN REMOVING -- AND THEN

10  RECLOSING IT DOWN?

11  A.   YES, SIR.

12  Q.   AND PLACING THE FLOAT --

13  A.   FLOAT UNDER THE SEAT.

14  Q.   -- UNDER THE SEAT.

15  A.   YES.

16  Q.   THAT WOULD STILL EMANATE -- THAT WOULD STILL SMELL OF GAS?

17  A.   YES, SIR.

18          MR. CONOVER:  YOUR HONOR, I WAS ABOUT TO GET INTO A

19  DIFFERENT AREA OF HIS TESTIMONY.  WOULD YOU LIKE ME TO CONTINUE

20  OR --

21          THE COURT:  YOU HAVE FIVE MINUTES.

22          MR. CONOVER:  ALL RIGHT.

23  BY MR. CONOVER:

24  Q.   WITH REGARDS TO THE PACKAGE SIZE HERE, ARE YOU FAMILIAR

25  WITH A BEETLE'S GAS TANK AND THE SIZE, APPROXIMATELY, OF A

1   BEETLE'S GAS TANK?

2   A.   YES, SIR.

3   Q.   AND IS THIS A FAIRLY ACCURATE DEPICTION OF THIS PARTICULAR

4   BEETLE THAT YOU LOOKED AT AND WHERE THE SENDING UNIT HOLE WOULD

5   BE LOCATED, THE SIZE OF THE SENDING UNIT, AND THE APPROXIMATE

6   LOCATION OF WHERE THOSE PACKAGES WOULD HAVE BEEN?

7   A.   YES.

8   Q.   OKAY.   AND LOOKING AT THIS PARTICULAR PHOTOGRAPH, HOW

9   WOULD YOU DESCRIBE THE SIZE AND SHAPE OF THESE PACKAGES?

10  A.   BARELY ABLE TO FIT THROUGH THAT HOLE.   I MEAN --

11  Q.   WHAT DO YOU MEAN BY "BARELY ABLE TO FIT THROUGH THAT

12  HOLE"?

13  A.   THE HOLE THAT YOU'RE GOING TO BE PUSHING THOSE PACKAGES

14  THROUGH IS ROUGHLY ONLY THIS BIG A ROUND, (INDICATING).

15  Q.   OKAY.   I'M GOING TO PUT UP HERE A PICTURE OF THAT HOLE.

16  IS THAT THE PICTURE OF THE HOLE YOU LOOKED AT WHEN YOU WERE OUT

17  THERE?

18  A.   YES, SIR.

19  Q.   AND THAT'S WHERE THE PACKAGES WOULD HAVE TO GO THROUGH?

20  A.   YES, SIR.

21  Q.   AND WHAT IF THE PACKAGES WERE WRAPPED IN A TUPPERWARE

22  CONTAINER, A SQUARE TUPPERWARE CONTAINER, WOULD THEY HAVE FIT

23  IN THAT HOLE?

24  A.   NO.

25  Q.   WHAT IF THEY WERE SQUARE AND A LITTLE LARGER, WOULD THEY

1  HAVE BEEN ABLE TO FIT INSIDE THAT HOLE?

2  A.   THE PACKAGES, THE MATERIAL IS FLEXIBLE, RIGHT.

3  Q.   IT IS.

4  A.   WELL, YOU COULD GO THROUGH AND, YOU KNOW, MASSAGE IT AND

5  GET IT TO GO THROUGH THE HOLE, PROBABLY.

6  Q.   WHAT IF THESE PACKAGES WERE ELONGATED TO -- SO THAT THEY

7  WERE, SAY, AN INCH OR TWO LONGER THAN THE SENDING UNIT, WOULD

8  THEY HAVE BEEN ABLE TO FIT IN AND GO INSIDE SIDE?

9  A.   YES, SIR.   YES, A PERSON WOULD BE -- BECAUSE THE PACKAGES

10 APPEAR TO BE FLEXIBLE, SHOULD I SAY, A PERSON COULD PROBABLY

11 WORK IT DOWN IN THERE, BUT IT ISN'T GOING TO BE EASY.

12 Q.   IT WOULD BE DIFFICULT TO DO?

13 A.   YES, SIR.

14 Q.   AND WHAT IF THEY WERE BIG, ROUND PACKAGES, LET'S JUST SAY?

15 A.   NO.

16 Q.   WOULD THEY FIT DOWN THAT HOLE?

17 A.   NO.

18 Q.   AND SO DO THESE PACKAGES, IN YOUR ESTIMATION, APPEAR TO BE

19 PERFECTLY DESIGNED TO FIT IN THAT PARTICULAR HOLE, BUT YET NOT

20 BE TOO LONG SO THEY WOULDN'T GO ALL THE WAY DOWN, BUT NOT BE

21 TOO SMALL OR TOO SHORT SO THEY WOULD REQUIRE 50 PACKAGES, DO

22 THEY APPEAR TO BE PERFECTLY SIZED PACKAGES?

23 A.   YES.   WELL, THEY'RE -- YEAH.   THEY'LL FIT.

24 Q.   TAKE YOUR TIME.   EXPLAIN TO THE JURY WHAT YOU MEAN BY, YOU

25 KNOW, BASED ON YOUR UNDERSTANDING OF HOW THE GAS TANK WORKS AND

1    YOUR --

2    A.   WELL, IT IS -- THERE -- THE PACKAGES ARE OF A SIZE AND

3    SHAPE THAT, YEAH, A PERSON COULD GET THEM DOWN IN THERE AND

4    STILL BE ABLE TO RETRIEVE THEM ALSO.

5    Q.   ALL RIGHT.

6    A.   I DON'T KNOW IF I'VE FULLY EXPLAINED THAT, BUT IT --

7    Q.   SURE.  IF THEY WERE A DIFFERENT SIZE AND SHAPE -- IS THERE

8    ANOTHER SIZE AND SHAPE THAT WOULD BE EASIER TO PUT THEM IN AND

9    RETRIEVE THEM?

10   A.   NOT THAT I CAN THINK OF OFF THE TOP OF MY HEAD.

11   Q.   SO THIS SIZE AND SHAPE APPEARS TO BE THE EASIEST SIZE AND

12   SHAPE TO GET PACKAGES IN THAT GAS TANK AND GET PACKAGES OUT OF

13   THAT GAS TANK?

14           MR. FAKHOURY:  OBJECTION.  CUMULATIVE.  ASKED AND

15   ANSWERED.

16           THE COURT:  SUSTAINED.  I THINK THAT IS TRUE.  THIS

17   IS A GOOD TIME FOR US TO TAKE OUR BREAK.

18       LADIES AND GENTLEMEN, I'M GOING TO SEND YOU HOME FOR THE

19   EVENING.  PLEASE REMEMBER MY ADMONITION:  NOT TO DISCUSS THIS

20   CASE AMONG YOURSELVES OR WITH ANYONE; DO NOT DO ANY INDEPENDENT

21   RESEARCH; PLEASE KEEP AN OPEN MIND; AND DO NOT READ, WATCH,

22   LISTEN TO ANY NEWS ACCOUNTS OF THIS CASE SHOULD THERE BE ANY.

23       SEE YOU PROMPTLY TOMORROW MORNING AT 9:00.  BEFORE YOU

24   LEAVE, PLEASE WRITE THIS PHONE NUMBER DOWN.  IF BY CHANCE,

25   SOMETHING SHOULD HAPPEN AND YOU'RE NOT ABLE TO BE HERE ON TIME,

1    PLEASE CALL THIS NUMBER AS SOON AS YOU KNOW, SO THAT WE WILL

2    KNOW WHAT IS GOING ON.

3         SO GLENN, GIVE US THE NUMBER PLEASE.

4            THE CLERK:  (619) 557-6422.

5            THE COURT:  SO AGAIN, PLEASE CALL US AS SOON AS

6    POSSIBLE.  IF YOU'RE GOING TO BE DELAYED, OR, GOD FORBID, YOU

7    GET IN A CAR ACCIDENT, OR SICK, OR WHATEVER.

8        OKAY, SO SEE YOU TOMORROW MORNING AT 9:00 A.M.

9        SIR, YOU MAY STEP DOWN.

10       AND YOU'RE WELCOME TO BRING COFFEE OR TEA, JUST MAKE SURE

11   IT COMES IN A SPILL-PROOF CONTAINER, OKAY.  THANK YOU.  SEE YOU

12   TOMORROW MORNING.

13       ALL RIGHT, WE'RE IN RECESS UNTIL TOMORROW MORNING, AT

14   9:00 A.M.

15                    (RECESS AT 4:33 P.M.)

16                      ---000---

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2           I HEREBY CERTIFY THAT I AM A DULY APPOINTED,

3    QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED

4    STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

5    TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;

6    THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY

7    STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES

8    WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL

9    CONFERENCE.

10          DATED:  JUNE 28, 2011, AT SAN DIEGO, CALIFORNIA

11

12          _____
                    S/DEBORAH M. O'CONNELL, CSR #10563
13                  REGISTERED PROFESSIONAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25