<pre>
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4    UNITED STATES OF AMERICA,        .
                                       .
 5          PLAINTIFF,                 . NO. 09-CR-4426
                                       .
 6             V.                      . FEBRUARY 24, 2011
                                       .
 7    GILBERT FLORES,                  . 9:05 A.M.
                                       .
 8          DEFENDANT.                 . SAN DIEGO, CALIFORNIA
      . . . . . . . . . . . . . . .    .
 9

10

11

             TRANSCRIPT OF JURY TRIAL, DAY 2
12          BEFORE THE HONORABLE ROGER T. BENITEZ
                UNITED STATES DISTRICT JUDGE
13

14     APPEARANCES:

15
        FOR THE PLAINTIFF:      U.S. ATTORNEY'S OFFICE
16                              SOUTHERN DISTRICT OF CALIFORNIA
                                BY:  MARK CONOVER, ESQ.
17                              BY:  SARAH BOOT, ESQ.
                                880 FRONT STREET, ROOM 6293
18                              SAN DIEGO, CALIFORNIA  92101

19     FOR THE DEFENDANT:       FEDERAL DEFENDERS OF SAN DIEGO
                                BY:  TIMOTHY GARRISON, ESQ.
20                              BY:  HANNI FAKHOURY, ESQ.
                                225 BROADWAY, SUITE 900
21                              SAN DIEGO, CALIFORNIA  92101

22
        COURT REPORTER:         DEBORAH M. O'CONNELL, RPR, CSR
23                              880 FRONT STREET, ROOM 4290
                                SAN DIEGO, CALIFORNIA, 92101
24

25    REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER
</pre>

I N D E X


GENERAL INDEX

|                                         | PAGE |
| --------------------------------------- | ---- |
| JURY INSTRUCTIONS                       | 237  |
| GOVERNMENT'S CLOSING ARGUMENT           | 250  |
| DEFENDANT'S CLOSING ARGUMENT            | 271  |
| GOVERNMENT'S FINAL CLOSING ARGUMENT     | 290  |
| FINAL JURY INSTRUCTIONS                 | 299  |


INDEX TO WITNESSES

| FOR THE GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
| ------------------ | ------ | ----- | -------- | ------- |
| (CON'T.D) RUSS BUTLER | | | | |
| BY MR. CONOVER | 5 | | 27 | |
| BY MR. FAKHOURY | | 12 | | |
| | | | | |
| ICE AGENT CASSANDRA BULLARD | | | | |
| BY MR. CONOVER | 29 | | 69 | |
| BY MR. GARRISON | | 44 | | 68, 72 |
| | | | | |
| ICE AGENT KENNETH KRAUSE | | | | |
| BY MR. CONOVER | 74 | | 180 | |
| BY MR. GARRISON | | 137 | | 181 |

CONT'D.

## INDEX TO WITNESSES

FOR THE DEFENDANT      DIRECT     CROSS   REDIRECT   RECROSS

INVESTIGATOR JOSE LEANO

BY MR. FAKHOURY        183                  214

BY MR. CONOVER                    208


JENNIFER JIMENEZ

BY MR. GARRISON        215


CHRISTOPHER M. FLORES

BY MR. GARRISON        219

INDEX TO EXHIBITS

| FOR THE GOVERNMENT | IDENTIFIED | RECEIVED |
|---|---|---|
| 1 | 106 | 107 |
| 23 | 33 | 33 |
| 24 | 33 | 33 |
| 25 | 41 | 41 |
| 26 | 41 | 41 |
| 27 | 32 | |
| 28 | 35 | 35 |
| 29 | 85 | |
| 31 | 71 | 71 |
| 32 | 113 | 117 |

| FOR THE DEFENDANT | IDENTIFIED | RECEIVED |
|---|---|---|
| A | 199 | 201 |
| B | 199 | 201 |
| C | 199 | 201 |
| D | 199 | 201 |
| E | 202 | 203 |
| F | 202 | 203 |
| G | 206 | |
| H | 47 | |
| I | 52 | |

```
 1              SAN DIEGO, CALIFORNIA, FEBRUARY 24, 2011, 9:05 A.M.

 2                               * * * *

 3              THE COURT:  ALL RIGHT.  I GUESS MR. GARRISON,

 4    MR. FAKHOURY, I HAVE SOMETHING I NEED TO TALK TO YOU ABOUT

 5    OUTSIDE THE PRESENCE OF GOVERNMENT'S COUNSEL AND THE JURY.  BUT

 6    SINCE THE JURY IS ALREADY WAITING AND WE'RE RUNNING LATE, WE'LL

 7    DO THAT OVER A BREAK, OKAY.  SO LET'S BRING THE JURY IN.

 8              THE CLERK:  JURY ENTERING.

 9                         (JURY ENTERS COURTROOM.)

10              THE COURT:  ALL RIGHT.  GOOD MORNING.  WELCOME BACK.

11        COUNSEL, YOU MAY PROCEED WITH YOUR EXAMINATION.

12              MR. CONOVER:  THANK YOU, YOUR HONOR.  MAY I APPROACH

13    THE WITNESS WITH THE EXHIBITS?

14              THE COURT:  YES.

15                    DIRECT EXAMINATION CONT'D.

16    BY MR. CONOVER:

17    Q.  MR. BUTLER, YESTERDAY WE WERE TALKING ABOUT THIS SENDING

18    UNIT AND THAT ARM AND FLOAT.  WE WERE TALKING ABOUT HOW THAT

19    WAS FOUND INSIDE THE DEFENDANT'S VEHICLE; IS THAT CORRECT?

20    A.  YES, SIR.

21    Q.  NOW THAT SENDING UNIT, CAN YOU DESCRIBE BASICALLY FOR THE

22    JURY ONE MORE TIME THE PURPOSE OF THE SENDING UNIT WITH REGARD

23    TO HOW IT AFFECTS THE GAS GAUGE ON A PERSON'S VEHICLE?

24              MR. FAKHOURY:  OBJECTION.  ASKED AND ANSWERED.

25              THE COURT:  YEAH, SUSTAINED.
```

1          MR. CONOVER:  ALL RIGHT.

2   BY MR. CONOVER:

3   Q.   COULD YOU DESCRIBE A GAS GAUGE ON A TYPICAL BEETLE,

4   VOLKSWAGEN 2002 BEETLE, WHAT THE GAS GAUGE DOES, ITS PURPOSE.

5   A.   THE GAS GAUGE IS TO INDICATE HOW MUCH FUEL IS ACTUALLY IN

6   THE TANK.  AND IT USES THE SENDING UNIT AND ARM AS THE

7   INSTRUMENT THAT MEASURES THE GAS, AND THEN IT IS INDICATED ON

8   THE DASH WITH A SWEEP GAUGE.

9   Q.   FROM YOUR EXPERIENCE WITH 30 YEARS OF MECHANICS, THE WAY

10  THAT SENDING UNIT IS RIGGED, WOULD THE GAS GAUGE SHOW THE

11  ACCURATE REPRESENTATION OF THE AMOUNT OF FUEL IN THE GAS GAUGE?

12  A.   NO, SIR.

13  Q.   WHY NOT?

14  A.   IT'S TIED INTO PLACE.  THEY INDICATE FULL NO MATTER WHAT

15  THE LEVEL OF THE GAS IS ON THE TANK.

16  Q.   SO REGARDLESS OF HOW FAR YOU DROVE THE VEHICLE, IT WOULD

17  REMAIN IN THE SAME POSITION OF INDICATING FULL?

18  A.   YES.

19          MR. FAKHOURY:  OBJECTION.  ASKED AND ANSWERED.

20          THE COURT:  OVERRULED.

21  BY MR. CONOVER:

22  Q.   SO IF A DRIVER WAS DRIVING THAT VEHICLE, WOULD THEY KNOW

23  HOW MUCH GAS WAS IN THEIR TANK?

24  A.   NO.

25  Q.   AND WOULD THEY HAVE A WAY OF NOT RUNNING OUT OF GAS?  IS

1    THERE A WAY TO FAST-TRACK, SAY, HOW LONG YOU'VE TRAVELED IN A

2    VEHICLE IF YOUR GAS GAUGE ISN'T WORKING?  IS THERE AN ODOMETER

3    IN A 2002 --

4    A.  YOU COULD USE THE ODOMETER BY THE MILEAGE IF YOU KNEW HOW

5    MUCH GAS HAD BEEN PUT IN THE VEHICLE AND WHAT THE CAPACITY OF

6    THE TANK IS.  IF YOU KNEW THE GENERAL MILEAGE THAT THE CAR GOT,

7    YOU COULD WATCH THE ODOMETER AND KNOW APPROXIMATELY HOW MANY

8    MILES YOU COULD GET.

9    Q.  WHAT IS THE GAS MILEAGE OF A 2002 VOLKSWAGEN BEETLE?

10    A.  THEY -- THEY RANGE ON THE HIGHWAY BASICALLY 29 MILES TO

11    THE GALLON, AND IN THE CITY, 21.

12    Q.  OKAY.  AND SO WHAT ABOUT STOPPING IN TRAFFIC, IF YOU'RE AT

13    A COMPLETE STOP, HOW MANY MILES PER GALLON DO YOU GET?

14    A.  WELL --

15          THE COURT:  IS THAT A TRICK QUESTION, COUNSEL?

16          THE WITNESS:  YEAH, THAT'S A SORT OF TRICK QUESTION.

17    BECAUSE IF YOU'RE STOPPED IN TRAFFIC, YOU GET BASICALLY ZERO

18    MILES TO THE GALLON.

19    BY MR. CONOVER:

20    Q.  WHAT IF YOU'RE IN BAD TRAFFIC, WHERE YOU'RE TRAVELING 5,

21    10, 15 MILES AN HOUR?  GIVE US YOUR BEST APPROXIMATION OF HOW

22    MANY MILES PER GALLON YOU WOULD GET.

23    A.  WELL, THE RATING ON THE VEHICLE IS 21 IN THE CITY, BUT

24    THAT -- WHENEVER THEY DO THEIR RATING, IT IS ACTUALLY BASED ON

25    AVERAGE CITY DRIVING.

1  Q.   OKAY.   AVERAGE CITY DRIVING?

2  A.   YOU'RE TALKING ABOUT STOP AND GO.   I MEAN, GENERALLY -- I

3  MEAN, IT CAN GO DOWN TO, YOU KNOW, 15, DEPENDING ON THE

4  CONDITIONS.

5  Q.   SO IF YOU'RE STOPPED IN TRAFFIC AT ZERO, AND IF YOU'RE

6  GOING AT THE TOP POSSIBLE SPEED FOR FUEL ECONOMY, IT'S 29; IS

7  THAT CORRECT?

8  A.   YES.

9  Q.   AND SO THE RANGE WOULD BE SOMEWHERE BETWEEN ZERO AND 29,

10  DEPENDING ON TRAFFIC?

11  A.   YES.

12  Q.   AND IF AN INDIVIDUAL WAS TRAVELING FROM OTAY MESA PORT OF

13  ENTRY, OR REALLY TRAVELING FROM SOMEWHERE WITHIN MEXICO, TO THE

14  LOS ANGELES AREA, ARE YOU FAMILIAR -- HAVE YOU EVER DRIVEN THAT

15  BEFORE?

16  A.   YEAH.

17  Q.   WOULD YOU CONSIDER THAT TO BE A HIGH TRAFFIC AREA OR LOW

18  TRAFFIC TYPE AREA?

19          MR. FAKHOURY:   OBJECTION.   IRRELEVANT.

20          THE COURT:   YEAH, OVERRULED.

21          THE WITNESS:   IT IS A HIGH TRAVELED AREA.

22  BY MR. CONOVER:

23  Q.   ALL RIGHT.   AND AN INDIVIDUAL DRIVING THAT VEHICLE WOULD

24  NOT KNOW THE LEVEL OF GAS IN THEIR TANK BASED ON THE GAS GAUGE;

25  IS THAT CORRECT?

1   A.   CORRECT.

2   Q.   AND HAVE YOU BEEN CALLED OUT AS A MECHANIC TO FIX GAS

3   GAUGES BEFORE?

4   A.   YES.

5   Q.   HAVE YOU BEEN CALLED OUT BECAUSE INDIVIDUALS RUN OUT OF

6   GAS, NOT KNOWING THE AMOUNT OF GAS IN THEIR TANK BECAUSE OF A

7   FAULTY GAS GAUGE?

8   A.   YES.

9   Q.   COULD YOU PLEASE HOLD UP THE FLOAT AND ARM THERE FOR THE

10  JURY REAL BRIEFLY.

11  A.   (WITNESS COMPLIES.)

12  Q.   NOW IF SOMEONE WAS WANTING TO REMOVE THE SENDING UNIT ON A

13  REGULAR BASIS FROM A VEHICLE, WOULD THEY REMOVE THAT ARM?

14  A.   YES.

15  Q.   NOW IF THAT ARM WAS TO HAVE BEEN LEFT INSIDE THE VEHICLE,

16  IN ITS PROPER POSITION, LET'S SAY, WOULD IT HAVE BEEN ATTACHED

17  WHERE THIS TOOTHPICK GOES?

18          MR. FAKHOURY:  OBJECTION.  ASKED AND ANSWERED.

19          THE COURT:  I THINK THAT'S TRUE.  SUSTAINED.

20  BY MR. CONOVER:

21  Q.   IF THIS WAS ATTACHED HERE WHERE A TOOTHPICK GOES, AND IT

22  WAS INSIDE THE GAS TANK, AND THAT GAS TANK WAS LOADED WITH 23

23  PACKAGES OF METHAMPHETAMINE, WOULD THOSE PACKAGES AFFECT THAT

24  FLOAT?

25  A.   YES.

1  Q.   HOW WOULD THEY AFFECT THAT FLOAT?

2  A.   AS THE CAR WOULD BE DRIVEN AROUND CORNERS, BUMPS, THIS,

3  THAT, IT'S REASONABLE THAT ONE OF THE PACKAGES WOULD EITHER

4  GET -- DEPENDING ON THE POSITION OF THE ARM BECAUSE OF HOW MUCH

5  FUEL IS IN THERE, THAT THE PACKAGE WOULD EITHER GET UNDER THE

6  FLOAT, WHICH WOULD HOLD IT UP, WHICH WOULD INDICATE MORE GAS IN

7  THE CAR AS IT'S BEING USED, OR A PACKAGE MAY END UP ON TOP OF

8  THE FLOAT, WHICH WOULD SHOVE IT TO THE BOTTOM, WHICH WOULD

9  INDICATE EMPTY, EVEN THOUGH THERE IS FUEL IN IT.

10  Q.   ALL RIGHT.  NOW IS IT COMMON IN THE MECHANIC INDUSTRY FOR

11  THERE TO BE ALLOWABLE TIMES FOR REPLACING AND MECHANIC WORK ON

12  DIFFERENT PARTS OF A VEHICLE?

13  A.   YES.

14  Q.   AND IS THERE A SET AMOUNT OF TIME SET OUT FOR THE

15  REPLACEMENT OF A STANDARD SENDING UNIT INSIDE A 2002 VOLKSWAGEN

16  BEETLE?

17  A.   YES.

18  Q.   AND WHAT IS THE ORGANIZATION OR THE MAGAZINE, WHATEVER IT

19  IS, THAT DETERMINES THOSE TIMES?

20  A.   IT'S CALLED A LABOR GUIDE.

21  Q.   WHAT IS A LABOR GUIDE?

22  A.   THE LABOR GUIDE IS AN INDUSTRY STANDARD, USUALLY DERIVED

23  BY THE BUILDER OF THE VEHICLE, THAT STATE WHAT THE AVERAGE

24  MECHANIC OR TECHNICIAN, AT A SKILL LEVEL TO DO THIS KIND OF

25  WORK, HOW LONG IT SHOULD BE ALLOWED TO DO -- OR HOW LONG IT

1   SHOULD TAKE.

2   Q.   ALL RIGHT.   AND FOR YOU AS A MECHANIC, DOES THAT LABOR

3   GUIDE AFFECT YOUR WORK?

4   A.   YES.

5   Q.   HOW IS THAT?

6   A.   THAT IS THE WAY THAT WE DO ESTIMATES IN SHOPS.   WHENEVER

7   YOU COME IN, WE DIAGNOSE YOUR VEHICLE.   WHENEVER YOU HAVE TO

8   GIVE AN ESTIMATE, YOU USE THE LABOR GUIDE TO SET YOUR PRICE ON

9   THE LABOR FOR THE REPAIR.

10  Q.   WHAT IS THE LABOR GUIDE'S PRICE FOR PROPER REPLACEMENT OF

11  THIS SENDING UNIT?

12  A.   ONE.

13          MR. FAKHOURY:  OBJECTION.   CALLS FOR HEARSAY.

14          THE COURT:  OVERRULED.

15          THE WITNESS:  1.4 HOURS.

16  BY MR. CONOVER:

17  Q.   1.4 HOURS IS THE AMOUNT OF TIME THAT THEY ALLOW FOR THE

18  REPLACEMENT?

19  A.   YES.

20  Q.   1.4, YOU SAID?

21  A.   YES.

22          MR. FAKHOURY:  OBJECTION.   ASKED AND ANSWERED.

23          THE COURT:  OVERRULED.

24  BY MR. CONOVER:

25  Q.   AND IS THAT FOR THE TIME IT TAKES TO ACCESS THE SENDING

1   UNIT, PULL IT OUT, AND REPLACE IT WITH A NEW ONE?

2   A.   YES.

3   Q.   AND TO DO ALL THE OTHER NECESSARY REQUIREMENTS OF PROPERLY

4   REMOVING THE ELECTRICAL DEVICE, AND THE TUBING FOR THE GAS, ALL

5   OF THOSE THINGS?

6   A.   YES.

7   Q.   DOES THAT INCLUDE ANY TIME FOR MODIFYING A SENDING UNIT SO

8   IT WOULD KEEP THE GAS GAUGE IN PLACE?

9   A.   NO.

10  Q.   DOES THAT INCLUDE ANY TIME FOR PUTTING ANYTHING INSIDE THE

11  GAS TANK?

12  A.   NO.

13          MR. CONOVER:  NOTHING FURTHER, YOUR HONOR.

14          THE COURT:  ALL RIGHT.  MR. FAKHOURY?

15          MR. FAKHOURY:  THANK YOU, YOUR HONOR.

16                    CROSS-EXAMINATION

17  BY MR. FAKHOURY:

18  Q.   GOOD MORNING, MR. BUTLER.

19  A.   GOOD MORNING.

20  Q.   SIR, YOU DID WRITE A REPORT IN THIS CASE; IS THAT CORRECT?

21  A.   YES, I DID.

22  Q.   YOU WROTE ONE REPORT?

23  A.   YES.

24  Q.   DID YOU REVIEW ANY OTHER REPORTS BEFORE YOUR TESTIMONY

25  TODAY?

1    A.   NO.

2    Q.   I WANT TO TALK A LITTLE BIT ABOUT WHEN YOU INSPECTED THE

3    VOLKSWAGEN BEETLE IN THIS CASE.   YOU'RE AWARE THAT THE BEETLE

4    WAS SEIZED ON NOVEMBER 29TH, 2009; IS THAT CORRECT?

5    A.   I'M NOT SURE ABOUT THE EXACT DATE, BUT THAT SOUNDS

6    CORRECT.

7    Q.   OKAY.   SO AT LEAST SOMETIME IN NOVEMBER OF 2009?

8    A.   YES.

9    Q.   OKAY.   AND YOU, YOURSELF, INSPECTED THE BEETLE ONCE; IS

10   THAT CORRECT?

11   A.   ACTUALLY, THERE WAS A SECOND TIME.   THERE WAS ANOTHER U.S.

12   ATTORNEY THAT WAS HANDLING THE CASE THAT WANTED TO GO OUT AND

13   REVIEW THE VEHICLE.   IT WASN'T REALLY AN INSPECTION, IT WAS

14   MORE OF A DISCUSSION ABOUT THE CASE.

15   Q.   OKAY.   LET'S TALK ABOUT THE INSPECTION OF THE CAR.

16   A.   YES, SIR.

17   Q.   AND I'M -- AT THE TIME THAT YOU INSPECTED THE CAR, THAT

18   WAS WHEN YOU ACTUALLY FOUND THE GAS FLOATER UNDER THE CAR SEAT;

19   IS THAT CORRECT?

20   A.   YES.

21   Q.   OKAY.   AND THAT INSPECTION OCCURRED ON AUGUST 24TH OF

22   2010; IS THAT CORRECT?

23   A.   YES, I BELIEVE THAT'S --

24   Q.   THAT'S THE FIRST TIME THAT YOU ACTUALLY SAW THE BEETLE?

25   A.   YES, SIR.

1    Q.   SO BETWEEN NOVEMBER 29TH -- OR SOMETIME IN NOVEMBER OF

2    2009, AND AUGUST OF 2010, YOU HAD NOT PERSONALLY SEEN THE

3    BEETLE AT ALL DURING THAT TIME, CORRECT?

4    A.   CORRECT.

5    Q.   OKAY.  NOW YOU NEVER SAW THE BEETLE AT THE OTAY MESA PORT

6    OF ENTRY; IS THAT RIGHT?

7    A.   CORRECT.

8    Q.   YOU SAW IT AT THE IMPOUND LOT?

9    A.   YES.

10   Q.   AND IT'S AN IMPOUND LOT ON 9020 AIRWAY ROAD, HERE IN

11   SAN DIEGO, CORRECT?

12   A.   YES, SIR.

13   Q.   AND THAT IMPOUND LOT IS A PRIVATELY OWNED AND OPERATED

14   IMPOUND LOT, CORRECT?

15   A.   YES, SIR.

16   Q.   AND YOU'RE AWARE THAT THE FEDERAL GOVERNMENT IS CONTRACTED

17   WITH THAT IMPOUND LOT TO HOLD ON TO SEIZED CARS?

18   A.   YES, SIR.

19   Q.   YOU SAID THERE WAS A SECOND TIME YOU SAW THE CAR, BUT YOU

20   DIDN'T REALLY INSPECT IT; IS THAT CORRECT?

21   A.   CORRECT.

22   Q.   THAT WAS AFTER AUGUST 24TH, OF 2010; IS THAT FAIR TO SAY?

23   A.   YES.

24   Q.   DO YOU REMEMBER WHEN THAT WAS?

25   A.   IT WAS OCTOBER?

1  Q.   OCTOBER OF 2010?

2  A.   YES.

3  Q.   OKAY.  I WANT TO SHOW YOU WHAT HAS BEEN ADMITTED AS

4  GOVERNMENT'S EXHIBIT 6.  THIS IS THE VOLKSWAGEN BEETLE THAT IS

5  AT ISSUE IN THIS CASE; IS THAT RIGHT?

6  A.   YES, SIR.

7  Q.   OKAY.  NOW WHEN YOU WENT TO THE IMPOUND LOT ON

8  AUGUST 24TH, THE BEETLE WASN'T IN THIS TYPE OF CONDITION, WAS

9  IT?

10  A.   NO.

11  Q.   IT -- WHAT TYPE OF CONDITION WAS IT IN?

12  A.   IT HAS -- WHENEVER THEY SEARCHED IT AND DISMANTLED IT, IT

13  HAS PIECES TAKEN OFF.  I MEAN -- IT'S -- YEAH -- IT'S BEEN

14  OPENED UP IN DIFFERENT AREAS, AND IT HAS SOME DAMAGE TO IT.

15  Q.   WOULD YOU SAY IT WAS OPERABLE?

16  A.   NO.

17  Q.   WOULD YOU SAY IT WAS SOMEWHAT CLOSE TO THIS TYPE OF

18  CONDITION AS SHOWN IN EXHIBIT 6?

19  A.   NOT REALLY.

20  Q.   LET'S TALK A LITTLE BIT ABOUT THE IMPOUND LOT.  IT SOUNDS

21  LIKE YOU'VE BEEN A MECHANIC FOR A LONG TIME, I'M ASSUMING.  AND

22  YOU CAN CORRECT ME IF I'M WRONG, BUT I'M ASSUMING YOU'VE BEEN

23  TO QUITE A FEW IMPOUND LOTS; IS THAT FAIR TO SAY?

24  A.   YES, SIR.

25  Q.   AND YOU'VE BEEN TO THE IMPOUND LOT ON 9020 AIRWAY ROAD

1    BEFORE; IS THAT CORRECT?

2    A.   YES, SIR.

3    Q.   AND AS YOU ALREADY EXPLAINED, IT IS A PRIVATELY OWNED AND

4    OPERATED IMPOUND LOT?

5    A.   YES, SIR.

6    Q.   ROBERTSON AUTO AUCTIONS, I BELIEVE, IS THE NAME OF IT; IS

7    THAT CORRECT?

8    A.   YES, SIR.

9    Q.   AND AT THAT IMPOUND LOT, THEY STORE HUNDREDS OF CARS; IS

10   THAT RIGHT?

11   A.   YES, SIR.

12   Q.   DO THEY STORE THOUSANDS OF CARS?

13   A.   WHEN IT'S FULL, IT WOULDN'T SURPRISE ME IF THERE WAS 1,000

14   CARS THERE.

15   Q.   OKAY.  AND BECAUSE IT'S A PRIVATELY OWNED AND OPERATED

16   IMPOUND LOT, THERE ARE EMPLOYEES THERE, RIGHT?

17   A.   YES, SIR.

18   Q.   AND THEY DON'T WORK FOR THE FEDERAL GOVERNMENT, CORRECT,

19   AS FAR AS YOU KNOW?

20   A.   AS FAR AS I KNOW.

21   Q.   MOST PRIVATELY OWNED AND OPERATED IMPOUND LOTS, IN YOUR

22   EXPERIENCE, THEY'RE STAFFED WITH PEOPLE WHO ARE HIRED BY THE

23   COMPANY; IS THAT FAIR TO SAY?

24   A.   YES, SIR.

25   Q.   SO THAT WOULD BE MAYBE SOMEBODY WITH MECHANIC EXPERIENCE;

1    IS THAT CORRECT?

2    A.  YES, SIR.

3    Q.  AND OBVIOUSLY THE OWNER AND OPERATOR OF THE IMPOUND LOT

4    HAS ACCESS TO ALL OF THE CARS IN THE IMPOUND LOT?

5    A.  YEAH, THAT WOULD BE A SAFE ASSUMPTION.

6    Q.  OKAY.  BASED ON YOUR EXPERIENCE, IS IT SAFE TO SAY THAT

7    IMPOUND LOT OWNERS, OR THE PEOPLE WHO RUN IMPOUND LOTS, HAVE

8    ACCESS TO CARS THAT ARE CONTAINED IN THE IMPOUND LOT?

9             MR. CONOVER:  OBJECTION.  CALLS FOR SPECULATION.

10   RELEVANCE.

11            THE COURT:  OVERRULED.

12            THE WITNESS:  YES.

13   BY MR. FAKHOURY:

14   Q.  OKAY.  AND THERE IS COMMON SENSE REASONS FOR THAT, RIGHT?

15   FOR EXAMPLE, THEY PARK THE CARS PRETTY CLOSE TOGETHER AT THE

16   IMPOUND LOT TO MAXIMIZE SPACE, RIGHT?

17   A.  YES, SIR.

18   Q.  SO IF ONE CAR NEEDED TO BE MOVED, THEY WOULD HAVE TO

19   ACCESS THAT CAR AND MOVE IT, CORRECT?

20   A.  YES, SIR.

21   Q.  OKAY.  YOU'VE BEEN RETAINED AS AN EXPERT WITNESS BY THE

22   FEDERAL GOVERNMENT BEFORE; IS THAT CORRECT?

23   A.  YES, SIR.

24   Q.  AND SO AS PART OF THOSE DUTIES, YOU'VE BEEN TO THE IMPOUND

25   LOT ON AIRWAY BOULEVARD -- I'M SORRY, AIRWAY ROAD ON OTHER

1  CASES; IS THAT CORRECT?

2  A.  YES, SIR.

3  Q.  NOW IT'S SAFE TO SAY THAT YOU WEREN'T THE ONLY PERSON WHO

4  HAD ACCESS TO THE BEETLE BETWEEN NOVEMBER 2009 AND AUGUST OF

5  2010, CORRECT?

6  A.  CORRECT.

7        MR. FAKHOURY:  MAY I APPROACH, YOUR HONOR?

8        THE COURT:  YES.

9  BY MR. FAKHOURY:

10  Q.  I WANT TO ASK YOU ABOUT THE FLOATER.  YOU FOUND THIS UNDER

11  THE CAR SEAT ON NOVEMBER -- I'M SORRY, LET ME STRIKE THAT.

12  WHEN YOU WENT TO INSPECT THE CAR ON AUGUST 24TH OF 2010, YOU

13  FOUND THE FLOATER UNDERNEATH THE CAR -- UNDERNEATH THE DRIVER'S

14  SEAT, RATHER; IS THAT RIGHT?

15  A.  YES, SIR.

16  Q.  BUT YOU DON'T KNOW IF THAT IS WHERE IT WAS ON

17  NOVEMBER 28TH OF 2009, CORRECT?

18  A.  NO.

19  Q.  THAT IS JUST WHERE IT WAS WHEN YOU SAW THE CAR?

20  A.  YES, SIR.

21  Q.  IT COULD HAVE BEEN MOVED OR PLACED THERE BY ONE OF THE

22  EMPLOYEES OF THE IMPOUND LOT, CORRECT?

23  A.  YES, SIR.

24  Q.  IT COULD HAVE BEEN MOVED OR PLACED THERE BY ONE OF THE

25  FEDERAL AGENTS WHO I THINK YOU SAID TORE UP THE CAR; IS THAT

1    CORRECT?

2    A.   YES, SIR.

3    Q.   OR A DEFENSE INVESTIGATOR, FOR EXAMPLE?

4    A.   YES, SIR.

5    Q.   NOW YOU TESTIFIED ALSO THAT THE FLOAT WOULD EMIT A VERY

6    STRONG GASOLINE SMELL; IS THAT CORRECT?

7    A.   WHEN IT WAS FIRST REMOVED FROM THE TANK, YEAH.

8    Q.   AND YOU SAID THAT IN YOUR SHOP, YOU TAKE YOUR -- YOU AND

9    YOUR EMPLOYEES TAKE PRECAUTIONS TO MINIMIZE THAT SMELL; IS THAT

10   SAFE TO SAY?

11   A.   YES.

12   Q.   ONE OF THE THINGS YOU TESTIFIED ABOUT WAS LETTING AIR

13   CIRCULATE THROUGHOUT THE CAR, CORRECT?

14   A.   YES, SIR.

15   Q.   AND COULD YOU DO THAT BY OPENING THE WINDOWS WHILE YOU'RE

16   REMOVING THE SENDING UNIT?

17   A.   YEAH, WE OPEN THE WINDOWS, OPEN THE -- IN THIS CASE, IT

18   WOULD BE BOTH DOORS, USUALLY SET UP A FAN.

19   Q.   AND YOU'RE FAMILIAR WITH A VOLKSWAGEN BEETLE, CORRECT?

20   A.   YES.

21   Q.   AND IT IS A HATCHBACK; IS THAT RIGHT?

22   A.   NO.

23   Q.   IT'S NOT A HATCHBACK, AS FAR AS YOU CAN REMEMBER?

24   A.   TO THE BEST OF MY RECOLLECTION, IT IS NOT.   IT ACTUALLY

25   HAS A TRUNK.

1  Q.  OKAY.  YOU TESTIFIED THAT IN COOLER WEATHER, THE GAS SMELL

2  WOULD BE LESS STRONG --

3  A.  YES.

4  Q.  -- CORRECT?  SO IN NOVEMBER, THE WEATHER IS COOLER, RIGHT?

5  A.  YES.

6  Q.  AND SO IT WOULDN'T BE AS HOT AS IT WOULD BE IN, LET'S SAY,

7  JULY IN EL CENTRO, FOR EXAMPLE?

8  A.  CORRECT.

9  Q.  YOU ALSO TESTIFIED -- AND AGAIN, CORRECT ME IF I'M

10  WRONG -- THAT OFTENTIMES WHEN YOU REMOVE THE SENDING UNIT, YOU

11  CAN PLACE IT IN A PAN, OR A CONTAINER OF SOME SORT, TO MAKE

12  SURE IT DOESN'T LEAK GAS ALL OVER THE CAR; IS THAT CORRECT?

13  A.  YES, SIR.

14  Q.  YOU COULD ALSO, FOR EXAMPLE, PLACE TOWELS ON THE TOP OF

15  THE RING OR NUT WHEN YOU'RE REMOVING IT SO GAS DOESN'T SPILL

16  ALL OVER THE PLACE; IS THAT CORRECT?

17  A.  CORRECT.

18  Q.  AND THAT'S WHAT YOU DO IN YOUR MECHANICS SHOP IF YOU HAD

19  TO ACTUALLY REMOVE A SENDING UNIT?

20  A.  YES.

21  Q.  AND THAT'S WHAT YOU TRAIN YOUR EMPLOYEES TO DO?

22  A.  YES.

23  Q.  YOU TESTIFIED THAT YOU'VE HAD COMPLAINTS FROM CUSTOMERS

24  WHO HAVE SAID THAT THEIR CAR SMELLED LIKE GASOLINE BEFORE?

25  A.  YES.

1   Q.   IT IS FAIR TO SAY, THOUGH, THAT'S THE EXCEPTION, RIGHT?

2   A.   CORRECT.

3   Q.   THAT IF YOU DO YOUR JOB RIGHT, IT WOULDN'T SMELL LIKE GAS,

4   REALLY?

5   A.   SPEAKING ON WHAT HAPPENS IN MY SHOP.

6   Q.   OKAY, LET'S TALK JUST SPECIFICALLY ABOUT THAT.

7        IN YOUR SHOP, THERE AREN'T MANY COMPLAINTS ABOUT CARS

8   SMELLING LIKE GAS?

9   A.   NO.  BUT IT HAS HAPPENED.

10  Q.   SURE.

11  A.   AND I ALSO -- MY PERSONAL WAY OF HANDLING IT IS, I USUALLY

12  TELL THE CUSTOMER UP FRONT THAT THERE IS PROBABLY GOING TO BE A

13  GAS ODOR IN YOUR CAR, BUT IT WILL DISSIPATE.

14  Q.   AND AS A RESULT, AS YOU SAID, THE NUMBER OF COMPLAINTS YOU

15  HAVE RECEIVED ARE TYPICALLY THE EXCEPTION, NOT THE NORM?

16  A.   RIGHT.

17  Q.   AND THAT'S BECAUSE YOU'RE GOOD AT WHAT YOU DO?

18  A.   I LIKE TO THINK SO.

19  Q.   OKAY.  I'M SHOWING YOU WHAT HAS BEEN ADMITTED AS

20  EXHIBIT 8.  THAT IS THE BACK SEAT OF THE VOLKSWAGEN BEETLE,

21  CORRECT?

22  A.   YES, SIR.

23  Q.   NOW YOU TESTIFIED THAT IN ORDER TO ACCESS THE GAS TANK IN

24  THE SENDING UNIT IN THE BEETLE, YOU HAVE TO REMOVE THE BACK

25  SEAT, CORRECT?

1    A.   YES, SIR.

2    Q.   NOW IT'S -- YOU DON'T NEED ANY SPECIAL TOOLS TO DO THAT;

3    IS THAT CORRECT?

4    A.   NO.

5    Q.   YOU CAN JUST LITERALLY TUG AT IT AND IT COMES OUT?

6    A.   ACTUALLY, IF I REMEMBER CORRECTLY, IT'S KIND OF A PUSH

7    BACK, DOWN, AND THEN UP AT THE SAME TIME TO HAVE IT UNLATCH.

8    Q.   BUT AGAIN, YOU DON'T EVEN NEED A SCREWDRIVER TO DO THAT?

9    A.   NO.

10   Q.   OKAY.  ONCE YOU HAVE TAKEN OUT THE BACK SEAT, THE NEXT

11   STEP IS TO REMOVE THE PLATE, RIGHT?

12   A.   YES.

13   Q.   AND THE PLATE, YOU TESTIFIED, HAS THREE SCREWS?

14   A.   YES, SIR.

15   Q.   AND THOSE ARE YOUR STANDARD SCREWS, RIGHT?

16   A.   YES, SIR.

17   Q.   SO THEY JUST NEED A SCREWDRIVER TO UNSCREW?

18   A.   YES, SIR.

19   Q.   OKAY.  SO YOU DON'T NEED ANY SPECIFIC, SPECIALIZED TOOLS

20   TO DO THAT?

21   A.   NO.

22   Q.   THE NEXT STEP IS TO TAKE OUT THE FUEL LINES, CORRECT?

23   A.   YES, SIR.

24   Q.   AND AGAIN, YOU HAVE TO BE CAREFUL WITH IT, OBVIOUSLY, SO

25   YOU DON'T GET GAS EVERYWHERE, RIGHT?

1   A.   YES, SIR.

2   Q.   BUT YOU DON'T NEED ANY SPECIAL TOOLS TO REMOVE THE FUEL

3   LINE?

4   A.   ACTUALLY, ON THIS ONE, IT USES A PINCH-PLUG TYPE FITTING

5   THAT LATCHES THE FUEL LINE DOWN ON THE SENDING UNIT.   AND

6   YOU'RE GOING TO HAVE TO HAVE EITHER A PAIR OF PLIERS THAT HAS A

7   SET OF SMALL JAWS, OR THEY ACTUALLY MAKE A TOOL FOR UNLATCHING

8   IT.

9   Q.   OKAY.   BUT AS YOU JUST EXPLAINED, IF YOU DON'T HAVE THE

10  TOOL, A SET OF PLIERS WOULD DO IT?

11  A.   YEAH, IT COULD BE DONE.

12  Q.   OKAY.   NEXT COMES THE RING.   AND YOU TESTIFIED THAT --

13  A.   I DON'T MEAN TO INTERRUPT, BUT YOU'D HAVE TO TAKE THE

14  ELECTRICAL OFF FIRST.

15  Q.   OH, OKAY.   NO, I'M GLAD YOU CORRECTED ME.

16       TO TAKE OUT THE ELECTRICAL, DO YOU NEED ANY SPECIAL TOOLS

17  TO DO THAT?

18  A.   YOU HAVE TO HAVE A VERY SMALL, STRAIGHT SCREWDRIVER TO

19  UNLATCH -- WHENEVER YOU PUSH THE PLUG DOWN ON IT, IT ACTUALLY

20  HAS CLIPS TO HOLD IT ON.

21  Q.   OKAY.   NOW IF I GOT MY SEQUENCE WRONG, PLEASE STEP IN AND

22  CORRECT ME BECAUSE YOU'RE THE EXPERT.   SO AFTER THE ELECTRICAL

23  WIRES AND FUEL LINES ARE TAKEN OUT, WOULD THE RING BE NEXT?

24  A.   YES.

25  Q.   AND FOR THE RING, YOU SAID THAT YOU WOULD NEED A

1   SCREWDRIVER AND HAMMER TO KIND OF GET THAT -- THAT INITIAL

2   TWIST OFF; IS THAT CORRECT?

3   A.   CORRECT.

4   Q.   AND AFTER THAT, YOU COULD ACTUALLY PHYSICALLY REMOVE THIS

5   WITH YOUR HAND?

6   A.   YES.

7   Q.   OKAY.  SO OTHER THAN A SCREWDRIVER AND HAMMER, YOU DON'T

8   NEED ANY SPECIAL TOOLS TO REMOVE THIS?

9   A.   NO.

10  Q.   NOW ONCE YOU'VE DONE ALL OF THAT, THEN YOU CAN ACTUALLY,

11  PHYSICALLY PULL OUT THE SENDING UNIT; IS THAT CORRECT?

12  A.   YES, SIR.

13  Q.   OKAY.  NOW AS PART OF YOUR INSPECTION, YOU INSPECTED THE

14  GAS TANK ITSELF, CORRECT?

15  A.   YES, SIR.

16  Q.   AND YOU DIDN'T NOTICE ANY MARKINGS ON THE GAS TANK ITSELF,

17  RIGHT?

18  A.   NO, SIR.

19  Q.   YOU DIDN'T NOTICE ANY MODIFICATIONS OR CHANGES?

20  A.   NO, SIR.

21  Q.   THE ONLY REAL MODIFICATION WAS THE TOOTHPICK AND THE

22  STRING ON THE SENDING UNIT?

23  A.   YES, SIR.

24  Q.   OTHER THAN THAT, THE GAS TANK WAS INTACT?

25  A.   YES, SIR.

1    Q.   THIS MAY BE A STUPID QUESTION, AND I'M SORRY IF IT IS, BUT

2    THERE IS NO WAY FOR ANYONE WITH THEIR NAKED EYE TO SEE THAT

3    THERE WERE ANY DRUGS HIDDEN IN THIS GAS TANK, CORRECT?

4    A.   NOT THAT I KNOW OF.

5    Q.   GAS TANK IS NOT CLEAR, RIGHT?

6    A.   NO.

7    Q.   AND BASICALLY, YOU'VE TESTIFIED THAT YOU HAD TO REMOVE THE

8    CAR SEAT, RIGHT?

9    A.   YES, SIR.

10   Q.   AND GET INTO THE GAS TANK?

11   A.   YES, SIR.

12   Q.   AND REMOVE THE SENDING UNIT, RIGHT?

13   A.   YES, SIR.

14   Q.   AND THEN THE DRUGS WERE THERE?

15   A.   YES, SIR.

16   Q.   OKAY.  YOU ALSO TESTIFIED THAT THIS VOLKSWAGEN BEETLE

17   COULD GET UP TO 29 MILES PER GALLON ON THE FREEWAY; IS THAT

18   RIGHT?

19   A.   YES, SIR.

20   Q.   AND YOU'RE AWARE THAT TO GET FROM SAN DIEGO TO

21   LOS ANGELES, YOU COULD TAKE HIGHWAY 5, RIGHT?

22   A.   YES, SIR.

23   Q.   FOR PROBABLY 100 MILES OR SO, WOULD YOU SAY?

24   A.   YES, SIR.

25   Q.   I WANT TO REVISIT REAL BRIEFLY MY LAST QUESTION ABOUT

1   TRAVELING TO LOS ANGELES FROM SAN DIEGO OR OTAY MESA.

2   OBVIOUSLY, THAT 5 IS -- IT CAN GET FILLED WITH A LOT OF CARS,

3   CORRECT?

4   A.   YES, SIR.

5   Q.   BUT, OBVIOUSLY, THAT DEPENDS ON THE TIME OF DAY THAT

6   YOU'RE TRAVELING, RIGHT?

7   A.   YES, SIR.

8   Q.   SOME DAYS, THE TRAFFIC FLOWS PRETTY GOOD?

9   A.   YES, SIR.

10  Q.   AND SOME DAYS, IT DOESN'T, RIGHT?

11  A.   CORRECT.

12  Q.   AND THE 29 MILES PER GALLON ESTIMATE IS ESTIMATING A SPEED

13  OF, WHAT, 55, 60 MILES PER HOUR?

14  A.   ACTUALLY, YEAH, IT IS HIGHWAY SPEED, SO IT WOULD BE

15  BETWEEN 60 AND 70.

16  Q.   AND, OBVIOUSLY, IF YOU HAVE THE AIR CONDITIONER ON, YOU'RE

17  GOING TO GET LESS MILEAGE, CORRECT?

18  A.   CORRECT.

19  Q.   AND IF YOU HAVE IT OFF, YOU'LL GET MORE, RIGHT?

20  A.   YES.

21  Q.   I ALSO WANT TO TALK TO YOU ABOUT THE MANUAL REGARDING THE

22  TIME ESTIMATE TO DO THIS WORK.  DID YOU, YOURSELF, REVIEW THE

23  MANUAL FOR A 2003 VOLKSWAGEN BEETLE?

24  A.   YES, SIR.

25  Q.   DO YOU HAVE THAT MANUAL WITH YOU?

1   A.   NO.

2          MR. FAKHOURY:   NOTHING FURTHER, THANK YOU.

3          THE COURT:   ALL RIGHT.   ANY REDIRECT?

4          MR. CONOVER:   YES.   THANK YOU, YOUR HONOR.

5                    REDIRECT EXAMINATION

6   BY MR. CONOVER:

7   Q.   MR. BUTLER, IF THE FLOAT YOU HAVE THERE IN FRONT OF YOU

8   WAS SOMEHOW NOT UNDERNEATH THE DRIVER'S SEAT THAT YOU FOUND,

9   LET'S SAY SOMEONE ELSE HAD HAD IT OUT AND PUT IT THERE, JUST

10  SOME -- SOME OTHER PERSON FOR SOME STRANGE REASON HAD DONE

11  THAT.   DOES IT MATTER WHERE IT IS IN THE COMPARTMENT REGARDING

12  WHETHER THE COMPARTMENT WOULD SMELL OF GAS?

13  A.   NO.

14  Q.   WHY NOT?

15  A.   BECAUSE IT'S GOING -- IT'S GOING TO EMIT AN ODOR WHETHER

16  IT'S UNDER THE SEAT, LAYING ON THE FLOOR, OR IN THE PASSENGER

17  SEAT.

18  Q.   WHAT IF IT WAS WAY IN THE BACK SEAT SOMEWHERE, WOULD YOU

19  STILL BE ABLE TO SMELL IT?

20  A.   YES.

21  Q.   SO IT DOESN'T MATTER WHERE IN THE PASSENGER COMPARTMENT,

22  AS LONG AS IT WASN'T IN THE GAS TANK; IS THAT CORRECT?

23  A.   CORRECT.

24  Q.   BECAUSE THE GAS TANK NORMALLY HAS THIS SENDING UNIT SEALED

25  TO KEEP THE VAPOR AND ODOR IN, CORRECT?

1              MR. FAKHOURY:  OBJECTION.  LEADING.

2              THE COURT:  OVERRULED.

3              THE WITNESS:  CORRECT.

4    BY MR. CONOVER:

5    Q.   DOES THE GAS TANK ALSO HAVE SOMETHING ELSE THAT SEALS IN

6    ODOR?

7    A.   YES.

8    Q.   WHAT IS THAT?

9    A.   THE PLATE RIGHT THERE IS THE PLATE THAT GOES ON THE BODY

10   TO SEAL IT BETWEEN THE GAS TANK, BETWEEN THE TANK AND THE

11   ACTUAL BODY, THE INSIDE OF THE PASSENGER COMPARTMENT.

12   Q.   AND WHEN YOU DO THIS JOB IN YOUR SHOP, YOU INFORM YOUR

13   CUSTOMERS THAT THERE IS LIKELY TO BE A SMELL OF GAS IN THEIR

14   CAR?

15   A.   YES.

16   Q.   OKAY.  THIS SORT OF MODIFICATION HERE THAT MR. FAKHOURY

17   JUST MENTIONED, IN ORDER TO VERIFY THAT THIS HAD WORKED, WOULD

18   THE CAR HAVE TO BE ON?

19   A.   IT WOULD HAVE TO HAVE -- YOU'D HAVE TO HAVE THE IGNITION

20   ON AND POWER TO THE SENDING UNIT PUMP.

21   Q.   SO NOT ONLY WOULD YOU HAVE TO HAVE THE KEY, BUT IT WOULD

22   HAVE TO BE TURNED ON?

23   A.   YES.

24   Q.   AND IF YOU WEREN'T TO TAKE ALL THE PRECAUTIONS THAT YOU

25   NORMALLY DO WHEN YOU REMOVE SENDING UNITS, AND YOU DIDN'T HAVE

1   THE PROPER TOOLS, WHAT WOULD HAPPEN WHEN YOU REMOVE A SENDING

2   UNIT?

3   A.   YOU'RE GOING TO BREAK THINGS, YOU'RE GOING TO END UP WITH

4   GASOLINE INSIDE OF THE CAR.  WELL, MOSTLY YOU'RE GOING TO

5   PROBABLY START BREAKING THINGS.  YOU'RE GOING TO DAMAGE --

6   YOU'RE GOING TO DAMAGE THE PUMP AND THE SENDING UNIT, THAT

7   PIECE THAT YOU HAVE RIGHT THERE.

8           MR. CONOVER:  NO FURTHER QUESTIONS, YOUR HONOR.

9           THE COURT:  MR. FAKHOURY?

10          MR. FAKHOURY:  JUST ONE MINUTE, YOUR HONOR.

11             (ATTORNEY CONVERSATION OFF THE RECORD.)

12          MR. FAKHOURY:  WE HAVE NO RECROSS.  THANK YOU.

13          THE COURT:  YOU'RE EXCUSED.

14     PLEASE CALL YOUR NEXT WITNESS.

15          MR. CONOVER:  THE UNITED STATES CALLS IMMIGRATION AND

16   CUSTOMS ENFORCEMENT AGENT, CASSANDRA BULLARD TO THE STAND.

17                   (WITNESS SWORN.)

18          THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

19   RECORD AND SPELL YOUR FIRST AND LAST NAME.

20          THE WITNESS:  CASSANDRA BULLARD, C-A-S-S-A-N-D-R-A,

21   BULLARD, B-U-L-L-A-R-D.

22                 DIRECT EXAMINATION

23   BY MR. CONOVER:

24   Q.   MS. BULLARD, THANK YOU FOR COMING TODAY.  WHERE ARE YOU

25   EMPLOYED?

1   A.   HERE IN SAN DIEGO, CET SAN DIEGO.

2   Q.   WHO DO YOU WORK FOR?

3   A.   DEPARTMENT OF HOMELAND SECURITY, IMMIGRATION AND CUSTOMS

4   ENFORCEMENT.

5   Q.   AND HOW LONG HAVE YOU WORKED FOR THE DEPARTMENT OF

6   HOMELAND SECURITY?

7   A.   HOMELAND SECURITY WAS FORMED, I WOULD SAY, SHORTLY AFTER

8   911.  I'VE BEEN EMPLOYED WITH THE GOVERNMENT SINCE 1982.

9   Q.   SINCE 1982, YOU'VE WORKED FOR THE DEPARTMENT OF HOMELAND

10  SECURITY OR ITS PREDECESSOR?

11  A.   I WORKED FOR LEGACY INS, IMMIGRATION AND NATURALIZATION

12  SERVICES, WHICH WAS DEPARTMENT OF JUSTICE.  WE MERGED INTO

13  DEPARTMENT OF HOMELAND SECURITY.

14  Q.   SO FOR APPROXIMATELY HOW MANY YEARS HAVE YOU WORKED FOR

15  THE GOVERNMENT IN THIS SORT OF CAPACITY?

16  A.   AS A CRIMINAL INVESTIGATOR, SINCE 1995, TO THE PRESENT.

17  Q.   ALL RIGHT.  AND COULD YOU DESCRIBE SOME OF THE TRAINING

18  AND EXPERIENCE YOU'VE RECEIVED AS A CRIMINAL INVESTIGATOR?

19  A.   I'VE ATTENDED THE ACADEMY, ON-THE-JOB TRAINING, PRETTY

20  MUCH THAT IS ABOUT IT.

21  Q.   AND WHERE WAS THE ACADEMY THAT YOU ATTENDED?

22  A.   IT IS IN GLYNCO, GEORGIA, FLETC, THE FEDERAL LAW

23  ENFORCEMENT TRAINING CENTER.

24  Q.   OKAY.  WHEN DID YOU FIRST COME IN CONTACT WITH THE -- AN

25  INDIVIDUAL THAT WAS DRIVING A SILVER VOLKSWAGEN BEETLE, WHAT

1   DAY?

2   A.   THAT WAS NOVEMBER 28TH, 2009.

3   Q.   WERE YOU ON DUTY THAT DAY?

4   A.   YES.  I HAVE PORT DUTY.  "DRUG DUTY" IS WHAT WE CALL IT.

5   Q.   WHAT IS "PORT DUTY" EXACTLY?  YOU WORK AT THE PORT?

6   A.   NO.  I'M NOT ASSIGNED TO THE PORT.  I WORK AT CET

7   SAN DIEGO.  WE'RE ASSIGNED TO GO DOWN TO THE PORT.  AND I THINK

8   OUR GROUP, WE GO DOWN THERE EVERY TEN WEEKS.  SO PORT DUTY

9   ENTAILS, WE RESPOND TO CALLS FROM SECTOR IN REGARDS TO DRUGS

10  THAT MAY BE SEIZED, ANY TYPE OF CONTRABAND, CIGARETTES.  SO WE

11  GET CALLS.

12  Q.   SO ON THAT DAY, DID YOU RECEIVE A CALL TO COME DOWN TO THE

13  PORT OF ENTRY?

14  A.   YES.

15  Q.   AND DID YOU COME IN CONTACT WITH AN INDIVIDUAL WHO WOULD

16  HAVE BEEN DRIVING A SILVER VOLKSWAGON BEETLE?

17  A.   YES.

18  Q.   DO YOU RECOGNIZE THAT INDIVIDUAL IN THE COURTROOM TODAY?

19  A.   YES.

20  Q.   COULD YOU PLEASE POINT THAT INDIVIDUAL OUT AND DESCRIBE AN

21  ITEM OF CLOTHING AND WHERE HE'S SEATED.

22  A.   IT'S THE GENTLEMAN SITTING DIRECTLY IN FRONT OF ME, AND I

23  THINK HIS SUIT IS A CHOCOLATE, OR BROWN COLOR, WITH A BURGUNDY

24  TIE.

25          MR. CONOVER:  YOUR HONOR, MAY THE RECORD REFLECT THE

1    WITNESS HAS IDENTIFIED THE DEFENDANT, MR. FLORES?

2            THE COURT:  YES.

3            MR. CONOVER:  THANK YOU.

4    BY MR. CONOVER:

5    Q.  AND WHEN YOU CAME IN CONTACT WITH THE DEFENDANT, WERE YOU

6    ALSO GIVEN SOME ITEMS THAT WERE TAKEN FROM HIS PERSON AND FROM

7    HIS VEHICLE?

8    A.  YES.

9            MR. CONOVER:  OKAY.  MAY I APPROACH THE WITNESS, YOUR

10   HONOR?

11           THE COURT:  YES.

12           MR. CONOVER:  THANK YOU.

13   BY MR. CONOVER:

14   Q.  I'M SHOWING YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

15   EXHIBIT NO. 27.

16           (GOVERNMENT'S EXHIBIT 27 MARKED FOR IDENTIFICATION.)

17   BY MR. CONOVER:

18   Q.  COULD YOU PLEASE OPEN THAT UP AND TELL THE JURY IF YOU

19   RECOGNIZE THAT.

20   A.  YES.  IT'S A CELL PHONE.

21   Q.  DO YOU RECOGNIZE THAT PARTICULAR CELL PHONE?

22   A.  YES.

23   Q.  HOW DID YOU COME IN CONTACT WITH THAT PHONE?

24   A.  IT WAS IN HIS PROPERTY BAG THAT THEY PUT ALL THE ITEMS IN.

25   SO IT WAS INCLUDED IN HIS PERSONAL BELONGINGS, ON HIS PERSON.

1  Q.   ALL RIGHT.   AND IT CAME FROM THE DEFENDANT'S PERSONAL

2  VEHICLE; IS THAT RIGHT?

3  A.   EITHER THE VEHICLE OR HIS PERSON.

4  Q.   AND DID -- ALL RIGHT.   I'M SHOWING YOU WHAT NOW HAS BEEN

5  MARKED AS GOVERNMENT'S EXHIBIT NO. 23 AND NO. 24.

6  (GOVERNMENT'S EXHIBITS 23 AND 24 MARKED FOR IDENTIFICATION.)

7  BY MR. CONOVER:

8  Q.   DO YOU RECOGNIZE GOVERNMENT'S EXHIBITS 23 AND 24?

9  A.   YES, I DO.

10 Q.   AND WHAT ARE THOSE EXHIBITS?

11 A.   THIS IS HIS DRIVER'S LICENSE, EXHIBIT 23, IS HIS

12 CALIFORNIA DRIVER'S LICENSE.   AND EXHIBIT 24 IS THE VEHICLE

13 REGISTRATION FOR THE CAR HE WAS DRIVING, WHICH IS A VOLKSWAGEN

14 2003.

15         MR. CONOVER:  YOUR HONOR, WE WOULD MOVE TO ADMIT

16 GOVERNMENT'S EXHIBITS 23, 24, AND 27.

17         THE COURT:  ANY OBJECTION?

18         MR. GARRISON:  YOUR HONOR, I HAVE NO OBJECTION AS TO

19 THE DRIVER'S LICENSE AND THE REGISTRATION.  AS TO THE PHONE, IT

20 CONTAINS A LOT OF INFORMATION.  I BELIEVE SOME OF IT MAY NOT BE

21 RELEVANT.

22         THE COURT:  ALL RIGHT.  OBJECTION IS OVERRULED.

23         MR. CONOVER:  THANK YOU.

24  (GOVERNMENT'S EXHIBITS 23, 24 AND 27 RECEIVED INTO EVIDENCE.)

25         MR. CONOVER:  THANK YOU.

1  BY MR. CONOVER:

2  Q.  SO I'M SHOWING YOU HERE ON THE BOARD NO. 24.  WHAT EXACTLY

3  IS THIS?

4  A.  VEHICLE REGISTRATION.

5  Q.  VEHICLE REGISTRATION FOR WHICH VEHICLE?

6  A.  IT SAYS VOLKSWAGEN 2003.

7  Q.  WHO IS THE REGISTERED OWNER?

8  A.  GILBERT FLORES.

9  Q.  SO MR. FLORES IS THE REGISTERED OWNER OF THE VOLKSWAGEN

10  BEETLE, AND THAT'S THE SAME VOLKSWAGEN BEETLE THAT WAS SEIZED

11  ON NOVEMBER 28, 2009?

12  A.  YES.

13  Q.  ALL RIGHT.  AND IS THIS A COPY OF HIS DRIVER'S LICENSE?

14  A.  YES.

15  Q.  I APOLOGIZE, THAT'S DIFFICULT TO SEE.  IS THAT A REGULAR

16  DRIVER'S LICENSE, OR IS THAT A COMMERCIAL DRIVER'S LICENSE?

17  A.  WELL, IT'S A COMMERCIAL DRIVER'S LICENSE, WHICH IS A

18  REGULAR ONE.

19  Q.  ARE YOU FAMILIAR WITH THE DIFFERENCES BETWEEN A COMMERCIAL

20  AND REGULAR DRIVER'S LICENSE, NOT THE SPECIFICS BUT JUST IN

21  GENERAL?

22  A.  YEAH.  THEY LOOK THE SAME, YEAH.

23  Q.  AND A COMMERCIAL DRIVER'S LICENSE IS SOMETHING THAT IS

24  DIFFERENT THAN A REGULAR DRIVER'S LICENSE; IS THAT CORRECT?

25  A.  I WOULD IMAGINE.

1    Q.   AND INSIDE THE DEFENDANT'S CELL PHONE, WERE THERE

2    CONTACTS?

3    A.   YES.

4    Q.   I'D LIKE TO SHOW YOU GOVERNMENT'S EXHIBIT NO. 28.  DO YOU

5    RECOGNIZE THIS?

6    A.   YES.

7              (GOVERNMENT'S EXHIBIT 28 MARKED FOR IDENTIFICATION.)

8    BY MR. CONOVER:

9    Q.   HOW DO YOU RECOGNIZE THAT?

10   A.   THERE WAS A LISTING ABOUT HIS CONTACTS, AND SO IT SAYS

11   "PINOKIO."

12   Q.   IS THAT ONE OF THE LISTINGS OF THE DEFENDANT'S CONTACTS?

13   A.   YES.

14   Q.   SO THIS IS ONE OF --

15   A.   SEVERAL.

16   Q.   ONE OF SEVERAL CONTACTS IN THE DEFENDANT'S CAR?

17   A.   YES.

18              MR. CONOVER:  YOUR HONOR, MOVE TO ADMIT GOVERNMENT'S

19   EXHIBIT 28.

20              MR. GARRISON:  NO OBJECTION.

21              THE COURT:  ALL RIGHT.  IT WILL COME IN.

22              (GOVERNMENT'S EXHIBIT 28 RECEIVED INTO EVIDENCE.)

23   BY MR. CONOVER:

24   Q.   SO COULD YOU DESCRIBE BRIEFLY HERE FOR THE JURY, IN CASE

25   THEY'RE NOT ABLE TO SEE THAT, WHAT THE NAME OF THIS CONTACT

1    WAS.

2    A.   IT LOOKS LIKE PINOKIO.

3    Q.   THE NUMBER, COULD YOU READ THAT NUMBER FOR THE JURY.

4         MR. GARRISON:  OBJECTION, YOUR HONOR.  THE JURY CAN

5    READ THE NUMBER.

6         THE COURT:  YEAH, I AGREE.

7    BY MR. CONOVER:

8    Q.   ARE YOU FAMILIAR WITH WHOSE NUMBER THAT NUMBER CORRESPONDS

9    TO?

10   A.   DAVID GUTIERREZ.

11   Q.   DAVID GUTIERREZ?

12   A.   UH-HUH.

13   Q.   AND SO THAT PHONE NUMBER, WITH THE NAME "PINOKIO," WAS IN

14   THE DEFENDANT'S PHONE?

15   A.   YES, YES.

16   Q.   AND THAT PHONE NUMBER CORRELATES IT TO DAVID GUTIERREZ,

17   HIS CELL PHONE?

18   A.   YES.

19   Q.   DID THE DEFENDANT EVER CALL DAVID GUTIERREZ?

20   A.   NOT IN MY PRESENCE, BUT ACCORDING TO OUR RECORDS, THERE

21   ARE SEVERAL PHONE CALLS.

22   Q.   HOW MANY PHONE CALLS, FROM THE RECORDS THAT WE HAVE, THAT

23   YOU RECEIVED -- THE RECORDS YOU RECEIVED ARE FROM AT&T; IS THAT

24   CORRECT?

25   A.   YES, IT IS.

1  Q.   FROM THOSE AT&T RECORDS, HOW MANY PHONE CALLS WERE BETWEEN

2  THE DEFENDANT AND MR. GUTIERREZ?

3         MR. GARRISON:   OBJECTION.   CALLS FOR HEARSAY.   THE

4  DOCUMENTS ARE IN EVIDENCE, YOUR HONOR.

5         THE COURT:   OVERRULED.

6         THE WITNESS:   MAYBE OVER 100.   QUITE A FEW.

7  BY MR. CONOVER:

8  Q.   OVER 100 CALLS?

9  A.   YES.

10  Q.   AND ARE YOU FAMILIAR -- OVER 100 CALLS BETWEEN THE TWO OF

11  THEM.   IS THAT FOR -- WHAT WAS THE TIME PERIOD, APPROXIMATELY,

12  THAT YOU RECEIVED THE TOLLS FROM AT&T, ABOUT?

13  A.   MAYBE SIX MONTHS.

14  Q.   SIX MONTHS.   SO FOR THAT SIX-MONTH TIME PERIOD, THERE WERE

15  OVER 100 CALLS?

16  A.   YES.

17  Q.   I'D LIKE TO SHOW YOU NOW A MAP THAT HAS BEEN PREVIOUSLY

18  ADMITTED INTO EVIDENCE.   ALONG WITH THE TOLLS THAT YOU RECEIVED

19  FROM AT&T, DID YOU ALSO RECEIVE CELL TOWER DATA FOR MR. FLORES'

20  PHONE FOR THE MONTH OF NOVEMBER?

21  A.   YES.

22  Q.   AND DID THAT CELL TOWER DATA SHOW THE TOWERS FOR WHICH

23  MR. FLORES' PHONE ROUTED THROUGH WHEN HE MADE CALLS?

24  A.   YES.

25  Q.   ON THE DAY BEFORE HIS ARREST, AT 8:10 AT NIGHT, DID HE

1  MAKE A CALL?

2  A.  YES.

3  Q.  AND DID THE CELL TOWER FOR WHICH THAT CALL WAS ROUTED

4  THROUGH, IS THAT LOCATED IN THE LOS ANGELES, MONTEBELLO AREA?

5  A.  YES.

6        MR. GARRISON:  OBJECTION, YOUR HONOR.  CUMULATIVE.

7        THE COURT:  YEAH, I THINK IT IS CUMULATIVE.  PLUS,

8  I'M NOT SURE THAT DOESN'T LACK FOUNDATION.  THE OBJECTION IS

9  SUSTAINED.

10  BY MR. CONOVER:

11  Q.  THE NEXT MORNING AT THE PORT OF ENTRY, DID THE DEFENDANT

12  MAKE ANOTHER -- DID HE RECEIVE A PHONE CALL TO HIS PHONE?

13  A.  I BELIEVE SO, YES.

14  Q.  AND DID THAT ROUTE THROUGH THE CELL SITE TOWER NEAR THE

15  PORT OF ENTRY?

16  A.  YES.

17        MR. GARRISON:  OBJECTION.  FOUNDATION.  MOVE TO

18  STRIKE.

19        THE COURT:  SUSTAINED.

20  BY MR. CONOVER:

21  Q.  ARE YOU FAMILIAR WITH THE PHONE RECORDS THAT WERE RECEIVED

22  FROM AT&T REGARDING MR. FLORES' CALLS?

23  A.  YES.

24  Q.  DID THEY CONTAIN A RECORD OF A CALL BEING RECEIVED FROM

25  HIS PHONE ON NOVEMBER 28TH, NEAR THE TIME OF HIS ARREST?

1    A.   YES.

2    Q.   AND ARE YOU FAMILIAR THAT THERE WAS CELL SITE DATA

3    SUPPLIED TO US BY AT&T?

4    A.   YES.

5    Q.   DID THAT CELL SITE DATA TELL WHERE THE TOWER WAS THAT THAT

6    CALL WAS ROUTED THROUGH?

7    A.   YES.

8    Q.   WAS THAT TOWER NEAR OTAY MESA?

9    A.   YES.

10            MR. GARRISON:   OBJECTION.   LEADING.

11            THE COURT:   NO, OVERRULED.

12   BY MR. CONOVER:

13   Q.   WAS THAT TOWER NEAR OTAY MESA?

14   A.   YES.

15   Q.   SO THE NIGHT BEFORE, THE CELL SITE TOWER IN LOS ANGELES,

16   CORRECT?

17   A.   YES.

18   Q.   THE NEXT DAY, THE CELL SITE TOWER NEAR OTAY MESA; IS THAT

19   CORRECT?

20   A.   YES.

21   Q.   THANK YOU.   DID YOU GO OUT AND DO AN INSPECTION OF THE

22   BEETLE THE DEFENDANT WAS DRIVING?

23   A.   YES.

24   Q.   I'M SHOWING YOU NOW WHAT HAS BEEN MARKED AS GOVERNMENT'S

25   EXHIBIT NO. 28.   COULD YOU PLEASE OPEN THAT UP AND TAKE OUT

1    WHAT YOU FIND IN THERE.

2            THE CLERK:  COUNSEL, 28 HAS ALREADY BEEN MARKED AS

3    THE CONTACT LIST.

4            MR. CONOVER:  LET ME BE CLEAR.  I APOLOGIZE.  I'M

5    REFERRING TO EXHIBIT NO. 26.  THANK YOU.

6    BY MR. CONOVER:

7    Q.   WHAT IS EXHIBIT NO. 26?

8    A.   IT'S LIKE A GARAGE DOOR OPENER.

9    Q.   WHERE WAS THAT GARAGE DOOR OPENER FOUND?

10   A.   THE DRIVER'S DOOR, NEAR A COMPARTMENT.  I WANT TO SAY,

11   LIKE, A COMPARTMENT NEAR THE DRIVER'S DOOR.

12   Q.   I'M SHOWING YOU NOW WHAT HAS BEEN MARKED AS GOVERNMENT'S

13   EXHIBIT 25.  DO YOU RECOGNIZE THAT?

14   A.   YES.

15   Q.   WHAT IS THAT?

16   A.   THAT'S THE COMPARTMENT DOOR ON THE DRIVER'S SIDE.

17   Q.   IS THAT AN ACCURATE PHOTOGRAPH OF WHERE IN THE DEFENDANT'S

18   CAR THAT GARAGE DOOR OPENER WAS FOUND?

19   A.   YES.

20           MR. CONOVER:  YOUR HONOR, MOVE TO ADMIT GOVERNMENT'S

21   EXHIBIT NO. 25 AND 26.

22           THE COURT:  ANY OBJECTION?

23           MR. GARRISON:  AS TO THE PICTURE, NO, YOUR HONOR.

24   BUT AS TO THE OTHER ITEM, THE -- OR THE ITEM CONTAINS HEARSAY.

25   THERE'S BEEN NO ESTABLISHED HEARSAY EXCEPTION.

1        THE COURT:  OVERRULED.  LET ME SEE THAT.  OVERRULED.

2            (GOVERNMENT'S EXHIBITS 25 AND 26 MARKED AND

3            RECEIVED INTO EVIDENCE.)

4   BY MR. CONOVER:

5   Q.   SO THIS PHOTOGRAPH HERE IS A PHOTOGRAPH OF WHERE IN THAT

6   CAR YOU FOUND THIS GARAGE DOOR OPENER; IS THAT CORRECT?

7   A.   YES, IT IS.

8   Q.   DESCRIBE FOR THE JURY EXACTLY WHERE THAT IS.

9   A.   ON THE DRIVER'S DOOR, SECOND COMPARTMENT, A LITTLE NET.

10  Q.   WHAT IS THIS NETTING THERE?

11  A.   IT IS JUST THE COMPARTMENT.  I GUESS THAT'S HOW THE CAR IS

12  MADE, YOU KNOW, THIS HOUSES STUFF.

13  Q.   SO WHEN YOU HAVE YOUR HAND --

14  A.   YEAH, YOU COULD PUT PAPERS AND STUFF IN THERE.

15  Q.   AND THAT IS WHERE THIS WAS FOUND?

16  A.   YES.

17  Q.   SO RIGHT NEXT TO THE STEERING WHEEL OF THE VEHICLE ON THE

18  LEFT?

19  A.   YES, ON THE DOOR.

20  Q.   AND LOOKING AT THAT GARAGE DOOR OPENER, IS THERE A TAG

21  ATTACHED TO IT?

22  A.   YES, IT IS.

23  Q.   COULD YOU DESCRIBE TO THE JURY WHAT IS CONTAINED ON THAT

24  TAG.

25  A.   VEHICLE INFORMATION.

1  Q.   VEHICLE INFORMATION FOR WHICH VEHICLE?

2  A.   IT LOOKS LIKE IT'S 2000.  IT'S KIND OF, LIKE, WORN.  AND

3  IT SAYS THE MAKE OF THE VEHICLE, WHICH IS A VOLKSWAGEN.  IT

4  SAYS THE MODEL.  IT SAYS NEW BEETLE.  IT SAYS COLOR.  IT SAYS

5  SILVER.  IT LOOKS LIKE IT HAS A SLASH THAT MAY SAY GRAY.  THE

6  HOLE IS GOING THROUGH THE TAG, SO I CAN'T READ THE LICENSE

7  PLATE NUMBER.  THEN UNDERNEATH THE LICENSE, IT HAS DATE.  AND

8  IT LOOKS LIKE IT'S NOVEMBER, OR IT LOOKS LIKE AN 11.  BUT THEN

9  THE HOLE, I CAN'T READ ANYTHING ELSE.  THE VIN NUMBER IS ON

10  THERE, AGAIN, KIND OF WORN.  AND ABOVE THE VIN NUMBER, IT SAYS

11  DAVID GUTIERREZ.  AND IT ALSO HAS LIKE A NUMBER, RO NO. 77627.

12  Q.   AND SO THAT TAG WHICH WAS ATTACHED TO THE GARAGE DOOR

13  OPENER, FOUND IN THE DEFENDANT'S VEHICLE, HAS THE IDENTIFIERS

14  FOR THE VEHICLE?

15  A.   YES.

16  Q.   AND THE NAME DAVID GUTIERREZ?

17  A.   YES.

18  Q.   NOT THE DEFENDANT'S NAME?

19  A.   NO.

20  Q.   AND IT SHOWS A DATE OF NOVEMBER OF 2009?

21          MR. GARRISON:  OBJECTION.  LEADING.  MISSTATES THE

22  TESTIMONY.

23          THE WITNESS:  YES, IT DOES.

24          THE COURT:  OVERRULED.

25          THE WITNESS:  BECAUSE I WAS LOOKING ON THE OTHER --

```
 1              THE COURT:  THAT'S OKAY.
 2              THE WITNESS:  I WAS LOOKING ON THE SIDE THAT IS KIND
 3   OF WORN.  BUT ON THE REVERSE SIDE, IT'S IDENTICAL INFORMATION.
 4   SO THERE I COULD SEE THE DATE AND IT SAYS NOVEMBER.  AND IT HAS
 5   A '09.  IT DOESN'T GIVE THE EXACT DATE.  WHERE IT SAYS LICENSE
 6   PLATE, I COULD SEE THE LAST FOUR NUMBERS.  IT LOOKS LIKE B-612.
 7   AND THE COLOR IS STILL THE SAME AND IT'S MORE WORN.
 8   BY MR. CONOVER:
 9   Q.  ALL RIGHT.  SO THE GARAGE DOOR OPENER WITH THE INFORMATION
10   HERE NOW, THE DATE --
11   A.  YEAH, THE ONE SIDE --
12   Q.  NOW IF YOU LOOK THERE, ARE YOU ABLE TO SEE THAT DATES FOR
13   THAT?  IF YOU LOOK AT THAT SIDE AND THE OTHER SIDE, USING BOTH
14   OF THOSE, ARE YOU ABLE TO DETERMINE WHAT THE DATE WAS THAT THAT
15   VEHICLE FOR -- WHOEVER PRINTED OUT THAT TAG PUT ON THAT TAG?
16   A.  IT LOOKS LIKE IT'S NOVEMBER.  I KNOW IT'S NOVEMBER.  IT
17   COULD BE 09 AND THEN LIKE 2009, BUT --
18   Q.  NOVEMBER 9, 2009?
19   A.  IT LOOKS LIKE IT COULD BE.  LIKE I SAY, IT'S KIND OF WORN,
20   SO --
21   Q.  NOW IF YOU LOOK AT ONE SIDE, IS THE 09 LESS WORN THAN THE
22   OTHER SIDE?
23   A.  IT APPEARS TO BE.
24   Q.  SO YOU'RE ABLE TO SEE 09 ON ONE SIDE?
25   A.  YES.
```

1   Q.   SO IT'S NOVEMBER 9, 2009?

2   A.   IT COULD BE, YEAH.

3          MR. GARRISON:  OBJECTION, LEADING.

4          MR. CONOVER:  SUSTAINED, IT IS LEADING.

5   BY MR. CONOVER:

6   Q.   COULD YOU PLEASE TELL THE JURY THE DATE ON THAT TAG.

7   A.   I'M GOING TO SAY NOVEMBER 9TH, 2009.

8          THE COURT:  MAY I SEE THAT AGAIN.

9          THE WITNESS:  YEAH.

10         THE COURT:  THANK YOU.

11         MR. CONOVER:  NO FURTHER QUESTIONS, YOUR HONOR.

12         THE COURT:  ALL RIGHT.

13       MR. GARRISON?

14         MR. GARRISON:  THANK YOU, YOUR HONOR.

15                    CROSS-EXAMINATION

16   BY MR. GARRISON:

17   Q.   GOOD MORNING, AGENT BULLARD.

18   A.   GOOD MORNING.

19   Q.   NOW IF I'M CORRECT, I THINK YOU'VE WRITTEN 15 REPORTS IN

20   THIS CASE; IS THAT RIGHT?

21   A.   I'VE WRITTEN QUITE A FEW, YES.  I CAN'T SAY YES OR NO TO

22   15.  IT SOUNDS LIKE A GOOD NUMBER.

23   Q.   OKAY.  WELL, I NEED TO KNOW EXACTLY.  I HAVE 15 SO --

24   A.   THEN I'VE WRITTEN 15 REPORTS.

25   Q.   OKAY.  DID YOU TAKE ANY NOTES ABOUT THIS CASE BESIDES YOUR

1    REPORTS?

2    A.   YES.

3    Q.   OKAY.  DO YOU PRESERVE THOSE NOTES?

4    A.   YES.

5           MR. GARRISON:  AT THIS TIME, YOUR HONOR, I'D MOVE FOR

6    PRODUCTION UNDER THE JENCKS ACT.

7           THE COURT:  COUNSEL, DO YOU HAVE THOSE NOTES?

8           MR. CONOVER:  I DON'T BELIEVE WE RECEIVED THOSE

9    NOTES.

10           THE WITNESS:  NO, YOU HAVE NOT.

11           MR. CONOVER:  THEY'VE ALL BEEN MEMORIALIZED IN THE

12    REPORTS, IS MY UNDERSTANDING, YOUR HONOR.  THE REPORTS

13    CONTAIN --

14           THE COURT:  I'LL TELL YOU WHAT, I'LL ORDER THAT SHE

15    PRODUCE THOSE THIS MORNING, BEFORE WE COME BACK FOR LUNCH,

16    OKAY.

17           MR. CONOVER:  SURE.

18           MR. GARRISON:  THANK YOU.

19    BY MR. GARRISON:

20    Q.   YOU TESTIFIED BEFORE ABOUT THIS CASE?

21    A.   PARDON ME?

22    Q.   HAVE YOU TESTIFIED PRIOR ABOUT THIS CASE?

23    A.   NO.

24    Q.   OKAY.  A FEW THINGS I JUST WANT TO TALK ABOUT REAL QUICK

25    IN THE BEGINNING HERE.  ON DIRECT, MR. CONOVER ASKED YOU A

1    QUESTION ABOUT, AND MADE REFERENCE TO, MR. FLORES BEING

2    ARRESTED IN THE MORNING; DO YOU RECALL THAT?

3    A.   I DON'T REMEMBER THE TIME OF DAY.  I JUST KNOW I WAS ON

4    DUTY.  SO I DON'T REMEMBER THE TIME OF DAY.  I WOULD HAVE TO

5    LOOK AT MY REPORT OR NOTES.

6    Q.   WELL, ACTUALLY, YOU KNOW THAT MR. FLORES WAS ARRESTED, OR

7    HE ACTUALLY CAME INTO THE UNITED STATES, PULLED UP TO PRIMARY,

8    AT 1:20 P.M., RIGHT?

9    A.   YES.

10   Q.   SO THAT'S -- 1:20 P.M. IS IN THE AFTERNOON, RIGHT?

11   A.   YES.

12   Q.   NOT IN THE MORNING?  IT IS NOT IN THE MORNING, IS IT?

13   A.   NO.  IT'S THE AFTERNOON.

14   Q.   NOW YOU'VE GONE OUT TO DO VEHICLE VIEWINGS ON THIS VEHICLE

15   THAT IS AT ISSUE MULTIPLE TIMES, RIGHT?

16   A.   YES.

17   Q.   IN FACT, YOU ACCOMPANIED MR. BUTLER WHEN HE WENT OUT; IS

18   THAT RIGHT?

19   A.   YES.

20   Q.   AND YOU ALSO ACCOMPANIED INVESTIGATORS FROM MY OFFICE WHEN

21   THEY WENT OUT, RIGHT?

22   A.   YES.

23   Q.   AND I BELIEVE THAT THE DATE THAT YOU ACCOMPANIED MY

24   INVESTIGATORS TO VIEW THE VEHICLE WAS ON AUGUST 18TH, CORRECT,

25   2010?

1   A.   IF THAT'S WHAT THE REPORT SAYS, YES.

2   Q.   WELL, LET'S BE SURE.  I'M GOING TO SHOW YOU --

3            MR. GARRISON:  IF I COULD HAVE ONE MOMENT, YOUR

4   HONOR.  THERE ARE MANY REPORTS HERE.

5   BY MR. GARRISON:

6   Q.   I'M GOING TO SHOW YOU WHAT I'VE PREMARKED AS DEFENDANT'S

7   EXHIBIT H.

8            THE CLERK:  "H," COUNSEL?

9            MR. GARRISON:  "H," FOR IDENTIFICATION.

10           (DEFENDANT'S EXHIBIT H MARKED FOR IDENTIFICATION.)

11           THE COURT:  MR. GARRISON, WOULD YOU MIND ASKING HER

12   IF REVIEWING HER REPORT WOULD REFRESH HER RECOLLECTION AS TO

13   THE DATE THAT SHE DID THE INVESTIGATION.

14           MR. GARRISON:  SURE, YOUR HONOR.

15   BY MR. GARRISON:

16   Q.   IF YOU WERE TO REVIEW YOUR REPORT, WOULD THAT REFRESH YOUR

17   RECOLLECTION?

18   A.   YES, IT WOULD.

19   Q.   OKAY.  I'M GOING TO SHOW YOU WHAT I'VE MARKED AS

20   DEFENDANT'S EXHIBIT H FOR IDENTIFICATION.  CAN YOU PLEASE TELL

21   ME WHAT THAT IS.

22   A.   IT'S A REPORT I WROTE, REPORT OF INVESTIGATION, WHICH IS

23   DATED SEPTEMBER 21ST, 2010.

24   Q.   CAN YOU BRIEFLY REVIEW THAT REPORT?

25   A.   UH-HUH, YES.

1    Q.   OKAY.   IS YOUR MEMORY NOW REFRESHED?

2    A.   UH-HUH.

3    Q.   ALL RIGHT.   SO YOU WENT OUT WITH MY INVESTIGATORS ON

4    AUGUST 18TH, 2010, CORRECT?

5    A.   YES.

6    Q.   AND YOU WENT OUT THE FIRST TIME WITH MR. BUTLER ON

7    AUGUST 24TH, 2010?

8    A.   YES.

9    Q.   ALL RIGHT.   LET'S TALK ABOUT GOVERNMENT'S EXHIBIT 26, ALL

10   RIGHT.   SO THIS GARAGE DOOR OPENER, YOU TESTIFIED YOU FOUND IT

11   IN THE CAR, RIGHT?

12   A.   YES, IT WAS LOCATED IN THE VEHICLE.

13   Q.   AND WHAT WE HAVE THERE IS, WE HAVE GOT THE INFORMATION FOR

14   THE CAR THAT WAS INVOLVED, RIGHT?

15   A.   YES.

16   Q.   AND THEN WE HAVE THE OWNER -- OR AT LEAST A NAME LISTED ON

17   THERE, DAVID GUTIERREZ?

18           MR. CONOVER:   OBJECTION AS TO "OWNER," YOUR HONOR.

19           THE COURT:   I'M SORRY?

20           MR. CONOVER:   THERE IS NO INDICATION --

21           MR. GARRISON:   I CORRECTED MYSELF.

22           THE COURT:   I'M SORRY, I DIDN'T HEAR YOU, SO I'M NOT

23   SURE.   JUST A SECOND.   SO YOUR QUESTION IS IT HAS A NAME ON IT?

24           MR. GARRISON:   RIGHT.

25           THE COURT:   OKAY.

1  BY MR. GARRISON:

2  Q.  SO IT HAS A NAME ON IT?

3  A.  YES.

4  Q.  THE NAME IS "DAVID GUTIERREZ"?

5  A.  YES.

6  Q.  SO FROM THIS PIECE OF EVIDENCE, WE CAN SEE THAT DAVID

7  GUTIERREZ HELD OUT THIS CAR AS HIS OWN?

8  A.  I WOULDN'T -- I HAVE NO IDEA.  IT IS JUST A GARAGE DOOR

9  OPENER.

10  Q.  BUT IT'S A GARAGE DOOR OPENER THAT HAS THE INFORMATION

11  FROM THIS CAR ON IT, RIGHT?

12  A.  UH-HUH.

13  Q.  AND DAVID GUTIERREZ'S NAME IS ON IT, RIGHT?

14  A.  YES, IT IS.

15  Q.  OKAY.  HAVE YOU EVER TAKEN YOUR CAR IN FOR WORK?

16  A.  YES.

17  Q.  WHEN YOU TAKE YOUR CAR IN FOR WORK, THEY USUALLY ASK YOU

18  YOUR NAME, RIGHT?

19  A.  I USUALLY HAVE AN APPOINTMENT.  I TAKE MY CAR TO THE

20  DEALER, SO THEY KNOW ME AS A CUSTOMER.

21  Q.  THEY KNOW YOUR NAME?

22  A.  YEAH.

23  Q.  THEY KNOW YOUR CAR?

24  A.  YES.

25  Q.  THEY MATCH UP YOUR NAME WITH THE CAR INFORMATION?

1    A.   YES.

2    Q.   AND THAT'S HOW THEY KNOW THAT WHEN THE WORK IS DONE,

3    THEY'RE TO GIVE YOU BACK THE CAR?

4    A.   YES.

5    Q.   NOT SANDRA BULLARD?

6    A.   I DON'T THINK THEY WOULD.

7    Q.   SANDRA BULLOCK, FOR THAT MATTER?

8    A.   I'M THE ONLY OWNER ON THE VEHICLE, SO THAT IS HOW THEY

9    KNOW ME BY.

10   Q.   NOW YOU'RE THE CASE AGENT IN THIS CASE, CORRECT?

11   A.   YES.

12   Q.   THAT MEANS THAT THIS IS YOUR CASE?

13   A.   YES.

14   Q.   THEREFORE, YOU'RE IN CHARGE OF THE INVESTIGATION?

15   A.   YES.

16   Q.   YOU'RE IN CHARGE OF THE EVIDENCE?

17   A.   YES.

18   Q.   YOU'RE IN CHARGE OF KEEPING ALL THE EVIDENCE TOGETHER?

19   A.   YES.

20   Q.   YOU'RE IN CHARGE OF ASSISTING THE UNITED STATES ATTORNEY

21   IN THE PREPARATION OF THIS CASE?

22   A.   YES.

23   Q.   AND YOU'RE IN CHARGE OF HELPING THE UNITED STATES ATTORNEY

24   PRESENT ITS CASE IN COURT?

25   A.   YES.

1   Q.   ALL RIGHT.   AND YOU'VE BEEN ON THIS CASE SINCE NOVEMBER OF

2   2009?

3   A.   YES.

4   Q.   AND YOU'VE WORKED CLOSELY WITH THE PROSECUTOR ON THIS

5   CASE?

6   A.   WHEN CALLED UPON, YES.

7   Q.   AND NOT JUST ONE PROSECUTOR, RIGHT?

8   A.   NO.

9   Q.   THERE HAVE BEEN MULTIPLE PROSECUTORS?

10  A.   YES.

11  Q.   NOW YOU DID AN INVESTIGATION ON THIS CASE?

12  A.   YES.

13  Q.   THROUGH YOUR INVESTIGATION, ONE OF THE THINGS THAT YOU

14  ASCERTAINED WAS THAT MR. FLORES WORKED FOR SOUTHERN CALIFORNIA

15  EDISON COMPANY?

16  A.   YES.

17  Q.   YOU SUBPOENAED EMPLOYMENT RECORDS FROM SOUTHERN CALIFORNIA

18  EDISON?

19  A.   YES.

20  Q.   YOU MADE PHONE CALLS TO SOUTHERN CALIFORNIA EDISON?

21  A.   YES.

22  Q.   YOU CALLED ON DECEMBER 7TH, 2009?

23  A.   YES, IF THAT'S THE DATE YOU HAVE.   I CALLED THERE.

24  Q.   OKAY.   WELL, IS YOUR MEMORY EXHAUSTED ON THAT POINT?

25  A.   YOU'D LIKE FOR ME TO CONFIRM THE DATE?

1    Q.   MY QUESTION IS, IS YOUR MEMORY EXHAUSTED ON THAT POINT?

2    A.   NO.

3    Q.   NO.  SO YOU AGREE THAT YOU CALLED THERE ON DECEMBER 7TH,

4    2009?

5    A.   I'D SAY YES.

6    Q.   YOU LEFT A MESSAGE?

7    A.   NO.  I DIDN'T LEAVE ANY MESSAGES, I RECALL.

8    Q.   OKAY.

9    A.   YEAH.

10   Q.   YOU DIDN'T LEAVE ANY MESSAGES?

11   A.   NOT TO MY KNOWLEDGE.

12   Q.   YOU DIDN'T LEAVE ANY VOICE MAILS?

13   A.   NOT TO MY KNOWLEDGE.

14   Q.   LET ME SHOW YOU WHAT I'M GOING TO MARK AS DEFENDANT'S

15   EXHIBIT I FOR IDENTIFICATION.

16        (DEFENDANT'S EXHIBIT I MARKED FOR IDENTIFICATION.)

17   BY MR. GARRISON:

18   Q.   CAN YOU PLEASE TAKE A LOOK AT THAT.

19   A.   YES.  OKAY.

20   Q.   NOW THIS IS A REPORT OF INVESTIGATION THAT YOU WROTE,

21   MA'AM, CORRECT?

22   A.   YES.

23   Q.   AND THIS REPORT, YOU STATED, ON DECEMBER 7TH, 2009, AT

24   APPROXIMATELY 17:00 HOURS, WRITER LEFT A TELEPHONE MESSAGE AT

25   EDISON COMPANY, CORRECT?

1    A.   YES.

2    Q.   SO YOU DID LEAVE A MESSAGE?

3    A.   YES.

4    Q.   YOU WERE WRONG?

5    A.   APPARENTLY SO.  I'VE WROTE A LOT OF REPORTS, SO DATES -- I

6    DIDN'T READ ANY REPORTS BEFORE COMING IN, SO I CAN'T REALLY

7    SAY, YOU KNOW WHAT, I WROTE 15 REPORTS.  SO IF THAT IS WHAT IS

8    CONTAINED IN THE REPORT, THAT'S WHAT HAPPENED.

9    Q.   YOU MADE A MISTAKE?

10   A.   I GUESS I DID.

11   Q.   THEN ON DECEMBER 8TH, YOU LEFT A SECOND MESSAGE WITH

12   EDISON, CORRECT?

13   A.   YES.

14   Q.   AND EDISON CALLED YOU BACK?

15   A.   YES.

16   Q.   THEY VERIFIED MR. FLORES'S EMPLOYMENT?

17   A.   YES.

18   Q.   THEY VERIFIED THAT HE WAS A SUPERVISOR THERE?

19   A.   YES.

20   Q.   THEY VERIFIED THAT HE BEGAN EMPLOYMENT THERE ON APRIL 7TH,

21   1986?

22   A.   YES.

23            MR. CONOVER:  OBJECTION AS IRRELEVANT, YOUR HONOR.

24            THE COURT:  SUSTAINED.

25   BY MR. GARRISON:

1   Q.   AS PART OF YOUR INVESTIGATION, YOU TRY TO LEARN AS MUCH AS

2   YOU CAN ABOUT A PERSON; IS THAT RIGHT?

3   A.   YES.

4   Q.   IN THIS CASE, YOU LEARNED THAT MR. FLORES IS 53 YEARS OLD?

5           MR. CONOVER:  OBJECTION, AS TO RELEVANCE, YOUR HONOR.

6           THE COURT:  SUSTAINED.

7   BY MR. GARRISON:

8   Q.   NOW ONE OF THE THINGS YOU DO WHEN YOU'RE CALLED TO THE

9   PORT, YOU TALK TO ALL THE OFFICERS FIRST THAT WERE INVOLVED IN

10  THE SEIZURE, RIGHT?

11  A.   NO.

12  Q.   NO?

13  A.   NO.

14  Q.   OKAY, SO YOU DON'T ASK ANY QUESTIONS OF ANY OF THE

15  OFFICERS?

16  A.   USUALLY IF WE SPEAK TO THE INSPECTORS, IT WOULD BE THE

17  PERSON CONDUCTING THE SEVEN-POINT.  SO I -- ON OCCASION, I DO

18  NOT TALK TO THE PRIMARY OFFICER; I DO NOT TALK TO THE SECONDARY

19  OFFICER.  WHEN WE RESPOND TO OUR CALL, WE'RE RESPONDING BECAUSE

20  THERE IS A SEIZURE.  SO WHEN WE GET TO THE PORT, WE SPEAK TO

21  THE SEIZING OFFICER, SO I HAD NO CONTACT WITH THE PRIMARY OR

22  SECONDARY.

23  Q.   YOU REVIEW PROPERTY --

24  A.   UH-HUH.

25  Q.   -- THAT IS ON A PERSON WHEN THEY'RE ARRESTED?

1   A.   UH-HUH, YES.

2   Q.   YOU REVIEWED THE PROPERTY MR. FLORES HAD ON HIM?

3   A.   YES.

4   Q.   FOUND THAT HE HAD $58 ON HIM WHEN HE WAS ARRESTED?

5   A.   YES.

6   Q.   ALL RIGHT.   NOW LET'S TALK ABOUT THE TELEPHONE.

7   A.   YES.

8   Q.   ON THE DAY THAT MR. FLORES WAS ARRESTED, YOU WANTED TO

9   LOOK IN MR. FLORES'S PHONE?

10  A.   REPEAT THAT.

11  Q.   ON THE DAY THAT MR. FLORES WAS ARRESTED, YOU WANTED TO

12  LOOK IN HIS PHONE?

13  A.   I DIDN'T WANT TO LOOK IN HIS PHONE.   IT WAS PART OF THE

14  PERSONAL PROPERTY; THE PHONE IS THERE.   WE TAKE IT INTO

15  CUSTODY, OR AS EVIDENCE.

16  Q.   YOU ACTUALLY ASKED HIM THAT DAY IF YOU COULD LOOK AT HIS

17  PHONE?

18  A.   I DID NOT ASK HIM THAT DAY.   I BELIEVE THE OFFICER THAT --

19  THE AGENT THAT WAS WORKING WITH ME ASKED HIM THAT DAY.   I DID

20  NOT BECAUSE USUALLY THE PHONES ARE THERE, I GO DOWN TO THE

21  PORT, AND IT IS TWO AGENTS THAT ARE THERE.   SO I DID NOT ASK

22  HIM TO LOOK AT HIS PHONE.

23  Q.   ON THAT DAY, HE GAVE YOU CONSENT TO SEARCH THE PHONE.

24  A.   PARDON?

25  Q.   HE CONSENTED TO THE OTHER AGENT LOOKING AT THE PHONE?

1    A.   THAT, I DON'T REMEMBER.

2    Q.   WELL, NOW YOU'RE FAMILIAR WITH THE CONTENTS OF THE

3    TELEPHONE, RIGHT?

4    A.   YES, UH-HUH.

5    Q.   BECAUSE THERE WAS A FORENSIC ANALYSIS DONE ON THE PHONE?

6    A.   YES.

7    Q.   THERE WAS 220 TEXT MESSAGES FOUND ON THAT PHONE?

8    A.   YES.

9    Q.   THERE WAS 27 IMAGE FILES?

10   A.   YES.

11   Q.   48 AUDIO FILES?

12   A.   YES.

13   Q.   ONE VIDEO FILE?

14   A.   YES.

15   Q.   152 CONTACTS?

16   A.   YES.

17   Q.   I'M GOING TO SHIFT YOUR ATTENTION TO NOVEMBER 17, 2010, ON

18   THAT DAY, YOU WENT ON INVESTIGATION REGARDING THIS CASE?

19   A.   YES.

20   Q.   YOU TRAVELED TO THE LOS ANGELES AREA?

21   A.   YES.

22   Q.   HOW MANY AGENTS WENT WITH YOU?

23   A.   I BELIEVE SIX.   THERE WERE SIX OF US.

24   Q.   SIX AGENTS?

25   A.   UH-HUH.

1   Q.   AND ALSO, LOCAL POLICE WOULD COME IN TO SEE IF YOU NEEDED

2   ASSISTANCE WHEREVER YOU WERE, CORRECT?

3   A.   YES.

4   Q.   FIRST TRAVELED TO ALTA DENA, CALIFORNIA; IS THAT RIGHT?

5   A.   YES.

6   Q.   TRAVELED TO 596 ALBERT STREET?

7   A.   I THINK IT WAS ALBERTA STREET.  I THINK IT WAS ALBERTA.

8   Q.   THAT WAS MR. FLORES'S SON'S RESIDENCE?

9   A.   YES.

10  Q.   HIS SON'S NAME IS ALEX?

11  A.   HE WASN'T HOME.  SO I BELIEVE THAT WAS -- COULD HAVE BEEN

12  ALEX.  WE SPOKE WITH HIS GIRLFRIEND, SO I BELIEVE IT WAS ALEX'S

13  PROPERTY.

14  Q.   HIS GIRLFRIEND WAS THERE?

15  A.   YES.

16  Q.   SHE OPENED THE DOOR?

17  A.   YES.

18  Q.   YOU SAID YOU WANTED TO SPEAK WITH HER?

19  A.   EXCUSE ME?

20  Q.   YOU SAID THAT YOU WOULD LIKE TO SPEAK WITH HER?

21          MR. CONOVER:  OBJECTION AS TO RELEVANCE.  IT'S

22  CALLING FOR HEARSAY.

23          THE COURT:  YEAH, SUSTAINED.

24  BY MR. GARRISON:

25  Q.   THE AGENTS WENT INTO HER HOUSE?

1          MR. CONOVER:  SAME OBJECTION, YOUR HONOR.

2          THE COURT:  ALL RIGHT, COUNSEL, PLEASE COME UP TO

3    SIDE BAR FOR A MINUTE.

4          (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY.)

5          THE COURT:  WHAT IS THE RELEVANCE OF THIS LINE OF

6    QUESTIONING, MR. GARRISON?

7          MR. GARRISON:  WELL, WHAT THEY DID OR DIDN'T DO ON

8    INVESTIGATION IS CLEARLY RELEVANT TO AN ARGUMENT THAT I WANT TO

9    MAKE AT CLOSING, THAT REASONABLE DOUBT CAN ARISE FROM LACK OF

10   EVIDENCE.  I'D LIKE THE FRUITS OF THOSE INVESTIGATIONS, WHAT

11   WAS BORNE OUT, IS CLEARLY RELEVANT TO AN ARGUMENT THAT THE

12   GOVERNMENT WILL ARGUE IN CLOSING, YOUR HONOR, THAT HE WAS PART

13   OF A CONSPIRACY; INDEED, THEY CHARGED IT AS SUCH.

14          THE COURT:  YEAH.

15          MR. GARRISON:  THE ARGUMENT IS THAT IF HE'S PART OF A

16   CONSPIRACY, THEY DID ALL OF THIS OTHER INVESTIGATION, WITH

17   THESE OTHER PLACES, THEY FOUND NO EVIDENCE OF MR. FLORES BEING

18   PART OF A CONSPIRACY.  THE FACT IS THAT THEIR INVESTIGATION

19   BORE NO FRUIT.  IT IS NOT ONLY EXCULPATORY TO MR. FLORES, BUT

20   IT'S ALSO CLEARLY RELEVANT TO THE JURY'S DETERMINATION,

21   ESPECIALLY, GIVEN THAT THESE TANDEM CROSSINGS ARE GOING TO COME

22   IN, ESPECIALLY GIVEN THAT THESE PHONE CALLS BETWEEN HIM AND

23   MR. GUTIERREZ ARE GOING TO COME IN.  HE'S BEING PAINTED BY THE

24   GOVERNMENT AS A MEMBER OF A LARGE DRUG SMUGGLING CONSPIRACY.

25          THE COURT:  THERE ARE A COUPLE PROBLEMS.  FIRST, THIS

1  CONSPIRACY GOES BEYOND THE SCOPE OF REDIRECT.  I'VE LET YOU ASK

2  THESE QUESTIONS BECAUSE THERE HAS BEEN NO OBJECTION.  I'LL TELL

3  YOU WHAT -- I DO UNDERSTAND.  BECAUSE YOU'LL BE ABLE TO CALL A

4  WITNESS ANYWAY, IF YOU WANT TO, I'LL LET YOU ASK QUESTIONS

5  ABOUT THE ULTIMATE ISSUE.  YOU CAN ASK WHETHER OR NOT, FOR

6  EXAMPLE, THEY WENT TO HIS SON'S HOUSE, OR WHETHER OR NOT THEY

7  CONDUCTED A SEARCH, DID THEY FIND ANY EVIDENCE LINKING

8  MR. FLORES TO A CONSPIRACY.  BUT WE -- MY CONCERN IS THAT YOU

9  CAN TAKE THIS -- THIS IS A LONG INVESTIGATION, YOU CAN -- IT'S

10 GOING TO RESULT IN AN UNDUE CONSUMPTION OF TIME, DEPENDING ON

11 HOW YOU'RE ASKING THE QUESTIONS.  AND SO I'LL GIVE YOU SOME

12 LATITUDE, BUT BE CAREFUL.  BECAUSE WE DON'T WANT TO GO THROUGH,

13 FOR EXAMPLE, YOU KNOW, YOU DON'T WANT TO ASK, YOU CAME TO THE

14 DOOR, WHAT DID SHE SAY, WHAT DID YOU SAY, AND WHAT KIND OF

15 COLORS WAS SHE WEARING, DID YOU GO IN, AND WHERE DID YOU SIT

16 DOWN, YOU SEE WHAT I'M SAYING?

17          MR. GARRISON:  I UNDERSTAND.

18          THE COURT:  I'LL GIVE YOU SOME LATITUDE IN THAT

19 REGARD, BUT I'M GOING TO ASK YOU TO PLEASE LIMIT YOUR QUESTIONS

20 TO THE REAL ISSUE.  THE REAL ISSUE IS:  DID YOU SEARCH THE

21 SON'S HOUSE?  DID YOU FIND ANYTHING THERE THAT YOU CONNECTED

22 MR. FLORES TO A CONSPIRACY?  YOU WANT TO ASK THAT QUESTION,

23 THAT'S FINE.

24          MR. CONOVER:  YOUR HONOR, TO BE CLEAR, THERE WERE NO

25 SEARCHES OF HOMES THAT WERE CONDUCTED.

1          THE COURT:  I DON'T KNOW WHAT THERE WAS.  I'M

2    SPECULATING.  BECAUSE I'M NOT GOING TO SIT HERE AND SPEND THREE

3    DAYS TRYING TO LISTEN TO --

4          MR. CONOVER:  OF COURSE.

5          THE COURT:  -- FIGURE OUT WHAT MAY HAVE HAPPENED.

6          MR. CONOVER:  WHAT IS MOST CONCERNING TO THE

7    GOVERNMENT IS THAT WE WOULD CALL THIS HEARSAY ABOUT THE

8    INDIVIDUALS THAT AREN'T GOING TO BE HERE TO TESTIFY.  THEY'RE

9    GOING TO BE ASKING WHAT WAS SAID AT THEIR INTERVIEWS.  IF THEY

10   WANT TO CALL THOSE WITNESSES TO SAY WHAT WAS SAID, THEY'RE

11   WELCOME TO DO THAT.  BUT IT'S IRRELEVANT.  IT'S HEARSAY.  AND

12   IT'S CERTAINLY BEYOND THE SCOPE, AS THE COURT HAS MENTIONED.

13          THE COURT:  IT'S NOT RELEVANT.  IF THEY CONDUCTED A

14   SEARCH AND THEY FOUND NOTHING ELSE, I THINK IT'S SOMETHING THAT

15   THE JURY COULD HEAR.

16          MR. CONOVER:  IF IT WAS PROPERLY BEFORE THE COURT,

17   THEY MAY BE ABLE TO --

18          THE COURT:  I DON'T KNOW, IT DEPENDS.  I HAVEN'T

19   HEARD THE TESTIMONY.  BUT, YES, IT MAY BE HEARSAY.

20          MR. CONOVER:  THANK YOU, YOUR HONOR.

21          MR. GARRISON:  WHILE WE'RE UP HERE, THE SCOPE OF MY

22   QUESTIONING WITH REGARDS TO WHAT PEOPLE SAID AND DIDN'T SAY,

23   VERY, VERY LIMITED.  AT MOST, I MIGHT ASK ABOUT WHAT

24   MR. GUTIERREZ SAID, HOW MR. GUTIERREZ WAS SUBPOENAED.

25          THE COURT:  MR. GUTIERREZ, YOU'RE TALKING ABOUT --

```
 1              MR. GARRISON:  DAVID GUTIERREZ.

 2              THE COURT:  DAVID GUTIERREZ.

 3              MR. GARRISON:  MR. GUTIERREZ WAS SUBPOENAED, COUNSEL

 4   WAS APPOINTED FOR HIM.  AND HIS COUNSEL, HE INVOKED IN FRONT OF

 5   THE GRAND JURY.  HIS COUNSEL CONVEYED TO ME THAT HE WOULD

 6   INVOKE IF CALLED TO TESTIFY AS A WITNESS IN THIS MATTER.  SOME

 7   OF HIS STATEMENTS THAT HE MADE ARE CLEARLY EXCULPATORY TO

 8   MR. FLORES.  AND SINCE I HAVE NO WAY TO CALL HIM, HE'S

 9   AFFECTIVELY BEEN MADE UNAVAILABLE.

10              THE COURT:  YOU CAN CALL HIM, CAN'T YOU, BUT HE'LL

11   ASSERT THE FIFTH AMENDMENT?

12              MR. GARRISON:  I WOULD CALL HIM, BUT OBVIOUSLY I

13   WOULDN'T WANT HIM TO INVOKE IN FRONT OF THE JURY.  SO WE WOULD

14   HAVE TO HAVE A HEARING OUTSIDE THE PRESENCE OF THE JURY, WHERE

15   HE WOULD INVOKE AND WE'D BE RIGHT BACK HERE.

16              MR. CONOVER:  YOUR HONOR, GETTING IN THE STATEMENT OF

17   ANOTHER COURT WITNESS BY MEANS OF ASKING THE INVESTIGATOR WHAT

18   THAT WITNESS SAID IS THE MOST PATENT, BLATANT HEARSAY THERE IS.

19   ASKING QUESTIONS ABOUT WHAT MR. GUTIERREZ SAID IN AN INTERVIEW

20   SOMEWHERE ELSE IS NOT ADMISSIBLE.

21              THE COURT:  WELL, YOU KNOW, I SUSPECT THIS IS AN

22   ISSUE THAT EVERYBODY SHOULD HAVE CONTEMPLATED BEFOREHAND, AND

23   WE SHOULD HAVE ADDRESSED IN MOTIONS IN LIM.

24              MR. CONOVER:  WE DIDN'T EVEN ANTICIPATE THAT THERE

25   WOULD BE ANY THOUGHT OF THAT TYPE OF HEARSAY COMING INTO A
```

1   TRIAL WHEN IT, SO OBVIOUSLY, IS HEARSAY.

2           MR. GARRISON:  YOUR HONOR, I THINK THEY DID

3   ANTICIPATE IT BECAUSE I ASKED THEM TO GIVE MR. GUTIERREZ

4   IMMUNITY, AND THEY REFUSED.

5           THE COURT:  I'M NOT READY TO RULE ON IT RIGHT NOW.

6   SO WE'RE GOING TO STAY OUT OF THAT AREA FOR THE TIME BEING.

7   I'LL GO BACK AND SEE WHAT I CAN FIND.  WE'LL TALK ABOUT IT

8   OUTSIDE OF THE PRESENCE OF THE JURY.

9           MR. GARRISON:  YES, SIR.

10          THE COURT:  I'M NOT GOING TO SUSTAIN IT NOW.

11      (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY CONCLUDED.)

12  BY MR. GARRISON:

13  Q.  SO WE WERE AT ON NOVEMBER 17TH, 2010, THERE YOU WERE IN

14  ALTA DENA, CALIFORNIA, REMEMBER?

15  A.  YES.

16  Q.  OKAY.  SO I BELIEVE YOU HAD TOLD US MR. FLORES'S

17  GIRLFRIEND WAS THERE?

18  A.  YES.

19  Q.  AGENTS WENT INSIDE THE HOUSE?

20  A.  WE ENTERED THE HOME, YES.

21  Q.  AGENTS SEARCHED THE HOME?

22  A.  WE DIDN'T SEARCH THE HOUSE FOR ANYTHING.  WE -- YEAH, WE

23  ENTERED THE HOUSE TO SPEAK WITH THE GIRLFRIEND.

24  Q.  SO NOBODY LOOKED AROUND?

25  A.  WE LOOKED AROUND FOR OFFICERS' SAFETY TO SEE WAS THERE

1    ANYONE ELSE IN THE HOME.  IT WAS LOOKING TO SEE WHETHER THERE

2    WERE ANY OTHER INDIVIDUALS IN THE HOME.  SO IF YOU WANT TO

3    CONSIDER THAT A SEARCH, YES, BUT WE DIDN'T SEARCH, LOOKING FOR

4    ANYTHING IN PARTICULAR.  WE WERE LOOKING FOR PEOPLE, MAKING

5    SURE THE ENVIRONMENT WAS SAFE.

6    Q.   YOU SPOKE WITH MS. JIMENEZ AT THAT TIME?

7    A.   YES.

8    Q.   NOW I DON'T WANT TO GET INTO THE WHOLE CONVERSATION, I

9    JUST WANT TO ASK, ONE OF THE AGENTS THAT WAS THERE, TOLD

10   MS. JIMENEZ THAT THEY WERE INVESTIGATING GILBERT FLORES, JR.;

11   IS THAT RIGHT?

12           MR. CONOVER:  OBJECTION, AS TO HEARSAY, YOUR HONOR.

13           THE COURT:  SUSTAINED.

14           MR. CONOVER:  BEYOND THE SCOPE.

15           THE COURT:  SUSTAINED.

16   BY MR. GARRISON:

17   Q.   NEXT, ON NOVEMBER 17 -- WELL, LET'S BACK UP.

18       SO FROM YOUR VISIT TO ALEX FLORES'S HOUSE, YOU FOUND NO

19   EVIDENCE OF A CONSPIRACY TO IMPORT DRUGS, CORRECT?

20   A.   NO.

21           THE COURT:  NO, IT'S NOT CORRECT?

22           THE WITNESS:  I MEAN, CAN YOU REPEAT THAT, PLEASE.

23   BY MR. GARRISON:

24   Q.   YOU FOUND NO EVIDENCE AS A RESULT OF YOUR INVESTIGATION AT

25   ALEX FLORES'S HOUSE THAT MR. FLORES WAS INVOLVED IN A

1    CONSPIRACY TO IMPORT DRUGS INTO THE UNITED STATES?

2    A.   WE FOUND NO EVIDENCE.

3    Q.   YOU THEN TRAVELED TO MR. FLORES'S RESIDENCE?

4    A.   YES.

5    Q.   ALL RIGHT.   YOU HAVE WORKED FOR THE FEDERAL GOVERNMENT

6    SINCE 1982, RIGHT?

7    A.   YES.

8    Q.   YOU'VE BEEN A CRIMINAL INVESTIGATOR SINCE 1995?

9    A.   YES.

10   Q.   YOU KNOW THAT ONCE A PERSON HAS COUNSEL, YOU'RE NOT

11   ALLOWED TO SPEAK WITH THEM?

12        MR. CONOVER:   OBJECTION, YOUR HONOR.   IT'S CALLING

13   FOR LEGAL CONCLUSION.

14        THE COURT:   I'M SORRY, WHAT IS THE OBJECTION?

15        MR. CONOVER:   THE OBJECTION IS, HE'S CALLING FOR

16   LEGAL CONCLUSIONS OUTSIDE THE KNOWLEDGE OF THE INVESTIGATOR.

17        THE COURT:   YEAH, SUSTAINED.

18   BY MR. GARRISON:

19   Q.   YOU WENT TO HIS HOUSE, CORRECT?

20   A.   YES.

21   Q.   YOU INTERVIEWED HIS NEIGHBORS?

22   A.   ONE NEIGHBOR, YES.

23   Q.   AND AS A RESULT OF THAT, OF THOSE ENCOUNTERS AT HIS HOUSE,

24   YOU FOUND NO EVIDENCE THAT HE WAS INVOLVED IN ANY CONSPIRACY TO

25   BRING DRUGS IN, OR TO DISTRIBUTE DRUGS IN, THE UNITED STATES?

1    A.   NO.

2    Q.   YOU THEN TRAVELED TO RIVERSIDE COUNTY?

3    A.   YES.

4    Q.   YOU TRAVELED TO DAVID GUTIERREZ'S HOUSE?

5    A.   YES.

6    Q.   ALL RIGHT.  AND I'M NOT GOING TO ASK YOU ABOUT THE

7    SUBSTANCE OF WHAT WAS SAID, OKAY.  I'M GOING TO ASK YOU SIMPLY,

8    MR. GUTIERREZ WAS THERE?

9    A.   YES.

10   Q.   MR. GUTIERREZ SAT DOWN AND SPOKE WITH YOU?

11           MR. CONOVER:  OBJECTION, YOUR HONOR.  BEYOND THE

12   SCOPE, GOING INTO HEARSAY.

13           THE COURT:  IT IS.

14           MR. GARRISON:  YOUR HONOR, IF I MAY, I'M JUST -- I'M

15   JUST ASKING WHETHER OR NOT THERE WAS A CONVERSATION.  I'M NOT

16   ASKING THE SUBSTANCE.

17           THE COURT:  I UNDERSTAND.  DO YOU WANT TO CALL THIS

18   WITNESS AS YOUR OWN WITNESS, MR. GARRISON?

19           MR. GARRISON:  I COULD.

20           THE COURT:  ALL RIGHT, WHY DON'T WE DO THAT.  I'LL

21   ALLOW YOU TO QUESTION HER AS YOUR OWN WITNESS ON DIRECT, OKAY.

22   BUT -- ALL RIGHT, SO --

23           MR. CONOVER:  THE OBJECTION --

24           THE COURT:  IT IS BEYOND THE SCOPE.

25           MR. CONOVER:  AND THE GOVERNMENT'S OBJECTION IS TO

1    HEARSAY, YOUR HONOR.  HE'S GOING INTO --

2              THE COURT:  I DON'T KNOW WHAT HE'S ASKING HER YET.

3    SO THE OBJECTION IS PREMATURE.

4              MR. GARRISON:  FOR TIME MANAGEMENT PURPOSES, THOUGH,

5    WE'LL KEEP GOING RIGHT NOW, RIGHT, YOUR HONOR?

6              THE COURT:  YES.

7    BY MR. GARRISON:

8    Q.  SO WHEN YOU WENT TO DAVID GUTIERREZ'S HOUSE, DID HE HAVE A

9    CONVERSATION WITH YOU?

10             MR. CONOVER:  OBJECTION AS TO HEARSAY.

11             THE COURT:  WELL, NO.  IT'S NOT HEARSAY.  OBJECTION

12   IS OVERRULED.

13             THE WITNESS:  YES.

14   BY MR. GARRISON:

15   Q.  ALL RIGHT.  NOW AS WE VISITED BEFORE, YOU'RE THE CASE

16   AGENT IN THE MATTER, RIGHT, IN THIS CASE?

17   A.  YES.

18   Q.  ALL RIGHT.  SO MR. GUTIERREZ IS SOMEBODY THAT YOU

19   INVESTIGATED?

20             MR. CONOVER:  OBJECTION, LEADING.

21             THE COURT:  NO, OVERRULED.  IT'S NOT.

22             THE WITNESS:  REPEAT THE QUESTION, PLEASE.

23   BY MR. GARRISON:

24   Q.  MR. GUTIERREZ IS SOMEBODY THAT YOU INVESTIGATED?

25   A.  SOMEONE THAT WE WERE GOING TO INTERVIEW, YEAH.  YES.

1   Q.   OKAY.  TO YOUR KNOWLEDGE, MR. GUTIERREZ -- IS

2   MR. GUTIERREZ CHARGED WITH ANY CRIME?

3   A.   NO.

4   Q.   TO YOUR KNOWLEDGE, HE'S NOT CHARGED IN THIS CASE, IS HE?

5           MR. CONOVER:  OBJECTION.  RELEVANCE, YOUR HONOR.

6           THE COURT:  SUSTAINED.

7   BY MR. GARRISON:

8   Q.   NOW AGENT, I THINK --

9           MR. GARRISON:  WELL, YOUR HONOR, CAN I HAVE JUST A

10  MOMENT?

11          THE COURT:  SURE.

12              (ATTORNEY CONVERSATION OFF THE RECORD.)

13  BY MR. GARRISON:

14  Q.   JUST A FEW LAST QUESTIONS.

15      ARE YOU BASED IN THE SAN DIEGO AREA?

16  A.   I WORK IN SAN DIEGO.

17  Q.   AND ON NOVEMBER 17TH, I THINK YOU SAID THAT YOU DID TRAVEL

18  TO MONTEBELLO; IS THAT RIGHT?

19  A.   YES.

20  Q.   AND AS THE CASE AGENT, YOU HAVE KNOWLEDGE OF THE DISTANCE

21  BETWEEN THE SAN DIEGO AREA AND MONTEBELLO, DO YOU?

22  A.   YES.

23  Q.   OKAY.  CAN YOU ESTIMATE HOW MANY MILES IT IS?

24  A.   IT FELT LIKE OVER 100, SO I'LL ESTIMATE OVER 100, YEAH.

25  Q.   HOW ABOUT 129; DOES THAT SOUND CORRECT?

1          MR. CONOVER:  OBJECTION.  LEADING, YOUR HONOR.

2          THE COURT:  SUSTAINED.

3          MR. GARRISON:  YOUR HONOR, AT THIS POINT, THEN, I'D

4   ASK TO REVERT BACK TO MY ORIGINAL CROSS.

5          THE COURT:  OKAY.

6          MR. GARRISON:  AND TAKE THE WITNESS AS HOSTILE.

7          THE COURT:  ALL RIGHT.

8                    CROSS-EXAMINATION

9   BY MR. GARRISON:

10  Q.  IT'S 129 MILES FROM THE SAN DIEGO AREA UP TO MONTEBELLO,

11  CORRECT?

12  A.  IF THAT'S WHAT YOU'RE TELLING ME, YES.  I DIDN'T MEASURE

13  THE DISTANCE, BUT I SAID OVER 100 MILES.

14  Q.  DID YOU HAVE ANY HAND IN MAKING THIS MAP?

15  A.  NO, I DID NOT.

16  Q.  SO DID YOU EVER LOOK AT A MAP TO SEE HOW MANY MILES IT

17  WOULD BE?

18         MR. CONOVER:  YOUR HONOR --

19         THE WITNESS:  NO.

20         MR. CONOVER:  -- THE GOVERNMENT WOULD STIPULATE IT IS

21  APPROXIMATELY 129 MILES FROM OTAY MESA TO MONTEBELLO.

22         THE COURT:  WILL THAT SATISFY YOU, MR. GARRISON?

23         MR. GARRISON:  SATISFIED.  THANK YOU.

24         THE COURT:  OKAY.  ANYTHING ELSE?

25         MR. GARRISON:  NO.  THANK YOU.

```
 1              THE COURT:  ALL RIGHT.

 2              MR. CONOVER:  THANK YOU, YOUR HONOR.

 3                      REDIRECT EXAMINATION

 4  BY MR. CONOVER:

 5  Q.  WERE YOU AT THE VIEWING THAT DEFENSE COUNSEL MENTIONED

 6  WHEN THE DEFENSE ATTORNEY WENT OUT AND VIEWED THE BEETLE?

 7  A.  YES.

 8  Q.  WERE YOU AT THE VIEWING WHEN MR. BUTLER WENT OUT AND

 9  VIEWED THE VEHICLE?

10  A.  YES.  I HAVE TO BE PRESENT AT ALL THOSE VIEWINGS AS THE

11  CASE AGENT.

12  Q.  WHY DO YOU HAVE TO BE PRESENT THERE?

13  A.  I GUESS THAT'S JUST A RULE OF THUMB.  BUT I HAVE TO BE

14  PRESENT.  I HAVE TO MAKE THE REQUEST.  I HAVE TO GET THE

15  DISPOSITION ORDER.  I HAVE TO HAVE A REQUEST AND A REASON TO GO

16  DOWN THERE.  SO I HAVE TO ACCOMPANY EVERYBODY.

17  Q.  YOU HAVE TO HAVE A DISPOSITION ORDER EVEN TO GET IN?

18  A.  YES.

19  Q.  SO IF YOU WANTED TO SHOW UP AND CHECK THE VEHICLE OUT,

20  COULD YOU?

21  A.  NO.

22  Q.  DOES EVERYONE'S NAME WHO IS GOING TO BE SEEING THE VEHICLE

23  GO ON A LOG?

24  A.  YES.

25  Q.  IS IT A SECURE AREA WHERE TO GET INSIDE, YOU HAVE TO HAVE
```

1   PERMISSION, AUTHORIZATION?

2   A.   YES.

3   Q.   AND THEN YOU, AS THE CASE AGENT, ACCOMPANY ANYONE THAT

4   GOES TO VIEW THE VEHICLE?

5   A.   YES.

6              MR. GARRISON:  OBJECTION.  LEADING.

7              THE COURT:  SUSTAINED.

8              MR. GARRISON:  MOVE TO STRIKE.

9              THE COURT:  DISREGARD THAT LAST ANSWER, LADIES AND

10  GENTLEMEN.

11  BY MR. CONOVER:

12  Q.   ON THE 24TH, WERE YOU THERE WITH MR. BUTLER?

13  A.   YES.

14  Q.   AND DO YOU RECALL THIS PHOTOGRAPH HERE?

15  A.   YES.

16  Q.   WHAT IS THAT A PHOTOGRAPH OF?

17  A.   IT IS, LIKE, THE FLOOR OF THE -- IS THAT THE DRIVER'S SIDE

18  -- OR JUST THE SEAT.  THAT'S THE FLOOR.

19  Q.   AND IS THAT -- THAT'S THE SEAT OF THE DRIVER'S SIDE OF THE

20  BEETLE; IS THAT CORRECT?

21  A.   YES.

22              MR. CONOVER:  MOVE TO ADMIT GOVERNMENT'S EXHIBIT NO.

23  31, YOUR HONOR.

24              THE COURT:  ANY OBJECTION?

25              MR. GARRISON:  IF I COULD TAKE A LOOK AT IT FOR A

1    SECOND.

2              THE COURT:  SURE.

3              MR. GARRISON:  NO OBJECTION.

4              THE COURT:  ALL RIGHT.  IT WILL COME IN.

5      (GOVERNMENT'S EXHIBIT 31 MARKED AND RECEIVED INTO EVIDENCE.)

6    BY MR. CONOVER:

7    Q.  DO YOU RECALL WHEN MR. BUTLER FOUND THAT FLOAT RIGHT THERE

8    IN FRONT OF YOU?

9    A.  YES.

10   Q.  AND WAS IT FOUND UNDERNEATH THAT SEAT?

11   A.  YES.

12   Q.  WHEN YOU WENT TO MR. FLORES'S RESIDENCE, DID YOU MAKE SURE

13   HE WASN'T THERE BEFORE YOU WENT TO HIS RESIDENCE?

14   A.  YES.

15   Q.  AND NO ONE WAS THERE; IS THAT CORRECT?

16   A.  NO ONE WAS THERE.

17              MR. GARRISON:  OBJECTION.  LEADING.

18              THE COURT:  OVERRULED.

19   BY MR. CONOVER:

20   Q.  AND DID YOU ATTEMPT TO SEE IF THIS GARAGE DOOR OPENER

21   OPENED MR. FLORES'S GARAGE?

22   A.  YES.

23   Q.  DID IT?

24   A.  NO.

25   Q.  WITH REGARDS TO THE PHONE CALLS THAT WERE MADE BETWEEN THE

1  DEFENDANT AND MR. GUTIERREZ, WAS THERE A SIGNIFICANT NUMBER OF

2  THOSE CALLS MADE ON THE DATE THAT THEY CROSSED INTO THE UNITED

3  STATES TOGETHER?

4          MR. GARRISON:  OBJECTION.  BEYOND THE SCOPE OF --

5          THE COURT:  SUSTAINED.

6          MR. CONOVER:  NO FURTHER QUESTIONS, YOUR HONOR.

7          THE COURT:  ALL RIGHT.  THANK YOU.

8          MR. GARRISON:  YOUR HONOR, CAN I HAVE A BRIEF

9  RECROSS?

10          THE COURT:  SURE, ABSOLUTELY.

11                    RECROSS-EXAMINATION

12  BY MR. GARRISON:

13  Q.   AGENT BULLARD, YOUR TESTIMONY IS THAT ON THE 17TH, WHEN

14  YOU WENT TO MR. FLORES'S HOUSE, YOU PRESSED THESE BUTTONS IN AN

15  ATTEMPT TO OPEN THE GARAGE?

16  A.   WE WERE JUST TESTING THEM AT THE PROPERTY.

17  Q.   MA'AM, DID YOU PRESS THESE BUTTONS?

18  A.   I DID NOT PRESS THOSE BUTTONS.  AN AGENT THAT WAS WITH US

19  PRESSED THE BUTTONS.

20  Q.   PRESSED THESE BUTTONS TO OPEN THE GARAGE DOOR?

21  A.   YES.

22  Q.   DID YOU SECURE A WARRANT?

23  A.   NO.

24          MR. GARRISON:  YOUR HONOR, I WOULD MOVE TO STRIKE ANY

25  AND ALL TESTIMONY REGARDING THAT THIS ATTEMPT TO SEARCH, LACK

1   OF A WARRANT, AND ASK THAT THE JURY BE INSTRUCTED.

2           MR. CONOVER:  OBJECTION TO SPEAKING OBJECTIONS.

3           THE COURT:  IT IS A SPEAKING OBJECTION.  THE

4   OBJECTION IS OVERRULED.

5   BY MR. GARRISON:

6   Q.  MA'AM, YOU'VE BEEN A SPECIAL AGENT FOR A LONG TIME,

7   CORRECT?

8   A.  YES.

9   Q.  YOU WENT TO GLYNCO, GEORGIA, TO THE ACADEMY, CORRECT?

10  A.  YES.

11  Q.  YOU LEARNED --

12          MR. CONOVER:  OBJECTION AS TO BEYOND THE SCOPE, YOUR

13  HONOR.  RELEVANCE.

14          THE COURT:  I'M NOT SURE WHERE HE'S GOING WITH THIS,

15  SO THE OBJECTION IS OVERRULED.  I'LL GIVE HIM SOME LEEWAY.

16  BY MR. GARRISON:

17  Q.  YOU LEARNED AT THE FEDERAL LAW ENFORCEMENT TRAINING CENTER

18  THAT YOU NEED A WARRANT TO SEARCH SOMEONE'S HOUSE?

19  A.  YES.

20  Q.  AND YOU DIDN'T GET ONE?

21  A.  WE DID NOT HAVE ONE --

22  Q.  TO SEARCH THIS HOUSE?

23  A.  WE DIDN'T SEARCH HIS HOUSE.  WE WERE JUST VISITING THE

24  PROPERTY.

25          MR. GARRISON:  NO FURTHER QUESTIONS.

1          THE COURT:  ALL RIGHT, THANK YOU, MA'AM.  YOU'RE

2     EXCUSED.

3        PLEASE CALL YOUR NEXT WITNESS.

4          MR. CONOVER:  THANK YOU, YOUR HONOR.  THE UNITED

5     STATES CALLS IMMIGRATION CUSTOMS ENFORCEMENT AGENT KENNETH

6     KRAUSE TO THE STAND.

7                         (WITNESS SWORN.)

8          THE CLERK:  STATE YOUR FULL NAME FOR THE RECORD,

9     SPELLING YOUR FIRST AND LAST NAME.

10         THE WITNESS:  KENNETH KRAUSE, K-E-N-N-E-T-H, KRAUSE.

11                        DIRECT EXAMINATION

12    BY MR. CONOVER:

13    Q.  MR. KRAUSE, WHERE ARE YOU EMPLOYED?

14    A.  CURRENTLY EMPLOYED WITH DEPARTMENT OF HOMELAND SECURITY --

15    Q.  HOW LONG --

16    A.  -- AS A SPECIAL AGENT WITH HOMELAND SECURITY

17    INVESTIGATIONS.

18    Q.  HOW LONG HAVE YOU WORKED FOR THE UNITED STATES GOVERNMENT?

19    A.  ABOUT 16 YEARS.  ABOUT -- ACTUALLY, OVERALL ABOUT 20

20    YEARS.

21    Q.  TWENTY YEARS.  AND WHAT IS IT THAT YOU CURRENTLY DO FOR

22    THE DEPARTMENT OF HOMELAND SECURITY?

23    A.  AS A SPECIAL AGENT WITH HOMELAND SECURITY INVESTIGATIONS,

24    CURRENTLY ASSIGNED TO SPECIAL INTELLIGENCE UNIT FOR THE LAST

25    COUPLE MONTHS.  THE BREATH OF MY EXPERIENCE REALLY HAS TO DO

1   WITH MY WORK BEFORE THAT.

2         PRIOR TO THAT, FOR ABOUT THE LAST -- THE LAST FOUR YEARS,

3   I WAS AN AGENT AT OPERATION ALLIANCE, WHICH IS A -- DESIGNATED

4   AS A HIGH-INTENSITY DRUG TRAFFICKING AREA GROUP, WHICH MEANS

5   FEDERAL DOLLARS ARE PUSHED TO THAT TASK FORCE, WHICH IS A

6   CULMINATION OF MULTI AGENCIES FOCUSED ON INTERDICTIONS AND

7   INVESTIGATING DRUG SMUGGLING.  BEFORE THAT, I WAS A CUSTOMS

8   AGENT WITH THE MARINE TASK FORCE HERE IN SAN DIEGO, ALSO

9   DESIGNATED AS A HIGH INTENSITY DRUG-TRAFFICKING AREA GROUP.

10  ONCE AGAIN, FEDERAL DOLLARS ARE DIVVIED TOWARDS THAT GROUP TO

11  COMBAT DRUG SMUGGLING, INVESTIGATE DRUG SMUGGLING CRIMES.

12  BEFORE THAT, I WAS A U.S. CUSTOMS INSPECTOR HERE IN SAN DIEGO

13  AT THE SAN YSIDRO, SAN DIEGO, IN OTAY MESA PORTS OF ENTRY.  AND

14  BEFORE THAT, I WAS A U.S. ARMY SOLDIER, AND U.S. MARINE, AND AS

15  A U.S. RICON MARINE, PARTICIPATED IN DRUG INTERDICTION

16  OPERATIONS WITH THE U.S. DEPARTMENT OF JUSTICE AND TREASURY

17  AGENTS.

18  Q.  SO FOR HOW MANY YEARS WOULD YOU SAY YOU'VE BEEN INVOLVED

19  IN THE INTERDICTION OF NARCOTICS?

20  A.  SIXTEEN.

21  Q.  COULD YOU DESCRIBE SOME OF YOUR EXPERIENCE STARTING WHEN

22  YOU FIRST BECAME INVOLVED IN INTERDICTING DRUGS UNTIL THE

23  CURRENT TIME.

24  A.  CERTAINLY.  IN 1995, BESIDES THE EXPERIENCES AS A RICON

25  MARINE, WHICH WAS A CULMINATION OF EFFORTS WITH MULTI AGENCIES.

1  FIRST FORMAL TRAINING I HAD WAS AS A CUSTOMS INSPECTOR.  IN

2  1995, I ATTENDED THE FEDERAL LAW ENFORCEMENT TRAINING CENTER,

3  WHICH IS LOCATED IN GLYNCO, GEORGIA, APPROXIMATELY ELEVEN OR

4  TWELVE WEEKS OF TRAINING FOR CUSTOMS INSPECTOR.  SOME OF THE

5  SUBJECTS WE FOCUSED ON WERE LAW, INTERDICTION, NARCOTICS, AND

6  SEARCH AND SEIZURES.

7      SUBSEQUENT TO THAT, I ATTENDED THE FEDERAL LAW ENFORCEMENT

8  TRAINING CENTER, IN 2002, AS A U.S. CUSTOMS SPECIAL AGENT.

9  ONCE AGAIN, THIS WAS ABOUT A 17- OR 18-WEEK PROGRAM, THAT

10  COVERED THE SAME SUBJECTS AND MORE IN-DEPTH SUBJECTS IN

11  CRIMINAL INVESTIGATION, ALSO MANAGING SOURCES OF INFORMATION,

12  OR INFORMANTS, AS THEY'RE KNOWN, AND INITIATING AND FULFILLING

13  CRIMINAL INVESTIGATIONS.

14      THE PREPONDERANCE OF BOTH OF THOSE TRAINING PERIODS,

15  REALLY, THE MOST EXPERIENCE ANYBODY WOULD GAIN FROM THAT WOULD

16  BE THE -- DOING THE JOB DAY-TO-DAY, ON A DAY-TO-DAY BASIS IN

17  BOTH OF THOSE CAPACITIES.

18  Q.  THANK YOU.  HAVE YOU BEEN RECOGNIZED FOR YOUR WORK THAT

19  YOU'VE DONE OVER THESE MANY YEARS?

20  A.  I HAVE.

21  Q.  COULD YOU DESCRIBE SOME OF THOSE RECOGNITIONS.

22      MR. GARRISON:  OBJECTION.  VOUCHING.

23      THE COURT:  OVERRULED.

24      THE WITNESS:  CERTAINLY.  AS A CUSTOMS INSPECTOR FOR

25  SAN DIEGO, SAN YSIDRO, OTAY MESA PORTS OF ENTRY, I'VE RECEIVED

1   NUMEROUS LETTERS OF RECOGNITION FOR CATCHING, INTERDICTING

2   DRUGS -- METHAMPHETAMINE, COCAINE, HEROIN, MARIJUANA.  AS A

3   MEMBER OF THE MARINE TASK FORCE, IN ADDITION TO PARTICIPATING

4   IN CONTROLLED DELIVERIES, WHICH ARE BASICALLY DELIVERIES WHERE

5   THE GOVERNMENT IS ACTING IN AN UNDERCOVER CAPACITY, ATTEMPTING

6   TO ARREST PEOPLE THAT ARE INVOLVED IN AN ORGANIZATION.  AND ONE

7   EXAMPLE OF THAT, IN 2004, THE MARINE TASK FORCE WAS RECOGNIZED

8   BY THE CALIFORNIA NARCOTICS OFFICERS ASSOCIATION, AS A NARCOTIC

9   TEAM LEADER IN CALIFORNIA, ONE OF FIVE TEAMS.  AND AS AN AGENT

10  AND IN OPERATION ALLIANCE, AND A MARINE TASK FORCE AGENT HERE

11  IN SAN DIEGO, IN ADDITION TO THE DAY-TO-DAY OPERATIONS OF

12  INTERVIEWING AND ARRESTING PEOPLE INVOLVED WITH DRUGS,

13  SMUGGLING, I ALSO INTERACT ON A DAILY BASIS WITH AGENTS OF THE

14  BUREAU OF NARCOTIC ENFORCEMENT FOR THE STATE OF CALIFORNIA,

15  DRUG ENFORCEMENT ADMINISTRATION, FEDERAL BUREAU OF

16  INVESTIGATION, AS WELL AS STATE AND LOCAL POLICE OFFICERS.  AND

17  THIS WORK ON A DAY-TO-DAY BASIS IN THESE TASK FORCES ENHANCES

18  MY APPRECIATION FOR DRUG SMUGGLING, AND THE EFFORTS THAT DRUG

19  SMUGGLERS WILL GO TO TO AVOID DETECTION.

20  BY MR. CONOVER:

21  Q.   THANK YOU.  IN THE COURSE OF YOUR TRAINING AND YOUR

22  EXPERIENCE AS A SPECIAL AGENT, HAVE YOU BECOME FAMILIAR WITH

23  THE WHOLESALE VALUE OF METHAMPHETAMINE, IN MEXICO?

24  A.   YES.

25  Q.   HOW IS THAT?

1    A.   THROUGH WORKING WITH THE OTHER AGENTS I'VE SPOKEN OF, AND

2    THROUGH TALKING TO SOURCES OR CRIMINAL SOURCES, WHICH ARE

3    PEOPLE WE HAVE ARRESTED OR HAVE INFORMATION REGARDING DRUG

4    SMUGGLING OR DRUG TRAFFICKING.   AND IN ADDITION TO THAT, ACROSS

5    THE COUNTRY, WE HAVE WHAT WE CALL CLEARING HOUSES.   HERE IN

6    SAN DIEGO, IT IS CALLED LAW ENFORCEMENT COMMUNICATIONS CENTER.

7    AND THESE CLEARING HOUSES MAINTAIN DATA ON DRUG PURCHASES AND

8    SALES.   SO, FOR EXAMPLE, IF A SAN DIEGO POLICE OFFICER TODAY

9    MADE AN UNDERCOVER PURCHASE FOR A TENTH OF A GRAM OF

10   METHAMPHETAMINE, OR ANY AMOUNT, AND THE PERSON WAS ARRESTED,

11   THAT OFFICER OF SAN DIEGO POLICE WOULD CONTACT THROUGH WHATEVER

12   INDICES THEY HAVE, THEY WOULD CONTACT THIS CLEARING HOUSE AND

13   REPORT THE AMOUNT THEY WERE GOING TO PURCHASE OR SELL THE DRUGS

14   FOR.   IN THE SAME FASHION, IF A FEDERAL AGENT WAS DOING THE

15   SAME THING FOR A KILOGRAM OF THE SAME PRODUCT IN THE LAST SIX

16   MONTHS, THEY WOULD ALSO REPORT THAT, THE PURCHASE PRICE OR SALE

17   PRICE.

18       AND THOSE CLEARING HOUSES ALLOW US TO MAINTAIN DATA

19   ACCURATELY ON WHAT DRUGS ARE SELLING FOR OR PURCHASED FOR ON

20   THE STREETS OF SAN DIEGO AND ACROSS THE COUNTRY.

21   Q.   I THINK THE COURT REPORTER IS HAVING A TOUGH TIME KEEPING

22   UP WITH YOU.

23   A.   SORRY.

24   Q.   THANK YOU, MR. KRAUSE.   HAVE YOU ALSO BECOME FAMILIAR WITH

25   THE WHOLESALE VALUE OF METHAMPHETAMINE IN SAN DIEGO AND WITHIN

1    THE UNITED STATES?

2    A.   I HAVE.

3    Q.   AND IS THAT FOR THE SAME REASONS AS YOU'RE FAMILIAR WITH

4    MEXICAN WHOLESALE VALUE?

5    A.   YES.

6    Q.   AND HAVE YOU BECOME FAMILIAR WITH THE RETAIL VALUE OF

7    METHAMPHETAMINE HERE IN SAN DIEGO?

8    A.   YES.

9    Q.   HOW HAVE YOU BECOME FAMILIAR WITH THE RETAIL VALUE OF

10   METHAMPHETAMINE?

11   A.   IN THE SAME MANNER WHICH I SPOKE OF.  IN ADDITION TO THAT,

12   I PARTICIPATED IN UNDERCOVER OPERATIONS HERE IN SAN DIEGO,

13   WHERE WE'VE ATTEMPTED TO PURCHASE OR SELL DRUGS, AND

14   SPECIFICALLY METHAMPHETAMINE, TO TRAFFICKERS IN A CAPACITY

15   WHICH I SPOKE OF, WHERE WE WERE PRETENDING TO BE ANOTHER

16   ELEMENT, A CRIMINAL ELEMENT.

17   Q.   TELL ME, WHAT IS THE DIFFERENCE BETWEEN WHOLESALE AND

18   RETAIL?  WHAT DOES THAT MEAN EXACTLY WITH REGARDS TO

19   METHAMPHETAMINE?

20   A.   WHOLESALE WOULD BE, AS AN EXAMPLE, IF WE'RE GOING TO

21   PURCHASE DRUGS FROM COSTCO, COSTCO IS GOING TO GIVE YOU A BREAK

22   IN PRICE, IF YOU BUY MORE AND IN BULK QUANTITY.  IF WE WERE TO

23   PURCHASE THE SAME COMMODITY FROM NORDSTROMS, YOU WOULD

24   CERTAINLY PAY A LOT MORE FOR SMALLER AMOUNTS.

25   Q.   AND FROM YOUR EXPERIENCE AS A SPECIAL AGENT, HAVE YOU

1   BECOME FAMILIAR WITH THE DIFFERENCE BETWEEN PERSONAL USE

2   AMOUNTS OF METHAMPHETAMINE, AND AMOUNTS THAT ARE USED FOR

3   DISTRIBUTION?

4   A.   I HAVE.

5   Q.   AND WHAT IS THE DIFFERENCE?

6   A.   PERSONAL AMOUNT USE FOR METHAMPHETAMINE SPECIFICALLY IS

7   GOING TO BE ABOUT A TENTH TO A TWENTIETH OF A GRAM, UP TO ABOUT

8   A QUARTER, AND NO MORE THAN A GRAM OF METHAMPHETAMINE.  AND THE

9   BIGGEST FACTORS THAT INFLUENCE THAT ARE THE SAME ONES THAT

10  INFLUENCE ANY OTHER DRUG, WHICH WOULD BE AGE, WEIGHT,

11  METABOLISM, AND WHATEVER TOLERANCE THEY'VE BUILT UP TOWARDS

12  THAT DRUG.  AS SUCH, A FIRST-TIME USER OF METHAMPHETAMINE, YOU

13  PROBABLY USE BETWEEN A TENTH AND A TWENTIETH OF A GRAM, BUT IF

14  YOU'VE BEEN USING IT MORE, AND YOUR METABOLISM OR AGE OR

15  PHYSICAL CONDITION IS BAD OR GOOD, IT WOULD CHANGE AS YOU USE

16  MORE OF THE DRUG.  DISTRIBUTION AMOUNT WOULD BE ANYTHING

17  GREATER, GENERALLY, THAN A GRAM OF METHAMPHETAMINE.

18  Q.   AND SO WHEN SOMEONE TAKES WHOLESALE AMOUNTS OF

19  METHAMPHETAMINE, BEFORE THEY'RE SOLD IN SAN DIEGO, ARE THEY

20  BROKEN DOWN INTO WHAT IS CALLED "PERSONAL USE AMOUNTS"?

21  A.   YES.

22  Q.   HOW DOES THAT PROCESS WORK?

23  A.   AS DRUGS ARE TRANSPORTED FROM THE BORDER, AS THEY CHANGE

24  HANDS, LIKE ANY BUSINESS, EVERYONE THAT RECEIVES THE DRUGS WILL

25  TRY TO INCREASE THEIR PROFIT IN A PROCESS THAT IS KNOWN AS

1    "STEPPING ON THE DRUG."  AND WHAT THAT MEANS IS, THE PERSON

2    RECEIVING THE DRUGS MOST OF THE TIME, IF NOT ALL OF THE TIME,

3    WILL ADD AN ADULTERANT TO IT.  WHAT I MEAN BY THAT IS,

4    SOMETHING THAT IS VERY NEUTRAL IN COLOR.  BECAUSE THE VALUE OF

5    METHAMPHETAMINE, CLEAR IS THE MOST VALUABLE, AND THEN WHITE

6    WOULD BE THE SECOND-MOST VALUABLE.

7        SO AN ADULTERANT LIKE FLOUR OR BAKING SODA WOULD BE ADDED

8    TO THE PRODUCT, AND THE PRODUCT WOULD BE STEPPED ON SO YOU

9    COULD TURN BASICALLY A POUND OF METHAMPHETAMINE INTO MAYBE A

10   POUND AND A HALF OR MAYBE TWO POUNDS IF IT'S VERY POTENT.

11   Q.   HAVE YOU SEEN METHAMPHETAMINE BEFORE?

12   A.   YES.

13   Q.   WHAT DOES IT LOOK LIKE?

14   A.   THERE ARE TWO FORMS OF METHAMPHETAMINE.  ONE WOULD BE A

15   POWDER, JUST WOULD LOOK LIKE TALCUM POWDER OR BABY POWDER BUT

16   IT'S A LITTLE THICKER.  SOMETIMES IT'S YELLOW IN COLOR.  WHEN

17   MORE ADULTERANTS ARE ADDED TO IT, BY THE TIME IT HITS THE

18   STREETS, THAT PROCESS OF BEING STEPPED ON HAS HAPPENED SO MANY

19   TIMES THAT IT IS LESS POTENT, AND USUALLY IT POSSESSES

20   COLORATION IN IT.  ICE, ANOTHER FORM OF METHAMPHETAMINE, WHICH

21   IS MORE EXPENSIVE, WHICH IS BASICALLY CHUNKS OF, LIKE, ICE

22   CRYSTALS.

23   Q.   I WOULD LIKE TO SHOW YOU NOW SOME PHOTOGRAPHS.  WHAT DOES

24   THIS PHOTOGRAPH APPEAR TO BE?

25            MR. GARRISON:  OBJECTION.  CUMULATIVE.

1          THE COURT:  OVERRULED.

2          THE WITNESS:  LADIES AND GENTLEMEN, THIS IS WHAT YOU

3    REFER TO AS "ICE."  ONE OF THE -- BESIDES THE TRAINING I'VE

4    TALKED ABOUT, I'VE ALSO BEEN A MEMBER OF THE CALIFORNIA

5    NARCOTICS OFFICERS ASSOCIATION.  AND IN THAT CAPACITY, WE DID

6    MAKE METHAMPHETAMINE IN A LABORATORY UNDER THE GUIDE OR

7    AUSPICES OF DEA, OR DRUG ENFORCEMENT ADMINISTRATION, CHEMISTS.

8          THIS IS A FORM OF METHAMPHETAMINE, WHICH IS CALLED "ICE."

9    AND THE DIFFERENCE BETWEEN THIS AND POWDER IS THAT THE PERSON

10   THAT MADE IT, TOOK ONE MORE EFFORT, ANOTHER STEP, TO

11   RECRYSTALLIZE IT INTO HARD CRYSTALS.  THIS IS THE MOST VALUABLE

12   FORM OF METHAMPHETAMINE THAT THERE IS.

13         NOW HAVING IT IN THAT FORM, IS MORE OF A MARKETING PLOY OR

14   TRICK OR GIMMICK.  BECAUSE GENERALLY, ONCE THE METHAMPHETAMINE

15   IS MADE IN A POWDER, THAT IS AS POTENT AS IT IS GOING TO BE.

16   WHEN IT IS CONVERTED TO ICE LIKE THIS, THEY'RE REALLY REMOVING

17   IMPURITIES.  AND IT'S MARKETED AS BEING A LOT MORE POTENT, EVEN

18   THOUGH REALLY THE POTENCY IS NOT GOING TO CHANGE; IT IS JUST

19   GOING TO REMOVE THE IMPURITIES.  AND SO THIS IS THE MOST

20   VALUABLE FORM OF METHAMPHETAMINE, AND IT IS CALLED "ICE."

21   BY MR. CONOVER:

22   Q.   DURING YOUR EXPERIENCE, HAVE YOU SPOKEN TO INDIVIDUAL

23   USERS OF METHAMPHETAMINE, ICE?

24   A.   I HAVE.

25   Q.   AND HAVE YOU SPOKEN TO INDIVIDUALS WHO SMUGGLE LARGE

1  AMOUNTS OF METHAMPHETAMINE, ICE?

2  A.  YES.

3  Q.  AND HAVE YOU INTERVIEWED INFORMANTS REGARDING THE

4  SMUGGLING OF METHAMPHETAMINE?

5  A.  YES.

6  Q.  AND HAVE YOU ALSO SPOKEN WITH AGENTS AND OFFICERS

7  REGARDING THE SMUGGLING OF METHAMPHETAMINE?

8  A.  YES.

9  Q.  APPROXIMATELY HOW MANY ARRESTS HAVE YOU PERSONALLY MADE

10  REGARDING DRUGS IN GENERAL?

11  A.  OVER 100 ARRESTS AS A PRIMARY, SECONDARY, TERTIARY AGENTS.

12  Q.  HOW MANY ARRESTS HAVE YOU BEEN INVOLVED IN WITH REGARD TO

13  METHAMPHETAMINE?

14  A.  ABOUT 30 AS A PRIMARY, SECONDARY, OR TERTIARY AGENT.

15  Q.  AND HOW MANY INVESTIGATIONS HAVE YOU BEEN INVOLVED IN WITH

16  REGARD TO INVESTIGATING THE SMUGGLING OF DRUGS FROM MEXICO INTO

17  THE UNITED STATES?

18  A.  OVER 200.

19  Q.  HOW MANY TIMES HAVE YOU FOUND NARCOTICS IN A GAS TANK?

20  A.  AS AN INSPECTOR AT SAN YSIDRO AND OTAY MESA PORTS OF

21  ENTRY, THE GAS TANK WAS USED -- WAS A PRIMARY USE FOR

22  METHAMPHETAMINE.  SO, APPROXIMATELY, PROBABLY ABOUT 40 OR 50

23  TIMES, I FOUND METHAMPHETAMINE IN THE GAS TANK.

24  Q.  HOW LONG, FROM YOUR ESTIMATION, DO DRUG -- DO PACKAGES OF

25  METHAMPHETAMINE GENERALLY STAY IN A GAS TANK?

```
 1   A.   METHAMPHETAMINE, LIKE ANY DRUG IN A GAS TANK, PEOPLE THAT

 2   ARE SMUGGLING IT ARE GOING TO ATTEMPT TO GET IT OUT AS FAST AS

 3   POSSIBLE FOR TWO REASONS, ONE IS THE SHEER VALUE OF NARCOTICS.

 4   A LOT OF TIMES, PEOPLE SMUGGLING ARE ACTUALLY FRONTED THE

 5   NARCOTICS.  AND WHAT THAT MEANS IS, THEY HAVE TO GET IT TO ITS

 6   FINAL DESTINATION AS SOON AS POSSIBLE SO THE DRUGS CAN CHANGE

 7   HANDS AND MONEY AS WELL.  THE SECOND REASON THEY'LL GET IT OUT

 8   OF THE GAS TANK FAST IS BECAUSE GAS IS VERY CAUSTIC.  THERE ARE

 9   CERTAIN TYPES OF PLASTICS THEY CAN USE TO WRAP IT IN, MUCH LIKE

10   A GAS CAN IN YOUR CAR THAT IS MADE OUT OF PLASTIC, THE SAME

11   TYPE OF PLASTIC LIKE THAT WHERE GAS WON'T EAT THROUGH IT.  BUT

12   THE RISK TO THE GROUP THAT IS SMUGGLING IS SIGNIFICANT IF GAS

13   DOES LEAK THROUGH THERE.  SO IF THEY USE THAT TYPE OF PLASTIC,

14   AND THEY DON'T SEAL IT WELL, IT WILL LEAK THROUGH AND DESTROY

15   THE PRODUCT OR BASICALLY THEIR MONEY.  SO WITH THAT IN MIND,

16   THEY WILL ATTEMPT TO GET IT OUT AS FAST AS POSSIBLE.

17        MR. GARRISON:  YOUR HONOR, I OBJECT.  THE RESPONSES

18   ARE NONRESPONSIVE.  THEY'RE IN A NARRATIVE FORM.  AND I ALSO

19   RENEW MY OBJECTIONS MADE PRIOR TO TRIAL.

20        THE COURT:  ALL RIGHT.  WELL, MR. GARRISON, LET ME

21   ASK YOU TO DO ME A FAVOR, IF YOU WOULD REFRAIN FROM SPEAKING

22   OBJECTIONS, I APPRECIATE IT.  SO YOUR OBJECTION IS THAT IT'S

23   NARRATIVE, IS THAT -- WE'RE NOT GOING TO GO OVER AGAIN THE

24   OBJECTIONS THAT WERE MADE PRE-TRIAL.  I MADE MY RULING, RIGHT,

25   WRONG, OR WHATEVER, BUT I MADE MY RULING IN THAT.  YOUR
```

1    OBJECTION AS TO THIS QUESTION IS, THAT IT'S -- OR THE ANSWER,

2    IS THAT IT'S NARRATIVE.  IS THAT CORRECT?

3              MR. GARRISON:  THAT IT'S NARRATIVE, AND

4    NONRESPONSIVE, AND IMPROPER EXPERT OPINION.

5              THE COURT:  AND NONRESPONSIVE.  OKAY.  OBJECTION IS

6    OVERRULED.  THANK YOU.

7    BY MR. CONOVER:

8    Q.   HAVE YOU TESTIFIED AS AN EXPERT IN FEDERAL COURT BEFORE?

9    A.   YES.

10   Q.   APPROXIMATELY HOW MANY TIMES?

11   A.   OVER TEN TIMES.

12   Q.   AND HAVE YOU TESTIFIED AS AN EXPERT REGARDING THE VALUE OF

13   METHAMPHETAMINE IN FEDERAL COURT BEFORE?

14   A.   YES.

15   Q.   ALL RIGHT.  TURNING TO THIS SPECIFIC CASE, HAVE YOU

16   TESTIFIED -- I'M SORRY, TURNING TO THIS SPECIFIC CASE, WERE YOU

17   ASKED BY MY OFFICE TO PREPARE AN EVALUATION OF THE VALUE OF THE

18   NARCOTICS IN THIS CASE?

19   A.   YES.

20             MR. CONOVER:  I'D LIKE TO APPROACH WITH WHAT HAS BEEN

21   MARKED AS GOVERNMENT'S EXHIBIT NO. 29.

22             (GOVERNMENT'S EXHIBIT 29 MARKED FOR IDENTIFICATION.)

23   BY MR. CONOVER:

24   Q.   DO YOU RECOGNIZE THIS?

25   A.   I DO.

1    Q.   HOW DO YOU RECOGNIZE THAT?

2    A.   THIS IS A CHART I CONSTRUCTED TO ASCERTAIN THE VALUE OF

3    THE NARCOTICS IN THIS SPECIFIC CASE.

4    Q.   FIRST, WERE YOU AWARE OF THE AMOUNTS OF NARCOTICS FOUND IN

5    THE DEFENDANT'S GAS TANK?

6    A.   YES.

7    Q.   WERE YOU AWARE OF THE WEIGHT?

8    A.   YES.

9    Q.   WHAT WAS THE WEIGHT OF THE NARCOTICS FOUND IN THE

10   DEFENDANT'S GAS TANK?

11   A.   22.59 POUNDS OR 10.27 KILOGRAMS.

12   Q.   ALL RIGHT.   AND YOU DESCRIBED EARLIER WHAT A PERSONAL USE

13   AMOUNT IS.   WHAT IS A PERSONAL USE AMOUNT OF METHAMPHETAMINE?

14   A.   GENERALLY SEEN AS A GRAM OR LOWER.

15   Q.   AND SO HOW MANY DOSES OF PERSONAL USE AMOUNTS OF

16   METHAMPHETAMINE WAS FOUND IN THE DEFENDANT'S GAS TANK, SO

17   HUNDREDS; IS THAT RIGHT?

18   A.   YEAH, THOUSANDS.

19   Q.   THOUSANDS.   SO IS THE AMOUNT FOUND IN THE DEFENDANT'S GAS

20   TANK AN AMOUNT THAT IS INTENDED FOR PERSONAL USE OR FOR

21   DISTRIBUTION?

22   A.   IT IS AN AMOUNT THAT IS FOR DISTRIBUTION.

23            MR. GARRISON:  OBJECTION.  FRE-704.

24            THE COURT:  OVERRULED.

25   BY MR. CONOVER:

1   Q.   YOU TESTIFIED EARLIER ABOUT YOUR EXPERIENCE WITH THE VALUE

2   OF -- WHOLESALE VALUE OF METHAMPHETAMINE IN MEXICO.

3   A.   YES.

4   Q.   BASED ON YOUR EXPERIENCE, WHAT IS THE WHOLESALE VALUE OF

5   THIS METHAMPHETAMINE IN MEXICO?

6   A.   IT'S A RANGE.  IT'S GOING TO BE BETWEEN 7,500 -- I'M

7   SORRY, EXCUSE ME.  IT IS GOING TO BE ABOUT $7,500 TO $9,000 PER

8   POUND, WHICH WOULD EQUATE TO $169,425 TO $203,310.

9   Q.   AND TURNING BACK TO GOVERNMENT EXHIBIT NO. 29 IN FRONT OF

10  YOU, YOU PREPARED THAT CHART FOR THIS CASE?

11  A.   I DID.

12  Q.   WOULD IT ASSIST IN YOUR TESTIMONY HERE TODAY?

13  A.   IT WOULD.

14          MR. CONOVER:  YOUR HONOR, MOVE TO ADMIT AND TO

15  PUBLISH.

16          THE COURT:  THE PREVIOUSLY RAISED OBJECTIONS --

17          MR. GARRISON:  YOUR HONOR, CAN WE GO SIDE BAR?

18          THE COURT:  NO.  IS THERE AN OBJECTION?

19          MR. GARRISON:  YES.

20          THE COURT:  WHAT IS THE OBJECTION?

21          MR. GARRISON:  DEMONSTRATIVE.

22          THE COURT:  ALL RIGHT.  OVERRULED.

23  BY MR. CONOVER:

24  Q.   IF YOU COULD PLEASE USE THE LASER POINTER THERE TO

25  DESCRIBE HERE TO THE JURY WHAT THIS CHART ENTAILS AND DESCRIBE

1  TO THEM WHAT YOUR FINDINGS WERE WITH THE QUANTITY OF

2  METHAMPHETAMINE IN MEXICO.

3  A.   OKAY.   THE FIRST PART OF IT IS THE -- LISTS THE DATE OF

4  THE SEIZURE, THE WEIGHT, IN KILOGRAMS AND POUNDS.  THIS NUMBER

5  IS THE SEIZURE NUMBER THAT WAS SEIZED AT THE PORT OF ENTRY BY

6  CUSTOMS OFFICERS.  THIS IS THE PURITY OF THE ICE AND

7  METHAMPHETAMINE FOUND IN THIS CASE.

8      THE FIRST PART OF THIS CHART IS THE WHOLESALE VALUE OF

9  METHAMPHETAMINE IN MEXICO.  AND IT'S LISTED THE RANGE IN POUNDS

10  AND THEN MULTIPLIED BY THE TOTAL WEIGHT TO GET THE RANGE OF

11  BASICALLY 170,000 TO $203,000.

12  Q.   THAT IS HOW MUCH THIS METHAMPHETAMINE WAS WORTH IN MEXICO,

13  WHOLESALE?

14  A.   CORRECT.

15  Q.   WHEN IT WAS BROUGHT TO THE UNITED STATES, ON A WHOLESALE

16  LEVEL, WHAT WAS YOUR DETERMINATION OF HOW MUCH IT WAS WORTH?

17  A.   ONCE IT CAME ACROSS THE BORDER, THE RANGE CHANGED FROM

18  $15,000 PER POUND TO $18,000 PER POUND.  THIS WOULD THEN CHANGE

19  THE TOTAL WEIGHT, OR TOTAL RANGE IN PRICE AND VALUE, $338,850,

20  TO $406,620.

21  Q.   THAT LOOKS LIKE IT DOUBLES?

22  A.   IT DOUBLES.

23  Q.   JUST FROM COMING ACROSS THE BORDER?

24  A.   CORRECT.

25  Q.   WHY IS THAT?

A.  THE RELATIONSHIP BETWEEN THE UNITED STATES AND MEXICO, CAN

BEST BE DESCRIBED AS AN HOUR GLASS.  ON ONE SIDE IS THE UNITED

STATES, AND THE OTHER SIDE IS MEXICO.  AND THERE IS A CHOKE

POINT IN BETWEEN.  NOW THE PORTS OF ENTRY ALONG THE UNITED

STATES REPRESENT THOSE CHOKE POINTS.  AND THE REASON THERE IS

GREATER RISK FOR ANYBODY SMUGGLING IS BECAUSE THERE ARE MORE

ASSETS FOCUSED AT COMBATING SMUGGLING.  WITH THIS, I MEAN,

THERE ARE MORE OFFICERS TRAINED TO LOOK FOR COMPARTMENTS,

TIRES, TANK LOADS.  THERE ARE MORE CANINE ENFORCEMENT OFFICERS

WITH DOGS THAT DETECT NARCOTICS.  THERE ARE MORE HIGH

TECHNOLOGY GEAR, SUCH AS X-RAYS, DENSITY METERS, FIBEROPTIC

SCOPES.  AND THERE ARE MORE CONTRACTORS EITHER ON CALL OR ON

STATION THAT ARE AVAILABLE TO TAKE APART VEHICLES IF THEY NEED

TO.

     BECAUSE OF THAT, THE GREATEST RISK FOR ANYONE SMUGGLING IS

THE PORTS OF ENTRY.  NOT TO SAY THAT A HIGHWAY PATROLMAN OR

SAN DIEGO POLICE OFFICER CANNOT FIND IT AS WELL, BUT THEY WILL

NOT HAVE AS MANY ASSETS AT THEIR DISPOSAL AS READILY.  SO THE

RISK IS GREATEST AT THE BORDER.  WHEN THEY CROSS THE BORDER AND

ENTER THE UNITED STATES, THE VALUE DOUBLES.

Q.  CAN ANY VEHICLE BE SEARCHED WHEN IT COMES INTO THE UNITED

STATES?

A.  YES.

     MR. GARRISON:  OBJECTION.  IT CALLS FOR LEGAL

CONCLUSION.

1          THE COURT:  OVERRULED.

2   BY MR. CONOVER:

3   Q.   YOU'VE WORKED AT THE PORTS OF ENTRY; IS THAT CORRECT?

4   A.   CORRECT.

5   Q.   BOTH SAN YSIDRO AND OTAY MESA?

6   A.   YES.

7          MR. GARRISON:  OBJECTION.  LEADING.

8          THE COURT:  OVERRULED.  IT'S FOUNDATIONAL.

9   BY MR. CONOVER:

10  Q.   WHEN A VEHICLE COMES ACROSS THE BORDER, WHAT OCCURS?

11  A.   THE OFFICER, AT WHATEVER PORT OF ENTRY WILL CONTACT THE

12  OCCUPANTS OF THE VEHICLE, DETERMINE CITIZENSHIP, A DECLARATION,

13  A CUSTOMS DECLARATION, WHAT THE PERSON HAS DECLARED THAT

14  THEY'RE BRINGING BACK, AND WILL DETERMINE IF THEY NEED TO

15  INSPECT THE VEHICLE OR PEOPLE FURTHER.

16  Q.   AND THAT IS WHERE THE ASSETS THAT YOU TALKED ABOUT

17  EARLIER, THE NARCOTIC DETECTION DOGS, AND ALL OF THOSE THINGS,

18  ARE BROUGHT TO BEAR ON TRYING TO DETECT THE NARCOTICS COMING

19  INTO THE UNITED STATES?

20  A.   CORRECT.

21  Q.   AND EXPLAIN -- SO THAT IS WHERE THE RISK IS?

22  A.   YES.

23  Q.   THE RISK OF WHAT?

24  A.   THE RISK OF BEING CAUGHT.

25  Q.   OKAY.

1    A.   OR DETECTION.

2    Q.   AND IF IT IS CAUGHT OR DETECTED, WHAT HAPPENS TO THE VALUE

3    OF THOSE DRUGS?

4    A.   WELL, IT IS COMPLETELY LOST.   SO WHATEVER THE VALUE IS, IT

5    WOULD BE GONE.

6    Q.   WHY IS THAT?

7    A.   BECAUSE THE GOVERNMENT WILL SEIZE THEM.

8    Q.   OKAY.   AND THAT IS WHY IT DOUBLES IN PRICE WHEN IT COMES

9    FROM MEXICO INTO THE UNITED STATES?

10   A.   CORRECT.

11   Q.   AND SO YOUR ESTIMATION OF THE RETAIL VALUE IN SAN DIEGO,

12   CALIFORNIA OF THESE DRUGS IS WHAT?

13   A.   THE RETAIL VALUE IS ALSO KNOWN, AS WE HEAR OFTENTIMES

14   CALLED THE "STREET VALUE."   AND THIS IS WHAT DRUGS ARE SOLD FOR

15   ON THE STREET.   AS I RELATED TO EARLIER, IT IS THE PRICE AFTER

16   THE DRUGS HAVE BEEN STEPPED ON, ALL THE WAY TO THE LOWEST USER.

17   IN SAN DIEGO, DURING THAT TIME FRAME, A QUARTER OF A GRAM WAS

18   GOING BETWEEN 20 AND $40, WHICH WOULD MAKE THE TOTAL AMOUNT OF

19   VALUE OF THIS NARCOTIC, OR STREET VALUE, OF $821,600 TO

20   $1.643 MILLION, APPROXIMATELY.

21   Q.   AND SO ONCE THIS METHAMPHETAMINE IS HERE IN THE UNITED

22   STATES, AND BEING DISTRIBUTED IN SAN DIEGO, IT IS WORTH BETWEEN

23   800,000 AND $1.6 MILLION?

24   A.   CORRECT.

25   Q.   THANK YOU, MR. KRAUSE.

1          THE COURT:  ALL RIGHT.  MR. GARRISON?

2          MR. CONOVER:  THERE IS STILL MORE, YOUR HONOR.

3          THE COURT:  I'M SORRY, I THOUGHT YOU WERE FINISHED.

4          MR. CONOVER:  WE'RE FINISHED WITH THE VALUE, BUT

5   MOVING ON TO SOME OTHER AREAS.

6   BY MR. CONOVER:

7   Q.   MR. KRAUSE, ARE YOU FAMILIAR WITH HOW METHAMPHETAMINE CAN

8   BE PACKAGED?

9   A.   PACKAGED?

10   Q.   YES.

11   A.   YES.

12   Q.   HOW ARE YOU FAMILIAR WITH THE DIFFERENT TYPES OF PACKAGING

13   OF METHAMPHETAMINE?

14   A.   PRIMARILY FROM BEING AN INSPECTOR ON THE BORDER AND SEEING

15   HOW METHAMPHETAMINE IS PACKAGED IN VEHICLES OR SECRETED IN

16   COMPARTMENTS.  SECONDARILY, FROM OPERATING AS AN AGENT AND

17   PARTICIPATING IN CONTROLLED DELIVERIES OF METHAMPHETAMINE AND

18   ALSO TALKING TO SOURCES WHO ARE SMUGGLING METHAMPHETAMINE.

19   Q.   CAN YOU DESCRIBE FOR THE JURY THE DIFFERENT TYPES OF

20   PACKAGING THAT YOU'VE SEEN IN THE PAST, THE MOST COMMON.

21   A.   THE MOST COMMON ONE WOULD BE A KILOGRAM PACKAGE, OR A

22   ONE-POUND BRICK PACKAGE.

23   Q.   WHY IS THAT?

24   A.   THE REASON FOR THAT IS BECAUSE THAT'S HOW IT'S DISTRIBUTED

25   OR SOLD.  IF IT WERE MADE IN ODD SHAPES OR WEIRD SIZES, IT IS

1   MORE DIFFICULT TO SELL WITHOUT SOMEONE WEIGHING IT.  A KILOGRAM

2   PACKAGE, OR ONE-POUND PACKAGE MAKES IT EASIER TO DISTRIBUTE

3   WITH A LARGER NETWORK.

4   Q.   IS THAT SIMILAR TO WHY YOU BUY A GALLON OF MILK OR HALF

5   GALLON?

6   A.   CORRECT, MEASURE.

7   Q.   SO WHEN PEOPLE ARE SELLING IT, THEY CAN SAY, OKAY, YOU

8   HAVE A KILO PACKAGE OR POUND PACKAGE?

9   A.   YES.

10  Q.   AND WHEN IT IS BROUGHT ACROSS THE BORDER, CAN YOU DESCRIBE

11  THE DIFFERENT PACKAGING YOU'VE SEEN.

12  A.   PACKAGING AT THE BORDER CAN BE ANYTHING FROM SOMETHING

13  SHOVED IN TUPPERWARE, TO SOMETHING CUT INTO SMALLER BRICKS,

14  JUST TO FIT IN A COMPARTMENT.  USUALLY IT HAS TO DO WITH THE

15  APPLICATION OF HOW THEY ARE SMUGGLED ACROSS DUE TO THE

16  COMPARTMENT, WHETHER IT IS A GAS TANK, OR DOOR, OR UNDERNEATH

17  THE SEAT.

18  Q.   IN THIS CASE, WERE YOU ASKED TO LOOK AT PHOTOGRAPHS OF THE

19  COMPARTMENT IN THIS CASE?

20  A.   YES.

21  Q.   AND WERE YOU ASKED TO LOOK AT PHOTOGRAPHS OF THE PACKAGES

22  OF DRUGS IN THIS CASE?

23  A.   YES.

24  Q.   WERE YOU ABLE TO REACH ANY CONCLUSIONS AS TO WHY THE

25  PACKAGES OF DRUGS, AND THE COMPARTMENT FOR THE PACKAGES OF

1    DRUGS, WHY THEY WERE MADE THE WAY THEY WERE?

2              MR. GARRISON:  OBJECTION.  CALLS FOR SPECULATION.

3              THE COURT:  SUSTAINED.

4    BY MR. CONOVER:

5    Q.   ARE YOU FAMILIAR WITH -- HOW MANY METHAMPHETAMINE LOADS

6    HAVE YOU PERSONALLY FOUND IN GAS TANKS?

7    A.   AS AN INSPECTOR AT THE PORT OF ENTRY, OVER 25.

8    Q.   AND DO THOSE LOADS CONTAIN THE EXACT SIZE PACKAGES, EACH

9    AND EVERY LOAD?

10   A.   NO.

11   Q.   ARE THE PACKAGE SIZES DIFFERENT?  WERE YOU ABLE TO DRAW

12   ANY CORRELATION BETWEEN THE PACKAGED SIZE AND SHAPE IN THOSE

13   LOADS WITH THE TYPE OF COMPARTMENT FROM WHICH YOU FOUND THOSE

14   LOADS CONTAINING THE PACKAGES?

15   A.   YES.

16   Q.   IN THIS CASE, ARE YOU ABLE TO DRAW, AS AN EXPERT WITNESS,

17   ANY CORRELATION BETWEEN THOSE PACKAGES AND THIS PARTICULAR

18   COMPARTMENT?

19   A.   YES.

20   Q.   COULD YOU PLEASE TELL THE JURY WHAT THAT CORRELATION IS.

21   A.    IN THIS CASE, THESE PACKAGES WERE MADE SPECIFICALLY FOR

22   THIS APPLICATION.  IN THIS, THEY'VE TAKEN THE METHAMPHETAMINE

23   AND CURVED IT INTO CYLINDRICAL-CURVED BRICKS SPECIFICALLY

24   BECAUSE THEY USED THE FUEL SENDING UNIT AS THE ACCESS OF THE

25   GAS TANK.  OFTENTIMES, FUEL TANK LOADS THAT ARE USED AT THE

1    BORDER, THEY'LL EITHER CUT UNDERNEATH THE FUEL TANK OR ON TOP

2    OF IT TO ACCESS OR MAKE A COMPARTMENT.  BUT BY UNSCREWING THE

3    FUEL TANK, THE FUEL SENDING UNIT, WHICH IS BASICALLY, ON MOST

4    CARS, JUST A CYLINDRICAL AREA THAT UNSCREWS AND THE FUEL PUMP

5    WILL COME OUT.  BY DOING THAT, THEY MOLDED THESE PACKAGES TO

6    STUFF THEM DOWN INTO THAT.  PUT THE FUEL SENDING UNIT BACK ON,

7    THUS HINDERING ANYBODY'S ABILITY TO DETECT A COMPARTMENT IN THE

8    FUEL TANK.

9    Q.   ALL RIGHT.  HOW LONG, FROM YOUR EXPERIENCE, DOES IT TAKE

10   TO WRAP AND PREPARE METHAMPHETAMINE IN PACKAGES LIKE THAT?

11   A.   AS I SPOKE OF BEFORE, IT IS EITHER IN A POUND OR KILO

12   QUANTITY.  WHEN IT COMES CLOSER TO THE BORDER, FOR THIS TYPE OF

13   APPLICATION, I WOULD SAY IT WOULD AT LEAST TAKE A FEW HOURS FOR

14   THIS SIZE LOAD.

15   Q.   AND IF THOSE PACKAGES WERE LONGER, WOULD THEY HAVE BEEN

16   APPROPRIATE FOR THIS TYPE OF COMPARTMENT, THIS TYPE OF GAS

17   TANK?

18   A.   NO.

19   Q.   WHY NOT?

20   A.   GAS TANKS -- IN THIS SPECIFIC CAR, IT IS MORE OF A SHALLOW

21   GAS TANK.  IF IT IS REALLY LONG, IT WOULDN'T FIT.  SO THEY HAVE

22   TO CREATE SHORTER PACKAGES SO THEY CAN PUT ONE AFTER ANOTHER.

23   Q.   WHAT IF THEY WERE IN THE TYPICAL SQUARE KILO PACKAGES IN

24   TUPPERWARE?

25   A.   THEY WOULDN'T FIT THROUGH THE FUEL SENDING UNIT, WHICH IS

1  THE FOCUS OF THIS SMUGGLING VENTURE.

2  Q.  SO, IN YOUR OPINION, THESE PACKAGES WERE DESIGNED FOR THIS

3  COMPARTMENT?

4  A.  CORRECT.

5  Q.  ALL RIGHT.

6          THE COURT:  ALL RIGHT, LADIES AND GENTLEMEN, IT'S --

7  ACCORDING TO MY WATCH, IT IS FIVE MINUTES AFTER 11:00.  WE'VE

8  GONE A LITTLE PAST WHAT I INTENDED TO BEFORE WE TOOK A BREAK.

9  BUT LET'S TAKE A 15-MINUTE RECESS.  LET'S BE BACK AT 20 MINUTES

10  AFTER 11:00.  I THEN PLAN TO GO UNTIL PROBABLY 12:30, AT WHICH

11  TIME, WE'LL TAKE A LUNCH BREAK.  AND I UNDERSTAND THAT SOME OF

12  YOU HAD A BIT OF A TIME GETTING TO THE CAFETERIA AND BACK IN 30

13  MINUTES.  SO WE'LL TAKE 45 MINUTES OFF TODAY.  SO THAT'S OUR

14  PLANNING FOR OUR SCHEDULE.

15          MR. CONOVER:  THANK YOU, YOUR HONOR.

16          THE COURT:  REMEMBER MY ADMONITION.

17      SIR, YOU MAY STEP DOWN.

18          THE WITNESS:  THANK YOU.

19          THE COURT:  COUNSEL, IF YOU WOULD REMAIN FOR A FEW

20  MINUTES.

21                  (JURY EXITS COURTROOM.)

22          THE COURT:  ALL RIGHT, THE RECORD SHOULD REFLECT THAT

23  ALL MEMBERS OF THE JURY HAVE NOW LEFT THE COURTROOM.  I THINK I

24  NEED TO SPEAK TO MR. GARRISON OUTSIDE OF THE PRESENCE OF THE

25  GOVERNMENT WITH REGARDS TO AN APPLICATION THAT I HAVE RECEIVED.

1    SO IF YOU WOULD PLEASE STEP OUTSIDE.

2            MR. CONOVER:  YES, YOUR HONOR.

3            THE COURT:  THANK YOU.

4            MR. CONOVER:  MAY WE REMAIN IN THE FOYER AREA?

5            THE COURT:  I THINK YOU CAN PROBABLY GO.

6            MR. CONOVER:  WE PROMISE NOT TO LISTEN IN.

7            THE COURT:  WELL, YOU CAN TAKE OFF AND COME BACK WHEN

8    THE BREAK IS OVER.

9            MR. CONOVER:  THANK YOU, YOUR HONOR.

10            MR. GARRISON:  YOUR HONOR, THERE WERE TWO ISSUES, OR

11    THREE ISSUES I WANTED TO ADDRESS, NOT EX PARTE.

12            THE COURT:  WELL, THEN YOU BETTER COME BACK.  ALL

13    RIGHT.  WHAT ARE THE ISSUES?  MAKE IT QUICK, BECAUSE WE HAVE TO

14    TAKE A BREAK AS WELL.

15            MR. GARRISON:  I'M SORRY.

16            THE COURT:  IT IS ALL RIGHT.

17            MR. GARRISON:  FIRST, MR. BUTLER TESTIFIED THAT HE

18    REVIEWED SOME MANUALS AND DIFFERENT PRICING GUIDES, OR SERVICE

19    GUIDES, IN FORMULATING HIS OPINIONS.  WE WOULD REQUEST THAT

20    THOSE BE PRODUCED.

21        SECOND OF ALL, EXHIBIT 29, TRIED TO HONOR THE COURT'S

22    ADMONITION TO ME, SO I WASN'T ABLE TO ARTICULATE THIS.  BUT I

23    WAS UNDER THE IMPRESSION, I WAS TOLD, THIS WAS ONLY COMING IN

24    FOR DEMONSTRATIVE PURPOSES, AND THEN IT WAS ADMITTED AS

25    SUBSTANTIVE EVIDENCE.

```
 1              THE COURT:  YEAH, I KNOW.  THESE COME IN ALL THE TIME

 2    AS DEMONSTRATIVE.  AND THERE IS A JURY INSTRUCTION THAT WILL

 3    ADDRESS THE EXHIBIT TO THE JURY.  SO --

 4              MR. GARRISON:  I GUESS MY QUESTION, YOUR HONOR, IS:

 5    DID IT COME IN AS DEMONSTRATIVE, OR DID IT COME IN AS

 6    SUBSTANTIVE?

 7              MR. CONOVER:  WE INTEND IT FOR DEMONSTRATIVE, YOUR

 8    HONOR.

 9              THE COURT:  IT IS ONLY DEMONSTRATIVE.  THE

10    SUBSTANTIVE -- THE TESTIMONY IS WHAT IS SUBSTANTIVE.  THE

11    EXHIBIT ITSELF IS ONLY DEMONSTRATIVE.

12              MR. GARRISON:  AND LASTLY, YOUR HONOR, I HAD NO

13    KNOWLEDGE BEFORE AGENT BULLARD TESTIFIED THAT THEY TRIED TO USE

14    THAT GARAGE DOOR OPENER ON MR. FLORES'S GARAGE.  BUT THAT WAS

15    AN ATTEMPT TO SEARCH.  AND THE TESTIMONY THAT IT DIDN'T OPEN

16    ANY OF THE GARAGE DOORS IS THE FRUIT OF THAT SEARCH.  AND THERE

17    WAS NO WARRANT, YOUR HONOR.  AND THERE IS NO EXCEPTION TO THE

18    WARRANT RULE, AND THAT'S WHY I ASKED FOR THAT TESTIMONY TO BE

19    STRICKEN.

20              THE COURT:  ALL RIGHT.

21              MR. CONOVER:  YOUR HONOR, WE DO NOT BELIEVE IT WAS AN

22    ATTEMPT TO SEARCH AT ALL.  PRESSING A GARAGE DOOR OPENER THAT

23    THE AGENTS BELIEVED DID NOT OPEN THE GARAGE TO VERIFY THAT IT

24    DID NOT IS NOT AN ATTEMPT TO SEARCH.  THEY WERE OUTSIDE, AWAY

25    FROM THE HOME, THEY DID NOT ENTER THE HOME.  THE GARAGE DOOR
```

1   DID NOT OPEN.  THE GOVERNMENT'S BELIEF IS THAT GARAGE DOOR

2   OPENER IS TO SOMETHING OTHER THAN THAT GARAGE, AND THEY

3   VERIFIED IT.  THAT'S ALL, YOUR HONOR.

4           THE COURT:  IT'S INTERESTING.  I CAN'T SAY THAT I'VE

5   EVER RUN INTO THIS ISSUE BEFORE, SO I DON'T KNOW THAT REALLY

6   CONSTITUTES A SEARCH OR NOT.  I MEAN -- AND I DON'T HAVE ANY

7   AUTHORITY TO RELY ON EITHER WAY.  I HAVE A COUPLE CASES IN

8   MIND, THAT SORT OF ARE -- REACH DIFFERENT CONCLUSIONS.  ONE OF

9   WHICH IS, YOU KNOW, THE CASE DEALING WITH THE THERMO IMAGING.

10  I CAN'T REMEMBER THE NAME OF THE CASE; WHEREIN, THE UNITED

11  STATES SUPREME COURT, I BELIEVE, FOUND THAT THAT WAS, IN FACT,

12  A SEARCH WITHOUT A WARRANT.

13      ON THE OTHER HAND, WE HAVE THE RECENT CASE WHERE THE

14  DEVICE WAS PLACED UNDER A VEHICLE, THAT WAS PARKED IN A

15  DRIVEWAY, AND THE NINTH CIRCUIT FOUND THAT IT WAS NOT A SEARCH.

16  SO THOSE TWO CASES KIND OF CONFLICT.  BUT I DON'T KNOW IF THERE

17  ARE ANY OTHER CASES ON POINT.

18          MR. CONOVER:  THE KEY TO THIS, YOUR HONOR, IS THAT

19  THE -- THEY NOT ONLY DID NOT INTEND TO SEARCH, THEY DID NOT

20  SEARCH.  GOING TO A RESIDENCE, IF THEY WOULD HAVE WENT DOWN THE

21  BLOCK AND PRESSED IT, AT ANYONE ELSE'S HOUSE, DID THEY INTEND

22  TO SEARCH ALL OF THOSE HOMES?

23          THE COURT:  I DON'T KNOW.  I DON'T KNOW.

24      BUT HERE IS AN ADDITIONAL PROBLEM, MR. GARRISON, FIRST OF

25  ALL, I NOTED THAT WHEN THE QUESTION WAS ASKED, AND THE ANSWER

WAS GIVEN, THERE WAS NO OBJECTION AT THE TIME.  SO I SUSPECT

ANY OBJECTION HAS BEEN WAIVED.  BUT I'M NOT SURE IF THIS IS A

SEARCH.  I GUESS IF, FOR EXAMPLE, THEY HAD A KEY TO UNLOCK AND

THEY CAME TO THE LOCK AND THEY INSERTED THE KEY, OR ATTEMPTED

TO INSERT THE KEY, BUT THE KEY DIDN'T GO IN, WOULD THAT

CONSTITUTE A SEARCH?  I DON'T KNOW.  YOU KNOW, I'LL TAKE A FEW

MINUTES AND LOOK AT IT DURING THE RECESS.

     BUT I'VE MADE MY RULINGS.  AND UNLESS I CAN BE PERSUADED

OTHERWISE, I'M NOT GOING TO CHANGE IT.  YOU KNOW, I HAD TO DO

WHAT I COULD AT THE MOMENT.  AND SO THAT'S ALL THERE IS TO IT.

     NOW, WITH THAT, LET'S SEE, WAS THERE ANYTHING ELSE WE

NEEDED TO ADDRESS WHILE MR. CONOVER IS PRESENT?

          MR. GARRISON:  JUST MY REQUEST FOR THE MATERIALS THAT

MR. BUTLER RELIED ON, AND THEN THE GOVERNMENT ALSO HAS TO

PROVIDE ME AGENT BULLARD'S NOTES.

          THE COURT:  YES, THE NOTES.

          MR. CONOVER:  WE'LL PROVIDE AGENT BULLARD'S NOTES.

WE'LL GET THOSE AS QUICKLY AS POSSIBLE.  AND WITH REGARDS TO

WHAT HE RELIED UPON, HE RELIED ON HIS KNOWLEDGE AND EXPERIENCE.

I BELIEVE HE REVIEWS, AS PART OF HIS JOB, THE LABOR GUIDE.

IT'S A LABOR GUIDE TO DETERMINE HOW MUCH HE CHARGES CUSTOMERS

EVERY DAY.

          THE COURT:  IS THAT WHAT YOU WERE TALKING ABOUT?

          MR. GARRISON:  YES, YOUR HONOR.  THE LABOR GUIDE AND

HE TESTIFIED HE REVIEWED THE VW MANUAL, SERVICE MANUAL.

1          THE COURT:  OKAY.

2          MR. CONOVER:  THINGS THAT ARE ALL AVAILABLE TO THE

3    DEFENSE, THAT ARE NOT MAYBE SPECIFIC TO THIS WITNESS.  THIS IS

4    A SERVICE MANUAL FOR THE DEFENDANT'S CAR.  SO --

5          THE COURT:  YOU'RE TALKING ABOUT THE SERVICE MANUAL

6    THAT WAS THE OWNER'S MANUAL?  IS THAT WHAT YOU'RE TALKING

7    ABOUT?

8          MR. CONOVER:  YES, THE OWNER'S MANUAL.

9          MR. GARRISON:  NO.

10         MR. CONOVER:  MAYBE IT'S THE SERVICE MANUAL.  I'M NOT

11   SURE TO BE HONEST.

12         THE COURT:  ALL RIGHT.  WELL, IT SOUNDS TO ME LIKE

13   MAYBE WHAT HE'S TALKING ABOUT IS THE -- OH, GOSH, WHAT IS THE

14   NAME OF THAT MANUAL THAT THEY USE TO ESTIMATE THE --

15         MR. CONOVER:  THE LABOR GUIDE.

16         THE COURT:  IS THAT WHAT IT'S CALLED?

17         MR. CONOVER:  YES.

18         THE COURT:  AND THAT'S A PRETTY STANDARDIZED DOCUMENT

19   THAT IS AVAILABLE TO ANYONE.  AND I THINK HE CAN TESTIFY TO IT,

20   TO THE INFORMATION IN IT.

21      DID WE EXCUSE MR. BUTLER?

22         MR. CONOVER:  HE IS HERE, YOUR HONOR.

23         THE COURT:  DO YOU KNOW IF HE HAPPENS TO HAVE THAT

24   GUIDE WITH HIM?

25         MR. CONOVER:  I DON'T BELIEVE HE BROUGHT IT WITH HIM.

1        THE COURT:  HERE IS THE PROBLEM, WE HAVE A JURY THAT

2   IS SITTING HERE WAITING, AND WE'RE IN TRIAL.  AND I DON'T KNOW

3   IF MR. BUTLER CAN GET US THAT GUIDE.

4        I'LL TELL YOU WHAT, I'M GOING TO ISSUE AN ORDER THAT

5   MR. BUTLER CAN GET THAT GUIDE TO US BY 1:00, IF HE HAS IT.

6   THEN HE'LL HAVE TO PRODUCE IT.  OTHERWISE, THE DEFENSE -- YOU

7   CAN PICK UP THE PHONE AND CALL ANY, YOU KNOW, ANY AUTO REPAIR

8   SHOP, AND THEY'LL HAVE THAT MANUAL.  I'M NOT SURE WHAT USE THAT

9   WOULD BE AT THIS POINT IN TIME, ANYWAY, SINCE MR. BUTLER IS OFF

10  THE WITNESS STAND.

11       ALL RIGHT, I NEED TO GO.  MY STAFF NEEDS A BREAK, AND WHY

12  DON'T YOU FOLKS LEAVE, AND WE'LL ADDRESS SOMETHING WITH

13  MR. GARRISON.

14       (EX PARTE HEARING, OUTSIDE PRESENCE OF GOVERNMENT COUNSEL.)

15       THE COURT:  ALL RIGHT.  MR. GARRISON, I HAVE AN EX

16  PARTE APPLICATION FOR AN ORDER FOR PERMITTING ISSUANCE OF A

17  SUBPOENA UNDER RULE 17(B) AND (C).  NOW AS BEST AS I CAN TELL,

18  WHAT I HAVE IS ONE SUBPOENA FOR JENNIFER JIMENEZ; IS THAT

19  CORRECT?

20       MR. GARRISON:  YES, YOUR HONOR.

21       THE COURT:  I JUST WANTED TO MAKE SURE THAT THAT WAS

22  THE ONLY ONE I HAD.  NOW I LOOKED AT THE STATEMENT OF FACTS

23  THAT WERE SUBMITTED IN CONNECTION WITH THE APPLICATION, AND,

24  FRANKLY, I FAILED TO SEE THE RELEVANCE.  IF THIS WERE A MOTION

25  TO SUPPRESS, THIS WOULD, PERHAPS, MAKE SENSE.  BUT THIS IS NOT

1    A MOTION TO SUPPRESS.

2         SO MAYBE YOU CAN HELP ME.  MAYBE YOU CAN TELL ME WHAT THE

3    RELEVANCE OF MS. JIMENEZ'S TESTIMONY IS AND WHY I SHOULD ISSUE

4    THIS SUBPOENA.

5            MR. GARRISON:  WELL, YOUR HONOR, FIRST OF ALL, WITH

6    REGARDS -- IT'S -- SINCE WE'RE EX PARTE, I CAN SAY THIS.  WHAT

7    IT IS IS, PART OF THE DEFENSE'S THEORY OF THE CASE IS THAT THE

8    EVIDENCE AT THE BORDER IS SO WEAK, THAT THERE WAS GOVERNMENT

9    OVERREACHING IN THE INVESTIGATION.

10        MS. JIMENEZ WAS ON THE OTHER SIDE OF THAT GOVERNMENT

11   OVERREACHING.  WE WOULD LIKE TO BRING MS. JIMENEZ TO TESTIFY AS

12   TO WHAT HAPPENED WHEN THE AGENTS CAME TO INVESTIGATE AT HER

13   SON'S HOUSE -- I'M SORRY, AT HER BOYFRIEND'S HOUSE, WHICH IS

14   MR. FLORES'S SON.

15        ADDITIONALLY, MS. JIMENEZ WILL PROVIDE CONTRADICTORY

16   TESTIMONY TO SPECIAL AGENT BULLARD, WHEN AGENT BULLARD

17   TESTIFIED THAT THEY DID NOT SEARCH THE HOUSE, SHE WILL, IN

18   FACT, TESTIFY THAT THEY DID SEARCH THE HOUSE.

19            THE COURT:  OKAY.  WELL, I'M GOING TO TELL YOU THAT I

20   THINK THAT TESTIMONY PROBABLY IS RELEVANT.  BECAUSE IT GOES TO

21   IMPEACH AGENT BULLARD'S TESTIMONY.  I THINK THE OTHER

22   TESTIMONY, HOWEVER, I'M GOING TO TELL YOU UP FRONT, I THINK IS

23   PROBABLY IRRELEVANT.  YOU KNOW, THE TESTIMONY SUPPOSEDLY THAT

24   SHE WAS WEARING PAJAMA BOTTOMS AND TANK TOP AND NO BRASSIERE,

25   ETC., ETC., THAT BASICALLY HAS ABSOLUTELY NO RELEVANCE.  IT

1    DOESN'T TEND TO, YOU KNOW, PROVE OR DISAPPROVE ANYTHING.

2        SO I'M GOING TO GO AHEAD AND SIGN THE SUBPOENA.  BUT I'M

3    GOING TO TELL YOU -- I MEAN, UNLESS THERE IS NO OBJECTION FROM

4    THE GOVERNMENT, IF THE GOVERNMENT DOESN'T OBJECT, THEN IT WILL

5    COME IN.  BUT I SEE NO REASON FOR US TO GET INTO ALL THAT OTHER

6    STUFF.  IT DOESN'T PROVE ANY MATERIAL ISSUE IN THE CASE AS FAR

7    AS I'M CONCERNED.  OKAY.  SO I'M SIGNING THIS SUBPOENA.  AND

8    WHAT IS TODAY, 24TH?

9              THE CLERK:  YEAH.

10             THE COURT:  ALL RIGHT.  SO THERE IT IS.  GOT IT.

11   THANK YOU.  WE'RE IN RECESS.  SORRY.

12                      (RECESS TAKEN.)

13             THE COURT:  ALL RIGHT.  GO AHEAD.

14             MR. CONOVER:  THANK YOU, YOUR HONOR.

15   BY MR. CONOVER:

16   Q.  MR. KRAUSE, ARE YOU FAMILIAR WITH A SYSTEM BY THE NAME OF

17   "TREASURY ENFORCEMENT COMMUNICATION SYSTEM"?

18   A.  YES.

19   Q.  HOW ARE YOU FAMILIAR WITH THAT SYSTEM?  IS IT REFERRED TO

20   AS "TECS"?

21   A.  IT IS, FOR THE TECS DATABASE.

22   Q.  HOW ARE YOU FAMILIAR WITH THE TECS DATABASE?

23   A.  THE TECS DATABASE IS THE PRIMARY CASE MANAGEMENT SYSTEM

24   FOR ALL HOMELAND SECURITY INVESTIGATION SPECIAL AGENTS, AS WELL

25   AS CUSTOMS AND BORDER PROTECTION OFFICERS.  INITIALLY, I BECAME

1   ACQUAINTED WITH IT IN 1985, AS THE MAIN FRAME COMPUTER FOR LAW

2   ENFORCEMENT FOR CUSTOMS OFFICERS IN THE BORDER.  IN 2002, AS A

3   CUSTOMS SPECIAL AGENT, I TRAINED ON THE TECS DATABASE TO BECOME

4   A CUSTOMS SPECIAL AGENT IN BOTH OF THOSE AREAS, TRAINED

5   INITIALLY ON IT.  BUT REALISTICALLY, THE BEST TRAINING FOR IT

6   WAS UTILIZING THE SYSTEM ON A DAY-TO-DAY BASIS FOR THE LAST 15

7   YEARS.

8   Q.   SO YOU'VE RECEIVED TRAINING IN THE TECS SYSTEM?

9   A.   CORRECT.

10   Q.   AND YOU'VE USED THE SYSTEM FOR THE LAST 15 YEARS?

11   A.   YES.

12   Q.   WHAT IS THE PURPOSE OF THE TECS SYSTEM?

13   A.   THE TECS DATABASE IS A LAW ENFORCEMENT TOOL FOR CUSTOMS

14   OFFICERS AND HOMELAND SECURITY AGENTS.  ONE OF THE THINGS IT

15   CAN DO, SPECIFICALLY RELATED TO THIS TRIAL, IT CAN KEEP TRACK

16   OF PEOPLE THAT ENTER AND DEPART THE COUNTRY, AS WELL AS

17   VEHICLES.

18   Q.   IS THE TECS SYSTEM SPECIFIC TO JUST SAN DIEGO?

19   A.   NO.

20   Q.   WHERE IS IT USED?

21   A.   IT IS USED AT ALL THE PORTS OF ENTRY IN THE UNITED STATES,

22   AND ALSO IN SOME FOREIGN OFFICES ABROAD.

23   Q.   WHAT INFORMATION DOES THE TECS SYSTEM CONTAIN REGARDING

24   THE SAN YSIDRO AND OTAY MESA, AND GENERAL LAND PORTS OF ENTRY?

25   A.   IN REGARDS TO THOSE PORTS OF ENTRY, IT RECORDS TWO TYPES

1  OF INFORMATION:  ONE IS ON VEHICLES THAT ENTER THE UNITED

2  STATES; THE OTHER IS ON PERSONS THAT ENTER THE UNITED STATES.

3  Q.  WHAT INFORMATION DOES THE TECS SYSTEM CONTAIN WHEN A

4  VEHICLE ENTERS THE UNITED STATES?

5  A.  AS A VEHICLE ENTERS THE UNITED STATES, AT SAN YSIDRO, OTAY

6  MESA PORT OF ENTRY, THERE IS WHAT WE OFTEN SEE AS RED LIGHT

7  CAMERAS, AUTOMATED LICENSE PLATE READERS, SET UP.  A CAR COMES

8  INTO A CERTAIN FRAME RIGHT BEFORE IT COMES TO THE BOOTH WITHIN

9  THE UNITED STATES.  A PICTURE IS TAKEN OF THE FRONT AND THE

10  BACK OF THE LICENSE PLATES.  THAT DATA IS THEN FED INTO THE

11  TECS DATABASE, AND A LICENSE PLATE IS PUSHED THROUGH THE

12  DATABASE AND AVAILABLE FOR THE CUSTOMS OFFICER AT THE BOOTH TO

13  REVIEW.  FROM THAT POINT, AS FAR AS THE CAR PLATE IS CONCERNED,

14  THE CUSTOMS OFFICERS IS ALLOWED TO AMEND THAT PLATE IF IT IS

15  INCORRECTLY READ BY THE SYSTEM.

16  Q.  SO WHO IS RESPONSIBLE WHEN SOMEONE COMES INTO THE UNITED

17  STATES TO VERIFY THAT THE PHOTOGRAPH, AND THE SOFTWARE THAT

18  RECOGNIZES THE NUMBERS AND LETTERS ON THE LICENSE PLATE IS

19  ACCURATELY INPUTTED INTO THE TECS SYSTEM?

20  A.  IT IS DONE BY THE OFFICER AT THE BOOTH AT THE TIME IT IS

21  HAPPENING.

22  Q.  OKAY.  I'D LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

23  GOVERNMENT'S EXHIBIT 1 FOR IDENTIFICATION.

24       (GOVERNMENT'S EXHIBIT 1 MARKED FOR IDENTIFICATION.)

25  BY MR. CONOVER:

1    Q.   DO YOU RECOGNIZE THIS?

2    A.   YES.

3    Q.   WHAT IS THIS A PHOTOGRAPH OF?

4    A.   IT IS AN OVERHEAD PICTURE OF THE SAN YSIDRO PORT OF ENTRY.

5    Q.   DOES THIS ACCURATELY DEPICT THE SAN YSIDRO PORT OF ENTRY

6    APPROXIMATELY AT THE TIME OF 2009?

7    A.   IT DOES.

8            MR. CONOVER:  YOUR HONOR, MOVE TO ADMIT AND TO

9    PUBLISH.

10           THE COURT:  IS THAT NOT ALREADY IN EVIDENCE?

11           MR. CONOVER:  NOT YET, YOUR HONOR.

12           THE COURT:  ANY OBJECTION?

13           MR. GARRISON:  RELEVANCE.

14           THE COURT:  I'M NOT SURE, WHAT IS THE RELEVANCE,

15   COUNSEL?

16           MR. CONOVER:  THE RELEVANCE IS THAT THIS PORT OF

17   ENTRY, AND THE OTAY MESA PORT OF ENTRY, WERE BOTH USED BY THE

18   DEFENDANT TO CROSS INTO THE UNITED STATES.  AND IT SHOWS TANDEM

19   CROSSING IN THE PEDESTRIAN LANES.

20           THE COURT:  ALL RIGHT.  OVERRULED.

21           (GOVERNMENT'S EXHIBIT 1 RECEIVED INTO EVIDENCE.)

22   BY MR. CONOVER:

23   Q.   MR. KRAUSE, IF YOU COULD JUST STEP DOWN REAL BRIEFLY.

24   I'LL PUT THIS UP ON THE EASEL.

25   A.   (WITNESS COMPLIES.)

1    Q.   WHEN SOMEONE COMES INTO THE UNITED STATES, AT THE SAN

2    YSIDRO PORT OF ENTRY, COULD YOU EXPLAIN WHERE IT IS THAT THE

3    VEHICLE LANES ARE, COMPARED TO WHERE THE PEDESTRIAN LANES ARE.

4    A.   CLEARLY, OBVIOUSLY, THE VEHICLE LANES, THESE ARE THE LANES

5    COMING INTO THE COUNTRY FROM MEXICO.  THE VERY TOP OF THE

6    PICTURE, THIS IS AN AREA WHERE PEOPLE COME OUT OR WALK ACROSS

7    THE PEDESTRIAN LANES HERE.  THESE ARE THE OUTBOUND LANES

8    DEPARTING THE UNITED STATES AND GOING INTO MEXICO.

9    Q.   SO THE PEDESTRIAN LANE IS WHERE, RIGHT --

10   A.   PEDESTRIAN, YOU GET OUT OR WALK ACROSS, IN THIS AREA RIGHT

11   HERE -- THE AREA AT THE TOP OF THE PHOTOGRAPH, WALK THROUGH THE

12   PORT OF ENTRY, AND EXIT -- ACTUALLY COME OUT SAN YSIDRO

13   BOULEVARD OUT HERE.

14   Q.   AND CAN SOMEONE WALKING IN THE PEDESTRIAN LANE, SEE THE

15   VEHICLE LANES?

16   A.   YES.

17   Q.   IS THAT THE SAME AT THE OTAY MESA PORT OF ENTRY?  I'M

18   SHOWING YOU NOW GOVERNMENT'S EXHIBIT NO. 3 WHICH HAS ALREADY

19   BEEN ADMITTED.

20   A.   YES.

21   Q.   COULD YOU SHOW THE JURY HERE WHERE THE VEHICLE AND

22   PEDESTRIAN LANES ARE.

23   A.   HERE ARE THE PRIMARY LANES HERE, THE VEHICLES WAITING TO

24   ENTER THE UNITED STATES, THE VEHICLES DEPARTING TO MEXICO, AND

25   ON THE SIDE, IN THE PORT HERE, ARE PEOPLE WALKING BY THE FLAG

1   POLES, AND WALK THROUGH THE PORT OF ENTRY HERE, AND EXIT

2   (INDICATING).

3   Q.   AND IF INDIVIDUALS WANTED TO DRIVE TO WHERE THE TRAFFIC

4   BEGINS AT THE PORT OF ENTRY, AND THEN ONE OF THE INDIVIDUALS

5   GET OUT, AND WALK IN THE PEDESTRIAN LANE, WOULD THEY BE ABLE

6   TO, THEN, MEET UP AFTERWARDS ONCE THEY BOTH ENTERED THE UNITED

7   STATES?

8   A.   YES.  WHAT IS IMPORTANT TO REMEMBER HERE IS THAT THE

9   UNITED STATES, IN BOTH OF THESE PICTURES, IS DEPICTED -- IT

10  STARTS HERE, NOT THE BOOTHS.  SO THIS IS UNITED STATES

11  TERRITORY HERE.  AND OFTENTIMES WHEN YOU CROSS THE BORDER,

12  YOU'LL SEE U.S. AGENTS CONDUCTING PREPRIMARY OPERATIONS.  AND

13  IT OFFERS A GOOD VIEW OF THE TRAFFIC FOR PEOPLE WALKING ACROSS.

14  Q.   GOOD FOR PEOPLE WALKING ACROSS TO HAVE A GOOD VIEW OF THE

15  TRAFFIC?

16  A.   YES.

17  Q.   SO IF YOU WERE IN THE PEDESTRIAN LANES, YOU CAN SEE THE

18  OTHER VEHICLES AND WHERE THE ROVING OPERATIONS WITH THE CANINE

19  ENFORCEMENT DOGS WERE OCCURRING?

20          MR. GARRISON:  OBJECTION.  LEADING.

21          THE COURT:  SUSTAINED.

22  BY MR. CONOVER:

23  Q.   COULD YOU DESCRIBE WHAT YOU'D BE ABLE TO SEE FROM THE

24  PEDESTRIAN LANES.

25  A.   FROM THE PEDESTRIAN LANES, AS YOU WALKED ACROSS, YOU COULD

1    SEE THE BREATH OF THE TRAFFIC, CERTAINLY IF IT IS MOVING FASTER

2    OR SLOWER, THE VEHICLE LANES THAT MOVE FASTER OR SLOWER AT THE

3    LANES CLOSED DOWN.  SOMETIMES WHEN AN OFFICER ESCORTS VEHICLE

4    TO SECONDARY, THE LANE IS CLOSED.  AND WHEN THAT HAPPENS, IF

5    SOMEONE WERE STANDING ALONGSIDE OF PEDESTRIAN, THEY COULD

6    IDENTIFY THAT THAT LANE IS CLOSED AND TRAFFIC IS STOPPED.  SO

7    THE VIEW THAT WOULD PROVIDE -- SITTING IN EITHER ONE OF THE

8    PEDESTRIAN AREAS, WOULD BE OF THE TRAFFIC FLOWS, THE LANE WOULD

9    MOVE FASTER AND SLOWER, AS WELL AS ENFORCEMENT TEAMS IN THE

10   PRE-PRIMARY, U.S. AREAS.

11   Q.   FROM THOSE MAPS, CAN YOU SHOW WHERE SOMEONE WOULD EXIT THE

12   PEDESTRIAN LANES AND THEN BE PICKED UP BY SOMEONE FROM THE

13   VEHICLE LANES?

14   A.   CERTAINLY.  SAN YSIDRO -- THE SAN YSIDRO BOULEVARD

15   ACTUALLY DEAD ENDS AT THE PORT.  AND THE PORT, AFTER THEY CROSS

16   THE PEDESTRIAN HERE, THEY CAN WALK UP ON THE TROLLEY STATION,

17   IF YOU GET PICKED UP ALONG THIS AREA.  AND OTAY MESA WOULD BE

18   THE SIMILAR FASHION.  THE PORT, YOU WOULD WALK ACROSS HERE AND

19   EXIT ALONGSIDE EXIT HERE TO BE PICKED UP HERE (INDICATING).

20   Q.   THANK YOU.  YOU CAN RETURN BACK TO YOUR SEAT.  THANK YOU,

21   MR. KRAUSE.

22        ONCE INFORMATION IS ADMITTED INTO THE TECS DATABASE, HOW

23   LONG IS IT STORED FOR?

24   A.   IT'S STORED PERMANENTLY.

25   Q.   AND WHO MAINTAINS THE TECS DATABASE?

1   A.   THE DEPARTMENT OF HOMELAND SECURITY.

2   Q.   AND ARE THEY UNDER A DUTY TO MAINTAIN IT ACCURATELY?

3   A.   YES.

4   Q.   AND ARE INDIVIDUALS THAT ENTER THAT INPUT INTO THE

5   DATABASE, ARE THEY TRAINED ON HOW TO ENTER THAT INPUT?

6   A.   THEY ARE.

7   Q.   AND ARE THEY UNDER A DUTY TO INPUT THE DATA ACCURATELY?

8   A.   YES.

9   Q.   AND CAN YOU RUN QUERIES OF THIS DATA?

10   A.   YOU CAN.

11   Q.   WHAT ARE THE TYPES OF QUERIES YOU CAN RUN?

12   A.   SPECIFIC TO THIS CASE, ONE THING YOU CAN RUN WOULD BE

13   VEHICLE CROSSINGS.  IN OTHER WORDS, IF I HAD THE VEHICLE PLATE,

14   YOU COULD RUN A CROSSING HISTORY TO SHOW HOW OFTEN THE VEHICLE

15   CROSSED, WHERE IT CROSSED, THE TIME OF DAY.  AND WITH REGARDS

16   TO PEOPLE, YOU COULD FIND THE SAME INFORMATION IF THEY WALKED

17   ACROSS, WHERE THEY CROSSED THE PORT OF ENTRY, TIME OF DAY, IF

18   THEY WERE INSPECTED OR NOT.

19   Q.   AND HOW MANY QUERIES HAVE YOU RUN OVER THE COURSE OF YOUR

20   CAREER?

21   A.   TENS OF THOUSANDS.

22   Q.   ALL RIGHT.  AND SO IN RUNNING THOSE QUERIES, YOU CAN

23   DETERMINE EVERY TIME AN INDIVIDUAL HAS ENTERED THE UNITED

24   STATES?

25   A.   YES.

1  Q.   YOU CAN DETERMINE EVERY TIME A CERTAIN VEHICLE ENTERED THE

2  UNITED STATES?

3  A.   CORRECT.

4  Q.   YOU CAN DETERMINE THE LANE THEY CAME THROUGH?

5  A.   YES.

6  Q.   AND THE PORT OF ENTRY THEY CAME THROUGH?

7  A.   CERTAINLY.

8  Q.   WHETHER THEY WERE IN A VEHICLE LANE?

9  A.   YES.

10          MR. GARRISON:  OBJECTION.  LEADING.

11          THE COURT:  OVERRULED.

12  BY MR. CONOVER:

13  Q.   YOU CAN DETERMINE IF THEY WERE IN THE PEDESTRIAN LANE?

14  A.   YES.

15  Q.   CAN YOU DETERMINE THE DATES THEY ENTERED?

16  A.   YES.

17  Q.   THE TIME OF DAY?

18  A.   CERTAINLY.

19  Q.   AND THE OFFICER THAT INSPECTED THEM?

20  A.   YES.

21  Q.   ARE INDIVIDUALS REQUIRED TO BE INSPECTED BOTH IN THE

22  VEHICLE LANES, AND THE PRIMARY -- THE PEDESTRIAN LANES?

23  A.   YES.

24  Q.   IS IT THE SAME ENTRY DOCUMENTS THAT ARE REQUIRED TO ENTER

25  THE UNITED STATES IN BOTH VEHICLE AND PEDESTRIAN?

1    A.   THEY ARE.

2         MR. GARRISON:  OBJECTION.  LEADING.

3         THE COURT:  OVERRULED.  NO, NO.

4    BY MR. CONOVER:

5    Q.   MR. KRAUSE, IS IT THE SAME DOCUMENTS THAT ARE REQUIRED TO

6    ENTER THE UNITED STATES BOTH IN THE VEHICLE LANES AND IN THE

7    PEDESTRIAN LANES?

8    A.   YES.

9    Q.   OKAY.  WERE YOU ASKED BY MY OFFICE TO RUN QUERIES IN THIS

10   CASE OF THE TECS DATABASE?

11   A.   I WAS.

12   Q.   I AM SHOWING YOU NOW WHAT HAS BEEN MARKED AS GOVERNMENT'S

13   EXHIBIT 32.

14         (GOVERNMENT'S EXHIBIT 32 MARKED FOR IDENTIFICATION.)

15   BY MR. CONOVER:

16   Q.   DO YOU RECOGNIZE THESE DOCUMENTS?

17   A.   YES.

18   Q.   HOW DO YOU RECOGNIZE THOSE DOCUMENTS?

19   A.   THESE ARE A SERIES OF QUERIES I CONDUCTED FOR THE UNITED

20   STATES ATTORNEY'S OFFICE.

21   Q.   AND ARE THOSE PRINTOUTS OF A COMPUTER QUERY?

22   A.   THEY ARE.  THEY'RE PRINTOUTS OF A COMPUTER QUERY FROM THE

23   TECS DATABASE REGARDING VEHICLE LANE CROSSINGS, AS WELL AS

24   PEOPLE.

25   Q.   COULD YOU DESCRIBE THE QUERIES THAT YOU RAN IN ORDER TO

1   GET THOSE PRINTOUTS FROM THE TECS DATABASE.

2   A.   YES.   INITIALLY, I RAN THE VEHICLE THAT WAS USED IN THIS

3   INSTANCE.   I RAN THE CROSSING DATA FOR THE LAST, APPROXIMATELY,

4   19 MONTHS.

5   Q.   WHICH VEHICLE WAS THAT?

6   A.   IT WAS A VOLKSWAGEN BUG.   THE LICENSE PLATE WAS 5, FOX

7   TROT, OR FFB612.

8   Q.   SO YOU RAN A QUERY FOR THE LICENSE PLATE OF THE VOLKSWAGEN

9   BEETLE?

10   A.   CORRECT.

11   Q.   WHAT OTHER QUERIES DID YOU RUN?

12   A.   I ALSO RAN TWO OTHER QUERIES.   I RAN ONE QUERY INITIALLY,

13   FOR THE SUBJECT THAT WAS ARRESTED, MR. FLORES, AND UTILIZING

14   HIS INFORMATION, HIS NAME, HIS DATE OF BIRTH.   I ALSO RAN THAT

15   FOR THE PRIOR YEAR AND A HALF OR SO.

16   Q.   SO YOU USED BOTH HIS NAME, GILBERT FLORES?

17   A.   YES.

18   Q.   WHICH IS A COMMON NAME, RIGHT?

19   A.   IT IS A COMMON NAME.

20   Q.   WHAT ELSE DID YOU USE TO VERIFY THAT IT WAS, IN FACT, THE

21   DEFENDANT'S CROSSINGS THAT YOU WOULD BE GETTING IN THIS QUERY?

22   A.   IN ADDITION TO THE NAME AND DATE OF BIRTH, I ALSO USED THE

23   DOCUMENT NUMBER THAT MR. FLORES USED TO CROSS, WHICH IS

24   SPECIFIC TO EACH INDIVIDUAL.   NO TWO DOCUMENTS ARE THE SAME

25   EXACT NUMBER ISSUED TO ANYONE IN THE UNITED STATES.

1   Q.   SO YOU USED THE NAME, DATE OF BIRTH, AND DOCUMENT NUMBER?

2   A.   CORRECT.

3   Q.   AND YOU QUERIED HIS CROSSINGS?

4   A.   CORRECT.

5   Q.   AND THE CROSSINGS OF THE BEETLE?

6   A.   YES.

7   Q.   AND DID YOU DO ANY OTHER QUERIES?

8   A.   YES.

9   Q.   WHAT WAS -- WHAT WERE THOSE?

10  A.   THE CANVASING QUERY, WHICH WAS TO ATTEMPT TO IDENTIFY OR

11  ASCERTAIN IF ANYONE ELSE WAS CROSSING WITH THE VEHICLE AND WITH

12  MR. FLORES AT THE SAME TIME, AT THE SAME PORTS OF ENTRY, IN THE

13  SAME PATTERN.

14  Q.   APPROXIMATELY, HOW MANY DOCUMENTS OR ENTRIES WERE YOU

15  QUERYING AT THAT TIME WHEN YOU ENTERED THIS INFORMATION?

16  A.   THAT WOULD BE -- SAN YSIDRO IS THE BUSIEST LAND BORDER IN

17  THE WORLD, AND OTAY MESA IS ALSO VERY BUSY.  SO A CONSERVATIVE

18  ESTIMATE WOULD BE OVER 10 MILLION RECORDS.

19  Q.   SO YOU'RE QUERYING OVER 10 MILLION RECORDS FOR ABOUT A

20  19-MONTH PERIOD?

21  A.   YES.

22  Q.   WHY DID YOU CHOOSE 19 MONTHS?

23  A.   EIGHTEEN OR NINETEEN MONTHS.  I PICK A RANGE, USUALLY A

24  YEAR TO YEAR AND A HALF IS WHAT I PICK UNLESS I'M ASKED TO DO

25  SOMETHING FURTHER.

1   Q.   AND THEN YOU QUERIED ALL OF THOSE RECORDS, MILLIONS OF

2   RECORDS, TO DETERMINE WHETHER OR NOT THERE WAS ANY PATTERNS OF

3   ANYONE ELSE CROSSING AT THE SAME TIME AND THE LOCATION?

4   A.   CORRECT.

5   Q.   AS THE DEFENDANT?

6   A.   YES.

7   Q.   AND THE DEFENDANT'S VEHICLE?

8   A.   YES.

9   Q.   WHAT DID YOU FIND?

10  A.   I FOUND OUT OF ALL THOSE QUERIES, THAT THERE WAS ONLY ONE

11  PERSON THAT CROSSED WITH ANY REGULARITY WITH THE DEFENDANT,

12  SAME PORT OF ENTRY, RIGHT AROUND THE SAME TIME OF DAY, AND

13  ABOUT 80 OR 85 PERCENT OF THE TIME WITH MR. FLORES AND HIS

14  VEHICLE.

15  Q.   AND DID THAT PERSON CROSS IN THE SAME VEHICLE WITH

16  MR. FLORES?

17  A.   NO.

18  Q.   NEVER?

19  A.   NO.

20  Q.   SO HE WOULD CROSS AT THE SAME TIME, AT THE SAME PORT OF

21  ENTRY, BUT NOT IN THE SAME VEHICLE?

22  A.   NO.

23  Q.   WHO WAS THAT PERSON?

24  A.   THAT PERSON'S NAME WAS DAVID GUTIERREZ PEREZ.

25  Q.   DAVID GUTIERREZ PEREZ?

1    A.  YES.

2    Q.  AND FROM YOUR QUERIES, THOSE PRINTOUTS -- I'M SORRY,

3    PRINTOUTS THAT YOU RECEIVED FROM THAT QUERY ARE CONTAINED THERE

4    AS WELL; IS THAT CORRECT?

5    A.  THAT'S CORRECT.

6    Q.  SO THOSE PRINTOUTS CONTAIN BOTH THE CROSSINGS FOR THE

7    DEFENDANT, HIS VEHICLE, AND FOR THE PERSON THAT YOU FOUND THAT

8    WAS CROSSING IN TANDEM, MR. DAVID GUTIERREZ?

9    A.  YES.

10           MR. CONOVER:  YOUR HONOR, WE WOULD MOVE TO ADMIT

11   GOVERNMENT'S EXHIBIT 32 INTO EVIDENCE.

12           THE COURT:  ANY OBJECTION?

13           MR. GARRISON:  OBJECTION.  HEARSAY WITHIN HEARSAY.

14   8038.  CRAWFORD.  SIXTH AMENDMENT.  FOUNDATION.

15           THE COURT:  ALL RIGHT, OVERRULED.  IT WILL COME IN.

16           (GOVERNMENT'S EXHIBIT 32 RECEIVED INTO EVIDENCE.)

17   BY MR. CONOVER:

18   Q.  WERE YOU ASKED TO PREPARE A CHART THAT EXPLAINED THESE

19   CROSSINGS?

20   A.  I WAS.

21   Q.  AND HAVE YOU SEEN THIS BEFORE?

22   A.  YES.

23   Q.  IS THIS THE CHART YOU PREPARED?

24   A.  IT IS.

25   Q.  WOULD THIS AID IN YOUR TESTIMONY TODAY OF EXPLAINING TO

1   THE JURY THE CORRELATION BETWEEN THESE CROSSINGS?

2   A.   CERTAINLY.

3          MR. CONOVER:  YOUR HONOR, MOVE TO ADMIT FOR

4   DEMONSTRATIVE PURPOSES AND FOR SUBSTANTIVE EVIDENCE UNDER

5   SUMMARY OF EVIDENCE PURPOSES.

6          THE COURT:  WELL, IT WILL BE ADMITTED FOR

7   DEMONSTRATIVE EVIDENCE PURPOSES.  I ASSUME THERE IS NO

8   OBJECTION?

9          MR. GARRISON:  NO OBJECTION TO DEMONSTRATIVE, YOUR

10  HONOR.

11         MR. CONOVER:  WE WOULD MOVE TO ADMIT BASED ON BEING A

12  SUMMARY OF VOLUMINOUS DOCUMENTS.

13         THE COURT:  HE CAN TESTIFY TO THE SUBSTANCE OF IT,

14  COUNSEL.

15         MR. CONOVER:  THANK YOU, YOUR HONOR.

16  BY MR. CONOVER:

17  Q.   MR. KRAUSE, WOULD YOU PLEASE STEP DOWN AND EXPLAIN HERE TO

18  THE JURY WHAT THIS CHART MEANS.

19  A.   THIS CHART REPRESENTS THE DATES AND TIMES MR. FLORES

20  CROSSED.  ON THE TOP, OBVIOUSLY, DATE, AND PORT OF ENTRY, TO

21  MR. FLORES'S NAME, MR. GUTIERREZ'S NAME, AND THE TIME OF

22  CROSSING.

23  Q.   SO HOW MANY TOTAL CROSSINGS WERE THERE WHEN THEY WERE

24  TOGETHER, AT THE SAME PORT OF ENTRY, AT THE SAME TIME, BUT NOT

25  IN THE SAME VEHICLE, IN THAT YEAR AND A HALF PERIOD THAT YOU

1   QUERIED?

2   A.   SIXTEEN.

3   Q.   SIXTEEN?   COULD YOU GO THROUGH EACH ONE OF THESE FOR THE

4   JURY AND EXPLAIN.   SO THE FIRST ONE HERE, WHAT TIME -- WHAT DAY

5   WAS IT?

6   A.   THIS IS ON AUGUST 24TH, 2008.

7   Q.   AND THE PORT OF ENTRY?

8   A.   OTAY MESA, IT WAS 3:12 P.M., MR. FLORES IN THE VEHICLE

9   CROSSED, AND MR. GUTIERREZ CROSSED ABOUT 15 MINUTES BEFORE IN

10  THE PEDESTRIAN.

11  Q.   WHAT DOES PED MEAN?

12  A.   THAT IS PEDESTRIAN.   THAT MEANS HE WAS LOGGED IN AS

13  CROSSING ON FOOT.

14  Q.   SO THIS IS AT THE OTAY MESA PORT OF ENTRY?

15  A.   YES.

16  Q.   SO THAT MEANS MR. FLORES WAS CROSSING HERE IN THE CAR?

17  A.   YES.

18  Q.   AND WHERE WAS MR. GUTIERREZ CROSSING?

19  A.   HE WALKED ACROSS THE PEDESTRIAN AND WALKED OUT THE EXIT.

20  Q.   ALL RIGHT.   AND THAT WAS -- THEY WERE ABOUT 15 MINUTES

21  APART?

22  A.   YES.

23  Q.   DO THESE LANES MOVE AT THE EXACT SAME SPEED, THE

24  PEDESTRIAN LANES?

25  A.   THEY DO NOT.

1    Q.   SO IF YOU WERE TO BOTH GET INTO THE LANES AT THE SAME

2    TIME, IT WOULD BE DIFFICULT TO DETERMINE WHICH ONE WOULD GET

3    THROUGH FIRST?

4    A.   CORRECT.

5    Q.   ALL RIGHT.  NEXT ONE, PLEASE.

6    A.   ON SEPTEMBER 10, 2008, AT THE OTAY MESA PORT OF ENTRY --

7              THE COURT:  GLENN, DO ME A FAVOR, PUT A MIKE ON

8    MR. KRAUSE.

9              MR. CONOVER:  YOU CAN CONTINUE, MR. KRAUSE.

10             THE WITNESS:  ALL RIGHT.  ON SEPTEMBER 10, OF 2008,

11   AT THE OTAY MESA PORT OF ENTRY, MR. FLORES CROSSED AT 8:17 P.M.

12   WITH THE VEHICLE, THE BEETLE.  AND 35 MINUTES EARLIER,

13   MR. GUTIERREZ CROSSED BY WALKING ACROSS THE PORT OF ENTRY, THE

14   SAME PORT OF ENTRY.

15   BY MR. CONOVER:

16   Q.   NOW IN EVERY ONE OF THESE CROSSINGS THAT YOU QUERIED FOR

17   MR. FLORES, IS IT TRUE THAT IN THAT PERIOD, HE CROSSED 25 TIMES

18   TOTAL?

19   A.   THAT SOUNDS ACCURATE.

20   Q.   AND MR. GUTIERREZ CROSSED ABOUT 45 TIMES?

21   A.   YES.

22   Q.   EVERY TIME THAT HE CROSSED, MR. FLORES, WAS HE IN THE

23   BEETLE?

24   A.   MR. FLORES WAS IN THE BEETLE.

25   Q.   AT ALL TIMES?

A.   YES.

Q.   BUT MR. GUTIERREZ, DID HE EVER CROSS IN THE BEETLE?

A.   NO.

Q.   ALL RIGHT.  AND SO THE NEXT ONE WAS ALSO AT OTAY MESA, AND IT WAS 15 MINUTES APART; IS THAT CORRECT?

A.   ON SEPTEMBER 20TH, 2008, THIS WAS AT OTAY MESA, AT 4:45 P.M.  AND AT 5:00 P.M., MR. GUTIERREZ WALKED BY -- WAS IN ANOTHER VEHICLE AND DROVE ACROSS IN A DIFFERENT LANE.

Q.   AND THE NEXT ONE IS 15 MINUTES APART?

A.   CORRECT.

Q.   AND THE NEXT ONE 5?

A.   CORRECT.

Q.   AND THE NEXT ONE 2 HOURS AND 55 MINUTES?

A.   YES.

Q.   WHAT EXPLAINS THIS?

A.   IT COULD BE VEHICLE TRAFFIC AT THE TIME.  MR. GUTIERREZ COULD HAVE BEEN DOING SOMETHING ELSE AT THE TIME.

Q.   SO SOMETIMES VEHICLES MAY BE VERY SLOW, OR PEDESTRIAN MAY BE VERY SLOW; YOU CAN GET IN THE LINE AT THE SAME TIME AND STILL BE THAT FAR APART?

A.   CORRECT.  ON BUSIER DAYS, AT PEAK TRAVEL, THE LINES AT SAN YSIDRO OR OTAY MESA CAN BE VERY EXTENSIVE.

Q.   THE NEXT ONE HERE APPEARS TO BE IN A DIFFERENT PORT OF ENTRY, SAN YSIDRO?

A.   CORRECT.

1   Q.   SO THESE CROSSINGS DID NOT OCCUR AT ONE PORT OF ENTRY?

2   A.   NO.

3   Q.   DID THE SAME PATTERN OCCUR?

4   A.   YES.

5   Q.   AT THE SAN YSIDRO ONE HERE, IT IS 15 MINUTES; IS THAT

6   RIGHT?

7   A.   YES.

8   Q.   NOW IF YOU GO TO THE SAN YSIDRO, COULD YOU SHOW WHERE IT

9   WOULD BE THAT THE DEFENDANT WOULD HAVE BEEN CROSSING IN THE

10  BEETLE.

11  A.   THE DEFENDANT WOULD HAVE BEEN IN ONE OF THE VEHICLE LANES

12  HERE, (INDICATING).

13  Q.   AND WHERE WOULD MR. GUTIERREZ HAVE BEEN?

14  A.   MR. GUTIERREZ WOULD HAVE WALKED IN THE PEDESTRIAN HERE,

15  ALONG THE SIDE, ENTERED IN THIS BUILDING HERE, AND EXITED HERE,

16  OUT TO THE STREET IN SAN YSIDRO BOULEVARD, WHICH HAS

17  RESTAURANTS AND SMALL HOTELS.

18  Q.   NOW FOR BOTH OTAY MESA AND SAN YSIDRO, WHEN MR. GUTIERREZ

19  WAS WALKING THROUGH PEDESTRIAN, HE WOULD HAVE BEEN ABLE TO SEE

20  OVER TO THESE VEHICLES; IS THAT RIGHT?

21  A.   CORRECT.

22  Q.   OKAY.   NOW IT APPEARS THAT AT SOME POINTS, MR. GUTIERREZ

23  CROSSES IN A VEHICLE; IS THAT RIGHT?

24  A.   YES.

25  Q.   BOTH AT SAN YSIDRO AND OTAY MESA?

1    A.   CORRECT.

2    Q.   AND ONE MINUTE APART IN A VEHICLE?

3    A.   YES.

4    Q.   AND THAT IS AT THE -- THAT'S AT SAN YSIDRO?

5    A.   YES.

6    Q.   SO EXPLAIN TO ME WHAT THAT WOULD HAVE LOOKED LIKE IF YOU

7    WERE A BIRD WATCHING TWO VEHICLES CROSS ONE MINUTE APART.

8    A.   BASICALLY THEY WOULD HAVE BEEN A FEW LANES APART.  AND ONE

9    VEHICLE WOULD HAVE BEEN HERE, AND MAYBE ONE VEHICLE OVER HERE.

10   AND THE LANE AT THE TIME, THE TIME OF DAY, TRAFFIC WAS PROBABLY

11   MOVING VERY RAPIDLY, SO EASY TO PREDICT.

12   Q.   BUT THEY WEREN'T IN THE SAME VEHICLE?

13   A.   NO.

14   Q.   BUT THEY WERE CROSSING AT THE EXACT SAME TIME?

15   A.   CORRECT.

16   Q.   ANOTHER ONE MINUTE APART HERE, BUT YET, THIS IS WHEN HE'S

17   ON FOOT, THIS IS THE VEHICLE?

18   A.   YES.

19   Q.   33 MINUTES HERE, VEHICLE, BUT THIS TIME, IT IS OTAY MESA

20   PORT OF ENTRY?

21   A.   YES.

22   Q.   SAME THING, TWO VEHICLES TOGETHER?

23   A.   YES.

24   Q.   AND THEN WE HAVE 33 MINUTES?

25   A.   YES.

1          MR. GARRISON:  OBJECTION, LEADING.

2          THE COURT:  IT IS LEADING.

3    BY MR. CONOVER:

4    Q.   MR. KRAUSE, WOULD YOU PLEASE PROCEED WITH THE CHART.

5    A.   CROSSING NO. 13 OCCURRED 33 MINUTES APART FROM EACH OTHER.

6    AND THIS ONE, MR. GUTIERREZ AND MR. FLORES WERE IN SEPARATE

7    VEHICLES.  THE NEXT ONE, ON THE 10TH OF OCTOBER, MR. GUTIERREZ

8    WALKED ACROSS ON PED, WHILE MR. FLORES DROVE ACROSS IN THE

9    VOLKSWAGEN BEETLE.  THEY WERE ABOUT 2 HOURS AND 16 MINUTES

10   APART.

11        NEXT CROSSING, WHICH WOULD BE NO. 15, ON THE 18TH OF

12   OCTOBER, AT THE OTAY MESA PORT OF ENTRY, MR. FLORES CROSSED

13   ABOUT 12:17 P.M. IN THE AFTERNOON.  MR. GUTIERREZ CROSSED ABOUT

14   12:12 P.M. IN PEDESTRIAN, OR ABOUT FIVE MINUTES DIFFERENCE.

15   Q.   AND MR. KRAUSE, SO THIS CHART REPRESENTS COORDINATED

16   TANDEM CROSSINGS; IS THAT CORRECT?

17   A.   YES.

18   Q.   AT TWO SEPARATE PORTS OF ENTRY?

19   A.   CORRECT.

20   Q.   SOMETIMES IN VEHICLE LANES?

21        MR. GARRISON:  OBJECTION.  LEADING.

22        THE COURT:  IT IS LEADING.

23   BY MR. CONOVER:

24   Q.   ARE THEY SOMETIMES IN VEHICLE LANES?

25   A.   SOMETIMES THEY'RE IN VEHICLE LANES.

1  Q.   AND SOMETIMES -- AND AT ALL TIMES, THE DEFENDANT IS

2  DRIVING THE VEHICLE, RIGHT?

3  A.   YES.

4  Q.   SOMETIMES --

5          MR. GARRISON:  OBJECTION.  LEADING.

6          THE COURT:  IT IS LEADING.  AND IT'S BEEN ASKED AND

7  ANSWERED.

8  BY MR. CONOVER:

9  Q.   AND SOMETIMES -- LET ME ASK YOU, ARE THERE TIMES WHEN ONE

10 PERSON WAS IN THE PEDESTRIAN AND THE OTHER PERSON WAS IN THE

11 VEHICLE?

12 A.   CORRECT.

13 Q.   AND THE LAST CROSSING HERE, NOVEMBER 28, 2009, WAS THAT

14 THE DATE OF THE DEFENDANT'S ARREST?

15 A.   IT WAS.

16 Q.   ON THAT DATE, CAN YOU DESCRIBE WHAT HAPPENED.

17 A.   CERTAINLY.  AT THE OTAY MESA PORT OF ENTRY, MR. FLORES AND

18 THE VEHICLE CROSSED AT 1:24 P.M.  MR. GUTIERREZ CROSSED AT

19 12:51 P.M., ABOUT A 33-MINUTE DIFFERENCE.  AND THEN, ON THE

20 SAME DAY, AT A DIFFERENT PORT OF ENTRY, MR. GUTIERREZ CROSSED

21 ABOUT THREE HOURS LATER, IN PEDESTRIAN, AT SAN YSIDRO.

22 Q.   IS THAT THREE HOURS LATER?

23 A.   APPROXIMATELY THREE, THREE AND A HALF HOURS LATER.

24 Q.   HOW COULD THAT HAPPEN IF HE JUST CAME IN THE UNITED

25 STATES, MR. GUTIERREZ -- SO MR. FLORES CAME IN AT 1:24; IS THAT

1    RIGHT?

2    A.   CORRECT.

3    Q.   AND HE WAS ARRESTED --

4    A.   HE WAS.

5    Q.   -- AT THAT TIME?

6        NOW MR. GUTIERREZ, HAD ALREADY CROSSED THE UNITED STATES A

7    FEW MINUTES EARLIER?

8    A.   CORRECT.

9            MR. GARRISON:  OBJECTION.  LEADING.

10           THE COURT:  IT IS LEADING.  SUSTAINED.

11   BY MR. CONOVER:

12   Q.   WHAT HAPPENED -- HOW IS IT THAT MR. GUTIERREZ WAS ABLE TO

13   CROSS BACK IN TO THE UNITED STATES THE SAME DAY?

14           MR. GARRISON:  CALLS FOR SPECULATION.

15           THE COURT:  DO YOU KNOW?

16           THE WITNESS:  YES.

17           THE COURT:  OKAY.

18           THE WITNESS:  MR. GUTIERREZ DEPARTED THE COUNTRY, AND

19   THEN WHILE IN MEXICO, WENT TO ANOTHER PORT OF ENTRY AND ENTERED

20   ON FOOT.

21   BY MR. CONOVER:

22   Q.   AND SO HE WOULD HAVE HAD TO GO BACK INTO MEXICO; IS THAT

23   WHAT YOU'RE SAYING?

24   A.   CORRECT.

25   Q.   DID HE COME BACK THROUGH THE SAME PORT OF ENTRY?

1    A.   HE DID NOT.

2    Q.   SO IT WAS THE SAME DAY?

3    A.   SAME DAY.

4    Q.   BUT A DIFFERENT PORT OF ENTRY?

5    A.   CORRECT.

6    Q.   FROM YOUR CALCULATIONS AND FROM YOUR QUERIES OF THE TECS

7    DATABASE, ARE THERE EVER INSTANCES WHERE THERE ARE CROSSING

8    RECORDS OF AN INDIVIDUAL NOT COMING INTO THE UNITED STATES, BUT

9    GOING TO MEXICO?

10   A.   YES.

11   Q.   THANK YOU.  YOU CAN TAKE A SEAT AND WE'LL TALK ABOUT THOSE

12   BRIEFLY.  FROM YOUR QUERY OF --

13          THE COURT:  BEFORE WE GO ANY FURTHER, LET ME ASK A

14   COUPLE QUESTIONS.

15       AGENT KRAUSE, THE INFORMATION ON THAT EXHIBIT THAT YOU'VE

16   BEEN TESTIFYING ABOUT --

17          THE WITNESS:  YES, SIR.

18          THE COURT:  -- IS THAT INFORMATION THAT IS FOUND IN

19   THE TECS RECORDS THAT YOU HAVE THAT HAVE ALREADY BEEN ADMITTED?

20          THE WITNESS:  IT IS, YOUR HONOR.

21          THE COURT:  GREAT, THANK YOU.

22          MR. CONOVER:  THANK YOU, YOUR HONOR.

23   BY MR. CONOVER:

24   Q.   IN ADDITION TO THE INFORMATION ON THIS CHART, DID YOU EVER

25   FIND IN YOUR QUERIES OF THE TECS DATABASE RECORDS OF MR. FLORES

1    GOING INTO MEXICO?

2    A.    ON RECORDS OF MR. FLORES -- MR. FLORES'S VEHICLE GOING TO

3    MEXICO.  COMING INTO THE UNITED STATES IS MORE ACCURATE THAN

4    GOING OUT AS FAR AS VEHICLES AND PEOPLE.  OUTBOUNDS, AS THEY

5    CALL THEM, DEPARTING THE UNITED STATES, THEY HAVE THE SAME

6    PLATE READERS GOING OUT, AND AS SUCH, THEY'LL RECORD VEHICLES

7    AS THEY DEPART THE UNITED STATES.

8    Q.    AND SO WHEN SOMEONE GOES INTO MEXICO, THEY'RE NOT

9    INSPECTED AND DETERMINED WHO THE DRIVER IS; IS THAT CORRECT?

10   A.    NORMALLY NO.  UNLESS YOU'RE DOING SOME SORT OF OUTBOUND

11   ENFORCEMENT OPERATION.

12   Q.    SO HOW IS IT WE KNOW WHEN SOMEONE WENT INTO MEXICO?

13   A.    IN THIS SPECIFIC CASE, WE RAN A VEHICLE LICENSE PLATE, AND

14   FOUND THE CROSSINGS, AND THE CROSSINGS ARE DISPLAYED -- THEY'RE

15   DISPLAYED AS COMING INTO THE UNITED STATES, AS WELL AS

16   DEPARTING THE UNITED STATES.

17   Q.    AND DO WE -- DOES THE TECS SYSTEM ALWAYS TRACK WHEN

18   SOMEONE EXITS THE UNITED STATES?

19   A.    IT TRACKS VEHICLE PLATES AS THEY DEPART.

20   Q.    ALWAYS, OR IS IT ONLY AT SOME POINTS WHEN THAT INFORMATION

21   IS ENTERED INTO THE SYSTEM?

22   A.    WELL, THE CAMERAS ARE ALWAYS ON, AND THE TECS DATABASES

23   ARE ALWAYS UP.  OF COURSE THERE CAN BE MECHANICAL DEFECTS, BUT

24   GENERALLY, AS LONG AS IT IS ON, THE SYSTEM IS RUNNING AND IT

25   WILL ALWAYS RECORD THAT INFORMATION.

1   Q.   AND IN THIS CASE, HOW MANY OUTBOUND CROSSINGS OR CROSSINGS

2   INTO MEXICO WERE YOU ABLE TO FIND?

3   A.   FOUR.

4   Q.   AND OF THOSE FOUR CROSSINGS, DID THEY CORRELATE WITH A

5   RETURN CROSSING BACK INTO THE UNITED STATES OF THAT SAME

6   BEETLE?

7   A.   YES, ALL FOUR DID.

8   Q.   AND WHAT WAS THE TIME FRAME -- WHAT WAS THE SHORTEST TIME

9   FRAME OF THOSE RETURN TRIPS; SO GOING DOWN TO MEXICO, OUTBOUND

10  CROSSING, COMING BACK INTO THE UNITED STATES, INBOUND CROSSING

11  OF THE SAME BEETLE?  APPROXIMATIONS ARE FINE.

12  A.   APPROXIMATELY, THREE HOURS.

13  Q.   SO THAT WAS THE APPROXIMATE TIME FRAME?

14  A.   YES.

15  Q.   AND WHAT WAS THE LONGEST TRIP?

16  A.   I THINK ABOUT FOUR, FIVE HOURS.

17  Q.   BUT THEY WERE ALL WITHIN A FEW HOURS?

18  A.   YES.

19  Q.   ALL WITHIN THE SAME DAY PERIOD?

20  A.   YES.

21  Q.   WHERE THE BEETLE WOULD GO INTO MEXICO, AND THEN COME BACK

22  IN THE UNITED STATES?

23  A.   CORRECT.

24  Q.   THANK YOU.  FROM YOUR EXPERIENCE AS AN AGENT, IN YOUR 13

25  YEARS, CAN YOU EXPLAIN THE PATTERN OF THESE CROSSINGS, AND WHAT

1   IT IS THAT YOU -- WHAT INFORMATION YOU CAN DRAW RELATED TO DRUG

2   SMUGGLING?

3   A.   IN THE 15 YEARS I'VE WORKED AS A CUSTOMS INSPECTOR, OR

4   CUSTOMS AGENT, FROM 1995, THIS PATTERN WAS IDENTIFIED TO LOOK

5   FOR AS AN INSPECTOR OFFICER AT THE BORDER.   GENERALLY THIS IS

6   SEEN AS A CONCURRENT CROSSING REPORT, WHICH WOULD BE SOMEONE

7   CROSSING AT THE SAME TIME, SAME DAY, GENERALLY, DIFFERENT PORTS

8   OF ENTRY, WOULD BE SOMEBODY INVOLVED IN A SMUGGLING VENTURE.

9        IN THIS CASE, WE WOULD REFER TO THAT AS A SCOUT; A PERSON

10  NOT IN THE LOAD, THE DRUG SMUGGLING VENTURE CAR, BUT WALKING

11  ACROSS OR DRIVING ACROSS.   AND ALSO AS A CUSTOMS SPECIAL AGENT,

12  THAT IDEA WAS RECONSTITUTED IN TRAINING, AS WELL AS ON-THE-JOB

13  TRAINING.

14  Q.   SO THIS ISN'T THE FIRST TIME YOU'VE SEEN THIS SORT OF

15  PATTERN?

16  A.   SINCE 1995 WOULD BE THE FIRST TIME I'D SEEN IT.

17  Q.   IN 1995 WAS THE FIRST TIME?

18  A.   CORRECT.

19  Q.   HAVE YOU SEEN IT MULTIPLE TIMES SINCE THEN?

20  A.   YES.

21  Q.   DESCRIBE WHY AN ORGANIZATION WOULD ENGAGE IN THIS SORT OF

22  BEHAVIOR.

23  A.   IT HAS TO DO WITH DIVISION OF LABOR.   AND IN SMUGGLING,

24  THERE IS USUALLY A PERSON THAT WOULD LOAD THE CAR, A DRIVER

25  THAT WILL DRIVE THE LOAD ACROSS THE BORDER, OR CONTRABAND, AND

1    ALSO A SCOUT WHO WILL KIND OF ACT AS A -- THEY ACT THREE-FOLD.

2    REALLY A SCOUT'S RESPONSIBILITIES ARE SECURITY OF THE DRUG

3    LOAD, COUNTER SURVEILLANCE, WHICH WITH THIS PATTERN WOULD SHOW

4    SOMEONE THAT STANDS OUT IN THE VEHICLE -- THE PEDESTRIAN LANES

5    OR VEHICLES AND LOOKS FOR LANES THAT ARE MOVING FASTER OR

6    SLOWER, FOR INSTANCE, OR COUNTER SURVEILLANCE FOR ENFORCEMENT

7    TEAMS.  THEY WOULD HAVE A PHONE.  THEY OBVIOUSLY KNOW THE

8    PERSON'S PHONE NUMBER IN THE CAR, AND THEY WOULD CONTACT THEM

9    AND LET THEM KNOW THAT.  AND ALSO COMMUNICATION.  NORMALLY THE

10   SCOUT IS SEPARATED.  THEY WOULD -- THERE ARE TWO PEOPLE ACTING

11   IN CONJUNCTION.  THEY WANT TO DISTANCE THEMSELVES FROM EACH

12   OTHER.  SO IF ONE GETS CAUGHT, THE SCOUT WOULD HAVE THE ABILITY

13   TO CONTACT THE SMUGGLERS INVOLVED WITH THIS TRANSACTION OR THIS

14   EVENT.  AND THE REASON THEY'RE TRYING TO CONTACT THOSE

15   SMUGGLERS IS BECAUSE THE GOVERNMENT ALSO, ONCE THEY ARREST

16   PEOPLE, THEY'LL TRY TO FLIP THEM, WHICH IS AT THE PORTS OF

17   ENTRY.  IN THIS SPECIFIC INSTANCE, WE WILL GO DOWN AS AGENTS

18   AND TRY TO GET THE PERSON TO DELIVER THE DRUGS TO THE FINAL

19   DESTINATION.

20        THE SCOUT FUNCTIONS BY CONTACTING OTHER PEOPLE IN THE DRUG

21   ORGANIZATION WITH HIS PHONE AND LET'S THEM KNOW THAT THE DRUG

22   LOAD HAS BEEN CAUGHT, WHICH WILL HINDER THE GOVERNMENT'S

23   ABILITY OR LAW ENFORCEMENT TO CONDUCT THAT CONTROLLED DELIVERY.

24   SO THERE IS REALLY THREE REASONS THEY WOULD USE A SCOUT.

25   Q.   WHAT ARE THOSE THREE REASONS?

1    A.   TO TOUCH ON IT AGAIN, SECURITY OF THE DRUG LOAD.

2    Q.   WHAT DO YOU MEAN BY SECURITY OF THE DRUG LOAD?

3    A.   THE SCOUT WILL BE RESPONSIBLE FOR ENSURING THAT THE LOAD

4    WILL GET TO ITS FINAL DESTINATION.

5    Q.   WITHIN THE UNITED STATES?

6    A.   WITHIN THE UNITED STATES.

7            MR. GARRISON:  OBJECTION.  LEADING.  ASKED AND

8    ANSWERED.

9            THE COURT:  OVERRULED.

10   BY MR. CONOVER:

11   Q.   SO HOW DOES THE SCOUT DO THAT WITH, WHEN IT -- WHY

12   WOULDN'T THE SCOUT JUST BE IN THE VEHICLE TO MAKE SURE IT WAS

13   SECURED?

14   A.   AS I IDENTIFIED BEFORE, THEY WANT TO SEPARATE THEMSELVES

15   FROM EACH OTHER.  AND THE REASON THEY'RE DOING THAT IS BECAUSE

16   THE PERSON IN THE VEHICLE, IN THIS CASE, THE REGISTERED

17   VEHICLE, HAS THE MOST CULPABILITY WHEN THEY'RE CAUGHT.  THE

18   SCOUT IS SEPARATE FROM THEM.  MOST OF THE TIME, THEY WALK

19   ACROSS OR DRIVE ACROSS IN ANOTHER LANE.  THEY'RE ABLE TO

20   PROVIDE SECURITY.  THEY'RE RESPONSIBLE FOR SECURITY OF THE DRUG

21   LOAD BECAUSE IT'S BASICALLY MONEY.  THEY'RE ALSO RESPONSIBLE

22   FOR COUNTER SURVEILLANCE.  IN OTHER WORDS, CALLING THE PERSON

23   IN THE CAR IF IT BECOMES AN ISSUE WHERE THE LANE IS CLOSED THAT

24   THEY'RE IN, OR THERE IS A LANE MOVING FASTER, THEY CAN DIRECT

25   THEM.  AND AS A TERTIARY ACTION, THEY'LL ALSO CONTACT, AS I

1   SAID, MEMBERS THAT MIGHT BE SMUGGLING WITH THEM TO LET THEM

2   KNOW THAT THE CAR WAS STOPPED OR TAKEN DOWN SO THAT THEY WOULD

3   NOT -- LAW ENFORCEMENT WOULD BE HINDERED FROM BEING ABLE TO DO

4   A CONTROLLED DELIVERY.

5   Q.   AND SO IF THE VEHICLE IS SUCCESSFUL IN COMING ACROSS THE

6   PORT OF ENTRY, WHAT IS THE SCOUT'S ROLE ONCE IT CROSSES THE

7   PORT OF ENTRY?

8   A.   ONCE THE SCOUT CROSSES THE PORT OF ENTRY, AND HE IS

9   ASSURED THAT THE LOAD HAS CROSSED WITHOUT BEING ARRESTED OR

10  STOPPED, HE'LL MEET UP WITH THE CAR AT SOME POINT, THROUGH

11  PREARRANGED PLANS, AND EITHER GET IN THE CAR OR GET IN ANOTHER

12  CAR AND ESCORT IT TO ITS FINAL DESTINATION.

13  Q.   WHY DOES THE ORGANIZATION REQUIRE TWO PEOPLE TO DO THAT?

14  WHY COULDN'T THEY DO ONE?  DOES IT DEPEND ON THE VALUE OF THE

15  DRUGS?

16  A.   SOME OF IT HAS TO DO WITH VALUE.  SOME OF IT HAS TO DO

17  WITH DIVISION OF LABOR.  DRUG SMUGGLING IS NOT UNLIKE MAKING A

18  CAR AT FORD PLANT?  SOME PEOPLE PUT ON TIRES, SOME PEOPLE WORK

19  ON THE ENGINES.  IN THIS CASE, ONE PERSON IS THE DRIVER, ONE

20  PERSON IS THE SCOUT.

21  Q.   AND IN A CASE WHERE THERE IS A MILLION DOLLARS AT STAKE,

22  IS IT MORE LIKELY TO HAVE ONE PERSON OR TWO PEOPLE VERIFYING

23  THAT THAT DRIVER TAKES IT TO WHERE HE IS SUPPOSED TO TAKE IT?

24  A.   TWO PEOPLE.

25  Q.   AND WHY WOULD THE DRIVER NOT STAY IN THE VEHICLE ITSELF?

1   WHAT ARE THE REASONS REGARDING THE ORGANIZATION'S PURPOSES AND

2   TRACKING TO THE ORGANIZATION?

3   A.   COULD YOU REPHRASE THE QUESTION.   WHY WOULD THE DRIVER NOT

4   STAY IN THE VEHICLE?

5   Q.   WHAT ARE THE REASONS THE DRIVER WOULDN'T STAY IN THE

6   VEHICLE WITH REGARD TO BEING ABLE TO TRACE THINGS BACK TO THE

7   ORGANIZATION?

8   A.   I'M NOT SURE I UNDERSTAND WHAT YOU MEAN.

9   Q.   YOU MENTIONED EARLIER ABOUT THE PHONE THAT THE SCOUT WOULD

10  HAVE.

11  A.   RIGHT.

12  Q.   AND WHY WOULD THE SCOUT NOT BE IN THE VEHICLE WITH THE

13  PHONE?

14  A.   SO FOR THE SCOUT NOT TO BE IN THE VEHICLE.   BASICALLY THE

15  PHONE THAT THE SCOUT WOULD BE USING, IS THE ONE THAT IS

16  CONNECTED OR A CONDUIT TO WHATEVER THE GROUP IS THAT IS

17  SMUGGLING.   THE DRIVER IS SEPARATED FROM THAT NOT ONLY BY

18  DISTANCE, BUT ALSO BY PHONES.   THE DRIVER WOULDN'T HAVE

19  NORMALLY ANY OF THE NUMBERS TO CALL WHEN THERE IS A SCOUT IN

20  THIS POSITION, OR IN THIS EXAMPLE.

21  Q.   SO THE DRIVER'S PHONE WOULDN'T BE THE DRUG PHONE?

22  A.   NO.

23  Q.   THE DRIVER'S PHONE MAY ONLY HAVE NO. 2, THE ONE PERSON WHO

24  HE CONTACTS, THE SCOUT?

25  A.   CORRECT.   IN CASE HE'S CAUGHT, AS A NORMAL METHOD OF

1   OPERATION, BESIDES ATTEMPTING TO DO A CONTROLLED DELIVERY,

2   AGENTS DURING THE INTERVIEW PROCESS WOULD ALSO COPY NUMBERS IN

3   THE PHONE AND TRY TO USE THAT AS INTELLIGENCE INFORMATION.

4        WITH A SCOUT, THE DRIVER OF THE VEHICLE, OF THE

5   CONTRABAND, WOULD RARELY HAVE ALL THE NUMBERS OF THE

6   ORGANIZATION IN HIS PHONE.  THE SCOUT WOULD HAVE ALL OF THAT

7   INFORMATION.

8   Q.   ALL RIGHT.  SO THE SCOUT OPERATES AS A SECURITY MEASURE TO

9   MAKE SURE THE LOAD GETS TO ITS DESTINATION; IS THAT RIGHT?

10  A.   CORRECT.

11  Q.   AS A MEASURE TO DISTANCE THE ORGANIZATION FROM THE LOAD?

12  A.   YES.

13  Q.   BECAUSE THE TYING -- THE PHONE CALLS, THE TEXT MESSAGES

14  THAT WOULD HAVE TIED TO THIS LOAD ARE NOT WITH THE LOAD DRIVER;

15  IS THAT RIGHT?

16        THE COURT:  COUNSEL, I THINK AGENT KRAUSE HAS ALREADY

17  TESTIFIED TO THIS.  PLEASE MOVE ON.

18        MR. CONOVER:  THANK YOU, YOUR HONOR.

19  BY MR. CONOVER:

20  Q.   FINALLY, AGENT KRAUSE, THE LAST QUESTIONS I'D LIKE TO ASK

21  YOU ARE:  FROM YOUR EXPERIENCE, IN THE HUNDREDS OF

22  INVESTIGATIONS YOU'VE DONE, DO DRUG SMUGGLING ORGANIZATIONS

23  ENTRUST THOUSANDS OF DOLLARS, OR MILLION DOLLARS WORTH OF

24  DRUGS, TO SOMEONE THAT DOES NOT KNOW THE DRUGS ARE THERE?

25        MR. GARRISON:  OBJECTION.  704.

```
1              THE COURT:  OVERRULED.

2              THE WITNESS:  NO.

3   BY MR. CONOVER:

4    Q.   WHY NOT?

5    A.   EVEN THOUGH DRUG SMUGGLERS DO NOT POSSESS INTELLECT LIKE A

6   WALL STREET FINANCIER, THEY DO POSSESS A SAVVY STREET SMART, IF

7   YOU WILL, TO LET THEM KNOW WHERE THEY WANT TO REDUCE RISKS.

8   AND EVEN THOUGH DRUG SMUGGLING IS TIED INTO A LOT OF VIOLENCE,

9   PEOPLE THAT ARE ACTUALLY ENGAGED IN IT WILL TRY TO REDUCE RISK

10  AS MUCH AS POSSIBLE.  AND THAT MEANS HAVING 100 PERCENT

11  ASSURANCES AT ALL COSTS.  THAT MEANS GETTING A PERSON THEY KNOW

12  THAT IS TRUSTED TO DRIVE THE CAR, SOMEONE WHO MAY ACT AS A

13  SCOUT THAT IS TRUSTED.  CONCEALING, A METHOD OF CONCEALING

14  WOULD BE ANOTHER WAY TO REDUCE RISK BY PUTTING IT IN A FUEL

15  PUMP AREA, WHICH MEANS IT IS HARDER TO DETECT.  AND THERE WOULD

16  BE SOME REASONS THEY WOULD NOT.  OTHERWISE, YOU BASICALLY HAVE

17  -- THE ONLY TIME I'VE REALLY EVER HEARD OF IT IS IN COURT, WHEN

18  SOMEONE IS TRYING TO POSITION ARGUMENT THAT SOMEBODY DIDN'T

19  KNOW.  SUGGESTING THERE ARE SURREPTITIOUS -- PEOPLE

20  SURREPTITIOUSLY HID DRUGS WITHIN A CAR, AND BASICALLY HOPED THE

21  CAR WOULD SHOW UP SOMEDAY AT THE LOCATION IT IS SUPPOSED TO.

22  THERE ARE TO --

23             MR. GARRISON:  OBJECTION --

24             THE WITNESS:  TOO MANY --

25             THE COURT:  I'M SORRY?
```

1          MR. GARRISON:  OBJECTION.  NONRESPONSIVE AT THIS

2     POINT.  IMPROPER.

3          THE COURT:  IT IS NONRESPONSIVE.

4       LADIES AND GENTLEMEN, I'M GOING TO ASK YOU TO DISREGARD

5     THE LAST ANSWER.

6     BY MR. CONOVER:

7     Q.  SO MR. KRAUSE, JUST TO BE CLEAR, THE REASON -- YOU'RE

8     EXPLAINING, THE REASON THEY WOULD NOT ENTRUST IT TO AN

9     UNKNOWING COURIER IS BECAUSE OF THE RISK THAT THEY WOULD NOT

10    GET THE LOAD TO ITS DESTINATION; IS THAT WHAT YOU'RE SAYING?

11    A.  CORRECT.

12          MR. CONOVER:  ALL RIGHT.  THANK YOU, YOUR HONOR.

13    NOTHING FURTHER.

14          THE COURT:  ALL RIGHT.  MR. GARRISON?

15          MR. GARRISON:  THANK YOU.

16                    CROSS-EXAMINATION

17    BY MR. GARRISON:

18    Q.  GOOD MORNING, AGENT KRAUSE.

19    A.  GOOD MORNING.

20    Q.  ALL RIGHT, AGENT KRAUSE, NOW DID YOU WRITE ANY REPORTS IN

21    THIS CASE?

22    A.  I DID NOT.

23    Q.  OKAY.  DID YOU MAKE ANY NOTES AT ANY TIME REGARDING ANY OF

24    YOUR ACTIONS IN THIS CASE?

25    A.  NO.

1    Q.   HAVE YOU TESTIFIED ABOUT THIS CASE BEFORE?

2    A.   I'VE NOT TESTIFIED ABOUT THIS CASE BEFORE, NO.

3    Q.   OKAY.  NOW I THINK YOU SAID, AND CORRECT ME IF I'M WRONG,

4    OKAY, THAT YOU PARTICIPATED IN APPROXIMATELY 200 DRUG SMUGGLING

5    INVESTIGATIONS; IS THAT CORRECT?

6    A.   RIGHT.  AS A PRIMARY, SECONDARY, OR TERTIARY AGENT.

7    Q.   PRIMARY, SECONDARY.  WHAT ABOUT AS A CASE AGENT?

8    A.   AS A CASE AGENT, PROBABLY OVER 65, 70.

9    Q.   OKAY, SO 65 OR 70 AS A CASE AGENT, EITHER A PRIMARY CASE

10   AGENT OR CO-CASE AGENT?

11   A.   RIGHT.  IF IT WAS PRIMARY OR CO-CASE, THEN IT WOULD

12   PROBABLY BE OVER 100.

13   Q.   OKAY.  ALL RIGHT.  AND WHEN YOU WERE -- I BELIEVE YOU

14   TESTIFIED THAT THERE WAS 40 TO 50 TIMES THAT YOU DEALT WITH

15   METHAMPHETAMINE SEIZURES; AM I CORRECT?

16   A.   YES.

17   Q.   AND WAS THAT DEALING WITH PRIMARY, SECONDARY, OR TERTIARY,

18   OR WAS THAT CASE AGENT?

19   A.   PRIMARY, SECONDARY, OR TERTIARY.

20   Q.   ALL RIGHT.  I WANT TO TALK TO YOU A LITTLE BIT ABOUT SOME

21   OF THE THINGS YOU TALKED ABOUT.  YOU SAID THE PORTS OF ENTRY

22   ARE CHOKE POINTS; IS THAT RIGHT?

23   A.   CORRECT.

24   Q.   THAT MEANS THAT THOSE PLACES ARE THE HARDEST PLACES TO

25   SMUGGLE THINGS INTO THE UNITED STATES; AM I RIGHT?

1    A.   THAT'S CORRECT.

2    Q.   THAT'S BECAUSE YOU HAVE GOT NARCOTICS DETECTOR DOGS?

3    A.   YES.

4    Q.   YOU HAVE TRAINED PRIMARY INSPECTORS?

5    A.   YES.

6    Q.   YOU HAVE TRAINED SECONDARY INSPECTORS?

7    A.   CORRECT.

8    Q.   YOU HAVE IMMIGRATION AND CUSTOMS ENFORCEMENT SPECIAL

9    AGENTS THERE?

10   A.   YES.

11   Q.   DEALING WITH MULTIPLE COMPUTER SYSTEMS THERE AS WELL?

12   A.   YES.

13   Q.   THE TECS SYSTEM?

14   A.   CORRECT.

15   Q.   VIDEO CAMERAS?

16   A.   THEY DO HAVE CAMERAS.

17   Q.   SO THIS IS A VERY HIGH SECURITY AREA?

18   A.   YES.

19   Q.   OKAY.  NOW DRUG SMUGGLING INTO THE UNITED STATES IS

20   ILLEGAL, CORRECT?

21   A.   CORRECT.

22   Q.   ALL RIGHT.  AND WHAT LAW ENFORCEMENT TRIES TO DO IS TO

23   CATCH THESE DRUG SMUGGLERS, RIGHT?

24   A.   YES.

25   Q.   THE SMUGGLERS MUST DEVISE WAYS TO DECEIVE LAW ENFORCEMENT?

1    A.   YES.

2    Q.   AT TIMES, THEY MUST DEVISE WAYS TO DECEIVE PEOPLE THAT ARE

3    CLOSE TO THEM?

4    A.   I'M NOT CERTAIN I UNDERSTAND THAT QUESTION.

5    Q.   AT SOME TIMES, THEY MAY HAVE TO DECEIVE OTHER PEOPLE WITH

6    REGARDS TO THEIR DRUG SMUGGLING?

7    A.   I'M NOT SURE HOW TO ANSWER THAT.

8    Q.   WELL, YOU'RE -- YOU TESTIFIED YOU'RE INTIMATELY FAMILIAR

9    WITH DRUG SMUGGLING ORGANIZATIONS; AM I RIGHT?

10   A.   YES.  BUT THE QUESTION IS VERY GENERAL.  I WOULD SAY,

11   GENERALLY, YES, THEY CAN DECEIVE OTHER PEOPLE.

12   Q.   DRUG SMUGGLING ORGANIZATIONS DON'T GO AROUND TELLING

13   PEOPLE WHAT THEY DO, RIGHT?

14   A.   CORRECT.

15   Q.   NOW THE MONEY THAT COMES FROM DRUG SMUGGLING, THAT IS

16   ILLEGAL MONEY, RIGHT?

17   A.   YES.

18   Q.   SO THAT CAN'T BE DECLARED ON SOMEBODY'S INCOME TAXES?

19   A.   CORRECT.

20   Q.   SO DRUG SMUGGLERS HAVE TO DECEIVE THE IRS?

21   A.   YES.

22   Q.   THEY HAVE TO DECEIVE OTHER DRUG SMUGGLERS?

23   A.   SURE.

24   Q.   SO FAIR STATEMENT TO SAY THAT LYING IS A PART OF THE DRUG

25   SMUGGLING BUSINESS?

1   A.   YES.

2   Q.   NOW YOU GAIN YOUR KNOWLEDGE REGARDING THESE THINGS YOU'VE

3   TESTIFIED TO FROM TALKING TO INFORMANTS, RIGHT?

4   A.   CORRECT.

5   Q.   FROM TALKING TO COURIERS?

6   A.   YES.

7   Q.   WHEN I SAY "COURIERS," I MEAN PEOPLE DELIVERING DRUGS FROM

8   ONE PLACE TO ANOTHER.

9   A.   YES.

10  Q.   FROM INTERACTING WITH PEOPLE WHO ARE DIRECTLY INVOLVED

11  WITH DRUG SMUGGLING?

12  A.   YES.

13  Q.   AND ONE OF THE THINGS THAT YOU KNOW IS THAT COURIERS ARE

14  NOT ALWAYS TOLD THE TRUTH; IS THAT RIGHT?

15  A.   I BELIEVE COURIERS ARE TOLD WHAT THEY NEED TO KNOW.

16  Q.   SO SOMETIMES A COURIER MAY BE TOLD A LOT OF INFORMATION;

17  AM I RIGHT?

18  A.   CORRECT.

19  Q.   SOMETIMES A COURIER MAY BE TOLD VERY LITTLE INFORMATION?

20  A.   YES.

21  Q.   ALL RIGHT.  SO IN YOUR EXPERIENCE, YOU GAIN YOUR

22  EXPERIENCE FROM TALKING TO GOVERNMENT INFORMANTS, IS ONE OF THE

23  WAYS, RIGHT?

24  A.   CORRECT.

25  Q.   NOW INFORMANTS ARE PEOPLE WHO ARE INVOLVED IN SOME TYPE OF

1   CRIMINAL ACTIVITY, RIGHT?

2   A.   GENERALLY, YES.

3   Q.   OR HAVE INTIMATE KNOWLEDGE OF CRIMINAL ACTIVITY?

4   A.   YES.

5   Q.   HOWEVER, INFORMANTS ARE FREQUENTLY PAID?

6   A.   CORRECT.

7   Q.   ALL RIGHT.  SO INFORMANTS, IF THEY GAVE AN AGENT

8   INFORMATION, FREQUENTLY RECEIVE PAYMENT FOR THAT INFORMATION?

9   A.   CORRECT.  HOWEVER, THE INFORMANTS OR SOURCES OF

10  INFORMATION I UTILIZED FOR THIS CASE TO PREPARE FOR IT DID NOT

11  RECEIVE ANY PAYMENT FOR ANY INFORMATION I GOT.

12  Q.   IN THIS CASE, YOU DERIVED A LOT OF YOUR INFORMATION, I

13  WOULD ASSUME, FROM SPEAKING WITH COURIERS WHO HAD BEEN

14  ARRESTED; AM I RIGHT?

15  A.   THAT IS PART OF IT.

16  Q.   SPEAKING TO THEM AFTER THEY'RE ARRESTED?

17  A.   YES.

18  Q.   MANY TIMES, SPEAKING TO THEM AFTER THEIR CASE HAS ALREADY

19  GONE TO COURT?

20  A.   CORRECT.

21  Q.   THE PURPOSE OF SPEAKING TO THEM AFTER THE CASE HAS GONE TO

22  COURT IS TO OBTAIN A BENEFIT FOR THEM, RIGHT?

23  A.   YES.

24  Q.   ALL RIGHT.  TO OBTAIN A LOWER SENTENCE, RIGHT?

25  A.   IT IS REALLY TWOFOLD.  IT'S TO RECEIVE A BENEFIT FOR THE

1   PERSON, AND TO ALSO PROVIDE THE GOVERNMENT WITH OTHER FACETS OF

2   HOW THEY WERE INVOLVED.

3   Q.   AND IF THE GOVERNMENT -- IF THEY PROVIDE THE GOVERNMENT

4   WITH INFORMATION THAT LEADS TO THE PROSECUTION OF OTHER PEOPLE,

5   THEN THAT INFORMATION -- THEN THEY CAN RECEIVE EVEN MORE TIME

6   OFF THEIR SENTENCE, RIGHT?

7   A.   YES.

8   Q.   AND YOU'RE AWARE THAT THESE MEETINGS ARE COMMONLY CALLED A

9   "SAFETY VALVE MEETING"?

10           MR. CONOVER:  OBJECTION AS TO RELEVANCE, YOUR HONOR.

11           THE COURT:  OVERRULED.

12  BY MR. GARRISON:

13  Q.   COMMONLY CALLED A "SAFETY VALVE MEETING"?

14  A.   YES.

15  Q.   THEY'RE COMMONLY CALLED "COOPERATION MEETINGS"?

16  A.   CERTAINLY.

17  Q.   DO YOU KNOW THE SIGNIFICANCE FOR FEDERAL SENTENCING IN

18  TERMS OF SAFETY VALVE AND COOPERATION?

19           MR. CONOVER:  CALLS FOR A LEGAL EXCLUSION.  AND IS

20  IRRELEVANT, YOUR HONOR.

21           THE COURT:  OVERRULED.

22           THE WITNESS:  I KNOW ONE IS GREATER TIME OFF, BUT I

23  DON'T KNOW THE DIFFERENCE, NO.

24  BY MR. GARRISON:

25  Q.   ARE YOU FAMILIAR WITH MANDATORY-MINIMUM SENTENCES?

1   A.   YES.

2   Q.   ARE YOU AWARE THERE ARE TWO WAYS FOR AN INDIVIDUAL TO GET

3   BELOW A MANDATORY-MINIMUM SENTENCE?

4   A.   NO.

5   Q.   YOU'RE NOT?

6   A.   I DO NOT.

7   Q.   SO HOW MANY SAFETY VALVE DEBRIEFS HAVE YOU CONDUCTED IN

8   YOUR CAREER?

9   A.   PROBABLY OVER 30.

10   Q.   AND HOW MANY COOPERATION DEBRIEFS HAVE YOU CONDUCTED IN

11   YOUR CAREER?

12   A.   WHEN I REFER TO SAFETY VALVE OR COOPERATION, IN MY MIND, I

13   REFER TO ALL OF THEM AS PROFFER SESSIONS, SOMETHING THEY'RE

14   PROFFERING TO THE GOVERNMENT.  SO WHETHER THEY'RE SAFETY VALVE

15   OR COOPERATION MEETINGS, I DON'T DIFFERENTIATE BETWEEN THE TWO,

16   AS MY ROLE IN THIS DOESN'T CHANGE.

17   Q.   THE PROFFER IS FREQUENTLY TO GET BELOW A MANDATORY-MINIMUM

18   SENTENCE, RIGHT?

19   A.   IT SOUNDS RIGHT.

20   Q.   OKAY.  SO THESE FOLKS THAT ARE TALKING TO YOU, THE

21   INFORMANTS HAVE BEEN SENT TO PLEASE YOU; AM I RIGHT?

22   A.   IN THOSE CASES, YES.

23   Q.   THE PEOPLE THAT YOU'RE TALKING TO IN PROFFER SESSIONS HAVE

24   INCENTIVE TO PLEASE YOU, RIGHT?

25   A.   ONCE AGAIN, IN THOSE SPECIFIC INCIDENTS, YES.

1    Q.   BECAUSE IF YOU FEEL THAT THEY'RE TRUTHFUL WITH YOU, THEN

2    THEY MAY GET BELOW A MANDATORY-MINIMUM SENTENCE?

3    A.   YES.   ALTHOUGH I'M NOT THE ONE WHO MAKES THAT

4    DETERMINATION.

5    Q.   OKAY.   NOW WE'VE ESTABLISHED THAT PEOPLE THAT ARE INVOLVED

6    IN DRUG SMUGGLING ARE FREQUENTLY -- LYING IS A PART OF THEIR

7    BUSINESS, RIGHT?

8    A.   CORRECT.

9    Q.   WHEN THEY'RE TALKING WITH THESE INFORMANTS, AND THESE

10   PEOPLE WHO THEIR CASES HAVE ALREADY GONE TO COURT, YOU'RE

11   TALKING TO THEM BECAUSE THEY'RE PART OF THIS DRUG SMUGGLING

12   BUSINESS, RIGHT?

13   A.   CORRECT.

14   Q.   AND LYING IS PART OF THEIR BUSINESS?

15   A.   I GUESS IT WOULD GO HAND AND HAND, YES.

16   Q.   AND YOU WOULDN'T HAVE PUT IT PAST AN INFORMANT TO LIE TO

17   YOU, WOULD YOU?

18   A.   NO.

19   Q.   AND YOU WOULDN'T PUT IT PAST A DEFENDANT WHO STANDS TO

20   GAIN A SUBSTANTIAL BENEFIT FROM LYING TO YOU?

21   A.   NO.

22   Q.   IN FACT, YOU HAVE BEEN LIED TO MULTIPLE TIMES DURING

23   PROFFER SESSIONS; IS THAT RIGHT?

24   A.   SURE.

25   Q.   OKAY.   NOW THE U.S. GOVERNMENT HAS NO IDEA OF THE NUMBER

1  OF PEOPLE THAT ACTUALLY BRING DRUGS ACROSS THE BORDER EVERY

2  DAY; IS THAT RIGHT?

3  A.   THEY DO NOT KNOW THE TOTAL NUMBER, NO.

4  Q.   BUT THE U.S. GOVERNMENT DOES KNOW WHAT THE SEIZURES ARE?

5  A.   YES.

6  Q.   AND BY THE GOVERNMENT'S OWN ESTIMATES, THE GOVERNMENT

7  ESTIMATES THAT 10 TO 20 PERCENT OF SMUGGLERS ARE ARRESTED,

8  RIGHT?

9  A.   I'M NOT CERTAIN WHAT THE ESTIMATE IS.  THERE ARE MANY

10 SOURCES THAT THAT WOULD COME FROM.

11 Q.   OKAY.  YOUR BEST OPINION AS AN EXPERT, AS FAR AS AN

12 ESTIMATE, CAN YOU GIVE AN ESTIMATE AS TO ACTUALLY HOW MUCH OF

13 THE ACROSS BORDER SMUGGLING IS ACTUALLY CAUGHT?  CAN YOU GIVE

14 AN ESTIMATE?

15 A.   NO.

16 Q.   ALL RIGHT.  SO OF THE PEOPLE THAT ARE ARRESTED, BRINGING

17 DRUGS ACROSS THE BORDER, 95 PERCENT OF THOSE PEOPLE PLEAD

18 GUILTY; AM I RIGHT?

19 A.   IT IS HIGH.  IT PROBABLY IS AROUND 90 OR 95 PERCENT RATIO.

20 Q.   AND AS WE COVERED BEFORE, A LOT OF YOUR INFORMATION COMES

21 FROM SPEAKING WITH THOSE PEOPLE?

22 A.   SOME OF IT DOES, IN ADDITION TO TALKING TO SOURCES, IN

23 ADDITION TO TALKING TO OTHER AGENTS, AND IN ADDITION TO

24 REVIEWING LITERATURE FROM THE NATIONAL DRUG INTELLIGENCE

25 CENTER, THE OFFICE OF NATIONAL DRUG CONTROL POLICY, THE DRUG

1   ENFORCEMENT ADMINISTRATION.  AND ALSO, I GARNER FURTHER

2   APPRECIATION FOR WHAT DRUG TRAFFICKERS ARE USING BY

3   PARTICIPATING IN WHAT YOU REFER TO AS WIRE TAP INVESTIGATIONS,

4   BY LISTENING ON LINES OF FEDERAL AND STATE WIRE TAPS.

5   Q.   NOW OF THAT SMALL PERCENTAGE OF PEOPLE WHO DO NOT PLEAD

6   GUILTY IN THEIR CASES, PRIOR TO TRIAL, YOU DON'T SPEAK TO THEM,

7   RIGHT?

8           MR. CONOVER:  OBJECTION AS TO RELEVANCE, YOUR HONOR.

9           THE COURT:  SUSTAINED.  SUSTAINED.

10  BY MR. GARRISON:

11  Q.   AND, OF COURSE, YOU DON'T SPEAK TO PEOPLE WHO DON'T GET

12  CAUGHT?

13          MR. CONOVER:  OBJECTION AS TO RELEVANCE.

14          THE COURT:  NO.  OVERRULED.

15          THE WITNESS:  I HAVE SPOKEN TO PEOPLE THAT HAVE

16  SUCCESSFULLY SMUGGLED DRUGS.  A LOT OF PEOPLE THAT WIND UP

17  BEING SOURCES OF INFORMATION THAT ARE UNPAID OFTEN WILL GIVE

18  THE AGENTS WHEN WE INTERVIEW THEM AN APPRECIATION OF HOW MANY

19  TIMES THEY DID IT AND HOW OFTEN THEY WEREN'T CAUGHT BY DOING

20  IT.

21  Q.   AND AS AN IMMIGRATION AND CUSTOMS ENFORCEMENT SPECIAL

22  AGENT, WHAT YOU WANT IS, YOU WANT THE MOST AMOUNT OF

23  INFORMATION THAT YOU CAN GET, RIGHT?

24  A.   CORRECT.  THE AGENCY IS ACTUALLY HOMELAND SECURITY

25  INVESTIGATIONS, AND, YES.

1    Q.   SO YOU'RE AWARE THAT THERE ARE PEOPLE THAT ARE ACQUITTED

2    OF DRUG SMUGGLING, RIGHT?

3    A.   CORRECT.

4    Q.   DO YOU SPEAK WITH THEM?

5    A.   I HAVE NOT.

6    Q.   SO YOU DON'T MAKE AN ACTIVE EFFORT TO GO OUT AND SPEAK TO

7    THE PEOPLE WHO ARE FOUND NOT GUILTY?

8    A.   NO.

9    Q.   YOU ONLY SPEAK WITH THE PEOPLE WHO HAVE PLED GUILTY?

10   A.   NO, THAT'S NOT CORRECT.   AS I ALLUDED TO EARLIER, I ALSO

11   SPEAK TO PEOPLE WHO HAVE SUCCESSFULLY SMUGGLED DRUGS FOR YEARS

12   AND NOT BEEN CAUGHT.

13   Q.   BUT YOU DON'T SPEAK TO PEOPLE WHO ARE ACQUITTED?

14   A.   I DO NOT.

15   Q.   OKAY.   YOU MENTIONED YOU SPEAK TO OTHER AGENTS; IS THAT

16   RIGHT?

17   A.   CORRECT.

18   Q.   SO I'M SURE YOU'RE AWARE, OR YOU KNOW YOUR COLLEAGUE,

19   SPECIAL AGENT ROBERT FARAHAN (PHONETIC)?

20   A.   ROBERT?

21   Q.   FARAHAN.

22   A.   FARAHAN?

23   Q.   YES.

24   A.   NO.   WHAT AGENCY DOES HE WORK FOR?

25   Q.   ICE SPECIAL AGENT.

1  A.   DON'T KNOW HIM.

2       AS A SIDE NOTE, ICE WAS CREATED YEARS AGO, AND IT IS AN

3  ENORMOUS AGENCY.   THE AGENCY HERE IN SAN DIEGO IS CALLED

4  HOMELAND SECURITY INVESTIGATIONS BUT IT STILL HAS OVER 4-, 5-,

5  600 AGENTS.   IT IS POSSIBLE I WOULDN'T KNOW HIM.   AND I DON'T.

6  Q.   YOU'RE BASED IN THE SOUTHERN DISTRICT OF CALIFORNIA?

7  A.   CORRECT.

8  Q.   DO YOU KNOW ALL THE ICE AGENTS IN SOUTHERN CALIFORNIA?

9  A.   ABSOLUTELY NOT.

10  Q.   ARE YOU FAMILIAR -- STRIKE THAT.

11       NOW THERE IS A LOT OF MONEY TO BE MADE IN THE DRUG

12  SMUGGLING BUSINESS; IS THAT A FAIR STATEMENT?

13  A.   YES.

14  Q.   AND DRUG DEALERS DO WHAT THEY DO -- DRUG SMUGGLERS DO WHAT

15  THEY DO TO MAKE MONEY?

16  A.   CORRECT.

17  Q.   THEY WANT TO MAKE AS MUCH MONEY AS POSSIBLE?

18  A.   YES.

19  Q.   AND SOMETIMES, AS WE ALL KNOW, VIOLENCE SOMETIMES EVEN

20  ACCOMPANIES THAT.

21  A.   CORRECT.

22  Q.   NOW MOST OF THE TIME, A KNOWING COURIER MUST BE PAID BY

23  THE DRUG SMUGGLING ORGANIZATION, RIGHT?

24  A.   YOU SAID "MOST OF THE TIME"?

25  Q.   A KNOWING COURIER MUST BE PAID?

1    A.    A KNOWING COURIER IS DOING IT TO GET PAID, SO IT WOULD BE

2    ALL THE TIME.

3    Q.    DOING IT FOR MONEY?

4    A.    YES.

5    Q.    NOW ON THE OTHER HAND, IF A PERSON HAS NO KNOWLEDGE, THEN

6    NO PAYMENT IS NEEDED, RIGHT?

7    A.    I'M NOT SURE BECAUSE I'VE NEVER HEARD OF THAT.

8    Q.    JUST AS A MATTER OF LOGIC, IF ALL COURIERS DO IT TO GET

9    MONEY, AND SOMEBODY DOESN'T KNOW THAT THERE ARE DRUGS IN THE

10   CAR, NO PAYMENT WOULD BE NECESSARY, RIGHT?

11   A.    IF WE'RE SPEAKING HYPOTHETICALLY, WHICH IT SOUNDS LIKE WE

12   ARE, THEN, YES, I AGREE, YES.

13   Q.    AND THAT WOULD INCREASE THE DRUG SMUGGLING ORGANIZATION'S

14   PROFIT?

15   A.    ONCE AGAIN, HYPOTHETICALLY, I SUPPOSE THAT'S CORRECT.  BUT

16   IT WOULD INCREASE THEIR SIGNIFICANT RISK OF GETTING CAUGHT.

17   Q.    NOW THE VAST AMOUNTS OF MONEY THAT THE DRUG SMUGGLING

18   ORGANIZATIONS MAKE, THEY WANT TO KEEP ON MAKING THAT MONEY,

19   RIGHT?

20   A.    CORRECT.  YOUR QUESTION ALLUDES, THOUGH, THAT IT'S A HUGE

21   DRUG SMUGGLING NETWORK, MAKING BILLIONS.  THE REALITY IS THERE

22   ARE NUMEROUS SMALL GROUPS OF PEOPLE, 2'S AND 3'S, AND 4'S THAT

23   ARE RUNNING, SMUGGLING DRUGS ON THEIR OWN.  NOT ONE BIG

24   COLLECTIVE NETWORK IS MAKING BILLIONS.

25   Q.    WHOEVER IS MAKING MONEY, THEY WANT TO KEEP MAKING MONEY?

1   A.   CORRECT.

2   Q.   AND IF THEY GET CAUGHT, THEY CAN'T MAKE ANYMORE MONEY,

3   RIGHT?

4   A.   CORRECT.

5   Q.   IF THEY GET CAUGHT, THEY'RE GOING TO JAIL?

6   A.   YES.

7   Q.   THEY DON'T WANT TO GET CAUGHT, RIGHT?

8   A.   NO.

9   Q.   NOW IF A DRUG SMUGGLING ORGANIZATION INFORMS A COURIER

10  ABOUT THE DRUGS, THAT PERSON CAN TELL OTHER PEOPLE; IS THAT

11  RIGHT?

12  A.   NOT COMPLETELY RIGHT, NO.  THEY'LL -- WITH -- AS I SPOKE

13  OF EARLIER, WITH THE DIVISION OF LABOR, THE DRUG COURIER IS

14  ONLY GIVEN SO MUCH INFORMATION, AS THE SCOUT, SO THEY WON'T BE

15  ABLE TO TELL VERY MUCH.

16  Q.   BUT THAT INFORMATION THAT THEY'RE GIVEN, THEY CAN TELL

17  THAT TO OTHER PEOPLE, RIGHT?

18  A.   IF THEY'RE GIVEN INFORMATION, OF COURSE THEY CAN TELL

19  OTHER PEOPLE.

20  Q.   THEY CAN TELL YOU THAT INFORMATION?

21  A.   YES.

22  Q.   AND FREQUENTLY, THEY DO?

23  A.   CORRECT.

24  Q.   SO THE LESS INFORMATION THAT A DRUG COURIER HAS, THE MOST

25  SAFETY FOR THE DRUG SMUGGLING ORGANIZATION, RIGHT?

1    A.   YES.

2    Q.   NOW YOU SAID ON DIRECT THAT THIS IS A BUSINESS, RIGHT?

3    A.   IT IS.

4    Q.   ARE YOU FAMILIAR WITH THE TERM "SHRINKAGE"?

5    A.   YES.

6    Q.   SHRINKAGE IS THE LOSS OF GOODS PRIOR TO SALES OF THOSE

7    GOODS, RIGHT?

8    A.   CORRECT.

9    Q.   AND MOST SHRINKAGE IS CAUSED BY THEFT?

10   A.   YES.

11   Q.   BUT TO STEAL SOMETHING, YOU HAVE TO KNOW ABOUT IT, RIGHT?

12   A.   THAT'S CORRECT.

13   Q.   SO IF YOU DON'T KNOW ABOUT IT, THEN YOU CAN'T STEAL IT?

14   A.   THAT'S CORRECT.

15   Q.   WITH REGARDS TO DRUG SMUGGLING, YOU TESTIFIED ABOUT THE

16   STRUCTURE OF DRUG SMUGGLING ORGANIZATIONS, RIGHT?

17   A.   YES.

18   Q.   YOU TESTIFIED ABOUT YOUR OPINION AS TO WHETHER UNKNOWING

19   COURIERS EXIST, RIGHT?

20   A.   I HAVE.

21   Q.   AS AN EXPERT IN THIS FIELD, HAVE YOU REVIEWED SCHOLARLY

22   ARTICLES REGARDING THIS EXACT SUBJECT?

23   A.   I'VE REVIEWED INTELLIGENCE ARTICLES, BASED ON DRUG

24   SMUGGLING NETWORKS.  THE PREPONDERANCE OF THE INFORMATION I

25   GET, I GARNER FROM MY EXPERIENCE, IS FROM TALKING TO ARRESTEES,

1   SOURCES, PEOPLE THAT RECRUIT PEOPLE AROUND DRUGS, AS WELL AS

2   SELLERS, LEADERS, SMUGGLING ORGANIZATIONS AND AGENTS.

3   Q.   YOU'RE FAMILIAR WITH WHAT A "BLIND MULE" IS, RIGHT?

4   A.   I'M FAMILIAR WITH IT FROM COURT.

5   Q.   "BLIND MULE" IS WHAT IS COMMONLY EQUATED TO AN UNKNOWING

6   COURIER, RIGHT?

7   A.   YES.

8   Q.   ARE YOU FAMILIAR WITH AN ARTICLE WRITTEN BY DEA AGENT JIM

9   DELANEY (PHONETIC), OUT OF THE SACRAMENTO DEA OFFICE, CALLED

10  "BLIND MULES, FACT OR FICTION"?

11  A.   NO.

12  Q.   ARE YOU FAMILIAR WITH AN ARTICLE WRITTEN BY MICHAEL

13  LEVINE, ENTITLED "BLIND MULES, FICTION OR FACT"?

14  A.   I KNOW A MICHAEL LEVINE, NOT PERSONALLY, BUT I'VE NOT READ

15  THAT ARTICLE.   I'VE HEARD PARTS OF IT.

16  Q.   YOU KNOW A MICHAEL LEVINE?

17  A.   YES.

18  Q.   YOU KNOW MICHAEL LEVINE WAS A FORMER CUSTOMS AGENT, RIGHT?

19  A.   HE'S A FORMER DRUG ENFORCEMENT AGENT, YES.

20  Q.   HE'S A FORMER BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS

21  AGENT.

22  A.   I DON'T KNOW THAT.

23  Q.   FORMER IRS CRIMINAL INVESTIGATOR.

24  A.   I DON'T KNOW.

25  Q.   FORMER MEMBER OF THE FBI, DEA TASK FORCE?

1   A.   I BELIEVE THAT TO BE CORRECT.

2   Q.   MICHAEL LEVINE IS ALSO AN EXPERT IN THE FIELD OF UNKNOWING

3   COURIERS, ISN'T HE?

4   A.   I DON'T KNOW IF HE'S AN EXPERT OR NOT.

5   Q.   MICHAEL LEVINE'S OPINION IS THAT THERE IS SUCH A THING AS

6   UNKNOWING COURIERS --

7        MR. CONOVER:  OBJECTION, YOUR HONOR.  IT IS IMPROPER

8   IMPEACHMENT.  IMPROPER QUESTIONING.  HE DOESN'T KNOW THIS

9   WITNESS HE'S REFERRING TO.  IT'S HEARSAY.  IT'S NOT A COURT

10  STATEMENT.

11        THE COURT:  SUSTAINED.

12        MR. GARRISON:  YOUR HONOR, CAN I MAKE A RECORD?

13        THE COURT:  NO.  THE OBJECTION IS SUSTAINED.

14  BY MR. GARRISON:

15   Q.   NOW AGENT KRAUSE, IN THIS CASE, YOU'RE TESTIFYING AS AN

16  EXPERT WITNESS, RIGHT?

17   A.   CORRECT.

18   Q.   HOWEVER, AND IN THE NORMAL COURSE OF CASE PRESENTATION,

19  THE EXPERT WITNESS REVIEWS THE MATERIALS, CORRECT?

20   A.   CORRECT.

21   Q.   AND THE EXPERT WITNESS PREPARES THEIR EXPERT OPINION,

22  RIGHT?

23   A.   YES.

24   Q.   AND THAT IS THE EXTENT OF THE EXPERT WITNESS'S INVOLVEMENT

25  IN THE CASE, RIGHT?

1   A.   GENERALLY.

2   Q.   THAT IS NOT THE CASE HERE, RIGHT?

3   A.   CORRECT.

4   Q.   YOU'VE BEEN INVOLVED IN THE INVESTIGATION OF THIS CASE?

5   A.   I'VE BEEN SUPERFICIALLY INVOLVED IN THE INVESTIGATION OF

6   THIS CASE.   I WAS ASKED ABOUT ONE TIME, ON ONE DAY, FOR A FEW

7   HOURS.

8   Q.   RIGHT.   ON NOVEMBER 17TH, YOU WERE ONE OF THE AGENTS THAT

9   WENT ON THE INVESTIGATION UP TO LOS ANGELES?

10   A.   CORRECT.

11   Q.   YOU WERE ONE OF THE AGENTS WHO WENT TO MR. FLORES'S SON'S

12   HOUSE?

13   A.   YES.

14   Q.   AND, IN FACT, IT WAS YOUR CARD THAT WAS LEFT WITH

15   MR. FLORES'S SON'S GIRLFRIEND?

16   A.   NOT A CARD.   JUST A PHONE NUMBER, A POINT OF CONTACT.

17   BECAUSE THERE WERE NUMEROUS PEOPLE BEING INTERVIEWED AT ONCE,

18   AND THE PERSON I WAS WITH THAT WAS INTERVIEWING, I LEFT MY

19   NUMBER INSTEAD OF THEIRS, BUT NOT A CARD.

20   Q.   NOW YOU WORK FOR THE UNITED STATES GOVERNMENT, CORRECT?

21   A.   CORRECT.

22        THE COURT:   ALL RIGHT, MR. GARRISON, I PROMISED THE

23   JURY THAT WE WOULD TAKE A LUNCH AT 12:30.   IT IS A COUPLE

24   MINUTES PAST THAT.

25      LET'S TAKE A LUNCH BREAK, LADIES AND GENTLEMEN.   I'M GOING

```
1    TO GIVE YOU 45 MINUTES, GIVE OR TAKE.  PLEASE BE BACK OUTSIDE

2    THOSE DOORS PROMPTLY AT A QUARTER AFTER, OKAY.  PLEASE REMEMBER

3    MY ADMONITION.  THANK YOU.

4         SIR, YOU MAY STEP DOWN.

5         ALL RIGHT, WE'RE IN RECESS.

6              MR. CONOVER:  YOUR HONOR, WE HAD ONE OTHER QUESTION

7    IF YOU DON'T MIND.  IT WILL TAKE ONE SECOND.  IF YOU DON'T

8    MIND.  I APOLOGIZE.

9                        (JURY EXITS COURTROOM.)

10             MR. CONOVER:  IT'S A SCHEDULING ISSUE, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

12   THAT THE JURY HAS LEFT THE COURTROOM.

13        ALL RIGHT, WHAT IS THE ISSUE?

14             MR. CONOVER:  THE GOVERNMENT HAS FINISHED ITS CASE.

15   THIS IS OUR LAST WITNESS.  I BELIEVE CROSS-EXAMINATION IS ABOUT

16   TO TERMINATE.  WE WANT TO LET THE COURT KNOW, WE WILL NOT BE

17   HAVING ANY WITNESSES.  WE'LL BE RESTING.  SO WE WANT TO SEE IF

18   WE SHOULD PLAN ON CLOSING THIS AFTERNOON OR IF THERE WOULD BE

19   ADDITIONAL WITNESSES BEING PUT ON BY THE DEFENSE.  IF WE SHOULD

20   PLAN ON TOMORROW MORNING FOR THE COURT, I WANTED TO GIVE THE

21   COURT AN UPDATE THAT WE WILL BE FINISHED.

22             THE COURT:  MR. GARRISON, MR. FAKHOURY, ARE YOU IN A

23   POSITION TO DISCLOSE WHETHER OR NOT YOU'RE GOING TO BE CALLING

24   ANY WITNESSES TO TESTIFY?

25             MR. GARRISON:  YOUR HONOR, WE'RE NOT IN THAT POSITION
```

1    RIGHT NOW.  HOWEVER, YOUR HONOR, IF I COULD JUST PROPOSE, WE

2    HAVEN'T DONE OUR RULE 30 CONFERENCE YET.

3            THE COURT:  RIGHT.

4            MR. GARRISON:  I AM NOT ABOUT TO BE DONE WITH THE

5    AGENT.  I STILL HAVE A WHOLE BUNCH OF CHAPTERS ON THE TECS

6    SYSTEM TO GO THROUGH.

7            THE COURT:  OKAY.

8            MR. GARRISON:  SO MY PROPOSAL WOULD BE THAT IF WE

9    FINISH TODAY, THAT WE DO OUR -- WE LET THE JURY GO, DO OUR RULE

10   30 CONFERENCE, AND THEN, DO OUR CLOSINGS TOMORROW MORNING, WHEN

11   THE JURY IS FRESH, INSTEAD OF AFTER A WHOLE DAY OF TESTIMONY.

12           THE COURT:  OKAY.

13           MR. CONOVER:  THE GOVERNMENT IS PREPARED TO DO

14   CLOSING ARGUMENTS TODAY, YOUR HONOR.  WE WOULDN'T SEE ANOTHER

15   REASON TO KEEP THE JURY AROUND FOR A FULL OTHER DAY.

16           THE COURT:  WE HAVE TO DO THE RULE 30 CONFERENCE.

17   BUT I DON'T WANT TO DO THE RULE 30 CONFERENCE UNTIL ALL THE

18   EVIDENCE IS IN.  SO I DON'T WANT TO DO IT BEFORE THE DEFENSE

19   HAS FINISHED WITH ITS WITNESSES IF IT'S GOING TO CALL ANY.

20           MR. GARRISON:  I WASN'T PROPOSING THAT, YOUR HONOR.

21           THE COURT:  I'M SORRY, I UNDERSTOOD YOU TO SAY THAT.

22           MR. CONOVER:  SINCE THE GOVERNMENT HAS FINISHED ITS

23   CASE, IS THERE A POINT WHEN THE DEFENSE -- IT SEEMS LIKE THAT

24   IS THE POINT WE SHOULD KNOW IF THEY'RE PUTTING ON A CASE.

25   WE'VE FINISHED OUR CASE.  THERE IS NO MORE WITNESSES FOR THE

1   GOVERNMENT.  AT THAT POINT, WE SHOULD BE ENTITLED TO HAVE AN

2   IDEA IF WE'RE CONTINUING ON OR FINISHING WITH THE JURY.

3           THE COURT:  I DON'T KNOW IF THERE IS ANYTHING THAT

4   SAYS I CAN FORCE THEM TO TELL ME WHETHER OR NOT THEY'RE CALLING

5   ANY WITNESS.  I DON'T KNOW ANY REASON WHY I SHOULD.  AGENT

6   KRAUSE IS STILL ON THE WITNESS STAND.  AND WE DON'T KNOW WHAT

7   IS GOING TO HAPPEN THEREAFTER.  SO I'M NOT GOING TO FORCE THEM

8   TO DISCLOSE THAT.

9       I AM GOING TO SAY THIS:  I DON'T KNOW THAT THE RULE 30 --

10  BY THE WAY, DID I GET ANY ADDITIONAL INSTRUCTIONS FROM THE

11  GOVERNMENT, ANY INSTRUCTIONS THAT WERE NOT ALREADY AGREED TO?

12          MR. CONOVER:  NO, YOUR HONOR.

13          THE COURT:  SO THE ONLY JURY INSTRUCTIONS THAT I'M

14  GOING TO HAVE TO TALK ABOUT AT THE RULE 30 CONFERENCE ARE THOSE

15  THAT HAVE BEEN SUBMITTED BY THE DEFENSE, WHICH THE GOVERNMENT

16  HAS NOT AGREED TO, RIGHT?

17          MR. FAKHOURY:  THAT'S CORRECT, YOUR HONOR.

18          THE COURT:  SO MY PROPOSAL IS THE FOLLOWING:  WE'RE

19  GOING TO FINISH WITH AGENT KRAUSE.  AND THEN I'M GOING TO ASK

20  THE DEFENSE IF THEY'RE GOING TO HAVE ANY WITNESSES.  AND THEN

21  WE'RE GOING TO SEE WHAT HAPPENS.  IF THERE AREN'T ANY

22  WITNESSES, THEN WE WILL HAVE OUR RULE 30.  I'LL SEND THE JURY

23  OUT FOR -- I CAN'T SEE THAT OUR RULE 30 WOULD TAKE MORE THAN

24  MAYBE, GOSH, AN HOUR IF THAT.  I WILL THEN COME BACK AND

25  INSTRUCT THE JURY, AND THEN LET YOU GO HOME, DEPENDING ON THE

1  AMOUNT OF TIME THAT IS LEFT, LET YOU GO HOME AND COME BACK

2  TOMORROW MORNING TO DELIVER YOUR CLOSING ARGUMENTS.  AND LET IT

3  GO AT THAT, OKAY.

4       ON THE OTHER HAND, IF WE -- IF WE FINISH EARLY ENOUGH, I

5  MAY JUST HAVE YOU DO YOUR CLOSING ARGUMENTS TONIGHT AS WELL.

6  WE'LL SEE.  I DON'T LIKE TO KEEP JURIES WAITING AND HANGING

7  AROUND ANYMORE -- THEIR TIME IS VALUABLE, ETC.  BUT BY THE SAME

8  TOKEN, SOMETIMES IT'S NECESSARY.  SO WE'LL SEE HOW IT GOES.

9  WE'LL PLAY IT BY EAR.

10            MR. CONOVER:  THANK YOU, YOUR HONOR.

11            THE COURT:  TRIAL COUNSEL ALWAYS HAVE BE READY TO

12  DEAL WITH THE UNEXPECTED, AT LEAST THAT HAS ALWAYS BEEN MY

13  VIEW, BOTH AS A LAWYER, AND AS A JUDGE.

14       SEE YOU AT A QUARTER AFTER 1:00.  THANK YOU.

15            MR. GARRISON:  THANK YOU.

16                      (LUNCH RECESS TAKEN.)

17            THE COURT:  WELCOME BACK.  ALL RIGHT, MR. GARRISON.

18  BY MR. GARRISON:

19  Q.  ALL RIGHT.  SO, AGENT KRAUSE, WE WERE TALKING ABOUT YOUR

20  EMPLOYMENT.  AND I HAD ASKED YOU RIGHT BEFORE WE LEFT, YOU WORK

21  FOR THE UNITED STATES GOVERNMENT, CORRECT?

22  A.  CORRECT.

23  Q.  AND THAT IS THE SAME UNITED STATES GOVERNMENT THAT IS

24  PROSECUTING MR. FLORES, RIGHT?

25  A.  THAT'S CORRECT.

1   Q.   NOW THE SAME GOVERNMENT THAT PAYS YOUR SALARY?

2   A.   YES.

3   Q.   YOU'RE TESTIFYING AS A GOVERNMENT WITNESS TODAY?

4   A.   THAT'S CORRECT.

5   Q.   NOT A DEFENSE WITNESS?

6   A.   NO.

7   Q.   YOU'VE MET WITH THE PROSECUTORS IN THIS CASE BEFORE?

8   A.   I HAVE.

9   Q.   HOW MANY TIMES HAVE YOU MET WITH THEM?

10  A.   NOT CERTAIN, PROBABLY FIVE OR SIX.

11  Q.   ALL RIGHT.  YOU'VE NEVER MET WITH ME, RIGHT?

12  A.   I DON'T BELIEVE SO.  NOT IN THIS CASE.

13  Q.   OR ANYONE FROM THE DEFENSE?

14  A.   NO.

15  Q.   NOW, I WANT TO TALK TO YOU ABOUT YOUR INVOLVEMENT IN THE

16  INVESTIGATION HERE.  SPECIFICALLY, I WANT TO DIRECT YOUR

17  ATTENTION TO WHEN YOU WERE AT ALEX FLORES'S HOUSE, OKAY?

18  A.   YES.

19  Q.   NOW AS YOU STATED -- OR I'M SORRY, I DON'T REMEMBER IF YOU

20  STATED, BUT MR. FLORES WAS NOT HOME AT THAT TIME?

21  A.   CORRECT.

22  Q.   HIS GIRLFRIEND WAS THERE?

23  A.   I DON'T REMEMBER HIS GIRLFRIEND -- ALEX FLORES LIVES AT

24  ALTA DENA?

25  Q.   YES.

1   A.   YES, HIS GIRLFRIEND WAS THERE.

2   Q.   AND THAT'S THE LADY THAT YOU GAVE YOUR NAME AND NUMBER TO,

3   RIGHT?

4   A.   CORRECT.

5   Q.   THE TEAM OF AGENTS WENT TO THE DOOR; IS THAT CORRECT?

6   A.   YES.

7   Q.   ENTERED THE HOUSE?

8   A.   CORRECT.

9   Q.   THE TEAM OF AGENTS SEARCHED THE HOUSE?

10   A.   IT WAS A FIELD INTERVIEW.  SO WHAT WE DO ON FIELD

11   INTERVIEWS IS, WE CONDUCT A KNOCK, WE IDENTIFY OURSELVES, AND

12   WE ASK PERMISSION TO COME IN.  AND AFTER WE WERE GIVEN

13   PERMISSION TO COME IN, WE TALKED TO I BELIEVE THIS LADY

14   REFERENCED, AND THEY GAVE US PERMISSION TO LOOK AROUND THE

15   HOUSE AND TALK TO THEM.

16   Q.   SO YOU ACTUALLY -- YOUR TESTIMONY IS THAT YOU DID SEARCH

17   THE HOUSE?

18   A.   I DON'T REMEMBER SEARCHING ANYTHING IN THE HOUSE.  I DID

19   NOT IS WHAT I CAN TESTIFY TO.

20   Q.   DID OTHER AGENTS?

21   A.   AS FAR AS I KNOW, NORMALLY ON THOSE TYPES OF INTERVIEWS, A

22   FIELD INTERVIEW LIKE THAT, WE WOULD NOT SEARCH ANYTHING IN THE

23   HOUSE.  WE MIGHT LOOK AT DIFFERENT AREAS, PERHAPS AREAS THAT

24   COULD HIDE PEOPLE.  BECAUSE IN FIELD INTERVIEWS, THE GREATEST

25   RISK TO THE OFFICER IS SITTING INSIDE SOMEONE'S HOUSE,

1    ESPECIALLY WITH DRUG TRAFFICKING, AND SOMEONE ELSE BEING

2    INVOLVED, SITTING OR HIDING IN CLOSETS.  SO NORMALLY, WHAT WE

3    WOULD DO SI, WE WOULD CLEAR THE HOUSE.  AND WE GO CLEAR THE

4    COMMON AREAS AND LOOK FOR OTHER PEOPLE BECAUSE THAT'S THE

5    GREATEST RISK.

6    Q.   THAT'S CALLED A "PROTECTIVE SWEEP"?

7    A.   I GUESS YOU COULD CALL IT A PROTECTIVE SWEEP.

8    Q.   AND THAT TAKES ROUGHLY ABOUT FIVE MINUTES, DEPENDING ON

9    THE SIZE OF THE HOUSE?

10   A.   I SUPPOSE IT DEPENDS ON THE SIZE OF THE HOUSE AND HOW MANY

11   PEOPLE YOU HAVE DOING IT, AND ALSO HOW MANY PEOPLE ARE

12   CONTACTED IN THE HOUSE.

13   Q.   HOW LONG DID IT TAKE HERE?

14   A.   I DON'T KNOW.  BECAUSE I WAS SITTING DOWN WITH TWO OTHER

15   AGENTS AND EVENTUALLY A POLICE OFFICER THAT WE CONTACTED CAME

16   OVER, WHICH WE NORMALLY DO IN THE COURSE OF DUTY FOR OFFICER

17   SAFETY.  IF THERE IS A SHOOTING OR SOME SORT IN THE HOUSE, IT'S

18   BETTER TO HAVE THE LOCAL POLICE NOT ONLY INVOLVED, BUT AWARE

19   THAT WE ARE THERE.  SO ONCE WE ENTERED THE HOUSE, I DIDN'T -- I

20   ACTUALLY SAT DOWN WITH THE FEMALE, THE GIRLFRIEND, AND TALKED

21   TO HER WITH OTHER AGENTS.

22   Q.   AND SHE WAS THE ONLY ONE IN THE HOUSE AT THAT TIME?

23   A.   NO, THERE WERE OTHER PEOPLE.

24   Q.   HOW MANY OTHER PEOPLE?

25   A.   I DO NOT RECALL.

1  Q.   AND THERE WERE SIX AGENTS?

2  A.   SIX AGENTS SOUNDS RIGHT.

3  Q.   AND ALSO HOW MANY LOCAL POLICE OFFICERS?

4  A.   ONE.   THE LOCAL POLICE OFFICER DID NOT COME UNTIL AFTER WE

5  WERE THERE FOR A FEW MINUTES.

6  Q.   LET'S MOVE TO TALK ABOUT TECS AND THAT AREA OF YOUR

7  TESTIMONY, OKAY?

8  A.   SURE.

9  Q.   IF I COULD -- YOU HAVE THE TECS RECORDS UP THERE?

10  A.   I DO.

11  Q.   IF I CAN RETRIEVE THOSE.   NOW I WANT TO TALK TO YOU FIRST

12  ABOUT SECONDARY INSPECTION, ALL RIGHT?

13  A.   ALL RIGHT.

14  Q.   SECONDARY INSPECTION IS A MORE INTENSIVE INSPECTION THAN

15  PRIMARY; IS THAT RIGHT?

16  A.   CORRECT.

17  Q.   AND THE BASIC POINT IS, THAT IF THERE IS SIGNS OF -- IF

18  SOMETHING APPEARS SUSPICIOUS, THEY GO TO A MORE INTENSIVE

19  INSPECTION, RIGHT?

20  A.   YES.   IT IS AN AREA WHERE THE OFFICERS -- THERE IS A

21  LITTLE MORE SECURITY FOR THE OFFICERS TO INSPECT THE VEHICLE.

22  Q.   NOW SOMETIMES PEOPLE, OR AUTOMOBILES, MAY BE REFERRED TO

23  SECONDARY INSPECTION AUTOMATICALLY; IS THAT RIGHT?

24  A.   THAT'S CORRECT.

25  Q.   ALL RIGHT.   BY THE COMPUTER?

1    A.   YES.

2    Q.   THAT WOULD BE CALLED A "COMPUTER-GENERATED REFERRAL"?

3    A.   RIGHT.   I BELIEVE THAT'S WHAT IT'S CALLED.

4    Q.   ALL RIGHT.   AND THEY COULD BE REFERRED EVERY TIME THEY

5    CROSS THE BORDER?

6    A.   NO.   WHAT YOU'RE TALKING ABOUT, THEY ARE TWO DIFFERENT

7    THINGS.   ONE IS ABOUT TEN OR TWELVE YEARS AGO, THE COMMISSIONER

8    OF CUSTOMS WANTED TO KNOW THAT VERY QUESTION YOU ASKED EARLIER,

9    HOW MANY DRUGS CROSS THE BORDER AND GET THROUGH.   SO THEY

10   DEVELOPED A RANDOM COMPUTER ANALYSIS THAT WOULD SEND CARS FOR

11   RANDOM INSPECTION.   THE OTHER TYPE OF INSPECTION, OR

12   COMPUTER-GENERATED REFERRAL, THAT EXISTS IS BY A TECS LOOKOUT

13   THAT AN OFFICER OR AGENT CAN PUT IN IF THEY SUSPECT SOMEONE IS

14   SMUGGLING DRUGS, WEAPONS, A FUGITIVE FROM JUSTICE OR ANYTHING

15   LIKE THAT.   SO THERE ARE TWO DIFFERENT TYPES.   ONE WOULD BE

16   RANDOMLY GENERATED BY THE COMPUTER.   ONE WOULD BE PLACED IN THE

17   SYSTEM BY AN OFFICER OR AGENT.

18   Q.   SO LET'S TALK ABOUT THE LATTER, WHICH WOULD BE -- YOU

19   INDICATED A FEW REASONS WHY THEY MIGHT HAVE THAT LOOKOUT IN THE

20   COMPUTER.   ONE OF THEM WOULD BE IF THEY WERE A FUGITIVE FROM

21   JUSTICE, RIGHT?

22   A.   CERTAINLY.

23   Q.   SO IF THERE WAS A WARRANT OUT FOR THEIR ARREST, THEN THEY

24   COULD HAVE A LOOKOUT IN THE COMPUTER, RIGHT?

25   A.   CORRECT.

1   Q.   AND JUST TO BE CLEAR, THERE ARE SOME FOLKS WHO ARE

2   REFERRED TO SECONDARY EVERY SINGLE TIME THEY CROSS THE BORDER?

3   A.   I DON'T KNOW OF ANY THAT ARE REFERRED EVERY SINGLE TIME

4   THEY CROSS THE BORDER.

5   Q.   YOU DON'T KNOW OF ANY?

6   A.   NO.   I'VE HEARD OF PEOPLE GETTING REFERRED MULTIPLE TIMES,

7   FOR DIFFERENT REASONS.   AND SOME OCCASIONS THEY'RE REFERRED TO

8   SECONDARY NOT BECAUSE OF ANYTHING GENERATED BY THE COMPUTER,

9   BUT MAYBE SOMETHING IS WRONG WITH THEIR DOCUMENT OR LICENSE

10  PLATE OR REGISTRATION.   AND IT'S SO EGREGIOUS, THAT EVERY

11  SINGLE OFFICER WILL REFER THEM.

12       ON OTHER OCCASIONS, IF THERE IS POTENTIALLY A RANDOM

13  LOOKOUT, OR LOOKOUT GENERATED, AFTER THE FIRST COUPLE TIMES

14  THEY'RE REFERRED AND NOTHING IS FOUND, NORMALLY THAT LOOKOUT

15  WOULD BE REMOVED.   SO AS FAR AS SOMEONE GETTING REFERRED EVERY

16  SINGLE TIME THEY CROSS, I HAVEN'T HEARD OF THAT FOR MORE THAN A

17  WEEK OR SO.

18  Q.   SOMETIMES A LOOKOUT MAY BE PUT IN THE COMPUTER IF SOMEBODY

19  HAS A PRIOR CONVICTION, RIGHT?

20  A.   IT IS POSSIBLE.

21  Q.   ALL RIGHT.   NOW IN TERMS OF HOW LONG SECONDARY TAKES, I

22  MEAN, OBVIOUSLY THAT'S A RELATIVE QUESTION, BUT SECONDARY CAN

23  TAKE A LONG TIME; IS THAT RIGHT?

24  A.   CORRECT.

25  Q.   FOR EXAMPLE, IF IT'S A BUSY DAY AT THE PORT, AND A CAR IS

1   REFERRED TO SECONDARY, THEY COULD BE IN SECONDARY FOR TWO TO

2   THREE HOURS?

3   A.   YES.

4   Q.   ALL RIGHT.   AND THAT CAN SIGNIFICANTLY DELAY PEOPLE; YOU

5   RECOGNIZE THAT?

6   A.   OF COURSE.

7   Q.   NOW I WANT TO TALK TO YOU ABOUT TANDEM CROSSINGS.   THERE

8   ARE THOUSANDS AND THOUSANDS OF PEOPLE WHO CROSS THE -- OUR

9   BORDERS EVERY DAY, RIGHT?

10  A.   CORRECT.

11  Q.   JUST AT SAN YSIDRO AND OTAY, WE HAVE THOUSANDS AND

12  THOUSANDS OF PEOPLE WHO CROSS EVERY DAY?

13  A.   YES.   ABOUT 75- OR 80,000 PEOPLE EVERY DAY.

14  Q.   SOME PEOPLE LIVE IN MEXICO AND COME HERE TO WORK?

15  A.   SURE.

16  Q.   SOME PEOPLE GO TO MEXICO TO WORK AND THEN LIVE IN THE

17  UNITED STATES?

18  A.   CORRECT.

19  Q.   WE CERTAINLY DO LIVE IN A CROSS-BORDER COMMUNITY, DON'T

20  WE?

21  A.   WE DO.

22  Q.   NOW THERE ARE SOME LEGITIMATE REASONS WHY A PERSON MAY

23  WALK ACROSS WHILE THEY'RE TRAVELING COMPANION DRIVES ACROSS,

24  AREN'T THERE?

25  A.   I'M NOT SURE.

1   Q.   WELL, ARE YOU FAMILIAR WITH THE "SENTRI PASS"?

2   A.   YES.

3   Q.   OKAY.   WHAT IS A "SENTRI PASS"?

4   A.   A SENTRI PASS IS THE GOVERNMENT'S ATTEMPT TO FACILITATE

5   TRAVELERS COMING IN AND OUT OF THE COUNTRY OR SPECIFICALLY INTO

6   THE COUNTRY AFTER THEY SUBMIT TO A BACKGROUND INVESTIGATION,

7   FINGERPRINT ANALYSIS, PAY A FEE, AND SUBMIT THEIR VEHICLE TO

8   PUT A TRANSPONDER ON IT.   IT'S BASICALLY TO EXPEDITE THE

9   PROCESS.   MOST PORTS OF ENTRY HAVE A LANE OR TWO THAT ARE

10  DESIGNATED SENTRI LANES.   AND WITH THAT TYPE OF PASS, THE ONLY

11  PEOPLE ALLOWED IN THAT CAR ARE THE ONES WHO HAVE GONE THROUGH

12  THAT BACKGROUND CHECK.

13  Q.   SO IF A DRIVER HAD THAT SENTRI PASS, THEY'RE GOING THROUGH

14  THE SENTRI LANE; IS THAT CORRECT?   BUT IF THEY HAVE --

15          THE COURT:   LET ME INTERRUPT YOU FOR A SECOND.

16      DID YOU SAY THEY PUT A TRANSPONDER ON THE VEHICLE?

17          THE WITNESS:   THEY DO, YOUR HONOR.

18          THE COURT:   OKAY.   I DIDN'T KNOW IF I HEARD YOU

19  CORRECTLY.

20          THE WITNESS:   BY TRANSPONDER, NOT THAT THE GOVERNMENT

21  IS GOING TO TRACK THEM, FOLLOW THEM, BUT MOREOVER, THE VEHICLE,

22  TO EXPEDITE PROCESSING THE VEHICLE, A SMALL TRANSPONDER IS

23  PLACED IN THE VEHICLE, AND IT TRANSMITS MESSAGES BEFORE IT EVEN

24  GETS TO THE BOOTH.   SOME OF THE MESSAGES IT TRANSPONDS ARE THE

25  PERSON THAT IS SUPPOSED TO BE WITHIN THE VEHICLE, THE VEHICLE

1    ITSELF, ANY PASSENGERS THAT ARE ENROLLED IN THE SENTRI PROGRAM.

2    SO IT'S NOT NECESSARILY A TRANSPONDER, LIKE TRACKING.  IT IS

3    GENERATING INFORMATION, MUCH LIKE AN EXPRESSWAY OR PASSWAY THAT

4    YOU PAY FOR.

5    BY MR. GARRISON:

6    Q.   SO OBVIOUSLY BACK TO MY QUESTION, I DON'T THINK WE GOT TO

7    IT, WHICH WAS, IF THE PERSON WHO WAS ACCOMPANYING THE SENTRI

8    PASSHOLDER, DOES NOT HAVE A SENTRI PASS, THEY CANNOT GO THROUGH

9    THE SENTRI LANE, RIGHT?

10   A.   CORRECT.  IN THIS EXAMPLE, THEY COULD NOT GO THROUGH THE

11   SENTRI LANE.

12   Q.   SO IN THAT CASE, IT WOULD SLOW DOWN THE PERSON WITH THE

13   SENTRI PASS TO HAVE THAT PERSON RIDE WITH THEM THROUGH THE

14   BORDER?

15   A.   I DON'T KNOW -- I DON'T KNOW IF IT WOULD SLOW THEM DOWN.

16   ALL THEY HAVE TO DO IS PULL OVER AND LET THE PERSON OUT.  IT

17   ISN'T GOING TO TAKE MUCH TIME TO DO THAT.

18   Q.   THEY WOULD LET THE PERSON OUT, AND THAT PERSON WOULD HAVE

19   TO CROSS PEDESTRIAN?

20   A.   CORRECT.

21   Q.   ALL RIGHT.  AND SO I GUESS ONE LEGITIMATE REASON THAT ONE

22   TRAVELER MAY WALK ACROSS AND A CO-TRAVELER MAY DRIVE ACROSS IS

23   IN TERMS OF TIME.  IT IS QUICKER SOMETIMES.

24   A.   I'M NOT SURE WHY IT WOULD BE ANY QUICKER.

25   Q.   IT TAKES LESS TIME SOMETIMES IF SOMEBODY WALKS ACROSS AND

1    SOMEBODY DRIVES ACROSS.

2    A.   IN THE SENTRI EXAMPLE, IT MAY.  OTHER EXAMPLES, IT WOULD

3    TAKE THE SAME AMOUNT OF TIME BECAUSE THE PEDESTRIAN ALSO HAS TO

4    WAIT UNTIL AFTER THE PERSON CLEARS THE PORT TO BE PICKED UP

5    AGAIN.

6    Q.   AND IF A PERSON HAD A TECS LOOKOUT, AND THEY KNEW THAT

7    THEY WERE FREQUENTLY REFERRED TO SECONDARY, THEY MAY WALK

8    THROUGH; IS THAT RIGHT?

9    A.   I SUPPOSE THAT IS POSSIBLE.

10   Q.   BECAUSE IF THEY WERE SITTING IN THE CAR, THAT MAY DELAY

11   THEIR CO-TRAVELER, RIGHT?

12   A.   NOT NECESSARILY.  SAN YSIDRO, OTAY MESA IS THE BUSIEST

13   PORTS OF ENTRY.  THE UNITED STATES DOES NOT REQUIRE U.S. AGENTS

14   TO SCAN AND SCREEN EVERY SINGLE PERSON IN THE CAR; IN FACT,

15   TYPICALLY, ONLY THE DRIVER IS SCREENED, WHICH MEANS MOST OF THE

16   PASSENGERS ARE NOT.  IT IS UP TO THE DISCRETION OF THE OFFICER

17   TO LOOK AT EACH PASSENGER TO DETERMINE OR ASCERTAIN IF THEY

18   WANT TO SCREEN THEM.  WHICH IS, ON A PERSON, AS THEY WALK

19   ACROSS OR DRIVE ACROSS, THE OFFICER WILL TAKE A MACHINE

20   READABLE DOCUMENT, NORMALLY A PASSPORT, OR MAYBE A CALIFORNIA

21   DRIVER'S LICENSE, AND THEY WILL SWIPE IT ON A MAGNETIC READER,

22   OR THEY CAN ALSO ENTER IT MANUALLY.  BUT AS FAR AS DELAYING, AS

23   YOUR QUESTION IS SAYING, OFTENTIMES, THE PASSENGER MAY NEVER BE

24   SCREENED AT ALL.  SO IT WOULD NOT DELAY IT ANYMORE BY HAVING

25   THEM IN THE VEHICLE.

1   Q.   BUT IF THE PASSENGER IS SCREENED, THEN IT'S GETTING

2   REFERRED TO SECONDARY?

3   A.   DEPENDING ON WHAT THE LOOKOUT IS, YES.

4   Q.   NOW I ASSUME IN YOUR LIFE EXPERIENCE, YOU'VE AGREED TO

5   MEET PEOPLE PLACES; AM I RIGHT?

6   A.   YES.

7   Q.   ALL RIGHT.  SO FOR EXAMPLE, YOU MAY BE AT THE MALL AND

8   AGREE TO MEET YOUR FRIEND IN FRONT OF NORDSTROMS AT 2:00 P.M.,

9   CORRECT?

10  A.   CORRECT.

11  Q.   AND NOTHING NEFARIOUS ABOUT THAT?

12  A.   NO.

13  Q.   LET'S TALK ABOUT SECONDARY REFERRAL SPECIFICALLY NOW.  IN

14  A TECS PRINTOUT, THERE IS A COLUMN THAT IS LABELED R-E-F; AM I

15  RIGHT?

16  A.   YES.

17  Q.   AND I'M JUST SHOWING YOU ONE PAGE OF GOVERNMENT'S 31.  AND

18  WE'LL GO THROUGH PEDESTRIAN FIRST.  SO, FOR EXAMPLE, I'LL TAKE

19  THIS PAGE, FROM EXHIBIT 31, MR. FLORES'S CROSSING HISTORY --

20  I'M SORRY, SO IF I CAN DIRECT YOUR ATTENTION TO SAY, FOR

21  EXAMPLE, YOU SEE ON THE LEFT-HAND SIDE, WHERE IT SAYS

22  MR. FLORES'S NAME?

23  A.   YES.

24  Q.   AND DO YOU SEE THE THIRD ENTRY OF HIS NAME?

25  A.   YES.

```
 1   Q.   AND THEN IF WE GO ACROSS THERE, WE SEE HIS DATE OF BIRTH;
 2   AM I RIGHT?
 3   A.   CORRECT.
 4   Q.   AND THEN WE SEE THE DATE THAT HE ENTERED?
 5   A.   YES.
 6   Q.   AND WE SEE THE TIME; HOWEVER, THAT IS EAST COAST TIME?
 7   A.   CORRECT.
 8   Q.   THEN --
 9          THE COURT:  MR. GARRISON, WOULD YOU LIKE TO BORROW MY
10   LASER?  WOULD THAT MAKE YOUR LIFE A LITTLE EASIER?  IT MIGHT
11   MAKE -- IT WOULD MAKE MY LIFE EASIER IF I CAN FOLLOW WHERE
12   YOU'RE POINTING.
13          MR. GARRISON:  I BROUGHT MY OWN LASER.
14          THE COURT:  IT MIGHT MAKE MY LIFE EASIER IF I CAN
15   FOLLOW WHERE YOU'RE POINTING.
16   BY MR. GARRISON:
17   Q.   SO THIS IS THE LINE WE'RE TALKING ABOUT, DATE OF BIRTH,
18   AND THEN THIS IS THE DATE; AM I RIGHT?
19   A.   YES.
20   Q.   EAST COAST TIME OF ENTRY?
21   A.   CORRECT.
22   Q.   SO THREE HOURS AHEAD OF WHERE WE ARE?
23   A.   YES.
24   Q.   OKAY.  SO NOW I'M SPECIFICALLY DIRECTING YOUR ATTENTION TO
25   THIS LANE, OR THIS COLUMN, WHICH IS R-E-F, THAT STANDS FOR
```

1   REFERRAL, RIGHT?

2   A.   IT STANDS FOR REFERRED.

3   Q.   AND WE SEE HERE THAT ON THE DAY MR. FLORES WAS ARRESTED,

4   THERE WAS A REFERRAL CUSTOMS, "CUS" STANDS FOR "CUSTOMS,"

5   RIGHT?

6   A.   CORRECT.

7   Q.   SO THERE WAS A CUSTOMS REFERRAL TO SECONDARY?

8   A.   YES.

9   Q.   AND EVERY TIME A CAR IS REFERRED TO SECONDARY, OR A

10  PERSON, FOR THAT MATTER, WE'RE GOING TO SEE AN INDICATION ON

11  THE TECS?

12  A.   GENERALLY.  HOWEVER, BECAUSE IT IS LAW ENFORCEMENT THE

13  SAME TIME, THE OFFICERS FOCUS AT THAT POINT WHEN THEY DECIDE TO

14  REFER SOMEBODY TO SECONDARY, THEY MAY DECIDE TO ESCORT IT.  IF

15  THEY THINK THERE IS AN ISSUE OF DANGER, THEY MAY NOT PUT A

16  REFERRAL EVERY SINGLE TIME THEY REFER A CAR OR PERSON.  IT

17  DEPENDS ON THE OFFICER'S SAFETY AT THE TIME.

18  Q.   I THINK WHAT YOU'RE SAYING IS, TO A CERTAIN EXTENT, THE

19  ACCURACY OF THESE RECORDS DEPEND UPON THE INSPECTOR PUTTING THE

20  INFORMATION IN?

21  A.   AS FAR AS -- ONLY AS FAR THE REFERRAL, CORRECT.

22  Q.   BUT IF IT'S THERE, WE KNOW IT HAPPENED, RIGHT?

23  A.   CORRECT.

24  Q.   ALL RIGHT.  SO ALL OF THESE OTHER TIMES THAT MR. FLORES

25  CROSSED, WE SEE NOTHING IN THE COLUMN, SO WE KNOW THAT, OR WE

1    CAN ASSUME THAT THERE WAS NO REFERRAL ON THOSE DATES?

2    A.   YES.   UNLESS THERE IS AN INCIDENT LOG PLACED IN THE

3    SYSTEM, WHICH HAPPENS FROM TIME TO TIME IF THEY --

4    Q.   IF THERE WAS WHAT?

5    A.   AN INCIDENT LOG.   IF THE CAR IS REFERRED AND NOT ANNOTATED

6    BY THE INSPECTORS ON THE LINE AND THEY BRING THE CAR TO

7    SECONDARY, AN INCIDENT LOG CAN BE CREATED IN THE -- IF THEY ARE

8    REFERRED TO THE SECONDARY LOT AND INTENSIVE INSPECTION OCCURS.

9    Q.   OKAY.   NOW WHEN WE'RE DEALING WITH AUTOMOBILES -- I'M

10   GOING TO SHOW YOU THE FIRST PAGE OF GOVERNMENT'S 31 HERE.   WHEN

11   WE'RE DEALING WITH AUTOMOBILES, WE HAVE A SIMILAR COLUMN,

12   RIGHT?

13   A.   CORRECT.

14   Q.   REFERRAL INDICATOR.

15   A.   YES.

16   Q.   NOW WHAT WE CAN SEE IS THAT ON NOVEMBER 28TH, OF 2009,

17   THIS AUTOMOBILE WAS REFERRED TO SECONDARY?

18   A.   YES.

19   Q.   THE DAY OF ARREST?

20   A.   YES.

21   Q.   AND WE HAVE A "C" THERE; THAT WAS A CUSTOMS REFERRAL?

22   A.   CORRECT.

23   Q.   NOW WE GO DOWN THE LINE, AND WE SEE "N'S" ON ALL THE OTHER

24   TIMES.   THAT MEANS THAT THE VEHICLE WAS NOT REFERRED TO

25   SECONDARY?

1   A.   YES.

2   Q.   NOW I'M GOING TO SHOW YOU ANOTHER PAGE OF GOVERNMENT'S 31.

3   I'M GOING TO DO MY BEST TO KEEP THESE IN ORDER FOR ALL OF US.

4   HERE, WE SEE ANOTHER PAGE OF THE CAR'S TECS PRINTOUT, RIGHT?

5   A.   YES.

6   Q.   AND WE SEE HERE AN "A" IN OUR REFERRAL INDICATOR?

7   A.   YES.

8   Q.   THAT DENOTES AN ADMINISTRATIVE REFERRAL, CORRECT?

9   A.   I BELIEVE IT IS AGRICULTURAL.  USUALLY TYPICALLY REFERRED

10  AS IMMIGRATION, AGRICULTURE, CUSTOMS.

11  Q.   IMMIGRATION, AGRICULTURAL, AND CUSTOMS.  AGRICULTURE MIGHT

12  HAVE SOMETHING TO DO WITH FRUIT?

13  A.   TOO MUCH FOOD PRODUCT, PERHAPS TOO MUCH LIQUOR, NOT

14  CERTAIN BY WHAT IT SAYS THERE.

15  Q.   BUT IF -- IT IS A SECONDARY REFERRAL; AM I RIGHT?

16  A.   YES.

17  Q.   SO WHAT WE CAN SEE IS, THAT THIS CAR ON JANUARY 11TH, '09,

18  CAME INTO THE UNITED STATES, RIGHT?

19  A.   YES.

20  Q.   AND WENT THROUGH A SECONDARY INSPECTION?

21  A.   WENT THROUGH A SECONDARY INSPECTION FOR AGRICULTURAL,

22  WHICH IS A DIFFERENT TYPE OF INSPECTION.

23  Q.   WELL, YOU WOULD AGREE WITH ME THAT ANY ADDITIONAL

24  INSPECTION IS GOING TO BE MORE INTENSIVE THAN THE PRIMARY

25  INSPECTION?

1   A.   NOT AS FAR AS AGRICULTURE IS CONCERNED.  THEY'RE VERY

2   FOCUSED ON ONE THING AND THAT IS AGRICULTURE.  AN AGRICULTURAL

3   OFFICER WOULD NOT NORMALLY INSPECT THE VEHICLE LIKE A CUSTOMS

4   OFFICER WOULD.  CUSTOMS GENERALLY FOCUS ON DRUGS AND WEAPONS.

5   AN AGRICULTURAL OFFICER OR AGENT IS FOCUSED MORE ON FRUITS,

6   VEGETABLES, PROHIBITED ITEMS.

7       AND WHAT HAPPENS IN THAT TYPE OF INSPECTION IS NOT NEARLY

8   AS INTENSIVE.  ONCE THE AGRICULTURAL REFERRAL IDENTIFIES THE

9   PROBLEM, THEY USUALLY STOP THERE.  THEY'RE NOT GOING TO SEARCH

10  THE ENTIRE CAR.

11  Q.   ALL RIGHT.  AND NOW ANOTHER THING THAT I WANT TO GO OVER

12  WITH YOU IS ALSO ON A VEHICLE TECS PRINTOUT.  AND THAT IS

13  SPECIAL OPERATIONS, THIS COLUMN RIGHT HERE.

14  A.   OKAY.

15  Q.   SO HERE WE CAN SEE SPECIAL OPERATIONS TRUNK, CORRECT?

16  A.   CORRECT.

17  Q.   SO THAT MEANS THAT ON THAT DAY, MAY 3RD, 2009, SPECIAL

18  OPERATIONS WERE CONDUCTED TO INSPECT THE TRUNK OF THAT VEHICLE?

19  A.   SPECIAL OPERATIONS WAS A FIELD CREATED -- AS A SIDE NOTE,

20  THE TECS SYSTEMS WAS CREATED ABOUT 25 YEARS AGO.  AND AS SUCH,

21  AT THAT TIME, CUSTOMS WAS UNDER TREASURY, WHICH IS WHY IT'S

22  CALLED THE TREASURY ENFORCEMENT COMMUNICATION SYSTEM.  WHEN

23  THEY CREATED SOME OF THESE FIELDS, THEY WERE CREATED 25 YEARS

24  AGO.  THE SPECIAL OPERATIONS FIELD DOES NOT NECESSARILY MEAN

25  THERE WAS A SPECIAL OPERATIONS ON THE VEHICLE, BUT RATHER THAT

```
1   THE OFFICER IS ALLOWED OR AFFORDED THE OPPORTUNITY DURING THE

2   INSPECTION OF THE LINE, WHICH HE CAN DO WITH DISCRETION.  IF HE

3   CHECKS THE HOOD OR TRUNK OR SOMETHING MORE, HE CAN INDICATE

4   THAT AS NERVOUSNESS, LIKE SOMETIMES THE REASONS OFFICERS WOULD

5   INSPECT A CAR ON THE LINE, NERVOUSNESS, CHECK THE TRUNK, CHECK

6   THE TANK, KIND OF GIVE IT A ONCE OVER AND MARK IT IN THE

7   SYSTEM, JUST TO LET OTHER OFFICERS KNOW THAT SOMETHING WAS UP

8   ON THAT DAY THAT THEY ACTUALLY DID A LITTLE MORE ON THE LINE,

9   BUT IT IS NOT NECESSARILY A SPECIAL OPERATION.

10  BY MR. GARRISON:

11  Q.   SO ON THAT DAY THAT WE'RE TALKING ABOUT, THEY ACTUALLY DID

12  A LITTLE BIT MORE ON THE CAR THAT DAY?

13  A.   YES.  ON PRIMARY.

14  Q.   ALL RIGHT.  WE SPENT A LOT OF TIME TALKING ON DIRECT

15  EXAMINATION ABOUT DAVID GUTIERREZ AND HIS TECS CROSSINGS,

16  RIGHT?

17  A.   YES.

18  Q.   AND YOU RAN ALL THE NECESSARY QUERIES; IS THAT RIGHT?

19  A.   CORRECT.

20  Q.   AND YOU CAME UP WITH DAVID GUTIERREZ'S CROSSING HISTORY?

21  A.   YES.

22  Q.   AND THAT'S HERE IN EVIDENCE.  I WANT TO SHOW YOU THIS TECS

23  PRINTOUT FOR DAVID GUTIERREZ.  IF WE LOOK IN REFERRALS, DAVID

24  GUTIERREZ WAS REFERRED ON A CUSTOMS REFERRAL ON 11/28/09; IS

25  THAT RIGHT?
```

1    A.   THAT'S INCORRECT.

2    Q.   THAT'S INCORRECT?

3    A.   INCORRECT.

4    Q.   SO THAT "C" IN DAVID GUTIERREZ'S TECS, DOESN'T MEAN

5    CUSTOMS REFERRAL?

6    A.   IN THIS PARTICULAR CASE, WITH A PERSON CROSSING, THE

7    BOTTOM PORTION HERE, IT SAYS OTAY MESA PASSENGER CROSSING, THE

8    DOCUMENT NUMBER IS HERE.  THIS REFERS TO A TYPE OF DOCUMENT

9    USED, WHICH IS A U.S. IMMIGRATION DOCUMENT OF SOME SORT.  I

10   DON'T KNOW WHAT TYPE IT IS, WHATEVER HE HAD.  IT DOESN'T SAY --

11   THE REFERRAL WOULD BE OVER HERE MORE.  THIS IS -- JUST BECAUSE

12   THE DOCUMENT HE WAS USING IS ISSUED BY THE U.S. AS SOME SORT OF

13   IMMIGRATION DOCUMENT, SO EACH ONE OF THESE IS NOT CUSTOMS

14   REFERRALS EACH TIME.

15   Q.   SO WHEN WE LOOK AT -- FOR EXAMPLE, WHEN WE LOOK AT --

16   STRIKE THAT.

17        SO EVEN THOUGH THESE "C'S" ARE IN THE COLUMN FOR REFERRAL,

18   THAT IS NOT WHAT THEY MEAN?

19   A.   IF YOU'RE REFERRING TO THE TYPE OF DOCUMENT USED TO

20   CROSSING, THEY MIGHT BE USI FOR IMMIGRATION, MIGHT BE USP, I

21   BELIEVE.  I'M NOT CERTAIN WHAT ALL -- EVERY CHARACTER STANDS

22   FOR.  BUT IT HAS REFERENCE TO DOCUMENT USED AT THE TIME OF

23   CROSSING, WHICH IS WHY THERE IS A "C" EVERY TIME.  I BELIEVE IT

24   STANDS FOR CITIZENSHIP PASS OR SOME SORT.

25        MR. GARRISON:  YOUR HONOR, COULD I HAVE ONE MOMENT?

1          THE COURT:  YES.

2               (ATTORNEY CONVERSATION OFF THE RECORD.)

3   BY MR. GARRISON:

4   Q.   YOU TESTIFIED THAT MR. GUTIERREZ HAD HOW MANY CROSSINGS

5   TOTAL?

6   A.   NOT CERTAIN IF IT WAS 20 OR 15.  I DON'T HAVE THE

7   INFORMATION IN FRONT OF ME.

8   Q.   DID YOU CROSS -- OR YOU DID NOT RUN ANY CROSS REFERENCE

9   SEARCHES ON ANYBODY THAT CROSSED AROUND THE SAME TIME AS HIM?

10  A.   THE QUERY I DID WAS A CONCURRENT CROSSING REPORT.  WHAT

11  THE COMPUTER DOES IS, IT TAKES PEOPLE CROSSING AT DIFFERENT

12  TIMES, DIFFERENT PLACES, WITH THE SUBJECT WHICH -- THE VEHICLE,

13  AND THE PERSON IN THIS CASE, AND IT ANALYZES AND DETERMINES HOW

14  IT CAN BE -- PRINTING IT UP DAY BY DAY, THE COMPUTER LOOKS AT

15  AND FINDS OUT WHO IS CROSSING THE MOST OFTEN.  AND THERE IS

16  ONLY ONE NAME THAT CAME UP OUT OF THE MILLIONS OF RECORDS THAT

17  ARE CANVASSED, AND THAT IS MR. GUTIERREZ.  THERE WILL ALWAYS BE

18  OTHER PEOPLE THAT CROSS.  FOR INSTANCE, IF THESE CROSSINGS WERE

19  AT THE SAME PORT OF ENTRY, SAME TIME OF DAY, OBVIOUSLY IT WOULD

20  BE A LOT OF PEOPLE BECAUSE A LOT OF PEOPLE GO TO WORK AT THE

21  SAME TIME.  NOT THE CASE IN THIS INSTANCE.  BECAUSE THEY'RE

22  DIFFERENT PORTS AT DIFFERENT TIMES OF DAY, 8:00 IN THE MORNING,

23  3:00 IN THE AFTERNOON.  AND AS SUCH, THE COMPUTER ELIMINATED

24  ALL THE VARIABLES AND FOUND THAT MR. GUTIERREZ IS THE ONLY ONE

25  EXCLUSIVELY CROSSING AT DIFFERENT PORTS, AT DIFFERENT TIMES OF

1    DAY, WITH MR. FLORES.

2    BY MR. GARRISON:

3    Q.   ALSO, THERE ARE TIMES WHEN MR. GUTIERREZ CROSSED IN A CAR?

4    A.   CORRECT.

5    Q.   YOU DID NOT RUN A QUERY ON THOSE PLATES?

6    A.   IN THE RESEARCH THAT I CONDUCTED, I HAVE CONDUCTED QUERIES

7    ON THE PLATE USED AT THE TIME AND WHEN IT DID CROSS, YES.

8    Q.   SO YOU DID RUN A QUERY?

9    A.   JUST TO FIND OUT WHAT VEHICLE IT WAS.

10   Q.   OKAY.  YOU DIDN'T LOOK FOR ANY PATTERNS BETWEEN THAT

11   VEHICLE AND POSSIBLY ANOTHER ONE?

12   A.   NO.

13   Q.   NOW THE LAST THING I WANTED TO ADDRESS WITH YOU IS, WHEN

14   YOU WENT TO -- YOU SAID YOU WENT TO THE LAW ENFORCEMENT ACADEMY

15   TWO TIMES?

16   A.   CORRECT.

17   Q.   AND YOU TOOK CLASSES THERE?

18   A.   YES.

19   Q.   ONE OF THE THINGS -- ONE OF THE CLASSES THAT YOU TOOK WAS

20   A CLASS ON HOW TO TESTIFY EFFECTIVELY, CORRECT?

21   A.   CORRECT.

22   Q.   YOU'VE TESTIFIED AS AN EXPERT MANY TIMES, SIR?

23   A.   YES.

24   Q.   AND EACH TIME, THE PROSECUTION HAS CALLED YOU?

25   A.   CORRECT.

1    Q.   NOT THE DEFENSE?

2    A.   NOT THE DEFENSE.

3             MR. GARRISON:  NO FURTHER QUESTIONS, YOUR HONOR.

4             THE COURT:  ALL RIGHT.  ANY REDIRECT?

5             MR. CONOVER:  YES, BRIEFLY, YOUR HONOR.

6                       REDIRECT EXAMINATION

7    BY MR. CONOVER:

8    Q.   TO BE CLEAR, THERE WERE NO SENTRI PASSES ASSOCIATED AT ALL

9    WITH THIS CASE?

10   A.   NO.

11   Q.   AND THERE WAS NOBODY REFERRED TO SECONDARY IN THIS CASE,

12   OTHER THAN THE AGRICULTURAL REFERRAL; IS THAT RIGHT?

13   A.   YES.  AND I THINK THE ONE -- THE VEHICLE WAS FOR WHAT HE

14   SHOWED ON THE DISPLAY JUST NOW.

15   Q.   SO ANY REFERENCE TO SOMEONE BEING REFERRED TO SECONDARY ON

16   A REGULAR BASIS DID NOT OCCUR OR IS ASSOCIATED WITH THIS CASE?

17   A.   IT IS ERRONEOUS.  IT DID NOT HAPPEN.

18   Q.   AND NO ONE IN THIS CASE WOULD HAVE BEEN -- HAD ACCESS TO

19   ANY SENTRI LANE BECAUSE THEY DIDN'T HAVE A SENTRI PASS, NEITHER

20   MR. FLORES, NOR MR. GUTIERREZ?

21            MR. GARRISON:  OBJECTION.  LEADING.  COMPOUND.

22            THE COURT:  OVERRULED.

23            THE WITNESS:  NO.  I DON'T BELIEVE EITHER ONE HAD A

24   SENTRI PASS.

25            MR. CONOVER:  NOTHING FURTHER, YOUR HONOR.

1          MR. GARRISON:  BRIEF RECROSS?

2          THE COURT:  YES.

3                    RECROSS EXAMINATION

4    BY MR. GARRISON:

5    Q.   NOW THERE WAS A DAY WHEN THE CAR WAS REFERRED TO THE

6    AGRICULTURAL REFERRAL; WE ALREADY TALKED ABOUT THAT, RIGHT?

7    A.   CORRECT.

8    Q.   AND ON THAT DAY -- WELL, THAT DAY WAS JANUARY 11TH, RIGHT?

9    A.   I DO NOT KNOW.  YOU HAVE THE INFORMATION.

10   Q.   SO THERE WE GO, JANUARY 11TH, IS WHEN WE HAD THE

11   AGRICULTURAL REFERRAL?

12   A.   CORRECT.

13   Q.   AND THAT WAS AT 1513, WHICH WOULD BE 12:13 P.M. PACIFIC

14   TIME, RIGHT?

15   A.   YES.

16   Q.   ALL RIGHT.  NOW ON THAT DAY, MR. GUTIERREZ CROSSED THE

17   BORDER AS WELL?

18   A.   I DON'T KNOW.  I DON'T HAVE THAT INFORMATION.

19   Q.   HERE WE SEE 1/11/09.  THESE ARE MR. GUTIERREZ'S TECS

20   RECORDS, RIGHT?

21   A.   YES.

22   Q.   CROSSING THE BORDER AT 12:15 PACIFIC TIME?

23   A.   OKAY.

24   Q.   IS THAT CORRECT?

25   A.   YES.

1   Q.   ALL RIGHT.  SO ON THE DAY WHERE THERE WAS THE AGRICULTURAL

2   INSPECTION, THAT WAS ANOTHER DAY THAT MR. GUTIERREZ CROSSED AT

3   THE SAME TIME AS THE CAR?

4   A.   COULD YOU SHOW THE FIRST ONE AGAIN, WITH THE VEHICLE

5   REFERRED TO, PLEASE.

6   Q.   SURE.  I APOLOGIZE, IT'S JUST THESE NUMBERS ALL RUN

7   TOGETHER.  HERE WE GO, WITH THE LICENSE, THE DATES 1/11/09; IS

8   THAT RIGHT?

9   A.   YES.

10  Q.   TIME 12:13 PACIFIC?

11  A.   CORRECT.

12  Q.   AND THIS IS OTAY MESA?

13  A.   YES.

14  Q.   AND THEN IF WE LOOK HERE ON MR. GUTIERREZ'S, WE SEE HIM

15  COMING IN -- I'M SORRY, I'M MISSING -- WE SEE HIM COMING IN

16  HERE, OTAY MESA, JANUARY 11TH, '09, AT 12:15, RIGHT?

17  A.   CORRECT.

18          MR. GARRISON:  OKAY.  NO FURTHER QUESTIONS.

19          THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP

20  DOWN.

21          THE WITNESS:  THANK YOU.

22          THE COURT:  DOES THE GOVERNMENT HAVE ANY OTHER

23  WITNESSES?

24          MR. CONOVER:  WE DO NOT, YOUR HONOR.  AT THIS TIME,

25  THE GOVERNMENT RESTS.

```
1           THE COURT:  OKAY.  DOES THE DEFENSE HAVE ANY
2    WITNESSES?
3           MR. GARRISON:  YES, YOUR HONOR.  YOUR HONOR, FOR THE
4    RECORD, RULE 29.
5           THE COURT:  ALL RIGHT, I'LL TAKE IT UNDER SUBMISSION.
6           MR. GARRISON:  YOUR HONOR, THE DEFENSE CALLS JOSE
7    LEANO TO THE STAND.
8                      (WITNESS SWORN.)
9           THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE
10   RECORD, AND SPELL YOUR FIRST AND LAST NAME.
11          THE WITNESS:  JOSE LEANO, J-O-S-E, L-E-A-N-O.
12                   DIRECT EXAMINATION
13   BY MR. FAKHOURY:
14   Q.   GOOD AFTERNOON, MR. LEANO.
15   A.   GOOD AFTERNOON.
16   Q.   WHO DO YOU WORK FOR, SIR?
17   A.   I'M EMPLOYED BY THE FEDERAL DEFENDERS OF SAN DIEGO.
18   Q.   WHAT IS YOUR JOB TITLE?
19   A.   I'M AN INVESTIGATOR WITH THE OFFICE.
20   Q.   HOW LONG HAVE YOU BEEN AN INVESTIGATOR?
21   A.   I'VE BEEN THERE FOR OVER 18 YEARS.
22   Q.   WHAT DOES AN INVESTIGATOR DO?
23   A.   THE DUTIES OF THE INVESTIGATOR IS TO READ THE DISCOVERY,
24   DEVELOP LEADS, LOCATE WITNESSES, INTERVIEW WITNESSES, SUBPOENA
25   WITNESSES THAT POTENTIALLY ARE NEEDED FOR COURT PURPOSES,
```

1    HEARINGS.  I ALSO VIEW EVIDENCE AND PHOTOGRAPH EVIDENCE.

2    Q.   WHAT TYPE OF EDUCATION DID YOU RECEIVE TO BECOME AN

3    INVESTIGATOR?

4    A.   I RECEIVED A BACHELOR'S DEGREE FROM SAN DIEGO STATE

5    UNIVERSITY, A MINOR IN MEXICAN-AMERICAN STUDIES.  I JOINED

6    FEDERAL DEFENDERS THROUGH AN INTERNSHIP PROGRAM THAT THEY HAD

7    TOGETHER WITH SAN DIEGO STATE.  THEN I WAS HIRED AS AN

8    INVESTIGATOR.  ANNUALLY, THERE IS A PROGRAM SPONSORED BY THE

9    ADMINISTRATIVE OFFICE THAT ALLOWS INVESTIGATORS, DEFENSE

10   INVESTIGATORS TO GET TOGETHER AND BE TRAINED IN DIFFERENT TYPES

11   OF INNOVATIONS, AS COMPUTERIZED SYSTEMS, RESEARCHES, AND

12   TECHNIQUES IN INTERVIEWING PEOPLE AND APPROACHING PEOPLE ONCE

13   YOU'RE ON THE STREETS.

14   Q.   IN ADDITION TO YOUR DUTIES AS AN INVESTIGATOR, DO YOU HAVE

15   ANY EXPERTISE OR EXPERIENCE WITH AUTO MECHANICS?

16   A.   YES.  I WAS EXPOSED TO AUTO MECHANICS AT AN EARLY AGE.  MY

17   FATHER WAS A MECHANIC, IS A MECHANIC, RETIRED.  I WAS ABLE TO

18   LEARN FROM HIM.  START DOING MY OWN WORK IN CARS AT THE AGE OF

19   14.  AND BE SELF-EMPLOYED AS A MECHANIC FOR A LONG TIME.  I

20   STILL DO MECHANICAL WORK AS A HOBBY.

21   Q.   YOU TESTIFIED THAT YOU STARTED -- YOU WERE EXPOSED TO CARS

22   AT THE AGE OF 14.  HOW OLD ARE YOU NOW?

23   A.   I'M 46, TURNING 47.

24   Q.   SO YOU'VE HAD OVER 30 PLUS YEARS OF EXPERIENCE WITH AUTO

25   MECHANICS?

1   A.   CORRECT.

2   Q.   YOU TESTIFIED THAT YOU WERE SELF-EMPLOYED AS A MECHANIC;

3   CAN YOU TELL THE JURY A LITTLE BIT ABOUT THAT.

4   A.   YES.  I ALSO WENT TO JUNIOR COLLEGE, SOUTHWESTERN COLLEGE,

5   WHERE I WANTED TO REFINE MY SKILLS IN AUTOBODY WORK, AND ALSO

6   BE MORE EXPOSED TO NEW ELECTRICAL SYSTEMS.  I TOOK A COURSE,

7   MATERIAL THERE, AND ALSO WORKING ON CARS ON WEEKENDS, I'M ABLE

8   TO LEARN A LOT ABOUT CARS.  ALSO THROUGH MY EXPERIENCE, I'M

9   ABLE TO USE MY EXPERIENCE WITH THE OFFICE OF FEDERAL DEFENDERS

10  BY INSPECTING VEHICLES.

11  Q.   IN CONNECTION WITH YOUR EXPERIENCE OR YOUR CAREER AS AN

12  INVESTIGATOR, HAVE YOU INSPECTED OTHER CARS THAT HAVE BEEN

13  SEIZED IN CONNECTION WITH CRIMINAL CASES?

14  A.   YES.  I HAVE, IN FACT, INSPECTED MANY VEHICLES, VEHICLES

15  THAT HAVE TO DO WITH THE CONCEALING CONTRABAND.  AND WE'RE

16  TALKING ABOUT MOTOR, ENGINE COMPARTMENTS, WE'RE TALKING ABOUT

17  FIRE WALLS, TIRES, BUMPERS, DASHBOARDS, TRANSMISSIONS, REAR

18  ENDS.  ANYTHING THAT IS RELATED TO A CAR THAT POTENTIALLY THERE

19  IS COMPARTMENT, THE OFFICE ASKED ME TO GO IN AND INSPECT THOSE

20  VEHICLES FOR THEM.

21  Q.   CAN YOU ESTIMATE HOW MANY CARS YOU'VE INSPECTED IN YOUR

22  CAREER?

23  A.   IN MY 18 YEARS WITH FEDERAL DEFENDERS, I -- MORE THAN 100

24  VEHICLES THAT HAVE TO DO WITH COMPARTMENTS.

25  Q.   HAVE YOU EVER TESTIFIED IN COURT BEFORE?

1   A.   YES, I HAVE.

2   Q.   HAVE YOU TESTIFIED AS AN EXPERT ON AUTO MECHANICS BEFORE?

3   A.   YES, I HAVE.

4   Q.   HOW MANY TIMES?

5   A.   OVER 25 TIMES.

6        MR. FAKHOURY:  AT THIS TIME, YOUR HONOR, I'D PROFFER

7   MR. LEANO AS AN EXPERT ON AUTO MECHANICS.

8        THE COURT:  ANY OBJECTION?

9        MR. CONOVER:  YES, YOUR HONOR.

10       THE COURT:  OKAY, WHAT IS THE OBJECTION?

11       MR. CONOVER:  THE OBJECTION IS, HE'S NOT A CERTIFIED

12  AUTO MECHANIC, DOESN'T WORK IN AUTO MECHANICS ON A DAILY BASIS,

13  AND THE ONLY TIMES HE DEALS WITH AUTO MECHANICS IS WHEN HE'S

14  GOING OUT TO LOOK AT A CAR.  IT IS A VERY SMALL PORTION OF HIS

15  WORK.

16       THE COURT:  MR. FAKHOURY, I'M NOT SURE THAT HE'S BEEN

17  QUALIFIED AS AN EXPERT, TO BE HONEST WITH YOU.  BUT MAYBE YOU

18  CAN LAY A LITTLE MORE FOUNDATION.  WHAT KIND OF EXPERIENCE DOES

19  HE HAVE WITH THIS KIND OF VEHICLE WE'RE TALKING ABOUT HERE.

20       MR. FAKHOURY:  SURE, YOUR HONOR.

21       THE COURT:  LET'S FIND OUT.

22       MR. FAKHOURY:  SURE.

23  BY MR. FAKHOURY:

24  Q.   MR. LEANO, IN YOUR EXPERIENCE, HAVE YOU INSPECTED

25  VOLKSWAGEN BEETLES BEFORE?

1   A.   YES, I HAVE.

2   Q.   HOW MANY VOLKSWAGEN BEETLES WOULD YOU SAY YOU'VE

3   INSPECTED?

4   A.   WITH FEDERAL DEFENDERS, APPROXIMATELY FIVE VEHICLES THAT

5   HAVE TO DO WITH THE SAME TYPE OF BODY STYLE.

6   Q.   SO A 2003 NEW BEETLE, FOR EXAMPLE?

7   A.   2002 AND ABOVE.

8   Q.   OKAY.  IN YOUR EXPERIENCE, HAVE YOU EVER DEALT WITH

9   SENDING UNITS IN A CAR'S GAS TANK?

10   A.   YES, I HAVE.

11   Q.   APPROXIMATELY HOW MANY SENDING UNITS HAVE YOU PERSONALLY

12   INSPECTED?

13   A.   THE SENDING UNIT IS A VERY IMPORTANT PART OF THE VEHICLE

14   BECAUSE THE FUEL PUMP IS IN THE SENDING UNIT.

15          THE COURT:  LET ME INTERRUPT YOU.  HE ASKED YOU HOW

16   MANY CARS.

17          THE WITNESS:  HOW MANY CARS?

18          THE COURT:  WASN'T THAT YOUR QUESTION?

19   BY MR. FAKHOURY:

20   Q.   YES.  HOW MANY SENDING UNITS HAVE YOU PERSONALLY EXAMINED?

21   A.   WITH FEDERAL DEFENDERS?

22   Q.   YES.

23   A.   I DON'T KNOW.  I WOULD SAY OVER 30 SENDING UNITS.

24   ANYTHING THAT HAS TO DO WITH THE COMPARTMENTS IN THE GAS TANK,

25   AND THE SENDING UNIT HAS TO BE REMOVED FROM THE GAS TANK, I

1   HAVE INSPECTED THOSE SENDING UNITS.

2   Q.   HAVE YOU REMOVED A SENDING UNIT FROM A GAS TANK BEFORE?

3   A.   YES.

4   Q.   HOW MANY TIMES?

5   A.   OUTSIDE FEDERAL DEFENDERS?

6   Q.   LET ME SAY IT THIS WAY:  IN YOUR OVERALL EXPERIENCE WITH

7   AUTO MECHANICS, 30-PLUS YEARS OF EXPERIENCE, HOW MANY SENDING

8   UNITS HAVE YOU REMOVED FROM GAS TANKS?

9   A.   OVER 30.

10   Q.   HOW MANY -- HAVE YOU REMOVED A SENDING UNIT FROM A 2003

11   VOLKSWAGON BEETLE?

12   A.   ABOUT FIVE.

13           MR. FAKHOURY:  AGAIN, YOUR HONOR, I'D RENEW MY

14   PROFFER.

15           THE COURT:  COUNSEL, YOU WANT TO TAKE HIM ON VOIR

16   DIRE?

17           MR. CONOVER:  YES, YOUR HONOR.

18           THE COURT:  WHY DON'T YOU GO AHEAD AND DO THAT.

19   BY MR. CONOVER:

20   Q.   MR. LEANO, HOW MUCH OF YOUR TIME DO YOU SPEND ON A DAILY

21   BASIS WORKING ON CARS?

22   A.   ON A DAILY BASIS, I WOULD SAY -- I DO OWN A RACE CAR.  I

23   DO WORK ON MY CAR, LIKE, ONE HOUR A DAY.  MOST OF THE TIME, I

24   DO IT ON WEEKENDS.  I WOULD SAY EIGHT TO TEN HOURS A DAY.

25   Q.   EIGHT TO TEN HOURS A DAY, YOU WORK ON YOUR RACE CAR?

A.   NO.  ON DIFFERENT CARS.  I DO WORK AS A HOBBY, AND PEOPLE

BRING CARS TO ME TO BE FIXED.  IT CAN BE PEOPLE I KNOW FROM THE

OFFICE OR OTHER PEOPLE THAT KNOW ME.  I DO --

Q.   TO BE SPECIFIC, WHAT IS THE LAST CAR THAT YOU REPAIRED FOR

AN INDIVIDUAL?

A.   FOR WHAT.

Q.   WHAT IS THE LAST CAR YOU REPAIRED FOR AN INDIVIDUAL?

A.   FOR A PERSON?

Q.   YES.

A.   LAST FRIDAY, I WORK ON A AUDI, A BRAND NEW AUDI, WHICH I

WAS ABLE TO PAINT THE WHOLE SIDE OF THE VEHICLE.

Q.   YOU REPAINTED IT?

A.   YES.  REPAINTED IT, YES.

Q.   WHEN IS THE LAST TIME YOU WERE HIRED TO WORK ON A SENDING

UNIT, TO REPLACE A SENDING UNIT OR PUT IT IN -- I'M NOT TALKING

ABOUT VIEWING IT, IN A VEHICLE VIEWING, BUT TALKING ABOUT, YOU

WERE HIRED TO ACTUALLY DO MECHANIC WORK ON A SENDING UNIT?

A.   IT WAS ABOUT FIVE MONTHS AGO.  A PACIFICA, A DODGE

PACIFICA.  IT HAD PROBLEMS WITH THE SENDING UNIT.  I WAS ABLE

TO REMOVE THE GAS TANK.  IN THAT PARTICULAR CAR, YOU HAD TO

REMOVE THE GAS TANK AND THEN REMOVE THE SENDING UNIT FROM THE

CAR.

Q.   WHO HIRED YOU TO REMOVE THAT SENDING UNIT?

A.   YES.

Q.   WHO WAS IT?

```
1    A.   MARIA ACUNA, FROM THE OFFICE.

2    Q.   FROM FEDERAL DEFENDERS?

3    A.   FROM FEDERAL DEFENDERS.   MARIA ACUNA.

4    Q.   THAT WAS PART OF A CASE?

5    A.   NOT RELATED TO A CASE.   IT WAS DIFFERENT FROM A CASE.

6    Q.   SO SHE JUST HIRED YOU TO REMOVE A SENDING UNIT FOR HER

7    CAR?

8    A.   YES, CORRECT.

9    Q.   HER PERSONAL CAR?

10   A.   YES.

11   Q.   WHAT DID YOU REMOVE THE SENDING UNIT FOR?

12   A.   SHE WAS HAVING PROBLEMS BECAUSE THE CAR DIDN'T START.

13   Q.   NOW THE SENDING UNIT HAS NOTHING TO DO WITH THE STARTING

14   OF THE VEHICLE?

15   A.   IT HAS TO DO WITH THE FUEL IN THE MOTOR.   IF THE SENDING

16   UNIT IS NOT FUNCTIONAL, OBVIOUSLY THE MOTOR IS NOT GOING TO

17   START.

18   Q.   SO THE -- THE SENDING UNIT WAS BROKEN?

19   A.   THE SENDING UNIT, FOR SOME REASON, THEY STOP WORKING.   THE

20   CARBONS THAT ARE INSIDE THE MOTOR OF THE SENDING UNIT THEY WERE

21   OUT, YOU LOSE CONTACT, AND THE MOTOR IS NO LONGER FUNCTIONAL SO

22   YOU HAVE TO REPLACE THEM.

23   Q.   AND IF THE CAR IS NOT ON, YOU CAN'T REALLY TELL IF THE

24   SENDING UNIT IS WORKING PROPERLY; IS THAT CORRECT?

25   A.   NO.   UNTIL YOU HIT THE SWITCH AND START THE CAR, THEN YOU
```

1   MEASURE THE PRESSURE OF THE INJECTORS AND YOU CAN DETERMINE THE

2   WEAK -- IF THE PRESSURE IS WEAK, OR IF THE FUEL IS IN THE LINE

3   TO START THE VEHICLE.

4   Q.   HOW MANY VEHICLES FOR FEDERAL DEFENDERS HAVE YOU LOOKED AT

5   WITH REGARD TO SENDING UNITS?

6   A.   RELATED TO CASES?

7   Q.   TOTAL.  FOR FEDERAL DEFENDERS, SENDING UNITS.

8   A.   I WOULD SAY, LIKE, AROUND FIVE, RELATED TO SENDING UNITS.

9   Q.   BECAUSE YOU TESTIFIED EARLIER IT WAS 30.

10   A.   OUTSIDE FEDERAL DEFENDERS, I HAVE PEOPLE BRING ME CARS.

11   ANY TYPE OF PROBLEM THEY HAVE, THEY CALL ME AND I CHECK THEIR

12   CARS.

13   Q.   ALL RIGHT.  NOW WHEN YOU DO THIS WORK FOR FEDERAL

14   DEFENDERS, IS IT AT A LOT, THAT -- WHERE IT HAS BEEN BROUGHT

15   AFTER IT'S BEEN SEIZED BY THE GOVERNMENT?

16   A.   I DON'T UNDERSTAND THE QUESTION.

17   Q.   WHEN YOU DO THE WORK FOR FEDERAL DEFENDERS, WHERE YOU GO

18   AND VIEW THESE VEHICLES, IS IT AT A LOT THAT HAS BEEN -- WHERE

19   THE VEHICLE HAS BEEN SEIZED BY THE FEDERAL GOVERNMENT?

20   A.   YES, CORRECT.  EVERY TIME I GO AND VIEW THE CAR, OBVIOUSLY

21   IT'S BEEN SEIZED BY THE GOVERNMENT.  AND THERE ARE CERTAIN

22   LOCATIONS WHERE THE CAR IS LOCATED.

23   Q.   THAT'S ALL I NEEDED TO KNOW.  NOW THE OTHER QUESTION I

24   HAVE FOR YOU IS, WHEN YOU GO THERE, IS THE VEHICLE EVER ON, OR

25   IS IT ALWAYS TURNED OFF?

1   A.   MOST VEHICLES HAVE DEAD BATTERIES, SO, OBVIOUSLY, THE CAR

2   IS OFF, YES.

3   Q.   SO YOU DON'T WORK ON VEHICLES THAT EVEN ARE OPERABLE AT

4   THAT POINT; IS THAT CORRECT?

5           MR. FAKHOURY:  OBJECTION.  MISSTATES HIS TESTIMONY.

6           THE COURT:  SORRY?

7           MR. FAKHOURY:  OBJECTION.  MISSTATES HIS TESTIMONY.

8           THE COURT:  WELL, I THINK YOU'RE TALKING ABOUT THE

9   CARS THAT ARE AT THE LOT --

10          MR. CONOVER:  THAT IS CORRECT.

11          THE COURT:  -- RIGHT?

12          MR. CONOVER:  YES.

13          THE COURT:  I THINK THAT'S WHAT HE TESTIFIED TO

14  BEFORE.

15          THE WITNESS:  YES.  WELL, I DO START VEHICLES

16  INSTANCE -- FOR INSTANCE, I HAD A CAR TODAY --

17  BY MR. CONOVER:

18  Q.   MR. LEANO, WHAT I ASKED WAS, WHEN YOU'RE AT THE LOT --

19  A.   YES.

20  Q.   -- ARE ANY OF THOSE VEHICLES OPERABLE, OR THE BATTERY IS

21  DEAD AND THEY DON'T EVEN TURN ON?

22  A.   SOME OF THEM ARE OPERABLE; OTHER ONES ARE NOT OPERABLE.

23  Q.   ARE THE BATTERIES DEAD?

24  A.   THE VOLKSWAGON BEETLE WAS OPERABLE?  NO, IT WAS NOT.

25  Q.   NO.  I ASKED, ARE THE BATTERIES DEAD AT THOSE VEHICLE --

1   A.   MOST VEHICLES HAVE BATTERIES THAT ARE DEAD, YES.

2   Q.   SO YOU'RE NOT ABLE TO DETERMINE WHETHER THE SENDING UNITS

3   ARE EVEN OPERATING?

4   A.   WELL, IF THE BATTERY IS DEAD, YOU CAN REQUEST FROM THE

5   IMPOUND YARD TO GIVE YOU A JUMP BOX.   BASICALLY WHAT IT IS, IT

6   IS A CAR THAT HAS A BATTERY THAT YOU CAN CONNECT TO THE BATTERY

7   OF THE CAR, AND THEN YOU'RE ABLE TO DETERMINE AND PUT AN ENERGY

8   TO THAT BATTERY.   AND IF YOU WANT TO CHECK THE DASHBOARD, OR

9   ANY ELECTRICAL SYSTEM, YOU WILL HAVE THE POSSIBILITY OF DOING

10  THAT IN THE IMPOUND YARD.

11  Q.   YOU DIDN'T DO THAT IN THIS CASE?

12  A.   NOT ON THIS CASE BECAUSE THE INSTRUMENT CLUSTER WAS

13  BROKEN, WHERE THE NEEDLES ARE, IT WAS BROKEN.

14  Q.   NOW YOU TESTIFIED BEFORE IN THE UNITED STATES VS. DARREN

15  LUIS AYALA; IS THAT CORRECT?

16          MR. FAKHOURY:   I WOULD OBJECT.   THIS IS BEYOND THE

17  SCOPE OF VOIR DIRE.   HE CAN IMPEACH HIM LATER IF NECESSARY.

18          MR. CONOVER:   IT GOES TO SHOW WHETHER OR NOT HE IS A

19  CREDIBLE MECHANIC WITNESS.

20          THE COURT:   CREDIBILITY IS FOR THE JURY TO DECIDE.

21  THIS IS NOT THE POINT FOR US TO DECIDE THAT.

22          MR. CONOVER:   IT GOES TO SHOW --

23          THE COURT:   COUNSEL, THE OBJECTION IS SUSTAINED.

24          MR. CONOVER:   WHAT I WANT TO REFER TO, YOUR HONOR,

25  WAS WHETHER OR NOT HE HAS EXPERIENCE AS A MECHANIC TO BE ABLE

1   TO LOOK AT PICTURES, AND ACCURATELY DEPICT WHAT THEY SAY.  AND

2   I CAN EXPLAIN AS I GO THROUGH, YOUR HONOR.  BECAUSE THAT'S WHAT

3   HE'LL BE DOING HERE TODAY.

4              MR. FAKHOURY:  AND I WOULD AGAIN OBJECT AS BEYOND THE

5   SCOPE OF VOIR DIRE.

6              THE COURT:  YEAH, I THINK IT IS.  OBJECTION

7   SUSTAINED.

8              MR. CONOVER:  ALL RIGHT.

9   BY MR. CONOVER:

10  Q.   IN YOUR WORK CURRENTLY, YOU SPEND A LOT OF YOUR TIME

11  SERVING SUBPOENAS; IS THAT CORRECT?

12  A.   YES.

13  Q.   AND A LOT OF YOUR TIME DOING CRIMINAL BACKGROUND CHECKS?

14  A.   CORRECT.

15  Q.   YOU HAVE DAILY INTERACTION WITH MAGISTRATE JUDGES?

16  A.   WHAT?

17  Q.   YOU WORK WITH MAGISTRATE JUDGES AS WELL?

18  A.   YES.  WE DO NEW ARRAIGNMENTS.  WHAT IT IS, WE PREPARE

19  PEOPLE WHEN THEY HAVE TO APPEAR IN COURT FOR THE FIRST TIME.

20  WE GO TO THE MARSHALS' TANK, AND WE DO THE PROCESS OF

21  INTERVIEWING PEOPLE AND PREPARE THEM FOR A COURT.

22  Q.   THAT IS ON A DAILY BASIS, RIGHT?

23  A.   MY DUTIES ONCE A WEEK, YES.

24  Q.   AND YOU INTERVIEW WITNESSES REGULARLY FOR FEDERAL

25  DEFENDERS, RIGHT?

1   A.   CORRECT.

2   Q.   AND YOU PREPARE EQUITY LETTERS FOR IMMIGRATION MATTERS?

3   A.   WE PREPARE BOND PAPERWORK.

4   Q.   BOND PAPER WORK.   YOU SPEND PART OF YOUR TIME RE-WEIGHING

5   NARCOTICS?

6   A.   CORRECT.

7   Q.   AND YOU SPEND PART OF YOUR TIME AS AN INTERPRETER FOR

8   FEDERAL DEFENDERS?

9   A.   CORRECT.

10  Q.   YOU SPEND PART OF YOUR TIME TO ASSIST ATTORNEYS IN OTHER

11  MATTERS THAT ARE NONMECHANIC RELATED; IS THAT CORRECT?

12  A.   CORRECT.

13  Q.   AND YOU SPEND PART OF YOUR TIME TESTIFYING IN COURT,

14  CORRECT?

15  A.   CORRECT.

16  Q.   AND YOU SPEND PART OF YOUR TIME DOING BASICALLY LOTS OF

17  NONMECHANIC RESPONSIBILITIES FOR THE FEDERAL DEFENDERS?

18  A.   CORRECT.

19  Q.   AND EACH YEAR, YOU TAKE A CERTAIN TRIP TO WASHINGTON,

20  D.C., FOR A SEMINAR THAT HAS NOTHING TO DO WITH MECHANICS?

21  A.   CORRECT.

22  Q.   AND HOW OFTEN DO YOU TAKE A TRIP FOR MECHANIC WORK?

23  A.   FOR MECHANICAL PURPOSES, THEY DO HAVE SEMINARS AT THE --

24  AT THE -- WHEN THE SEMINARS ARE OFFERED, THERE IS SOME MATERIAL

25  THAT HAS TO DO WITH FORENSICS --

1   Q.   LET ME ASK YOU, SIR, HAVE YOU EVER ATTENDED A SEMINAR

2   DEALING WITH MECHANICS, FOR FEDERAL DEFENDERS, MECHANICS?

3   A.   NO, I HAVE NOT.

4   Q.   AND THAT ACTUALLY DEALS WITH JURY TRAINING MOSTLY, THAT

5   TRAINING IN WASHINGTON, D.C.?

6   A.   INTERVIEWING AND INTERACTING WITH PEOPLE.

7   Q.   AND YOU HAVE A COLLEGE DEGREE, RIGHT?

8   A.   YES.

9   Q.   AND WHAT IS YOUR DEGREE IN?

10   A.   SPANISH.

11   Q.   SPANISH?

12   A.   YES.

13   Q.   AND LITERATURE, RIGHT?

14   A.   LITERATURE, CORRECT.

15   Q.   AND DO YOU HAVE A DEGREE IN AUTO MECHANICS?

16   A.   NO, I DON'T.

17   Q.   DO YOU HAVE ANY SORT OF CERTIFICATION SAYING, I'M A

18   MECHANIC?

19   A.   NO, I'M NOT.

20   Q.   HAVE YOU EVER WORKED IN A MECHANICS SHOP WHERE YOU WERE

21   PAID?

22   A.   FOR A SHORT PERIOD OF TIME, YES.

23   Q.   WHERE WAS THAT?

24   A.   IT WOULD BE 1986.

25   Q.   AND WHERE WAS THAT?

1  A.   IN TIJUANA, MEXICO.

2  Q.   1986, YOU WORKED IN TIJUANA, MEXICO.  WHAT WAS THE NAME OF

3  THE SHOP?

4  A.   IT WAS CARLOS SHOP, BODY SHOP.

5  Q.   IT WAS --

6  A.   IT WAS A BODY SHOP.

7  Q.   AND YOU WORKED THERE FOR HOW LONG?

8  A.   TWO MONTHS.  IT WAS SUMMER WORK.

9  Q.   SO THE GRAND TOTAL OF YOUR PAID EXPERIENCE AS A MECHANIC

10  IN A SHOP IS TWO MONTHS FROM 1986?

11  A.   CORRECT.

12        MR. FAKHOURY:  OBJECTION.  MISSTATES THE TESTIMONY.

13        THE COURT:  OVERRULED.

14        THE WITNESS:  I ALSO -- BACK IN '96, '97, '98, ME AND

15  MY PARTNER, WE HAD A DEALERSHIP, WHERE WE PURCHASED VEHICLES IN

16  AUTO AUCTIONS.  I WOULD FIX THEM, RECONDITION THE CARS, AND

17  RESELL THEM TO MAKE A PROFIT.

18  BY MR. CONOVER:

19  Q.   SO THE VAST MAJORITY OF YOUR TIME THAT YOU SPENT IS NOT

20  DOING MECHANICS, IS IT?

21  A.   MOST OF THE TIME IT HAD TO DO WITH CARS THAT ARE BEING

22  WRECKED.  I HAD TO DO THE BODY WORK --

23  Q.   MR. LEANO, YOUR TIME, ON A REGULAR BASIS, FROM 9:00 TO

24  5:00 OR ANY DAY THROUGHOUT THE WEEK, IS THE VAST MAJORITY OF

25  YOUR TIME DOING MECHANIC WORK OR DOING SOMETHING ELSE FOR

1    FEDERAL DEFENDERS?

2    A.    CORRECT.

3    Q.    CORRECT, WHICH WAY?

4    A.    CORRECT, I DO MOST OF MY DAY -- I DO SPEND THE TIME

5    WORKING FOR FEDERAL DEFENDERS, NOT AS A MECHANIC.

6            MR. CONOVER:   THANK YOU.   NOTHING FURTHER, YOUR

7    HONOR.

8            THE COURT:   ALL RIGHT.   WELL, I'M GOING TO ALLOW THE

9    TESTIMONY SUBJECT TO A MOTION TO STRIKE AT THE CONCLUSION.   I'M

10   GOING TO HAVE TO WAIT AND SEE WHAT THE TESTIMONY IS.

11           MR. CONOVER:   THANK YOU, YOUR HONOR.

12           MR. FAKHOURY:   THANK YOU, YOUR HONOR.

13   BY MR. FAKHOURY:

14   Q.    MR. LEANO, IN CONNECTION WITH THIS CASE, WERE YOU ASKED TO

15   VIEW A 2003 VOLKSWAGEN BEETLE?

16   A.    YES.

17   Q.    AND WHEN DID YOU VIEW THAT BEETLE?

18   A.    I INSPECTED THAT VEHICLE BACK IN AUGUST 18, OF LAST YEAR,

19   2010.

20   Q.    AND WHERE DID YOU INSPECT THAT VEHICLE?

21   A.    AT THE OTAY MESA IMPOUND YARD.

22   Q.    WHO ELSE WAS THERE WHEN YOU INSPECTED THAT VEHICLE?

23   A.    IT WAS THE ASSIGNED INVESTIGATOR FOR THIS CASE, AND IT WAS

24   ALSO THE CASE AGENT OR THE U.S. ATTORNEY'S OFFICE.

25   Q.    WAS THAT AGENT BULLARD?

1   A.   CORRECT.

2   Q.   DID THE CAR LOOK LIKE THIS WHEN YOU INSPECTED IT?   THIS IS

3   EXHIBIT 6, FOR THE RECORD.

4        DID THE CAR LOOK LIKE THIS WHEN YOU INSPECTED IT?

5   A.   IS THAT THE CAR, BUT IT DIDN'T LOOK LIKE THAT.

6   Q.   SO IT WASN'T IN THIS TYPE OF CONDITION?

7   A.   CORRECT.

8   Q.   WHAT TYPE OF CONDITION WOULD YOU SAY THE CAR WAS IN WHEN

9   YOU INSPECTED IT?

10  A.   THE CAR WAS -- THE INTERIOR WAS DESTROYED, PARTS WERE

11  BROKEN, FENDERS BROKEN.   PART OF THE REAR TRUNK WAS ALSO --

12  MOLTENS WERE REMOVED FROM THE VEHICLE.   ALSO, THE SENDING UNIT

13  WAS ON THE FLOOR.   AND PARTS WERE LOCATED INSIDE THE VEHICLE IN

14  DIFFERENT LOCATIONS.

15            MR. FAKHOURY:   OKAY.   MAY I APPROACH, YOUR HONOR?

16            THE COURT:   YES.   JUST A SECOND.   I'M NOT SURE I

17  HEARD CORRECTLY.   DID YOU SAY THE SENDING UNIT WAS ON THE

18  FLOOR?

19            THE WITNESS:   ON THE FLOOR OF THE VEHICLE.

20            THE COURT:   OKAY.

21  BY MR. FAKHOURY:

22  Q.   MR. LEANO, I'M HANDING YOU WHAT HAS BEEN MARKED AS DEFENSE

23  EXHIBITS A, B, C, AND D FOR IDENTIFICATION.

24  (DEFENDANT'S EXHIBITS A THROUGH D MARKED FOR IDENTIFICATION.)

25  BY MR. FAKHOURY:

1    Q.   CAN YOU TAKE A MINUTE TO TAKE A LOOK AT THEM.

2    A.   YES.

3         MR. FAKHOURY:   I THINK I HAVE A COPY FOR THE COURT,

4    JUST A SECOND.

5    BY MR. FAKHOURY:

6    Q.   LET ME ASK AGAIN, HAVE YOU HAD A CHANCE TO LOOK AT THOSE

7    EXHIBITS I'VE JUST HANDED TO YOU?

8    A.   YES.

9    Q.   DO THEY LOOK FAMILIAR?

10   A.   YES.   THIS IS THE VOLKSWAGEN THAT I INSPECTED AT THE OTAY

11   MESA IMPOUND YARD.

12   Q.   DID YOU TAKE THOSE PICTURES?

13   A.   YES.

14   Q.   WOULD YOU SAY THAT THESE PICTURES ACCURATELY DEPICT THE

15   CONDITION OF THE VOLKSWAGEN BEETLE AT THE TIME YOU INSPECTED IT

16   AT THE IMPOUND LOT ON AUGUST 18TH, 2010?

17   A.   CORRECT.

18        MR. FAKHOURY:   YOUR HONOR, I'D MOVE TO ADMIT EXHIBITS

19   A, B, C, AND D.

20        MR. CONOVER:   NO OBJECTION, YOUR HONOR.

21        THE COURT:   ALL RIGHT, THEY'LL COME IN.

22        MR. FAKHOURY:   AND PERMISSION TO PUBLISH, YOUR HONOR.

23        THE COURT:   YES.

24        MR. FAKHOURY:   THANK YOU.

25   (DEFENDANT'S EXHIBITS A THROUGH D RECEIVED INTO EVIDENCE.)

1  BY MR. FAKHOURY:

2  Q.  LET'S START WITH EXHIBIT A.  CAN YOU DESCRIBE THIS TO THE

3  JURY.

4  A.  THIS IS THE REAR RIGHT FENDER OF THE VOLKSWAGEN BEETLE.

5  AND YOU CAN SEE THAT THE TAILLIGHTS ARE MISSING, AND THE REAR

6  RIGHT FENDER IS BROKEN, ALSO AS WELL AS IT HAS A FLAT TIRE.

7  Q.  AND I'M GOING TO SHOW YOU NOW EXHIBIT B.  CAN YOU DESCRIBE

8  THAT TO THE JURY AS WELL.

9  A.  YES.  THIS IS A DIFFERENT ANGLE OF THE VEHICLE, WHICH

10  DEPICTS THE TWO TAILLIGHTS MISSING.  AND ALSO, YOU CAN SEE

11  HOLES THAT WERE PUNCHED IN THE DOORS OF THE VEHICLE.

12  Q.  HOW ABOUT EXHIBIT C?

13  A.  IT IS ALSO AN ANGLE FROM THE REAR OF THE VEHICLE, WHICH

14  DEPICTS HOW THE CAR WAS DESTROYED.  YOU CAN SEE SOME TAILLIGHTS

15  MISSING, FENDER BROKEN, AND ALSO HOLES PUNCHED IN THE SIDE OF

16  THE VEHICLE.

17  Q.  ONE LAST ONE, AND THIS IS EXHIBIT D.  WHAT IS THIS?

18  A.  THIS IS THE INSTRUMENT CLUSTER OF THE SAME VOLKSWAGEN

19  BEETLE.  IT SHOWS THE DASHBOARD, WHICH HAS BEEN SMASHED WITH

20  SOME OBJECT.

21  Q.  SO IS IT SAFE TO SAY WHEN YOU INSPECTED THIS VOLKSWAGEN

22  BEETLE, ON AUGUST 18, 2010, IT DIDN'T LOOK LIKE THIS, RIGHT?

23  A.  IT DIDN'T.

24  Q.  OKAY.  UP ON THE ELMO IS WHAT HAS BEEN ADMITTED AS

25  GOVERNMENT'S EXHIBIT 15.  DO YOU RECOGNIZE WHAT THIS IS?

1    A.   YES.   THAT'S A FLOATER FROM A SENDING UNIT.

2    Q.   DID YOU SEE THIS WHEN YOU INSPECTED THE CAR ON AUGUST 18,

3    OF 2010?

4    A.   YES.   WHEN I INSPECTED THE VEHICLE BACK IN AUGUST, I DID

5    HAVE A CHANCE TO PHYSICALLY TOUCH THE SENDING UNIT, AS WELL AS

6    THE FLOATER.

7    Q.   I'M GOING TO HAND YOU WHAT HAS BEEN PREMARKED FOR

8    IDENTIFICATION AS DEFENDANTS E AND F.

9        (DEFENDANT'S EXHIBITS E AND F MARKED FOR IDENTIFICATION.)

10   BY MR. FAKHOURY:

11   Q.   CAN YOU TAKE A LOOK AT THOSE.

12   A.   YES.

13   Q.   DO THOSE -- WHAT ARE EXHIBITS E AND F?

14   A.   THESE ARE PHOTOGRAPHS OF MY LEFT HAND AND ARM, HOLDING THE

15   FLOATER, WHICH I'M POSITIONING THE FLOATER CLOSE TO THE SENDING

16   UNIT ON EXHIBIT E.   ON EXHIBIT F IS A CLOSER VIEW OF THE

17   SENDING UNIT, WHICH DEPICTS THE LOCATION OF THE MARKER AND

18   WHERE I'M PUTTING TOGETHER VERY CLOSE TO THE ARM OF THE

19   FLOATER.

20   Q.   SO DID YOU TAKE THESE PICTURES?

21   A.   NO.

22   Q.   WHO DID?

23   A.   THE ASSIGNED INVESTIGATOR IN THE CASE, LEANA PEREZ.

24   Q.   DO THESE PICTURES ACCURATELY DEPICT THE SENDING UNIT AND

25   GAS FLOATER AT THE TIME YOU WENT TO INSPECT THE CAR ON

1   AUGUST 18TH, OF 2010?

2   A.   CORRECT.

3   Q.   WERE YOU PRESENT WHEN THESE PICTURES WERE TAKEN?

4   A.   CORRECT.

5   Q.   THAT'S YOUR ARM IN THE PICTURE, RIGHT?

6   A.   CORRECT.

7           MR. FAKHOURY:  AT THIS TIME, YOUR HONOR, I'D MOVE TO

8   ADMIT EXHIBITS E AND F.

9           MR. CONOVER:  NO OBJECTION, YOUR HONOR.

10          THE COURT:  ALL RIGHT.  THEY'LL COME IN.

11          MR. FAKHOURY:  AND MAY I PUBLISH, YOUR HONOR?

12          THE COURT:  SURE.

13      (DEFENDANT'S EXHIBITS E AND F RECEIVED INTO EVIDENCE.)

14  BY MR. FAKHOURY:

15  Q.   I'M GOING TO PUT UP ON THE SCREEN HERE EXHIBIT E.  CAN YOU

16  EXPLAIN WHAT -- I KNOW YOU BRIEFLY EXPLAINED IT, BUT CAN YOU GO

17  INTO MORE DETAIL ABOUT WHAT THIS IS.

18  A.   YES.  CAN I USE THIS MARKER?

19  Q.   YES.  JUDGE BENITEZ DOES NOT WANT IT IN HIS EYES.

20  A.   CORRECT.

21          THE COURT:  I DON'T WANT IT IN ANYBODY'S EYES.

22          THE WITNESS:  THIS IS THE SENDING UNIT AND THIS IS

23  THE FLOATER.  AND RIGHT HERE IS A LITTLE PLASTIC ARM, WHICH IS

24  THE INDICATOR.  AS THEY -- AS THE ARM IS ATTACHED TO THE

25  MARKER, IT WILL GIVE YOU -- IT WILL SEND A MESSAGE TO THE

1  INSTRUMENT CLUSTER, GIVING YOU A READING OF HOW MUCH FUEL THE

2  CAR HAS.  THE RELEVANCE OF THIS PHOTOGRAPH IS THAT THERE IS A

3  RED PIECE OF THREAD HERE, WHICH IS HOLDING THE MARKER IN A

4  CERTAIN POSITION.  AND THE IMPORTANCE OF THIS IS THAT THE

5  FLOATER IS UP, WHICH MEANS THAT IT WILL SEND A MESSAGE TO THE

6  INSTRUMENT CLUSTER THAT THE CAR HAS A FULL TANK OF GAS.

7  BY MR. FAKHOURY:

8  Q.  OKAY.  I'M GOING TO SHOW YOU EXHIBIT F NOW.  CAN YOU -- IS

9  THIS JUST A CLOSE UP OF EXHIBIT E, BASICALLY?

10  A.  YES.  THIS IS A CLOSE UP OF EXHIBIT.  AS YOU CAN SEE, THIS

11  IS THE ARM OF THE FLOATER.  AND THIS ARM INSERTS THROUGH THIS

12  CAVITY RIGHT HERE, WHERE THEY PUT A TOOTHPICK.  RIGHT HERE, YOU

13  CAN SEE A TOOTHPICK BECAUSE THEY REMOVED THE FLOATER.  BUT IF

14  THE TOOTHPICK IS NOT THERE, YOU CAN INSERT THIS ARM INTO THE

15  MARKER.  AND THIS RIGHT HERE, ARE THE ONES THAT HOLD THE

16  FLOATER IN POSITION.  AND THIS IS THE CHANNEL, WHICH HAS

17  DIFFERENT LINES, WHICH ALLOWS TO SEND A MESSAGE TO THE CLUSTER,

18  INDICATING HOW MUCH FUEL THERE IS IN THE VEHICLE.

19  Q.  NOW, OBVIOUSLY, IN CONNECTION WITH TAKING THESE -- WITH

20  INSPECTING THE CAR, DID YOU PHYSICALLY PICK UP THE GAS FLOATER?

21  A.  YES.

22  Q.  DID YOU PICK IT UP INSIDE THE CAR?

23  A.  YES.

24  Q.  DID YOU TAKE IT OUTSIDE OF THE CAR?

25  A.  YES.  ALL THESE PHOTOGRAPHS ARE TAKEN ON THE ROOF OF THE

VEHICLE.  EVERYTHING IS OUTSIDE THE VEHICLE, AND AS I'M PUTTING

THE PIECES TOGETHER, ARE ON TOP OF THE VEHICLE.

Q.   SO THAT IS THE ROOF OF THE CAR IN THIS PICTURE?

A.   THIS IS THE FRONT END OF A DIFFERENT VEHICLE.

MR. CONOVER:  YOUR HONOR, AGAIN WE WOULD OBJECT TO

THE PLAYING OF THE VIDEO WE TALKED ABOUT EARLIER, PRETRIAL, AS

WELL AS THE FACT THAT IT HAS NOT BEEN ESTABLISHED THAT THE

DEFENDANT -- THAT THE EXPERT IS A MECHANIC.

THE COURT:  I DON'T RECALL IF MY RULING WAS PRETRIAL

WITH REGARDS TO THE VIDEO.  DID I RULE ON IT?

MR. CONOVER:  YOUR HONOR, YOU DID.  IT WAS RULED IT

WOULD COME IN SUBJECT TO HIM BEING QUALIFIED AS AN EXPERT.

THE COURT:  WELL, OKAY.  LET'S PLAY IT.  IF IT TURNS

OUT THAT EITHER IT APPEARS HE'S NOT QUALIFIED, OR THERE IS SOME

OTHER OBJECTION, I'LL STRIKE IT AND INSTRUCT THE JURY TO

DISREGARD IT.  AND I PROMISED TO DO THAT.  SO LET'S SEE WHAT

THIS VIDEO SHOWS.

MR. FAKHOURY:  CAN I PUT IN THE FOUNDATION, SO IT CAN

BE ADMITTED?

THE COURT:  SURE.

MR. CONOVER:  WE DON'T OBJECT TO IT BEING ADMITTED

FOUNDATION WISE, YOUR HONOR.

THE COURT:  OKAY, THERE YOU GO.

MR. FAKHOURY:  THEN I WOULD MOVE TO ADMIT EXHIBIT G.

THE COURT:  I'LL RESERVE RULING ON THAT UNTIL WE'RE

1   FINISHED WITH THE TESTIMONY, OKAY.

2           MR. FAKHOURY:  I THINK WE NEED ONE MINUTE OF

3   TECHNICAL --

4           (DEFENDANT'S EXHIBIT G MARKED FOR IDENTIFICATION.)

5           THE COURT:  HOW LONG IS THIS VIDEO?

6           MR. FAKHOURY:  THIRTY SECONDS.

7           THE COURT:  OKAY.

8   BY MR. FAKHOURY:

9   Q.  WHILE THAT'S WARMING UP, LET ME ASK YOU BRIEFLY,

10  MR. LEANO, REGARDING -- DID YOU TAKE ANY VIDEO WHEN YOU WERE

11  INSPECTING THE VEHICLE ON AUGUST 18, 2010?

12  A.  A VIDEO WAS TAKEN OF MYSELF AS I WAS ACCESSING THE

13  LOCATION WHERE THE SENDING UNIT IS ON THE VEHICLE.  THE VIDEO

14  WAS TAKEN BY THE INVESTIGATOR IN CHARGE OF THE CASE, LEANA

15  PEREZ.

16  Q.  NOW, OBVIOUSLY, IN MAKING THIS VIDEO, YOU DIDN'T CONNECT

17  ALL THE WIRES TO THE -- ALL THE PUMPS, RATHER, THE WIRES,

18  WIRING TO THE SENDING UNIT, CORRECT?

19  A.  NO.  THE RELEVANCE OF THIS VIDEO IS THE ACCESS TO THE

20  SENDING UNIT, THE LOCATION AND HOW EASY ACCESS A PERSON HAS TO

21  THE SENDING UNIT.

22  Q.  OKAY.

23                  (VIDEOTAPED RECORDING PLAYED.)

24  BY MR. FAKHOURY:

25  Q.  OKAY, NOW OBVIOUSLY, THAT VIDEO WAS ABOUT 30 MINUTES, BUT

1  IT WOULD TAKE LONGER THAN 30 MINUTES TO ACTUALLY REMOVE THE

2  SENDING UNIT OUT OF --

3  A.   THIRTY SECONDS IN DURATION, THE VIDEOTAPE.

4  Q.   AND, OBVIOUSLY, IT WOULD TAKE LONGER THAN THAT TO REMOVE

5  THE SENDING UNIT, CORRECT?

6  A.   YES, CORRECT.  I DID MY OWN EXPERIMENT.  AND I WENT TO A

7  LOCAL JUNK YARD, AND I ASKED PERMISSION TO REMOVE A SENDING

8  UNIT TO A CAR SIMILAR IN QUESTION.  AND I DID THE WHOLE PROCESS

9  IN ABOUT 25 MINUTES, MOVING THE SEAT FORWARD, REMOVING THE

10 METAL PLATE, REMOVING THIS, DISCONNECTING THE TWO PRESSURE

11 GASOLINE, FUEL LINES, REMOVING THE CONNECTOR WITH THE CURRENT,

12 AS WELL AS REMOVING THE NUT, UNIT NUT, WHICH IS A PLASTIC NUT

13 THAT YOU -- IT'S ATTACHED TO THE SENDING UNIT TO THE GAS TANK.

14 ONCE YOU REMOVE ALL OF THAT, THEN YOU HAVE ACCESS TO PULLING

15 THE SENDING UNIT OUTSIDE OF THE GAS TANK.

16 Q.   NOW WHEN YOU SAID YOU DID THAT EXPERIMENT, WHEN DID DO YOU

17 THAT?

18 A.   LAST TUESDAY, AS A MATTER OF FACT.

19 Q.   AND WHEN YOU SAID IT TOOK 25 MINUTES, YOU'RE REFERRING TO

20 KIND OF A ONE WAY --

21 A.   YES.

22 Q.   -- TWENTY-FIVE MINUTES TO JUST ACCESS THE PANEL, REMOVE

23 THE SENDING UNIT?

24 A.   IT IS ONLY THE REMOVAL OF THE SENDING UNIT FROM A GAS

25 TANK.

1  Q.   SO IT WOULD TAKE ANOTHER 25 MINUTES TO REPLACE EVERYTHING,

2  CORRECT?

3  A.   YES.  REVERSE THE SEQUENCE OF THE OBJECTS YOU REMOVED, AND

4  OBVIOUSLY THE SENDING UNIT IS PLACED BACK.

5           MR. FAKHOURY:  I HAVE NOTHING FURTHER.

6           THE COURT:  ALL RIGHT.

7                        CROSS-EXAMINATION

8  BY MR. CONOVER:

9  Q.   MR. LEANO, HOW MANY TIMES HAVE YOU LOOKED AT A SENDING

10 UNIT FOR FEDERAL DEFENDERS?

11 A.   IT IS IN MANY DIFFERENT CASES.  I DON'T HAVE A NUMBER WITH

12 ME RIGHT NOW.

13 Q.   GIVE ME YOUR BEST ESTIMATE.

14 A.   I DON'T KNOW, MAYBE -- EVERY TIME THERE IS A CASE RELATED

15 TO A GAS TANK COMPARTMENT, I GO AND SEE THE VEHICLE.  IT CAN BE

16 OVER 30 TIMES, 40 TIMES.

17 Q.   BECAUSE ORIGINALLY YOU TESTIFIED 30.  AND THEN I ASKED YOU

18 A FEW MINUTES AGO, AND YOU SAID FIVE.  AND NOW YOU'RE SAYING --

19 A.   NO.  I SAID FIVE FOR THIS PARTICULAR CAR, THIS PARTICULAR

20 MODEL.

21 Q.   OKAY.

22 A.   I'VE SEEN OTHER CARS THAT HAVE TO DO WITH COMPARTMENTS AND

23 GAS TANKS, AND -- OR SENDING UNITS THAT HAD TO BE REMOVED.

24 Q.   SO YOU'VE DEALT WITH FIVE SENDING UNITS FOR A BEETLE?

25 A.   CORRECT.

1     Q.   SO THERE HAVE BEEN FIVE CASES THAT FEDERAL DEFENDERS HAVE

2   HANDLED IN THE LAST -- HOW LONG HAS IT BEEN?

3     A.   YOU'RE TALKING ABOUT A SPECIFIC CAR --

4     Q.   TALKING ABOUT BEETLES --

5     A.   -- AND A SPECIFIC BODY TYPE.

6     Q.   NO.   YOU WERE TALKING ABOUT THAT.   BECAUSE YOU JUST SAID

7   YOU'VE DONE IT FIVE TIMES, YOU'VE DEALT WITH THE SENDING UNIT

8   FOR A BEETLE; IS THAT RIGHT?

9     A.   CORRECT.

10           MR. FAKHOURY:   OBJECTION.   ARGUMENTATIVE.

11           THE COURT:   NO.   IT'S NOT ARGUMENTATIVE.   OVERRULED.

12   BY MR. CONOVER:

13     Q.   IS THAT WHAT YOU SAID, SIR?

14     A.   CORRECT.

15     Q.   HOW LONG A TIME PERIOD BECAUSE I WANT TO BE ABLE TO GO

16   BACK AND VERIFY THAT.

17     A.   THE LAST FIVE, SIX YEARS.

18     Q.   OKAY.   FIVE, SIX YEARS.   ALL RIGHT.   NOW YOU'VE TESTIFIED

19   IN FEDERAL COURT BEFORE?

20     A.   YES.

21     Q.   YOU TESTIFIED BEFORE JUDGE BURNS BEFORE?

22     A.   YES.

23     Q.   IN UNITED STATES VS. DARWIN LUIS AYALA; IS THAT CORRECT?

24     A.   YES.

25     Q.   AND THE COURT THERE, JUDGE BURNS, FOUND YOUR TESTIMONY TO

1    BE INACCURATE; IS THAT CORRECT?

2              MR. FAKHOURY:  OBJECTION.  IMPROPER QUESTION.

3              THE COURT:  NO, OVERRULED.

4    BY MR. CONOVER:

5    Q.   THE COURT THERE, YOU TESTIFIED THAT YOU LOOKED AT TWO SETS

6    OF PHOTOGRAPHS AND SAID THOSE ARE TWO DIFFERENT TRAILERS.  AND

7    THE COURT LOOKED AT THOSE SAME PHOTOGRAPHS AND SAID, NO, NO,

8    NO, THIS IS THE SAME FLATBED TRAILER HERE AND FOUND YOUR

9    TESTIMONY TO BE -- NOT CREDIBLE; IS THAT CORRECT?

10   A.   MAYBE.  I DON'T REMEMBER.  I DON'T RECALL.

11   Q.   YOU DON'T RECALL A FEDERAL JUDGE SAID YOUR TESTIMONY

12   WASN'T ACCURATE?

13             MR. FAKHOURY:  OBJECTION.  ARGUMENTATIVE.

14             THE COURT:  OVERRULED.

15             THE WITNESS:  I HAVE DONE MANY DIFFERENT CASES.  IT'S

16   HARD FOR ME TO RECALL NAMES AND WHAT I SAID ON PREVIOUS CASES.

17   ON THIS PARTICULAR CASE, I NEED TO SEE MORE DETAILS IN ORDER TO

18   RESPOND TO THAT.

19   BY MR. CONOVER:

20   Q.   ON APRIL 9, 2007, IN THIS COURTHOUSE, IN JUDGE BURNS, HE'S

21   ON THE SECOND FLOOR IN THE COURTROOM, TO THE FAR SIDE THERE,

22   DID YOU TESTIFY IN COURT ABOUT A CASE WHERE THE DEFENSE WAS,

23   THESE ARE TWO SEPARATE FLATBED TRAILERS, NOT THE SAME FLATBED

24   TRAILER, SO THE DRUGS COULDN'T HAVE BEEN IN THE DEFENDANT'S

25   TRAILER; DID YOU TESTIFY IN THAT CASE?

1         MR. FAKHOURY:  OBJECTION.  ARGUMENTATIVE.

2         THE COURT:  OVERRULED.

3         THE WITNESS:  I MIGHT HAVE.  I DON'T RECALL.

4    BY MR. CONOVER:

5    Q.  ALL RIGHT.  IT IS OKAY IF YOU DON'T RECALL.

6        BACK TO THE CASE IN QUESTION, WHERE DID YOU FIND THIS?

7    A.  I FOUND IT INSIDE THE VEHICLE.

8    Q.  WHERE IN THE VEHICLE?

9    A.  IN THE REAR PART OF THE VEHICLE, ON THE FLOOR.

10   Q.  SO YOU FOUND IT ON THE FLOOR OF THE VEHICLE?

11   A.  YES.

12   Q.  SO IT WASN'T DOWN IN THE GAS TANK?

13   A.  I DON'T RECALL SEEING IT INSIDE THE GAS TANK.

14   Q.  YOU FOUND IT ON THE FLOOR, RIGHT?

15   A.  YES.

16   Q.  SO IT WASN'T IN THE GAS TANK?

17   A.  I DON'T RECALL SEEING IT INSIDE THE GAS TANK.

18   Q.  YOU FOUND IT ON THE FLOOR, RIGHT?

19   A.  YES.

20   Q.  SO IT WASN'T IN THE GAS TANK WHEN YOU FOUND IT?

21        MR. FAKHOURY:  OBJECTION.  ARGUMENTATIVE.  HE

22   ANSWERED THE QUESTION.

23        THE COURT:  I THINK IT HAS BEEN ASKED AND ANSWERED.

24   BY MR. CONOVER:

25   Q.  ALL RIGHT.  SO YOU FOUND THIS IN THE PASSENGER COMPARTMENT

1  OF THE VEHICLE?

2  A.  I FOUND IT ON THE REAR PART OF THE VEHICLE, TOGETHER WITH

3  MANY DIFFERENT PARTS.

4  Q.  AND WHAT DID YOU DO WHEN YOU WERE DONE WITH IT?  WHERE DID

5  YOU PUT IT?

6  A.  EVERYTHING -- ONCE I FINISH MY INSPECTION, EVERYTHING IS

7  PLACED BACK IN THE VEHICLE.

8  Q.  WHERE DID YOU PLACE IT EXACTLY IN THE VEHICLE?

9  A.  I DON'T REMEMBER.  I JUST TOSS EVERYTHING BACK THERE, THE

10  WAY IT WAS.

11  Q.  JUST KIND OF TOSSED IT BACK THERE?

12  A.  YES.

13  Q.  DID YOU PUT IT UNDER THE FRONT SEAT?

14  A.  NO.

15  Q.  YOU DIDN'T PUT IT ON THE FRONT SEAT?

16  A.  NO, SIR.  I WOULDN'T DO THAT.

17  Q.  BUT YOU FOUND THIS IN THE VEHICLE, NEAR -- JUST ON THE

18  FLOOR?

19  A.  YES.

20  Q.  ALL RIGHT.  AND THE VIDEO THAT YOU TOOK THERE, DID YOU GET

21  PERMISSION FROM THE CASE AGENT OR ANYONE THERE TO TAKE VIDEO?

22  A.  THE PERMISSION --

23          MR. FAKHOURY:  OBJECTION.  IRRELEVANT.

24          THE WITNESS:  THE VIDEO WAS NOT TAKEN BY ME --

25          THE COURT:  I'M SORRY?

1        MR. FAKHOURY:  OBJECTION.  IRRELEVANT.

2        THE COURT:  OVERRULED.

3        THE WITNESS:  THE VIDEO WAS NOT TAKEN BY ME, AS I WAS

4  DOING MY OWN INSPECTION.  THE INVESTIGATOR IN CHARGE DECIDED TO

5  TAKE A VIDEO AND -- OF ME FINDING THE LOCATION WHERE THE

6  SENDING UNIT IS.

7  BY MR. CONOVER:

8  Q.   OKAY.  SO NO ONE HAD GOTTEN PERMISSION?

9  A.   PARDON ME?

10  Q.   SO NO ONE HAD PERMISSION; IS THAT CORRECT?

11  A.   I CAN'T HEAR YOU.

12  Q.   NO ONE HAD PERMISSION TO DO THE VIDEO; IS THAT CORRECT?

13  A.   CORRECT.

14  Q.   AND YOU DIDN'T WRITE A REPORT?

15  A.   NO, I DID NOT.

16  Q.   NO RECORD OF HAVING DONE ANY OF THIS WORK?

17  A.   AS SOON AS I FINISH WITH MY CAR, I DO HAVE A VERBAL

18  COMMUNICATION WITH THE ATTORNEYS.  AND I EXPLAIN TO THEM WHAT I

19  SAW.

20  Q.   IS THERE A RECORD OF THAT, OR ARE YOU JUST TALKING VERBAL

21  COMMUNICATION?

22  A.   I DIDN'T WRITE A REPORT.  I JUST TOLD THEM WHAT I SAW.

23  Q.   THERE IS NO RECORD OF WHAT YOU DID?

24  A.   THE PHOTOGRAPHS.

25        MR. CONOVER:  OKAY.  NOTHING FURTHER, YOUR HONOR.

1          THE COURT:  ALL RIGHT.

2          MR. FAKHOURY:  CAN I HAVE THREE QUESTIONS?

3          THE COURT:  OKAY.

4                    REDIRECT EXAMINATION

5     BY MR. FAKHOURY:

6     Q.   REGARDING THE VIDEO, MR. LEANO, WHEN YOU TOOK THAT VIDEO,

7     WAS AGENT BULLARD THERE?

8     A.   YES, CORRECT.

9     Q.   DID SHE TELL YOU NOT TO TAKE VIDEO?

10    A.   NO.  SHE HAD NO OBJECTION TO THAT.

11         MR. FAKHOURY:  THANK YOU.  NOTHING FURTHER.

12         THE COURT:  ALL RIGHT.  I BELIEVE THAT I HAD AN

13    OBJECTION TO THE WITNESS'S QUALIFICATIONS.  I BELIEVE HE'S

14    TESTIFIED THAT HE HAS LOOKED AT SENDING UNITS FIVE TIMES

15    PREVIOUSLY.  I THINK THE QUESTION IS, DOES HIS TESTIMONY HELP

16    THE JURY OR NOT HELP THE JURY IN DECIDING AN ISSUE WHERE EXPERT

17    TESTIMONY MIGHT BE APPROPRIATE.  I THINK THE AMOUNT OF WEIGHT

18    TO BE GIVEN TO IT BY THE JURY IS UP TO THE JURY.  BUT I THINK

19    THERE IS SUFFICIENT BASIS THAT HAS BEEN LAID TO QUALIFY HIM AS

20    AN EXPERT.  SO THE TESTIMONY WILL BE ALLOWED IN.  OKAY.

21         MR. CONOVER:  THANK YOU, YOUR HONOR.

22         MR. FAKHOURY:  THANK YOU, YOUR HONOR.

23         THE COURT:  CALL YOUR NEXT WITNESS.

24      YOU MAY STEP DOWN, SIR.

25         THE WITNESS:  THANKS.

1          MR. GARRISON:  THE DEFENSE CALLS JENNIFER JIMENEZ.

2          THE COURT:  ALL RIGHT.

3                    (WITNESS SWORN.)

4          THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

5     RECORD, AND SPELL YOUR FIRST AND LAST NAME.

6          THE WITNESS:  JENNIFER, J-E-N-N-I-F-E-R, JIMENEZ,

7     J-I-M-E-N-E-Z.

8                    DIRECT EXAMINATION

9     BY MR. GARRISON:

10    Q.   GOOD AFTERNOON, MA'AM.

11    A.   GOOD AFTERNOON.

12    Q.   THANK YOU FOR COMING.  CAN YOU TELL THE JURY -- WELL,

13    LET'S START, HOW OLD ARE YOU?

14    A.   I'M 23 YEARS OLD.

15    Q.   AND WHAT DO YOU DO FOR A LIVING?

16    A.   I WORK AT A BEAUTY STORE AS A SALES MANAGER.

17    Q.   AND DO YOU KNOW GILBERT FLORES?

18    A.   YES, I DO.

19    Q.   HOW DO YOU KNOW HIM?

20    A.   HE'S THE FATHER OF MY EX-BOYFRIEND.

21    Q.   AND WHAT'S YOUR EX-BOYFRIEND'S NAME?

22    A.   ALEX FLORES.

23    Q.   OKAY.  WHERE DO YOU RESIDE?

24    A.   I RESIDE IN -- DO YOU WANT THE ADDRESS?

25    Q.   NO.  THE CITY IS FINE.

1    A.   LOS ANGELES.

2    Q.   LOS ANGELES, OKAY.  ON NOVEMBER 17TH, OF LAST YEAR, WHERE

3    DID YOU RESIDE?

4    A.   I WAS LIVING WITH MY BOYFRIEND, EX-BOYFRIEND, AT THE TIME.

5    Q.   ALEX?

6    A.   IN NOVEMBER, YES.

7    Q.   DIRECTING YOUR ATTENTION SPECIFICALLY TO NOVEMBER 17TH, DO

8    YOU REMEMBER FEDERAL AGENTS COMING TO THE HOUSE THAT DAY?

9    A.   YES, THAT MORNING.

10   Q.   CAN YOU TELL THE JURY WHAT HAPPENED.

11   A.   I WAS ASLEEP, BECAUSE IT WAS MY DAY OFF, AND I HEARD THE

12   DOORBELL.  AND I WENT DOWNSTAIRS, HALF ASLEEP, AND THEY WERE AT

13   THE DOOR, AND I OPENED THE DOOR.

14   Q.   AND WHAT HAPPENED WHEN YOU OPENED THE DOOR?

15   A.   I DON'T RECALL EXACTLY WHAT THEY SAID, BUT SOMETHING ALONG

16   THE LINES OF, IF THEY COULD COME IN, THEY WERE INVESTIGATING A

17   CASE.

18   Q.   OKAY.  DID THEY GIVE YOU ANY SPECIFIC DIRECTION AS TO WHO

19   THEY WERE INVESTIGATING?

20   A.   YOU MEAN, WHEN I OPENED THE DOOR?

21   Q.   AT ANY TIME THAT DAY.

22   A.   YEAH, THEY DID.

23   Q.   WHAT DID THEY SAY?

24   A.   THEY JUST BRIEFLY SAID -- I DON'T REMEMBER EXACTLY HOW IN

25   DETAILS THEY WERE ABOUT IT, BUT THEY DID MENTION THAT THEY WERE

1    INVESTIGATING A CASE TO DO WITH -- SOMETHING TO DO WITH SOME

2    KIND OF SMUGGLING -- I CAN'T REALLY RECALL EXACTLY HOW THEY

3    DESCRIBED IT.

4    Q.   DID THEY MENTION ANY NAMES TO YOU?

5    A.   YOU'RE TALKING ABOUT THE WHOLE TIME THEY WERE THERE,

6    RIGHT?

7    Q.   YES.

8    A.   YES, THEY DID.

9    Q.   WHO DID THEY MENTION?

10   A.   WELL, FIRST THEY ASKED ME TO IDENTIFY MY EX-BOYFRIEND AND

11   HIS BROTHERS BECAUSE THEY HAD PICTURES OF THEM.

12   Q.   OKAY.  AND WHILE THIS WAS GOING ON, HOW MANY AGENTS WERE

13   THERE IN YOUR HOUSE?

14   A.   I WOULDN'T BE ABLE TO TELL YOU AN EXACT NUMBER.  I WAS --

15   I COULDN'T TELL YOU.  MAYBE ABOUT -- I DON'T KNOW, I'D SAY MORE

16   THAN FOUR, AT LEAST -- FOR SURE MORE THAN FOUR.  I WOULDN'T BE

17   ABLE TO TELL YOU AN EXACT NUMBER.

18   Q.   ON THAT DAY, DID THEY SEARCH THAT HOUSE?

19   A.   FROM WHAT I UNDERSTAND, YES.  I WAS SITTING DOWN THE WHOLE

20   TIME.

21   Q.   OKAY.

22   A.   I DIDN'T SPECIFICALLY SEE THEM SEARCHING, BUT I'M ASSUMING

23   THEY DID.  I WAS SITTING DOWN THE WHOLE TIME BEING QUESTIONED.

24   Q.   CAN YOU ESTIMATE HOW LONG IT TOOK FOR THEM TO SEARCH THE

25   HOUSE?

1          MR. CONOVER:  OBJECTION.  MISSTATES THE FACTS.  SHE

2    SAID SHE WASN'T ABLE TO TELL IF THEY SEARCHED THE HOUSE.

3          THE COURT:  YEAH.  SUSTAINED.  CALLS FOR SPECULATION.

4    BY MR. GARRISON:

5    Q.   WERE ALL THE AGENTS SITTING WITH YOU WHEN YOU WERE SITTING

6    DOWN?  DID SOME OF THEM GO INTO OTHER ROOMS, AND WERE THEY GONE

7    FOR A PERIOD OF TIME?

8    A.   THE WHOLE TIME.

9    Q.   OKAY.  AND IF YOU CAN JUST ESTIMATE, APPROXIMATELY HOW

10   LONG WERE THEY GONE?

11   A.   THE ONES THAT WERE SEARCHING?

12   Q.   YES.

13   A.   THE WHOLE TIME.  THERE WERE ONLY TWO THAT WERE TALKING TO

14   ME, AND THE REST WERE, I GUESS, LOOKING IN OTHER ROOMS.

15   Q.   I UNDERSTAND THE WHOLE TIME.  BUT CAN YOU GIVE US A TIME

16   PERIOD --

17   A.   OH, NO LONGER THAN -- LONGER THAN 30 MINUTES, BUT I

18   WOULDN'T BE ABLE TO SAY IT WAS LONGER THAN AN HOUR.  IT WAS

19   QUITE A WHILE BUT NOT LONGER THAN AN HOUR.

20   Q.   BETWEEN 30 MINUTES AND AN HOUR?

21   A.   MAYBE LESS THAN AN HOUR, YEAH.

22   Q.   ON THAT DAY, HOW DID YOU FEEL?

23          MR. CONOVER:  OBJECTION, YOUR HONOR, RELEVANCE.

24          THE COURT:  SUSTAINED.

25          MR. GARRISON:  YOUR HONOR, COULD I HAVE A MOMENT?

1          THE COURT:  YES.

2    BY MR. GARRISON:

3    Q.    JUST A COUPLE LAST QUESTIONS.

4          YOU SAID YOUR EX-BOYFRIEND; IS THAT RIGHT?

5    A.    YES.

6    Q.    SO YOU GUYS ARE NO LONGER TOGETHER?

7    A.    NO.

8          MR. GARRISON:  OKAY, NO FURTHER QUESTIONS.

9          THE COURT:  ANY QUESTIONS?

10         MR. CONOVER:  NO QUESTIONS, YOUR HONOR.

11         THE COURT:  ALL RIGHT, MA'AM.  YOU'RE EXCUSED.  THANK

12   YOU.

13         PLEASE CALL YOUR NEXT WITNESS.

14         MR. GARRISON:  THE DEFENSE CALLS CHRISTOPHER FLORES.

15         JUST ONE MOMENT, YOUR HONOR.

16                    (WITNESS SWORN.)

17         THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

18   YOUR FIRST AND LAST NAME FOR THE RECORD.

19         THE WITNESS:  CHRISTOPHER MARTIN FLORES, FIRST NAME

20   IS C-H-R-I-S-T-O-P-H-E-R, LAST NAME IS FLORES, F-L-O-R-E-S.

21                   DIRECT EXAMINATION

22   BY MR. GARRISON:

23   Q.    GOOD AFTERNOON, MR. FLORES.  SIR, DO YOU KNOW GILBERT

24   FLORES?

25   A.    YES.

1   Q.   HOW DO YOU KNOW HIM?

2   A.   HE'S MY DAD.

3   Q.   OKAY.  AND I ASSUME SINCE HE'S YOUR DAD, YOU'VE KNOWN HIM

4   YOUR WHOLE LIFE?

5   A.   YES.

6   Q.   ALL RIGHT.

7            THE COURT:  COUNSEL, THAT WAS ANOTHER ONE OF THOSE

8   TRICK QUESTIONS.

9   BY MR. GARRISON:

10  Q.   AND DO YOU HAVE ANY BROTHERS AND SISTERS?

11  A.   YES, I DO.  I HAVE THREE BROTHERS, TWO OLDER BROTHERS AND

12  A YOUNGER BROTHER.

13  Q.   AND THEN SISTERS?

14  A.   YES.  STEP-SISTER.

15  Q.   ALL RIGHT.  AND ALL OF THOSE CHILDREN EXCEPT FOR THE

16  STEP-SISTER, ARE THEY CHILDREN OF YOUR FATHER?

17  A.   YES.

18  Q.   ALL RIGHT.

19           MR. CONOVER:  OBJECTION AS TO RELEVANCE, YOUR HONOR.

20           THE COURT:  OVERRULED.

21  BY MR. GARRISON:

22  Q.   MR. FLORES, WHAT DO YOU DO FOR A LIVING?

23  A.   I'M A HIGH SCHOOL TEACHER AND A FOOTBALL COACH.

24  Q.   WHERE AT?

25  A.   AT CATHEDRAL HIGH SCHOOL, IN DOWNTOWN LOS ANGELES.

1   Q.   DO YOU WORK 40 HOURS A WEEK?

2   A.   YES.

3   Q.   AND DO YOU KNOW WHERE YOUR FATHER LIVES?

4   A.   YES, I DO.

5   Q.   WHERE DOES HE LIVE?

6   A.   IN MONTEBELLO, CALIFORNIA.

7   Q.   AND WHERE DO YOU RESIDE?  YOU CAN JUST SAY THE CITY.

8   A.   IN ALHAMBRA.

9   Q.   ARE YOU MARRIED OR SINGLE?

10  A.   I'M MARRIED.

11  Q.   HOW LONG HAVE YOU BEEN MARRIED?

12  A.   TWO YEARS NOW.

13  Q.   AND I WANT TO ASK YOU SOME QUESTIONS ABOUT -- DO YOU KNOW

14  A MAN NAMED DAVID GUTIERREZ?

15  A.   YES, I DO.

16  Q.   WHO IS DAVID GUTIERREZ?

17  A.   HE'S A FAMILY FRIEND.

18  Q.   HOW LONG HAVE YOU KNOWN HIM?

19  A.   SINCE I CAN REMEMBER.

20  Q.   ALL RIGHT, HOW OLD ARE YOU?

21  A.   I'M 26.

22  Q.   TO YOUR KNOWLEDGE, DOES MR. GUTIERREZ KNOW WHERE YOU LIVE?

23  A.   YES.

24  Q.   DO YOU KNOW IF YOUR FATHER AND MR. GUTIERREZ WOULD TRAVEL

25  TO MEXICO TOGETHER?

1    A.   I DON'T KNOW.

2    Q.   OKAY.  NOW I WANT TO SPECIFICALLY DIRECT YOU TO YOUR

3    FATHER -- DO YOU RECALL YOUR FATHER HAVING A 2003 VOLKSWAGON

4    BEETLE?

5    A.   YES.

6    Q.   OKAY.  WHY?

7    A.   WE USED TO BORROW SOME OF MY DAD'S CARS, AND THAT WAS ONE

8    OF THE CARS I WOULD BORROW.

9    Q.   WHY WOULD YOU BORROW IT?

10   A.   I WAS A COLLEGE STUDENT, AND I WAS LIVING WITH MY FIANCEE

11   AT THAT TIME.  AND WE HAD ONE CAR, SO WE WOULD HAVE TO BORROW A

12   CAR FROM TIME TO TIME.  AND I WAS MOVING BACK HOME AND MY

13   SCHOOL WAS QUITE A WAYS AWAY, SO I NEEDED A CAR.

14   Q.   WHAT TIME PERIOD WAS THAT?

15   A.   I DON'T KNOW EXACTLY.  IT WAS SPREAD OUT, DIFFERENT TIMES,

16   BECAUSE I BORROWED IT FOR DIFFERENT REASONS.

17   Q.   LET ME ASK YOU DIRECTLY, DID YOU BORROW THE CAR IN 2009,

18   THAT WHOLE YEAR?

19   A.   I'M PRETTY SURE I DID, YES.

20   Q.   NOW EVERY TIME YOU'VE DRIVEN THIS CAR, HAS THE GAS GAUGE

21   WORKED?

22   A.   YES.

23        MR. GARRISON:  NO FURTHER QUESTIONS, YOUR HONOR.

24        THE COURT:  OKAY.  ANY QUESTIONS?

25        MR. CONOVER:  NO QUESTIONS, YOUR HONOR.

1          THE COURT:  ALL RIGHT, SIR, YOU MAY STEP DOWN.  THANK

2     YOU.

3          THE WITNESS:  THANK YOU.

4          THE COURT:  PLEASE CALL YOUR NEXT WITNESS.

5          MR. GARRISON:  THE DEFENSE RESTS, YOUR HONOR.

6          THE COURT:  OKAY.  WELL, ACCORDING TO MY WATCH,

7     LADIES AND GENTLEMEN, IT IS APPROXIMATELY A QUARTER UNTIL 3:00.

8     I NEED TO MEET AND TALK WITH THE ATTORNEYS FOR A LITTLE WHILE,

9     AND I NEED TO DO THIS OUTSIDE OF YOUR PRESENCE.  I NEED TO GO

10    OVER SOME THINGS WITH THEM, INCLUDING POSSIBLY SCHEDULING.  I'M

11    GOING TO TRY TO GET THIS DONE IN 20 MINUTES, IF I CAN.  IT MAY

12    TAKE ME A LITTLE LONGER, SO BEAR WITH ME.  I WOULD ASK THAT YOU

13    COME BACK AT FIVE MINUTES AFTER 3:00.  BE OUTSIDE THOSE DOORS.

14        AND IT MAY TAKE A LITTLE LONGER, SO PLEASE BE PATIENT WITH

15    ME IF I'M NOT READY AT FIVE AFTER 3:00.  REMEMBER MY

16    ADMONITION.  PLEASE DO KEEP AN OPEN MIND, OKAY.

17                    (JURY EXITS COURTROOM.)

18        THE COURT:  ALL RIGHT, I BELIEVE THE JURY HAS LEFT

19    THE COURTROOM.  FIRST OF ALL, LET ME ADDRESS THE RULE 29

20    MOTION.  I'M GOING TO DENY THE MOTION.  I BELIEVE THAT THERE IS

21    SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION.  AND A REASONABLE,

22    RATIONAL JURY COULD, IN FACT, RETURN A CONVICTION BASED ON THE

23    EVIDENCE THAT HAS BEEN PRESENTED.

24        I HAVE TO LOOK AT THE EVIDENCE IN THE LIGHT MOST FAVORABLE

25    TO THE GOVERNMENT.  AND IT APPEARS THAT CERTAINLY MR. FLORES

1   WAS DRIVING A VEHICLE WHICH CONTAINED A LARGE QUANTITY OF

2   CRYSTAL METH.  AND IT HAD A CONSIDERABLE VALUE.  THE

3   CIRCUMSTANCES ARE CERTAINLY SUSPECT.  I'M NOT GOING TO GO TOO

4   MUCH INTO THE FACTS BECAUSE IN DOING SO, I MAY BE GIVING THE

5   GOVERNMENT, PERHAPS, UNNEEDED EDUCATION OR COACHING, BUT AS TO

6   AT LEAST WHAT I FIND TO BE SIGNIFICANT IN THE CASE.  BUT

7   CERTAINLY WE KNOW THAT THE VEHICLE'S SENDING UNIT WAS TAMPERED

8   WITH, WE KNOW THAT IT WAS MADE TO APPEAR THAT THE VEHICLE HAD

9   MORE GAS IN IT THAN IT OTHERWISE WOULD HAVE.

10  IT CERTAINLY APPEARS FROM LOOKING AT THE RECORDS, THAT

11  THERE IS A CLOSE CONNECTION BETWEEN THE ENTRIES BY MR. FLORES

12  AND MR. GUTIERREZ.  AND I THINK IF YOU LOOK AT THE

13  CIRCUMSTANTIAL EVIDENCE, ONE COULD EASILY CONCLUDE THAT THOSE

14  WERE BEING DONE FOR PURPOSES OF SMUGGLING DRUGS INTO THE UNITED

15  STATES.

16  LASTLY, I NOTE THAT THERE WAS A GARAGE DOOR OPENER IN THE

17  VEHICLE.  AND THAT GARAGE DOOR OPENER DID NOT OPEN MR. FLORES'S

18  GARAGE DOOR.  IN FACT, IT OPENED -- OR IT DID NOT OPEN

19  MR. FLORES'S GARAGE.  SO LOOKING AT THE TOTALITY OF THE

20  CIRCUMSTANCES, IT APPEARS TO ME THERE IS SUFFICIENT EVIDENCE

21  FOR A JURY TO CONVICT.

22  NOW I'M GOING TO TURN MY ATTENTION VERY QUICKLY, I HAD

23  RULED ON THE QUESTION OF THE GARAGE DOOR OPENER.  AS I NOTED

24  PREVIOUSLY, THERE WAS NO OBJECTION TO THE QUESTION WHEN IT WAS

25  FIRST ASKED.  BUT, HOWEVER, THERE WAS A SUBSEQUENT OBJECTION.

1    I RULED THAT I DID NOT BELIEVE THAT IT WAS A SEARCH, BUT THAT I

2    WOULD GO BACK AND DO SOME RESEARCH TO SEE IF -- BECAUSE I HATE

3    TO SHOOT FROM THE HIP.  SOMETIMES, OBVIOUSLY, AS TRIAL JUDGES,

4    WE HAVE TO DO THAT ALL THE TIME.  BUT I WANTED TO SEE WHETHER

5    OR NOT I WAS -- PERHAPS, I MADE AN ERROR IN THAT REGARD.  SO I

6    HAD MY LAW CLERKS PULL SOME CASES, AND I TOOK A LOOK AT THE

7    CASES OVER LUNCH AND HAVE CONCLUDED THAT I -- THAT MY ORIGINAL

8    RULING WAS CORRECT.  I THINK THIS IS PROBABLY MORE ANALOGOUS

9    TO -- IN FACT, I THINK I MAY HAVE SAID THIS ALREADY, I'M NOT

10   SURE.  BUT THIS IS ANALOGOUS TO PUTTING A KEY INTO A DOOR LOCK,

11   IS THAT REALLY A SEARCH?  AND LO AND BEHOLD, WHETHER IT'S

12   BECAUSE I HAD READ THIS CASE A LONG TIME AGO AND DIDN'T

13   REMEMBER IT, OR WHETHER IT'S JUST THAT I'M SO BRIGHT, THAT I

14   SOMETIMES AMAZE MYSELF, I DON'T KNOW.

15       BUT IN ANY EVENT, THERE IS A NINTH CIRCUIT CASE, AND IT'S

16   CALLED UNITED STATES OF AMERICA VS. $109,179 IN UNITED STATES

17   CURRENCY, WHEREIN THE NINTH CIRCUIT COURT OF APPEALS FOUND THAT

18   THE DISCREET ACT OF STICKING A KEY INTO A DOOR LOCK IS NOT,

19   ITSELF, A SEARCH.

20       AND INTERESTINGLY ENOUGH, THERE ARE CASES FROM OTHER

21   CIRCUITS THAT HAVE FOUND SIMILAR CIRCUMSTANCES INVOLVING CAR

22   DOOR LOCKS; ALL OF WHICH HAVE FOUND THAT THAT ITSELF IS NOT A

23   SEARCH.  AND SO, CONSEQUENTLY, I THINK I WAS RIGHT IN MY

24   RULING.  SO I PROMISED YOU THAT I WOULD LOOK INTO IT.  I HAVE,

25   AND I'M STICKING TO MY RULING.  AND AS THE SAYING GOES, THAT'S

1    MY STORY AND I'M STICKING TO IT.

2         ALL RIGHT.  LET'S TALK ABOUT THE RULE 30 ISSUES.  I HAVE

3    SOME INSTRUCTIONS THAT HAVE BEEN SUBMITTED BY THE DEFENSE.  I

4    HAVE TAKEN A LOOK AT THOSE INSTRUCTIONS.  NOW I DID THE BEST I

5    COULD, GIVEN THE TIME I HAD AND THE OTHER THINGS THAT WERE

6    GOING ON, TO TRY TO COMPARE THE INSTRUCTIONS THAT I'VE BEEN

7    ASKED TO GIVE TO THE MODEL NINTH CIRCUIT INSTRUCTIONS.

8         FIRST OF ALL, I NOTE, IF I'M NOT MISTAKEN, ALL BUT ONE OF

9    THE PROPOSED INSTRUCTIONS ARE, ESSENTIALLY, NINTH CIRCUIT

10   INSTRUCTIONS THAT HAVE BEEN MODIFIED IN SOME WAY.

11   UNFORTUNATELY, WHAT WAS SUBMITTED TO ME DID NOT INDICATE WHAT

12   THE MODIFICATION WAS.

13             MR. FAKHOURY:  THAT'S MY FAULT, YOUR HONOR.  I'M

14   SORRY.

15             THE COURT:  AND ON TOP OF THAT, YOU VIOLATED MY NO. 1

16   RULE AND PRINCIPLE, WHICH I THOUGHT WE HAD TALKED ABOUT, AND

17   WHICH I KNOW YOU KNOW BECAUSE YOU'VE TRIED CASES BEFORE ME,

18   WHICH IS, YOU'RE NOT TO INCLUDE ANY AUTHORITY ON THE

19   INSTRUCTIONS, RIGHT?

20             MR. FAKHOURY:  I'M SO SORRY, YOUR HONOR.

21             THE COURT:  YOU SHOULD BE.

22             MR. FAKHOURY:  I AM.

23             THE COURT:  I'M GIVING YOU A BAD TIME.  THE RECORD

24   SHOULD REFLECT WE'RE BOTH SMILING.

25             MR. FAKHOURY:  OKAY.

1          THE COURT:  ANYWAY, SO TELL ME WHAT IS SO IMPORTANT

2     ABOUT THESE MODIFICATIONS THAT YOU HAVE MADE THAT I SHOULD

3     ADOPT YOUR MODIFIED INSTRUCTION RATHER THAN THE MODEL

4     INSTRUCTIONS.

5          MR. FAKHOURY:  YOUR HONOR, THERE IS TWO MAIN POINTS.

6     AND THEY -- IT PERTAINS TO ALL FOUR OF THE INSTRUCTIONS THAT

7     HAVE BEEN MODIFIED, WHICH ARE BASICALLY THE ELEMENTS OF THE

8     OFFENSE.

9          THE COURT:  OKAY.

10          MR. FAKHOURY:  THE FIRST MODIFICATION, YOUR HONOR, IN

11     THE GOVERNMENT'S PROPOSED INSTRUCTION, WHICH WOULD BE, FOR

12     EXAMPLE, 9.32, WHEN YOU LOOK AT THE ACTUAL INSTRUCTION ON-LINE

13     IT SAYS --

14          THE COURT:  JUST A SECOND.  I APOLOGIZE, BUT I DON'T

15     KNOW THAT I HAVE A GOVERNMENT'S INSTRUCTION.  WHAT I HAVE IS

16     THE JOINT PROPOSED JURY INSTRUCTIONS.

17          MR. FAKHOURY:  YOUR HONOR, AND IT WOULD BE JURY

18     INSTRUCTION NO. 29.  IF YOU'RE LOOKING AT THE GOVERNMENT -- AT

19     THE JOINT PROPOSED, AT THE TOP HEADING, THERE IS --

20          THE COURT:  SO YOU'RE SAYING THESE WERE NOT AGREED

21     TO?

22          MR. FAKHOURY:  I THINK IT'S THROUGH NO FAULT OF

23     MR. CONOVER'S.  WE HAD GONE BACK AND FORTH, AND THE MAJORITY OF

24     THEM HAD BEEN AGREED TO.  I HAD REQUESTED A COUPLE OF

25     MODIFICATIONS, WHICH I DON'T THINK MADE ITS WAY IN, WHICH IS

1   WHY I FILED -- GAVE OTHER INSTRUCTIONS UNDER SEPARATE COVER.

2   BUT BASICALLY, YOUR HONOR, WITH RESPECT TO INSTRUCTION NO.

3   29 --

4           THE COURT:  YES.

5           MR. FAKHOURY:  THE ONE DIFFERENCE FROM WHAT I'VE

6   PROPOSED IS, IF YOU LOOK AT LINE 10, IT SAYS, THE GOVERNMENT IS

7   NOT REQUIRED TO PROVE THE AMOUNT OR QUANTITY OF

8   METHAMPHETAMINE.  IT NEED ONLY PROVE BEYOND A REASONABLE DOUBT

9   THAT THERE WAS A MEASURABLE OR DETECTABLE AMOUNT OF

10  METHAMPHETAMINE.

11      IN THE COMMENTARY, IT SAYS -- IT'S BRACKETED, WHICH MEANS

12  IT CAN BE OMITTED.  AND IT SPECIFICALLY SAYS, THAT IF THE COURT

13  GIVES INSTRUCTION 9.32, WHICH IS CONTAINED IN THE JOINT PACKET,

14  AS INSTRUCTION NO. 42.  AND I'M SORRY, IT'S 9.16, WHICH IS

15  LISTED AS JURY INSTRUCTION 42.  THAT INSTRUCTION ACTUALLY

16  DIRECTS THE JURY TO DETERMINE THE QUANTITY OF METHAMPHETAMINE.

17      SO WE WERE OF THE OPINION THAT THE TWO INSTRUCTIONS KIND

18  OF CONFLICTED.  EITHER THE COURT SHOULD GIVE 9.16 AND TELL THE

19  JURY THEY SHOULD FIND THE AMOUNT OF METHAMPHETAMINE, IN WHICH

20  CASE, THAT PORTION OF INSTRUCTION 9.32, WHICH IS JURY

21  INSTRUCTION NO. 29, WHICH TELLS THEM THE GOVERNMENT IS NOT

22  REQUIRED TO PROVE THE AMOUNT --

23          THE COURT:  SLOW DOWN, I'M NOT SURE MY COURT REPORTER

24  IS ABLE TO KEEP UP WITH YOU.

25          MR. FAKHOURY:  I'M SORRY.  SO BASICALLY, THE

1    INSTRUCTION, AS PROPOSED BY THE GOVERNMENT, TELLS THE JURY THEY

2    DON'T HAVE TO -- THE GOVERNMENT DOESN'T HAVE TO PROVE THE

3    QUANTITY OF METHAMPHETAMINE, BUT THEY'RE GIVEN ANOTHER

4    INSTRUCTION LATER ON THAT SAYS THEY DO NEED TO DETERMINE IT.

5         THE COURT:   THAT IS TRUE.   THE GOVERNMENT DOES NOT

6    HAVE TO PROVE THE QUANTITY.   THE ONLY TIME THEY HAVE TO PROVE

7    THE QUANTITY IS IF, IN FACT, THEY'RE TRYING TO RAISE THE

8    POSSIBLE PUNISHMENT, THE MAXIMUM SENTENCE THAT CAN BE IMPOSED,

9    RIGHT?

10        MR. FAKHOURY:   THAT'S TRUE, YOUR HONOR.

11        THE COURT:   OKAY.

12        MR. FAKHOURY:   BUT THE WAY THE SUPERSEDING INDICTMENT

13   IS CHARGED, IT DOES CHARGE SPECIFIC AMOUNTS.

14        THE COURT:   YEAH, BUT DOES THAT MATTER?   THAT IS NOT

15   AN ISSUE.   THE QUESTION IS, FOR PURPOSES OF THE BASIC COUNT,

16   THE AMOUNT IS NOT AN ELEMENT.   AND I THINK IT WOULD BE MORE

17   CONFUSING TO THE JURY TO GIVE THAT INSTRUCTION.   SO I THINK AS

18   LONG AS THEY ARE THEN TOLD THAT THEY HAVE TO FIND -- AND, IN

19   FACT, I HAVE A VERDICT FORM WHICH HAS BEEN -- WHICH I HAVE

20   PREPARED, WHICH, IN FACT, WILL ASK THE JURY TO FIND WHETHER OR

21   NOT THE QUANTITY OF METHAMPHETAMINE EXCEEDED 50 GRAMS.   WHERE

22   IS MY PROPOSED JURY INSTRUCTION.   OKAY, SO THAT'S THE -- I WAS

23   TRYING TO FIND WHAT PRECISELY WAS THE MODIFICATION, AND SO NOW

24   THAT I KNOW, I'M GOING TO STICK TO THE MODEL INSTRUCTIONS IN

25   THAT REGARD, OKAY, MR. FAKHOURY.

1          MR. FAKHOURY:  THERE IS A SECOND MODIFICATION.  IT'S

2     WITH RESPECT TO THE CONSPIRACY COUNTS, YOUR HONOR.  AND

3     BASICALLY, THE WAY THE MODEL IS INSTRUCTED -- SORRY, THE WAY

4     THE MODEL INSTRUCTION IS WRITTEN, IT -- AND NOW I'M LOOKING AT

5     JURY INSTRUCTION NO. 32.

6          THE COURT:  OKAY.  GIVE ME ONE MINUTE.

7          MR. FAKHOURY:  SURE.

8          THE COURT:  LOOKING AT 32, OKAY.

9          MR. FAKHOURY:  IF YOU LOOK AT PARENTHESIS 2 --

10         THE COURT:  YES.

11         MR. FAKHOURY:  -- IT SAYS, THE DEFENDANT JOINED IN

12    THE AGREEMENT, KNOWING OF ITS PURPOSE, THE IMPORTATION OF

13    METHAMPHETAMINE, AND INTENDING TO HELP ACCOMPLISH THAT PURPOSE.

14    THE ONLY DIFFERENCE BETWEEN THAT MODEL INSTRUCTION AND WHAT I

15    PROPOSED IS, I BASICALLY SPLIT THAT ELEMENT INTO TWO SEPARATE

16    ELEMENTS, OR BULLET POINTS, I GUESS, IS ONE WAY TO SAY IT.

17         SO BECAUSE THE MODEL INSTRUCTION SAYS THERE HAS TO BE --

18    HE HAS TO HAVE JOINED IN THE AGREEMENT, KNOWING OF ITS PURPOSE,

19    ONE, AND TWO, INTENDING TO HELP ACCOMPLISH THAT PURPOSE.  SO I

20    SPLIT THOSE UP INTO TWO SEPARATE SECTIONS BECAUSE I THINK IT

21    READS A LITTLE BIT CLEARER, AND IT'S A LITTLE CLEARER TO THE

22    JURY.

23         SO THAT'S THE ONLY SUBSTANTIVE DIFFERENCE IN THE

24    CONSPIRACY INSTRUCTIONS BETWEEN WHAT THE MODEL IS.

25              THE COURT:  OKAY.

1          MR. FAKHOURY:  THOSE ARE THE ONLY TWO MODIFICATIONS.

2          THE COURT:  ALL RIGHT.  AGAIN, I HAVE NOTHING BUT THE

3    UTMOST RESPECT FOR THE NINTH CIRCUIT JURY INSTRUCTION

4    SUBCOMMITTEE.  THEY WORK VERY, VERY HARD.  AND GIVEN THAT THIS

5    IS THE MODEL INSTRUCTION, I INTEND TO GIVE THE MODEL

6    INSTRUCTION AS IT IS.

7          ALL RIGHT, THAT LEAVES US, I BELIEVE, IF I'M NOT MISTAKEN,

8    THERE IS ONE OTHER INSTRUCTION THAT YOU WERE ASKING ME TO GIVE,

9    WHICH WAS THE CIRCUMSTANTIAL EVIDENCE INSTRUCTION.  I HAVE

10   DECLINED TO GIVE THAT INSTRUCTION TIME AND TIME AND TIME AGAIN.

11         MR. FAKHOURY:  NEVER HURTS TO ASK.

12         THE COURT:  I UNDERSTAND.  THAT'S RIGHT.  AND YOU

13   HAVE MADE A RECORD, AND I UNDERSTAND THAT.  BUT I'M GOING TO

14   DECLINE YOUR INVITATION THAT I GIVE THAT INSTRUCTION.  YOU CAN

15   CERTAINLY ARGUE ALL OF THIS TO THE JURY.  BUT I THINK THAT FOR

16   WHATEVER REASON -- ALTHOUGH, I KNOW THAT INSTRUCTION IS GIVEN

17   IN THE STATE COURTS, HAVING BEEN A STATE SUPERIOR COURT JUDGE,

18   BUT IT'S NOT ONE, IN MY EXPERIENCE, NORMALLY GIVEN IN THE

19   FEDERAL COURTS, SO I'M NOT GOING TO GIVE IT.  THAT, I BELIEVE,

20   TAKES CARE OF ALL THE INSTRUCTIONS, CORRECT?

21         MR. FAKHOURY:  THERE ARE TWO OTHER ONES, YOUR HONOR.

22   ONE WAS, MODEL INSTRUCTION 4.3, WHICH IS, OTHER CRIMES, WRONGS,

23   OR ACTS OF THE DEFENDANT.  JUST BECAUSE THE TECS RECORDS DIDN'T

24   COME IN --

25         THE COURT:  YES, YES, YES.  AND DOES THE GOVERNMENT

1    HAVE ANY OBJECTION TO MY GIVING THAT INSTRUCTION?

2              MR. CONOVER:  YES, YOUR HONOR.  THIS IS A CONSPIRACY

3    CHARGE, WHERE THEY'RE ALL INTERTWINED TO THE CONSPIRACY.  THERE

4    ARE NO OTHER ACTS OR CRIMES THAT DON'T BEAR ON THIS DEFENDANT'S

5    CULPABILITY FOR THE CONSPIRACY CHARGE.

6        WE HAVEN'T BROUGHT IN ANYTHING ABOUT HIS CRIMINAL HISTORY,

7    OR WHAT HE'S DONE IN THE PAST, OTHER THAN DIRECTLY RELATED TO

8    CONSPIRACY, SO WE WOULD OBJECT.

9              THE COURT:  SO WHAT ARE THE OTHER CRIMES, WRONGS, OR

10   ACTS?

11             MR. FAKHOURY:  THE OTHER ACTS, YOUR HONOR, ARE THE

12   ENTRIES INTO THE BORDER.  I MEAN, PART OF THE PROBLEM, AND PART

13   OF THE REASON WE OBJECT TO TECS RECORDS IS IT CREATES SOMEWHAT

14   OF AN INFERENCE THAT, PERHAPS, YOU KNOW, MR. FLORES WAS

15   SMUGGLING DRUGS ON OTHER OCCASIONS.

16             THE COURT:  THAT IS THE INFERENCE THEY'RE GOING TO

17   TRY AND DRAW.

18             MR. FAKHOURY:  AND THAT'S WHAT THE 4.3 IS DESIGNED TO

19   INSTRUCT THE JURY, THAT, LOOK, THEY CAN ONLY CONSIDER THAT

20   EVIDENCE FOR A LIMITED PURPOSE, WHICH IS, YOU KNOW, HE CAME AND

21   WENT ON THOSE DAYS.  BECAUSE THERE HAS BEEN ZERO EVIDENCE

22   PRESENTED THAT HE SMUGGLED DRUGS ON THOSE OCCASIONS, REGARDLESS

23   OF THE FACT THAT IT'S CHARGED AS A CONSPIRACY.

24        AND THE OTHER ISSUE, YOUR HONOR, IS THERE ARE TWO

25   SUBSTANTIVE COUNTS, AND THERE ARE TWO CONSPIRACY COUNTS.  AND

1   EACH OF THOSE COUNTS, OBVIOUSLY, HAVE TO BE CONSIDERED

2   SEPARATELY.

3       SO TO THE EXTENT THAT THE GOVERNMENT CAN TRY TO BOOTSTRAP

4   AND SAY, WELL, SINCE HE CROSSED ON THOSE PRIOR OCCASIONS, AND

5   THAT GOES TO CONSPIRACY, THEREFORE, ACCORDINGLY, IT MUST BE,

6   THAT HE ALSO IMPORTED ON THAT ACTUAL DAY, THEY SHOULDN'T BE

7   PERMITTED TO DO THAT.  4.3 IS DESIGNED TO COVER CRIMES, BUT

8   IT'S ALSO DESIGNED TO COVER ACTS.  AND IN ANY EVENT, TECS

9   RECORDS TYPICALLY COME IN UNDER 404(B) AS OTHER ACTS.  AND 4.3

10  JUST REMINDS THE JURY, HEY, LOOK, THIS WAS ADMITTED, YOU CAN

11  CERTAINLY CONSIDER IT, BUT BE WARNED THAT YOU SHOULD ONLY

12  CONSIDER IT FOR THE PURPOSE FOR WHICH IT WAS ADMITTED, WHICH

13  WAS TO SHOW HE CROSSED ON THOSE DAYS AND THE RECORDS SHOW THAT

14  HE CROSSED AND NOT FOR ANY OTHER INFERENCE.  SO THAT'S WHY WE

15  WOULD REQUEST IT.

16          MR. CONOVER:  YOUR HONOR, THE INDICTMENT CHARGES A

17  CONSPIRACY THAT ENDS ON THE DATE OF HIS ARREST, NOT BEGINS.

18  ALL OF THESE CROSSINGS --

19          THE COURT:  RIGHT.

20          MR. CONOVER:  -- SHOW THE CONSPIRACY.  THEY SHOW THE

21  DEFENDANT WAS SMUGGLING DRUGS, AND LIKELY METHAMPHETAMINE

22  BEFORE.  AND THE GOVERNMENT BELIEVES THAT THE EVIDENCE STRONGLY

23  SUPPORTS THOSE CONCLUSIONS.

24          THE COURT:  OKAY.  I DON'T HAVE THE SUPERSEDING

25  INDICTMENT IN FRONT OF ME.  BUT DO ALL OF THE ENTRIES IN THE

1  TECS, DO THEY COVER THE PERIOD OF TIME -- I MEAN, DOES THE

2  SUPERSEDING INDICTMENT COVER THE PERIOD OF TIME THAT THE TECS

3  ENTRIES REFLECT?

4         MR. CONOVER:  THE ANSWER TO THAT IS YES, YOUR HONOR.

5  THE SUPERSEDING INDICTMENT STATES THE FOLLOWING, IT SAYS,

6  BEGINNING ON A DATE UNKNOWN TO THE GRAND JURY, AND CONTINUING

7  AND INCLUDING NOVEMBER 28.  SO, YES.  IT DOES NOT START AT A

8  SPECIFIC DATE.  ALL IT DOES IS HAVE AN ENDING DATE BECAUSE WE

9  DON'T KNOW WHEN THESE GUYS STARTED SMUGGLING DRUGS TOGETHER.

10         THE COURT:  OKAY.  I'M NOT GOING TO GIVE THAT

11  INSTRUCTION.  THE NEXT INSTRUCTION IS MERE PRESENCE.  AND IT

12  CERTAINLY SEEMS TO ME THAT THAT IS AN INSTRUCTION THAT SHOULD

13  BE GIVEN.

14         MR. CONOVER:  MERE PRESENCE IS ONLY APPROPRIATE IN

15  THE GOVERNMENT'S ESTIMATION WHEN THERE IS TWO INDIVIDUALS IN A

16  VEHICLE TOGETHER AND ONE INDIVIDUAL SAY --

17         THE COURT:  NOT NECESSARILY.  YOU CAN HAVE A SINGLE

18  INDIVIDUAL IN A VEHICLE.

19         MR. CONOVER:  OKAY.  AND MERELY PRESENT WOULD BE IF

20  HE IS DRIVING THE VEHICLE, KNOWING THERE ARE DRUGS THERE, BUT

21  NOT BEING PAID, NOT BEING INVOLVED IN IT AT ALL.

22         THE COURT:  MERE PRESENCE COULD BE HE COULD BE IN THE

23  CAR AND NOT KNOW THAT THE DRUGS WERE IN IT.

24         MR. CONOVER:  THAT WOULD BE NOT MERE PRESENCE.  THAT

25  WOULD BE NO KNOWLEDGE OF THE DRUGS AT ALL.  MY UNDERSTANDING OF

1   MERE PRESENCE, YOUR HONOR, IN THIS CIRCUMSTANCE, IT SAYS, MERE

2   PRESENCE AT THE SCENE OF THE CRIME OR MERE KNOWLEDGE THAT A

3   CRIME IS BEING COMMITTED IS NOT SUFFICIENT TO ESTABLISH

4   MR. FLORES COMMITTED THE CRIME OF IMPORTATION -- HIS

5   PARTICIPATION HERE, YOUR HONOR, WITHOUT ANY QUESTION, EVEN IF

6   HE DIDN'T KNOW THE DRUGS WERE THERE, HE WAS PARTICIPATING BY

7   DRIVING THE VEHICLE ACROSS.

8       NOW THE MERE PRESENCE WOULD BE FOR SOMEONE THAT WAS INSIDE

9   A VEHICLE, PRESENT WHEN THE CRIME WAS BEING COMMITTED, BUT NOT

10  HAVING A ROLE IN THE CRIME.  HERE, HE IMPORTED THE DRUGS.

11          THE COURT:  WE DON'T KNOW THAT.  THAT'S FOR THE JURY

12  TO DECIDE.

13          MR. CONOVER:  IT IS AGREED UPON, EVEN WITH COUNSEL,

14  THAT HE IMPORTED THE DRUGS.  THE QUESTION IS, DID HE KNOW THEY

15  WERE THERE.  MERE PRESENCE DOESN'T GO TO HIS KNOWLEDGE.  IT

16  GOES ON TO WHETHER OR NOT HE WAS ONLY THERE AND WAS NOT

17  INVOLVED IN THE CRIME.  SO I JUST THINK IT IS INAPPROPRIATE

18  GIVEN THAT THERE WERE NOT TWO INDIVIDUALS IN THE VEHICLE.

19          THE COURT:  OKAY.  I'M GOING TO GIVE THE INSTRUCTION.

20      ALL RIGHT.  I BELIEVE THAT TAKES CARE OF THE RULE 30

21  CONFERENCE, IF I'M NOT MISTAKEN.  RIGHT?

22          MR. CONOVER:  YES, YOUR HONOR.

23          THE COURT:  BE PREPARED TO DELIVER YOUR CLOSING

24  ARGUMENTS WHEN THE JURY RETURNS, WHICH, ACCORDING TO MY WATCH,

25  WILL BE IN ABOUT THREE MINUTES.  BUT I'M GOING TO GIVE MY STAFF

1   A LITTLE BREAK IN CASE THEY NEED TO USE THE RESTROOM OR

2   WHATEVER.  AND THEN WE'LL COME BACK.  THANK YOU.

3                    (RECESS TAKEN.)

4           THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

5   WE'RE OUTSIDE THE PRESENCE OF THE JURY.  BEFORE WE BRING THE

6   JURY IN, LET ME MAKE A COUPLE OF COMMENTS.  I HAVE DELETED SOME

7   OF THE INSTRUCTIONS THAT WERE INCLUDED IN THE PROPOSED JOINT

8   INSTRUCTIONS.  FIRST OF ALL, I HAVE DELETED THE INSTRUCTION

9   REGARDING THE SPANISH LANGUAGE, THAT IS, HIS TESTIMONY IN

10  SPANISH.  I DON'T THINK THERE WAS ANY OF THAT, RIGHT?

11          MR. FAKHOURY:  THAT'S CORRECT, YOUR HONOR.

12          THE COURT:  SO I'M DELETING THAT.  I'M DELETING THE

13  INSTRUCTION THAT SAYS, THE DEFENDANT HAS TESTIFIED, FOR HE DID

14  NOT.

15     AGAIN, I'M DELETING INSTRUCTION 28.  THE SPANISH LANGUAGE

16  WASN'T USED DURING THIS TRIAL.  I DON'T THINK ANY OF THAT

17  HAPPENED.

18     AND LASTLY, I DELETED THE STATEMENT, INSTRUCTION THAT SAYS

19  THE DEFENDANT HAS MADE A STATEMENT.  I DON'T THINK THERE WAS

20  ANY TESTIMONY --

21          MR. FAKHOURY:  I DON'T BELIEVE SO, YOUR HONOR.

22          MR. CONOVER:  THANK YOU, YOUR HONOR.

23          THE COURT:  ALL RIGHT, LET'S BRING THE JURY IN,

24  PLEASE.

25          THE CLERK:  YOUR HONOR, I WANT TO CONFIRM, THE DVD

1    CAME IN AS EVIDENCE, CORRECT?

2              THE COURT:  YES.

3              THE CLERK:  OKAY.

4              MR. CONOVER:  DO YOU PREINSTRUCT?

5              THE COURT:  YES, I DO.  YES.

6                        (JURY ENTERS COURTROOM.)

7              THE COURT:  WELL, LADIES AND GENTLEMEN, AS I PROMISED

8    YOU, WE WOULD TRY AND GET THIS CASE SUBMITTED TO YOU AS QUICKLY

9    AS WE COULD.  THANKS TO THE COOPERATION OF COUNSEL, WE'VE MOVED

10   ALONG A LITTLE FASTER THAN, PERHAPS, EVEN I ANTICIPATED.  SO

11   WE'RE NOW AT THE STAGE WHERE YOU RECALL, AT THE BEGINNING OF

12   THE TRIAL, I TOLD YOU YOU WOULD BE THE SOLE TRIERS OF THE

13   FACTS, AND I WOULD BE GIVING YOU THE LAW THAT YOU WOULD APPLY

14   TO THOSE FACTS.

15       I'M NOW GOING TO GIVE YOU SOME INSTRUCTIONS, JUST AS I DID

16   AT THE BEGINNING OF THE TRIAL.  AGAIN, I APOLOGIZE FOR THE FACT

17   THAT I HAVE TO READ THESE, BUT THEY'RE SOMEWHAT LENGTHY.

18   THEY'RE IMPORTANT, HOWEVER, AND YOU SHOULD PAY ATTENTION TO

19   THEM CLOSELY, OKAY.

20                      JURY INSTRUCTIONS

21             THE COURT:  MEMBERS OF THE JURY, NOW THAT YOU'VE

22   HEARD ALL THE EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE

23   LAW WHICH APPLIES TO THIS CASE.  A COPY OF THESE INSTRUCTIONS

24   WILL BE AVAILABLE TO YOU IN THE JURY ROOM FOR YOU TO CONSULT.

25       IN THAT REGARD, YOU'RE GOING TO SEE THE INSTRUCTIONS

1   ARE -- YOU'LL SEE THAT THERE ARE NUMBERS AT THE TOP AND MAYBE

2   HEADINGS, AND MAYBE YOU'LL SEE THAT SOME ARE DIFFERENT THAN

3   OTHERS, TYPE, FONT, DON'T WORRY ABOUT ANY OF THAT.   NONE OF

4   THAT HAS ANY SIGNIFICANCE AT ALL.   JUST WORRY ABOUT THE TEXT

5   AND THE CONTENT OF THE INSTRUCTIONS.   DON'T GET DISTRACTED BY

6   WHY IS NUMBER, YOU KNOW, 29 BEFORE 21, OR WHATEVER.   IT HAS NO

7   BEARING, WHATSOEVER.

8        NOW IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

9   EVIDENCE IN THE CASE.   TO THOSE FACTS, YOU WILL APPLY THE LAW

10  AS I GIVE IT TO YOU.   YOU MUST FOLLOW THE LAW AS I GIVE IT TO

11  YOU, WHETHER YOU AGREE WITH IT OR NOT.   AND YOU MUST NOT BE

12  INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS,

13  PREJUDICES, OR SYMPATHY.   THAT MEANS THAT YOU MUST DECIDE THE

14  CASE SOLELY ON THE EVIDENCE BEFORE YOU.   YOU WILL RECALL THAT

15  YOU TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING OF THE

16  CASE.

17       IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

18  AND NOT SINGLE OUT SOME AND IGNORE OTHERS.   THEY'RE ALL EQUALLY

19  IMPORTANT.   YOU MUST NOT READ INTO THESE INSTRUCTIONS OR INTO

20  ANYTHING THE COURT MAY HAVE SAID OR DONE ANY SUGGESTION AS TO

21  WHAT VERDICT YOU SHOULD RETURN.   FOR THAT IS A MATTER THAT IS

22  ENTIRELY UP TO YOU.

23       THE INDICTMENT IS NOT EVIDENCE.   THE DEFENDANT HAS PLEADED

24  NOT GUILTY TO THE CHARGES.   AND THE DEFENDANT IS PRESUMED TO BE

25  INNOCENT AND DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE

1   TO PROVE INNOCENCE.  THE GOVERNMENT HAS THE BURDEN OF PROVING

2   EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

3       NOW A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL

4   RIGHT NOT TO TESTIFY.  AND NO PRESUMPTION OF GUILT MAY BE

5   RAISED AND NO INFERENCE OF ANY KIND MAY BE DRAWN FROM THE FACT

6   THAT THE DEFENDANT DID NOT TESTIFY.

7       NOW THE COURT HAS DECIDED IT IS NOT NECESSARY TO RECEIVE

8   EVIDENCE OF THE FACT THAT THE OTAY MESA PORT OF ENTRY IS

9   LOCATED WITHIN THE SOUTHERN DISTRICT OF CALIFORNIA BECAUSE THIS

10  FACT IS OF SUCH COMMON KNOWLEDGE, YOU MAY, BUT ARE NOT REQUIRED

11  TO ACCEPT THIS FACT AS TRUE.

12      NOW THE EVIDENCE FROM WHICH YOU ARE TO DECIDE WHAT THE

13  FACTS ARE CONSISTS OF:  THE SWORN TESTIMONY OF A WITNESS; THE

14  EXHIBITS WHICH HAVE BEEN RECEIVED INTO EVIDENCE; AND ANY FACTS

15  TO WHICH ALL THE LAWYERS MAY HAVE STIPULATED.

16      I DON'T BELIEVE THERE WERE ANY STIPULATIONS IN THIS CASE,

17  WERE THERE?

18          MR. CONOVER:  NO, YOUR HONOR.

19          MR. GARRISON:  YOUR HONOR, THERE WAS -- THE

20  GOVERNMENT STIPULATED THAT MONTEBELLO WAS APPROXIMATELY 129

21  MILES AWAY --

22          THE COURT:  THAT'S TRUE.

23          MR. GARRISON:  -- FROM THE SAN DIEGO AREA.

24          THE COURT:  THANK YOU.

25      IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

1   TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE, AGAIN, AND THE

2   STIPULATION, AND CERTAIN THINGS ARE NOT EVIDENCE AND YOU MAY

3   NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE.  I WILL LIST

4   THEM FOR YOU:  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

5   EVIDENCE.  LAWYERS ARE NOT WITNESSES, AND WHAT THEY HAVE SAID

6   IN THEIR OPENING STATEMENTS AND WILL SAY IN THEIR CLOSING

7   ARGUMENTS AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET

8   THE EVIDENCE, BUT IT'S NOT EVIDENCE.  IF THE FACTS AS YOU

9   REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS STATE THEM, YOUR

10  MEMORY OF THEM CONTROLS.

11       QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

12  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

13  BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

14       YOU SHOULD NOT BE INFLUENCED BY THE QUESTION, THE

15  OBJECTION, OR THE COURT'S RULING ON IT.

16       TESTIMONY THAT HAS BEEN EXCLUDED, OR STRICKEN, OR THAT

17  YOU'VE BEEN INSTRUCTED TO DISREGARD IS NOT EVIDENCE AND MUST

18  NOT BE CONSIDERED.

19       IN ADDITION, SOME TESTIMONY EXHIBITS MAY HAVE BEEN

20  RECEIVED ONLY FOR A LIMITED PURPOSE.  AND WHERE I'VE GIVEN YOU

21  A LIMITING INSTRUCTION, YOU MUST FOLLOW THAT INSTRUCTION.

22       ANYTHING THAT YOU MAY HAVE SEEN OR HEARD WHEN THE COURT

23  WAS NOT IN SESSION IS ALSO NOT EVIDENCE.  YOU'RE TO DECIDE THE

24  CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

25       NOW EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY OF AN
EYEWITNESS.

CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE.  THAT IS,
PROOF OF A CHAIN OF FACTS FROM WHICH YOU CAN FIND THAT ANOTHER
FACT EXISTS, EVEN THOUGH IT HAS NOT BEEN PROVED DIRECTLY.

YOU'RE TO CONSIDER BOTH KINDS OF EVIDENCE.  AND THE LAW
PERMITS YOU TO GIVE EQUAL WEIGHT TO BOTH.  BUT IT IS FOR YOU TO
DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE
WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.
YOU MAY BELIEVE EVERYTHING THAT A WITNESS SAYS, OR PART OF IT,
OR NONE OF IT.

IN CONSIDERING THE TESTIMONY OF A WITNESS, YOU MAY TAKE
INTO ACCOUNT:  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO
SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO; THE WITNESS'S
MEMORY; THE WITNESS'S MANNER WHILE TESTIFYING; THE WITNESS'S
INTEREST IN THE OUTCOME OF THE CASE; AND ANY BIAS OR PREJUDICE;
WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY;
THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF ALL
THE EVIDENCE; AND ANY OTHER FACTOR THAT MAY BEAR ON
BELIEVABILITY.

THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT
NECESSARILY DEPEND UPON THE NUMBER OF WITNESSES WHO TESTIFY.
NOW YOU'VE HEARD TESTIMONY FROM PERSONS, WHO, BECAUSE OF
EDUCATION OR EXPERIENCE, WERE PERMITTED TO STATE OPINIONS AND

1    THE REASONS FOR THEIR OPINIONS.  SUCH OPINION TESTIMONY SHOULD

2    BE JUDGED JUST LIKE ANY OTHER TESTIMONY; YOU MAY ACCEPT IT, OR

3    REJECT IT, AND GIVE IT AS MUCH WEIGHT AS YOU THINK IT DESERVES,

4    CONSIDERING THE WITNESS'S EDUCATION AND EXPERIENCE, THE REASONS

5    GIVEN FOR THE OPINION, AND ALL THE OTHER EVIDENCE IN THE CASE.

6         NOW DURING THE TRIAL, CERTAIN CHARTS AND SUMMARIES WERE

7    SHOWN TO YOU IN ORDER TO HELP EXPLAIN THE EVIDENCE IN THE CASE.

8    THESE CHARTS AND SUMMARIES WERE NOT ADMITTED INTO EVIDENCE AND

9    WILL NOT GO INTO THE JURY ROOM WITH YOU.  THEY'RE NOT

10   THEMSELVES EVIDENCE OR PROOF OF ANY FACT.  IF THEY DO NOT

11   CORRECTLY REFLECT THE FACTS OR FIGURES SHOWN BY THE EVIDENCE IN

12   THE CASE, YOU SHOULD DISREGARD THESE CHARTS AND SUMMARIES AND

13   DETERMINE THE FACTS FROM THE UNDERLYING EVIDENCE.

14        NOW THE DEFENDANT IS ON TRIAL ONLY FOR THE CRIMES CHARGED

15   IN THE INDICTMENT AND NOT FOR ANY OTHER ACTIVITIES.  A SEPARATE

16   CRIME IS CHARGED AGAINST THE DEFENDANT IN EACH COUNT.  YOU MUST

17   DECIDE EACH COUNT SEPARATELY.  YOUR VERDICT, ON ONE COUNT

18   SHOULD NOT CONTROL YOUR VERDICT ON ANY OTHER COUNT.

19        NOW PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES

20   YOU FIRMLY CONVINCED THAT THE DEFENDANT IS GUILTY.  IT IS NOT

21   REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE

22   DOUBT.  A REASONABLE DOUBT IS A DOUBT BASED UPON REASON, AND

23   COMMON SENSE, AND IS NOT BASED PURELY ON SPECULATION.  IT MAY

24   ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL THE

25   EVIDENCE OR FROM LACK OF EVIDENCE.  IF AFTER A CAREFUL AND

1   IMPARTIAL CONSIDERATION OF ALL THE EVIDENCE, YOU'RE NOT

2   CONVINCED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS

3   GUILTY, IT IS YOUR DUTY TO FIND THE DEFENDANT NOT GUILTY.  ON

4   THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION

5   OF ALL THE EVIDENCE, YOU'RE CONVINCED BEYOND A REASONABLE DOUBT

6   THAT THE DEFENDANT IS GUILTY, IT IS YOUR DUTY TO FIND THE

7   DEFENDANT GUILTY.

8        NOW IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF COUNT

9   2, IMPORTATION OF METHAMPHETAMINE, THE GOVERNMENT MUST PROVE --

10  I'M SORRY, I MISSPOKE.  A DEFENDANT MAY BE FOUND GUILTY OF

11  COUNT 1, UNLAWFUL IMPORTATION -- WAIT A MINUTE.  JUST A SECOND.

12  BEAR WITH ME.

13       GLENN, DO YOU HAVE THE VERDICT FORM?  THANK YOU.

14       I APOLOGIZE FOR THAT, LADIES AND GENTLEMEN.

15       ALL RIGHT, IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY

16  OF COUNT 1, CONSPIRACY TO IMPORT METHAMPHETAMINE, THE

17  GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A

18  REASONABLE DOUBT:  ONE, BEGINNING ON A DATE UNKNOWN, AND

19  CONTINUING UP TO, AND INCLUDING, NOVEMBER 28, 2009, THERE WAS

20  AN AGREEMENT BETWEEN TWO OR MORE PERSONS TO IMPORT

21  METHAMPHETAMINE; AND TWO, THE DEFENDANT JOINED IN THE

22  AGREEMENT, KNOWING OF ITS PURPOSE, I.E., IMPORTATION OF

23  METHAMPHETAMINE, AND INTENDING TO HELP ACCOMPLISH THAT PURPOSE.

24       A CONSPIRACY IS A KIND OF CRIMINAL PARTNERSHIP, AN

25  AGREEMENT OF TWO OR MORE PERSONS TO COMMIT ONE OR MORE CRIMES.

THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO SOMETHING THAT IS UNLAWFUL.  IT DOES NOT MATTER WHETHER THE CRIME AGREED UPON WAS COMMITTED.  FOR A CONSPIRACY TO HAVE EXISTED, IT'S NOT NECESSARY THAT THE CONSPIRATORS MADE A FORMAL AGREEMENT OR THAT THEY AGREED ON EVERY DETAIL IN THE CONSPIRACY.

IT IS NOT ENOUGH, HOWEVER, THAT THEY SIMPLY MET, DISCUSSED MATTERS OF COMMON INTEREST, ACTED IN SIMILAR WAYS, OR, PERHAPS, HELPED ONE ANOTHER.  YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT AT LEAST ONE OF THE CRIMES ALLEGED IN THE INDICTMENT AS AN OBJECT OR PURPOSE IN THE CONSPIRACY, WITH ALL OF YOU AGREEING AS TO THE PARTICULAR CRIME WITH WHICH THE CONSPIRATORS AGREED TO COMMIT.

ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE OR FURTHER SOME OBJECT OR PURPOSE OF THE CONSPIRACY, EVEN THOUGH THE PERSON DOES NOT HAVE FULL KNOWLEDGE OF ALL THE DETAILS OF THE CONSPIRACY.

FURTHERMORE, ONE WHO WILLFULLY JOINS AN EXISTING CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE ORIGINATORS.  ON THE OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF A CONSPIRACY, BUT HAPPENS TO ACT IN A WAY WHICH FURTHERS SOME OBJECT OR PURPOSE OF A CONSPIRACY, DOES NOT, THEREBY, BECOME A CONSPIRATOR.

SIMILARLY, A PERSON WHO DOES NOT BECOME A CONSPIRATOR MERELY BY ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS, NOT MERELY BY KNOWING THAT A CONSPIRACY EXISTS.

1   NOW THE DEFENDANT MAY BE FOUND GUILTY OF COUNT 2, THE UNLAWFUL

2   IMPORTATION, AND COUNT 4, POSSESSION WITH INTENT TO DISTRIBUTE,

3   EVEN IF THE DEFENDANT PERSONALLY DID NOT COMMIT THE ACT OR ACTS

4   CONSTITUTING THE CRIME, BUT AIDED AND ABETTED IN ITS

5   COMMISSION.

6        TO PROVE A DEFENDANT GUILTY OF AIDING AND ABETTING, THE

7   GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT:  ONE, THE

8   CRIME CHARGED, IMPORTATION OF METHAMPHETAMINE, FOR COUNT 2, OR

9   POSSESSION OF METHAMPHETAMINE, WITH INTENT TO DISTRIBUTE, FOR

10  COUNT 4, WAS COMMITTED BY SOMEONE; TWO, THE DEFENDANT KNOWINGLY

11  AND INTENTIONALLY AIDED, COUNSELED, COMMANDED, INDUCED, OR

12  PROCURED THAT PERSON TO COMMIT EACH ELEMENT OF THE CRIME

13  CHARGED, I.E., IMPORTATION OR POSSESSION WITH INTENT TO

14  DISTRIBUTE; AND THREE, THE DEFENDANT ACTED BEFORE THE CRIME WAS

15  COMPLETED.

16       IT IS NOT ENOUGH THAT THE DEFENDANT MERELY ASSOCIATED WITH

17  THE PERSON COMMITTING THE CRIME, OR UNKNOWINGLY OR

18  UNINTENTIONALLY DID THINGS THAT WERE HELPFUL TO THAT PERSON, OR

19  WAS PRESENT AT THE SCENE OF THE CRIME.

20       THE EVIDENCE MUST SHOW BEYOND A REASONABLE DOUBT THAT THE

21  DEFENDANT ACTED WITH THE KNOWLEDGE AND INTENTION OF HELPING

22  THAT PERSON COMMIT THE CRIME CHARGED, THAT IS, IMPORTATION OR

23  POSSESSION WITH INTENT TO DISTRIBUTE.

24       THE GOVERNMENT IS NOT REQUIRED TO PROVE PRECISELY WHICH

25  DEFENDANT ACTUALLY COMMITTED THE CRIME AND WHICH DEFENDANT

1    AIDED AND ABETTED.

2        NOW IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF COUNT

3    2, IMPORTATION OF METHAMPHETAMINE, THE GOVERNMENT MUST PROVE

4    EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:  ONE,

5    THE DEFENDANT KNOWINGLY BROUGHT METHAMPHETAMINE INTO THE UNITED

6    STATES FROM A PLACE OUTSIDE THE UNITED STATES; AND TWO, THE

7    DEFENDANT KNEW THAT THE SUBSTANCE HE WAS BRINGING INTO THE

8    UNITED STATES WAS METHAMPHETAMINE OR SOME OTHER PROHIBITED

9    DRUG.

10       THE GOVERNMENT IS NOT REQUIRED TO PROVE THE AMOUNT OR

11   QUANTITY OF METHAMPHETAMINE AND NEED ONLY PROVE BEYOND A

12   REASONABLE DOUBT THAT THERE WAS A MEASURABLE OR DETECTABLE

13   AMOUNT OF METHAMPHETAMINE.  IT DOES NOT MATTER WHETHER THE

14   DEFENDANT KNEW THAT THE SUBSTANCE WAS METHAMPHETAMINE.  IT IS

15   SUFFICIENT THAT THE DEFENDANT KNEW THAT IT WAS SOME KIND OF A

16   PROHIBITED DRUG.

17       NOW IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF COUNT

18   3, CONSPIRACY TO DISTRIBUTE METHAMPHETAMINE, THE GOVERNMENT

19   MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE

20   DOUBT:  ONE, BEGINNING ON A DATE UNKNOWN, AND CONTINUING UP TO

21   AND INCLUDING NOVEMBER 28, 2009, THERE WAS AN AGREEMENT BETWEEN

22   TWO OR MORE PERSONS TO DISTRIBUTE METHAMPHETAMINE; AND TWO, THE

23   DEFENDANT JOINED IN THE AGREEMENT KNOWING OF ITS PURPOSE, I.E.,

24   THE IMPORTATION OF METHAMPHETAMINE, AND INTENDING TO HELP

25   ACCOMPLISH THAT PURPOSE.

1    NOW TO "DISTRIBUTE" MEANS TO DELIVER OR TRANSFER

2   POSSESSION OF THE METHAMPHETAMINE TO ANOTHER PERSON WITH OR

3   WITHOUT ANY FINANCIAL INTEREST IN THAT TRANSACTION.

4    A CONSPIRACY IS A KIND OF CRIMINAL PARTNERSHIP; AN

5   AGREEMENT OF TWO OR MORE PERSONS TO COMMIT ONE OR MORE CRIMES.

6   THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO SOMETHING

7   UNLAWFUL.  IT DOES NOT MATTER WHETHER THE CRIME AGREED UPON WAS

8   COMMITTED.  FOR A CONSPIRACY TO HAVE EXISTED, IT IS NOT

9   NECESSARY THAT THE CONSPIRATORS MADE A FORMAL AGREEMENT OR THAT

10  THEY AGREED ON EVERY DETAIL OF THE CONSPIRACY.  IT IS NOT

11  ENOUGH, HOWEVER, THAT THEY SIMPLY MET, DISCUSSED MATTERS OF

12  COMMON INTEREST, ACTED IN SIMILAR WAYS, OR, PERHAPS, HELPED ONE

13  ANOTHER.

14   YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT AT LEAST ONE

15  OF THE CRIMES ALLEGED IN THE INDICTMENT AS AN OBJECT OR PURPOSE

16  OF THE CONSPIRACY, WITH ALL OF YOU AGREEING AS TO THE

17  PARTICULAR CRIME WHICH THE CONSPIRATORS AGREED TO COMMIT.  NOW

18  ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY PARTICIPATING

19  IN THE UNLAWFUL PLAN, WITH THE INTENT TO ADVANCE OR FURTHER

20  SOME OBJECT OR PURPOSE OF THE CONSPIRACY, EVEN THOUGH THE

21  PERSON DOES NOT HAVE FULL KNOWLEDGE OF ALL THE DETAILS OF THE

22  CONSPIRACY.

23   FURTHERMORE, ONE WHO WILLFULLY JOINS AN EXISTING

24  CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE ORIGINATORS.  ON THE

25  OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF A CONSPIRACY, BUT

1   HAPPENS TO ACT IN A WAY WHICH FURTHERS SOME OBJECT, OR PURPOSE

2   OF THE CONSPIRACY, DOES NOT, THEREBY, BECOME A CONSPIRATOR.

3   SIMILARLY, A PERSON DOES NOT BECOME A CONSPIRATOR MERELY BY

4   ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS, NOR

5   MERELY BY KNOWING THAT A CONSPIRACY EXISTS.

6       NOW IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF COUNT

7   4, POSSESSION OF METHAMPHETAMINE, WITH THE INTENT TO

8   DISTRIBUTE, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

9   ELEMENTS BEYOND A REASONABLE DOUBT:  ONE, THE DEFENDANT

10  KNOWINGLY POSSESSED METHAMPHETAMINE; AND TWO, THE DEFENDANT

11  POSSESSED THE METHAMPHETAMINE WITH THE INTENT TO DISTRIBUTE IT

12  TO ANOTHER PERSON.

13      THE GOVERNMENT IS NOT REQUIRED TO PROVE THE AMOUNT OR

14  QUANTITY OF METHAMPHETAMINE.  IT NEED ONLY PROVE BEYOND A

15  REASONABLE DOUBT THAT THERE WAS A MEASURABLE OR DETECTABLE

16  AMOUNT OF METHAMPHETAMINE.  IT DOES NOT MATTER WHETHER THE

17  DEFENDANT KNEW THAT THE SUBSTANCE WAS METHAMPHETAMINE.  IT IS

18  SUFFICIENT THAT THE DEFENDANT KNEW THAT IT WAS SOME KIND OF A

19  PROHIBITED DRUG.

20      POSSESSED WITH INTENT TO DISTRIBUTE MEANS TO POSSESS WITH

21  INTENT TO DELIVER OR TRANSFER POSSESSION OF METHAMPHETAMINE TO

22  ANOTHER PERSON, WITH OR WITHOUT ANY FINANCIAL INTEREST IN THE

23  TRANSACTION.

24      NOW AN ACT IS DONE KNOWINGLY IF THE DEFENDANT IS AWARE OF

25  THE ACT AND DOES NOT ACT, OR FAILS TO ACT, THROUGH IGNORANCE,

1    MISTAKE, OR ACCIDENT.  THE GOVERNMENT IS NOT REQUIRED TO PROVE

2    THAT THE DEFENDANT KNEW THAT HIS ACTS OR OMISSIONS WERE

3    UNLAWFUL.

4         YOU MAY CONSIDER EVIDENCE OF THE DEFENDANT'S WORDS, ACTS,

5    OR OMISSIONS, ALONG WITH ALL THE OTHER EVIDENCE, IN DECIDING

6    WHETHER THE DEFENDANT ACTED KNOWINGLY.

7         NOW MERE PRESENCE AT THE SCENE OF A CRIME, OR MERE

8    KNOWLEDGE THAT A CRIME IS BEING COMMITTED, IS NOT SUFFICIENT TO

9    ESTABLISH THAT MR. FLORES COMMITTED THE CRIME OF IMPORTATION OF

10   METHAMPHETAMINE, POSSESSION OF METHAMPHETAMINE, WITH INTENT TO

11   DISTRIBUTE, AND CONSPIRACY TO IMPORT AND POSSESS

12   METHAMPHETAMINE WITH THE INTENT TO DISTRIBUTE.  MR. FLORES MUST

13   BE A PARTICIPANT AND NOT MERELY A KNOWING SPECTATOR.

14   MR. FLORES'S PRESENCE MAY BE CONSIDERED BY THE JURY, ALONG WITH

15   OTHER EVIDENCE IN THE CASE.

16        NOW A PERSON HAS POSSESSION OF SOMETHING IF A PERSON KNOWS

17   OF ITS PRESENCE AND HAS PHYSICAL CONTROL OF IT, OR KNOWS OF ITS

18   PRESENCE AND HAS THE POWER AND INTENTION TO CONTROL IT.  MORE

19   THAN ONE PERSON CAN HAVE POSSESSION OF SOMETHING IF EACH KNOWS

20   OF ITS PRESENCE AND HAS THE POWER AND INTENTION TO CONTROL IT.

21        ALL RIGHT.  IS THE GOVERNMENT READY TO BEGIN THEIR CLOSING

22   ARGUMENT?

23             MR. CONOVER:  YES, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  PLEASE PROCEED.

25                  GOVERNMENT'S CLOSING ARGUMENT

1         MR. CONOVER:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

2    THIS CASE IS REALLY QUITE SIMPLE.  THIS CASE IS ABOUT AN

3    INDIVIDUAL WHO WAS CAUGHT RED-HANDED SMUGGLING METHAMPHETAMINE

4    INTO THIS COUNTRY.  AND THEN IN AN EFFORT TO AVOID THE

5    CONSEQUENCE OF BEING CAUGHT, ATTEMPTED TO BLAME HIS PARTNER IN

6    CRIME.  NOW, OF COURSE, THAT IS WHAT YOU DO WHEN YOU'RE CAUGHT

7    WITH 22 POUNDS OF METHAMPHETAMINE IN YOUR GAS TANK, WORTH OVER

8    $1 MILLION; YOU HAVE TO BLAME SOMEBODY ELSE.

9         NOW WHEN MY COLLEAGUE, MS. BOOT, GOT UP HERE YESTERDAY,

10   SHE TOLD YOU IT WAS A FAIRLY SIMPLE CASE, AND SHE DESCRIBED TO

11   YOU WHAT HAPPENED ON NOVEMBER 28, OF 2009.  AS YOU RECALL, AND

12   FROM THE TESTIMONY YOU HEARD FROM THESE WITNESSES, THE

13   DEFENDANT DROVE IN FROM MEXICO TO THE UNITED STATES THAT

14   MORNING, NOVEMBER 28.  HE CAME IN THAT DAY, HE CHOSE LANE 12,

15   THE LANE WITH THE SHORTEST AMOUNT OF TIME IN THAT PRE-PRIMARY

16   AREA, THE LANE WITH THE SHORTEST AMOUNT OF TIME TO BE INSPECTED

17   BY A DRUG SMUGGLER'S WORST ENEMY, THOSE CANINES.

18        NOW WHEN HE WAS IN THAT LANE, AS OFFICER COVE APPROACHED

19   HIM, WITH HER CANINE DETECTION DOG ARIES, HE TOOK OFF.  AND HE

20   GOT AS MUCH DISTANCE AS HE COULD BETWEEN THAT DOG AND HIS CAR.

21   HE DROVE UP TO THAT PRIMARY BOOTH.  AND ON HIS WAY UP, BEFORE

22   HE EVEN STOPPED THAT VEHICLE, HE HAD HIS ARM EXTENDED, AND HE

23   WAS THRUSTING HIS PASSPORT INTO THE PRIMARY OFFICER'S BOOTH,

24   SAYING, U.S. CITIZEN.

25        THE PRIMARY OFFICER SAID SHE SAW THIS HAPPEN.  THAT SHE

1   SAW, LOOKING BACK, AND SAW THE DEFENDANT LOOKING IN THE

2   REARVIEW MIRRORS, LOOKING IMPATIENT, AGITATED, CONCERNED ABOUT

3   THE DOG, AND THEN TAKE OFF AND DRIVE QUICKLY TO HER BOOTH AND

4   THRUST HIS ARM OUT THERE IN A TERSE MANNER, STATE, U.S. CITIZEN

5   AND KEEP HIS ARM EXTENDED.  NOW WHY, LADIES AND GENTLEMEN, WAS

6   HE IN SUCH A HURRY?  WHY WAS HE IMPATIENT?  BECAUSE A DRUG

7   SMUGGLER'S WORST ENEMY IS THOSE NARCOTIC DETECTION DOGS.  AND

8   HE KNEW THAT DOG WAS INTERESTED IN HIS VEHICLE.  BECAUSE HE

9   KNEW WHAT WAS IN HIS VEHICLE.  AND HE ATTEMPTED TO GET AWAY THE

10  BEST HE COULD.  BUT HE WAS ARRESTED.  HE WAS TAKEN INTO CUSTODY

11  THERE AT PRIMARY.

12      THE PRIMARY OFFICER TESTIFIED TO YOU THAT BECAUSE OF HIS

13  ACTIONS, REGARDLESS OF THE NARCOTIC DETECTION DOG'S HIT ON THAT

14  GASOLINE TANK, SHE WOULD HAVE SENT HIM TO SECONDARY FOR FURTHER

15  INSPECTION BECAUSE OF HIS BEHAVIOR OF PUTTING HIS ARM OUT

16  BEFORE HE EVEN STOPPED, DRIVING SO QUICKLY TO HER LANE, HANDING

17  THE PASSPORT OUT BEFORE EVER BEING ASKED, AND HIS IMPATIENT,

18  AGITATED LOOK ON HIS FACE, AND CONCERN, ABOUT THE DOG.

19      AND THEN IN SECONDARY, WHAT DO THEY FIND, LADIES AND

20  GENTLEMEN?  QUITE QUICKLY, THEY NOTICED THAT THERE WERE

21  PACKAGES IN THE VEHICLE.  THEY LOOKED THROUGH THAT FIBEROPTIC

22  SCOPE, AND THEY SAW PACKAGES IN THE VEHICLE, AND THEY WENT

23  DIRECTLY TO WHERE YOU COULD ACCESS IT.

24      THEY PULLED BACK THE BACK SEAT, THEY PULLED BACK THAT FELT

25  PANEL, AND THEY SAW THIS SENDING UNIT.  THE SENDING UNIT, OF

1   COURSE, WAS DOWN IN THE GAS TANK.  SO ALL THEY SAW AT FIRST WAS

2   THIS ACCESS PLATE.  WHAT DID OFFICER SANCHEZ SAY HE SAW AND

3   NOTICED ABOUT THIS ACCESS PLATE?  HE NOTICED THAT THE SCREWS,

4   THESE THREE SCREWS HERE, HAD BEEN TAMPERED WITH, THAT THEY HAD

5   BEEN USED BEFORE, BASICALLY.  I'M SURE MANY OF YOU HAVE USED A

6   SCREWDRIVER AND SCREWS BEFORE.  WHEN THEY'RE FIRST FRESH, AND

7   HAVEN'T BEEN OPENED BEFORE, THEY LOOK LIKE BRIGHT SCREWS.  IF

8   THEY'VE BEEN USED A FEW TIMES, THEY START TO LOOK WORN.  HE

9   TESTIFIED THESE SCREWS LOOKED WORN.

10       NOW WHY DOES THAT MATTER?  HOW OFTEN DO YOU NEED TO ACCESS

11  THE SENDING UNIT FOR YOUR CAR?  HOW OFTEN DO YOU ACCESS THE

12  SENDING UNIT IN YOUR CAR?  THERE IS A RARE NEED FOR THAT,

13  LADIES AND GENTLEMEN, UNLESS THE PURPOSE OF YOUR CAR IS TO

14  TRANSPORT NARCOTICS INTO THE UNITED STATES.  UNLESS YOU'RE

15  ENGAGED IN A CRIMINAL CONSPIRACY WITH OTHER PEOPLE, AND THAT

16  THIS VEHICLE IS SOLELY A CONDUIT OF YOUR JOB TO SMUGGLE DRUGS.

17       AND WHAT ELSE DID THEY NOTICE?  THEY TOOK OFF THE LID, AND

18  THERE WERE GAS TUBES, ELECTRICAL DEVICES HERE ATTACHED.  AND

19  THEY REMOVED THOSE.  AND THE SECONDARY OFFICER WASN'T A

20  MECHANIC, JUST A REGULAR GUY THAT HAD SOME MECHANIC EXPERIENCE.

21  HE DIDN'T REALIZE THIS WAS PRESSURIZED.  HE TOOK THAT TUBE OFF,

22  AND IT SQUIRTED ON HIM.  HE REMOVED EVERYTHING THERE.  AND HE

23  NOTICED THAT THERE WERE TOOL MARKS ON THIS.  SHOWING THIS, AS

24  YOU CAN SEE HERE, IT HAD BEEN REMOVED MULTIPLE TIMES BEFORE.

25  HE SAID THAT GAS SMELL PERMEATED THE INTERIOR OF THE CAR AND IT

1  STAYED ON HIS SHIRT FOR A WHILE, AS WOULD BE THE CASE WHENEVER

2  A SENDING UNIT IS REMOVED FROM A CAR.  EVEN IF YOU'RE CAREFUL,

3  AND YOU DON'T SPRAY GAS ALL OVER THE CAR, LIKE THEY DID, THAT

4  WHEN YOU REMOVE SOMETHING THAT'S SOAKED IN GAS, YOU TAKE IT OUT

5  OF THE CAR, GAS HAS A CERTAIN ODOR THAT CAN STAY WITH A CAR FOR

6  A WHILE.  HOW MANY OF YOU HAVE GOTTEN GAS ON YOUR HAND WHEN

7  PUTTING GAS IN YOUR CAR, AND YOU COME BACK TO YOUR CAR, AND

8  YOUR CAR SMELLS LIKE GAS?  BUT IMAGINE IF, IN YOUR CAR, THERE

9  WERE 23 PACKAGES THAT ALSO HAD TO BE REMOVED OF

10  METHAMPHETAMINE, NOT ONLY IN THE SENDING UNIT, BUT 23 PACKAGES

11  OF GAS (SIC) CAME OUT.

12      NOW THEY DRAINED THE GAS OUT.  THEY DRAINED THAT GAS INTO

13  A SINGULAR CAN, SO WE KNOW THERE WASN'T THAT MUCH GAS IN THAT

14  CAR.  THAT IS GOING TO BECOME VERY IMPORTANT LATER ON AS I'LL

15  TALK TO YOU ABOUT IT.

16      BUT LET'S TALK REAL BRIEFLY ABOUT WHAT THEY FOUND WITH

17  THIS SENDING UNIT.  THEY FOUND THIS WASN'T A NORMAL SENDING

18  UNIT.  THEY FOUND IT HAD RED STRING ATTACHED TO IT, AND A

19  TOOTHPICK OF SOME SORT PLACED IN THE HOLE WHERE THE FLOAT

20  SHOULD HAVE BEEN.  THIS WAS MODIFIED TO SHOW THREE-QUARTERS TO

21  FULL, REGARDLESS OF THE LEVEL OF GAS INSIDE THAT TANK.

22  REGARDLESS OF HOW FAR YOU DROVE THAT VEHICLE, REGARDLESS OF HOW

23  LONG, WHETHER YOU'RE IN TRAFFIC OR NOT, WHEN YOU RUN OUT OF GAS

24  IN THIS VEHICLE, YOU DON'T KNOW, YOU DON'T KNOW.  BECAUSE THIS

25  FLOAT WAS NOT ATTACHED.  BUT WE KNOW WHERE THIS FLOAT WAS.

1   THIS WAS IN THE PASSENGER CABIN OF THE VEHICLE, SO UNDERNEATH

2   HIS SEAT.

3        NOW REGARDLESS OF WHERE IN THE CABIN THIS WAS, WE KNOW IT

4   WASN'T IN THE GAS TANK.  WE CERTAINLY KNOW IT WASN'T ATTACHED

5   HERE.  HOW DO WE KNOW THAT?  YOU HEARD TESTIMONY THAT IT WASN'T

6   ATTACHED.  YOU HEARD TESTIMONY FROM OFFICER SANCHEZ AND OFFICER

7   MORTON, AND ALSO YOUR COMMON SENSE TELLS YOU, THERE IS A STICK

8   THERE, IT CAN'T BE ATTACHED, IT IS NOT SUPPOSED TO BE ATTACHED.

9   IT IS SUPPOSED TO BE UNDERNEATH THE SEAT TO BE REATTACHED LATER

10  ON.

11       AND YOU HEARD TESTIMONY THAT THIS WOULD EMANATE THROUGHOUT

12  THE CABIN OF GAS.  IT IS A POROUS MATERIAL.  THIS WOULD SMELL,

13  AND YOU WOULD KNOW IT IS THERE.  NOW YOU DIDN'T HEAR ANY

14  TESTIMONY THAT IT SMELLED THAT DAY, THAT THE CAR SMELLED LIKE

15  GAS THAT DAY.  LADIES AND GENTLEMEN, THAT'S BECAUSE THIS HAD

16  BEEN REMOVED FOR A LONG TIME.  BECAUSE THIS WAS NOT THE FIRST

17  TIME MR. FLORES HAD USED HIS BEETLE TO SMUGGLE METHAMPHETAMINE

18  INTO THIS COUNTRY.  IT HAD BEEN USED MULTIPLE TIMES BEFORE, AND

19  THAT GAS SMELL WAS GONE.  AND SO WAS MR. FLORES'S CONCERN ABOUT

20  BEING CAUGHT UNTIL HE SAW THAT DOG THAT DAY.

21       NOW AFTER THEY TOOK OUT THESE PACKAGES, THEY WERE WEIGHED,

22  THEY WERE PUT ON A SCALE, AND THEY WERE SENT TO A LABORATORY.

23  22 POUNDS OF METHAMPHETAMINE PACKAGED IN A PARTICULAR WAY.  WHY

24  DOES THE PACKAGING MATTER?  WHY HAVE I SPENT SO MUCH TIME

25  THROUGHOUT THIS TRIAL ASKING WITNESSES ABOUT THESE PACKAGES?

1    THE PACKAGING MATTERS, LADIES AND GENTLEMEN, BECAUSE THESE

2   PACKAGES ARE SPECIFICALLY SIZED AND SHAPE TO FIT IN THIS

3   COMPARTMENT, SPECIFICALLY SIZED AND SHAPED TO GO RIGHT IN THAT

4   SENDING UNIT HOLE; SMALL ENOUGH TO FIT THROUGH THIS HOLE, LARGE

5   ENOUGH SO YOU DON'T HAVE 50 TINY LITTLE PACKAGES; SHORT ENOUGH

6   SO THEY CAN DROP DOWN, BUT YET -- AND COME INTO THE GAS TANK;

7   NOT SO LONG THAT THEY WOULDN'T HIT THE BOTTOM.  ROUND PACKAGES

8   FOR A ROUND HOLE, LADIES AND GENTLEMEN.  THAT'S WHAT WE HAVE

9   THERE, 23 OF THEM.

10    AND WHY DOES THAT MATTER?  IT SHOWS THAT THEY HAD PLANNED

11   TO USE THIS VEHICLE.  BEFORE THAT VEHICLE EVER ARRIVED IN

12   MEXICO, THEY HAD PACKAGES THERE READY TO BE PUT IN IT.  WHY,

13   LADIES AND GENTLEMEN?  BECAUSE THIS IS WHAT THEY DO.  THIS IS

14   WHAT THIS VEHICLE IS USED FOR.  THIS IS A SMUGGLING MOBILE.

15    NOW I'D LIKE TO TALK WITH YOU ABOUT WHAT MR. FLORES WAS

16   CHARGED WITH.  BECAUSE OF HIS CRIMES, HE WAS CHARGED WITH FOUR

17   SEPARATE, DISTINCT CRIMES.  I WANT TO TALK WITH YOU ABOUT EACH

18   ONE OF THESE.  BUT BEFORE I DO, I'D LIKE TO TALK TO YOU ABOUT

19   WHAT THE GOVERNMENT'S BURDEN IS.  THE GOVERNMENT'S BURDEN IS TO

20   PROVE TO YOU BEYOND A REASONABLE DOUBT EACH OF THESE CRIMES.

21   AND THAT BURDEN STAYS HERE WITH THE GOVERNMENT TABLE AT ALL

22   TIMES.  IT STAYS HERE WITH ME.  I ACCEPT THAT BURDEN.  AND

23   WE'RE HAPPY TO SHOW YOU HOW THAT BURDEN HAS BEEN PROVEN.

24    BUT THE BURDEN IS BEYOND A REASONABLE DOUBT.  AND YOU

25   HEARD THE COURT READ THIS INSTRUCTION:  PROOF BEYOND A

REASONABLE DOUBT IS PROOF THAT LEAVES YOU FIRMLY CONVINCED THE

DEFENDANT IS GUILTY.  IT IS NOT REQUIRED THE GOVERNMENT PROVE

GUILT BEYOND ALL POSSIBLE DOUBT.  REASONABLE DOUBT IS DOUBT

BASED UPON REASON AND COMMON SENSE, NOT BASED PURELY ON

SPECULATION.

NOW THAT'S IMPORTANT, LADIES AND GENTLEMEN.  THAT IS THE

ONE THING THAT YOU ARE SUPPOSED TO BRING WITH YOU.  YOU'RE

SUPPOSED TO LEAVE YOUR SYMPATHIES AND YOUR BIAS AT THE DOOR,

CHECK IT AT THE DOOR.  BUT YOUR COMMON SENSE YOU BRING WITH YOU

HERE TODAY.  AND WHAT DOES YOUR COMMON SENSE TELL YOU ABOUT

WHETHER OR NOT THE DEFENDANT KNEW THAT METHAMPHETAMINE WAS IN

HIS CAR?  YOUR COMMON SENSE, LADIES AND GENTLEMEN, TELLS YOU HE

KNEW.  AND THAT EACH ONE OF THESE CRIMES THE DEFENDANT HAD BEEN

PROVEN GUILTY BEYOND A REASONABLE DOUBT.

THERE REALLY IS NO DOUBT LEFT IN THIS CASE.  LET'S TALK

ABOUT THAT, LADIES AND GENTLEMEN.  THE FIRST ONE IS CONSPIRACY

TO IMPORT METHAMPHETAMINE.  BASICALLY, THIS IS A PARTNERSHIP.

TWO INDIVIDUALS AGREE TOGETHER TO BRING METHAMPHETAMINE INTO

THIS COUNTRY.  AND WE KNOW THOSE TWO INDIVIDUALS, DAVID

GUTIERREZ AND THE DEFENDANT.  THERE WAS AN AGREEMENT BETWEEN

TWO OR MORE PERSONS TO IMPORT METHAMPHETAMINE INTO THE UNITED

STATES FROM A PLACE OUTSIDE THE UNITED STATES.  NO QUESTION

HERE, LADIES AND GENTLEMEN.

LET'S TALK ABOUT WHAT IS NOT EVEN DISPUTED.

METHAMPHETAMINE WAS BROUGHT INTO THIS COUNTRY FROM MEXICO.  NO

1    ONE DISPUTES THAT.  METHAMPHETAMINE WAS BROUGHT INTO THIS

2    COUNTRY BY THE DEFENDANT IN HIS VEHICLE.  NOBODY DISPUTES THAT.

3        THE DEFENDANT JOINED IN THE AGREEMENT, KNOWING OF ITS

4    PURPOSE, IMPORTATION OF METHAMPHETAMINE, AND INTENDING TO

5    FURTHER THAT PURPOSE.

6        I'M GOING TO TALK WITH YOU IN LENGTH ABOUT THE EVIDENCE

7    THAT HAS SHOWN THE DEFENDANT DID ENGAGE IN THIS AGREEMENT, THAT

8    HE DID AGREE WITH MR. GUTIERREZ TO BRING THIS METHAMPHETAMINE

9    INTO THIS COUNTRY.

10       SO THAT'S THE FIRST COUNT.  THE SECOND ONE IS VERY

11   SIMILAR, DEALING WITH THE IMPORTATION, BRINGING IT INTO THE

12   COUNTRY.  THE DEFENDANT KNOWINGLY BROUGHT METHAMPHETAMINE INTO

13   THE UNITED STATES FROM A PLACE OUTSIDE, AND THE DEFENDANT KNEW

14   THE SUBSTANCE HE WAS BRINGING INTO THE UNITED STATES WAS

15   METHAMPHETAMINE.  NO QUESTION IT WAS BROUGHT INTO THIS COUNTRY.

16   THERE IS ALSO NO QUESTION THAT HE KNEW IT WAS THERE.  AND I'M

17   GOING TO TALK TO YOU ABOUT HOW ALL THE EVIDENCE PROVES DIRECTLY

18   TO HIS KNOWLEDGE THAT HE KNEW IT WAS THERE.

19       CONSPIRACY TO DISTRIBUTE METHAMPHETAMINE.  THERE WAS AN

20   AGREEMENT BETWEEN TWO OR MORE PERSONS TO DISTRIBUTE

21   METHAMPHETAMINE.  THE DEFENDANT JOINED THE AGREEMENT KNOWING OF

22   ITS PURPOSE, THE DISTRIBUTION OF METHAMPHETAMINE AND INTENDING

23   TO FURTHER ITS PURPOSE.  YOU HEARD TESTIMONY ABOUT THE AMOUNT

24   IN THIS CASE, 22 POUNDS OF METHAMPHETAMINE, BEING THOUSANDS OF

25   INDIVIDUAL-USE DOSES.  NO QUESTION THAT THEY WANTED TO TAKE

1    THIS AND DELIVER IT TO ANOTHER PERSON; THAT IS DISTRIBUTION.

2    THAT IS ALL IT TAKES, IS THAT YOU'RE DELIVERING THIS TO ANOTHER

3    PERSON.

4         AND THAT'S THE SAME DOWN HERE FOR THE FOURTH COUNT; THE

5    DEFENDANT KNOWINGLY POSSESSED METHAMPHETAMINE, AND THE

6    DEFENDANT POSSESSED IT WITH THE INTENT TO DISTRIBUTE IT.  IN

7    THIS CASE, THE AMOUNT OF DRUGS ITSELF ESTABLISHES THE INTENT TO

8    DISTRIBUTE.  THERE IS NO QUESTION THAT THAT AMOUNT OF DRUGS IS

9    NOT FOR MR. FLORES'S PERSONAL USE.

10        SO WHAT IS IN DISPUTE HERE?  WHAT IS IN DISPUTE IS THE

11   DEFENDANT AGREEING TO BRING THIS METHAMPHETAMINE INTO THE

12   COUNTRY WITH MR. GUTIERREZ AND HIM KNOWING IT WAS THERE.  AND

13   THOSE GO HAND IN HAND.  OF COURSE, IF HE KNEW IT WAS THERE, HE

14   WAS IN AN AGREEMENT TO BRING IT WITH MR. GUTIERREZ.  NO

15   QUESTION THERE WAS COORDINATED CROSSINGS, THAT THEY HAD SOME

16   SORT OF AGREEMENT; THIS WASN'T COINCIDENTAL.

17        THE QUESTION IS, WAS THE AGREEMENT TO GO TO MEXICO AND GET

18   TACOS AND HANG OUT WITH FRIENDS AND FAMILY, OR WAS THE

19   AGREEMENT TO GO TO MEXICO TO FURTHER YOUR CRIMINAL PARTNERSHIP

20   OF BRINGING IN METHAMPHETAMINE?  THERE WAS AN AGREEMENT, LADIES

21   AND GENTLEMEN.  AND IT'S FOR YOU TO DECIDE WHAT THE PURPOSE OF

22   THAT AGREEMENT WAS.

23        LET'S TALK ABOUT INDIVIDUAL PIECES OF EVIDENCE AND HOW

24   EACH ONE OF THOSE PIECES OF EVIDENCE ESTABLISH THE DEFENDANT

25   KNEW THAT THERE WERE DRUGS IN HIS CAR.  FIRST, HE IS THE

DRIVER, SOLE OCCUPANT, AND OWNER OF THIS VEHICLE SINCE 2002.
THIS ISN'T SOMEONE ELSE'S VEHICLE.  FIRST, AS THE DRIVER, THAT
MEANS HE HAD CONTROL OF WHERE THAT VEHICLE WAS GOING.  HE HAD
CONTROL OF WHETHER OR NOT HE WAS GOING TO COME INTO THE UNITED
STATES THAT DAY OR WHETHER OR NOT HE WAS GOING TO STAY IN
MEXICO, AND DECIDE, I WAS GOING TO DRIVE TO THE BEACH THAT DAY,
OR DECIDE HE WAS GOING TO SEE FAMILY SOMEWHERE ELSE.

     HE HAD COMPLETE CONTROL OF WHERE THAT VEHICLE WAS GOING.
AND ALSO BECAUSE HE HAD CONTROL OF THE VEHICLE, HE HAD CONTROL
OF WHERE THAT $1.6 MILLION WORTH OF METHAMPHETAMINE WAS GOING
TO GO.  HE WAS THE SOLE OCCUPANT.  THERE IS NO ONE ELSE IN THAT
CAR TO POINT A FINGER AT, THERE IS NO ONE ELSE IN THAT CAR TO
CONTROL WHERE IT WAS GOING.

     AND AS THE REGISTERED OWNER OF THAT CAR SINCE 2002, HE WAS
INTIMATELY FAMILIAR WITH HOW THAT CAR WORKED.  IT WAS HIS CAR.
HE HAD POSSESSION, CONTROL.  HOW MANY OF YOU, LADIES AND
GENTLEMEN, WITH YOUR OWN CAR, THINK BACK, YOU KNOW WHERE YOU
KEEP YOUR WALLET IN YOUR CAR?  DO YOU KNOW WHERE YOU KEEP A
BACKPACK?  DO YOU KNOW WHERE YOU KEEP YOUR SUNGLASSES?  MAYBE
WHERE YOU PLACE YOUR CELL PHONE?  DO YOU KNOW IF YOUR CAR HAS A
CERTAIN SOUND IT MAKES?  TEN YEARS -- IN THIS CASE, SEVEN
YEARS, GIVES YOU PLENTY OF TIME TO BECOME FAMILIAR WITH YOUR
CAR, AND TO KNOW WHAT KIND OF GAS MILEAGE YOUR CAR GETS, TO BE
AWARE WHEN THE GAS GAUGE IS PEGGED IN A CERTAIN LOCATION AND
DOESN'T MOVE.  HE'S HAD THIS VEHICLE FOR A LONG TIME.  IT IS

1    HIS VEHICLE.

2         SECOND, HE CHOSE LANE 12.  WHY DID HE CHOOSE LANE 12?

3    WITH ALL THE OTHER LANES TO CHOSE FROM, HE CHOSE THE LANE WITH

4    THE LEAST AMOUNT OF TIME FOR THOSE CANINE INSPECTION DOGS.  AND

5    YOU'LL HEAR, HE ALMOST MADE IT.  HE WAS RIGHT THERE CLOSE TO

6    THE PRIMARY BOOTH WHEN THOSE DOGS FINALLY CAME BY, AND THE DOG

7    NOTICED IT.  AND HE TOOK OFF.  YOU HEARD TESTIMONY THAT THAT

8    ALLOWED THE SCENT -- WHEN THE VEHICLE WAS PULLED AWAY FROM THE

9    SCENT, IT ALLOWED THE DOG TO SMELL THAT AND TO FOLLOW THAT

10   VEHICLE AND ALERT TO THE UNDERCARRIAGE NEAR THE GAS TANK.  HE

11   CHOSE LANE 12 FOR A REASON.  AND HE PROBABLY, LADIES AND

12   GENTLEMEN, CHOSE LANE 12 WITH THE HELP OF HIS SCOUT,

13   MR. GUTIERREZ.

14        YOU HEARD LOTS OF TESTIMONY ABOUT HOW AT THE SAN YSIDRO

15   PORT OF ENTRY, AND AT THE OTAY MESA PORT OF ENTRY, THAT THE

16   PEDESTRIAN LANES, WHERE MR. GUTIERREZ WAS THAT DAY, AND WHERE

17   HE WAS ON MANY OTHER CROSSINGS, 16 OTHER CROSSINGS, LADIES AND

18   GENTLEMEN, THAT HE WAS EITHER IN THE PEDESTRIAN LANES OR IN A

19   VEHICLE LANE CLOSE BY, THAT HE WAS ACTING AS THE SCOUT.  THAT

20   HE COULD BE TELLING THE DEFENDANT, GO TO LANE 12, IT LOOKS LIKE

21   THAT LANE IS MOVING THE FASTEST.

22        AND YOU HEARD TESTIMONY THAT IN OTAY MESA, THAT LANE IS

23   OFTEN THE ONE THAT MOVES THE FASTEST.  BECAUSE IT BRANCHES INTO

24   THREE SEPARATE BOOTHS, AND SO YOU HAVE THREE INSPECTION BOOTHS

25   HERE; WHEREAS, THE OTHER LANES, THERE IS JUST ONE.  ONLY IF

1   THEY'RE OPEN, WHEREAS, ON THIS DAY, IT APPEARS AS THOUGH

2   THEY'RE NOT.  AND WE HEARD TESTIMONY THAT ON THAT DAY, THE

3   LANES WERE OPEN.

4        NEXT, HE WAS IN A HURRY TO GET THROUGH THE INSPECTION TO

5   AVOID THE DOG.  YOU HEARD TESTIMONY ABOUT THAT, LADIES AND

6   GENTLEMEN.  YOU'VE HEARD ME TALK ABOUT IT.  WHY WAS HE IN A

7   HURRY?  WHAT DID HE HAVE TO BE CONCERNED AND NERVOUS ABOUT?

8   HE'S BEEN THROUGH THIS PORT OF ENTRY ON LOTS OF OCCASIONS.  YOU

9   HEARD AGENT KRAUSE TESTIFY THAT HE HAD CROSSED THE PORT OF

10  ENTRY 25 TIMES.  WE KNOW 16 OF THOSE TIMES, HE HAD HIS BUDDY

11  WITH HIM, HIS PARTNER IN CRIME.

12       HE IS NOT UNFAMILIAR WITH THE PORT OF ENTRY.  HE IS NOT

13  UNFAMILIAR WITH CANINES AT THE PORTS OF ENTRY.  HE IS

14  INTIMATELY FAMILIAR WITH THIS AREA AND DOES THIS ON A REGULAR

15  BASIS.  BUT THAT DAY, HE HAD GOOD REASON TO BE WORRIED.

16  BECAUSE HE KNEW HIS GAS TANK WAS STUFFED FULL OF

17  METHAMPHETAMINE AND THAT THERE WAS A CANINE NARCOTIC DETECTION

18  DOG APPROACHING HIS VEHICLE.  THERE IS NO OTHER GOOD

19  EXPLANATION FOR THAT SORT OF BEHAVIOR, LADIES AND GENTLEMEN.

20  NO OTHER.  HE KNEW.

21       THE SENDING UNIT WAS RIGGED TO AVOID SUSPICION BY THE

22  OFFICERS.  YOU HEARD TESTIMONY THAT OFFICERS WILL LOOK AT THE

23  GAS GAUGES OF VEHICLES.  AND IF THE GAS GAUGES ARE ALL THE WAY

24  EMPTY, THEY FIND THAT SUSPICIOUS, OR IF THEY'RE ALL THE WAY

25  PAST FULL, THEY FIND THAT SUSPICIOUS.

1    AND YOU HEARD TESTIMONY FROM RUSS BUTLER, THE AUTO

2 MECHANIC EXPERT, THAT IF THIS SENDING UNIT HAD NOT BEEN RIGGED

3 THE WAY IT WOULD HAVE BEEN RIGGED, AND THEY HAD REMOVED THIS

4 FLOAT, THAT IT WOULD SHOW EMPTY, BELOW EMPTY.  THAT IT WOULD,

5 IN ESSENCE, GO TO ZERO WHEN THIS IS REMOVED.  AND THE

6 ELECTRONIC CURRENT THAT WOULD BE SENT TO THE SENDING UNIT, TO

7 THE GAS GAUGE, WOULD SHOW NO GAS, WHATSOEVER, WHICH WOULD ALERT

8 CUSTOMS INSPECTORS TO THERE BEING SOMETHING TO LOOK AT WITH

9 REGARD TO THAT VEHICLE.

10    AND DRUG SMUGGLERS, DRUG SMUGGLERS DON'T WANT THEIR

11 VEHICLES LOOKED AT THAT CAREFULLY.  SO THEY GO TO MEASURES LIKE

12 THIS TO MAKE SURE THEY CAN STUFF THIS WITH METHAMPHETAMINE AND

13 STILL HAVE IT APPEAR ON THE OUTSIDE TO BE A PERFECTLY NORMAL

14 VEHICLE.  BUT THIS ONE WASN'T.

15    SO THE SENDING UNIT BEING RIGGED ALSO SHOWS THAT THERE

16 WOULD BE NO WAY OF KNOWING HOW MUCH GAS WAS IN THAT CAR IF

17 YOU'RE DRIVING IT.  AND WE KNOW THAT THE DEFENDANT DROVE THAT

18 CAR ON A REGULAR BASIS.  WE KNOW THE NIGHT BEFORE, AT

19 8:10 P.M., HE WAS UP IN LOS ANGELES.  AND THAT NEXT DAY, AT

20 APPROXIMATELY 1:00, HE WAS COMING BACK TO THE PORT OF ENTRY.

21 CELL SITE TOWER DATA ESTABLISHED THAT; CELL SITE TOWER HERE, UP

22 IN THE LOS ANGELES AREA, CELL SITE TOWER DATA BACK DOWN HERE AT

23 THE PORT OF ENTRY.

24    WE KNOW WHERE HE WAS, LADIES AND GENTLEMEN.  AND WE KNOW

25 THAT'S AN AWFULLY QUICK TRIP ON A FRIDAY NIGHT TO DRIVE ALL THE

WAY FROM LA, DOWN TO MEXICO, AND THEN COME BACK THE NEXT DAY.
THAT'S A LOT OF DRIVING DOWN IN A VERY DIFFICULT AREA.  FRIDAY
NIGHTS, SATURDAY MORNINGS, BEACH TRAFFIC ON I-5, GETTING BACK
INTO THE UNITED STATES FROM MEXICO ON A SATURDAY, WITH ONLY A
FEW GALLONS OF GAS IN YOUR TANK, AND YOUR GAS METER SHOWING YOU
ON FULL, WITH $1.6 MILLION IN YOUR TANK.  THAT'S A LOT OF RISK,
LADIES AND GENTLEMEN, IF YOU DON'T KNOW.  THAT'S WHY WE KNOW HE
DID KNOW.  BECAUSE IF HE DIDN'T KNOW, HE COULD HAVE EASILY RAN
OUT OF GAS.  AND DRUG SMUGGLERS ARE GREEDY.  THEY DO THIS FOR A
LIVING.  THEY'RE NOT GOING TO RISK LOSING THEIR ENTIRE SHIPMENT
BY SOMEONE NOT KNOWING THAT THEY DON'T HAVE ENOUGH GAS AND
RUNNING OUT.  HE KNEW.

TOOL MARKS ON THE SENDING UNIT, LID, AND SCREWS.  WE
TALKED ABOUT THAT.  THE SCREWS HERE, THE MARKS ON THIS NUT,
SHOWED THEY HAD BEEN REMOVED MULTIPLE TIMES.  THIS SHOWED THIS
WAS NOT THE FIRST TIME THE DEFENDANT'S VEHICLE HAD BEEN USED TO
SMUGGLE DRUGS.  AND WE ALSO KNOW THAT TO BE TRUE BECAUSE WE
HAVE THE CROSSINGS TO BACK IT UP.  WE HAVE THE CROSSINGS TO
SHOW HE AND MR. GUTIERREZ COMING INTO THE UNITED STATES
TOGETHER, WITH MR. GUTIERREZ ALWAYS DRIVING THAT SAME VEHICLE.
THIS WASN'T THE FIRST TIME.  OVER TWO HOURS IN REMOVING THE
SENDING UNIT AND STASHING THE DRUGS.

NOW YOU HEARD TESTIMONY FROM A TRUE MECHANIC EXPERT, THAT
DOES THIS FOR A LIVING ON A DAILY BASIS, OF HOW LONG IT TAKES
TO ACCESS A SENDING UNIT, PROPERLY REMOVE IT.  AND HE TOLD YOU

1   THAT 1.4 HOURS WAS THE AMOUNT OF TIME THAT IS ALLOTTED,

2   ACCORDING TO THE LABOR GUIDE, TO FIX A SENDING UNIT; BASICALLY

3   TO TAKE IT OUT, AND PUT A NEW ONE IN.

4        AND HE TALKED TO YOU ABOUT THE PROCESS THAT NEEDED TO BE

5   DONE AND SOME OF THE TOOLS.  AND HE EXPLAINED IT TAKES SOME

6   TIME, AND THAT IT WOULD TAKE MORE TIME TO GO AHEAD AND RIG THIS

7   PROPERLY.  AND HE SAID TO RIG THIS IN PLACE THE WAY IT IS, YOU

8   WOULD HAVE HAD TO HAVE ACCESS TO THE VEHICLE.  BECAUSE YOU

9   WOULD HAVE HAD TO HAVE BEEN ABLE TO GET INSIDE THE VEHICLE, FOR

10  ONE, BUT NOT ONLY THAT, YOU WOULD HAVE HAD TO HAVE THE KEY TO

11  TURN ON THE VEHICLE TO ALLOW THE ELECTRONIC DEVICE HERE TO WORK

12  PROPERLY BECAUSE IT NEEDS ELECTRICITY TO IT.  THE CAR HAS TO BE

13  ON TO DETERMINE WHETHER OR NOT THIS IS IN PLACE PROPERLY TO

14  SHOW ON THE GAS GAUGE THREE-QUARTERS FULL.

15       SO TWO HOURS OF TIME.  WHY DOES THE TIME MATTER?  IF

16  SOMEONE WAS JUST GOING TO SNEAK INTO SOMEONE'S CAR, AND QUICKLY

17  STASH THE DRUGS, AND SNEAK BACK OUT, AT LEAST TWO HOURS HERE,

18  LADIES AND GENTLEMEN.  AND THAT'S ASSUMING THEY HAPPENED TO

19  HAVE KNOWN BEFORE THAT THE EXACT TYPE AND PACKAGES TO PREPARE.

20  AND ASSUMING THAT THEY WERE SOMEHOW ABLE TO DO WHAT MR. BUTLER

21  IS UNABLE TO DO, AS AN EXPERT, WITH ALL THE PRECAUTIONS HE HAS

22  AT HIS SHOP TO MAKE SURE IT DOESN'T END UP SMELLING OF GAS.

23       REMOVING THE SENDING UNIT CAUSES THE ENTIRE CAR TO REEK.

24  TAKING THE CAR OUT -- TAKING THE SENDING UNIT OUT, THE CAR IS

25  GOING TO SMELL, OKAY.  IT'S HIS CAR.  HE DRIVES IT REGULARLY.

1    HE'S GOING TO NOTICE THE SMELL.  OF COURSE THE FLOAT IS GOING

2    TO MAKE IT SMELL AS WELL.  AND WHY DOES THE SMELL MATTER?  WHY

3    DOES IT MATTER IF HE NOTICES A SMELL?  BECAUSE IT ALERTS HIM TO

4    SOMETHING WITH HIS VEHICLE, SOMETHING WITH REGARD TO, MY GAS,

5    MY GAS TANK IS NOT RIGHT.

6        LADIES AND GENTLEMEN, THESE ARE ALL SMALL PIECES OF

7    EVIDENCE THAT POINT IN ONLY ONE DIRECTION, THAT HE KNEW THE

8    DRUGS WERE THERE.  THE PACKAGES OF DRUGS WERE THE PERFECT SIZE

9    AND SHAPE TO FIT IN THE HOLE.  WE TALKED ABOUT THAT AS WELL.

10   EACH ONE OF THOSE PACKAGES FIT IN THAT HOLE.

11       WHY DOES THAT MATTER?  BECAUSE IT SHOWS COLLUSION.  IT

12   SHOWS THIS CONSPIRACY.  IT SHOWS HE WAS NOT ACTING ALONE.  THAT

13   OTHER PEOPLE, BEFORE HE CAME DOWN, 8:10 AT NIGHT, AND CAME DOWN

14   THAT NEXT DAY, OR THAT NIGHT, WHENEVER HE DECIDED TO GO TO

15   MEXICO, THEY WERE THERE, THEY HAD THE PACKAGES OF

16   METHAMPHETAMINE PREPARED SO THEY COULD PUT THEM IN HIS CAR AND

17   HE COULD BRING THEM BACK AND PLAY HIS ROLE IN THIS

18   ORGANIZATION, THE ROLE OF TAKING THE MOST RISK OF CROSSING THEM

19   ACROSS THE BORDER.

20       NEXT, THE FLOAT AND ARM UNDERNEATH THE DEFENDANT'S SEAT.

21   YOU HEARD TESTIMONY FROM BOTH AGENT BULLARD AND RUSS BUTLER

22   THAT THEY FOUND THAT FLOAT UNDERNEATH THE DEFENDANT'S SEAT.

23   WHAT DOES THAT TELL US?  WELL, IT WOULD SMELL OF GAS, SO THAT

24   WOULD LET THE DEFENDANT KNOW, HEY, THERE IS A FLOAT UNDERNEATH

25   MY SEAT.  IF YOU PULL A FLOAT FROM UNDERNEATH YOUR SEAT WHEN

YOU'RE DRIVING AROUND IN YOUR VEHICLE, IS THAT GOING TO

SURPRISE YOU?  IS THAT GOING TO MAKE YOU THINK, HEY, THIS

SMELLS LIKE GAS, WHY IS IT HERE?  YOU SLAM ON THE BRAKES, AND

IT SLIDES FORWARD UNDERNEATH YOUR PEDALS, YOU HIT A BUMP AND IT

RATTLES BECAUSE THIS IS METAL, AND THE METAL CAGE UNDERNEATH,

THE SEAT IS METAL, ALL OF THESE THINGS GO TO SHOW, LADIES AND

GENTLEMEN, THAT IF YOU'RE A DRUG SMUGGLING ORGANIZATION, WITH

$1.6 MILLION WORTH OF PRODUCT, YOU DON'T LEAVE THE FLOAT THERE

WITH THE PERSON YOU'RE TRYING TO SET UP.  YOU DON'T.  BUT IF

YOU'RE USING YOUR VEHICLE KNOWINGLY TO SMUGGLE DRUGS, LADIES

AND GENTLEMEN, YOU KEEP THOSE THINGS.  BECAUSE YOU'RE GOING TO

WANT TO BE ABLE TO PUT IT BACK IN TO MAKE YOUR VEHICLE OPERATE

NORMALLY WHEN YOU'RE DONE SMUGGLING THE DRUGS.

        NEXT, DRIVING THROUGH TWO HIGH-TRAFFIC AREAS ON VERY

LITTLE GAS.  SAME THING, DRUG SMUGGLING ORGANIZATIONS DON'T

RISK THEIR PRODUCT THAT WAY.  THE DEFENDANT KNEW THAT HIS GAS

GAUGE DIDN'T WORK.  HE KNEW IT WAS PEGGED.  AND IT PROBABLY HAD

BEEN PEGGED THAT WAY FOR A LONG TIME.  BECAUSE IT DIDN'T SMELL

ANY MORE, LADIES AND GENTLEMEN, WHICH MEANS IT HAD BEEN OUT OF

HIS CAR FOR A WHILE.

        HE KNEW HE DIDN'T HAVE ENOUGH GAS.  HE HAD AN ODOMETER, A

TRIP ODOMETER THAT RUSS BUTLER TOLD YOU COULD BE USED TO TRACK

HOW MANY MILES HE HAD GONE AFTER HE PUTS GAS IN THE CAR.  TWO

HIGH-TRAFFIC AREAS, DRIVING ALL THE WAY FROM LOS ANGELES, DOWN

FOR A QUICK TRIP TO TURN AROUND, LOAD IT UP WITH

METHAMPHETAMINE, BACK UP TO THE LOS ANGELES AREA. HE WOULD NOT

HAVE DONE THAT WITHOUT KNOWING HE HAD PLENTY OF GAS. AND HE

KNEW HE NEEDED TO GET GAS BECAUSE HE KNEW ABOUT THE DRUGS.

$1.6 MILLION WORTH OF METHAMPHETAMINE, THIS HARDLY NEEDS

EXPLANATION, LADIES AND GENTLEMEN. THERE IS NO METH FAIRY.

THERE IS NO SOMEONE THAT JUST GIVES YOUR CAR -- HE SAYS HE BUYS

THE CAR NEW IN 2002 FOR 10-, $15,000, AND IT APPRECIATES IN

VALUE TO $1.6 MILLION? NO. THAT DOESN'T COMPORT WITH YOUR

COMMON SENSE. WHAT COMPORTS WITH YOUR COMMON SENSE IS, OVER

TIME, HE BECAME A TRUSTED ALI. OVER TIME, AFTER CROSSING AFTER

CROSSING, HE BECAME SOMEONE THEY COULD TRUST WITH A SIGNIFICANT

AMOUNT OF NARCOTICS, WORTH A LARGE AMOUNT OF MONEY. YOU DON'T

TRUST THAT MUCH MONEY TO SOMEONE THAT DOESN'T KNOW.

SIXTEEN COORDINATED CROSSINGS WITH GUTIERREZ. NOW THIS

GOES TO SHOW NOT ONLY THE DEFENDANT'S KNOWLEDGE, BUT IT GOES TO

SHOW THEY WERE IN A CONSPIRACY TOGETHER. STARTING BACK IN

2008, AND YOU REMEMBER, AGENT KRAUSE'S TESTIMONY IS THE QUERY

FROM THE TECS DATABASE WAS ONLY FOR APPROXIMATELY A YEAR AND A

HALF PERIOD. WE DON'T KNOW HOW MUCH BEFORE THIS MR. GUTIERREZ

AND MR. FLORES WERE ENGAGED IN THIS SORT OF CROSSING PATTERN.

MR. GARRISON: OBJECTION. VOUCHING.

THE COURT: OVERRULED.

MR. CONOVER: WE DON'T KNOW HOW LONG THEY WERE

ENGAGED IN THIS SORT OF CROSSING PATTERN. WHAT WE KNOW IS THAT

THE TECS RECORDS START BACK IN '08, AND THEIR CROSSING PATTERN

1    STARTS BACK IN '08.  ON 16 DIFFERENT OCCASIONS, THEY CROSSED

2    THE PORT OF ENTRY THE SAME DAY, NEAR THE SAME TIME, OFTENTIMES

3    WITHIN MINUTES, BUT AT THE VERY MOST, WITHIN THREE HOURS.  BUT

4    THEY NEVER CROSSED IN THE SAME CAR.  HE WOULD NEVER JUMP IN THE

5    CAR WITH HIM.  THERE WAS NO ISSUES WITH SENTRI PASSES OR

6    SECONDARY REFERRALS.  THAT IS SMOKE AND MIRRORS, SMOKE AND

7    MIRRORS, LADIES AND GENTLEMEN.  THERE WAS NO REASON, NO

8    REASONABLE EXPLANATION FOR THAT, OTHER THAN HE IS A SCOUT.

9        AS YOU HEARD FROM AGENT KRAUSE, HIS JOB IS TO BOTH

10   INSULATE THE ORGANIZATION, BY HAVING THE DRUG PHONE WITH HIM,

11   WITH THE CONTACTS THAT GO BACK TO THE ORGANIZATION, TO BE

12   SECURITY FOR THAT LOAD, TO MAKE SURE THAT MR. FLORES DOESN'T

13   RUN OFF WITH THAT $1.6 MILLION ON HIS OWN.  THAT HE FOLLOWS HIM

14   CAREFULLY TO MAKE SURE THAT IT GETS TO ITS ULTIMATE

15   DESTINATION.  HE'S THE SCOUT, AND THESE CROSSINGS PROVE IT.

16       NEXT, YOU HEARD THE TESTIMONY ABOUT EXACTLY WHAT I JUST

17   SAID, THAT THE BEHAVIOR IS TYPICAL OF THE DRUG SMUGGLERS.  YOU

18   HEARD HIM SAY EXACTLY THAT, AND YOU HEARD HIM TESTIFY TO YOU

19   THAT IN HIS EXPERIENCE, DRUG SMUGGLING ORGANIZATIONS DO NOT

20   ENTRUST LARGE QUANTITIES OF NARCOTICS TO UNKNOWING COURIERS

21   BECAUSE THEY DON'T WANT THE RISK.  WHEN ALL THEY HAVE TO DO IS

22   PAY SOMEONE TO DO IT.

23       CALLS BETWEEN THE DEFENDANT AND GUTIERREZ.  YOU HEARD

24   TESTIMONY THAT IN THE SHORT TIME PERIOD THAT THE INVESTIGATOR

25   HAD REQUESTED CALLS FROM AT&T, ABOUT A SIX-MONTH PERIOD, THAT

THE TWO OF THEM HAD CALLED EACH OTHER OVER 100 TIMES DURING

THAT SIX-MONTH PERIOD.  DURING 180 DAYS, THEY CALLED EACH OTHER

100 TIMES, ALMOST EVERY OTHER DAY.  AND THEN ON THE FEW

CROSSINGS DURING THAT TIME PERIOD, THE ONES THAT OCCURRED LATER

IN 2009, ON THOSE FEW CROSSINGS, WHAT DID WE LEARN?  TWENTY-ONE

CALLS ON THOSE DAYS.  SO WHEN THEY'RE CROSSING TOGETHER, OF

COURSE THEY'RE CALLING EACH OTHER TO COORDINATE IT.  NO

QUESTION ABOUT THAT.

THE QUICK IN AND OUT TRIPS.  NOW IF YOU'RE GOING TO SPEND

A LONG TIME TRAVELING ALL THE WAY DOWN TO MEXICO, ALL THE WAY

FROM HERE, YOU WOULD NEED SOME EXPLANATION, I WOULD ASSUME,

THAT IF YOU'RE GOING TO TRAVEL ALL THE WAY DOWN THERE, YOU

WOULD WANT TO HAVE A REASON TO GO TO MEXICO.  BUT IF YOU'RE

GOING DOWN AND TURNING AROUND AND COMING RIGHT BACK, THE

LONGEST TIME PERIOD, I BELIEVE, WAS FOUR TO FIVE HOURS, SHORTER

OFTEN, WHAT DOES THAT TELL US?  THOSE SHORT TRIPS HAD A

PURPOSE.  AND THOSE SHORT TRIPS COMPORT WITH ALL THE OTHER

EVIDENCE WE HAVE SHOWING WHAT THAT PURPOSE WAS:  TO SMUGGLE

NARCOTICS.

THE DEFENDANT IN THE LA AREA, AT 9:10 P.M., THE NIGHT

BEFORE, YOU HEARD AT&T TESTIFY ABOUT THE CELL SITE DATA THAT

THEY MAINTAINED.  8:10 THE NIGHT BEFORE, HE'S IN TO MEXICO, AND

HE'S BACK IN A VERY SHORT AMOUNT OF TIME.  WE DON'T KNOW WHAT

TIME HE LEFT, BUT WE KNOW AT 8:10 AT NIGHT, HE WAS STILL IN THE

LA AREA.  WE DON'T KNOW IF HE LEFT THAT NEXT MORNING.  WE DON'T

1    KNOW WHEN, BUT WE KNOW IT WAS A VERY SHORT TRIP.

2        NEXT, WE HAVE OTHER EVIDENCE OF THE CONSPIRACY.  AND THIS

3    IS VERY IMPORTANT EVIDENCE, LADIES AND GENTLEMEN.  AND YOU'LL

4    GET A CHANCE TO LOOK AT THIS GARAGE DOOR OPENER.  YOU'LL GET A

5    CHANCE TO EXAMINE THIS TAG AND TO SEE DAVID GUTIERREZ'S NAME ON

6    THE TAG.  YOU'LL GET A CHANCE TO SEE THE VIN, THE MAKE, THE

7    MODEL.  IT SHOWS THAT MR. GUTIERREZ HAD HAD CONTROL OF THIS

8    VEHICLE BEFORE.  MR. GUTIERREZ AND MR. FLORES SHARED THIS

9    VEHICLE.  IT IS NOT A VEHICLE THEY USED FOR DRIVING AROUND,

10   NORMAL ACTIVITY.  IT IS THE LOAD VEHICLE.  IT'S AN INSTRUMENT

11   OF THEIR CRIMINAL ACTIVITIES.  AND THIS FURTHER TIES

12   MR. GUTIERREZ TO THIS VEHICLE.  THE TOLLS TIE HIM TO THE

13   DEFENDANT.  THE CROSSING HISTORY TIES HIM TO THE CRIMINAL

14   ACTIVITY THAT WAS TESTIFIED TO, BEING THE SCOUT.  AND THIS,

15   LADIES AND GENTLEMEN, TIE HIM FURTHER TO THAT VEHICLE.

16       AND IS THIS THE GARAGE DOOR OPENER TO MR. FLORES'S HOUSE?

17   NO.  YOU HEARD TESTIMONY THEY TRIED TO OPEN MR. FLORES'S

18   GARAGE, BUT IT DIDN'T WORK.  WHY IS THAT, LADIES AND GENTLEMEN?

19   BECAUSE THIS GARAGE DOOR OPENER IS FOR A LOAD VEHICLE.  LOAD

20   VEHICLES DON'T GO BACK TO YOUR HOME; THEY GO TO THE STASH

21   HOUSE.

22       MR. GARRISON:  OBJECTION, AS TO "STASH HOUSE."  FACTS

23   NOT IN EVIDENCE.

24       THE COURT:  OVERRULED.

25       MR. CONOVER:  AT THE END OF THE DAY, LADIES AND

GENTLEMEN, WHEN YOU LOOK AT ALL THE EVIDENCE IN THIS CASE, WHEN

YOU COMBINE THE DEFENDANT'S DEMEANOR AND BEHAVIOR AT PRIMARY,

ALL THE OTHER PIECES OF EVIDENCE THAT I'VE TALKED TO YOU ABOUT,

THE COORDINATED CROSSINGS, MANY OF YOU WILL BELIEVE THAT JUST

THE FACT THAT AN INDIVIDUAL IS CAUGHT WITH A SIGNIFICANT AMOUNT

OF DRUGS IN HIS VEHICLE, AS A REGISTERED OWNER, AND THE SOLE

OCCUPANT DRIVER, THAT ALONE IS PROOF BEYOND A REASONABLE DOUBT

THAT THE DEFENDANT IS GUILTY OF THESE CRIMES.

        BUT IN THIS CASE, WE HAVE SO MUCH MORE.  THERE IS SO MUCH

MORE THAT WE JUST TALKED ABOUT.  THE CONCEPT THAT THE DEFENDANT

JUST DIDN'T KNOW THE DRUGS WERE IN HIS CAR IS RIDICULOUS.  IT

DOES NOT COMPORT WITH YOUR COMMON SENSE.  ALL THE EVIDENCE HERE

POINTS TO ONE CONCLUSION, LADIES AND GENTLEMEN, AND THAT IS

THAT THE DEFENDANT IS GUILTY.  THANK YOU.

            THE COURT:  ALL RIGHT, MR. GARRISON.

            MR. GARRISON:  THANK YOU, YOUR HONOR.  COULD I HAVE A

MOMENT TO GET OUR PROJECTOR UP?

            THE COURT:  SURE.

                    DEFENDANT'S CLOSING ARGUMENT

            MR. GARRISON:  THIS BOTHERS ME.  THIS BOTHERS ME

BECAUSE THIS, LADIES AND GENTLEMEN, AMONG A FEW OTHER THINGS,

IS WHAT THIS CASE IS ABOUT, ALL RIGHT.  THIS SENDING UNIT YOU

WILL HAVE.  THIS SENDING UNIT GIVES ME AN ACHE IN MY GUT.  LOOK

AT THIS SENDING UNIT WHEN YOU TAKE IT BACK.  LOOK AT WHERE IT

IS TIED UP TO.  IS IT TIED UP TO THREE-QUARTERS FULL, OR IS IT

1  TIED UP TO TOTALLY FULL?  BECAUSE IT LOOKS TO ME LIKE IT'S TIED

2  TOTALLY FULL.

3       I BRING THAT UP BECAUSE THE GOVERNMENT HAS SAID TIME AND

4  TIME AGAIN THAT IT WAS THREE-QUARTERS FULL, THAT THE TANK

5  SHOWED THREE-QUARTERS FULL.  THE PHYSICAL EVIDENCE DOES NOT

6  BEAR IT OUT.  THE PHYSICAL EVIDENCE, HOW THEY WANT THE EVIDENCE

7  TO COME OUT, IS NOT HOW IT CAME OUT.  AND YOU CAN SEE THAT.

8  YOU ALL WERE ATTENTIVE JURORS.  YOU ALL TOOK COPIOUS NOTES.

9  AND, YOU KNOW, YOU HEARD THE TESTIMONY THAT THAT ARM, THIS

10  FLOATER ARM, WAS FOUND UNDER THE SEAT ON AUGUST 24TH, 2010.

11  YOU KNOW THAT AN INVESTIGATOR -- TWO INVESTIGATORS FROM MY

12  OFFICE WERE TAKING PICTURES OF THIS FLOATER ARM ON AUGUST 18TH,

13  2010.

14       HOW MANY TIMES DID MR. CONOVER TELL YOU THAT THIS WAS

15  UNDER THE SEAT?  HOW MANY TIMES DID HE RATTLE HIS PROVERBIAL

16  SWORD?  IT WASN'T -- IT WASN'T UNDER THE SEAT WHEN MR. FLORES

17  CAME ACROSS THE BORDER.  IT WAS UNDER THE SEAT AFTER MY

18  INVESTIGATORS HAD ALREADY GONE OUT AND VIEWED THE VEHICLE.  AND

19  THEN THEY WENT OUT AND FOUND IT UNDER THE SEAT.  WHEN MY

20  INVESTIGATORS LOOKED AT THE CAR, IT WAS TRASHED.  THE SENDING

21  UNIT AND ALL THE PARTS WERE STREWN ABOUT THE INTERIOR OF THE

22  VEHICLE.  IT IS PREPOSTEROUS.  IT STRIKES AT THE HEART OF

23  COMMON SENSE TO BELIEVE THAT ON AUGUST 24TH, 2010, ANYTHING IN

24  THAT CAR WAS THE SAME AS THE WAY IT WAS WHEN MR. FLORES DROVE

25  IT ACROSS THE BORDER NINE MONTHS EARLIER -- I'M SORRY, NINE

1    MONTHS EARLIER.

2       HOW MANY TIMES DO WE HAVE TO TALK ABOUT THIS BEING UNDER

3    THE SEAT?  EVERYBODY KNOWS IT -- EVERYBODY KNOWS IT WAS FOUND

4    AFTER OTHER PEOPLE HANDLED IT, AFTER CUSTOMS AND BORDER

5    PROTECTION OFFICERS SEARCHED THE CAR THOROUGHLY.

6       MR. FLORES, GILBERT FLORES, THE MAN THAT SAT THERE THE

7    WHOLE TRIAL, IS NOT GUILTY OF ANY OF THESE FOUR CHARGES.  HE'S

8    INNOCENT.  HE WAS INNOCENT WHEN HE CAME IN HERE.  HE HAS BEEN

9    INNOCENT THIS WHOLE TIME, AND HE'S INNOCENT NOW.  AND THAT'S

10   THE TRUTH.

11      HOW DO WE KNOW HE IS INNOCENT?  HOW DO WE KNOW MR. FLORES

12   DIDN'T DO THIS?  HOW DO WE KNOW HE'S NOT A DRUG SMUGGLER?  THIS

13   SENDING UNIT WAS MODIFIED TO SHOW IT WAS FULL.  THIS SENDING

14   UNIT WAS MODIFIED TO TRICK MR. FLORES.  NO TWO WAYS ABOUT IT.

15   THREE-QUARTERS OF A TANK IS A FIGMENT OF THE GOVERNMENT'S

16   IMAGINATION.  LOOK AT IT WHEN YOU TAKE IT BACK THERE.

17      IF YOU'VE EVER SEEN A GAUGE, IF YOU'VE EVER SEEN SOMETHING

18   THAT LOOKS FULL, LOOK AT THIS ALL THE WAY UP TO THE TOP.  IT

19   WAS MODIFIED TO SHOW FULL.  THIS IS AN ACHE IN YOUR GUT.

20      NOW THE GOVERNMENT WILL SAY ON REBUTTAL -- THEY GET

21   ANOTHER CHANCE TO TALK TO YOU.  I GET ONE.  THE GOVERNMENT WILL

22   GET UP HERE, AND THEY WILL SAY, THE SENDING UNIT WAS MODIFIED,

23   IT SHOWS HE'S GUILTY.  BECAUSE IF HE HAS TOO MUCH GAS, THEN

24   IT -- OBVIOUSLY, IT SHOWS SOMETHING IS WRONG.  IF HE HAS TOO

25   LITTLE GAS, IT SHOWS SOMETHING IS WRONG.  WHAT IS THIS?  THIS

1    IS NOT ANY KIND OF REASONED DECISION.  THIS IS, IF IT IS, THEN

2    HE'S GUILTY; IF IT'S NOT, THEN HE'S GUILTY.  IT DOESN'T MAKE

3    SENSE.  THAT MAKES NO SENSE.

4         WHY MODIFY IT LIKE THIS?  IF MR. FLORES KNEW THAT THERE

5    WERE DRUGS IN THAT GAS TANK, WHY MODIFY IT?  MR. FLORES WOULD

6    KNOW, I'M DRIVING THE CAR, I HAVE DRUGS IN THE GAS TANK, THERE

7    IS THIS MANY GALLONS OF GAS IN THERE, I NEED TO PULL OVER AT

8    THIS TIME TO FILL UP.  THERE WOULD BE NO NEED TO DO THIS, NO

9    NEED, WHATSOEVER, BUT YET IT WAS DONE.  AND THE GOVERNMENT

10   WANTS YOU TO BELIEVE THAT THIS HAD BEEN DONE FOR A VERY LONG

11   TIME.  WELL, A FEW THINGS ABOUT IT BEING DONE FOR A VERY LONG

12   TIME; NO. 1, MR. FLORES'S SON, CHRISTOPHER, CAME IN AND

13   TESTIFIED THAT IN 2009, HE DROVE THAT CAR AND THE GAS GAUGE

14   WORKED.  SO IF CHRISTOPHER FLORES IS DRIVING THIS CAR, I GUESS

15   IT'S NOT SITTING IN THE STASH HOUSE, IS IT?  NO, IT'S NOT.

16   THIS WAS MR. FLORES'S DAILY DRIVE.  LOOK AT THE MAN; SUPERVISOR

17   SOUTHERN CALIFORNIA EDISON, 53 YEARS OLD.  HIS BIRTH DATE IS ON

18   THOSE TECS RECORDS THAT CAME INTO EVIDENCE, 53 YEARS OLD.  HE

19   HAS FOUR CHILDREN AND A STEPCHILD.  HE HAS RAISED GOOD KIDS.

20        MR. CONOVER:  OBJECTION, YOUR HONOR.  IMPROPER

21   ARGUMENT.  IT GOES TO SYMPATHY.  IRRELEVANT.

22        THE COURT:  SUSTAINED.

23      LADIES AND GENTLEMEN, DISREGARD THAT LAST COMMENT.

24        MR. GARRISON:  YOU'RE THE JUDGES OF CREDIBILITY.

25   YOU'RE THE JUDGES OF DEMEANOR.  YOU'RE THE JUDGES OF HOW MUCH

1   WEIGHT TO GIVE EVIDENCE.  TAKE A LOOK AT CHRISTOPHER FLORES,

2   TEACHER, COLLEGE GRADUATE, OUTSTANDING YOUNG MAN, I SUBMIT.

3   YOU JUDGE HIS CREDIBILITY.  YOU DECIDE.

4        THE GOVERNMENT WANTS YOU TO BELIEVE THAT THE EVIDENCE IN

5   THIS CASE IS SO OVERWHELMING, THAT NOTHING, IT'S BEYOND ALL

6   DOUBT, IT'S SO EXTENSIVE, THAT YOU DON'T EVEN NEED TO BE HERE.

7   INDEED, AGENT KRAUSE SAYS EVERYONE IS GUILTY.  WELL, THAT'S HIS

8   OPINION, I GUESS.  YOU DO NEED TO BE HERE.  YOU TWELVE PEOPLE

9   NEED TO BE HERE.  MR. FLORES NEEDS YOU HERE.  THAT INNOCENT MAN

10  THAT SITS THERE NEEDS YOU HERE.  THAT 53-YEAR-OLD FATHER OF

11  FOUR CHILDREN AND ONE STEPCHILD NEEDS YOU HERE.  HE NEEDS YOU

12  HERE TO LOOK AT THIS WITH UNBIASED EYES, TO BE NOT SWAYED AND

13  NOT BIASED AND NOT PREJUDICED TOWARDS HIM FROM THE OUTSET, AS

14  SO MANY WHO HAVE TAKEN THAT WITNESS STAND ARE AND WERE.

15            MR. CONOVER:  OBJECTION.  MISSTATES THE FACTS, YOUR

16  HONOR.

17            THE COURT:  OVERRULED.

18            MR. GARRISON:  LOOK AT WHAT THEY DID.  NOVEMBER 17TH,

19  2010, WAS A BANNER DAY FOR IMMIGRATION AND CUSTOMS ENFORCEMENT

20  AGENTS, AT LEAST SIX OF THEM.  THEY TRAVELED 129 MILES UP TO

21  THE LOS ANGELES AREA; THEY WENT TO MR. FLORES'S SON'S HOUSE.

22  NO ALLEGATION THAT HIS SON IS INVOLVED IN ANYTHING.  THEY WENT

23  TO HIS HOUSE.

24       AGENT FULLER AND AGENT KRAUSE TOLD YOU, WE DIDN'T SEARCH

25  THE HOUSE.  AGENT FULLER SAID, WE DID A PROTECTIVE SWEEP.

1    AGENT KRAUSE SAID, OH, YOU KNOW, WE CHECK TO MAKE SURE THERE

2    WERE OTHER PEOPLE, BUT THAT WASN'T -- THAT DIDN'T TAKE VERY

3    LONG.

4        JENNIFER JIMENEZ CAME IN.  SHE SAID, THERE WERE AGENTS

5    WALKING AROUND THAT HOUSE FOR HALF AN HOUR.  THEY WERE

6    SEARCHING THE HOUSE.  THEY CATEGORICALLY DENIED THAT THEY

7    SEARCHED THAT HOUSE, AND YET THE LAY WITNESS, WHO CAME IN, WHO

8    WAS THERE, TOLD YOU THAT THEY DID.  AND YOU CAN TAKE THAT INTO

9    ACCOUNT WHEN JUDGING THEIR CREDIBILITY.  BUT ALSO TAKE INTO

10   ACCOUNT WHAT THEY FOUND.  IN ALTA DENA, NOTHING, NOTHING.  AT

11   MR. FLORES'S HOUSE, NOTHING.  WHAT THEY DID FIND, ONE VERY,

12   VERY IMPORTANT PIECE OF THE PUZZLE.  I'M SORRY, ONE OTHER

13   REASON WE KNOW HE'S INNOCENT, AND WE'LL COME BACK TO THIS

14   LATER, THE EASE WITH WHICH THAT METH COULD BE PUT IN AND TAKEN

15   OUT OF THAT GAS TANK.  BACK TO WHERE WE WERE IN OUR TALK,

16   THAT'S WHAT THEY FOUND.  ON THAT TRIP, ON NOVEMBER 17TH, 2010,

17   THEY FOUND DAVID GUTIERREZ.  AND AGENT BULLARD TOLD YOU, HE SAT

18   DOWN, HE TALKED TO THEM.  AND MR. CONOVER MADE NO BONES ABOUT

19   IT, THAT DAVID GUTIERREZ IS THE CO-CONSPIRATOR IN THIS CASE.

20   DAVID GUTIERREZ IS JUST AS GUILTY AS MR. FLORES IS.  WHERE IS

21   HE?  WHERE IS HE AS A DEFENDANT?  WHERE IS HE AS A WITNESS?

22   BECAUSE YOU CAN BET IF HE HAD ANYTHING BAD TO SAY ABOUT

23   MR. FLORES, HE WOULD HAVE BEEN HERE.

24        MR. CONOVER:  OBJECTION, YOUR HONOR.  IT'S IMPROPER.

25        THE COURT:  NO.  OVERRULED.

1          MR. GARRISON:  IT'S THEIR BURDEN.  THEY HAVE TO BRING

2    YOU THE EVIDENCE.  MR. FLORES -- MR. CONOVER TOLD YOU THAT THE

3    BURDEN STAYS HERE.  THE BURDEN STAYS HERE.  AND YOUR QUESTIONS

4    GO THERE.  SO WHEN YOU'RE BACK IN THAT JURY ROOM, AND YOU'RE

5    THINKING ABOUT, WHO IS DAVID GUTIERREZ?  WHERE IS DAVID

6    GUTIERREZ?  ASK THEM.  THEY DIDN'T TELL YOU.  DOES THAT GIVE

7    YOU A FEELING IN YOUR GUT?  IT DOES IN MINE.  I'LL TELL YOU WHO

8    HE IS.  HE'S A FRIEND OF MR. FLORES, A FRIEND FOR YEARS.  A

9    PERSON WHO KNEW WHERE MR. FLORES LIVED.  HE IS A MAN THAT

10   MR. FLORES TRUSTED.  HE'S A MAN THAT WOULD GO TO MEXICO WITH

11   MR. FLORES.

12          MR. CONOVER:  STATING FACTS NOT IN EVIDENCE, YOUR

13   HONOR.

14          THE COURT:  THAT'S TRUE.  SUSTAINED.

15        LADIES AND GENTLEMEN, DISREGARD THAT LAST COMMENT.

16          MR. CONOVER:  IF IT CAN BE REMOVED FROM THE OVERHEAD

17   AS WELL, YOUR HONOR.

18          THE COURT:  YEAH, PLEASE.  I'M NOT SURE YOU CAN DO

19   THAT.

20          MR. GARRISON:  LET ME MOVE ON.  WELL, LET'S TALK

21   ABOUT WHO GUTIERREZ IS.  THEY SPENT A BUNCH OF TIME SHOWING YOU

22   THAT GUTIERREZ AND MR. FLORES WERE IN MEXICO TOGETHER.  BUT I

23   GUESS NOW THEY WEREN'T.  INCONSISTENCIES, LADIES AND GENTLEMEN.

24   WHEN A MAN'S LIBERTY IS ON THE LINE, THESE INCONSISTENCIES

25   CANNOT BE OVERLOOKED.  THEY CANNOT BE TOSSED ASIDE.  THEY MUST

1  BE SCRUTINIZED.

2      GUTIERREZ HAD ACCESS TO THAT CAR.  WE KNOW IT.  HIS NAME

3  IS ON THAT LITTLE PIECE OF PAPER THAT YOU'LL HAVE.  WE KNOW

4  GUTIERREZ HAD ACCESS TO THAT CAR.  WE KNOW GUTIERREZ HELD THAT

5  CAR OUT AS HIS OWN.  HE KNEW WHERE HE LIVED.  HE HELD THE CAR

6  OUT AS HIS OWN, AND HE HAD A PLAN.  THE PLAN INVOLVED

7  MR. FLORES DRIVING THAT CAR ACROSS, WITHOUT KNOWING.

8      GUTIERREZ IS GUILTY.  NOT HERE, THOUGH.  YOU'RE NOT HERE

9  TO DECIDE THE FATE OF GUTIERREZ.  YOU'RE HERE TO DECIDE THE

10  FATE OF MR. FLORES.  HOW DID THIS METHAMPHETAMINE GET IN?  VERY

11  EASILY.  IT'S NOT AN EXTENDED PROCESS.  THEY DIDN'T HAVE TO

12  DROP THE GAS TANK.  THEY DIDN'T HAVE TO CREATE AN ACCESS PANEL.

13  THE FACTORY ALREADY MADE ONE.  PULL DOWN THE BACK SEAT, YOU

14  UNSCREW THE ACCESS PANEL, YOU TAKE OUT THE SENDING UNIT, AND

15  YOU PUT THE METH IN.  AND THAT CAN BE DONE QUITE QUICKLY.  THAT

16  DOESN'T NEED A HUGE AMOUNT OF TIME TO HAPPEN.  MR. LEANO --

17  GRANTED, THE SENDING UNIT IS NOT IN THERE.  BUT THAT TOOK LESS

18  THAN A MINUTE.  ARE WE TO BELIEVE THAT IT COULD BE SO EXTENDED?

19  IT'S EASY.  TOOK THIS OUT, THEY PUT THE METHAMPHETAMINE IN, AND

20  THEY RIGGED IT SO MR. FLORES WOULDN'T KNOW.  WHO IS MR. FLORES?

21  HE'S A HUSBAND.  HE IS A FATHER.

22      MR. CONOVER:  OBJECTION, YOUR HONOR, TO THE ENTIRE

23  SCREEN AND THIS SORT OF DISCUSSION IN CLOSING.

24      THE COURT:  YES.

25      MR. CONOVER:  IT'S COMPLETELY IMPROPER.

1        THE COURT:  MR. GARRISON, I THINK I'VE INSTRUCTED THE

2   JURY THAT THEY'RE NOT TO ALLOW THEIR SYMPATHY TO INTERVENE WITH

3   THEIR JUDGMENT IN THIS CASE.  AND I THINK THAT CLEARLY DOES GO

4   TO SYMPATHY.  SO PLEASE REMOVE IT.  THANK YOU.

5        MR. GARRISON:  WALLS ARE VERY IMPORTANT IN THIS CASE.

6   THE GOVERNMENT HAS BEEN BUILDING WALLS SINCE MR. FLORES WAS

7   ARRESTED; WALLS OF METHAMPHETAMINE, WALLS TO BLOCK.  HOW MANY

8   TIMES DID THEY LEAVE THIS SITTING RIGHT HERE TO SHOW YOU THIS

9   METHAMPHETAMINE?  IT'S A WALL.  AND ALL THEY'VE DONE IS,

10  THEY'VE TAKEN THIS METHAMPHETAMINE, AND THEY'VE STACKED IT IN

11  FRONT OF MR. FLORES THIS WHOLE TRIAL.  IT GOES SO DEEP.

12       OFFICER MORTON BUILT THE WALL WHEN HE WEIGHED IT.  THE

13  CHEMIST BUILT THE WALL WHEN HE TOOK THAT PICTURE.  AND GRANTED,

14  HE DIDN'T TAKE THE PICTURE LENGTHWISE.  HE DIDN'T TAKE THE

15  PICTURE LOOKING ONTO THE LENGTH.  HE TOOK THE PICTURE LOOKING

16  ONTO THE WIDTH BECAUSE THAT MAKES THE BIGGEST WALL.  ANOTHER

17  PICTURE OF METHAMPHETAMINE, ANOTHER PART OF THE WALL.  THAT'S

18  WHAT IT IS.  IT'S A WALL.  BUT THE FACT THAT THAT

19  METHAMPHETAMINE HAD NOTHING TO DO WITH THE FACT OF MR. FLORES

20  KNOWING OR NOT KNOWING THAT IT IS IN HIS CAR?  DID SOMEONE

21  KNOW?  OH, YEAH.  SOMEONE PUT IT IN THERE, PROBABLY DAVID

22  GUTIERREZ.

23       KRAUSE TESTIFIED THAT GUTIERREZ WAS IN MEXICO THAT DAY.

24  GUTIERREZ WE KNOW HAD ACCESS TO THE CAR.  WE KNOW THAT HE HELD

25  THE CAR OUT AS HIS OWN, AS HIS OWN ON CERTAIN TIMES.  SOMEBODY

1   KNEW.  BUT DID MR. FLORES KNOW IS THE OPERATIVE QUESTION IN

2   THIS CASE.

3      KNOWLEDGE IS KEY.  KNOWLEDGE IS KEY.  BECAUSE ALL OF THESE

4   CHARGES STEM FROM KNOWLEDGE.  IF MR. FLORES KNEW, THEN HE'S

5   GUILTY OF EVERYTHING.  IF HE DIDN'T KNOW, THEN HE IS NOT

6   GUILTY.  THAT'S THE LOGICAL CONCLUSION.  THAT'S THE REASONABLE

7   CONCLUSION.  AND THE CORRECT CONCLUSION IS THAT HE DID NOT

8   KNOW.

9      LET'S TALK ABOUT THE COUNTS BRIEFLY.  THE COUNTS ARE:

10   CONSPIRACY TO IMPORT; IMPORTATION; CONSPIRACY TO POSSESS WITH

11   INTENT TO DISTRIBUTE; AND POSSESSION WITH INTENT TO DISTRIBUTE.

12   ON THE CONSPIRACY, THE JUDGE INSTRUCTED YOU, IT IS NOT ENOUGH,

13   HOWEVER, THAT THEY SIMPLY MET, DISCUSSED MATTERS OF COMMON

14   INTEREST, ACTED IN SIMILAR WAYS, OR, PERHAPS, HELPED ONE

15   ANOTHER.

16      HE ALSO INSTRUCTED, ONE WHO HAS NO KNOWLEDGE OF A

17   CONSPIRACY, BUT HAPPENS TO ACT IN A WAY WHICH FURTHERS SOME

18   OBJECT OR PURPOSE OF THE CONSPIRACY, DOES NOT, THEREBY, BECOME

19   A CONSPIRATOR.  SIMILARLY, A PERSON WHO DOES NOT BECOME A

20   CONSPIRATOR -- OR A PERSON DOES NOT BECOME A CONSPIRATOR MERELY

21   BY ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS,

22   NOR MERELY BY KNOWING THAT A CONSPIRACY EXISTS.

23      WAS THERE A CRIMINAL AGREEMENT?  YES, BETWEEN DAVID

24   GUTIERREZ AND SOMEONE.  WAS THERE A CRIMINAL AGREEMENT BETWEEN

25   DAVID GUTIERREZ AND MR. FLORES?  NO.  WAS THERE A CRIMINAL

AGREEMENT BETWEEN MR. FLORES AND ANYBODY?  NO.

HE KNOWS MR. GUTIERREZ.  HE'S KNOWN HIM FOR A LONG TIME. THAT'S WHAT HIS SON TOLD US.  THAT BEING THE CASE, IT'S NOT UNREASONABLE TO BELIEVE THAT THEY WOULD GO TO MEXICO TOGETHER.

YOU ALSO RECEIVED AN INSTRUCTION ON AIDING AND ABETTING. BASICALLY THAT A PERSON MAY ALSO BE GUILTY OF A CRIME THROUGH A THEORY OF LIABILITY CALLED AIDING AND ABETTING.  WHAT IS THIS? IT'S A SHOTGUN PROSECUTION.  IT'S A SHOTGUN.  BECAUSE WHEN YOU SHOOT A SHOTGUN, AND YOU HIT A BIRD, IT DOESN'T MATTER WHETHER TEN PELLETS HIT THAT BIRD OR ONE PELLET HITS THAT BIRD; THAT BIRD IS JUST AS GOOD AS DEAD IF ONE PELLET HITS IT.

THE GOVERNMENT DOESN'T HAVE A CLEAR THEORY OF WHAT HAPPENED IN THIS CASE.  BUT THEY PUT TOGETHER, THEY COBBLED TOGETHER, WHATEVER CHARGES THEY CAN.  HE'S GUILTY OF CONSPIRACY.  HE'S GUILTY OF ACTUALLY DOING IT.  HE'S GUILTY OF CONSPIRACY.  HE IS GUILTY OF DOING THIS.  AND IF HE IS NOT GUILTY IN ALL OF THOSE WAYS, HE'S GUILTY OF AIDING AND ABETTING.

BUT WE DEMAND MORE, AS SOCIETY, AS PEOPLE, AS COMMON EVERYDAY PEOPLE WITH REASON AND COMMON SENSE.  WE DEMAND MORE. WE DEMAND THAT THE GOVERNMENT LAY OUT EXACTLY HOW SOMEBODY IS GUILTY.  THERE ARE SO MANY INCONSISTENCIES IN THEIR PRESENTATION OF THE EVIDENCE.  AND IT ALMOST SEEMS TO VARY WITH WHAT POINT THEY'RE ARGUING ON -- AT ANY GIVEN TIME.

AT ONE POINT, DURING THEIR CLOSING ARGUMENT, THEY SAID

1   THAT THIS SMELLED LIKE GAS.  AT ONE POINT, THEY SAID IT DIDN'T

2   SMELL LIKE GAS BECAUSE IT HAD BEEN SITTING OUT SO LONG.

3       AT ONE POINT, IN THEIR CLOSING ARGUMENT, THEY SAID THE CAR

4   DIDN'T SMELL LIKE GAS.  AT ANOTHER POINT IN THEIR CLOSING

5   ARGUMENT, THEY SAID THE CAR DID SMELL LIKE GAS.  WHICH IS IT?

6       AND AGENT BULLARD NEVER TESTIFIED THAT THAT FLOAT WAS

7   FOUND UNDER THE SEAT ON THE DAY OF ARREST.  AGENT BULLARD WENT

8   OUT TO VIEW THE CAR ON AUGUST 18TH, AND SHE WENT OUT ON

9   AUGUST 24TH.  AND SHE WENT OUT SUBSEQUENTLY, I BELIEVE, THE

10  TESTIMONY WAS IN OCTOBER SOMETIME.  BUT SHE DIDN'T INSPECT IT

11  ON THAT NIGHT, OR ON THAT AFTERNOON THAT HE WAS ARRESTED.

12      LET'S TALK ABOUT THE WITNESSES.  CREDIBILITY IS HUGE,

13  OKAY.  FIRST, OFFICER COVE, OFFICER COVE TESTIFIED THAT HE

14  DROVE AWAY RIGHT WHEN THE DOG WAS BEHIND HIS CAR.  WELL,

15  OFFICER COVE ALSO ADMITTED THAT SHE WROTE THOROUGH, ACCURATE,

16  COMPLETE, TRUTHFUL REPORTS.  AND THEN WHEN CONFRONTED WITH THE

17  FACT THAT THAT WASN'T IN HER REPORT, THEN THE STORY CHANGED.

18  THEN IT WAS, SHE DOESN'T WRITE DOWN ALL OBSERVATIONS, ONLY WHAT

19  IS NECESSARY.

20      SO SHE TESTIFIED TO SOMETHING THAT WASN'T IN HER REPORT.

21  WE'RE IN ALMOST MARCH NOW, END OF FEBRUARY, SO WE'RE LOOKING AT

22  THREE MONTHS -- 15 MONTHS AFTER THE FACT, AFTER THIS HAPPENED,

23  SHE TESTIFIES TO IT.  THEN WE TALK ABOUT OFFICER FIGUEROA.

24  OFFICER FIGUEROA HAD A WHOLE BUNCH OF THINGS THAT SHE DIDN'T

25  WRITE IN HER REPORT; EVERYTHING ABOUT HIM LOOKING IN THE

1    REARVIEW MIRRORS, THAT HE THRUST HIS ARM OUT, THAT HE SAID U.S.

2    CITIZEN, NOTHING WAS IN HER REPORT.

3        AND KEEP IN MIND, THE GOVERNMENT WILL NO DOUBT ADDRESS MY

4    ARGUMENT ABOUT WHY THIS SENDING UNIT WAS MODIFIED.  AND THE

5    GOVERNMENT WILL SAY BECAUSE THE INSPECTORS CHECK IT, HE'S

6    TRYING TO GET THROUGH.  DID EITHER FIGUEROA OR COVE TESTIFY

7    THAT THEY CHECKED HIS GAS GAUGE?  NO.

8        I WANT TO TALK TO YOU A LITTLE BIT ABOUT MR. BUTLER.

9    MR. BUTLER CAME IN, HE DID THE JOB OF GOING THROUGH, LOOKING AT

10   THE SENDING UNIT AND GIVING YOU GOOD INFORMATION ABOUT HOW IT

11   WAS MODIFIED, HOW IT WORKED.  BUT MR. BUTLER SAW IT AFTER MY

12   INVESTIGATORS.  SO MR. BUTLER -- I JUST WANT YOU TO TAKE AWAY

13   FROM THE FACT THAT MR. BUTLER HAD ALREADY -- OR THAT THAT HAD

14   ALREADY BEEN VIEWED, AND THAT THAT FLOAT ARM WAS NOT UNDER THE

15   SEAT AS THEY CLAIM.

16       LET'S TALK ABOUT AGENT BULLARD.  THIS PHONE IS IN

17   EVIDENCE.  AND IT DOES TURN ON, SO YOU'LL HAVE THE OPPORTUNITY

18   TO GO THROUGH THIS PHONE.

19           MR. CONOVER:  OBJECTION.  IMPROPER, YOUR HONOR.

20           THE COURT:  THAT IS TRUE, MR. GARRISON.

21       LADIES AND GENTLEMEN, YOU'RE NOT ALLOWED TO LOOK AT THAT

22   PHONE AND SEE WHAT IS IN IT.  THAT'S NOT EVIDENCE.  IT'S NOT

23   BEEN PRESENTED TO YOU.

24           MR. GARRISON:  IT MAKES THAT SOUND WHEN YOU TURN IT

25   OFF, YOUR HONOR.  I OBJECTED TO THE CONTENTS OF THIS PHONE

1    COMING IN AND IT WAS OVERRULED.

2            THE COURT:  YOU'RE GOING TO ARGUE WITH ME,

3    MR. GARRISON?

4            MR. GARRISON:  NO, SIR.

5            THE COURT:  LADIES AND GENTLEMEN, THE TESTIMONY

6    YOU'VE HEARD, THE EXHIBITS THAT HAVE BEEN ADMITTED INTO

7    EVIDENCE, YOU'RE ALLOWED TO CONSIDER.  YOU MAY NOT TURN ON THAT

8    PHONE AND SEE WHAT IS IN THE PHONE BECAUSE YOU HAVEN'T HEARD

9    ABOUT IT.  SO DON'T DO THAT.

10       ALL RIGHT, MR. GARRISON, GO AHEAD.

11           MR. GARRISON:  WELL, THERE HAS BEEN A LOT OF

12   TESTIMONY ABOUT PHONES, ABOUT PHONE RECORDS, MR. FLORES'S PHONE

13   RECORDS, ABOUT SCOUTS USING PHONES TO CALL DRIVERS AND

14   COURIERS.  IF DAVID GUTIERREZ IS A SCOUT AND MR. FLORES IS THE

15   DRUG COURIER, WHY DIDN'T THEY GET DAVID GUTIERREZ'S PHONE

16   RECORDS?  WHY WEREN'T THOSE PRESENTED TO YOU?  THEY HAD HIS

17   PHONE NUMBER.  YOU RECALL THEY INTRODUCED INTO EVIDENCE THE

18   PHONE NUMBER THAT WAS IN MR. FLORES'S PHONE.  THEY HAD THE

19   PHONE NUMBER.  THEY COULD HAVE GOTTEN THE RECORDS.  THEY

20   CERTAINLY GOT MR. FLORES'S.  THEY DIDN'T.

21       NOW WE HAVE TO TALK A LITTLE BIT ABOUT AGENT KRAUSE.

22   BECAUSE AGENT KRAUSE GOT UP THERE AND TOLD YOU THAT EVERYBODY

23   THAT BRINGS -- OR THAT HAS DRUGS IN THEIR CAR WHEN THEY CROSS

24   THE BORDER KNOWS THERE ARE DRUGS IN THERE.  TAKE A STEP BACK

25   AND PONDER THAT FOR A MOMENT.  EVERYBODY THAT IS ACCUSED OF

1    THIS CRIME IS GUILTY OF THIS CRIME?  MY MOTHER ALWAYS SAID,

2    "ALWAYS" AND "NEVER" ARE TWO WORDS THAT YOU SHOULD ALWAYS NEVER

3    USE.  IT'S PREPOSTEROUS.  EVERYBODY IS ALWAYS GUILTY.  IT'S A

4    GASP, AND IT'S A CLUTCH OF DESPERATION TO PUT SOMETHING ONTO

5    MR. FLORES THAT DOESN'T BELONG THERE.

6        I WANT TO TALK ABOUT SOME OF THE GOVERNMENT'S KEY PIECES

7    OF EVIDENCE THAT THEY ARGUED IN THEIR CLOSING.  THE SCREWS.

8    THE SCREWS HAD BEEN USED.  WELL, OF COURSE, THE SCREWS HAD BEEN

9    USED.  SOMEBODY TOOK THIS THING APART THAT DAY AND PUT THE

10   METHAMPHETAMINE IN THERE.  THE SCREWS HAD BEEN USED, YES, OKAY.

11   AND I BROUGHT THIS UP BEFORE, THE SMELL OF GAS.  DID IT SMELL

12   LIKE GAS?  DID IT NOT SMELL LIKE GAS?  NOBODY TESTIFIED THAT IT

13   SMELLED LIKE GAS.  NOBODY TESTIFIED THAT MR. FLORES SMELLED

14   LIKE GAS BECAUSE HE DIDN'T.

15       JUST LOOK AT THIS, LADIES AND GENTLEMEN.  JUST LOOK AT THE

16   LENGTHS THEY'LL GO TO EVEN WHEN THE EVIDENCE COMES OUT

17   DIFFERENTLY THAN THEY WANTED TO; THEY WILL STILL PROCEED WITH

18   THE WAY THEY ENVISION IT.  FOR EXAMPLE, CUSTOMS AND BORDER

19   PROTECTION OFFICER MORTON, HE PUT THE GAS IN ONE CONTAINER.  SO

20   AFTER HE WAS DONE WITH DIRECT, THAT CONTAINER COULD HAVE BEEN

21   AS SMALL AS A QUART OF MILK, IT COULD HAVE BEEN AS BIG AS A

22   TRASH DUMPSTER, WE DON'T KNOW.

23       I ASKED HIM, SEVEN GALLONS, SEVEN GALLONS, AND HE PUT IT

24   SEVEN GALLONS IN THE CONTAINER.  BUT STILL, THEY STILL

25   PRESENTED TO YOU AS ONE CONTAINER, IT FIT IN ONE CONTAINER.

1   FIFTEEN GALLONS FITS IN ONE CONTAINER.  IT IS CALLED A GAS

2   TANK.  IT'S AN ATTEMPT TO MINIMIZE A HORRIBLE BAD FACT IN THEIR

3   CASE, SEVEN GALLONS.  AND THAT WILL BECOME VERY IMPORTANT IN A

4   MOMENT.

5       PACKAGING MATTERS.  GOVERNMENT SAID, PACKAGING MATTERS.

6   THESE PACKAGES WERE DESIGNED SPECIFICALLY TO BE PUT INTO THAT

7   GAS TANK.  WHO HAD ACCESS TO THE CAR?  MR. GUTIERREZ.  IS IT

8   BEYOND THE REALM OF POSSIBILITY THAT MR. GUTIERREZ HAD THESE

9   PACKAGES DESIGNED THAT WAY?  NO.  DAVID GUTIERREZ AND

10  MR. FLORES HAD AN AGREEMENT.  WHAT EVIDENCE HAS THERE BEEN OF

11  ANY AGREEMENT?  NONE.  REALLY?  ALL WE'VE HEARD ABOUT GUTIERREZ

12  IS, THEY FOUND HIM, THEY TALKED TO HIM, AND THEY DIDN'T BRING

13  HIM.

14      HE CHOSE LANE 12.  HE CHOSE LANE 12 TO GET IN BECAUSE HE

15  DIDN'T WANT THE DOGS TO SNIFF HIS CAR.  HE CHOSE LANE 12

16  BECAUSE THAT'S THE FASTEST WAY TO GET INTO THE UNITED STATES.

17  NOT BECAUSE HE WANTS TO GET IN FAST BECAUSE HE'S SMUGGLING

18  DRUGS.  BECAUSE WE, AS PEOPLE, DON'T LIKE WAITING IN LINE,

19  ESPECIALLY NOT IN OUR CULTURE TODAY.  OUR CULTURE OF FAST FOOD

20  AND INSTANT GRATIFICATION.  WE WANT WHAT WE WANT, AND WE WANT

21  IT NOW.  WE DON'T LIKE WAITING IN LINE.  NOBODY DOES.  AND IT

22  DOESN'T MAKE SOMEBODY GUILTY THAT THEY WANT TO GET THROUGH A

23  LINE QUICKER, IT JUST DOESN'T.

24      MR. GUTIERREZ COULD HAVE BEEN CALLING MR. FLORES AND

25  TELLING HIM -- LOOK AT THE PHONE RECORDS, SEE IF -- MATCH THEM

1    UP WITH THE TECS RECORDS.

2        NOW THE GOVERNMENT SAID ALSO IN THEIR FIRST CLOSING

3    ARGUMENT THAT RUSS BUTLER TESTIFIED THAT IF IT WASN'T LIKE

4    THIS, IT WOULD GO ALL THE WAY DOWN.  BUT THAT'S NOT WHAT HE

5    TESTIFIED TO.  THAT IS ONLY PART OF IT.  HE TESTIFIED THAT

6    MAYBE THE FLOATER WOULD GO ALL THE WAY DOWN AND REGISTER EMPTY,

7    OR MAYBE THE FLOATER WOULD HIT A PACKAGE AND GET STUCK THERE.

8    SO IT'S NOT AN ABSOLUTE THAT IF THEY HADN'T HAD DONE THIS, THE

9    FLOATER WOULD HAVE GONE ALL THE WAY DOWN TO EMPTY, AND THAT

10   WOULD HAVE ALERTED THE PRIMARY INSPECTORS, AND ALL OF THOSE

11   THINGS THAT THEY WANT YOU TO BELIEVE.

12       THE FACTS OF INNOCENCE, THE REASONABLE DOUBTS, LADIES AND

13   GENTLEMEN.  THE SENDING UNIT WAS MODIFIED TO SHOW THAT

14   MR. FLORES -- TO SHOW MR. FLORES THAT THE GAS TANK WAS FULL.

15   THE SENDING UNIT WAS MODIFIED TO SHOW MR. FLORES, TO DUPE HIM.

16   GUTIERREZ, WHERE WAS HE?  IF HE HAD ANYTHING BAD TO SAY TO YOU,

17   HE WOULD HAVE SAID IT.  GUTIERREZ HAS ACCESS TO THE CAR.

18   MR. GUTIERREZ GOING BACK INTO MEXICO WHEN MR. FLORES WAS

19   ARRESTED.

20       AND THE LAST FACT OF INNOCENCE, 21 MILES PER GALLON, THAT

21   IS CITY, TIMES 7 GALLONS, EQUALS 147 MILES.  MR. FLORES LIVES

22   129 MILES AWAY.  AND GUESS WHO KNOWS WHERE HE LIVES?  KEEP IN

23   MIND ALSO, IT IS 29 MILES HIGHWAY.  GUESS WHO KNOWS WHERE HE

24   LIVES?

25       NOT GUILTY, LADIES AND GENTLEMEN.  AND THE FACT THAT HE

1  CROSSED THE BORDER WITH SOMEBODY THAT HE'S KNOWN AT THE SAME

2  TIME DOESN'T MAKE HIM GUILTY.  THE FACT THAT A GOVERNMENT

3  WITNESS GETS UP AND SAYS THAT EVERYONE IS GUILTY, DOESN'T MAKE

4  HIM GUILTY, EITHER.

5       WE TALKED ABOUT REASONABLE DOUBTS.  REASONABLE DOUBT

6  LEAVES YOU FIRMLY CONVICTED; FIRM, FIRM AS THIS TABLE, FIRM AS

7  THIS DESK.  IT DOESN'T LEAVE YOU WITH A FEELING AND ACHE IN

8  YOUR GUT.  REASONABLE DOUBT IS BASED ON REASON AND COMMON

9  SENSE, NOT BASED PURELY ON SPECULATION.  ISN'T THAT REALLY WHAT

10 THEY'RE ASKING YOU TO DO?  THEY'LL PROBABLY SAY I'M ASKING YOU

11 TO SPECULATE, BUT ISN'T THAT WHAT THEY'RE ASKING YOU TO DO,

12 SPECULATE ABOUT WHY THEY WERE CROSSING TOGETHER?  SPECULATE

13 ABOUT THIS RELATIONSHIP, SPECULATE ABOUT THIS AGREEMENT.

14      REASONABLE DOUBT CAN ARISE FROM THE EVIDENCE OR THE LACK

15 OF EVIDENCE OF PEOPLE WHO WEREN'T HERE, THE THINGS THAT YOU

16 DIDN'T SEE, THE THINGS THAT YOU DON'T KNOW, THE QUESTIONS YOU

17 HAVE THAT ALL POINT TO THIS TABLE.

18      THAT FEELING IN YOUR GUT IS YOUR DUTY TO FIND THE

19 DEFENDANT NOT GUILTY.  BECAUSE AS I TOLD YOU WHEN I STARTED, HE

20 WAS INNOCENT WHEN HE WALKED IN HERE, AND HE REMAINS INNOCENT,

21 AND HE'S INNOCENT NOW.  THE DEFENDANT IS PRESUMED TO BE

22 INNOCENT.  HE DOESN'T HAVE TO TESTIFY OR PRESENT ANY EVIDENCE

23 TO PROVE THAT.  AND THE EVIDENCE THEY'VE GIVEN YOU ISN'T

24 ENOUGH.  IT'S NOT ENOUGH.  AGENT KRAUSE'S OPINION ISN'T ENOUGH.

25 GREED, COUNSELS FOR UNKNOWING COURIERS; SHRINKAGE, COUNSELS FOR

UNKNOWING COURIERS; ECONOMICS, COUNSELS FOR UNKNOWING COURIERS.
AND HE GETS HIS INFORMATION FROM LIARS, PEOPLE WHO ARE
MOTIVATED TO LIE, BY MONEY, OR BY A HOPE, A PRAYER THAT HE
LIKES WHAT THEY SAY.  HE HAS A CORRUPT SAMPLE.

HE TOLD YOU HE DOESN'T GO TALK TO THE PEOPLE WHO ARE
ACQUITTED OF THESE TYPES OF OFFENSES.  HE TALKS TO THE PEOPLE
THAT PLEAD GUILTY, PEOPLE THAT HE KNOWS ARE INVOLVED,
INFORMANTS AND THE LIKE.  IT'S A CORRUPT SAMPLE.  IT IS AS IF
HE WENT IN TO IN-N-OUT AND ASKED, WHO IN HERE LIKES HAMBURGERS?
ALMOST EVERYBODY DOES.  BUT HE DIDN'T GO TO THE TACO BELL, OR
HE DIDN'T GO ACROSS THE STREET TO THE GREEK JOINT.  NO, HE ONLY
WENT TO THE IN-N-OUT, AND THEN HE GOT UP AND TOLD YOU THAT
EVERYBODY LIKES HAMBURGERS.  IT'S NOT THERE.

HE'S INNOCENT.  AND NO MATTER HOW THEY SPIN THE FACTS, NO
MATTER WHAT THEY WANT YOU TO BELIEVE AT ANY GIVEN POINT IN ONE
OF THEIR ARGUMENTS, IT DOESN'T MAKE SENSE.

I HAVE TO SIT DOWN, LIKE I TOLD YOU.  I DON'T GET ANOTHER
CHANCE TO GET BACK UP HERE.  BUT WHEN THE PROSECUTOR DOES MAKE
THE FINAL CLOSING ARGUMENT, I ASK YOU TO THINK ABOUT WHAT I
WOULD SAY.  BECAUSE I THINK YOU KNOW WHAT I WOULD SAY.  I WOULD
SAY, DON'T LET THEM BUILD THAT WALL.  I WOULD SAY, I HAVE A
FEELING IN MY GUT.  AND I WOULD SAY, THAT THAT MAN THAT SITS
THERE IS NOT GUILTY OF THESE CRIMES.  THANK YOU.

THE COURT:  ALL RIGHT, REBUTTAL.

GOVERNMENT'S REBUTTAL ARGUMENT

1           MR. CONOVER:  LADIES AND GENTLEMEN, THE THEORY OF THE

2     GOVERNMENT'S CASE IS CLEAR.  WE'VE BEEN VERY CLEAR WITH YOU

3     FROM THE BEGINNING, WHAT THE THEORY OF THIS CASE IS.  IT IS,

4     THE DEFENDANT IS A DRUG SMUGGLER.  THE DEFENDANT KNOWINGLY

5     BROUGHT METHAMPHETAMINE INTO THIS COUNTRY.  AND HE CONSPIRED

6     WITH HIS PARTNER, DAVID GUTIERREZ, TO BRING THOSE DRUGS INTO

7     THIS COUNTRY.  THAT'S IT.  IT'S VERY CLEAR.

8           AND THE JUDGE WILL TELL YOU THAT YOU ARE TO CONSIDER

9     CIRCUMSTANTIAL AND DIRECT EVIDENCE BOTH.  AND ALL OF THOSE

10    PIECES OF EVIDENCE, LADIES AND GENTLEMEN, LEAD YOU TO ONE

11    CONCLUSION; THEY LEAD YOU TO THE CONCLUSION THAT THEY KNEW THE

12    DRUGS WERE THERE.

13          NOW LET'S TALK ABOUT WHAT DEFENSE'S CASE IS AND WHAT THEY

14    TOLD YOU HERE.  WITH REGARDS TO THE FLOAT, WE KNOW WHERE IT WAS

15    FOUND, BY BUTLER.  RUSS BUTLER FOUND IT UNDERNEATH THE DRIVER'S

16    SEAT.  BUT DOES IT MATTER WHETHER IT WAS THE DRIVER'S SEAT OR

17    BACK PASSENGER CABIN?  NOT REALLY.  WHAT MATTERS IS, IT WASN'T

18    IN THE GAS TANK.  SMOKE AND MIRRORS, LADIES AND GENTLEMEN.  IT

19    DOESN'T REALLY MATTER WHERE THAT FLOAT WAS FOUND.  THEY WANT TO

20    DISTRACT YOU.  IT DOESN'T MATTER.  IF IT WAS FOUND UNDERNEATH

21    THE SEAT, IF THAT IS WHERE IT WAS, IT WOULD HAVE BEEN RATTLING

22    AROUND.  AND IT WOULD HAVE BEEN MORE LIKELY THAT YOU WOULD FIND

23    IT, EVEN IF IT DIDN'T SMELL.  THE BACK PASSENGER CABIN, ANY

24    PLACE OTHER THAN THAT GAS TANK, IT'S GOING TO SMELL.

25          LET'S TALK ABOUT THE SMELL HERE.  YOU CAN ONLY HAVE IT ONE

WAY.  IF IT WAS JUST MODIFIED, THE DAY BEFORE OR WHEN HE WAS

DOWN IN MEXICO, THEY SNUCK IN THERE AND MODIFIED IT, WELL, THEN

THAT WOULD SMELL REALLY BAD BECAUSE IT JUST CAME OUT OF THE GAS

TANK.

AND IF IT DIDN'T SMELL, THAT MEANS THAT IT HAD BEEN

MODIFIED A WHILE AGO BECAUSE IT'S COARSE MATERIAL; THE SMELL

HAD DISSIPATED, WHICH MEANS HE HAS BEEN DRIVING AROUND ON A GAS

TANK THAT DOESN'T SHOW AND REGISTER PROPERLY.  SO ONE WAY, IF

IT SMELLED, WELL, HE WOULD HAVE NOTICED THE SMELL BECAUSE IT

JUST CAME OUT OF THE GAS TANK, IF THEY HAD PUT IT INTO HIS GAS

TANK THAT DAY.

THE OTHER WAY IS, HE'S BEEN DRIVING AROUND IN A VEHICLE

THAT DOESN'T TELL YOU WHEN IT'S GOING TO RUN OUT OF GAS.  SO

LADIES AND GENTLEMEN, WHETHER OR NOT THE FLOAT SMELLED OF GAS

AT THAT TIME OR IT DIDN'T, OR WHETHER IT WAS UNDER A SEAT IN

THE BACK, IT DOESN'T MATTER.  WHAT MATTERS IS THAT FLOAT WASN'T

IN ITS PROPER LOCATION.  AND THAT AT ONE POINT WHEN IT DID COME

OUT, IT WOULD HAVE SMELLED OF GAS.

AND LET'S TALK ABOUT THE SENDING UNIT.  DOES IT MATTER

WHETHER IT IS THREE-QUARTERS OR FULL?  IT DOESN'T MATTER,

LADIES AND GENTLEMEN.  WHAT MATTERS IS, IT DOESN'T SHOW WHEN IT

IS EMPTY.  WHAT MATTERS IS, THE INDIVIDUAL, WHO HAPPENS TO BE

THE DEFENDANT, IS DRIVING THIS VEHICLE AROUND.  WHAT MATTERS

IS, THAT HE'S GOING TO RUN OUT OF GAS IF HE DOESN'T KNOW THIS

IS RIGGED.  WHY DOES IT MATTER IF IT IS THREE-QUARTERS FULL OR

1   FULL?  I DON'T KNOW.  I'M SURE THIS HAS BEEN BOUNCED AROUND A

2   LOT.  THAT'S NOT WHAT MATTERS.  ALL THAT MATTERS IS THAT IT'S

3   RIGGED SO THAT THE DRIVER DOESN'T KNOW WHEN HE IS GOING TO RUN

4   OUT OF GAS.  THAT IS THE ARGUMENT.

5       BUT THAT DOESN'T WORK, LADIES AND GENTLEMEN.  PEOPLE

6   PROTECT THEIR INVESTMENTS.  DRUG SMUGGLERS PROTECT THEIR

7   INVESTMENTS.  YOU SAW A COMPUTATION HERE THAT LOOKS LIKE WITH 7

8   GALLONS OF GAS, AT 21 MILES PER GALLON, HE MIGHT HAVE JUST BEEN

9   ABLE TO COAST INTO HIS HOUSE IN MONTEBELLO ON FUMES.  HE MIGHT

10  HAVE BEEN ABLE TO MAKE IT.

11      LADIES AND GENTLEMEN, THAT DOESN'T MATTER, EITHER; THE

12  FACT THAT HE MIGHT HAVE BEEN ABLE TO MAKE IT IF TRAFFIC WAS

13  GOOD?  IS A DRUG SMUGGLING ORGANIZATION GOING TO PROTECT THEIR

14  INVESTMENT BY MAKING SURE THAT THE PERSON DRIVING THAT CAR

15  KNOWS IT'S THERE AND KNOWS TO GO GET GAS BEFORE HE TAKES IT TO

16  THE STASH HOUSE?  HE WASN'T TAKING IT BACK TO HIS HOME IN

17  MONTEBELLO, LADIES AND GENTLEMEN.  BUT THE FACT THAT --

18          MR. GARRISON:  OBJECTION.  VOUCHING.

19          THE COURT:  OVERRULED.

20          MR. CONOVER:  BUT THE FACT THAT HE LIVES IN

21  MONTEBELLO TELLS US THAT HE HAD TO HAVE KNOWN.  THE DRUG

22  SMUGGLING ORGANIZATION ISN'T GO TO SAY, ALL RIGHT, IT LOOKS

23  LIKE THE CALCULATIONS HERE ARE 7 GALLONS, HE COULD PROBABLY

24  MAKE IT BACK.  SO LET'S THINK, LET'S PUT 7 GALLONS IN THERE,

25  RIG IT SO HE DOESN'T KNOW, AND HOPE HE MAKES IT.  BUT IF HE

1   RUNS OUT OF GAS, LET'S SEE, THE CHP IS GOING TO COME, OR AAA IS

2   GOING TO COME, AND THEY'RE GOING TO SEE THE GAS GAUGE DOESN'T

3   WORK, THEY'RE GOING TO TRY TO FIGURE IT OUT.

4       LET'S SAY HE DECIDES NOT TO GO HOME TO MONTEBELLO.  LET'S

5   SAY, HE'S LIKE ME, HE'S A LITTLE BIT OF A JUNK FOOD KIND OF

6   GUY, AND HE DECIDES TO STOP AT 7-ELEVEN, OR HE DECIDES, YOU

7   KNOW WHAT, IT'S A BEAUTIFUL DAY HERE, IT'S SATURDAY AFTER

8   THANKSGIVING, NOVEMBER 28TH, YOU KNOW WHAT, I DON'T WANT TO

9   HEAD ALL THE WAY BACK.  TRAFFIC IS GOING TO BE BAD TODAY WITH

10  EVERYBODY ELSE HEADING BACK.  I THINK I'M GOING TO STAY IN

11  MEXICO, OR I'M GOING TO GO TO THE BEACH IN SAN DIEGO, SPEND THE

12  DAY IN SAN DIEGO.

13      THEY DON'T KNOW, LADIES AND GENTLEMEN, WHAT HE'S GOING TO

14  DO WITH THAT CAR.  MR. GUTIERREZ DID KNOW WHERE THE DEFENDANT

15  WAS GOING TO TAKE THAT CAR BECAUSE HE HAD AGREED WITH THE

16  DEFENDANT.  NOW WE DON'T HAVE TO SHOW TO YOU, LADIES AND

17  GENTLEMEN, A TAPE-RECORDED CONVERSATION OF THEM SAYING, OKAY,

18  NOW, YOU KNOW HOW THE DRUGS ARE IN YOUR TANK, RIGHT, OKAY YOU

19  HAVE TO GO GET SOME GAS.

20      THE CIRCUMSTANTIAL EVIDENCE SUPPORTS THE CONCLUSION THAT

21  THEY HAD CRIMINAL AGREEMENTS.  THERE ARE CALLS BETWEEN THEM;

22  THEY'RE CAUGHT.  AND WHAT IS MORE, LADIES AND GENTLEMEN, WHAT

23  IS VERY INTERESTING IS WHAT HAPPENS ON THE DAY OF THE ARREST.

24  WHAT DOES MR. GUTIERREZ DO?  EXACTLY WHAT HE'S SUPPOSED TO DO.

25  HE GETS IN THERE, HE SEES THE LOAD VEHICLE DIDN'T MAKE IT

THROUGH.  WHAT DOES HE DO?  HE TURNS AROUND AND HEADS BACK TO

MEXICO.  WHERE DOES HE GO?  IT LOOKS LIKE HE CAME BACK THROUGH

OVER TIJUANA, AT THE SAN YSIDRO PORT OF ENTRY.  WHAT IS HIS

JOB?  REMEMBER, HIS JOB IS TO BE THE SECONDARY EYES ON THE

VEHICLE.  HE HAD A TOUGH DAY THAT DAY.  HE HAS TO GO BACK AND

TELL THEM, WE LOST THE LOAD.  AND THAT'S THE COST OF DOING

BUSINESS; THEY LOSE LOADS.  THIS IS A BIG LOAD, AND THEY LOST

IT.

     HE HAS TO GO BACK AND TELL THE ORGANIZATION, WE LOST THE

LOAD.  BUT YOU'RE INSULATED, AND I'M INSULATED BECAUSE WE'RE

NOT IN THAT CAR, AND MY PHONE, THE DRUG PHONE, IS NOT IN THAT

CAR EITHER.  ALL WE HAVE IS MR. FLORES -- MR. FLORES'S PERSONAL

PHONE.  SO THEIR PLAN, AND IT'S ONLY A PLAN B, OF COURSE.  PLAN

A IS TO GET THROUGH WITH THE DRUGS.  PLAN B IS, WHEN YOU DON'T

GET THROUGH, TO MAKE SURE THAT THE AUTHORITIES AREN'T AT YOUR

DOOR.

     LET'S TALK ABOUT HYPOTHETICALLY, LADIES AND GENTLEMEN, IF

YOU WERE GOING TO SET SOMEBODY UP.  IF YOU WERE GOING TO STUFF

$1 MILLION WORTH OF DRUGS IN HIS CAR AND NOT TELL HIM ABOUT IT,

WHO WOULD YOU CHOOSE?  WOULD YOU CHOOSE SOMEBODY WHO YOU KNOW

CAN LEAD DIRECTLY TO YOUR DOORSTEP, WHO YOU KNOW THAT AS SOON

AS HE GETS OVER, HE CAN TELL THE AUTHORITIES?  HE CAN TELL THE

AUTHORITIES RIGHT AWAY, I MUST HAVE BEEN SET UP BY

MR. GUTIERREZ, I KNOW WHERE HE LIVES, WE CAN GO TO HIS HOUSE.

YOU WOULDN'T SET UP SOMEBODY WHO CAN LEAD THEM DIRECTLY TO YOU.

1    AND MR. GUTIERREZ KNEW THAT.  HE KNEW BECAUSE HE CAME BACK INTO

2    THE UNITED STATES, BACK THROUGH THAT PORT OF ENTRY.  HE KNEW

3    THAT IF HE HAD BEEN TOLD ON, THAT IF HE HAD -- IF MR. FLORES

4    REALLY HAD NOT KNOWN, MR. FLORES WOULD HAVE SAID SOMETHING

5    ALONG THE LINES OF, WELL, IF I'M SET UP, I CAN TAKE YOU

6    STRAIGHT TO HIS HOUSE.  BUT HE KNEW THAT.  HE KNEW THAT HE HAD

7    NOT BEEN INFORMED UPON AND CAME BACK INTO THE UNITED STATES,

8    BACK THROUGH CUSTOMS AND BORDER PROTECTION, BACK THROUGH THE

9    TECS CROSSING SYSTEM, THAT HE KNEW HE WOULD HAVE HAD A LOOK OUT

10   ON HIM FOR -- IF IT WOULD HAVE BEEN AN UNKNOWING COURIER,

11   SOMEONE THAT WOULD HAVE BEEN CUT OFF AND SURPRISED AND TOLD THE

12   AUTHORITIES, I DON'T KNOW WHAT IS GOING ON HERE, IT MUST HAVE

13   BEEN MR. GUTIERREZ.

14        MR. GUTIERREZ KNEW THAT IS NOT WHAT HAPPENED.  HE CAME

15   BACK INTO THE UNITED STATES, KNOWING FULL WELL HE WOULDN'T BE

16   FOUND OUT.  AND THE ONLY TIME THAT HE WAS FOUND OUT WAS AFTER

17   RUNNING A QUERY WITH MILLIONS OF RECORDS TO FIND THE SCOUTING

18   PATTERN, LADIES AND GENTLEMEN.

19        SO THEIR PLAN, WHICH IS PLAN B, AFTER YOU'RE CAUGHT,

20   WORKED.  HE WAS INSULATED; THE ORGANIZATION WAS INSULATED.  BUT

21   MR. FLORES IS NOT INSULATED FROM THESE COSTS, LADIES AND

22   GENTLEMEN.  HE IS GUILTY, AND ALL OF THE EVIDENCE POINTS TO HIS

23   GUILT.

24        LET'S TALK ABOUT THE DEFENSE CASE.  THEY'RE NOT UNDER ANY

25   OBLIGATION TO PUT ON A CASE.  WE'RE REQUIRED TO PROVE BEYOND A

1   REASONABLE DOUBT IN THIS CASE, AND WE HAVE MET THAT BURDEN TO

2   YOU.

3       BUT WHAT DID THEY DECIDE TO PUT ON?  WHO DID YOU SEE?  YOU

4   SAW AN EX-GIRLFRIEND OF THE SON, WHO IS GOING TO TALK ABOUT THE

5   FACT THAT AGENTS CAME TO HER HOUSE, AND WHETHER THERE WAS A

6   SEARCH OR NOT A SEARCH.  I THINK THAT WAS THE ESSENCE OF HER

7   TESTIMONY.  IRRELEVANT TO WHETHER OR NOT MR. GUTIERREZ AND

8   MR. FLORES WERE IN A CONSPIRACY TOGETHER, AND WHETHER

9   MR. FLORES KNEW DRUGS WERE IN THAT CAR.  IT DOESN'T MATTER.  IT

10  DOESN'T MAKE THE GOVERNMENT LOOK BAD.  WE DIDN'T EVEN BOTHER TO

11  CROSS-EXAMINE HER.  IT DOESN'T MATTER IF SHE SAID THERE WAS A

12  SEARCH, IF SHE THOUGHT IT WAS A SEARCH.  IT DOESN'T MATTER,

13  LADIES AND GENTLEMEN.  IT IS SMOKE AND MIRRORS TO DISTRACT YOU

14  FROM THE FACTS OF THIS CASE.

15      WHAT WAS THE OTHER PIECE OF EVIDENCE THEY PUT ON?  THEY

16  PUT ON MR. LEANO, THEIR INVESTIGATOR, WHO I WILL REFRAIN FROM

17  CALLING HIM A "MECHANIC" BECAUSE HE'S NOT.  THEY PUT ON THEIR

18  INVESTIGATOR TO SAY WHAT?  WHAT DID HE SAY?  THE SAME THING

19  MR. BUTLER SAID, AND TO SHOW YOU A SILLY VIDEO; OKAY, TWIST THE

20  CAP, THERE IS NO SCREWS IN PLACE, THE SENDING UNIT IS NOT IN

21  PLACE, BUT LOOK HOW QUICK YOU CAN GET TO THOSE DRUGS.

22      LADIES AND GENTLEMEN, YOU HEARD TESTIMONY FROM THE REAL

23  MECHANIC EXPERT, AND YOU HEARD THE LABOR GUIDE, 1.4 HOURS TO

24  REPLACE THE SENDING UNIT PROPERLY.  WHETHER THEY CAN DO IT

25  FASTER OR SLOWER, THESE GUYS ARE PROBABLY PRETTY FAST BECAUSE

1      THEY HAVE A LOT OF PRACTICE MOVING THAT SENDING UNIT.  THEY'VE

2      TAKEN THE FLOAT OUT SO IT POPS RIGHT IN AND OUT.

3          AND MR. FLORES IS PROBABLY PRETTY USED TO THIS.  AND HE'S

4      PROBABLY PRETTY USED TO A VEHICLE HAVING THE SMELL OF GAS, AND

5      HE KNOWS EXACTLY WHY.

6          AND LASTLY, THEY PUT ON THE DEFENDANT'S SON.  THE

7      DEFENDANT'S SON TO DO WHAT?  TO SAY HE BORROWED THE CAR, AND

8      THAT THE DEFENDANT AND MR. GUTIERREZ WERE FRIENDS.  DOES THAT

9      GO TO WHETHER OR NOT, ON THE DAY OF HIS ARREST, HE KNEW THERE

10     WERE DRUGS IN HIS CAR?  I SUBMIT TO YOU IT HAS NO RELEVANCE,

11     WHATSOEVER, NONE.  THE FACT THAT THE DEFENDANT'S DEFENSE IS

12     THAT HE AND MR. GUTIERREZ HAVE BEEN FRIENDS FOR YEARS?  WHAT IS

13     HE TELLING YOU?  I GO TO MEXICO ON A REGULAR BASIS WITH A

14     FRIEND OF MINE WHO IS A DRUG SMUGGLER.

15              MR. GARRISON:  OBJECTION.  FACTS NOT IN EVIDENCE.

16              THE COURT:  OVERRULED.

17              MR. CONOVER:  I GO TO MEXICO WITH A FRIEND OF MINE

18     WHO IS A DRUG SMUGGLER.  THAT'S THEIR DEFENSE, LADIES AND

19     GENTLEMEN, ADMITTING THAT THEY TRAVEL REGULARLY DOWN TO MEXICO

20     WITH A DRUG SMUGGLER.  I SUBMIT TO YOU THAT YOU BELIEVE PART OF

21     WHAT --

22              THE COURT:  WAIT A MINUTE, THAT FACT IS NOT IN

23     EVIDENCE.  IN FACT, I THINK YOU HAD OBJECTED TO WHAT

24     MR. GARRISON OBJECTED TO.  THERE IS NO EVIDENCE THAT THEY WENT

25     DOWN TO MEXICO TOGETHER.

1          MR. CONOVER:  THANK YOU, YOUR HONOR.

2      I TRAVELED BACK FROM MEXICO ON 16 OCCASIONS IN TANDEM WITH

3  MR. GUTIERREZ.  I CROSSED THE PORT OF ENTRY WITH MR. GUTIERREZ,

4  IN FACT, WITH MR. GUTIERREZ ON A REGULAR BASIS.

5      AT THE END OF THE DAY, LADIES AND GENTLEMEN, THE DEFENSE

6  WANTS YOU TO SPECULATE ABOUT SOME POSSIBLE EXPLANATION OF HOW

7  THIS COULD HAVE HAPPENED, HOW MR. GUTIERREZ COULD HAVE ACCESSED

8  THIS AND PUT DRUGS IN.  BUT DID HE GIVE YOU ANY EXPLANATION

9  WHAT THEY WERE GOING TO DO ONCE THEY CAME ACROSS THE PORT OF

10  ENTRY?

11          MR. GARRISON:  OBJECTION.  BURDEN SHIFTING.

12          THE COURT:  NO.  OVERRULED.

13          MR. CONOVER:  THE BURDEN IS ALWAYS WITH THE

14  GOVERNMENT.  BUT WHEN THEY PUT ON A DEFENSE, WHAT HAPPENS AFTER

15  THEY COME ACROSS THE PORT OF ENTRY?  WHAT HAPPENS, LADIES AND

16  GENTLEMEN, HOW DO THEY GET THOSE DRUGS OUT OF MR. FLORES'S

17  VEHICLE?  HE GOES TO HIS HOUSE, AND HE PUTS THEM IN HIS GARAGE,

18  AND MR. GUTIERREZ SOMEHOW GETS INSIDE THE GARAGE?  AND LADIES

19  AND GENTLEMEN, DRUG SMUGGLING ORGANIZATIONS DON'T TAKE THOSE

20  KIND OF WHAT-IFS.  IT'S A LOT OF DRUGS; PEOPLE ARE WAITING FOR

21  THOSE DRUGS.

22      AT THE END OF THE DAY, WE DON'T WANT YOU TO SPECULATE.  WE

23  DON'T WANT YOU TO BASE YOUR DECISION ON SYMPATHY.  YOU SAW A

24  LOT OF ATTEMPTS HERE TO PUT UP THINGS ABOUT BEING A FATHER,

25  THINGS ALONG THOSE LINES.  LADIES AND GENTLEMEN, YOU'RE NOT

1    ALLOWED TO CONSIDER THOSE.  YOUR REASONABLE DOUBT, ANY DOUBT,

2    IS NOT ALLOWED TO BE BASED ON SPECULATION.  IT MUST BE BASED ON

3    REASON AND EVIDENCE IN THIS CASE, LADIES AND GENTLEMEN, AND

4    POINTS IN ONE AND ONLY ONE DIRECTION.

5        ONE THING I DO AGREE WITH DEFENSE ON IS, YOU SHOULD FOLLOW

6    YOUR GUT.  AND WHAT DOES YOUR GUT AND YOUR COMMON SENSE TELL

7    YOU IN THIS CASE, LADIES AND GENTLEMEN?  IS IT REASONABLE TO

8    BELIEVE AFTER ALL THESE PIECES OF EVIDENCE, AFTER ALL THE

9    CORRELATION, THE DEFENDANT DID NOT KNOW THE DRUGS WERE IN HIS

10   CAR?  THAT IS PREPOSTEROUS.  YOUR COMMON SENSE TELLS YOU HE

11   KNEW.  THE EVIDENCE TELLS YOU HE KNEW.  AND AT THE END OF THE

12   DAY, LADIES AND GENTLEMEN, I'D ASK YOU TO GO BACK AND RETURN

13   THE ONLY JUST VERDICT IN THIS CASE, AND THAT'S GUILTY ON ALL

14   COUNTS.  THANK YOU.

15                    FINAL JURY INSTRUCTIONS

16        THE COURT:  NOW, LADIES AND GENTLEMEN, WHEN YOU BEGIN

17   YOUR DELIBERATIONS, YOU SHOULD ELECT ONE MEMBER OF THE JURY AS

18   YOUR FOREPERSON.  THAT PERSON WILL PRESIDE OVER THE

19   DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

20        YOU'LL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

21   REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER GUILTY

22   OR NOT GUILTY, MUST BE UNANIMOUS.  EACH OF YOU MUST DECIDE THE

23   CASE FOR YOURSELVES, BUT YOU SHOULD DO SO ONLY AFTER YOU HAVE

24   CONSIDERED ALL THE EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER

25   JURORS, AND LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.  DO

1    NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION

2    PERSUADES YOU THAT YOU SHOULD, BUT DO NOT COME TO A DECISION

3    SIMPLY BECAUSE OTHER JURORS THINK IT'S RIGHT.

4        IT'S IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

5    VERDICT, BUT ONLY IF EACH OF YOU CAN DO SO AFTER HAVING MADE

6    YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN HONEST

7    BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE SIMPLY TO

8    REACH A VERDICT.

9        NOW BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE

10   EVIDENCE RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I

11   REMIND YOU THAT YOU MUST NOT BE EXPOSED TO ANY OTHER

12   INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES.

13       EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS,

14   DURING YOUR DELIBERATIONS, DO NOT COMMUNICATE WITH ANYONE IN

15   ANY WAY AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY

16   WAY ABOUT THE MERITS OF THE CASE OR ANYTHING TO DO WITH IT;

17   THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING, BY

18   PHONE, ELECTRONIC MEANS, VIA E-MAIL, TEXT MESSAGING, OR ANY

19   INTERNET CHAT ROOM, BLOG, WEBSITE, OR OTHER FEATURE.  THIS

20   APPLIES TO COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR

21   EMPLOYER, THE MEDIA, OR THE PRESS, AND THE PEOPLE INVOLVED IN

22   THE TRIAL.

23       IF YOU'RE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

24   SERVICE, OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU

25   HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

1  CONTACT TO THE COURT.  DO NOT READ, WATCH, OR LISTEN TO ANY

2  NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING

3  TO DO WITH IT.  DO NOT DO ANY RESEARCH, SUCH AS CONSULTING

4  DICTIONARIES, SEARCHING THE INTERNET, OR USING OTHER REFERENCE

5  MATERIALS.  AND DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER

6  WAY TRY TO LEARN ABOUT THE CASE ON YOUR OWN, LADIES AND

7  GENTLEMEN; THAT WOULD INCLUDE, FOR EXAMPLE, TAKING THAT PHONE

8  INTO THE JURY DELIBERATION AND TURNING THE PHONE ON AND TRYING

9  TO LOOK THROUGH THE PHONE BECAUSE THAT WOULD INCLUDE EVIDENCE

10 THAT HAS NOT BEEN PRESENTED TO YOU UNDER OATH.  SO DON'T DO

11 THAT.

12      NOW THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THAT THE

13 PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH

14 PARTY HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES

15 THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE

16 PROCEEDINGS AND A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE

17 ENTIRE TRIAL PROCESS TO START OVER.

18      IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

19 NOTIFY THE COURT IMMEDIATELY.

20      NOW SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.

21 WHETHER OR NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN

22 MEMORY OF WHAT WAS SAID.  YOUR NOTES ARE ONLY TO ASSIST YOU IN

23 YOUR MEMORY.  YOU SHOULD NOT BE OVERLY INFLUENCED BY THE NOTES.

24 AND THE PUNISHMENT PROVIDED BY LAW FOR THIS CRIME IS FOR THE

25 COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING

1    WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST THE

2    DEFENDANT BEYOND A REASONABLE DOUBT.

3        NOW A VERDICT FORM HAS BEEN PREPARED FOR YOU.  I'M GOING

4    TO HOLD IT UP AND SHOW THIS TO YOU.  IT'S REALLY PRETTY

5    SELF-EXPLANATORY, BUT I'LL GO OVER IT WITH YOU VERY QUICKLY.

6    YOU'LL SEE THAT IT SAYS, WE THE JURY IN THE ABOVE-ENTITLED

7    CAUSE, FIND THE DEFENDANT, GILBERT FLORES, YOU'LL SEE THERE IS

8    A BLANK LINE THAT SAYS "NOT GUILTY" OR "GUILTY" OF CONSPIRACY

9    TO IMPORT METHAMPHETAMINE, IN VIOLATION OF TITLE 21, U.S.C.,

10   952, 960, AND 963.

11       NOW, IF ALL TWELVE OF YOU AGREE -- AND BY THE WAY, I HAVE

12   TO DISCUSS THIS IN SOME ORDER, SO PLEASE DO NOT TAKE ANY KIND

13   OF MESSAGE FROM THE WAY I'M ADDRESSING THIS.  SO JUST BECAUSE I

14   ADDRESS ONE FIRST AND THE OTHER SECOND, DOESN'T MEAN I'M

15   SOMEHOW SENDING YOU A MESSAGE THAT THIS SHOULD BE YOUR VERDICT,

16   OKAY.

17       SO IF ALL 12 OF YOU AGREE THAT THE DEFENDANT IS NOT

18   GUILTY, THEN YOU SHOULD WRITE THE WORDS "NOT GUILTY" ON THAT

19   BLANK.  ON THE OTHER HAND, IF ALL TWELVE OF YOU AGREE THAT HE'S

20   GUILTY, YOU SHOULD WRITE THE WORD "GUILTY" ABOVE THE BLANK.

21       NOW ONLY IF ALL TWELVE OF YOU AGREE THAT HE'S GUILTY, YOU

22   SHOULD THEN GO ON TO THIS NEXT LINE THAT SAYS, WE FURTHER FIND

23   THAT THE AMOUNT OF ACTUAL METHAMPHETAMINE INVOLVED IN THE

24   OFFENSE WAS 50 GRAMS OR MORE.  IF YOU AGREE, ALL TWELVE OF YOU

25   AGREE, THEN YOU SHOULD CHECK THE BOX "YES."  IF YOU DON'T

1    AGREE, YOU SHOULD CHECK THE BOX "NO."  IF ALL TWELVE OF YOU DO

2    NOT BELIEVE THAT THE AMOUNT OF METHAMPHETAMINE WAS LESS THAN 50

3    GRAMS, YOU SHOULD CHECK "NO."

4         OKAY, WITH REGARD TO THE SECOND PAGE, THE SECOND PAGE

5    TALKS ABOUT COUNT 2.  AGAIN, YOU'LL LOOK AT IT, AND IT WILL

6    SAY, WE THE JURY IN THE ABOVE-ENTITLED CAUSE FIND THE DEFENDANT

7    GILBERT FLORES NOT GUILTY OR GUILTY OF IMPORTATION OF

8    METHAMPHETAMINE.  AGAIN, IF YOU FIND HIM GUILTY OF THAT COUNT,

9    YOU SHOULD GO ON TO THE NEXT LINE.  IT SAYS, WE FURTHER FIND

10   THAT THE ACTUAL AMOUNT OF METHAMPHETAMINE IN THE OFFENSE

11   WEIGHED 50 GRAMS OR MORE.  DO YOU AGREE, CHECK YES.  IF YOU

12   DISAGREE, CHECK NO.  YOU'LL SEE IT IS THE SAME FOR COUNT 3 AND

13   COUNT 4.

14        WHEN YOU'VE REACHED A VERDICT ON ALL FOUR, HAVE YOUR

15   FOREPERSON ANSWER THE QUESTIONS, IF NECESSARY, HAVE YOUR

16   FOREPERSON SIGN WHERE IT SAYS, FOREPERSON OF THE JURY, DATE IT,

17   SIGN IT, PUT IT INTO THE ENVELOPE WE'LL GIVE YOU, AND NOTIFY US

18   AND LET US KNOW YOU HAVE REACHED A VERDICT, OKAY.  AFTER YOU'VE

19   REACHED A UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON

20   WILL FILL IN THE FORM THAT'S BEEN GIVEN TO YOU, SIGN AND DATE

21   IT, AND ADVISE THE BAILIFF THAT YOU'RE READY TO RETURN TO THE

22   COURTROOM.

23        AS I SAID, IF YOU FIND THE DEFENDANT GUILTY OF ONE OR MORE

24   OF THE CHARGES IN COUNT 2, OR -- IN ANY OF THE COUNTS, YOU'RE

25   THEN TO DETERMINE WHETHER OR NOT THE GOVERNMENT PROVED BEYOND A

1    REASONABLE DOUBT THAT THE AMOUNT OF METHAMPHETAMINE EQUALED OR

2    EXCEEDED -- NEVER MIND, STRIKE THAT INSTRUCTION.  JUST DO AS I

3    SUGGESTED.  GO THROUGH IT, FIND OUT WHETHER OR NOT IT INVOLVED

4    50 GRAMS OR MORE, AND THEN CHECK THE APPROPRIATE BOX.

5         NOW IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

6    COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE BAILIFF,

7    SIGNED BY YOUR FOREPERSON, OR BY ONE OR MORE MEMBERS OF THE

8    JURY.  NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE

9    WITH ME EXCEPT BY SIGNED WRITING.  I'LL RESPOND TO THE JURY

10   CONCERNING THE CASE ONLY IN WRITING OR HERE IN OPEN COURT.

11        IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

12   LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

13   CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

14   QUESTION.  REMEMBER THAT YOU'RE NOT TO TELL ANYONE, INCLUDING

15   ME, HOW THE JURY STANDS NUMERICALLY OR OTHERWISE ON THE

16   QUESTION OF THE GUILT OF THE DEFENDANT UNTIL AFTER YOU'VE

17   REACHED A UNANIMOUS VERDICT OR HAVE BEEN DISCHARGED.

18        BEFORE I SEND YOU IN, I'M GOING TO TALK TO THE LAWYERS FOR

19   JUST A SECOND AT SIDE BAR.

20        COUNSEL, WOULD YOU PLEASE COME UP TO SIDE BAR FOR A

21   MINUTE.

22             (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY.)

23             THE COURT:  ALL RIGHT, COUNSEL, I GAVE YOU THE

24   VERDICT FORM FOR REVIEW.  AND I'M LOOKING AT JURY INSTRUCTION

25   NO. 42, AND THAT JURY INSTRUCTION IS TALKING ABOUT 500 GRAMS AS

1    OPPOSED TO 50 GRAMS.  IS THERE SOMETHING THAT I'M MISSING?

2            MR. GARRISON:  500 GRAMS IS THE AMOUNT FOR METH MIX,

3    AND 50 GRAMS FOR METH PURE.

4            THE COURT:  BUT HERE WE HAVE ACTUAL METHAMPHETAMINE,

5    RIGHT?

6            MR. CONOVER:  WE DO HAVE ACTUAL METHAMPHETAMINE, YOUR

7    HONOR.

8            THE COURT:  AND I BELIEVE IT IS 95 PERCENT PURE, AS I

9    RECALL.

10           MR. CONOVER:  YES.  TO BE SAFE, YOUR HONOR, WE WOULD

11   ASK THE JURY TO FIND THE 500 GRAMS, RATHER THAN THE 50.

12           THE COURT:  OKAY.  ALL RIGHT.

13           MR. GARRISON:  YOUR HONOR, ONE OTHER THING I WANTED

14   TO BRING UP ABOUT THE VERDICT FORM, I ADMIT IT SAYS "GUILTY,"

15   "NOT GUILTY," AND THEN IT JUST HAS A QUESTION, WAS IT OVER A

16   CERTAIN AMOUNT.

17           THE COURT:  YES.

18           MR. GARRISON:  NORMALLY WHAT I'VE DONE IN THE PAST IS

19   PUT, IF YOU ANSWER GUILTY, THEN PLEASE MOVE ON TO THIS PART.

20           THE COURT:  I'VE JUST EXPLAINED THAT TO THEM.

21           MR. GARRISON:  I KNOW YOU DID, YOUR HONOR.  I JUST

22   THINK WE RAISE IMPOSSIBLE INCONSISTENT VERDICTS, AND THAT'S

23   JUST -- THAT IT WOULD BE LOGICAL FOR THEM TO SAY, JUDGE, HE'S

24   NOT GUILTY, BUT THEN COME BACK WITH AN AMOUNT, YOUR HONOR, YOU

25   KNOW.

1          THE COURT:  THEY CAN ACTUALLY FIND -- THEY CAN FIND

2    MORE THAN 500 GRAMS, BUT FIND THAT THE DEFENDANT IS NOT GUILTY.

3          MR. GARRISON:  I GUESS YOU'RE RIGHT, TOO.

4          THE COURT:  THEY CAN BELIEVE MR. GUTIERREZ WAS THE

5    PERSON.

6          MR. GARRISON:  THAT'S WHY YOU'RE THE JUDGE.

7          MR. CONOVER:  THANK YOU, YOUR HONOR.

8          THE COURT:  THANK YOU.

9       (SIDE BAR DISCUSSION OUTSIDE PRESENCE OF JURY CONCLUDED.)

10         THE COURT:  LADIES AND GENTLEMEN, AS I TOLD YOU AT

11   THE VERY BEGINNING OF THE TRIAL, WE DON'T HAVE A DRESS

12   REHEARSAL, AND WE DON'T HAVE A SCRIPT TO GO BY.  SO I'M GOING

13   TO CORRECT SOMETHING I SAID TO YOU EARLIER.  IN THE VERDICT

14   FORM, WHAT I AM GOING TO ASK YOU TO DO IS AS FOLLOWS:  AGAIN,

15   LOOKING AT COUNT 1, ASSUMING THAT ALL TWELVE OF YOU WERE TO

16   FIND THAT MR. FLORES WAS GUILTY OF CONSPIRACY TO IMPORT

17   METHAMPHETAMINE COUNT, YOU WOULD THEN GO DOWN, AND ONLY IF YOU

18   FOUND HIM TO BE GUILTY OF THE CONSPIRACY COUNT, YOU WOULD GO

19   DOWN HERE AND YOU'D SAY, WE FURTHER FIND THAT THE AMOUNT OF

20   METHAMPHETAMINE INVOLVED IN THE OFFENSE WEIGHED 500 GRAMS OR

21   MORE.  AND I APOLOGIZE FOR THAT.  BUT THE VERDICT FORM YOU WILL

22   GET, THAT WILL GO IN THERE WITH YOU, WILL ACTUALLY HAVE THE

23   RIGHT AMOUNT IN THERE.  SO PLEASE FORGIVE ME FOR HAVING MADE

24   THAT ERROR.

25         A COUPLE THINGS I WANT TO TALK TO YOU ABOUT, IF YOU HAVE

1    ANY QUESTIONS, OR IF YOU WANT TO TAKE A BREAK, OR IF YOU REACH

2    A VERDICT, THE WAY YOU'RE GOING TO NOTIFY US OF THAT, IS THERE

3    IS A BUTTON IN THERE THAT YOU WILL PUSH AND MY BAILIFFS WILL

4    SHOW YOU WHERE THE BUTTON IS.  THAT BUTTON RINGS IN MY

5    CHAMBERS.  WE WILL HEAR IT.  THERE IS AT LEAST FOUR OF US IN

6    THERE.  ONE OF US WILL HEAR IT.

7        I WANT TO TELL YOU THAT THE NOISE THAT THAT -- WHEN YOU

8    PUSH THAT BUTTON, THE NOISE THAT MAKES IN MY CHAMBERS IS, LIKE,

9    SUPER ANNOYING, OKAY.  IT'S REALLY ANNOYING.  SO WHEN YOU PRESS

10   THE BUTTON, JUST PRESS THE BUTTON A SECOND OR TWO, MAYBE THREE,

11   AND THEN LET GO.  AND I ASSURE YOU WE HAVE HEARD YOU.  IT MAY

12   TAKE SOME TIME FOR US TO GET BACK TO YOU, AS I SAID IN THE

13   INSTRUCTION, BUT TRUST ME, WE'VE HEARD YOU.  SO PLEASE DO NOT

14   KEEP RINGING IT OR SIT ON IT OR WHATEVER.  THAT MAKES THE JUDGE

15   REALLY ANNOYED, AND YOU DON'T WANT TO ANNOY THE JUDGE.  PRESS

16   IT A COUPLE SECONDS AND WE'LL GET BACK TO YOU.

17       THERE IS SOMETHING ELSE I WANT TO TELL YOU ABOUT.

18   CONVERSATIONS BETWEEN JURORS ARE TO BE CONFIDENTIAL.  THAT'S

19   WHY WE SEND YOU OFF INTO THAT LITTLE ROOM BY YOURSELVES.  SO

20   IT'S IMPORTANT THAT YOU NOT TALK ABOUT THE CASE WHEN ANYONE

21   ELSE IS PRESENT, WHEN THAT DOOR IS OPENED.  AND SO IF ONE OF MY

22   BAILIFFS WERE TO COME IN, FOR EXAMPLE, FOR WHATEVER REASON, TO

23   BRING EXHIBITS OR JURY INSTRUCTIONS, OR WHATEVER, STOP TALKING

24   ABOUT THE CASE, OKAY.  WHEN THAT PERSON HAS LEFT, OR THE DOOR

25   HAS BEEN CLOSED, YOU CAN ONCE AGAIN START TALKING ABOUT THE

1   CASE.

2       ONE LAST THING, YOU SHOULD ALL BE CONSIDERING THE SAME

3   EVIDENCE; THEREFORE, IT IS IMPORTANT THAT ALL TWELVE OF YOU BE

4   IN THAT ROOM WHEN YOU'RE TALKING ABOUT THE CASE.  IF FOR

5   WHATEVER REASON ONE OR MORE OF YOU IS NOT PRESENT, STOP TALKING

6   ABOUT THE CASE.  WHY?  IT IS OBVIOUS; IF SOMEBODY IS MISSING,

7   THEY'RE MISSING OUT ON WHATEVER IT IS YOU'RE TALKING ABOUT, AND

8   THEY SHOULD BE THERE.  SO DO NOT TALK ABOUT THE CASE UNLESS ALL

9   TWELVE OF YOU ARE PRESENT.  DO NOT TALK ABOUT THE CASE WHEN

10  SOMEONE ELSE IS PRESENT OR THE DOOR IS OPEN.  ALL RIGHT.

11      NOW WITH THAT, GLENN, DO ME A FAVOR, AND PLEASE SWEAR IN

12  THE BAILIFFS.  I WOULD APPRECIATE IT.

13                      (BAILIFFS SWORN.)

14          THE COURT:  ALL RIGHT, IF YOU WOULD PLEASE ESCORT THE

15  JURY INTO THE JURY DELIBERATION ROOM.  NOW JUROR NO. 28, GUESS

16  WHAT, YOU GET TO STAY WITH US.  SO IF YOU WOULD JUST STAY THERE

17  FOR A LITTLE BIT, WE'LL GET TO YOU IN JUST A FEW MINUTES.

18              (JURY ENTERS DELIBERATION ROOM.)

19          THE COURT:  BEFORE I FORGET, IT IS MY NORMAL PRACTICE

20  TO SEND THE ALTERNATE HOME, PROVIDED WE HAVE A PHONE NUMBER

21  WHERE WE CAN REACH YOU AND HAVE YOU BACK HERE ON SHORT NOTICE

22  IF WE NEED YOU.  SO WE'RE GOING TO SEND YOU HOME, AND ASK YOU

23  TO LEAVE A PHONE NUMBER WITH MY COURTROOM DEPUTY.

24          THE CLERK:  I ALREADY HAVE IT.

25          THE COURT:  OKAY.  NOW THE ADMONITION I GAVE YOU, IT

1    STILL HOLDS.  YOU CAN'T TALK ABOUT THE CASE.  YOU CANNOT DO ANY

2    INDEPENDENT RESEARCH.  YOU CAN'T READ, WATCH, OR LISTEN TO ANY

3    NEWS ACCOUNTS OF THE CASE.  AND YOU SHOULD STILL KEEP AN OPEN

4    MIND.  BECAUSE IF WE ASK YOU TO COME BACK HERE, WE'RE GOING TO

5    WANT YOU TO PARTICIPATE IN THE DISCUSSION WITH THE OTHER

6    JURORS.  AND IT'S IMPORTANT THAT YOU DELIBERATE AND YOU TALK

7    ABOUT THE EVIDENCE ALL AT THE SAME TIME, OKAY.  SO I WANT TO

8    THANK YOU IN CASE I DON'T SEE YOU AGAIN.  WE'LL NOTIFY YOU --

9              JUROR NO. 28:  IF I NEED TO COME BACK?

10             THE COURT:  THAT'S RIGHT.  AND WE'LL ALSO NOTIFY YOU

11   WHEN THE CASE IS CONCLUDED, AT WHICH POINT IN TIME YOU'RE FREE

12   TO DISCUSS THE CASE WITH ANYONE YOU WANT TO DISCUSS THE CASE

13   WITH, BUT YOU HAVE NO OBLIGATION TO DO THAT, OKAY.

14        COUNSEL, I ASSUME THAT MY PRACTICE IS ACCEPTABLE TO THE

15   GOVERNMENT?

16             MR. CONOVER:  YES, YOUR HONOR.

17             THE COURT:  I ASSUME IT IS ACCEPTABLE TO THE DEFENSE?

18             MR. GARRISON:  YES, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  WITH THAT, YOU'RE FREE TO GO.

20             JUROR NO. 28:  THANK YOU.

21             THE COURT:  YOU TAKE CARE.

22                  (ALTERNATE JUROR EXITS COURTROOM.)

23             THE COURT:  ALL RIGHT, COUNSEL, YOU HAVE IN YOUR

24   HAND, I BELIEVE, OR AT LEAST ONE OF YOU HAS THE NEW VERDICT

25   FORM.  I'M NOT SURE IF THAT IS ACCEPTABLE.  IF IT IS NOT

1    ACCEPTABLE, THEN I SHOULD MODIFY IT AGAIN AND BRING THE JURY

2    BACK IN AND REDO IT.

3              MR. CONOVER:  ACCEPTABLE, YOUR HONOR.

4              THE COURT:  OKAY.

5              MR. GARRISON:  IT IS ACCEPTABLE.

6              THE COURT:  ALL RIGHT.  GREAT.  THEN LET'S SEND THAT

7    IN TO THE JURY ROOM, OKAY.

8              THE CLERK:  COUPLE QUESTIONS ABOUT EXHIBITS.

9              THE COURT:  YOU HAVE QUESTIONS ABOUT EXHIBITS.  LET'S

10   ADDRESS THAT NOW.  WHAT ARE THEY?

11             THE CLERK:  EXHIBIT 29, THERE IS A LARGE BLOW-UP, BUT

12   ACCORDING TO THE EXHIBIT LIST, IT'S FOR DEMONSTRATIVE.

13             THE COURT:  THAT'S RIGHT.  IT'S JUST FOR

14   DEMONSTRATIVE.

15             THE CLERK:  SO THIS ONE ISN'T GOING IN?

16             THE COURT:  THAT'S CORRECT.

17             THE CLERK:  EXHIBIT 30, AS WELL?

18             THE COURT:  THAT IS NOT GOING IN, EITHER.

19             THE CLERK:  19, YOUR HONOR, IS THIS AND THERE IS A

20   19-A, WHICH IS A BLOWN-UP VERSION OF THIS.  19 -- BOTH OF THEM

21   ARE IN, BUT THIS IS 19-A, THE BIG PICTURE IS NOT GOING IN?

22             THE COURT:  YEAH, JUST THIS ONE.  DON'T SEND THE BIG

23   BLOW-UP IN THERE.

24             THE CLERK:  AND ONE MORE, EXHIBIT 18, GOVERNMENT

25   STATES IT IS ONLY FOR DEMONSTRATIVE PURPOSES.  IT CAME IN ON

1   THE 23RD, YESTERDAY, SO I WANT TO MAKE SURE, IS IT GOING IN OR

2   NOT?

3            THE COURT:  WHAT IS 18?

4            THE CLERK:  DIAGRAM OF DEFENDANT'S VEHICLE.

5            THE COURT:  THAT IS NOT GOING IN, EITHER.  THAT'S

6   DEMONSTRATIVE.  ALL RIGHT.

7        COUNSEL, YOU'RE WELCOME TO GO TO YOUR RESPECTIVE OFFICES.

8   I'LL PROBABLY KEEP THE JURY HERE UNTIL 6:00.  AT 6:00, I'M

9   GOING TO SEND THEM HOME.  JUST SORT OF REMIND THEM OF THE

10  ADMONITION AND ASK THEM TO COME BACK TOMORROW MORNING AT 9:00.

11            MR. CONOVER:  THANK YOU, YOUR HONOR.

12            THE COURT:  YOU'RE WELCOME TO STAY HERE IF YOU WANT.

13  YOU'RE WELCOME TO BE HERE WHEN I SEND THEM HOME.  YOU'RE

14  WELCOME TO BE HERE TOMORROW MORNING WHEN THEY COME IN.  BUT

15  WHEN THEY COME IN, I'M GOING TO ASK THEM TO GO STRAIGHT INTO

16  THAT JURY DELIBERATION ROOM.  SO THE CHOICE IS YOURS.  IF YOU

17  WANT TO HANG AROUND, FINE.  IF YOU DON'T, IT WON'T HURT MY

18  FEELINGS.  OKAY, WE'RE IN RECESS.  THANK YOU.

19                      (RECESS TAKEN.)

20            THE COURT:  BRING THE JURY IN.

21                  (JURY ENTERS COURTROOM.)

22            THE COURT:  ALL RIGHT.  WELL, LADIES AND GENTLEMEN, I

23  THINK YOU'VE EARNED YOUR 45 OR 50 BUCKS TODAY, IF I'M NOT

24  MISTAKEN.  YOU'VE BEEN HERE SINCE 9:00 OR THEREABOUTS.  I'M

25  GOING TO SEND YOU HOME FOR THE EVENING.  I'M GOING TO ASK YOU

1    TO COME BACK TOMORROW MORNING AT 9:00 A.M.

2        NOW I WILL NOT BE HERE TO GREET YOU.  SO WHEN YOU COME

3    HERE IN THE MORNING, YOU CAN COME STRAIGHT IN.  YOU DON'T HAVE

4    TO WAIT FOR ANYONE OUTSIDE.  YOU CAN COME STRAIGHT IN AND GO

5    INTO THE JURY DELIBERATION ROOM.  I'LL REMIND YOU NOT TO

6    DISCUSS THE CASE OR THE EVIDENCE UNLESS AND UNTIL ALL TWELVE OF

7    YOU ARE PRESENT, OKAY.  AND I ALSO WANT TO REMIND YOU OF THE

8    ADMONITION, WHICH I HAVE NOW GIVEN TO YOU SEVERAL TIMES.  IT IS

9    REALLY IMPORTANT THAT YOU ABIDE BY THAT ADMONITION WHEN YOU GO

10   HOME.  I'M GOING TO SEND YOU HOME AND ASK YOU TO COME BACK AT

11   9:00 TOMORROW MORNING, OKAY.  I WON'T SEE YOU IN THE MORNING,

12   ALL RIGHT.

13                    (JURY EXITS COURTROOM.)

14        THE COURT:  OKAY, WE'RE ADJOURNED UNTIL TOMORROW

15   MORNING AT 9:00 A.M.

16                    (RECESS AT 6:03 P.M.)

17                       ---000---

18

19

20

21

22

23

24

25

1              C-E-R-T-I-F-I-C-A-T-I-O-N

2         I HEREBY CERTIFY THAT I AM A DULY APPOINTED,

3    QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED

4    STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

5    TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;

6    THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY

7    STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES

8    WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL

9    CONFERENCE.

10        DATED:  JUNE 29, 2011, AT SAN DIEGO, CALIFORNIA

11

12        _____
          S/DEBORAH M. O'CONNELL, CSR #10563
13        REGISTERED PROFESSIONAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25